UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AMERICAN TRANSIT INSURANCE COMPANY,

PLAINTIFF,

-against-

ALL CITY FAMILY HEALTHCARE CENTER INC., BRONX SC, LLC D/B/A
EMPIRE STATE AMBULATORY SURGERY CENTER, FIFTH AVENUE
SURGERY CENTER, LLC F/K/A FIFTH AVENUE ASC ACQUISITION,
LLC, MANALAPAN SURGERY CENTER, INC. F/K/A MANALAPAN
SURGERY CENTER, P.A., NEW HORIZON SURGICAL CENTER LLC,
NYEEQASC, LLC D/B/A NORTH QUEENS SURGICAL CENTER,
ROCKAWAYS ASC DEVELOPMENT, LLC, ROCKLAND AND BERGEN
SURGERY CENTER LLC, SURGICORE OF JERSEY CITY LLC,
SURGICORE, LLC A/K/A SURGICORE SURGICAL CENTER, ANTHONY
DEGRADI, WAYNE HATAMI, FELIKS KOGAN, LEONID TYLMAN A/K/A
LENNY TILMAN, SURGICORE MANAGEMENT INC, SURGICORE
MANAGEMENT NY LLC, JOHN ALJIAN, MD, EDWIN CHAN, MD,
ALEXANDER COCOZIELLO, DO, ANDREW KOPLIK, MD, PETER
MENGER, MD, RAVI NAIK, MD, ANTHONY PACIA, MD, MERWIN
RICHARD, MD, STUART SPRINGER, MD, BRIAN WEINER, MD, MARINA
AMINOVA, MELISSA FINNEGAN, LETICIA M. LANGARITA-HOYLE,
MSN-AGNP-C, HENRY KILROY, PAOLA LOPEZ, YANIN LUCERO,
MONIQUE MORRIS A/K/A MONIQUE DEMARTINO A/K/A MONIQUE
KILROY, AMAURY ROMERO A/K/A AMAURY SANCHEZ, TAMI SANTORA,
JOSE SANTOS, MARK SPINA, LANA YOUNG, ILANA POCH-ZYBIN, PAUL
ACKERMAN, M.D., CONTEMPORARY ORTHOPEDICS, PLLC, ALEXIOS
APAZIDIS, M.D., ALEXIOS APAZIDIS, M.D. P.C. A/K/A TOTAL SPINE AND
SPORTS CARE, HOWARD BAUM, M.D., BAY RIDGE ORTHOPEDIC
ASSOCIATES, P.C., DOV BERKOWITZ, M.D., ADVANCED
ORTHOPAEDICS, P.L.L.C., MARK BURSZTYN, M.D., GABRIEL DASSA,
D.O., DASSA ORTHOPEDIC MEDICAL SERVICES, P.C., ALBERT
GRAZIOSA, M.D., ALBERT GRAZIOSA MD, P.C., ROBERT HAAR, M.D.,
HAAR ORTHOPAEDICS & SPORTS MEDICINE, P.C., EMMANUEL
HOSTIN, M.D., HOSTIN ORTHOPAEDICS & SPORTS MEDICINE, P.C.,
BARRY KATZMAN, M.D., KATZMAN ORTHOPEDICS P.C., KENNETH
MCCULLOCH, M.D., MCCULLOCH ORTHOPAEDIC SURGICAL
SERVICES, P.L.L.C. A/K/A NEW YORK SPORTS & JOINTS ORTHOPAEDIC
SPECIALISTS, NEW YORK SPORTS AND JOINTS ORTHOPAEDIC
SPECIALISTS PLLC, MARK MCMAHON, M.D., MARK S. MCMAHON,
M.D., P.C., RICHARD SELDES, M.D., NYC ORTHOPEDIC AND SPINE,
P.C., PASSAIC ORTHOPEDIC GROUP P.C., RICHARD M. SELDES, M.D.,
P.C., ANJANI SINHA, M.D., ANJANI SINHA MEDICAL P.C., UPENDRA
SINHA, M.D., U.K. SINHA PHYSICIAN P.C., VINAYAK SINHA AS
ADMINISTRATOR OF THE ESTATE OF AJOY SINHA, M.D.,

24-CV-____

COMPLAINT

(TRIAL BY JURY
DEMANDED)

MUSCULOSKELETAL AND ARTHRITIS JOINT REPLACEMENT OF QUEENS, PC, SINHA ORTHOPEDICS PC, BRADLEY WASSERMAN, M.D., BW ORTHOPEDICS, LLC, GENNADIY SHAMALOV, P.A. ALEXANDER BOWEN, M.D., BOWEN, MD PLLC, ANDREW HALL, M.D., ANDREW HALL, M.D., PLLC, JOSEPH JIMENEZ, M.D., J SPORTS MEDICINE P.C., DEV HEALTHCARE LLC, WILLIAM B. JONES, M.D., PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTER PAIN MANAGEMENT & REHABILITATION, GAUTAM KHAKHAR, M.D., PHYSICAL MEDICINE & REHABILITATION OF NEW YORK, PC, HERSCHEL KOTKES, M.D., HERSCHEL KOTKES, M.D., P.C., BENJAMIN PORTAL, M.D., PORTAL MEDICAL, PC, DAVID SHABTIAN, D.O., TOTAL ANESTHESIA PROVIDER, PC, KETAN VORA, D.O., KDV MEDICAL, P.C., KETAN D. VORA, D.O., P.C., KV MEDICAL OF NY, P.C., NJ VORA HEALTH P.C. A/K/A VORA HEALTH, NON-SURGICAL ORTHOPEDICS OF NEW JERSEY, PC, JINGHUI XIE, M.D., INTEGRATED PAIN MANAGEMENT, PLLC, ALEXANDER BOWEN, MD PLLC, IGOR AMIGUD, M.D., FIFTH AVENUE ANESTHESIA ASSOCIATES, P.C., IGOR AMIGUD PHYSICIAN P.C., EDWARD EATON, M.D., CHAD ITZKOVICH, M.D., SYNERGY ANESTHESIA LLC, WAEL ELKHOLY, M.D., PRECISION ANESTHESIA ASSOCIATES, P.C. F/K/A PRECISION ANESTHESIA ASSOCIATES INC, NEAL KURTTI, M.D., KAREEM ELTAKI, M.D., F. ROBERT MCCARTHY III, M.D., QUALITY ANESTHESIA SERVICES LLC, SEN PIN KAO, PROGRESSIVE-HUDSON ANESTHESIA, LLC, ASIM KHAN, M.D., ANESTHESIA PROFESSIONALS PA, AVISHAI T. NEUMAN, M.D., AVISHAI T. NEUMAN MD, PLLC D/B/A CENTURION ANESTHESIA, AVISHAI NEUMAN MEDICAL PC, CENTURION ANESTHESIA SURGICAL CENTERS, LLC, CENTURION MIDTOWN ANESTHESIA, PLLC, CENTURION MIDTOWN MEDICAL, PLLC, SEDATION VACATION PERIOPERATIVE MEDICINE, PLLC D/B/A CENTURION ANESTHESIA, ATHANASIOS SCINAS, M.D., ROXBURY ANESTHESIA, LLC, ADVANCED PMR MANAGEMENT LTD LIABILITY CO., AEH HEALTHCARE MANAGEMENT CONSULTING LLC, ASC INVESTMENT SERVICES LLC, ASAR HEALTHCARE LLC, AS MED INVEST LLC, BDP VENTURES INC, BDP VENTURES LLC, BLUE WALL MANAGEMENT, LLC, BOOST HS LLC, CAPLEO HOLDINGS, LLC, CONTE DE FEES INC., FIABA LLC, 50 FRANKLIN LN REALTY LLC, FIWA 1049 REALTY, LLC, FLBD MANAGEMENT LLC, FOUR D INVESTMENTS INC, FOUR D INVESTMENTS LLC, GESHEFT ASSOCIATES LLC, HEALTH PLUS MANAGEMENT, LLC (F/K/A ACC INTERMEDIATE HOLDING COMPANY I, LLC), HDS INVESTMENTS, LLC, KOSTANIAN CONSULTING ASSOCIATES INC., MAIN STREET MEDICAL MANAGEMENT INC., MEGA GROUP SOLUTION INC., MEDA MANAGEMENT, LLC, MEH INVESTMENTS INC, MIDTOWN 305 REALTY, LLC, MK MED INVEST LLC, ORTUZ LLC, REDY VENTURES LLC, SIGNME, LLC, SJ2 VENTURES, SURGICORE 5TH AVENUE LLC, SURGICORE RBSC, LLC, YCENTURY LLC, JONATHAN ARREDONDO-CALLE, STUART BLUMBERG, AMANDA CHAVEZ, KRISTEN DEGRADI

A/K/A KRISTEN LAIRD, SERGEY DENEVICH, MARY HATAMI, HARRIS
HAFEEZ, M.D., JACOB KATANOV, SVETLANA KATANOV, MARINA
KEYSERMAN, GARY KLEIN, D.C., BEATA KOGAN, ARTHUR
KOSTANIAN, LISA PASSANISI, SALVATORE PASSANISI, SHAREN
PYATETSKAYA, MARIBEL RAMIREZ A/K/A MARIBEL ROMERO A/K/A
MARIBEL RAMIREZ-PIMIENTA A/K/A MARIBEL PIMIENTA, DANIEL
REIZIS, M.D., ALLA REVUTSKY. JEFFREY RUBIN, MARLA SELDES,
ALBERT SHAKAROV, ROZA YADGAROV, YURA YAGUDA, JOHN DOE 1,
JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20,

DEFENDANTS.

# CONTENTS

PRELIMINARY STATEMENT ........................................................................ 5
STATUTORY/REGULATORY BACKGROUND OF SYSTEMATIC FRAUD ...................... 32
NATURE OF THE ACTION ........................................................................ 50
NATURE OF RELIEF SOUGHT .................................................................... 50
THE PARTIES ........................................................................................ 52
    I.      Plaintiff ................................................................................ 52
    II.     The Surgicore ASCs .............................................................. 52
    III.    The Controllers .................................................................... 57
    IV.    The Surgicore Management Companies ................................... 62
    V.     The Surgicore Medical Directors/Administrators ...................... 64
    VI.    The Surgicore Orthopedic Providers ....................................... 80
    VII.   The Surgicore Pain Management Providers ............................. 106
    VIII.  The Surgicore Anesthesia Providers ...................................... 122
    IX.    The Associated Companies/Individuals ................................... 137
    X.     The John Doe Defendants ..................................................... 180
    XI.    The ABC Corporations ......................................................... 181
JURISDICTION AND VENUE .................................................................... 181
FACTUAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION .................. 182
    I.      Relevant Laws Governing No-Fault Reimbursement ................. 183
         A.    Relevant New York Laws and Regulations ......................... 183
         B.    Relevant New Jersey Laws and Regulations ....................... 193
    II.     Backdrop and the Surgicore Health Care Providers' Submission of
    Fraudulent Bills .................................................................... 205
THE MECHANICS OF THE SCHEME TO DEFRAUD ....................................... 211
    I.      Overview of Defendants Fraudulent Scheme ........................... 211
    II.     The Documented Fraudulent History of the Surgicore ASCs ...... 230
    III.    Illegal Operation of the Surgicore NJ ASCs ........................... 235
         A.    The Illegal Operation of New Horizon ASC ........................ 238
         B.    Illegal Operation of Manalapan ASC ................................. 276
         C.    Illegal Operation of Saddlebrook ASC ............................... 289
         D.    Illegal Operation of Jersey City ASC ................................. 307
         E.    Illegal Operation of Rockland and Bergen ASC ................... 323

IV. Illegal Operation of the Surgicore NY ASCs ................................................... 336
  A. Illegal Operation of All City ASC ............................................. 338
  B. Illegal Operation of Fifth Avenue ASC ................................... 354
  C. Illegal Operation of Empire State ASC .................................. 366
  D. Illegal Operation of North Queens ASC................................. 376
  E. Illegal Operation of Rockaways ASC ..................................... 387
V. The Illegal Kickback and Referral Relationships ............................................. 393
VI. No-Fault Fraudulent Billing Scheme ................................................................ 444
  A. The No-Fault Clinics Exist to Advance Insurance Fraud ....................... 444
VII. The Fraudulent Billing And Treatment Protocol .............................................. 499
  A. No-Fault Billing Regulations In The State Of New York ..................... 503
  B. Misrepresentations Concerning CPT Codes ........................... 504
  C. The Fraudulent Initial Examinations ...................................... 506
  D. The Surgicore Pain Management Providers' And Surgicore
  Orthopedic Providers' Medically Unnecessary Procedures And/Or
  Surgeries ............................................................................................. 538
  E. The Fraudulent Percutaneous Discectomies ........................... 551
  F. The Fraudulent IDETS.............................................................. 564
  G. The Fraudulent Discograms ..................................................... 572
  H. The Fraudulent Epidural Steroid Injections ........................... 577
  I. The Fraudulent Epidurograms ................................................ 581
  J. Fraudulent Trigger Point Injections ....................................... 587
  K. Medically Unnecessary Anesthesia Services........................... 595
  L. Fraudulent Charges For Arthroscopy....................................... 598
DISCOVERY OF THE FRAUD ...................................................................................... 604
CLAIMS FOR RELIEF .................................................................................................... 606
 FIRST CLAIM FOR RELIEF ................................................................................ 606
 SECOND CLAIM FOR RELIEF ........................................................................... 616
 THIRD CLAIM FOR RELIEF ............................................................................... 622
 FOURTH CLAIM FOR RELIEF ........................................................................... 628
 FIFTH CLAIM FOR RELIEF ................................................................................ 634
 SIXTH CLAIM FOR RELIEF................................................................................ 639
 SEVENTH CLAIM FOR RELIEF ......................................................................... 645
 EIGHTH CLAIM FOR RELIEF ............................................................................ 651
 NINTH CLAIM FOR RELIEF............................................................................... 656
 TENTH CLAIM FOR RELIEF .............................................................................. 662
 ELEVENTH CLAIM FOR RELIEF ...................................................................... 667
 TWELFTH CLAIM FOR RELIEF......................................................................... 673
 THIRTEENTH CLAIM FOR RELIEF .................................................................. 678
 FOURTEENTH CLAIM FOR RELIEF ................................................................. 687
 FIFTEENTH CLAIM FOR RELIEF ..................................................................... 687
JURY DEMAND ............................................................................................................... 690

American Transit Insurance Company ("Plaintiff" or "American Transit"), by its attorneys Manning & Kass, Ellrod, Ramirez, Trester LLP and Cadwalader, Wickersham & Taft, LLP, for its Complaint against Defendants All City Family Healthcare Center Inc. ("All City ASC"), Bronx SC, LLC (doing business as Empire State Ambulatory Surgery Center) ("Empire State ASC"), Fifth Avenue Surgery Center, LLC (formerly known as Fifth Avenue ASC Acquisition, LLC) ("Fifth Avenue ASC"), Manalapan Surgery Center, Inc. (formerly known as Manalapan Surgery Center, P.A.) ("Manalapan ASC"), New Horizon Surgical Center LLC ("New Horizon ASC"), NYEEQASC, LLC doing business as North Queens Surgical Center ("North Queens ASC"), Rockaways ASC Development, LLC ("Rockaways ASC"), Rockland and Bergen Surgery Center LLC ("Rockland and Bergen ASC"), Surgicore of Jersey City LLC ("Jersey City ASC"); Surgicore, LLC a/k/a Surgicore Surgical Center ("Saddlebrook ASC") (collectively, the "Surgicore ASCs"); Anthony Degradi ("Degradi"), Wayne Hatami ("Hatami"), Feliks Kogan ("Kogan"), Leonid Tylman a/k/a Lenny Tilman ("Tylman"), (collectively the "Controllers"); Surgicore Management Inc ("Surgicore Management"), Surgicore Management NY LLC ("Surgicore Management NY") (collectively the "Surgicore Management Companies"); John Aljian, MD ("Aljian"), Edwin Chan, MD ("Chan"), Alexander Cocoziello, DO ("Cocoziello"), Andrew Koplik, MD ("Koplik"), Peter Menger, MD ("Menger"), Ravi Naik, MD ("Naik"); Anthony Pacia, MD ("Pacia"); Merwin Richard, MD ("Richard"), Stuart Springer, MD ("Springer"), Brian Weiner, MD ("Weiner") (collectively the "Surgicore Medical Directors"); Marina Aminova ("Aminova"), Melissa Finnegan ("Finnegan"), Leticia M. Langarita-Hoyle, MSN-AGNP-C ("Hoyle"), Henry Kilroy ("Kilroy"), Paola Lopez ("Lopez"), Yanin Lucero ("Lucero"), Monique Morris a/k/a Monique DeMartino a/k/a Monique Kilroy ("Morris"), Amaury Romero a/k/a Amaury Sanchez ("Romero"), Tami Santora ("Santora"), Jose Santos ("Santos"),

1

Mark Spina ("Spina"), Lana Young ("Young"), Ilana Poch-Zybin ("Zybin") (collectively the "Surgicore Administrators"); Paul Ackerman, M.D. ("Ackerman"), Contemporary Orthopedics, PLLC ("Contemporary Orthopedics"), Alexios Apazidis, M.D. ("Apazidis"), Alexios Apazidis, M.D. P.C. also known as Total Spine and Sports Care ("Apazidis PC"), Howard Baum, M.D. ("Baum"), Bay Ridge Orthopedic Associates, P.C. ("Bay Ridge PC"), Dov Berkowitz, M.D. ("Berkowitz"), Advanced Orthopaedics, P.L.L.C. ("Advanced Orthopaedics"), Mark Bursztyn, M.D. ("Bursztyn"), Gabriel Dassa, D.O. ("Dassa"), Dassa Orthopedic Medical Services, P.C. ("Dassa Orthopedic"), Albert Graziosa, M.D. ("Graziosa"), Albert Graziosa MD, P.C. ("Graziosa PC"), Robert Haar, M.D. ("Haar"), Haar Orthopaedics & Sports Medicine, P.C. ("Haar Orthopaedics"), Emmanuel Hostin, M.D. ("Hostin"), Hostin Orthopaedics & Sports Medicine, P.C. ("Hostin Orthopaedics"), Barry Katzman, M.D. ("Katzman"), Katzman Orthopedics P.C. ("Katzman PC"), Kenneth McCulloch, M.D. ("McCulloch"), McCulloch Orthopaedic Surgical Services, P.L.L.C. a/k/a New York Sports & Joints Orthopaedic Specialists ("McCulloch Orthopaedic"), New York Sports and Joints Orthopaedic Specialists PLLC ("NYSJ"), Mark McMahon, M.D. ("McMahon"), Mark S. McMahon, M.D., P.C. ("McMahon PC"), Richard Seldes, M.D. ("Seldes"), NYC Orthopedic and Spine, P.C. ("NYC Orthopedic"), Passaic Orthopedic Group P.C. ("Passaic Orthopedic"), Richard M. Seldes, M.D., P.C. ("Seldes PC"), Anjani Sinha, M.D. ("Sinha"), Anjani Sinha Medical P.C. ("Anjani PC"), Upendra Sinha, M.D. ("Upendra Sinha"), U.K. Sinha Physician P.C. ("U.K. PC"), Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., Musculoskeletal and Arthritis Joint Replacement of Queens, PC ("MSJR"), Sinha Orthopedics PC ("Sinha Orthopedics"), Bradley Wasserman, M.D. ("Wasserman"), BW Orthopedics, LLC ("BW Orthopedics"), Gennadiy Shamalov, P.A. ("Shamalov") (collectively the "Surgicore Orthopedic Providers"); Alexander Bowen, M.D.

("Bowen"), Bowen, MD PLLC ("Bowen PLLC"), Andrew Hall, M.D. ("Hall"), Andrew Hall, M.D., PLLC ("Hall PLLC"), Joseph Jimenez, M.D. ("Jimenez"), J Sports Medicine P.C. ("J Sports"), Dev Healthcare LLC ("Dev Healthcare"), William B. Jones, M.D. ("Jones"), Phoenix Medical Services, P.C. d/b/a Rockville Center Pain Management & Rehabilitation ("Phoenix Medical"), Gautam Khakhar, M.D. ("Khakhar"), Physical Medicine & Rehabilitation of New York, PC ("PM&R"), Herschel Kotkes, M.D. ("Kotkes"), Herschel Kotkes, M.D., P.C. ("Kotkes PC"), Benjamin Portal, M.D. ("Portal"), Portal Medical, PC ("Portal Medical"), David Shabtian, D.O. ("Shabtian"), Total Anesthesia Provider, PC ("Total Anesthesia"), Ketan Vora, D.O. ("Vora"), KDV Medical, P.C. ("KDV Medical"), Ketan D. Vora, D.O., P.C. ("Vora PC"), KV Medical of NY, P.C. ("KV Medical"), NJ Vora Health P.C. also known as Vora Health ("NJ Vora"), Non-Surgical Orthopedics of New Jersey, PC ("Non-Surgical Orthopedics"), Jinghui Xie, M.D. ("Xie"), Integrated Pain Management, PLLC ("Integrated Pain Management") (collectively the "Surgicore Pain Management Providers"); Alexander Bowen, MD PLLC ("Alexander Bowen PLLC"), Igor Amigud, M.D. ("Amigud"), Fifth Avenue Anesthesia Associates, P.C. ("Fifth Avenue Anesthesia"), Igor Amigud Physician P.C. ("Amigud PC"), Edward Eaton, M.D. ("Eaton"), Chad Itzkovich, M.D. ("Itzkovich"), Synergy Anesthesia LLC ("Synergy Anesthesia"), Wael Elkholy, M.D. ("Elkholy"), Precision Anesthesia Associates, P.C. formerly known as Precision Anesthesia Associates Inc ("Precision Anesthesia"), Neal Kurtti, M.D. ("Kurtti"), Kareem Eltaki, M.D. ("Eltaki"), F. Robert McCarthy III, M.D. ("McCarthy"), Quality Anesthesia Services LLC ("Quality Anesthesia"), Sen Pin Kao ("Kao"), Progressive-Hudson Anesthesia, LLC ("Progressive-Hudson"), Asim Khan, M.D. ("Khan"), Anesthesia Professionals PA ("Anesthesia Professionals"), Avishai T. Neuman, M.D. ("Neuman"), Avishai T. Neuman MD, PLLC d/b/a Centurion Anesthesia ("Neuman PLLC"), Avishai Neuman Medical PC, ("Neuman PC"),

Centurion Anesthesia Surgical Centers, LLC ("Centurion Anesthesia Surgical"), Centurion Midtown Anesthesia, PLLC ("Centurion Midtown Anesthesia"), Centurion Midtown Medical, PLLC ("Centurion Midtown Medical"), Sedation Vacation Perioperative Medicine, PLLC doing business as Centurion Anesthesia ("Sedation Vacation"), Athanasios Scinas, M.D. ("Scinas"), Roxbury Anesthesia, LLC ("Roxbury Anesthesia") (collectively the "Surgicore Anesthesia Providers"); Advanced PMR Management Ltd Liability Co. ("Advanced PMR"), AEH Healthcare Management Consulting LLC ("AEH Healthcare Management"), ASC Investment Services LLC ("ASC Investment Services"), ASAR Healthcare LLC ("ASAR Healthcare"), AS Med Invest LLC ("AS Med Invest"), BDP Ventures Inc ("BDP Ventures Inc."), BDP Ventures LLC ("BDP Ventures LLC"), Blue Wall Management, LLC ("Blue Wall Management"), Boost HS LLC ("Boost HS"), Capleo Holdings, LLC ("Capleo Holdings"), Conte De Fees Inc. ("Conte De Fees"), Fiaba LLC ("Fiaba"), 50 Franklin Ln Realty LLC ("50 Franklin Ln Realty"), FIWA 1049 Realty, LLC ("FIWA 1049 Realty"), FLBD Management LLC ("FLBD Management"), Four D Investments Inc ("Four D Investments Inc"), Four D Investments LLC ("Four D Investments LLC"), Gesheft Associates LLC ("Gesheft Associates"), Health Plus Management, LLC (f/k/a ACC Intermediate Holding Company I, LLC) ("Health Plus Management"), HDS Investments, LLC ("HDS Investments"), Kostanian Consulting Associates Inc. ("Kostanian Consulting Associates"), Main Street Medical Management Inc. ("Main Street Medical"), Mega Group Solution Inc. ("Mega Group Solution"), MEDA Management, LLC ("MEDA Management"), MEH Investments Inc ("MEH Investments"), Midtown 305 Realty, LLC ("Midtown 305 Realty"), MK Med Invest LLC ("MK Med Invest"), Ortuz LLC ("Ortuz"), Redy Ventures LLC ("Redy Ventures"), SignMe, LLC ("SignMe") SJ2 Ventures ("SJ2 Ventures"), Surgicore 5th Avenue LLC ("Surgicore 5th Avenue"), Surgicore RBSC, LLC ("Surgicore RBSC"), YCentury LLC

("YCentury"), Jonathan Arredondo-Calle ("Arredondo-Calle"), Stuart Blumberg ("Blumberg"), Amanda Chavez ("Chavez"), Kristen Degradi a/k/a Kristen Laird ("K. Degradi"), Sergey Denevich ("Denevich"), Mary Hatami ("M. Hatami"), Harris Hafeez, M.D. ("Hafeez"), Jacob Katanov ("J. Katanov"), Svetlana Katanov ("S. Katanov"), Marina Keyserman ("Keyserman"), Gary Klein, D.C. ("Klein"), Beata Kogan ("B. Kogan"), Arthur Kostanian ("Kostanian"), Lisa Passanisi ("L. Passanisi"), Salvatore Passanisi ("S. Passanisi"), Sharen Pyatetskaya ("Pyatetskaya"), Maribel Ramirez a/k/a Maribel Romero a/k/a Maribel Ramirez-Pimienta a/k/a Maribel Pimienta ("Ramirez"), Daniel Reizis, M.D. ("Reizis"), Alla Revutsky ("Revutsky"), Jeffrey Rubin ("Rubin"), Marla Seldes ("M. Seldes"), Albert Shakarov ("Shakarov"), Roza Yadgarov ("Yadgarov"), Yura Yaguda ("Yaguda") (collectively, the "Associated Companies/Individuals"); John Doe 1, John Does 2 through 20 (collectively, the "John Doe Defendants"); and ABC Corporations 1 through 20 (the "ABC Corporations") (collectively the "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1. Through the filing of this Complaint, American Transit brings into laser focus the rampant fraud and abuse that is endemic to the New York State Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law §§ 5101, *et seq.* (popularly known as the "No-Fault Law"). Such fraud has significant and adverse consequences to both consumers and insurers and, in particular, impacts both rates and the financial condition of insurers that charge the rates and pay claims. Under the No-fault Law, Plaintiff is required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insureds' motor vehicles, pedestrians, and bicyclists ("Covered Persons") that arise from the use or operation of such motor vehicles in the State of New York.

2.	The No-Fault Law was enacted in 1974 and requires insurers to compensate Covered Persons, by reimbursing them for "Basic Economic Loss" (alternatively known as Personal Injury Protection or PIP coverage, hereinafter "PIP Benefits"), consisting of medical costs, incidental costs, and lost earnings. The No-Fault Law was enacted in the wake of rapidly rising automobile insurance costs and when accident victims were experiencing long delays in compensation, in part due to the increasing number of automobile insurance disputes overburdening the courts.

3.	Personal line auto insurers that insure personal or private passenger vehicles are required to provide statutory mandated PIP Benefits up to $50,000.00 per Covered Person for necessary expenses that are, among other things, incurred for health care goods and services, including but not limited to physician services, diagnostic services, procedures, surgeries, pain management services, chiropractic care, physical therapy services, and acupuncture services.

4.	Commercial automobile insurers, such as Plaintiff, that insure yellow cabs (picking up street-hailing passengers), livery cars, and ride-share vehicles operating in the City of New York are required to provide the statutory mandated PIP Benefits up to $200,000 per Covered Person—four times the amount of insurance coverage as standard for private automobile drivers. This has put a target on the backs of livery vehicles, and the insurance companies which insure them, for unsavory persons seeking to capitalize on payouts following injuries. In the aggregate, those abusing the No-Fault Law have racked up hundreds of millions in fraudulent payments, destabilized the livery insurance markets in New York City, increased premiums for hard working taxi-cab and livery drivers, and harmed the public.

5.	Pursuant to New York Insurance Law Section 409, insurers, such as American Transit, are required to formulate a fraud prevention plan for the investigation and prevention of

fraudulent insurance activities. The plan is required to include provisions for "the investigation and initiation of civil actions." N.Y. Ins. Law § 409. This Complaint, brought by necessity pursuant to American Transit's Section 409 plan to address part of the rampant and ongoing No-fault fraud, alleges a scheme to defraud Plaintiff through abuse of the No-Fault Law and submission of hundreds of millions of dollars in excess billing by unlawfully operated providers for unnecessary or nonexistent medical services.

6.      Pursuant to the scheme to defraud alleged herein, Defendants, acting in concert with nonparty medical clinics and a bevy of health care professionals, executing a predetermined fraudulent protocol and treatment plan to bill for medically unnecessary services to Covered Persons  under the No-Fault Law, billed American Transit in excess of $400 million, including bills submitted on the same claim files for which Defendants submitted bills for reimbursement to American Transit. Through this Complaint, American Transit seeks to recover compensatory damages in excess of $153 million and treble damages in excess of $459 million. Each of the Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC, Saddlebrook ASC Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR,  Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, Bowen, Alexander Bowen PLLC, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC,

Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia Surgical, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, one or more of the John Does 1 through 20 and/or one or more of the ABC Corporations 1 through 20 (hereinafter, the "Surgicore Health Care Providers") are ostensibly health care providers ("HCPs") that bill for medical services to, among others, Covered Persons. In exchange for their services, the Defendant Surgicore Health Care Providers accept assignments of benefits from Covered Persons and submit claims for payment to No-Fault insurance carriers, in general, and to Plaintiff, in particular.

      7.     At least since 2009 and continuing through the filing of this Complaint, Defendants Degradi, Hatami, Kogan, Tylman and/or one or more of John Does 3 through 20 (individually referred to by name and collectively referred to as the "Controllers") have created and continue to preside over a vast network of ambulatory surgical centers ("ASCs") across the states of New York and New Jersey that have stolen hundreds of millions of dollars from automobile insurance companies, including American Transit—activity that continues unabated as of the filing of this Complaint—through New York State's No-Fault system via the submission of thousands of fraudulent claims for medical services submitted by and through fraudulently and improperly licensed ASCs, including Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen

ASC, Jersey City ASC, and Saddlebrook ASC (when not referred to individually, the foregoing ASCs are collectively referred to as the "Surgicore ASCs").

8.      At all relevant times mentioned herein, every bill for reimbursement which is the subject of this Complaint and submitted to American Transit by or on behalf of one or more of the Defendants named herein was the result of: (i) fraudulently and improperly licensed ASCs that are operated in violation of the substantive licensing, regulatory and applicable operating laws and requirements of New York and/or New Jersey; (ii) illegal kickbacks and/or unlawful referral relationships to fraudulently bill for medically unnecessary services; (iii) a predetermined fraudulent protocol designed to justify and maximize expensive, medically unnecessary services to Covered Persons; and/or (iv) charges for medical services that were fraudulently billed in excess of the amounts that the Defendants would be entitled to receive pursuant to the No-Fault Law, if the related services were legitimately provided.

9.      In furtherance of the fraudulent scheme alleged herein, the purported Medical Directors for each of the Surgicore ASCs include Defendants Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Shabtian, Springer, Weiner, and/or one or more of John Does 3 through 20.

10.      The Controllers misrepresented in the respective applications and submissions to New York and/or New Jersey that the Surgicore ASCs would have medical directors in place in compliance with applicable New York and/or New Jersey law. In the fact they did not.

11.      The Controllers, in compliance with applicable New York and/or New Jersey law, designated and/or reported that they designated for the Surgicore ASCs the following Surgicore Medical Directors:

| SURGICORE ASC | SURGICORE MEDICAL DIRECTOR |
|---|---|
| All City ASC | David Shabtian, DO |
| Empire State ASC | John Aljian, MD |
| Fifth Avenue ASC | Stuart Springer, MD |
| Jersey City ASC | Merwin Richard, MD |
| Manalapan ASC | Brian Weiner, MD |
| New Horizon ASC | Ravi Naik, MD<br>Andrew Koplik, MD (2013-2019) |
| North Queens ASC | Peter Menger, MD<br>Edwin K. Chan (2019-2020) |
| Rockaways ASC | Anthony Pacia, MD |
| Rockland and Bergen ASC | John Doe 1 |
| Saddlebrook ASC | Alexander Cocoziello, DO |

12. At all relevant times mentioned herein, the Surgicore Medical Directors served as nominal, sham medical directors in which their statutorily mandated responsibilities were actually dictated and carried out by one or more of the Controllers and/or others acting under their control in violation of the applicable laws of New York and/or New Jersey. With respect to New Horizon ASC, the unlawful and improper licensing violations described herein began at least in or about 2011 and continued through the date of the filing of this complaint.

13. At all relevant times mentioned herein, the Surgicore ASCs were fraudulently and improperly licensed in violation of the applicable laws of New York and/or New Jersey and, therefore, are ineligible for the reimbursement of benefits under the No-Fault Law.

14. Using the Surgicore ASCs and a confederate of conspiring and complicit health care professionals and others unknown to American Transit, for nearly 15 years, from 2009 through the filing of this Complaint, Defendants systematically defrauded automobile insurers in general, and American Transit in particular, as well as the public at large, of tens of millions of dollars per year by fraudulently billing and collecting for, among other things, facility fees,

purported arthroscopic procedures (including but not limited to knee, shoulder, wrist and ankle arthroscopies), interventional pain management services (including but not limited to trigger point injections, epidural steroid injections, epidurograms, discograms, percutaneous discectomies, and intradiscal electrothermoplasties (also known as annuloplasties) ("IDETs")), and related anesthesia services (collectively referred to as the "Fraudulent Services") that were provided at, by, and/or through the Surgicore ASCs.

15.    At all relevant times mentioned herein, the Surgicore ASCs were not properly licensed in accordance with applicable New York and/or New Jersey state laws, hosted services for which they billed insurers in general, and Plaintiff in particular, a facility fee, as a result of paying illicit and illegal kickbacks and/or entering into other illegal financial compensation agreements with so-called multidisciplinary practices (the "No-Fault Clinics") and provided, pursuant to a predetermined fraudulent protocol to maximize reimbursement from insurers in general, and Plaintiff in particular, for No-Fault benefits for medically unnecessary services under New York's No-Fault Law.

16.    As part of the predetermined fraudulent protocol of treatment, after receiving a standard battery of medical services at the No-Fault Clinics, the Covered Persons were and are ultimately referred for orthopedic and/or pain management evaluations by one of the Defendant Surgicore Orthopedic Providers or Surgicore Pain Management Providers (defined below) at the No-Fault Clinics, resulting in interventional pain management and/or arthroscopic procedures and/or surgeries at one or more of the Surgicore ASCs in New York and New Jersey. Covered Persons were then instructed to return to the same No-Fault Clinics for post-operative follow-up care. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay. Attached as Exhibit "1" is a list of more than 5,800 Covered Persons who were

purportedly treated at or through various No-Fault Clinics and the Surgicore ASCs. This exhibit details that each Covered Person received virtually the same regimen of medical and health-related services described herein. The Defendants, acting in concert with the No-Fault Clinics, Surgicore Orthopedic Providers, Surgicore Pain Management Providers and Surgicore Anesthesia Providers (defined below), carried out the predetermined fraudulent protocol in furtherance of the scheme to defraud alleged herein.

17. The Controllers through entities they owned, controlled, and/or operated, or through others acting at their direction and on their behalf, entered into separate arrangements with one or more No-Fault Clinics operating in the New York metropolitan area that bill No-Fault insurers for purported medical services to obtain referrals to the Surgicore ASCs. Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-Fault Clinics, which are not named as defendants in this action (the "Associated Health Care Providers" (defined below), facilitated and carried out the scheme in several ways, including but not limited to:

- Unlike legitimate medical practices, the No-Fault Clinics created predetermined fraudulent protocols to exploit the No-Fault system to maximize reimbursement for the No-Fault Clinics and the Associated Health Care Providers, which provided and billed for virtually the same types of services, irrespective of the Covered Persons' reported injuries, their positions in the vehicle at the time of the accidents, the circumstances surrounding the reported accidents, and whether such services were medically necessity;

- Unlike legitimate medical practices, pursuant to the established predetermined fraudulent protocol, irrespective of the individual circumstances surrounding their purported motor vehicle accidents and claimed injuries, the vast majority of Covered Persons "treated" at the No-Fault Clinics and by the Associated Health Care Providers received a substantially similar regimen of treatments, including but not limited to examinations, modalities (physical therapy, chiropractic, and acupuncture services), durable medical equipment ("DME"), pain medication, diagnostic procedures and tests, referrals to pain management doctors and

orthopedists and referrals for interventional pain management and/or arthroscopic procedures and/or surgeries performed at, by and/or through the Surgicore ASCs;

- Unlike legitimate medical practices, the No-Fault Clinics misrepresented the existence or severity of any injuries that Covered Persons may have had, and the course of any treatments;

- Unlike legitimate medical practices, the No-Fault Clinics, and Associated Health Care Providers, established a fraudulent protocol for the "treatment" of Covered Persons;

- Unlike legitimate medical practices, as part of a scheme to increase profits, the No-Fault Clinics either performed or routinely referred Covered Persons for magnetic resonance imaging ("MRIs"), nerve conduction velocity tests ("NCV"), and electromyograms ("EMG"),, and other diagnostic services that were medically unnecessary;

- Unlike legitimate medical practices, the No-Fault Clinics carried out a pay-to-play system in which in exchange for being able to bill for purported services to Covered Persons that were medically unnecessary, the Associated Health Care Providers, Surgicore Orthopedic Providers, and Surgicore Pain Management Providers paid kickbacks disguised as rent and/or other financial arrangements to the No-Fault Clinics;

- Unlike legitimate medical practices, the No-Fault Clinics and Associated Health Care Providers who purportedly provided services did not undertake any efforts to determine whether the claimed injures were causally related and arose out of an automobile accident and therefore would be covered under the No-Fault Law; and

- Unlike legitimate medical practices, the No-Fault Clinics and Associated Health Care Providers submitted bills, using the prescribed "NF-3" forms promulgated by the Superintendent of Insurance, entitled "Verification of Treatment by Attending Physician or Other Provider of Health Services" or substantially similar forms, wherein they knowingly misrepresented that the services reflected therein were medically necessary when in fact they were not.

18.     The Surgicore Orthopedic Providers purportedly performing arthroscopic procedures at, by, and/or through the Surgicore ASCs include, but are not limited to Defendants Ackerman, Apazidis, Baum, Berkowitz, Bursztyn, Dassa, Graziosa, Haar, Hostin, Katzman, McCulloch, McMahon, Seldes, Sinha, Upendra Sinha, and Wasserman, along with the late Ajoy

Sinha (individually referred to by name and collectively referred to as the "Surgicore Orthopedic Providers"). The Surgicore Orthopedic Providers billed in their individual capacity and/or through professional entities in which they are the record owners, including the following:

| Surgicore Orthopedist | Professional Entity | Associated Surgicore ASCs |
|---|---|---|
| Paul Ackerman, M.D. | Contemporary Orthopedics | All City ASC<br>Jersey City ASC<br>North Queens ASC<br>Rockaways ASC |
| Alexios Apazidis, M.D. | Apazidis PC | All City ASC<br>Fifth Avenue ASC |
| Howard Baum, M.D. | Bay Ridge PC | All City ASC<br>Empire State ASC |
| Dov Berkowitz, M.D. | Advanced Orthopaedics | All City ASC<br>Empire State ASC<br>Fifth Avenue ASC<br>Jersey City ASC<br>Manalapan ASC<br>North Queens ASC<br>New Horizon ASC |
| Gabriel Dassa, D.O. | Dassa Orthopedic | Empire State ASC<br>New Horizon ASC<br>Rockland and Bergen ASC |
| Albert Graziosa, M.D. | Graziosa PC | Empire State ASC<br>North Queens ASC<br>Rockaways ASC |
| Robert Haar, M.D. | Haar Orthopaedics | New Horizon ASC<br>Jersey City ASC |
| Emmanuel Hostin, M.D. | Hostin Orthopaedics | All City ASC<br>Empire State ASC<br>Fifth Avenue ASC<br>Jersey City ASC<br>New Horizon ASC<br>Saddlebrook ASC |
| Barry Katzman, M.D. | Katzman PC | All City ASC<br>Fifth Avenue ASC<br>North Queens ASC |
| Kenneth McCulloch, M.D. | McCulloch Orthopaedic | All City ASC<br>Empire State ASC<br>Fifth Avenue ASC<br>Jersey City ASC<br>New Horizon ASC<br>North Queens ASC |

| Surgicore Orthopedist | Professional Entity | Associated Surgicore ASCs |
|---|---|---|
| | | Rockland and Bergen ASC<br>Saddlebrook ASC |
| | NYSJ | All City ASC<br>North Queens ASC<br>Saddlebrook ASC |
| Mark McMahon, M.D. | McMahon PC | Fifth Avenue ASC |
| Richard Seldes, M.D. | NYC Orthopedic | Empire State ASC<br>New Horizon ASC |
| | Passaic Orthopedic | New Horizon ASC |
| | Seldes PC | New Horizon ASC |
| Ajoy K. Sinha, MD | Sinha Orthopedics<br>MSJR | New Horizon ASC<br>Saddlebrook ASC |
| Anjani Sinha, M.D. | Anjani PC | All City ASC<br>Fifth Avenue ASC<br>Manalapan ASC<br>North Queens ASC<br>Rockaways ASC |
| Upendra Sinha, M.D. | U.K. PC | All City ASC<br>Empire State ASC<br>Fifth Avenue ASC<br>Rockaways ASC |
| Bradley Wasserman, M.D. | BW Orthopedics | Jersey City ASC |

19.     The Surgicore Pain Management Providers who purportedly performed pain management services at, by, and/or through one or more of the Surgicore ASCs include, but are not limited to Bowen, Hall, Jimenez, Jones, Khakhar, Kotkes, Portal, Shabtian, Vora, and Xie (individually referred to by name and collectively referred to as the "Surgicore Pain Management Providers"). The Surgicore Pain Management Providers billed in their individual capacity and/or through professional entities in which they are the record owners, including the following:

| Surgicore Pain Management Doctor | Professional Entity | Associated Surgicore ASC |
|---|---|---|
| Alexander Bowen, M.D. | Bowen PLLC | Fifth Avenue ASC<br>North Queens ASC<br>Rockaways ASC |
| Andrew Hall, M.D. | Hall PLLC | All City ASC<br>Empire State ASC<br>Fifth Avenue ASC<br>North Queens ASC |

| Surgicore Pain Management Doctor | Professional Entity | Associated Surgicore ASC |
|---|---|---|
| | | Rockaways ASC |
| Joseph Jimenez, M.D. | J Sports | All City ASC<br>Empire State ASC<br>Fifth Avenue ASC<br>North Queens ASC<br>Rockaways ASC<br>Saddlebrook ASC |
| | Dev Healthcare | Jersey City ASC<br>Rockaways ASC |
| William B. Jones, M.D. | Phoenix Medical | Fifth Avenue ASC<br>Jersey City ASC<br>New Horizon ASC<br>North Queens ASC<br>Rockaways SC |
| Gautam Khakhar, M.D. | PM&R | Empire State ASC<br>Fifth Avenue ASC |
| Herschel Kotkes, M.D. | Kotkes PC | All City ASC<br>Jersey City ASC<br>North Queens ASC<br>Rockaways ASC |
| Benjamin Portal, M.D. | Portal Medical | All City ASC<br>Empire State ASC<br>Fifth Avenue ASC<br>Rockaways ASC |
| David Shabtian, D.O. | Total Anesthesia | All City ASC<br>Fifth Avenue ASC<br>North Queens ASC<br>Rockaways ASC |
| Ketan Vora, D.O. | KDV Medical, P.C. | North Queens ASC |
| | Vora PC | North Queens ASC<br>Rockaways ASC |
| | KV Medical. | North Queens ASC<br>Rockaways ASC |
| | NJ Vora | New Horizon ASC<br>Rockland and Bergen ASC<br>Saddlebrook ASC |
| | Non-Surgical Orthopedics | Manalapan ASC<br>New Horizon ASC<br>Saddlebrook ASC |
| Jinghui Xie, M.D. | Integrated Pain Management | Jersey City ASC<br>Manalapan ASC<br>New Horizon ASC<br>Saddlebrook ASC |

20.     The Surgicore Anesthesia Providers purportedly administering anesthesia or causing anesthesia to be administered at, by, and/or through the Surgicore ASCs include, but are not limited to Defendants Amigud, Bowen, Eaton, Itzkovich, Elkholy, Kurtti, Eltaki, McCarthy, Kao, Khan, Neuman, and Scinas (individually referred to by name and collectively referred to as the "Surgicore Anesthesia Providers"). The Surgicore Anesthesia Providers billed through professional entities in which they are the record owners, including the following:

| Surgicore Anesthesiologist | Professional Entity | Associated Surgicore ASC |
|---|---|---|
| Igor Amigud, M.D. | Fifth Avenue Anesthesia | Fifth Avenue ASC |
| | Amigud PC | Fifth Avenue ASC |
| Edward Eaton, M.D. | Synergy Anesthesia | New Horizon ASC |
| Chad Itzkovich, M.D. | | |
| Wael Elkholy, M.D. | Precision Anesthesia | All City ASC<br>Manalapan ASC<br>New Horizon ASC<br>Saddlebrook ASC |
| Neal Kurtti, M.D. | Quality Anesthesia | Rockland and Bergen ASC |
| Kareem Eltaki, M.D. | | |
| F. Robert McCarthy III, M.D. | | |
| Sen Pin Kao, M.D. | Progressive-Hudson | Saddlebrook ASC |
| Asim Khan, M.D. | Anesthesia Professionals | Manalapan ASC |
| Avishai T. Neuman, M.D. | Neuman PLLC | All City ASC<br>Empire State ASC |
| | Neuman PC | All City ASC<br>Empire State ASC<br>North Queens ASC |
| | Centurion Anesthesia Surgical | Fifth Avenue ASC |
| | Centurion Midtown Anesthesia | Fifth Avenue ASC |
| | Centurion Midtown Medical | New Horizon ASC |
| | Sedation Vacation | All City ASC<br>Empire State ASC<br>Fifth Avenue ASC<br>North Queens ASC<br>Rockaways ASC |
| Athanasios Scinas, M.D. | Roxbury Anesthesia | Jersey City ASC<br>Manalapan ASC |
| Alexander Bowen, M.D. | Alexander Bowen PLLC | Fifth Avenue ASC |

21.     At all relevant times mentioned herein, the Surgicore Orthopedic Providers, Surgicore Pain Management Providers and Surgicore Anesthesia Providers, acting in concert with

the Controllers and Surgicore ASCs and in furtherance of the scheme to defraud alleged herein, knowingly and with the intent to deceive submitted, or caused to be submitted, bills for the Fraudulent Services under their respective names and/or their respective professional corporations.

22. With the exception of Hatami, the Controllers are laypersons who are not licensed to practice any healthcare profession in the State of New York or New Jersey and committed theft through various nefarious means, including the creation of illegally and improperly licensed ASCs that were used to fraudulently bill insurance companies.

23. With respect to Hatami, while he is licensed to practice physical therapy in the State of New York, he, along with the Controllers, presided over the illegal and fraudulent operations of the Surgicore ASCs and, because he was prohibited by law from doing so, did not serve as a medical director or in any other medical capacity for the Surgicore ASCs.

24. Since around 2009, the Controllers have embarked on an aggressive plan to acquire and form new ASCs in New York and New Jersey to continue to exploit the New York No-Fault system. The Controllers' acquisition and formation of ASCs has been predicated upon misrepresentations in their applications filed in New York and New Jersey as to the appointment of legitimate medical directors that would carry out those functions entrusted to them by law when in fact the Surgicore Medical Directors did not carry out such functions. Their business development was and would be founded upon kickbacks to various parties to secure a patient population and entering into improper financial arrangements with orthopedists and pain management doctors to perform procedures and pain management services at the Surgicore ASCs; and that concealed various owners and parties who had or would have a financial interest in the Surgicore ASCs, often times by disguising their interests as those of family members and/or close

associates, or opaque corporations that they or their family members or close associates owned and/or controlled.

25.     The Controllers created a complex web of companies to conceal their interests and, as described below, to provide ownership interests in the Surgicore ASCs to numerous orthopedists and pain management doctors performing medically unnecessary procedures and pain management services at the Surgicore ASCs, as well as to their family members, close associates and strategic partners (such as the Health Plus Defendants described below) who, in exchange for such interests, provided referrals and supposed marketing services to provide a patient population to the Surgicore ASCs, irrespective of medical need.

26.     In addition to the monies they received directly from the Surgicore ASCs, as more fully described below, the Controllers also formed management service and real estate holding companies to funnel money from the Surgicore ASCs to companies that one or more of them owned and controlled. By way of example but not limitation:

- Defendant Surgicore Management NY was owned by the Controllers and received payments from All City ASC, Fifth Avenue ASC, Empire State ASC, North Queens ASC, and Rockaways ASC as their purported management company;

- Defendant HDS Investments was owned by the Controllers and Defendant R. Seldes, and received payments from New Horizon ASC as its purported landlord;

- Defendant 50 Franklin Ln Realty was owned by Controllers Tylman and Kogan, and received payments from Manalapan ASC as its purported landlord; and

- Defendant FIWA 1049 Realty was owned by Controller Kogan and, on information and belief, one or more of the other Controllers, and received payments from Fifth Avenue ASC as its purported landlord for its 1049 Fifth Avenue location.

27.     As more fully described below, the Controllers also sought to conceal their interests in various entities that purportedly provided services to the Surgicore ASCs or their management

companies. By way of example and not limitation, Surgicore Management and Surgicore Management NY were owned by one or more of the Controllers and purported to provide management and/or other services to the Surgicore ASCs, but in fact were used as another vehicle to funnel additional fraudulently obtained insurance payments from the Surgicore ASCs to the Controllers.

28.    As more fully described below, the Controllers also sought to conceal their interests in various entities with purported ownership interests in the Surgicore ASCs through the assistance of their family members and close associates who were listed as the owners of such entities, when in fact the Controllers had interests in and/or financially benefited from payments to such entities from the Surgicore ASCs or other entities that purportedly provided services to the Surgicore ASCs or Controllers. By way of example and not limitation, ASAR Healthcare, Surgicore RBSC, BDP Ventures LLC, BDP Ventures Inc, and MEH Investments, each of which purportedly have ownership interests in one or more of the Surgicore ASCs, were owned by family members of one or more of the Controllers and used as another vehicle to funnel additional fraudulently obtained insurance payments from the Surgicore ASCs to one or more of the Controllers.

29.    In New York State, the formation and operation of hospitals, which includes ASCs, is governed by Article 28 of the Public Health Law.

30.    While laypersons can own and control an ASC in New York, they may only do so in strict compliance with Article 28 and its implementing regulations found in 10 NYCRR § 751.4, which requires that there be a medical director who "is a physician licensed by and currently registered with the New York State Education Department," who "develops and recommends to the operator policies and procedures governing patient care in accordance with generally accepted

standards of professional practice" and "is responsible for the supervision of the quality assurance program and for reporting the activities of the program to the operator."

31.    The New Jersey state analogue to New York's Article 28, governing the control of ASCs, is found in Chapter 43A of the New Jersey Administrative Code, which, like New York, requires that New Jersey ASCs have a physician on staff as medical director responsible for the "direction, provision, and quality of medical services provided to patients" and is charged with the responsibility of developing and maintaining written objectives, procedures, policies and protocols governing patient care in accordance with generally accepted standards of professional practice.

32.    In contravention of the respective State laws of New York and New Jersey, and to circumvent such laws, the Controllers installed the Surgicore Medical Directors as sham medical directors to conceal their control over the statutory and regulatory components required to be carried out by licensed physicians.

33.    The Controllers implemented their massive scheme to defraud through the use of complicit sham medical directors, who in exchange for ostensibly being paid to serve as medical directors, allowed their names and licenses to be used to fraudulently bill insurance companies for services that were provided at, by, and/or through the improperly licensed Surgicore ASCs.

34.    Defendants misrepresented in each of the bills and supporting documents submitted to American Transit that:

> (i) the Surgicore ASCs were lawful entities operated with legitimate medical directors installed as required by applicable state laws when in fact they were sham medical directors and the Controllers and/or others unknown to American Transit were in reality the medical directors in violation of such applicable state laws;
>
> (ii) the Covered Persons were legitimately examined to determine the true nature and extent of their injuries (if any) when, in fact, they were not;
>
> (iii) the Covered Persons' purported injuries were causally related to an accident when, in fact, they were not;

(iv) the services were provided as billed when in fact they were not;

(v) the billed-for-services, including but not limited to examinations, modality treatments, diagnostic tests, DME, and pain management services that were purportedly provided by the Associated Health Care Providers at or through the No-Fault Clinics were not provided pursuant to a kickback arrangement and knowingly predetermined fraudulent protocol that was used as a pretext to justify the Fraudulent Services when, in fact, they were;

(vi) The Fraudulent Services and related services were medically necessary when, in fact, they were not; and

(vii) the billed for services were not provided pursuant to an illegal kickback and other "pay-to-play" arrangements with the conspiring No-Fault Clinics, orthopedists and pain management doctors and/or were provided pursuant to a predetermined fraudulent protocol when, in fact, they were.

35. The Surgicore Medical Directors played an essential role in the overall scheme to defraud alleged herein, including by allowing the Controllers and/or others unknown to American Transit conceal their illegal operation of the Surgicore ASCs in violation of applicable state laws, and the billing and provision of medically unnecessary services in exchange for the kickbacks and financial arrangements as alleged herein.

36. Notwithstanding that in the applications submitted by one or more of the Controllers to New York and/or New Jersey to operate the Surgicore ASCs the Surgicore Medical Directors were represented as the medical directors for their corresponding Surgicore ASCs, in actuality, they were not legitimate medical directors in that they exercised none of the medical oversight, supervision, and other responsibilities with which they are charged by applicable law.

37. At all relevant times mentioned herein, each of the Surgicore Medical Directors knowingly and in furtherance of the scheme to defraud, allowed fraudulent bills to be submitted by the Controllers, through the Surgicore ASCs, that misrepresented that(1) the Surgicore Medical Directors were legitimate medical directors when, in fact, they were not; and (2) the Surgicore

ASCs were properly licensed in accordance with applicable state laws when, in fact, they were not.

38.     By agreeing to be sham medical directors, the Surgicore Medical Directors permitted the Controllers to do that which they are prohibited by law: to control and dictate the medical policies and procedures for the Surgicore ASCs. In so doing, the Controllers and Surgicore Medical Directors severely compromised the safety and integrity of the healthcare delivery system in New York and New Jersey.

39.     At all relevant times mentioned herein, one or more of the Controllers and others unknown to American Transit illegally served as the medical directors for the Surgicore ASCs.

40.     As New York law requires that a licensed physician serve as the medical director of an ASC, the circumvention of that requirement by the Controllers and/or others unknown to Plaintiff, in which one or more of the Controllers served as the medical directors for the Surgicore ASCs, constituted the unauthorized practice of medicine. The practice of medicine by one who is not a physician, as well as the sale of a medical license by a physician, are felonies pursuant to New York Education Law § 6512.

41.     As New Jersey law requires that a licensed physician serve as the medical director of an ASC, the circumvention of that requirement by the Controllers and/or others unknown to Plaintiff, in which one or more of the Controllers served as the medical directors for the Surgicore ASCs, constituted the unauthorized practice of medicine. The practice of medicine by one who is not a physician is an indictable offense pursuant to New Jersey Statutes § 2C:21-20, and accomplices to the offence subject to prosecution pursuant to New Jersey Statutes § 2C:2-6.b(3) and c(1)(b).

42.     The Controllers have presided and continue to preside over schemes intended to circumvent, and in fact, violate Article 28 of the New York State Public Health Law and Article 43A of the New Jersey Administrative Code, which prohibit laypersons from being the medical directors of the ASCs, as well as each state's law proscribing the unauthorized practice of medicine.

43.     By using sham medical directors to form the Surgicore ASCs, the Controllers, together with the other Defendants, held out the Surgicore ASCs to be legitimate ASCs in compliance with core licensing requirements when, in fact, they were not. In doing so, the Controllers perpetrated a fraud upon the public and American Transit, among others.

44.     By allowing their names to be used by the Controllers to fraudulently operate the Surgicore ASCs, the Surgicore Medical Directors held out the Surgicore ASCs to be legitimate ASCs in compliance with core licensing requirements when, in fact, they were not. In doing so, the Surgicore Medical Directors, together with the other Defendants, perpetrated a fraud upon the public and American Transit, among others.

45.     The Controllers orchestrated a scheme to defraud with the assistance, participation, and agreement of the Surgicore Medical Directors through the creation of the illegally and improperly licensed Surgicore ASCs that were used to fraudulently bill insurance companies in general, and American Transit, in particular.

46.     In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005), the New York Court of Appeals held, in part, that (1) a professional corporation not licensed in accordance with applicable New York State law is not entitled to recover benefits under the New York State No-Fault Law and implementing regulations; and (2)

an insurer is entitled to recover payments made to such entity and may look beyond the facially-valid license to determine compliance with applicable state and local law.

47.     In the respective cases of *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273 (E.D.N.Y. 2013) and *Gov't Emps. Ins. Co. v. Uptown Health Care Mgmt., Inc*., 945 F. Supp. 2d 284 (E.D.N.Y. 2013), the United States District Court for the Eastern District of New York recognized that *Mallela* made no distinction between health care providers incorporated as business entities pursuant to the business corporation law, and health care providers, such as ASCs, licensed as Article 28 facilities under the public health law and that insurers were entitled to withhold and recover payments made to improperly licensed Article 28 corporations in the same way they may pursue such claims against entities formed under Article 15 of the Business Corporation Law. The same is true for ASCs formed under New Jersey law.

48.     This action seeks to recoup payments and prevent the Defendants from continuing to illegally seek reimbursement of benefits under New York State's No-Fault system through the fraudulently licensed Surgicore ASCs.

49.     In violation of Article 28 of New York's Public Health Law and Chapter 43A of New Jersey's Administrative Code and the stringent eligibility and reimbursement requirements mandated under the New York State No-Fault Law and implementing regulations, from the date the Controllers formed or otherwise acquired the Surgicore ASCs through other companies they control and/or maintain a financial interest, the Controllers have installed sham medical directors, including but not limited to the Surgicore Medical Directors to allow them to conceal the fact that they were illegally exercising the oversight responsibilities charged to licensed physicians by applicable state laws and that the Surgicore ASCs were not eligible for No-Fault benefits.

50.     By using the names and licenses of the sham Surgicore Medical Directors to

fraudulently operate and control the Surgicore ASCs, the Controllers, together with the other Defendants, held out the Surgicore ASCs to be properly licensed and operated in compliance with core licensing requirements when, in fact, they were not. In doing so, the Controllers perpetrated a fraud upon the public and Plaintiff, among others.

51.     By allowing their names and licenses to be used to allow the Controllers and others unknown to Plaintiff to fraudulently operate and control the medical decision making, policies, procedures, patient assurance programs, and protocols, the Surgicore Medical Directors participated in and provided the essential means in furtherance of the scheme to defraud alleged herein that the Surgicore ASCs were in compliance with core licensing requirements of the states in which they were located when, in fact, they were not. In doing so, the Surgicore Medical Directors, together with the other Defendants, perpetrated a fraud upon the public, and Plaintiff, among others.

52.     In contravention of the strong public policy concerns of New York and New Jersey State Legislatures in regulating the licensing of, and limiting the practice of medicine to, qualified professionals, the Controllers have circumvented the laws of these States and imperiled the safety and welfare of the public by installing sham medical directors.

53.     Defendants repeatedly violated the laws established by the States of New York and New Jersey to protect the public for the purpose of converting money, in disregard of its impact on the premium-paying public.

54.     Each of the Controllers have been the subject of insurance fraud complaints brought by insurers.

55.     By way of example and not limitation, Defendant Controller Degradi has a long history of being sued for No-Fault insurance fraud, including for his alleged ownership of

fraudulently incorporated MRI facilities: Patchogue Open MRI, P.C., Main Street Medical Imaging, P.C., Southwest Medical Imaging, P.C., Lyons Medical, P.C., Instar Medical, P.C. (not named as defendants herein). *See Farmington Cas. Co., et al. v. Patchogue Open MRI, P.C., et al.,* 22-cv-00999(E.D.N.Y. 2022); *Gov't Emp. Ins. Co. v. Lyons Medical, P.C.,* 20-cv-2089 (E.D.N.Y. 2020); *Allstate Ins. Co., et al. v. Payne, et al.,* 18-cv-3972 (E.D.N.Y. 2018).

56.     As alleged in *Allstate Ins. Co., et al. v. Mendoza, et al.,* 608378/2018, ECF No. 28 (N.Y. Sup. Ct. [Nassau] Feb. 13, 2019), the alleged fraudulently incorporated MRI facilities in which Degradi was the true owner had an illegal referral relationship with one or more of the Surgicore ASCs, including but not limited to New Horizon ASC.

57.     Defendant Controller Hatami has also been named in insurance fraud complaints, including those in which Degradi was a defendant in which he was also alleged to be an illegal owner of Main Street Medical Care P.C., a medical professional corporation in which, under New York State law, he was not entitled to own or maintain an interest. *See Allstate Ins. Co., et al. v. Mendoza, et al.,* 608378/2018, ECF No. 28 (N.Y. Sup. Ct. [Nassau] Feb. 13, 2019); *Roosevelt Road Re, Ltd. et al. v. Hajjar et al.,* 24-cv-1549, ECF No. 1 (E.D.N.Y. Mar. 1, 2024).

58.     In furtherance of the scheme to defraud detailed herein, in or about 2018, the Controllers, created defendant Surgicore Management, one of the Defendant Surgicore Management Companies, in which they all maintain a financial interest.

59.     In carrying out their scheme to defraud, Defendants stole tens of millions of dollars from American Transit by submitting fraudulent medical claims for persons who allegedly sustained injuries covered under the No-Fault Law.

60.     Defendants' activity promoted and facilitated other acts that caused losses to American Transit well beyond the insurance proceeds that Defendants collected for the Fraudulent

Services, including but not limited to the various medical services purportedly provided at and/or through referrals from the No-Fault Clinics that were intended to justify the Fraudulent Services provided at, by, and through the Surgicore ASCs when in fact such services were not medically necessary and were provided pursuant to the payment of kickbacks to the No-Fault Clinics by the providers purportedly providing services out of the No-Fault Clinics, including but not limited to the Surgicore Orthopedic Providers and Surgicore Pain Management Providers.

61.     Other losses caused by Defendants' fraudulent scheme included payments on bodily injury claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the Surgicore ASCs that inflated the nature and extent of Covered Persons' injuries, resulting in bodily injury settlements and verdicts that would not have been paid but for the intentional inflation of the Covered Persons' injuries.

62.     At all relevant times mentioned herein, American Transit justifiably relied on the medical records submitted, or caused to be submitted, by the No-Fault Clinics and Defendants to make payment determinations in the processing of No-Fault, bodily injury, Supplementary Uninsured/Underinsured Motorist" ("SUM"), and Uninsured Motorist ("UM") claims.

63.     Since 2018, the Surgicore ASCs have submitted bills to American Transit in excess of $63 million in which they have been paid nearly $17 million for the Fraudulent Services.

64.     Since 2018, in excess of 1,000 associated health care providers, including No-Fault Clinics and all of the other health care professionals who purportedly provided services at and/or based on referrals from the No-Fault Clinics, including but not limited to physicians, physical therapists, chiropractors, acupuncturists, diagnosticians, radiological services, durable medical equipment providers, pharmacies, orthopedists, podiatrists and pain management doctors who are

not named as defendants in this Complaint (collectively, the "Associated Health Care Providers") have fraudulently billed American Transit in excess of $400 million for health care related services they purportedly provided to Covered Persons on the same claim files as the Surgicore ASCs in which they have been paid in excess of $100 million.

65. The Associated Health Care Providers, many of which have long been associated with No-fault fraud and operated out of multiple No-Fault Clinic locations in downstate New York based on referrals from the No-Fault Clinics where Covered Persons first reported for treatment following purported motor vehicle accidents (which reportedly involved minor impacts if they occurred at all) in which they reportedly alleged involvement suffered soft-tissue injuries, to the extent they were injured at all.

66. As alleged herein, the initial visit to the No-Fault Clinic triggered an array of billing for medically unnecessary services by the Associated Health Care Providers who, in exchange for paying kickbacks disguised as rent and/or other financial compensation to the No-Fault Clinics, treated the Covered Persons pursuant to a predetermined fraudulent protocol, including but not limited to initial and follow up examinations; physical therapy; chiropractic and acupuncture services multiple times per week; prescriptions for expensive pain medication and DME; referrals for a rash of diagnostic tests, including but not limited to X-rays, MRIs, NCV and EMGs, culminating with pain management and/or orthopedic examinations that resulted in the Defendants submitting bills to American Transit for the Fraudulent Services provided at, by, and through the Surgicore ASCs.

67. In furtherance of Defendants' scheme to defraud alleged herein, and pursuant to the established predetermined fraudulent protocol, the initial consultations and follow-up visits at the No-Fault Clinics created and maintained the illusion of serious injuries by uniformly and falsely

reporting the nature of Covered Persons' purported injuries and slow response to treatment, a misrepresented fact that was used to justify further consultations, testing, treatment, as well as the pain management and orthopedic consultations at the No-Fault Clinics that are followed by interventional pain management and/or orthopedic procedures and/or surgeries at one or more of the Surgicore ASCs where they also receive anesthesia by or through one of the Defendant Surgicore Anesthesia Providers. As demonstrated in Exhibit "1," by the conclusion of their treatment, each Covered Person would receive virtually identical examinations, modality services, DME, prescriptions for pain medication, referrals for expensive diagnostic tests and consultations for one or more interventional pain management and/or orthopedic procedures and/or surgeries provided at, by, and through the Surgicore ASCs.

68.     The Controllers and/or others acting under their direction and control, including through one or more of the Surgicore ASCs and/or Controller Ancillary Entities (as defined herein), paid kickbacks and/or entered into other compensation arrangements with the No-Fault Clinics and/or the Surgicore Orthopedic Providers, Surgicore Pain Management Providers and Surgicore Anesthesia Providers that, together with the Associated Health Care Providers operating from those clinics, would provide the necessary pretext to justify the Fraudulent Services. Through the myriad of services purportedly provided at, by, and through the No-Fault Clinics, Defendants intended to have a bogus medical history developed to justify the Fraudulent Services.

69.     But for the No-Fault Clinics and Associated Health Care Providers developing the bogus medical history to justify the Fraudulent Services, Defendants could not have carried out their scheme in which they paid for the referrals of Covered Persons supported by bogus documented medical histories that they knew reflected medically unnecessary treatments and diagnostic tests to bill for the Fraudulent Services.

70.     The Surgicore Orthopedic Providers and Surgicore Pain Management Providers paid kickbacks, disguised as rent and/or entered into other financial arrangements, to the No-Fault Clinics to conduct initial examinations at the No-Fault Clinics on Covered Persons who invariably would perform one or more of the Fraudulent Services provided at, by, and through the Surgicore ASCs.

71.     The Fraudulent Services provided at, by and through the Surgicore ASCs resulted in tens of millions of dollars in billing and collections from American Transit for the Controllers, derived from the Surgicore ASCs.

72.     As a direct and proximate result of the Defendants' scheme to defraud alleged herein, the Associated Health Care Providers, including the No-Fault Clinics billed and/or collected from American Transit over $400 million.

73.     The Fraudulent Services were provided in furtherance of a fraudulent scheme to intentionally inflate the bodily injury claims of the Covered Persons who were represented by attorneys with whom the Defendants and/or No-Fault Clinics, acting in concert, had established codependent relationships in which certain attorneys, who are not named as defendants in this Complaint, referred the Covered Persons for the performance of the Fraudulent Services by, at, and through the Surgicore ASCs.

74.     As a direct result of the Defendants' intentional inflation of bodily injury claims through the purported provision of the Fraudulent Services, American Transit has paid nearly $30 million in connection with bodily injury lawsuits based on the provision of medically unnecessary services which, if at all, were rendered pursuant to a predetermined fraudulent protocol.

75.     As a direct result of the Defendants' intentional inflation of bodily injury claims through the purported provision of the Fraudulent Services, American Transit projects that, unless

the fraud alleged herein is arrested through the filing of this action, that it will pay, in the future, approximately $48 million to settle additional bodily injury lawsuits that are pending as of the date of the filing of this complaint.

76.     As a direct result of the Defendants' intentional inflation of bodily injury claims through the purported provision of the Fraudulent Services, American Transit has paid nearly $7 million in connection with SUM and UM claims based on the provision of medically unnecessary services which, if rendered at all, were rendered pursuant to a predetermined fraudulent protocol.

77.     As a direct result of the Defendants' intentional inflation of bodily injury claims through the purported provision of the Fraudulent Services, American Transit projects that, unless the fraud alleged herein is arrested through the filing of this action, that it will pay, in the future, approximately $3 million to settle additional SUM and UM claims that are pending as of the date of the filing of this complaint.

## STATUTORY/REGULATORY BACKGROUND OF SYSTEMATIC FRAUD

78.     The three principal objectives for enacting the No-Fault Law were: "[1] to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, [2] to reduce the burden on the courts and [3] to provide substantial premium savings to New York motorists," while concomitantly achieving cost containment and fraud prevention. *Medical Society of State v. Serio*, 100 N.Y.2d 854, 860, 870 (N.Y. 2003).

79.     Notwithstanding the Legislature's intentions, the legislative objectives have not been achieved.

80.     Since its enactment, the No-Fault Law's mandated minimum basic coverage of $50,000 ($200,000 for commercial auto-insurers like American Transit) per eligible injured person

has provided a powerful incentive for insurance fraud rings and unscrupulous providers to seek to exploit a No-Fault system that lends itself to fraud and abuse.

81. According to the Insurance Information Institute, the cumulative cost of No-Fault fraud between 2005 and 2009 was at least $617,000,000.00, which had adverse financial impacts on both consumers and insurers.

82. The New York Court of Appeals has recognized that the New York No-Fault industry is plagued by systematic fraud. *See Medical Soc'y of N.Y., Inc. v. Serio*, 100 N.Y.2d 854, 860-862 (2003) (explaining that "no-fault fraud rose from 489 cases in 1992 to 9,191 in 2000, a rise of more than 1700%" and that "the combined effect of no-fault insurance fraud has been an increase of over $100 per year in annual insurance premium costs for the average New York motorist.").

83. In a 2005 decision, the Court of Appeals found that abuse "abounds" in the No-Fault industry. *Pommells v. Perez*, 4 N.Y.3d 566, 570-571 (2005).

84. In a November 2011 opinion, the Court of Appeals found that "[n]o-fault abuse still abounds today." *Perl v. Meher*, 18 N.Y.3d 208, 214 (N.Y. Nov. 22, 2011).

85. The Court of Appeals finding was echoed by New York State Senator James L. Seward, Chair of the Senate's Insurance Committee, when he exclaimed that "New York's no-fault auto insurance system is broken and needs to be fixed now." *See* "Save on Auto Insurance, Cut 'Fraud Tax'," Published on New York State Senate, Feb. 8, 2011, attached as Exhibit "2" (also available at www.nysenate.gov).

86. Estimates of the cost of No-Fault fraud and abuse in New York reached $241 million for 2010. *See* "No-Fault Insurance Fraud in New York State is Ramping Up Premiums," Insurance Information Institute (available at <u>http://www.iii.org/article/no-fault-insurance-fraud-</u>

in-ny-state.html). The total cost of No-Fault fraud and abuse in New York between 2005 and early 2011 was estimated to likely exceed $1 billion. *Id.*

87.    The Insurance Information Institute noted that no-fault fraud is a lucrative business, "earning unethical medical providers and their accomplices an average of nearly $628,000 per day" in 2009 and $660,275 per day in 2010. *Id.*

88.    Systematic No-Fault fraud persists today despite attempts by the New York State Department of Financial Services ("DFS") to implement countermeasures, including requiring that all excessive medical treatment is reported and that claim submissions contain certain standard forms that must be completed and signed. (*See e.g.* Jesse O'Neill, *Feds Bust Doctors, Law Firm Workers, NYPD Officer in $100M Fraud Scheme*, New York Post (Jan. 14, 2022, 7:43 AM), https://nypost.com/2022/01/13/doctors-law-workers-nypd-officer-bilked-100m-fraud-feds/.)

89.    In 2018, through promulgation of the Thirty-Third Amendment to 11 N.Y.C.R.R. 68 ("Regulation 83"), DFS sought to address the abusive billing practices of out-of-state healthcare providers seeking reimbursement under the No-Fault Law for providing services to individuals referred by No-Fault Clinics located in New York to ambulatory surgical centers in New Jersey that bill for surgical procedures such as MUAs, trigger point injections, and arthroscopies at rates that have no relation to those under fee schedules that might exist in the service-providers' home states or, if there is no fee schedule, bare no relation to the prevailing rate in the geographic location for where the services were rendered.

90.    In support of the amendment of Regulation 83, DFS stated it was addressing the ongoing abuse of the No-Fault system concerning out-of-state providers who, "taking advantage of current provisions in the regulation, submit grossly inflated bills for services rendered, thus

quickly depleting the $50,000 no-fault coverage limit available to an eligible injured party." *See* DFS Assessment of Public Comments.

91.     With an effective date of January 23, 2018, Regulation 83 limits reimbursement for out-of-state providers to the lesser of (1) the amount of the fee set forth in the region of this State that has the highest applicable amount in the fee schedule for that service; (2) the amount charged by the provider; and (3) the prevailing fee in the geographic location of the provider.

92.     The Defendant Surgicore New Jersey ASCs and the New Jersey professional corporations and limited liability companies through which the Surgicore Orthopedists, Surgicore Pain Management Doctors and Surgicore Anesthesiologists billed insurers are emblematic of the abusive out-of-state billing practice Regulation 83 sought to address.

93.     All of the bills for one or more of the Fraudulent Services submitted by the Surgicore Health Care Providers to American Transit involved insurance policies issued by American Transit in New York State to New York policyholders.  Nearly all of such bills related to purported medical services  to Covered Persons who reportedly were involved in low-impact automobile collisions occurring (if at all) in New York State, and who were purportedly treated at New York No-Fault Clinics, evaluated at those same New York No-fault clinics by the same doctors or medical practices, including the Surgicore Orthopedists and/or Surgicore Pain Management Doctors, who ultimately purportedly performed the Fraudulent Services, and transported across state lines by or through the Defendants and/or companies they control or with which they are associated to the Surgicore New Jersey ASCs for medically unnecessary services at facilities that were not properly licensed in accordance with applicable law.

94.     Notwithstanding legislative and administrative efforts, No-Fault fraud continues to exponentially grow under the current laws and regulations. The latest report from the Coalition

Against Insurance Fraud, published in August 2022, found that insurance fraud today costs consumers and businesses $308.6 billion annually, with property & casualty insurance fraud (which includes auto insurance) accounting for $45 billion of that cost, and auto theft fraud totaling $7.4 billion of that cost.

95.     One of the biggest drivers of No-Fault fraud is billing for bogus medical services through fraudulently incorporated professional corporations and ambulatory surgical centers that are improperly licensed under Article 28 of the Public Health Law.

96.     Many of the No-Fault Clinics bill for services that were not provided, pursuant to illicit kickback arrangements and/or pursuant to a predetermined fraudulent protocol designed to justify and maximize expensive, medically unnecessary services.

97.     Many of the Covered Persons treated at No-Fault Clinics are referred by runners or individuals who are paid by the clinics for making such referrals or by law firms who, in exchange for the referrals, are assured that the Covered Persons will receive a regimen of medically unnecessary treatments and diagnostic testing, culminating in the purported performance of one or more of the Fraudulent Services by one or more of the Surgicore ASCs. The regimen of services, including the Fraudulent Services is intended to, and does in fact, inflate the potential value of the bodily injury claims that are filed by the law firms on behalf of the Covered Persons.

98.     Recognizing that the No-Fault system was uniquely susceptible to fraudulent schemes, Defendants embarked on a years-long campaign to enrich themselves through a sophisticated scheme to defraud that exploited the high reimbursement rates available to ASCs.

99.     The Defendants executed, and continue to carry out, a scheme to defraud that is unprecedented in its magnitude and ambition to exploit the New York State No-Fault Law through

the fraudulent proliferation of illegally operated ASCs(including but not limited to the Surgicore ASCs) throughout New York and New Jersey.

100.    The Defendants, through the Surgicore ASCs, have constructed a complex web of management companies and entities through which the Controllers hide behind to conceal their illegal operation of the medical dictates, policies, and patient care that the States of New York and New Jersey entrust by statute to licensed physicians.

101.    Through the cross-pollination of services provided by multiple Surgicore ASCs purportedly providing services and/or billing for facility fees on the same claim files as the No-Fault Clinics, Defendants have unleashed a brazen attack on the No-Fault system in which they are attached and/or associated with other pay-to-play providers in billing insurers hundreds of millions of dollars. By way of example and not limitation, attached as Exhibit "3" is a list of more than 800 claims in which more than one ASC billed on the same claim file.

102.    Not only did the Defendants provide the Fraudulent Services at, by, and through the Surgicore ASCs, in numerous instances, they also billed for such Fraudulent Services that other ASCs (the "Non-Party Network"), which are not named as defendants in this Complaint have billed to the same Covered Persons.

103.    The Non-Party Network included, among others, Hackensack Specialty ASC LLC f/k/a Dynamic Surgery Center LLC, Excel Surgery Center LLC, Integrated Specialty ASC LLC f/k/a Healthplus Surgery Center LLC, Hudson Regional Hospital, Citimed Surgery Center, Triborough ASC, Accelerated Surgical Center, and Barnert Surgical Center, which have been alleged in lawsuits brought by American Transit and other insurers of fraudulently billing for the same types of services that are the subject of this Complaint. *See Gov't Emp. Ins. Co., et al v. Moshe et al.*, 20-cv-1098-FB-RER (E.D.N.Y. 2020); *State Farm Mutual Automobile Ins. Co., et*

*al. v. Metro Pain Specialists P.C. et al.,* 21-cv-5523-MKB-PK (E.D.N.Y. 2021); *Gov't Emp. Ins. Co., et al. v. Accelerated Rehab and Pain Management, PA*, 20-cv-16361-KM-ESK (D.N.J. 2020). Attached as Exhibit "4" is a list of claims in which one or more Surgicore ASCs and one or more Non-Party Network ASCs billed for procedures and/or pain management services to the same Covered Persons.

104.    On information and belief, every aspect of the Defendants' operation is driven by fraud, forging kickback relationships with referring providers, including orthopedists and pain management doctors, providing a haven for the billing of medically unnecessary services and providing personal injury attorneys with medical records that intentionally inflate the value of potential settlements and jury verdicts.

105.    As detailed and alleged herein, many of the Surgicore Orthopedic Providers and Surgicore Pain Management Providers who performed one or more of the Fraudulent Services at the Surgicore ASCs received kickbacks from the Controllers in the form of non-disclosed ownership interests in one or more of the Surgicore ASCs and/or other financial compensation.

106.    To avoid any statutory notice or disclosure requirements that might be triggered if they had an ownership interest in the Surgicore ASCs where the surgeries or procedures are performed and to further conceal their relationship with the Surgicore ASCs, the Controllers give the Surgicore Orthopedists interests in Surgicore ASCs where they do not perform any such services.

107.    The No-Fault Clinics, through which the Surgicore Orthopedic Providers and Surgicore Pain Management Providers purportedly examine the Covered Persons before performing medically unnecessary surgeries and/or interventional pain management procedures at a Defendant Surgicore ASC, receive kickbacks from one or more of the Defendants.

108. The kickbacks paid by one or more of the Defendants to the No-Fault Clinics are disguised as "rent" that, in actuality, reflect a "pay-to-play" system that ensures a steady stream of Covered Persons to the Surgicore ASCs.

109. At all relevant times mentioned herein, in furtherance of the scheme to defraud, the Surgicore Orthopedic Providers knowingly performed medically unnecessary procedures on Covered Persons, pursuant to a predetermined fraudulent protocol, including arthroscopies, performed at Surgicore ASCs for which the Controllers, through Surgicore ASCs, bill American Transit thousands of dollars in facility fees for each such procedure.

110. At all relevant times mentioned herein, the Surgicore Orthopedic Providers knew that the Covered Persons were involved in minor impact accidents in which they suffered soft tissue injuries to the extent they were injured at all.

111. At all relevant times mentioned herein, in furtherance of the scheme to defraud, the Surgicore Pain Management Providers performed medically unnecessary interventional pain management services on Covered Persons pursuant to a predetermined fraudulent protocol, including but not limited to trigger point injections, epidural steroid injections, epidurograms, discograms, percutaneous discectomies, and IDETs, performed at the Surgicore ASCs for which the Controllers, through the Surgicore ASCs, bill American Transit thousands of dollars in facility fees for each such service.

112. At all relevant times mentioned herein, the Surgicore Pain Management Providers knew that the Covered Persons were involved in minor impact accidents in which they suffered soft tissue injuries to the extent they were injured at all.

113. Central to the Controllers' scheme to defraud was establishing the illicit financial relationships with the No-Fault Clinics, Surgicore Orthopedic Providers and Surgicore Pain

Management Providers to perform the Fraudulent Services at the Surgicore ASCs, through which the Controllers could maximize reimbursement for Facility Fees for each such service. As detailed and alleged below, based on the findings of biomechanical engineers, at least 450 reported accidents in which Covered Persons received surgeries, procedures, and pain management services at one or more of the Surgicore ASCs were the product of collisions that as a matter of physics could not have produced the claimed injuries and/or were not causally related to an automobile collision. Attached as Exhibit "5" is a list of 450 Covered Persons who were purportedly involved in collisions in which the force of the impact, the load and/or Covered Persons' positioning in the vehicle at the time of impact were found not to be causally related to the reported injuries but nevertheless reported to one or more of the Surgicore ASCs where they allegedly received one or more surgeries, procedures, and/or pain management services eventually billed to American Transit.

114. As detailed and alleged below, demonstrating that the Defendants' scheme was motivated by greed rather than medical necessity, the Surgicore ASC routinely performed multiples surgeries, procedures, and/or pain management services on Covered Persons, even though they were involved, if at all, in minor impact accidents in which, if they were injured at all, they suffered soft-tissue injuries. Attached as Exhibit "6" is a list of Covered Persons that reportedly received one or more surgeries, procedures, and/or pain management services despite either refusing medical attention at the scene of the reported accident or never seeking emergency medical care following the incident. Attached as Exhibit "7" is a list of claims in which the Covered Persons received one or more surgeries, procedures, and/or pain management services in which the Covered Persons initially reported suffering soft-tissue injuries, such as a sore shoulder, knee, and/or back but were discharged from the emergency room without any objective finding of injury.

115.    As detailed and alleged below, demonstrating that Defendants' scheme was motivated by greed rather than medical necessity, the Surgicore Health Care Providers routinely performed surgeries, procedures, and pain management services on areas of the Covered Persons' body even though they initially reported pain to a different part of their body to (1) emergency room personnel; or (2) to the doctor at the No-Fault Clinic they went to after the reported accident.

116.    By way of example and not limitation, Covered Person J.A., Claim no.1105535-01, was reportedly involved in an automobile collision on November 8, 2021, Covered Person J.A. was taken from the scene of the reported incident to the emergency room and complained of pain in their chest, back, and left leg. Notwithstanding this, after undergoing a protocol of treatment at the No-Fault Clinic, surgery was performed on J.A.'s shoulder at Defendant Empire State ASC. Attached as Exhibit "8" is list identifying a representative sample of claims where the Covered Person initially reported areas of pain that were different than the body parts in which the Surgicore ASCs performed surgeries.

117.    At all times relevant herein, Defendants submitted or caused to be submitted bills and supporting documentation that are fraudulent in that they represent services were performed and were medically necessary and reimbursable when, in fact, they were not.

118.    Defendants, acting in concert with the No-Fault Clinics and Associated Health Care Providers, submitted or caused to be submitted bills and supporting documentation to American Transit for the Fraudulent Services and related services detailed above. These bills and supporting documentation are fraudulent because the services were not reimbursable and/or were not medically necessary.

119.    Further, the success of Defendants' scheme depends on concealing from American Transit and other insurers the existence of the improper operation of the Surgicore ASCs; financial

arrangements among Defendants, as well as the No-Fault Clinics, and the predetermined ttreatment protocol to induce insurers to pay for Defendants' Fraudulent Services and related services.

120.     As alleged herein, to conceal the nature and breath of their scheme to defraud alleged herein, Defendants hid behind a confederation of corporations in which they doled out supposed "investment interests" and/or other financial interests to numerous complicit parties, including the Surgicore Orthopedic Providers, Surgicore Pain Management Providers, the Controllers' family members and/or close associates and so-called administrators. Defendants also developed a large network of orthopedists and pain management doctors to perform one or more of the Fraudulent Services at the Surgicore ASCs to further conceal the scheme by, among other things, submitting multiple bills from multiple providers and by changing providers operating at, by, and through the Surgicore ASCs. Defendants submit bills in this manner because they know insurers like American Transit, who under the No-Fault Law have strict truncated deadlines within which to pay or deny claims rely on the contents of each individual, facially valid bill and related supporting documentation to make a payment determination.

121.     As part of the Defendants efforts to conceal the scheme, Defendants avoided and/or obfuscated attempts to verify the claims submitted to American Transit. By way of example, at all relevant times mentioned herein, through requests for additional verification in the form of examinations under oath ("EUO") in accordance with the No-Fault regulations, 11 N.Y.C.R.R. § 65-3.5, American Transit sought to verify that the Surgicore ASCs were properly licensed in accordance with applicable state laws and therefore eligible for reimbursement of No-Fault benefits; that the billed for services were not provided pursuant to an illegal kickback arrangement with the No-Fault Clinics and/or the Surgicore Orthopedic Providers and Surgicore Pain

Management Providers; and that the billed for services were not provided pursuant to a predetermined fraudulent protocol and the billed for services were provided as billed.

122.     Towards that end, in late 2023, American Transit began noticing the Surgicore ASCs for EUOs related to submitted claims and has continued to do so through the filing date of this Complaint.

123.     In or about early 2024, the Surgicore ASCs, through their counsel, agreed to submit to the respective EUOs in accordance with the No-Fault Law in which Defendant Zybin would appear on behalf of All City ASC and North Queens ASC and other administrators or representatives would appear on behalf of the remaining Surgicore ASCs, with the EUOs being conducted in succession on different days until they were completed.

124.     Notwithstanding the Surgicore ASCs initially agreeing they would comply with American Transit's request for additional verification by submitting to an EUO, with the exception of All City ASC, the Surgicore ASCs ultimately refused to appear for their respective EUOs to verify the Surgicore ASCs' claims for reimbursement under the No-Fault Law.

125.     With respect to All City ASC, Defendant Zybin, the administrator for All City ASC, appeared for an EUO on March 12, 2024 and April 11, 2024.

126.     During the EUO, Zybin testified that, notwithstanding that she has an ownership interest in All City ASC, she does not have a college degree or possess any licenses or certifications in health care or health care administration or qualifications concerning the administration of ASCs. She also testified that she started working behind the reception desk at All City ASC in 1998 or 1999, when she 19 and was promoted to administrator in 2012 or 2013 by All City ASC's original owner, Nasser Hassan (not named as a defendant herein) who converted his then multi-

disciplinary practice to an ASC in or about November 2010. Zybin's employment continued her family's connection to All City ASC in that her mother Rosa Pokh had previously worked there.

127.     Zybin testified that, in or about 2017, Nasser Hassan sold All City ASC to the Controllers.

128.     During All City ASC's EUO, Zybin provided largely evasive testimony concerning, among other things, the Controllers; the Controllers' respective interests and roles in All City ASC and the Surgicore ASCs; the Controllers' associated management, services, and real estate companies; the Surgicore Medical Directors; patient quality assurance and medical policies, procedures, and protocols; referral network, ownership, and/or investment interests of the Surgicore Owners; and relationships and any financial arrangements All City ASC and/or the Controllers had with the Surgicore Orthopedic Providers and Surgicore Pain Management Providers.

129.     Based on the topics that were the subject of the All City ASC EUO, including but not limited to the ownership interests of the various Surgicore Owners, Surgicore Orthopedic Providers and Surgicore Pain Management Providers, coupled with Zybin's evasive answers, following All City ASC's continued EUO on April 11, 2024, the Surgicore ASCs refused to comply with American Transit's request for an EUO.

130.     On information and belief, the Surgicore ASCs' refusal to comply with American Transit's request for an EUO was decided by the Controllers and/or others acting at their direction.

131.     In electing not to appear for an EUO, the Controllers sought to and did further conceal their illegal and improper operation of the Surgicore ASCs; the ownership interests of various co-conspirators, including but not limited to the Surgicore Orthopedic Providers, Surgicore Pain Management Providers, and purported administrators, like Defendant Zybin; the payment of

kickbacks that were disguised in the numerous ways alleged herein; the purported provision of the Fraudulent Services that were dependent upon a predetermined fraudulent protocols and treatment plans that originated at the No-Fault Clinics and continued at, by, and through the Surgicore ASCs.

132.    The Controllers' decision not to produce the Surgicore ASCs (except All City ASC) for an EUO allowed Defendants to continue to execute the scheme to defraud detailed in this Complaint.

133.    As a foreseeable, direct, and proximate result of the Defendants' scheme to defraud alleged herein, American Transit has paid in excess of $30 million in bodily injury settlements and $7 million in supplemental underinsured motorists ("SUM") and uninsured motorists ("UM") claims that were the product of medically unnecessary surgeries, pain management services and procedures purportedly performed by the Surgicore ASCs on individuals who filed lawsuits and/or bodily injury claims who were involved, if at all, in minor impact accidents in which they suffered soft-tissue injuries and/or otherwise were uninjured but nevertheless received aggressive treatments and diagnostic testing at purported No-Fault Clinics, culminating in the submission of bills to American Transit for unnecessary surgeries, procedures and pain management services by the Surgicore ASCs that were performed, if at all, pursuant to illegal kickbacks and other improper compensation arrangements for referrals to maximize reimbursement of No-Fault benefits for the Surgicore ASCs, while inflating the potential value of bodily injury and SUM/UM claims for the benefit of one or more attorneys and/or law firms (sued herein as one or more of the John Does 2 through 20 and/or ABC Corporations 1 through 20).

134.    As a foreseeable, direct, and proximate result of the Defendants' scheme to defraud alleged herein, American Transit anticipates paying out approximately $48 million in additional bodily injury settlements and approximately $3 million in additional SUM and UM claims,

resulting from medically unnecessary surgeries, pain management services and procedures purportedly performed by the Surgicore ASCs on individuals who filed lawsuits and/or bodily injury claims who were involved, if at all, in minor impact accidents in which they suffered soft-tissue injuries and/or otherwise were uninjured.

135.     The attorneys and/or law firms paid runners to refer individuals who were involved in intentionally caused motor vehicle collisions or were involved in minor impact accidents where they suffered soft-tissue injuries to the extent they suffered any injuries at all.

136.     At all relevant times mentioned herein, the attorneys and/or law firms knew that the individuals referred to them by the runners involved fictitious claims and injuries in which, complicit with the Defendants, they had their clients undergo various surgeries, procedures, and pain management services at and through the Surgicore ASCs, exposing them to unnecessary health risks associated with undergoing such unnecessary surgeries, procedures, pain management services, and anesthesia.

137.     At all relevant times mentioned herein, Controllers, through the Surgicore ASCs submitted and continue to submit bills and/or seek collection for payment to No-Fault insurers, in general, and American Transit in particular, for one or more of the Fraudulent Services.

138.     At all relevant times mentioned herein, the Surgicore Orthopedic Providers, through their respective professional corporations, submitted and continue to submit bills and/or seek collection for payment to No-Fault insurers, in general, and American Transit in particular, for procedures and related services.

139.     At all relevant times mentioned herein, the Surgicore Pain Management Providers, through their respective professional corporations, submitted and continue to submit bills and/or

seek collection for payment to No-Fault insurers, in general, and American Transit in particular, for pain management related services.

140.     At all relevant times mentioned herein, the Surgicore Anesthesia Providers, through their respective professional corporations and/or entities, submitted and continue to submit bills and/or seek collection for payment to No-fault insurers, in general, and American Transit in particular, for anesthesiology related services.

141.     Under the fraudulent schemes alleged herein, the Surgicore ASCs bill for facility fees related to the Fraudulent Services in excess of the prevailing fee schedules and in violation of the applicable state laws of New York and New Jersey governing the lawful operation of ASCs.

142.      In contravention of the strong public policy concerns of the state legislatures of New York and New Jersey, in regulating the licensing of, and limiting the practice of medicine to, qualified professionals, the Controllers have circumvented the laws of the State and imperiled the welfare of the public by engaging in the wholesale purchase and misuse of the Surgicore Medical Directors' medical licenses.

143.     On information and belief, Defendants repeatedly violated the laws established by the States of New York and New Jersey to protect the public from the unlicensed practice of medicine for the purpose of converting money, in disregard of its impact on the premium-paying public and insurers.

144.     Every aspect of Defendants' fraudulent scheme was motivated by money and greed, without regard to the grave harm inflicted on the public at large by the Surgicore ASCs, which held themselves out as being legitimate ASCs when, in fact, they were not.

145.     The practices alleged herein were conducted willfully, with the sole object of converting money, in utter disregard of their impact on the premium-paying public and insurers in flagrant disregard of the rules and laws governing provision of services under the No-Fault Law.

146.     The fraudulent billing activity described herein not only is an imminent and ongoing threat to consumers' health, but it drains the limited health care resources of this country, resources which are already under strain to meet legitimate healthcare needs. The New York State DFS and insurance committees in both the New York State Senate and Assembly each estimate that No-Fault insurance fraud is costing New York State consumers more than one billion dollars a year.

147.     The duration, scope, and nature of all Defendants' illegal conduct brings this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—they adopted a fraudulent blueprint as their business plan and used it to participate in a systematic pattern of racketeering activity. Every facet of Defendants' operations, from the improper licensure of the Surgicore ASCs; the securing and recruiting of a patient population for which they could bill No-Fault insurers, in general, and American Transit in particular, for the Fraudulent Services through an elaborate kickback/referral scheme, to generating fraudulent supporting medical documents that misrepresented the medical necessity of the billed for services, which were predicated upon a predetermined fraudulent protocol, and/or that the services were provided as billed, was carried out for the purpose of committing fraud.

148.     The No-Fault Law is a statutory creation, in derogation of the common law, and must be strictly construed. This lawsuit seeks to, among other things, enforce the plain language

of the No-Fault Law and the implementing regulations, as well as its underlying public policy, which limits reimbursement of No-Fault benefits to properly licensed ASCs. In doing so, Plaintiff seeks compensatory and punitive damages and declaratory judgments that Plaintiff is not required to pay any No-Fault claims from the Surgicore ASCs that seek reimbursement for any medical services: (1) because they are not properly licensed, in that they have been and continue to be operated without a medical director in accordance with applicable state laws due to the Surgicore ASCs fraudulent incorporation and/or control/ownership by non-physicians; and (2) as a result from unlawful kickback, referral, fraudulent billing, and/or illegal fee-splitting activities. Thus, American Transit seeks a declaration that it is not legally obligated to pay reimbursement on more than $60,000,000.00 in pending billed for Fraudulent Services submitted, or caused to be submitted, by the Defendants through the Surgicore ASCs, Surgicore Orthopedic Providers, Surgicore Pain Management Providers, and Surgicore Anesthesia Providers.

149.    Such claims continue to be submitted by and/or in the name of the Surgicore Health Care Providers and are, or can be, the subject of No-Fault collection actions and/or arbitrations to recover benefits, and thus constitute a continuing harm to Plaintiff.

150.    By way of example and not limitation, annexed hereto as Exhibit "9" is a representative sample list of the No-Fault claims that Plaintiff paid to Defendants, to which Defendants were not entitled because of their fraudulent corporate structure and/or because they resulted from unlawful kickback, referral, fraudulent billing, and/or illegal fee-splitting schemes. By way of further example and not limitation, annexed hereto as Exhibit "10" is a non-exhaustive list of the No-Fault claims that form the basis of Plaintiff's request for declaratory relief. Said spreadsheets are grouped by claim number, PC, date of service and the amount billed. By way of further example but not limitation, annexed hereto as Exhibit "11" is a non-exhaustive list of

Associated Health Care Providers and the amounts each were paid by American Transit on the same claim files as the Surgicore ASCs.

**NATURE OF THE ACTION**

151.    This action is brought pursuant to:

      (a)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c), and 1964(c);

      (b)    New York state common law; and

      (c)    The Federal Declaratory Judgment Act; 28 U.S.C. §§ 2201, 2202

**NATURE OF RELIEF SOUGHT**

152.    Plaintiff seeks treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and the Defendants' acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-Fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiff for medical services Defendants allegedly rendered to Covered Persons.

153.    Plaintiff seeks compensatory damages to recover from Defendants all payments made to the Surgicore ASCs, Surgicore Orthopedic Providers, Surgicore Pain Management Providers, Surgicore Anesthesia Providers, Associated Health Care Providers, and the Surgicore Medical Network Enterprise as those terms are defined herein, together with punitive damages to recover payments made to the Defendants because they fraudulently obtained payments from Plaintiff for services purportedly rendered pursuant to and as a result of unlawful referrals, fraudulent billing, and/or illegal fee-splitting schemes.

154.    Plaintiff further seeks recovery of the No-Fault claim payments made under the independent theory of unjust enrichment.

155.    Plaintiff also seeks a judgment declaring that:

(a)     Plaintiff is under no obligation to pay any of the Surgicore ASCs because they were, and continue to be, fraudulently operated in violation of the substantive licensing, regulatory, and applicable operating laws and requirements of New York and/or New Jersey;

(b)     The Defendant Surgicore Health Care Providers as defined herein are not entitled to recover No-Fault benefits for any health care related services because Defendants engaged in a scheme to defraud New York automobile insurers using unlawful fee-splitting, kickbacks, and illegal referral arrangements with unlicensed persons in violation of New York and New Jersey law to fraudulently bill Plaintiff for medically unnecessary services;

(c)     Surgicore Health Care Providers' No-fault claims because the billed-for services, to the extent they were provided at all, were not provided as billed;

(d)     Plaintiff is under no obligation to pay any of the Defendant Surgicore Health Care Providers' No-fault claims because the billed-for services were not medically necessary and were provided pursuant to a pre-determined course of treatment irrespective of medical necessity, to the extent they were provided at all;

(e)     Plaintiff is under no obligation to pay any of the Defendant Surgicore Health Care Providers' No-fault claims because the billed-for Fraudulent Services, to the extent provided at all, were performed pursuant to unlawful kickback or referral arrangements and a predetermined fraudulent protocol to maximize billing for medically unnecessary services; and

(f)     Plaintiff is under no obligation to pay any of the Defendant Surgicore Health Care Providers' because the CPT codes used to bill for the Fraudulent Services misrepresented and exaggerated the services purportedly provided in order to inflate the charges submitted to Plaintiff, such that they were not reimbursable.

156.     As a result of Defendants' actions alleged herein, Plaintiff was defrauded of an amount in excess of $153,000,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiff for purported medical services provided by the improperly licensed and operated Surgicore ASCs and unlawful kickbacks and

referrals, pursuant to a predetermined fraudulent protocol in which the billed-for services were provided, if at all, irrespective of medical need.

## THE PARTIES

### I. Plaintiff

157.    Plaintiff American Transit Insurance Company is a corporation duly organized and existing under the laws of the State of New York, and the Brooklyn judicial district of the Eastern District of New York is where a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated, including the place where a number of the defendants reside and/or maintain their principal place of business and where the fraudulent insurance claims that are the subject of this Complaint were processed.

158.    Plaintiff is duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and to provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

### II. The Surgicore ASCs

159.    Defendant All City Family Healthcare Center, Inc. ("All City ASC") was incorporated on or about October 14, 1997, and purports to be a corporation authorized to do business in the State of New York, as a licensed ASC, with its principal place of business located at 3632 Nostrand Avenue, Brooklyn, New York 11229. One or more of the Controllers had majority ownership of and/or otherwise controlled All City ASC and used All City ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant All City ASC was operated in violation of New York State law and was used as a vehicle to submit fraudulent insurance claims to American Transit in violation of New York law.

160.     Defendant Bronx SC, LLC doing business as Empire State Ambulatory Surgery Center ("Empire State ASC") was organized on or about May 21, 2010, and purports to be a limited liability company authorized to do business in the State of New York, as a licensed ASC, with its principal place of business located at 3170 Webster Avenue, Bronx, New York 10467. One or more of the Controllers had majority ownership of and/or otherwise controlled Empire State ASC and used Empire State ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant Empire State ASC was operated in violation of New York State law and was used as a vehicle to submit fraudulent insurance claims to American Transit in violation of New York law.

161.     Defendant Fifth Avenue Surgery Center, LLC, formerly known as Fifth Avenue ASC Acquisition, LLC ("Fifth Avenue ASC") was organized on or about July 23, 2008, and purports to be a limited liability company authorized to do business in the State of New York, as a licensed ASC, with its principal place of business located at 1049 Fifth Avenue, New York, New York 10028. One or more of the Controllers had majority ownership of and/or otherwise controlled Fifth Avenue ASC and used Fifth Avenue ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant Fifth Avenue ASC was operated in violation of New York State law and was used as a vehicle to submit fraudulent insurance claims to American Transit in violation of New York law.

162.     Defendant Manalapan Surgery Center, Inc., formerly known as Manalapan Surgery Center, P.A. ("Manalapan ASC") was incorporated on or about May 20, 2003, and purports to be a foreign corporation authorized to do business in the State of New Jersey, as a licensed ASC, with its principal place of business located at 50 Franklin Lane, Suite 101, Manalapan Township, New Jersey 07726. One or more of the Controllers had majority ownership of and/or otherwise

controlled Manalapan ASC and used Manalapan ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant Manalapan ASC was operated in violation of New York and/or New Jersey State law and was used as a vehicle to submit bills to American Transit for one or more of the Fraudulent Services in violation of New York and/or New Jersey law. Defendant Manalapan ASC transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

163.    Defendant New Horizon Surgical Center LLC ("New Horizon ASC") was organized on or about April 13, 2009, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, as a licensed ASC, with its principal place of business located at 680 Broadway, Suites 110 & 201, Paterson, New Jersey 07514. As alleged herein, in or about 2011, and continuing after a confidential settlement agreement with American Transit that resolved pending claims between American Transit and New Horizon ASC for claims for reimbursement on or before October 22, 2019, one or more of the Controllers had majority ownership of and/or otherwise controlled New Horizon ASC and used New Horizon ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant New Horizon ASC was operated in violation of New York and/or New Jersey State law and was used as a vehicle to submit bills to American Transit for one or more of the Fraudulent Services in violation of New York and/or New Jersey law. Defendant New Horizon ASC transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

164.     Defendant NYEEQASC, LLC doing business as North Queens Surgical Center ("North Queens ASC") was organized on or about January 7, 2011, and purports to be a limited liability company authorized to do business in the State of New York, as a licensed ASC, with its principal place of business located at 45-64 Francis Lewis Boulevard, Suite 200, Bayside, New York 11361. One or more of the Controllers had majority ownership of and/or otherwise controlled North Queens ASC and used North Queens ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant North Queens ASC was operated in violation of New York State law and was used as a vehicle to submit fraudulent insurance claims to American Transit in violation of New York law.

165.     Defendant Rockaways ASC Development, LLC ("Rockaways ASC") was organized on or about April 30, 2012, and purports to be a limited liability company authorized to do business in the State of New York, as a licensed ASC, with its principal place of business located at 105-20 Rockaway Beach Boulevard, Suite 301, Rockaway Park, New York. One or more of the Controllers had majority ownership of and/or otherwise controlled Rockaways ASC and used Rockaways ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant Rockaways ASC was operated in violation of New York State law and was used as a vehicle to submit fraudulent insurance claims to American Transit in violation of New York law.

166.     Defendant Rockland and Bergen Surgery Center LLC ("Rockland and Bergen ASC") was organized on or about June 25, 2009, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, as a licensed ASC, with its principal place of business located at 133 N. Kinderkamack Road, Montvale, New Jersey 07645. One or more of the Controllers had majority ownership of and/or otherwise controlled Rockland and

Bergen ASC and used Rockland and Bergen ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant Rockland and Bergen ASC was operated in violation of New York and/or New Jersey State law and was used as a vehicle to submit bills to American Transit for one or more of the Fraudulent Services in violation of New York and/or New Jersey law. Defendant Rockland and Bergen ASC transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

167. Defendant Surgicore of Jersey City LLC ("Jersey City ASC") was organized on or about August 16, 2016, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, as a licensed ASC, with its principal place of business located at 444 Market Street, Saddlebrook, New Jersey 07663. One or more of the Controllers had majority ownership of and/or otherwise controlled Jersey City ASC and used Jersey City ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant Jersey City ASC was operated in violation of New York and/or New Jersey State law and was used as a vehicle to submit bills to American Transit for one or more of the Fraudulent Services in violation of New York and/or New Jersey law. Defendant Jersey City ASC transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

168. Defendant Surgicore, LLC, also known as Surgicore Surgical Center ("Saddlebrook ASC") was organized on or about November 4, 2015, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, as a licensed ASC, with its principal place of business located at 444 Market Street, Saddle Brook, New Jersey 07663. One or more of the Controllers had majority ownership of and/or otherwise controlled Saddlebrook

ASC and used Saddlebrook ASC as a vehicle to submit fraudulent billing to Plaintiff and other insurers. At all relevant times herein, Defendant Saddlebrook ASC was operated in violation of New York and/or New Jersey State law and was used as a vehicle to submit bills to American Transit for one or more of the Fraudulent Services in violation of New York and/or New Jersey law. Defendant Saddlebrook ASC transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

### III.   The Controllers

169.    Defendant Anthony Degradi ("Degradi") resides in and is a citizen of Florida. Degradi has never been a licensed physician or a licensed health care professional. At all relevant times herein, Degradi, along with the other Controllers, had majority ownership interests in and/or otherwise controlled, and derived financial benefit from, the Surgicore ASCs. In order to conceal the referral/kickback scheme and the full extent of Degradi's ownership and control of the Surgicore ASCs, Degradi purchased or otherwise acquired ownership interests in the Surgicore ASCs through companies that he owned and/or controlled, and/or his family members or close associates and/or companies that they owned and controlled; and established, owned, and maintained a financial interest in or otherwise derived financial benefit from the Controller Ancillary Entities (as defined herein); and the Surgicore ASCs issued regular payments to or for the benefit of Degradi, which were disguised as dividends or other cash distributions for his "investments" in the Surgicore ASCs, but which, in fact, were illegal kickbacks for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs. Degradi caused billing for the Fraudulent Services to be submitted through the Surgicore ASCs to American Transit.

170.     Degradi has a long and sordid history of involvement in No-Fault insurance fraud schemes, in which he owned and controlled numerous healthcare practices, despite his lack of any healthcare license, and used them as vehicles to submit fraudulent No-Fault insurance billing to insurance companies. *See e.g.*, *Allstate Ins. Co., et al. v. Payne, et al.*, 18-cv-03972 (E.D.N.Y.) (alleging that Degradi unlawfully owned, operated, and controlled multiple professional corporations, defrauded plaintiff insurance company through a No-Fault billing scheme, and share in the professional fee/profits of the professional corporations through his management companies); *Allstate Ins. Co., et al. v. Mendoza, et al.*, 18-cv-04361 E.D.N.Y.) (alleging that Degradi and fellow defendants utilized an elaborate referral network wherein they would regularly funnel covered persons to related entities to increase billing submitted to plaintiff insurance company); *Allstate Ins. Co., et al. v. Lyons Medical P.C., et al.*, 23-cv-08045 (E.D.N.Y.) (alleging that during the course of the fraudulent scheme, Degradi controlled three professional corporations and caused the professional corporations to fraudulently seek No-Fault reimbursement from plaintiff insurance company); *Roosevelt Road Re, Ltd. et al. v. Hajjar, et al.*, 24-cv-01549 (E.D.N.Y.) (alleging that defendants, including Degradi, exploited the New York State Workers' Compensation system by submitting fraudulent claims pursuant to a fraudulent treatment protocol including Surgicore ASCs controlled by Degradi, Kogan, Hatami, and Tylman); *Gov't Emp. Ins. Co. v. Lyons Medical, P.C.*, 20-cv-02089 (E.D.N.Y.) (alleging that Degradi devised a scheme to unlawfully own and control professional corporations, submit fraudulent insurance charges to plaintiff insurance company, and siphon the profits to himself and others through kickback arrangements); *Farmington Casualty Company v. Patchogue Open MRI, P.C.*, 22-cv-00999 (E.D.N.Y.) (alleging that Degradi unlawfully controlled, managed, and shared in the fees and

profits from professional corporations and Degradi caused these professional corporations to render fraudulent, non-compensable healthcare services to covered persons).

171.    Defendant Wayne Hatami, P.T. ("Hatami") resides in and is a citizen of New York, and was licensed as a physical therapist in the State of New York on or about February 14, 1997 under license number 016816. Hatami has never been a licensed physician. At all relevant times herein, Hatami, along with the other Controllers, had majority ownership interests in and/or otherwise controlled, and derived financial benefit from, the Surgicore ASCs. In order to conceal the referral/kickback scheme and the full extent of Hatami's ownership and control of the Surgicore ASCs, Hatami purchased or otherwise acquired ownership interests in the Surgicore ASCs through companies that he owned and/or controlled, and/or that his family members or close associates and/or companies owned and controlled; and established, owned, maintained a financial interest in or otherwise derived financial benefit from the Controller Ancillary Entities (as defined herein); and the Surgicore ASCs issued regular payments to or for the benefit of Hatami, which were disguised as dividends or other cash distributions for his "investments" in the Surgicore ASCs, but which, in fact, were illegal kickbacks for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs. Hatami caused billing for the Fraudulent Services to be submitted through the Surgicore ASCs to American Transit.

172.    Defendant Hatami has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices, despite not being a licensed physician, and used them as vehicles to submit fraudulent insurance billing to insurance companies.

173.    For example, in *Roosevelt Road Re, Ltd. et al. v. Hajjar, et al.*, 24-cv-01549 (E.D.N.Y.), plaintiffs alleged that defendants exploited the New York State Workers'

Compensation system by submitting fraudulent claims pursuant to a fraudulent treatment protocol including billing from Surgicore ambulatory surgical centers controlled by Hatami, along with Degradi, Kogan, and Tylman.

174. In *Allstate Ins. Co., et al. v. Mendoza, et al.*, 18-cv-04361 E.D.N.Y.), plaintiffs claimed that Hatami owned NY Spine/Physical Therapy, P.C. ("NY Spine") (not named as a defendant herein), funneled covered persons to related entities, including New Horizon ASC, to increase fraudulent billing. Additionally, it was alleged that the defendants were involved in an elaborate kickback scheme whereby Hatami and NY Spine provided a steady stream of covered persons to New Horizon ASC, and in return M. Hatami, Hatami's wife and the paper owner of NY Spine, received a steady stream of kickback money.

175. Defendant Feliks Kogan ("Kogan") resides in and is a citizen of New York. Kogan has never been a licensed physician or a licensed health care professional. At all relevant times herein, Kogan, along with the other Controllers, had majority ownership interests in and/or otherwise controlled, and derived financial benefit from, the Surgicore ASCs. In order to conceal the referral/kickback scheme and the full extent of Kogan's ownership and control of the Surgicore ASCs, Kogan purchased or otherwise acquired ownership interests in the Surgicore ASCs through companies that he owned and/or controlled, and/or that his family members or close associates and/or companies owned and controlled; and established, owned, and maintained a financial interest in or otherwise derived financial benefit from the Controller Ancillary Entities (as defined herein); and the Surgicore ASCs issued regular payments to or for the benefit of Kogan, which were disguised as dividends or other cash distributions for his "investments" in the Surgicore ASCs, but which, in fact, were illegal kickbacks for steering or referring, or causing to

60

be steered or referred, patients to one or more of the Surgicore ASCs. Kogan caused billing for the Fraudulent Services to be submitted through the Surgicore ASCs to American Transit.

176.    Defendant Kogan has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices, despite his lack of any healthcare license, and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Roosevelt Road Re, Ltd. et al. v. Hajjar, et al.*, 24-cv-01549 (E.D.N.Y.), plaintiffs alleged that defendants exploited the New York State Workers' Compensation system by submitting fraudulent claims pursuant to a fraudulent treatment protocol including billing from Surgicore ambulatory surgical centers controlled by Kogan, along with Degradi, Hatami, and Tylman.

177.    Defendant Leonid Tylman (a/k/a Lenny Tilman) ("Tylman") resides in and is a citizen of New York. Tylman has never been a licensed physician or a licensed health care professional. At all relevant times herein, Tylman, along with the other Controllers, had majority ownership interests in and/or otherwise controlled, and derived financial benefit from, the Surgicore ASCs. In order to conceal the referral/kickback scheme and the full extent of Tylman's ownership and control of the Surgicore ASCs, Tylman purchased or otherwise acquired ownership interests in the Surgicore ASCs through companies that he owned and/or controlled, and/or that his family members or close associates and/or companies that they owned and controlled; and established, owned, maintained a financial interest in or otherwise derived financial benefit from the Controller Ancillary Entities (as defined herein); and the Surgicore ASCs issued regular payments to or for the benefit of Tylman, which were disguised as dividends or other cash distributions for his "investments" in the Surgicore ASCs, but which, in fact, were illegal kickbacks for steering or referring, or causing to be steered or referred, patients to one or

more of the Surgicore ASCs. Tylman caused billing for the Fraudulent Services to be submitted through the Surgicore ASCs to American Transit.

178.    Defendant Tylman has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices, despite not being a licensed physician, and used them as vehicles to submit fraudulent insurance billing to insurance companies.

179.    For example, in *Roosevelt Road Re, Ltd. et al. v. Hajjar, et al.*, 24-cv-01549 (E.D.N.Y.), plaintiffs alleged that defendants exploited the New York State Workers' Compensation system by submitting fraudulent claims pursuant to a fraudulent treatment protocol including billing from Surgicore ambulatory surgical centers controlled by Tylman, along with Degradi, Kogan, and Hatami.

180.    In *Allstate Ins. Co. v. Zhigun*, 603669/2003 (N.Y. Cnty. Sup. Ct. 2003), the plaintiffs alleged that Tylman was owner and operator of a durable medical equipment ("DME") company "whose operating procedure, patterns and practices mirrored" other DME companies, and was alleged to have forged illicit kickback relationships with" DME wholesalers and presided over two separate RICO enterprises (a DME network enterprise and a "criminal" medical network enterprise).

## IV.    The Surgicore Management Companies

181.    Defendant Surgicore Management Inc ("Surgicore Management") was incorporated on or about May 2, 2018, and is purported to be a domestic for-profit corporation authorized to do business in the State of New Jersey, with its principal place of business located at 444 Market Street, Saddlebrook, New Jersey. At all relevant times herein, Surgicore Management Inc has been owned and controlled by the Controllers. According to public records, each of the Controllers is a

member/director of Surgicore Management. According to public records, Surgicore Management is the purported "management" company for New Horizon ASC, Saddlebrook ASC, Jersey City ASC, and Rockland and Bergen ASC. Pursuant to the scheme to defraud as alleged herein, Surgicore Management is being used to conceal the full extent of the Controllers' ownership and control over the Surgicore ASCs, to funnel proceeds from one or more of the Surgicore ASCs back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services. Defendant Surgicore Management transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

182.    Defendant Surgicore Management NY LLC ("Surgicore Management NY") was organized on or about August 3, 2018, and is purported to be a domestic limited liability company authorized to do business in the State of New York, with its registered address located at 505 Park Avenue, New York, New York. At all relevant times herein, Surgicore Management NY has been owned and controlled by the Controllers. In their applications to NYDOH, Empire State ASC and North Queens ASC represented that the Controllers each had a 25 percent ownership interest in Surgicore Management NY.  According to public records, Kogan is president, manager, member of Surgicore Management NY and Degradi was its organizer and member. According to public records, Surgicore Management NY is the purported "management" company for the Surgicore ASCs (as defined herein). Pursuant to the scheme to defraud as alleged herein, Surgicore

Management NY is being used to conceal the full extent of the Controllers' ownership and control over the Surgicore ASCs, to funnel proceeds from one or more of the Surgicore ASCs back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

## V.     The Surgicore Medical Directors/Administrators

183.    Defendant John Aljian, MD ("Aljian"), is a natural person residing in the State of New Jersey. According to public records, Aljian has been the purported "medical director" of Empire State ASC since approximately 2019. Public records indicate that, since at least approximately 2016, Aljian has had approximately a 2.04 to 3.79 percent ownership interest in Empire State ASC and, on information and belief, Aljian continues to have an ownership interest in Empire State ASC. Defendant Aljian transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

184.    In furtherance of the schemes to defraud alleged herein, Aljian was employed as a sham "medical director" of Empire State ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore

ASCs and/or for permitting one or more of the Controllers to operate Empire State ASC without the required medical director oversight.

185.    Defendant Edwin K. Chan, MD ("Chan"), is a natural person residing in the State of New York. According to public records, Chan was the purported "medical director" of North Queens ASC in around 2019 and 2020. Public records indicate that, since approximately 2011 or 2012, Chan has had approximately a 2.11 to 2.95 percent ownership interest in North Queens ASC and, on information and belief, Chan continues to have ownership interests in North Queens ASC. In furtherance of the schemes to defraud alleged herein, Chan was employed as a sham "medical director" of North Queens ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate North Queens ASC without the required medical director oversight.

186.    Defendant Alexander Cocoziello, DO ("Cocoziello"), is a natural person residing in the State of New Jersey. According to public records, since approximately 2015, Cocoziello has been the purported "medical director" of Saddlebrook ASC. In furtherance of the schemes to defraud alleged herein, Cocoziello was employed as a sham "medical director" of Saddlebrook ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred,

Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Saddlebrook ASC without the required medical director oversight. Defendant Cocoziello transacted business in New York State, including but not limited to participating and/ or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

187.    Defendant Andrew Koplik, MD ("Koplik"), is a natural person residing in the State of New Jersey. According to public records, Koplik was the purported "medical director" of New Horizon ASC from approximately 2013 to 2019. In furtherance of the schemes to defraud alleged herein, Koplik was employed as a sham "medical director" of New Horizon ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate New Horizon ASC without the required medical director oversight. Defendant Koplik transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted

in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

188.    Defendant Stuart Springer, MD ("Springer"), is a natural person residing in the State of New York. According to public records, Springer is or was the purported "medical director" of Fifth Avenue ASC. In furtherance of the schemes to defraud alleged herein, Springer was employed as a sham "medical director" of Fifth Avenue ASC who  never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Fifth Avenue ASC without the required medical director oversight.

189.    Defendant Peter Menger, MD ("Menger"), is a natural person residing in the State of New York. According to public records, Menger is the purported current "medical director" of North Queens ASC.

190.    In furtherance of the schemes to defraud alleged herein, Menger was employed as a sham "medical director" of North Queens ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate North Queens ASC without the required medical director oversight.

191.    Defendant Ravi Naik, MD ("Naik"), is a natural person residing in the State of New Jersey. According to public records, since approximately 2019 Naik has been the purported "medical director" of New Horizons ASC. Public records indicate that, since approximately July of 2018, Naik has had approximately a 0.31 to 0.68 percent ownership interest in New Horizon ASC and Naik continues to have an ownership interest in New Horizon ASC; and between approximately 2012 and around April of 2023, Naik had approximately a 0.41 to 1.33 percent ownership interest in Rockland and Bergen ASC through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC (not named as defendants herein). Defendant Naik transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

192.    In furtherance of the schemes to defraud alleged herein, Naik was employed as a sham "medical director" of New Horizon ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate New Horizon ASC without the required medical director oversight.

193. Defendant Anthony Pacia, MD ("Pacia"), is a natural person residing in the State of New York. According to public records, Pacia was the purported "medical director" of Rockaways ASC in or around 2012. Public records indicate that, since approximately 2012, Pacia has had approximately a 10 percent ownership interest in Rockaways ASC and, on information and belief, Pacia continues to have an ownership interest in Rockaways ASC.

194. In furtherance of the schemes to defraud alleged herein, Pacia knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons that he purportedly performed at one or more of the Surgicore ASCs and billed to American Transit in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in Rockaways ASC. In furtherance of the schemes to defraud alleged herein, Pacia was employed as a sham "medical director" of Rockaways ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Rockaways ASC without the required medical director oversight.

195. Defendant Merwin Richard, MD ("Richard"), is a natural person residing in the State of New York. According to public records, Richard has been the purported "medical director" of Jersey City ASC since approximately May of 2019. Public records indicate that, between approximately 2017 and 2020, Richard had approximately a 0.9 to 1.3 percent ownership interest in Jersey City ASC. In furtherance of the schemes to defraud alleged herein, Richard was employed

as a sham "medical director" of Jersey City ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Jersey City ASC without the required medical director oversight.

196.     Defendant Brian Weiner, MD ("Weiner"), is a natural person residing in the State of Florida. According to public records, Weiner was the purported "medical director" of Manalapan ASC from approximately 2012 to 2016. Public records indicate that, between approximately 2003 and 2019, Weiner had approximately a 15.38 to 33.33 percent ownership interest in Manalapan ASC. In furtherance of the schemes to defraud alleged herein, Weiner was employed as a sham "medical director" of Manalapan ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Manalapan ASC without the required medical director oversight. Weiner transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

197.     Defendant Marina Aminova ("Aminova") is a natural person residing in the State of New Jersey. According to public records, since approximately 2017, Aminova has been the

purported "administrator" of Jersey City ASC, and, in approximately September of 2020, was the purported "administrator" of Saddlebrook ASC. In furtherance of the schemes to defraud alleged herein, Aminova was employed as a sham "administrator" of Jersey City ASC and Saddlebrook ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Jersey City ASC and Saddlebrook ASC without the required administrator oversight. Defendant Aminova transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

198. Defendant Melissa Finnegan ("Finnegan") is a natural person residing in the State of New York. According to public records, at all times relevant herein, Finnegan has been the purported "administrator" of Rockland and Bergen ASC. In furtherance of the schemes to defraud alleged herein, Finnegan was employed as a sham "administrator" of Rockland and Bergan ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons

to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Rockland and Bergen ASC without the required administrator oversight.

199.    Defendant Henry Kilroy ("Kilroy"), is a natural person residing in the State of New Jersey. According to public records, Defendant Monique Morris is Kilroy's wife. According to public records, in or around 2017, Kilroy was the purported "administrator" of Jersey City ASC. In furtherance of the schemes to defraud alleged herein, Kilroy was employed as a sham "administrator" of Jersey City ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Jersey City ASC without the required administrator oversight. Defendant Kilroy transacted business in New York State, including but not limited to participating and/ or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

200.    Defendant Paola Lopez ("Lopez") is a natural person residing in the State of New Jersey. According to public records, from approximately May of 2021 to September of 2022, Lopez was the purported "administrator" of Saddlebrook ASC, and, is the purported "administrator" of Empire State ASC. In furtherance of the schemes to defraud alleged herein, Lopez was employed as a sham "administrator" of Saddlebrook ASC and Empire State ASC who

never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Saddlebrook ASC and Empire State ASC without the required administrator oversight. Defendant Lopez transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law

201.    Defendant Yanin Lucero ("Lucero") is a natural person residing in the State of New Jersey. According to public records, since approximately September of 2022, Lucero has been the purported "administrator" of Saddlebrook ASC. In furtherance of the schemes to defraud alleged herein, Lucero was employed as a sham "administrator" of North Queens ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate North Queens ASC without the required administrator oversight.  Defendant Lucero transacted business in New York State, including but not limited to participating and/or facilitating

the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

202. Defendant Monique Morris a/k/a Monique DeMartino a/k/a Monique Kilroy ("Morris") is a natural person residing in the State of New Jersey. According to public records, Morris is Defendant Kilroy's wife. According to public records, in or around 2016 and between approximately January of 2019 and May of 2021, Morris was the purported "administrator" of Saddlebrook ASC. In furtherance of the schemes to defraud alleged herein, Morris was employed as a sham "administrator" of Saddlebrook ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Saddlebrook ASC without the required administrator oversight. Defendant Morris transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

203. Defendant Ilana Poch-Zybin ("Zybin") is a natural person residing in the State of New York. According to public records and All City ASC's EUO, Zybin has been the purported "administrator" of All City ASC since approximately 2012 or 2013 and has been the purported "administrator" of North Queens ASC since approximately August of 2022. Records produced by All City ASC indicate that, since approximately April of 2019, Zybin has had 3.839 percent ownership interest in All City ASC and, on information and belief, Zybin continues to have an ownership interest in All City ASC. In furtherance of the schemes to defraud alleged herein, Zybin was employed as a sham "administrator" of All City ASC and North Queens ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate All City ASC and North Queens ASC without the required administrator oversight.

204. Defendant Amaury Romero a/k/a Amaury Sanchez ("Romero") is a natural person residing in the State of New Jersey. According to public records, Romero is Defendant Ramirez's husband. According to public records, Romero is also related to and/or otherwise closely associated with Defendant Chavez including through joint corporate ownership and real estate transactions, and is closely associated with Randolph, Esq., including through one or more of the Surgicore ASCs and multiple real estate transactions. Romero was identified in corporate filings as one or New Horizon ASC's managing members when it was first formed in 2009. According to NJDOH records, Romero has been New Horizon ASC's "administrator" since at least 2010, was Manalapan ASC's "administrator" in or around 2015 and was Saddlebrook ASC's "administrator"

in or around 2017. Corporate filings also identified Romero as New Horizon ASC's secretary in 2024. Though he was not identified in any records received from NJDOH as having any direct or indirect ownership interests in New Horizon ASC since at least as early as 2011, Romero repeatedly held himself out as a member/manager of New Horizon ASC on records submitted to NJDOH between at least 2016 and 2023. Though he was not identified in any records received from NJDOH as having any direct or indirect ownership interests in Saddlebrook ASC, Romero held himself out as a managing partner/member of Saddlebrook ASC between at least 2016 and 2020. On information and belief, Romero and/or one or more of the John Does 2 through 20, were the actual owners of ASC Investment Services. Romero facilitated the scheme to defraud by recruiting Ramirez and Chavez to serve as straw officers/directors of New Horizon ASC and straw owners of New Horizon ASC, Saddlebrook ASC, and Jersey City ASC, through ASC Investment Services, in order to conceal Romero and/or one or more of the John Does 2 through 20's ownership interests in and control over New Horizon ASC, Saddlebrook ASC, and Jersey City ASC and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, Saddlebrook ASC, and/or Jersey City ASC, and Romero and/or one or more of the John Does 2 through 20, as alleged herein. In furtherance of the schemes to defraud alleged herein, Romero was employed as a sham "administrator" of New Horizon ASC, Manalapan ASC, and Saddlebrook ASC, who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate New Horizon ASC, Manalapan ASC, and Saddlebrook ASC

without the required administrator oversight. Defendant Romero transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

205. Defendant Tami Santora ("Santora") is a natural person residing in the State of New York. According to public records, from approximately November of 2019 to October of 2021, Santora was the purported "administrator" of North Queens ASC. In furtherance of the schemes to defraud alleged herein, Santora was employed as a sham "administrator" of North Queens ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate North Queens ASC without the required administrator oversight.

206. Defendant Jose Santos ("Santos") is a natural person residing in the State of New Jersey. According to public records, from approximately May of 2017 to July of 2019, Santos was the purported "administrator" of Manalapan ASC. In furtherance of the schemes to defraud alleged herein, Santos was employed as a sham "administrator" of Manalapan ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs,

legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Manalapan ASC without the required administrator oversight. Defendant Santos transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

207. Defendant Mark Spina ("Spina") is a natural person residing in the State of New York. According to public records, in or around 2022, Spina was the purported "administrator" of North Queens ASC. In furtherance of the schemes to defraud alleged herein, Spina was employed as a sham "administrator" of North Queens ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate North Queens ASC without the required administrator oversight.

208. Defendant Lana Young ("Young") is a natural person residing in the State of New York. According to public records, from approximately July of 2019 to May of 2024, Young was the purported "administrator" of Manalapan ASC. In furtherance of the schemes to defraud alleged

herein, Young was employed as a sham "administrator" of Manalapan ASC who never intended to (and never did) fulfill her administrator duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate Manalapan ASC without the required administrator oversight.

209. Defendant Leticia M. Langarita-Hoyle, MSN-AGNP-C, a/k/a Leticia Langarita a/k/a Leticia Hoyle ("Hoyle") is a natural person residing in the State of New Jersey. According to public records, Hoyle is the purported "chief clinical officer" and/or "chief nursing officer" of the Surgicore ASCs and her duties consist of overseeing the Surgicore ASCs' putative "directors of nursing." At all relevant times herein, AEH Healthcare Management has been owned and controlled by Hoyle. Public records indicate that Hoyle had ownership interests in Rockland and Bergen ASC, Empire State ASC, and North Queens ASC through AEH Healthcare Management and, on information and belief, Hoyle continues to have ownership interests in Rockland and Bergen ASC, Empire State ASC, and North Queens ASC through AEH Healthcare Management. In furtherance of the schemes to defraud alleged herein, Hoyle was employed as a sham "chief clinical officer" and/or "chief nursing officer" of the Surgicore ASCs who ensured that each of the Surgicore ASCs' "directors of nursing" did not fulfill their statutory and regulatory requirements and/or permitted the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and ceded all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore

ASCs, to the Controllers, in exchange for compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary and/or other legitimate compensation, but which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate the Surgicore ASCs without the required nursing director oversight. Defendant Hoyle transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

## VI.    The Surgicore Orthopedic Providers

210.    Defendant Paul Ackerman, M.D. ("Ackerman") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about May 18, 1979 under license number 138111 and in the State of New Jersey on or about January 30, 1984 under license number 25MA04374600, and is listed with the New York Departments of State and/or Education as one of the record owners of Contemporary Orthopedics. Public records indicate that Ackerman was the director of orthopedics for Saddlebrook ASC after March of 2015 (the exact dates of which are presently unknown to Plaintiff).

211.    In furtherance of the schemes to defraud alleged herein, Ackerman knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through Contemporary Orthopedics, which in exchange for kickbacks and/or

other compensation, he purportedly performed at the Surgicore ASCs including but not limited to All City ASC, North Queens ASC, Rockaway ASC, Fifth Avenue ASC, and Jersey City ASC, and billed to American Transit through each of these entities.

212.    Based on substantial charges of negligence, failure to maintain records, and failure to respond to written requests from Department of Health brought by the Office of Professional Medical Conduct, by Consent Order and Agreement dated May 6, 2015 and modified March 30, 2016 and again May 24, 2017, Ackerman originally agreed, *inter alia*, to censure and reprimand, and probation for a period of thirty-six months. The probation period was terminated by the Second Modification Order dated May 24, 2017.

213.    Defendant Ackerman has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Gov't Emp. Ins. Co., et al., v. Triboro Med Supply, Inc., et al.*, 16-cv-2079 (E.D.N.Y.), plaintiffs allege that Ackerman performed basic arthroscopic surgeries on GEICO insured and, in exchange for financial and/or other considerations, routinely prescribed medically unnecessary post-rehabilitative equipment that was dispensed by durable medical equipment providers.

214.    Defendant Contemporary Orthopedics, PLLC ("Contemporary Orthopedics") was organized on or about February 25, 2009, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 3041 Avenue U, Brooklyn, New York 11229. Defendant Ackerman is the record owner of Contemporary Orthopedics and purportedly provided examinations to Covered Persons through Contemporary Orthopedics, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of

medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

215. Defendant Alexios Apazidis, M.D. ("Apazidis") is a natural person residing in the State of Massachusetts, was licensed to practice medicine in the State of New York on or about March 13, 2008 under license number 247904, in the State of New Jersey on or about March 23, 2020 under license number 25MA10810500, and in the State of Florida on or about February 10, 2020 under license number ME144100, and is listed with the New York Departments of State and/or Education as the record owner of Apazidis PC. Public records indicate that, since approximately August of 2018, Apazidis has had an ownership interest in All City ASC (the percentage of which is presently unknown to Plaintiff), and, on information and belief, Apazidis continues to have an ownership interest in All City ASC. In furtherance of the schemes to defraud alleged herein, Apazidis knowingly provided fraudulent medical and other healthcare services, including arthroscopic surgeries to Covered Persons through Apazidis PC that he purportedly performed at one or more of the Surgicore ASCs, including All City ASC and Fifth Avenue ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in All City ASC. Apazidis transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

216. Based on substantial charges of negligence, incompetence, and failing to comply with state regulation brought by the Office of Professional Medical Conduct, by Consent Order and Agreement dated June 10, 2015, Apazidis agreed, *inter alia*, to a license suspension for thirty-

six months, stayed with probation for thirty-six months, and a $50,000 fine. Apazidis paid the fine and his probation was completed on August 17, 2018.

217.    Defendant Apazidis has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Allstate Ins. Co., et al. v. Excell Clinical Lab, Inc., et al.*, 22-cv-00334 (E.D.N.Y.), plaintiffs alleged that defendants submitted false and fraudulent insurance claims through the U.S. Mail seeking reimbursement under New York's "No-Fault" Laws (N.Y. Ins. Law 5101, et seq.) for urine drug testing and medical services, including surgeries and injections, that were medically unnecessary and were submitted using fraudulent billing practices and fake diagnoses. These allegations include Apazidis' medically unnecessary provision of surgical procedures and/or injections, along with fraudulent referrals to an unlicensed urine drug testing laboratory where services were never actually provided, along with similar acts by Drs. Jones and Kotkes.

218.    Defendant Alexios Apazidis, M.D. P.C., also known as Total Spine and Sports Care ("Apazidis PC") was incorporated on or about September 22, 2015, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 1 Pine Point, Saint James, New York 11780. Defendant Apazidis is the record owner of Apazidis PC and purportedly provided examinations to Covered Persons through Apazidis PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

219.    Defendant Howard Baum, M.D. ("Baum") is a natural person residing in the State

of New York, was licensed to practice medicine in the State of New York on or about January 3,

1991 under license number 184624, and is listed with the New York Departments of State and/or

Education as the record owner of Bay Ridge Orthopedic. In furtherance of the schemes to defraud

alleged herein, Baum knowingly provided fraudulent medical and other healthcare services,

including arthroscopic surgeries to Covered Persons through Bay Ridge Orthopedic, which in

exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore

ASCs including but not limited to All City ASC and Empire State ASC, and billed to American

Transit through each of these entities.

220.    Defendant Bay Ridge Orthopedic Associates, P.C. ("Bay Ridge PC") was

incorporated on or about October 01, 1970, and purports to be a professional corporation

authorized to do business in the State of New York, with its principal place of business located at

476 Bay Ridge Parkway Brooklyn, New York 11209. Defendant Baum is the record owner of Bay

Ridge Orthopedic and purportedly provided examinations to Covered Persons through Bay Ridge

Orthopedic, and fraudulently billed American Transit for medical and other healthcare services,

pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in

exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers

and/or other entities owned, controlled, and operated by them and/or one or more of the John Does

2 through 20 or ABC Corporations 1 through 20.

221.    Defendant Dov Berkowitz, M.D. ("Berkowitz") is a natural person residing in the

State of New York, was licensed to practice medicine in the State of New York on or about

November 5, 1982 under license number 152385 and in the State of New Jersey on or about August

16, 2013 under license number 25MA09367300 and in the State of Florida on or about May 10,

2022 and under license number ME156781, and is listed with the New York Departments of State and/or Education as the record owner of Advanced Orthopaedics and Gesheft Associates. Public records and/or records produced by All City ASC indicate that, between approximately May of 2017 and May of 2018, Berkowitz had approximately a 2.87 percent ownership interest in New Horizon ASC; between approximately April of 2017 and January of 2019, Berkowitz had approximately a 3 to 4 percent ownership interest in Saddlebrook ASC; since approximately April of 2017, Berkowitz has had approximately a 3.72 to 25 percent ownership interest in Jersey City ASC, including though Gesheft Associates, and, on information and belief, Berkowitz continues to have an ownership interest in Jersey City ASC through Gesheft Associates; since approximately May of 2022, Berkowitz has had approximately a 3.4775 percent ownership interest in Rockland and Bergen ASC, including though Gesheft Associates and Surgicore RBSC, and Berkowitz continues to have an ownership interest in Rockland and Bergen ASC through Gesheft Associates and Surgicore RBSC; since approximately November of 2018, Berkowitz has had approximately a 2.304 percent ownership interest in All City ASC, and Berkowitz continues to have an ownership interest in All City ASC; since approximately January of 2023, Berkowitz has an ownership interest in Rockaways ASC, and Berkowitz continues to have an ownership interest in Rockaways ASC. On information and belief, Berkowitz also has ownership interests in Fifth Avenue ASC through Gesheft Associates. In furtherance of the schemes to defraud alleged herein, Berkowitz knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through Advanced Orthopaedics that he purportedly performed at one or more of the Surgicore ASCs, including Jersey City ASC, Fifth Avenue ASC, Manalapan ASC, All City ASC, Empire State ASC, Rockaways ASC and North Queens ASC, and billed to American Transit through each of those entities, in exchange for kickbacks and/or other

compensation which were disguised as dividends or other cash distributions for his "investment" in New Horizon ASC, Saddlebrook ASC, Jersey City ASC, Rockland and Bergen ASC, All City ASC and/or Rockaways ASC. Defendant

222.     Defendant Advanced Orthopaedics, P.L.L.C., also known as Rockaway Beach Advanced ("Advanced Orthopaedics") was formed on or about July 22, 1997, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 80-02 Kew Gardens Road, Kew Gardens, New York 11415. Defendant Berkowitz is the record owner of Advanced Orthopaedics and purportedly provided examinations to Covered Persons through Advanced Orthopaedics, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

223.     Defendant Mark Bursztyn, M.D. ("Bursztyn") is a natural person residing in the State of New York, and was licensed to practice medicine in the State of New York on or about April 23, 2002 under license number 224551 and in the State of New Jersey on or about July 10, 2006 under license number 25MA08105200. Records produced by All City ASC indicate that, since approximately August of 2018, Bursztyn has had approximately a 2.304 percent ownership interest in All City ASC and, Bursztyn continues to have ownership interests in All City ASC. On information and belief, Bursztyn was also employed by, and/or was an independent contractor of, McCulloch Orthopaedic, NYSJ and Advanced Orthopaedics, and purportedly provided one or more of the Fraudulent Services at one or more of the Surgicore ASCs, including and through

those entities also submitted bills to American Transit for such services. In furtherance of the schemes to defraud alleged herein, Bursztyn knowingly provided fraudulent medical and other healthcare services, including arthroscopic surgeries to Covered Persons that he purportedly performed at one or more of the Surgicore ASCs, including but not limited to All City ASC and Saddlebrook ASC and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in All City ASC.

224. Defendant Gabriel Dassa, D.O. ("Dassa") is a natural person residing in the State of New York, and was licensed to practice medicine in the State of New York on or about August 17, 1992 under license number 190113 and in the State of New Jersey on or about April 2, 2012 under license number 25MB09083500, and in the State of Florida on or about March 16, 2012 under license number OS11630, and is listed with the New York Departments of State and/or Education as the record owner of Dassa Orthopedic. Public records indicate that, between approximately August of 2015 and August of 2016, Dassa had approximately a 0.7 to 1.23 percent ownership interest in New Horizon ASC; and, since at least approximately 2016, Dassa has had approximately a 1.6253 to 3.0064 percent ownership interest in Empire State ASC and Dassa continues to have an ownership interest in Empire State ASC. In furtherance of the schemes to defraud alleged herein, Dassa knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through Dassa Orthopedic that he purportedly performed at one or more of the Surgicore ASCs, including New Horizon ASC, Empire State ASC, and Rockland and Bergen ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as

dividends or other cash distributions for his "investments" in New Horizon ASC and/or Empire State ASC.

225.    Defendant Dassa has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Allstate Ins. Co., et al., v. Dassa, et al.,* 23-cv-07515 (D.N.J.), plaintiffs alleged that defendants, both laypersons and healthcare providers, banded together to access and exploit the benefits available to automobile accident victims under New York's "No-Fault" Laws. Dassa Orthopedic, which was registered under Dassa's name, was actually owned by the layperson defendants and used to deliver medically unnecessary services to patients which would be billed to Allstate. Further, in *Gov't Emp. Ins. Co., et al., v. Datta, M.D., et al.,* 22-cv-10531 (S.D.N.Y.), plaintiffs alleged that Dassa, as owner of Dassa Orthopedic, submitted thousands of fraudulent and unlawful No-Fault insurance charges as a result of secret agreements with other healthcare providers to receive and give unlawful and medically unnecessary referrals.

226.    Defendant Dassa Orthopedic Medical Services, P.C. ("Dassa Orthopedic") was incorporated on or about April 6, 2010, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 43 Penwood Road, Mount Kisco, New York 10549. Defendant Dassa is the record owner of Dassa Orthopedic and purportedly provided examinations to Covered Persons through Dassa Orthopedic, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other

entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

227. Defendant Albert Graziosa, M.D. ("Graziosa") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about August 11, 1998 under license number 211656, and is listed with the New York Departments of State and/or Education as the record owner of Graziosa PC. Public records indicate that, since at least approximately 2016, Graziosa has had approximately a 1.0750 to 1.9884 percent ownership interest in Empire State ASC and Graziosa continues to have an ownership interest in Empire State ASC. In furtherance of the schemes to defraud alleged herein, Graziosa knowingly provided fraudulent medical and other healthcare services, including arthroscopic surgeries to Covered Persons through Graziosa PC, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to North Queens ASC, Empire State ASC, and Rockaway ASC, and billed to American Transit through each of these entities.

228. Defendant Albert Graziosa MD, P.C. ("Graziosa PC") was incorporated on or about September 07, 2005, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 3511A East Tremont Avenue, Bronx, New York 10461. Defendant Graziosa is the record owner of Graziosa PC and purportedly provided examinations to Covered Persons through Graziosa PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and

operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

229.     Defendant Robert Haar, M.D. ("Haar") is a natural person residing in the State of Florida, was licensed to practice medicine in the State of New York on or about July 20, 1979 under license number 139052 and in the State of New Jersey on or about December 6, 1994 under license number 25MA06159900, and is listed with the New York Departments of State and/or Education as the record owner of Haar Orthopaedics. Public records indicate that, between approximately November 2015 and June 2017, Haar had approximately a 0.63 to 6.47 percent ownership interest in New Horizon ASC. In furtherance of the schemes to defraud alleged herein, Haar knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through Haar Orthopaedics that he purportedly performed at one or more of the Surgicore ASCs, including New Horizon ASC and Jersey City ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in All City ASC. Defendant Haar transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

230.     Defendant Haar has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Gov't Emp. Ins. Co., et al. v. CPM Med Supply, Inc., et al*, 17-cv-07041 (E.D.N.Y.), plaintiffs alleged that defendants, including Haar, routinely prescribed unnecessary post-rehabilitative medical equipment in exchange for kickbacks and other forms of financial consideration. Further, in *Allstate Ins. Co., et al. v.*

*Mendoza, M.D., et al*, 18-cv-04361 (E.D.N.Y.), plaintiffs alleged that Haar, as owner of Haar Orthopaedics, routinely provided office based surgeries despite not being an accredited office based surgery provider ("OBSP"). Additionally, in order to improperly bill for facility fees, Haar routinely billed for surgeries performed in ambulatory surgical centers and described them as necessary despite the fact that these surgeries should have been performed in a licensed OBSP.

231.    Defendant Haar Orthopaedics & Sports Medicine, P.C., also known as Park East Imaging ("Haar Orthopaedics") was incorporated on or about December 11, 1997, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 1735 York Avenue Suite Place, New York, New York 10128. Defendant Haar is the record owner of Haar Orthopaedics. Public records indicate that, between approximately November 2015 and March 2023, Haar Orthopaedics had approximately a 3.36 to 6.47 percent ownership interest in New Horizon ASC. Haar purportedly provided examinations to Covered Persons through Haar Orthopaedics, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

232.    Defendant Emmanuel Hostin, M.D. ("Hostin") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about August 6, 2002 under license number 225878, and is listed with the New York Departments of State and/or Education as the record owner of Hostin Orthopaedics. Public records indicate that, since at least approximately 2016, Hostin has had approximately a 1.0750 to 1.9884 percent ownership interest in Empire State ASC and continues to have ownership interests in Empire State ASC. In

furtherance of the schemes to defraud alleged herein, Hostin knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through Hostin Orthopaedics that he purportedly performed at one or more of the Surgicore ASCs, including Empire State ASC, Fifth Avenue ASC, All City ASC, New Horizon ASC, Jersey City ASC, Saddlebrook ASC, and Rockaway ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in Empire State ASC.

233.    Defendant Hostin Orthopaedics & Sports Medicine, P.C. ("Hostin Orthopaedics") was incorporated on or about February 14, 2006, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 369 Lexington Avenue, Floor 8, New York, New York 10017. Defendant Hostin is the record owner of Hostin Orthopaedics and purportedly provided examinations to Covered Persons through Hostin Orthopaedics, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

234.    Defendant Barry Katzman, M.D. ("Katzman") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about September 20, 1994 under license number 197240, and is listed with the New York Departments of State and/or Education as the record owner of Katzman PC. Public records and/or records produced by All City ASC indicate that, since approximately August 2018, Katzman has had approximately a 1.536 percent ownership interest in All City ASC, and  Katzman continues to

have an ownership interest in All City ASC; since sometime after March 2017 and prior to November 2024, Katzman has had approximately a 1.2 to 2.8 percent ownership interest in Fifth Avenue ASC and Katzman continues to have ownership interests in Fifth Avenue ASC. In furtherance of the schemes to defraud alleged herein, Katzman knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through Katzman PC that he purportedly performed at one or more of the Surgicore ASCs, including Fifth Avenue ASC, North Queens ASC and All City ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in All City ASC.

235.    Defendant Katzman Orthopedics P.C. ("Katzman PC") was incorporated on or about February 11, 2005, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 261 Jericho Turnpike, Floral Park, New York 11001. Defendant Katzman is the record owner of Katzman PC and purportedly provided examinations to Covered Persons through Katzman PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

236.    Defendant Kenneth McCulloch, M.D. ("McCulloch") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about January 18, 2001 under license number 220173 and in the State of New Jersey on or about October 12, 2011 under license number 25MA09009600, and is listed with the New York Departments of

State and/or Education as one of the record owners of McCulloch Orthopaedic and NYSJ. Public records indicate that, since approximately June of 2015, McCulloch has had approximately a 6 to 15.09 percent ownership interest in New Horizon ASC and  McCulloch continues to have an ownership interest in New Horizon ASC; and since approximately February 2017, McCulloch has had approximately a 12.54 to 18.87 percent ownership interest in Saddlebrook ASC and McCulloch continues to have an ownership interest in Saddlebrook ASC; since sometime after March of 2017 and prior to November of 2024, McCulloch has had approximately a 3.4 to 7.5 percent ownership interest in Fifth Avenue ASC and McCulloch continues to have ownership interests in Fifth Avenue ASC. In furtherance of the schemes to defraud alleged herein, McCulloch knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through McCulloch Orthopaedic and NYSJ that he purportedly performed at one or more of the Surgicore ASCs, including New Horizon ASC, Fifth Avenue ASC, Saddlebrook ASC, Empire State ASC, All City ASC, North Queens ASC, Rockland and Bergen ASC, and Jersey City ASC, and billed to American Transit through each of those entities, in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in New Horizon ASC and/or Saddlebrook ASC.

237.    Defendant McCulloch has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Allstate Ins. Co., et al., v. Mendoza, D.C., et al.,* 18-cv-04361 (E.D.N.Y.), the plaintiffs alleged that McCulloch, through his involvement with New Horizon ASC, took part in a fraudulent scheme that included unnecessary medical referrals and services. Specifically, McCulloch was alleged to have become an owner/investor of New Horizon ASC in approximately 2014, which was merely used as a way to

disguise payments for patient referrals as returns on his purported investment. The payments from New Horizon ASC were alleged to have far eclipsed McCulloch's investment. This scheme was alleged to be part of a broader practice in which medical professionals were made partial owners of New Horizon ASC in exchange for patient referrals. This scheme resulted in fraudulent billing practices, such as billing for services that were not necessary or not performed as described. Additionally, McCulloch was alleged to have received substantial payments from New Horizon ASC before his ownership was approved by NJDOH. Also, in *Gov't Emp. Ins. Co., et al., v. Accelerated DME Recovery, Inc. et al.*, 16-CV-00132 (E.D.N.Y.), the plaintiffs alleged that McCulloch, with other defendants, participated in a fraudulent scheme in which McCulloch performed medically unnecessary arthroscopic surgeries that did not require prolonged use of expensive rehabilitative devices, but for which McCulloch prescribed medically unnecessary post-surgical rehabilitative devices, such as Continuous Passive Motion Units and Cold Therapy Units. These prescriptions were alleged to have been made as a result of agreements with DME providers from which McCulloch would receive kickbacks for his referrals.

238. Defendant McCulloch Orthopaedic Surgical Services, P.L.L.C., also known as New York Sports and Joints Orthopaedic Specialists ("McCulloch Orthopaedic") was organized on or about May 17, 2010, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 125-10 Queens Boulevard Suite 9, Kew Gardens, New York 11415. Defendant McCulloch is the record owner of McCulloch Orthopaedic and purportedly provided examinations to Covered Persons through McCulloch Orthopaedic, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or

more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

239. Defendant New York Sports and Joints Orthopaedic Specialists PLLC ("NYSJ") was organized on or about January 10, 2014, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 63036 99th Street, 1st Floor, Rego Park, New York 11374, until its dissolution on or about August 10, 2021. Defendant McCulloch is the record owner of NYSJ and purportedly provided examinations to Covered Persons through NYSJ, including after it, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

240. Defendant Mark McMahon, M.D. ("McMahon") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about November 13, 1987 under license number 173006 and in the State of New Jersey on or about September 26, 2013 under license number 25MA09388700, and is listed with the New York Departments of State and/or Education as the record owner of McMahon PC. Public records indicate that, since sometime after March of 2017 and prior to November of 2024, McMahon has had approximately a 1.2 to 2.7 percent ownership interest in Fifth Avenue ASC and McMahon continues to have an ownership interest in Fifth Avenue ASC. In furtherance of the schemes to defraud alleged herein, McMahon knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through McMahon PC, which in

exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Fifth Avenue ASC, and billed to American Transit through each of these entities.

241.    Defendant Mark S. McMahon, MD, PC ("McMahon PC") was incorporated on or about November 02, 1995, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 876 Park Avenue, New York, New York 10021. Defendant McMahon is the record owner of McMahon PC and purportedly provided examinations to Covered Persons through McMahon PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

242.    Defendant Passaic Orthopedic Group P.C. ("Passaic Orthopedic") was incorporated on or about March 24, 2010, and purports to be a professional corporation authorized to do business in the State of New Jersey, with its principal place of business located at 4 Rose Haven Lane, Rockleigh, New Jersey 07647. Defendant R. Seldes is the record owner of Passaic Orthopedic and purportedly provided examinations to Covered Persons through Passaic Orthopedic, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Passaic Orthopedic Group P.C. transacted

business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

243.     Defendant Richard Seldes, M.D. ("R. Seldes") is a natural person residing in the State of New Jersey, was licensed to practice medicine in the State of New York on or about November 2, 1999 under license number 216190 and in the State of New Jersey on or about September 16, 2003 under license number 25MA07659600, and is listed with the New York Departments of State and/or Education and/or New Jersey Department of Treasury as the record owner of NYC Orthopedic, Passaic Orthopedic, Seldes PC and Blue Wall Management. Public records indicate that, since approximately March of 2013, R. Seldes has had approximately a 12.12 to 14.86 percent ownership interest in New Horizon ASC through Blue Wall Management and R. Seldes continues to have an ownership interest in New Horizon ASC through Blue Wall Management. In furtherance of the schemes to defraud alleged herein, R. Seldes knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons through NYC Orthopedic, Passaic Orthopedic, and Seldes PC that he purportedly performed at one or more of the Surgicore ASCs, including Empire State ASC and New Horizon ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in New Horizon ASC. Defendant R. Seldes transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

244.     Defendant R. Seldes has a history of involvement in insurance fraud schemes, in which he purported to own and control numerous health care practices and used them as vehicles

to submit fraudulent insurance billing to insurance companies. For example, in *Allstate Ins. Co., et al. v. Melgar, P.T., et al.,* 22-cv-07634 (E.D.N.Y.), the plaintiffs alleged that defendants provided medically unnecessary and excessive healthcare services from various healthcare facilities that were, contrary to R. Seldes's claim of being sole owner and operator, actually managed and controlled by other defendants. Also, in *Allstate Ins. Co., et al., v. Walter E. Mendoza, D.C., et al.,* 18-cv-04361 (E.D.N.Y.), plaintiffs alleged that Seldes and Blue Wall Management were financially linked to New Horizon ASC and that Seldes submitted fraudulent billing to plaintiff insurance companies, and, through a referral network, regularly funneled patients to related PCs thus increasing billing to plaintiffs.

245. Defendant NYC Orthopedic and Spine, P.C. ("NYC Orthopedic") was incorporated on or about March 12, 2010, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 740 Broadway Suite 605, New York, New York 10003. Defendant Seldes is the record owner of NYC Orthopedic and purportedly provided examinations to Covered Persons through NYC Orthopedic, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

246. Defendant Richard M. Seldes, M.D., P.C. ("Seldes PC") was incorporated on or about August 15, 2003, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 95-25 Queens Boulevard, 1st Floor, Rego Park, New York 11374. Defendant Seldes is the record owner of Seldes PC and

purportedly provided examinations to Covered Persons through Seldes PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

247.    Defendant Gennadiy Shamalov, P.A. ("Shamalov") is a natural person residing in the State of New York, and was licensed as a physician assistant in the State of New York on or about July 25, 2001 under license number 008219 and in the State of New Jersey on or about August 26, 2021 under license number 25MP00644300. Public records indicate that, since approximately August of 2018, Shamalov has had approximately 0.384% ownership interests in All City ASC, and Shamalov continues to have an ownership interest in All City ASC. On information and belief, Shamalov was also employed by and/or was an independent contractor of Apazidis PC and purportedly provided one or more of the Fraudulent Services at one or more of the Surgicore ASCs, including All City ASC and Fifth Avenue ASC, and through these entities also submitted bills to American Transit for such services. In furtherance of the schemes to defraud alleged herein, Shamalov knowingly provided fraudulent medical and other healthcare services to Covered Persons through Apazidis PC that he purportedly performed at one or more of the Surgicore ASCs, including All City ASC and Fifth Avenue ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in All City ASC.

248.    Based on substantial charges of practice without adequate supervision and failure to maintain records brought by the Office of Professional Medical Conduct, by Consent Order and

Agreement dated August 18, 2009, Shamalov agreed, *inter alia*, to a censure and reprimand, three years of probation, and a $10,000 fine. Shamalov completed the terms of his order effective August 25, 2012.

249. Defendant Vinayak Sinha is a natural person residing in the State of Virginia and is named as a Defendant herein solely in his representative capacity as the Administrator of the Estate of Ajoy K. Sinha, M.D. ("Ajoy Sinha") who, until his death on or about July 24, 2023, was a natural person residing in the State of New York and was licensed to practice medicine in the State of New York on or about May 1, 1996 under license number 202830. Ajoy Sinha is the record owner of Sinha Orthopedics and MSJR. Public records and/or records produced by All City ASC indicate that, since approximately February of 2017, Ajoy Sinha has had approximately 1.68 to 1.71 percent ownership interests in Saddlebrook ASC, since approximately August 30, 2018, Ajoy Sinha has had approximately a 1.536 percent ownership interest in All City ASC, and since sometime after March of 2017 and prior to November of 2024, Ajoy Sinha had approximately a 0.8 to 1.8 percent ownership interest in Fifth Avenue ASC; and, on information and belief, Ajoy Sinha continues to have ownership interests in Saddlebrook ASC, All City ASC, and Fifth Avenue ASC. In furtherance of the schemes to defraud alleged herein, Ajoy Sinha knowingly provided fraudulent medical and other healthcare services including arthroscopic surgeries to Covered Persons that he purportedly performed at one or more of the Surgicore ASCs, including All City ASC, Saddlebrook ASC, and New Horizon ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investments" in Saddlebrook ASC, All City ASC, and Fifth Avenue ASC. Ajoy Sinha transacted business in New York State, including but not

limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

250. Defendant Sinha Orthopedics PC ("Sinha Orthopedics") was incorporated on or about September 29, 2015, and purports to be a professional corporation authorized to do business in the State of New Jersey, with its principal place of business located at 680 Broadway, Suite 205, Paterson, New Jersey 07514. Ajoy Sinha is the record owner of Sinha Orthopedics, and purportedly provided examinations to Covered Persons through Sinha Orthopedics, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Sinha Orthopedics transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

251. Defendant Musculoskeletal and Arthritis Joint Replacement of Queens ("MSJR") PC was incorporated on or about December 27, 1996, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 295 Northern Boulevard, Suite 212, Great Neck, New York 11021. Ajoy Sinha is the record owner of MSJR and purportedly provided examinations to Covered Persons through MSJR, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other

entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

252. Defendant Anjani Sinha, M.D. ("Anjani Sinha") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about August 21, 1981 under license number 147448 and in the State of New Jersey on or about April 28, 1987 under license number 25MA04979400, and is listed with the New York Departments of State and/or Education as the record owner of Anjani PC. Public records indicate that, since approximately December of 2023, Anjani Sinha has had approximately 0.6098 to 0.63 percent ownership interest in Manalapan ASC and Anjani Sinha continues to have an ownership interest in Manalapan ASC. In furtherance of the schemes to defraud alleged herein, Anjani Sinha knowingly provided fraudulent medical and other healthcare services, including arthroscopic procedures and/or surgeries to Covered Persons through Anjani PC that he purportedly performed at one or more of the Surgicore ASCs, including All City ASC, Manalapan ASC, and Fifth Avenue ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in Manalapan ASC.

253. Defendant Anjani Sinha Medical P.C. ("Anjani PC") was incorporated on or about May 22, 2019, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 10 Colonial Drive Upper, Brookville, New York 11545. Defendant Sinha is the record owner of Anjani PC and purportedly provided examinations to Covered Persons through Anjani PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation

paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

254. Defendant Upendra Sinha, M.D. ("Upendra Sinha") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about June 15, 1979 under license number 138337 and in the State of New Jersey under license number 25MA03603100, and is listed with the New York Departments of State and/or Education as the record owner of UK Sinha PC. Public records indicate that, between approximately January of 2020 through January of 2023, Upendra Sinha had approximately a 1.34 percent ownership interest in Saddlebrook ASC. In furtherance of the schemes to defraud alleged herein, Upendra Sinha knowingly provided fraudulent medical and other healthcare services, including arthroscopic procedures and/or surgeries to Covered Persons through UK Sinha PC that he purportedly performed at one or more of the Surgicore ASCs, including All City ASC and Rockaways ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in Saddlebrook ASC.

255. Defendant U.K. Sinha Physician P.C. ("U.K. PC") was incorporated on or about September 14, 2020, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 61-55 Junction Boulevard, Apt 21L, Rego Park, New York 11374. Defendant Upendra Sinha is the record owner of U.K. PC and purportedly provided examinations to Covered Persons through U.K. PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned,

controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

256.    Defendant Bradley Wasserman, M.D. ("Wasserman") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about September 10, 2007 under license number 246054 and in the State of New Jersey on or about January 28, 2015 under license number 25MA09628500, and is listed with the New Jersey Department of Treasury as the record owner of BW Orthopedics. Public records indicate that, since approximately December 2017, Wasserman has had approximately a 0.935 to 2 percent ownership interest in Jersey City ASC and Wasserman continues to have an ownership interest in Jersey City ASC. In furtherance of the schemes to defraud alleged herein, Wasserman knowingly provided fraudulent medical and other healthcare services including arthroscopic procedures and/or surgeries to Covered Persons through BW Orthopedics that he purportedly performed at one or more of the Surgicore ASCs, including Jersey City ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in Jersey City ASC.

257.    Defendant Wasserman has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Douglas Schottenstein, et al., v. U.S. Food and Drug Administration, et al.*, 122-cv-10883 (S.D.N.Y.), the plaintiffs allege that Wasserman conspired with Orthogen to exclude plaintiffs from the right to practice under the Regenokine Program License, resulting in the collection of monies that should have gone to plaintiffs for related blood drawing procedures and violating his duty to plaintiffs with deliberate fraud and deceit that risked the safety of patients due to the lack of government oversight.

258.     Defendant BW Orthopedics, LLC ("BW Orthopedics") was organized on or about May 2017, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 125 East 63rd Street, New York, New York 10065. Defendant Wasserman is the record owner of BW Orthopedics and purportedly provided examinations to Covered Persons through BW Orthopedics, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant BW Orthopedics transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State and seeking reimbursement pursuant to the New York State No-Fault Law.

## VII.     The Surgicore Pain Management Providers

259.     Defendant Alexander Bowen, M.D. ("Bowen") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about May 19, 2016 under license number 284514, and is listed with the New York Departments of State and/or Education as the record owner of Alexander Bowen PLLC and Bowen PLLC. In furtherance of the schemes to defraud alleged herein, Bowen knowingly provided or caused to be provided fraudulent medical and other healthcare services, including pain management procedures, surgeries, and/or anesthesia services to Covered Persons directly and through Alexander Bowen PLLC and Bowen PLLC, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Fifth Avenue ASC, Rockaway ASC, and North Queens ASC, and billed to American Transit through each of these

entities. On information and belief, Bowen was also employed by, and/or was an independent contractor of, Amigud PC and Sedation Vacation and purportedly provided one or more of the Fraudulent Services at one or more of the Surgicore ASCs and through these entities also submitted bills to American Transit for such service.

260.     Defendant Bowen, MD PLLC ("Bowen PLLC") was organized on or about January 06, 2021, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 68-38 Yellowstone Boulevard Suite BB1, Forest Hills, New York 11375. Bowen is the record owner of Bowen PLLC and purportedly provided examinations to Covered Persons through Bowen PLLC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

261.     Defendant Andrew Hall, M.D. ("Hall") is a natural person residing in the States of Florida and New York, and was licensed to practice medicine in the State of New York on or about September 14, 2018 under license number 296074, and is listed with the New York Departments of State and/or Education as the record owner of Hall PLLC. In furtherance of the schemes to defraud alleged herein, Hall knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Hall PLLC, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Rockaways ASC, Fifth Avenue ASC, North Queens ASC, and All City ASC, and billed to American Transit through each of these entities. On

information and belief, Hall was also employed by, and/or was an independent contractor of, Amigud PC, Sedation Vacation, and Portal Medical and purportedly provided one or more of the Fraudulent Services at one or more of the Surgicore ASCs and through these entities also submitted bills to American Transit for such service. Hall transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

262.    Defendant Andrew Hall, M.D., PLLC ("Hall PLLC") was organized on or about May 13, 2021, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 10 East 26th Street, #16E, New York, New York 10016. Defendant Hall is the record owner of Hall PLLC and purportedly provided examinations to Covered Persons through Hall PLLC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Hall transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

263.    Defendant William B. Jones, M.D. ("Jones") is a natural person residing in the State of New York, and was licensed to practice medicine in the State of New York on or about December 2, 1997 under license number 209039 and in the State of New Jersey on or about July 10, 2012 under license number 25MA09152600, and is listed with the New York Departments of State and/or Education as the record owner of Phoenix Medical. Public records indicate that,

between approximately February of 2018 and January of 2024 Jones had approximately a 0.958 to 1.302 percent ownership interest in Jersey City ASC; and between approximately April of 2018 and January of 2022 Jones had an ownership interest between approximately 1.75 to 1.90 percent in New Horizon ASC. In furtherance of the schemes to defraud alleged herein, Jones knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Phoenix Medical that he purportedly performed at one or more of the Surgicore ASCs, including New Horizon ASC, Jersey City ASC, North Queens ASC, and Fifth Avenue ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in Jersey City ASC and/or New Horizon ASC.

264. Defendant Jones has a history of involvement in insurance fraud schemes, in which he owned and/or controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Allstate Ins. Co., et al. v. Excell Clinical Lab, Inc., et al.*, 22-cv-00334 (E.D.N.Y.), plaintiffs alleged that defendants submitted false and fraudulent insurance claims through the U.S. Mail seeking reimbursement under New York's "No-Fault" Laws (N.Y. Ins. Law 5101, et seq.) for urine drug testing and medical services, including surgeries and injections, that were medically unnecessary and were submitted using fraudulent billing practices and fake diagnoses. These allegations include Defendant Jones' medically unnecessary provision of surgical procedures and/or injection, along with fraudulent referrals to an unlicensed urine drug testing laboratory where services were never actually provided, along with similar acts by Defendants Kotkes and Apazidis.

265. Defendant Phoenix Medical Services, P.C. d/b/a Rockville Center Pain Management & Rehabilitation ("Phoenix Medical") was incorporated on or about July 17, 2000,

and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 165 North Village Avenue Suite 5, Rockville Central, New York, 11570. Defendant Jones is the record owner of Phoenix Medical and purportedly provided examinations to Covered Persons through Phoenix Medical, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

266.    Defendant Joseph Jimenez, M.D. ("Jimenez") is a natural person residing in the State of New Jersey, and was licensed to practice medicine in the State of New York on or about June 2, 2017 under license number 289551 and in the State of New Jersey on or about July 2, 2007 under license number 25MA08277400, and is listed with the New York and New Jersey State Department of Treasury as the record owner of J Sports and Dev Healthcare. In furtherance of the schemes to defraud alleged herein, Jimenez knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through J Sports and Dev Healthcare, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Rockaways ASC, Empire State ASC, Saddlebrook ASC, All City ASC, Fifth Avenue ASC, North Queens ASC, and Jersey City ASC, and billed to American Transit through each of these entities. Defendant Jimenez transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

267.    Defendant J Sports Medicine P.C. ("J Sports") was incorporated on or about July 28, 2020, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 150 Broadhollow Road, Melville, New York 11747. Defendant Jimenez is the record owner of J Sports and purportedly provided examinations to Covered Persons through J Sports, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

268.    Defendant Dev Healthcare LLC ("Dev Healthcare") was organized on or about August 14, 2018, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 679 Montgomery Street, Jersey City, New Jersey 07306. Defendant Jimenez is the record owner of Dev Healthcare and purportedly provided examinations to Covered Persons through Dev Healthcare, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Dev Healthcare transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

269.    Defendant Gautam Khakhar, M.D. ("Khakhar") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about June

30, 2000 under license number 218201, and is listed with the New York Departments of State and/or Education as the record owner of PM&R. Public records indicate that, since at least 2023, Khakhar had an ownership interest (the percentage of which is presently unknown to Plaintiff) in Empire State ASC, and, on information and belief, Defendant Khakhar continues to have an ownership interest in Empire State ASC; and since sometime after January of 2019, Khakhar has had an ownership interest in North Queens ASC (the percentage of which is presently unknown to Plaintiff) and, on information and belief, Khakhar continues to have an ownership interest in North Queens ASC. In furtherance of the schemes to defraud alleged herein, Khakhar knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through PM&R, which he purportedly performed at one or more of the Surgicore ASCs, including Empire State ASC and Fifth Avenue ASC, and billed to American Transit through each of those entities, in exchange for kickbacks and/or other compensation disguised as dividends or other cash distributions for his "investments" in Empire State ASC and/or North Queens ASC.

270.     Defendant Physical Medicine & Rehabilitation of New York, PC ("PM&R") was incorporated on or about February 28, 2005, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 3815 Putnam Avenue, Bronx, New York 10463. Defendant Khakhar is the record owner of PM&R and purportedly provided examinations to Covered Persons through PM&R, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities

owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

271.    Herschel Kotkes, M.D. ("Kotkes") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about July 10, 2001 under license number 221937, in the State of New Jersey on or about December 6, 2001 under license number 25MA07344300, and in the State of Florida on or about April 13, 2023 under license number ME161979, and is listed with the New York Departments of State and/or Education as the record owner of Kotkes PC. Public records indicate that, between approximately August 2020 and November 2023, Defendant Kotkes had approximately a 0.238 to 0.283 percent ownership interest in Jersey City ASC; and, between approximately November 2012 and March 2023,  Kotkes had approximately a 0.95 to 1.38 percent ownership interest in Rockland and Bergen ASC and Defendant Kotkes continues to have an ownership interest in Rockland and Bergen ASC. In furtherance of the schemes to defraud alleged herein, Kotkes knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Kotkes PC that he purportedly performed at the Surgicore ASCs including but not limited to Fifth Avenue ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investments" in Jersey City ASC and Rockland and Bergen ASC.

272.    Defendant Kotkes has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Allstate Ins. Co., et al. v. Excell Clinical Lab, Inc., et al.*, 22-cv-00334 (E.D.N.Y.), plaintiffs alleged that defendants

submitted false and fraudulent insurance claims through the U.S. Mail seeking reimbursement under New York's "No-Fault" Laws (N.Y. Ins. Law 5101, et seq.) for urine drug testing and medical services, including surgeries and injections, that were medically unnecessary and were submitted using fraudulent billing practices and fake diagnoses. These allegations include Defendant Kotkes' medically unnecessary provision of surgical procedures and/or injection, along with fraudulent referrals to an unlicensed urine drug testing laboratory where services were never actually provided, along with similar acts by Drs. Jones and Apazidis. Further, in *State Farm Mutual Automobile Insurance Company, et al. v. Herschel Kotkes, M.D., P.C., et al* 22-cv-03611 (E.D.N.Y.), plaintiffs alleged that defendants, including Defendant Kotkes, submitted fraudulent and misleading bills to plaintiff for services purportedly rendered to individuals involved in motor vehicle accidents who were eligible for No-Fault insurance benefits. The medical treatments rendered were the product of a fraudulent predetermined treatment protocol designed to unlawfully exploit the patients' No-Fault benefits while maximizing payments to Defendant Kotkes.

273.     Defendant Herschel Kotkes, MD, PC ("Kotkes PC") was incorporated on or about March 4, 2005, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 77 North Central Avenue, Rockville Center, New York 11570. Defendant Kotkes is the record owner of Kotkes PC and purportedly provided examinations to Covered Persons through Kotkes PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

274.     Defendant Benjamin Portal, M.D. ("Portal") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about August 2, 2018 under license number 295350, and is listed with the New York Departments of State and/or Education as the record owner of Portal Medical. In furtherance of the schemes to defraud alleged herein, Portal knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Portal Medical, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Rockaway ASC and Fifth Avenue ASC, and billed to American Transit through each of these entities. On information and belief, Portal was also employed by, and/or was an independent contractor of Total Anesthesia, Sedation Vacation, Kotkes PC, Bowen PLLC, and Hall PLLC, and purportedly provided one or more of the Fraudulent Services at one or more of the Surgicore ASCs and through these entities also submitted bills to American Transit for such services.

275.     Defendant Portal Medical, PC ("Portal Medical") was incorporated on or about December 07, 2022, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 37 Auerbach Lane Lawrence, New York 11559. Defendant Portal is the record owner of Portal Medical and purportedly provided examinations to Covered Persons through Portal Medical, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

276.    Defendant David Shabtian, D.O. ("Shabtian") is a natural person residing in the State of New York, and was licensed to practice medicine in the State of New York on or about May 10, 2010 under license number 257043, and is listed with the New York Departments of State and/or Education as the purported owner of Total Anesthesia. Public records indicate that, since approximately September 2021, Shabtian had approximately a 0.768 percent ownership interest in All City ASC, and Defendant Shabtian continues to have an ownership interest in All City ASC. According to public records, Shabtian has been the purported "medical director" of All City ASC since approximately November 1, 2022.

277.    In furtherance of the schemes to defraud alleged herein, Shabtian knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Total Anesthesia, which he purportedly performed at one or more of the Surgicore ASCs, including All City ASC, North Queens ASC, Rockaway ASC, and Fifth Avenue ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation disguised as dividends or other cash distributions for his "investment" in All City ASC. On information and belief, Shabtian was also employed by, and/or was an independent contractor of Sedation Vacation and purportedly provided one or more of the Fraudulent Services at one or more of the Surgicore ASCs and through these entities also submitted bills to American Transit for such services. In furtherance of the schemes to defraud alleged herein, Shabtian was employed as a sham "medical director" of All City ASC who never intended to (and never did) fulfill his medical director duties as required by law, and who received compensation disguised as legitimate investment interests in one or more Surgicore ASCs, legitimate salary, and/or other legitimate compensation, which was in fact compensation for illegal kickbacks for steering or referring, or causing to be steered or referred,

Covered Persons to one or more of the Surgicore ASCs and/or for permitting one or more of the Controllers to operate All City ASC without the required medical director oversight.

278.    Defendant Total Anesthesia Provider, PC ("Total Anesthesia") was incorporated on or about May 21, 2014, and is a Domestic Professional Service Corporation authorized to do business in the State of New York, with its principal place of business located at 4 Sands Ct Great Neck, New York 11023. Defendant Shabtian is the record owner of Total Anesthesia and purportedly provided examinations to Covered Persons through Total Anesthesia, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more John Does or ABC Corporations.

279.    Defendant Ketan Vora, D.O. ("Vora") is a natural person residing in the State of New York, was licensed to practice medicine in the State of New York on or about February 22, 2007 under license number 243182, and in the State of New Jersey on or about April 13, 2009 under license number 25MB08561100, and is listed with the New York Departments of State and/or Education as the record owner of Vora PC, KDV Medical, KV Medical, NJ Vora, and Non-Surgical Orthopedics. Public records indicate that, between approximately December 2015 and December 2022, Vora had approximately a 0.61 percent ownership interests in New Horizon ASC; and since approximately November 2019, Vora has had approximately 1.23 to 1.79 percent ownership interests in Saddlebrook ASC and Vora continues to have ownership interests in Saddlebrook ASC. In furtherance of the schemes to defraud alleged herein, Vora knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Vora PC, KDV Medical, KV Medical, NJ Vora, and

Non-Surgical Orthopedics that he purportedly performed at one or more of the Surgicore ASCs, including North Queens ASC, Rockaway ASC, Saddlebrook ASC, New Horizon ASC, and Rockland and Bergen ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investments" in New Horizon ASC and/or Saddlebrook ASC.

280.    Defendant Ketan D. Vora, D.O., P.C. ("Vora PC") was incorporated on or about August 13, 2010, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 68-60 Austin Street Suite 404, Forest Hills, New York 11375. Defendant Vora is the record owner of Vora PC and purportedly provided examinations to Covered Persons through Vora PC and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

281.    Defendant KDV Medical, P.C. ("KDV Medical") was incorporated on or about November 18, 2020, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 193 North Wellwood Avenue, Lindenhurst, New York 11759. Defendant Vora is the record owner of KDV Medical and purportedly provided examinations to Covered Persons through KDV Medical, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities

owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

282.     Defendant KV Medical of NY, P.C. ("KV Medical") was incorporated on or about March 23, 2018, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 96 East Street, Hicksville, New York 11801. Defendant Vora is the record owner of KV Medical and purportedly provided examinations to Covered Persons through KV Medical, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

283.     Defendant NJ Vora Health P.C., also known as Vora Health ("NJ Vora") was incorporated on or about January 9, 2020, and purports to be a foreign professional corporation authorized to do business in the State of New Jersey, with its principal place of business located at 1651 Federspiel Street, Fort Lee, New Jersey 07024. Defendant Vora is the record owner of NJ Vora and purportedly provided examinations to Covered Persons through NJ Vora, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant NJ Vora transacted business in New York State,

including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

284. Defendant Non-Surgical Orthopedics of New Jersey, PC ("Non-Surgical Orthopedics") was incorporated on or about July 7, 2011, and purports to be a foreign professional corporation authorized to do business in the State of New Jersey, with its principal place of business located at 1107 Convery Boulevard, Suite 201, Perth Amboy, New Jersey 08861. Defendant Vora is the record owner of Non-Surgical Orthopedics. Public records indicate that, between approximately December 2015 and January 2022, Non-Surgical Orthopedics had approximately a 0.61 to 1.29 percent ownership interest in New Horizon ASC. Vora purportedly provided examinations to Covered Persons through Non-Surgical Orthopedics, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Non-Surgical Orthopedics transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

285. Defendant Jinghui Xie, M.D. ("Xie") is a natural person residing in the State of New Jersey, and was licensed to practice medicine in the State of New York on or about October 5, 2012 under license number 267042, and is listed with the New York Departments of State and/or Education as the record owner of Integrated Pain Management. Public records indicate that, between approximately May 2017 and March 2018, Xie had approximately a 2.15 percent ownership interest in Saddlebrook ASC. In furtherance of the schemes to defraud alleged herein,

Xie knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Integrated Pain Management he purportedly performed at one or more of the Surgicore ASCs, including Manalapan ASC, Jersey City ASC, New Horizon ASC, and Saddlebrook ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in Saddlebrook ASC. Defendant Xie transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

286.    Defendant Xie has a history of involvement in insurance fraud schemes, in which she owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Gov't Emp. Ins. Co., et al. v. Caring Pain Management PC, et al.*, 22-cv-05017 (D.N.J.), plaintiffs alleged that defendants submitted fraudulent and unlawful No-Fault insurance charges through Caring Pain Management PC, owned by Xie for purported health services. Xie paid unlawful compensation in exchange for patient referrals to Caring Pain Management PC, received unlawful compensation in exchange for patient referrals to other facilities, and purported to perform many fraudulent services on behalf of Caring Pain Management PC. Further, in *Gov't Emp. Ins. Co., et al. v. Accelerated Rehab and Pain Management, et al.*, 20-cv-16361 (D.N.J.), plaintiffs alleged that defendants submitted fraudulent and unlawful No-Fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services. As part of the fraud, Xie purported to perform many fraudulent services billed to GEICO through Accelerated Rehab, which included initial

exams in which it was represented that the covered persons presented with problems of moderate to high severity.

287. Defendant Integrated Pain Management, PLLC ("Integrated Pain Management") was organized on or about May 16, 2014, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 4602 6th Avenue, Brooklyn, New York 11220. Defendant Xie is the record owner of Integrated Pain Management and purportedly provided examinations to Covered Persons through Integrated Pain Management, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

## VIII. The Surgicore Anesthesia Providers

288. Defendant Alexander Bowen, MD PLLC ("Alexander Bowen PLLC") was organized on or about July 10, 2017, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 68-38 Yellowstone Boulevard Suite BB1, Forest Hills, New York 11375. Defendant Bowen is the record owner of Alexander Bowen PLLC and purportedly provided anesthesia services to Covered Persons through Alexander Bowen PLLC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

289.    Defendant Igor Amigud, M.D. ("Amigud") is a natural person residing in the State of New York, and was licensed to practice medicine in the State of New York on or about August 11, 1995 under license number 200459, and is listed with the New York Departments of State and/or Education as the record owner of Amigud PC and Fifth Avenue Anesthesia. Public records indicate that, between at least as early as March 2017 and prior to November 2024, Amigud had approximately an 8 to 10 percent ownership interest in Fifth Avenue ASC. In furtherance of the schemes to defraud alleged herein, Amigud knowingly provided fraudulent medical and other healthcare services including anesthesia services to Covered Persons through Amigud PC and Fifth Avenue Anesthesia that he purportedly performed at one or more of the Surgicore ASCs, including Fifth Avenue ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in All City ASC.

290.    Based on substantial charges of failing to file a report required by the health department brought by the Office of Professional Medical Conduct, by Consent Order and Agreement dated December 21, 2006, Amigud agreed, *inter alia*, to a $10,000 fine.

291.    Defendant Igor Amigud Physician P.C. ("Amigud PC") was incorporated on or about February 05, 2001, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 211 East 53rd Street Suite 3K New York, New York 10022. Defendant Amigud is the record owner of Amigud PC and purportedly provided examinations to Covered Persons through Amigud PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities

owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

292. Defendant Fifth Avenue Anesthesia Associates, P.C. ("Fifth Avenue Anesthesia") was incorporated on or about January 09, 2002, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 1409 Fifth Avenue, New York, New York 10028. Defendant Amigud is the record owner of Fifth Avenue Anesthesia and purportedly provided examinations to Covered Persons through Fifth Avenue Anesthesia, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

293. Defendant Edward Eaton, M.D. ("Eaton") is a natural person residing in the State of New Jersey, was licensed to practice medicine in the State of New York on or about November 13, 2003 under license number 230509 and in the State of New Jersey on or about February 1, 2006 under license 25MA08038300, and is listed with the New Jersey State Department of Treasury as one of the record owners of Synergy Anesthesia. In furtherance of the schemes to defraud alleged herein, Eaton knowingly provided fraudulent medical and other healthcare services, including anesthesia services, to Covered Persons through Synergy Anesthesia, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Rockland and Bergen ASC, and billed to American Transit through each of these entities. Defendant Eaton transacted business in New York State, including

but not limited to participating in the mailing of fraudulent insurance claims in New York State and seeking reimbursement pursuant to the New York State No-Fault Law.

294.     Defendant Wael Elkholy, M.D. ("Elkholy") is a natural person residing in the State of New Jersey, was licensed to practice medicine in the State of New York on or about May 23, 1996 under license number 203076, in the State of New Jersey on or about May 1, 2000 under license number 25MA07057900 and in the State of Florida on or about February 15, 2024 under license number ME166813, and is listed with the New Jersey State Department of Treasury as the record owner of Precision Anesthesia. Public records indicate that, between approximately December 2014 and February 2018, Elkholy had approximately a 0.5 to 0.81 percent ownership interest in New Horizon ASC; and between at least approximately April 2015 and November 2022, Elkholy had approximately a 1.57 to 16.18 percent ownership interest in Manalapan ASC. In furtherance of the schemes to defraud alleged herein, Elkholy knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Precision Anesthesia that he purportedly performed at one or more of the Surgicore ASCs including but not limited to New Horizon ASC, Manalapan ASC and Saddlebrook ASC, and billed to American Transit through each of those entities in exchange for kickbacks and/or other compensation which were disguised as dividends or other cash distributions for his "investment" in Manalapan ASC. Defendant Elkholy transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

295.     Defendant Elkholy has a history of involvement in insurance fraud schemes, in which he owned and controlled numerous healthcare practices and used them as vehicles to submit fraudulent insurance billing to insurance companies. For example, in *Gov't Emp. Ins. Co., et al.,*

*v. Wael Elkholy, et al.,* 21-cv-16255 (D.N.J.), plaintiffs allege that Elkholy, as owner of Precision Pain & Spine Institute, L.L.C., provided medically unnecessary services, if services were provided at all, pursuant to a pre-determined protocol designed to enrich himself rather than treat the insureds. Further, Elkholy received unlawful compensation in exchange for patient referrals and engaged in an unlawful self-referral scheme.

296.    Defendant Precision Anesthesia Associates, P.C., formerly known as Precision Anesthesia Associates Inc ("Precision Anesthesia") was incorporated on or about September 23, 2016, and purports to be a foreign professional corporation authorized to do business in the State of New Jersey, with its principal place of business located at 127 Grayson Drive, Belle Mead, New Jersey 08502. Defendant Elkholy is the record owner of Precision Anesthesia and purportedly provided examinations to Covered Persons through Precision Anesthesia, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Precision Anesthesia transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

297.    Defendant Kareem Eltaki, M.D. ("Eltaki") is a natural person residing in the State of New Jersey and was licensed to practice medicine in the State of New York on or about August 17, 2012 under license number 266330 and in the State of New Jersey on or about December 3, 2007 under license number 25MA08345400, and is listed with the New Jersey State Department of Treasury as one of the record owners of Quality Anesthesia. Defendant Eltaki transacted

business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

298.     In furtherance of the schemes to defraud alleged herein, Eltaki knowingly provided fraudulent medical and other healthcare services, including anesthesia services, to Covered Persons through Quality Anesthesia, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Rockland and Bergen ASC, and billed to American Transit through each of these entities. Defendant Eltaki transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

299.     Defendant Sen Pin Kao, MD ("Kao") is a natural person residing in the State of New Jersey and was licensed to practice medicine in the State of New Jersey on or about November 16, 1973 under license number 25MA02802800, and is listed with the New Jersey State Department of Treasury as the record owner of Progressive-Hudson. In furtherance of the schemes to defraud alleged herein, Kao knowingly provided fraudulent medical and other healthcare services, including anesthesia services to Covered Persons through Progressive-Hudson, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs and billed to American Transit through each of these entities. Defendant Kao transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

300. Defendant Progressive-Hudson Anesthesia, LLC ("Progressive-Hudson") was organized on or about June 11, 2009, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 444 Market Street, Saddlebrook, New Jersey 07633. Defendant Kao is the record owner of Progressive-Hudson and purportedly provided services to Covered Persons through Progressive-Hudson, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

301. Defendant Asim Khan, M.D. (" Khan") is a natural person residing in the State of New Jersey and was licensed to practice medicine in the State of New York on or about June 10, 2024 under license number 330845, and is listed with the New Jersey State Department of Treasury as the record owner of Anesthesia Professionals. In furtherance of the schemes to defraud alleged herein, Khan knowingly provided fraudulent medical and other healthcare services, including anesthesia services, to Covered Persons through Anesthesia Professionals, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Manalapan ASC, and billed to American Transit through each of these entities. Khan transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

302. Defendant Anesthesia Professionals PA ("Anesthesia Professionals") was formed on or about February 2018, and purports to be a foreign professional association authorized to do

128

business in the State of New Jersey, with its principal place of business located at 1919 Greenfree Road, Cherry Hill, New Jersey 08003. Defendant Khan is the record owner of Anesthesia Professionals and purportedly provided examinations to Covered Persons through Anesthesia Professionals, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Anesthesia Professionals transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

303. Defendant Chad Itzkovich, M.D. ("Itzkovich") is a natural person residing in the State of New Jersey and was licensed to practice medicine in the State of New York on or about September 23, 2004 under license number 234062 and in the State of New Jersey on or about February 2, 2006 under license number 25MA08040300, and is listed with the New Jersey State Department of Treasury as one of the record owners of Synergy Anesthesia. In furtherance of the schemes to defraud alleged herein, Itzkovich knowingly provided fraudulent medical and other healthcare services, including anesthesia services, to Covered Persons through Synergy Anesthesia, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Rockland and Bergen ASC, and billed to American Transit through each of these entities. Defendant Itzkovich transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance

claims in New York State and seeking reimbursement pursuant to the New York State No-Fault Law.

304. Defendant Synergy Anesthesia LLC ("Synergy Anesthesia") was organized on or about April 25, 2011, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 1 Gatehall Drive, Suite 206, Parsippany, New Jersey 07054. Defendants Drs. Eaton and Itzkovich are the record owners of Synergy Anesthesia and purportedly provided examinations to Covered Persons through Synergy Anesthesia, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Synergy Anesthesia transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State and seeking reimbursement pursuant to the New York State No-Fault Law.

305. Defendant Neal Kurtti, M.D. ("Kurtti") is a natural person residing in the State of New York and was licensed to practice medicine in the State of New York on or about December 7, 1989 under license number 180952 and in the State of New Jersey on or about September 3, 1993 under license number 25MA05987400, and is listed with the New Jersey State Department of Treasury as one of the record owners of Quality Anesthesia. Public records indicate that, between approximately May 2012 and April 2022, Kurtti had approximately 0.33 to 0.89 percent ownership interests in Rockland and Bergen ASC through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC (not named as defendants herein). In furtherance of the

schemes to defraud alleged herein, Kurtti knowingly provided fraudulent medical and other healthcare services, including anesthesia services, to Covered Persons through Quality Anesthesia, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Rockland and Bergen ASC, and billed to American Transit through each of these entities.

306.    Defendant F. Robert McCarthy III, M.D. ("McCarthy") is a natural person residing in the State of New Jersey and was licensed to practice medicine in the State of New York on or about November 1, 1985 under license number 164625, and is listed with the New Jersey State Department of Treasury as one of the record owners of Quality Anesthesia. Public records indicate that, between approximately September 2009 and April 2022, McCarthy had approximately 0.33 to 1.33 percent ownership interests in Rockland and Bergen ASC through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC (not named as defendants herein).

307.    In furtherance of the schemes to defraud alleged herein, McCarthy knowingly provided fraudulent medical and other healthcare services, including pain management procedures and/or surgeries, to Covered Persons through Quality Anesthesia, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Rockland and Bergen ASC, and billed to American Transit through each of these entities. Defendant McCarthy transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

308.    Defendant Quality Anesthesia Services LLC ("Quality Anesthesia") was organized on or about January 6, 2020, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 32 Bonnie

Way, Allendale, New Jersey 07401. Defendants Drs. Kurtti, Eltaki, and McCarthy are the record owners of Quality Anesthesia and purportedly provided anesthesia services to Covered Persons through Quality Anesthesia, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Quality Anesthesia transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

309.    Defendant Avishai T. Neuman, M.D. ("Neuman") is a natural person residing in the State of New York and was licensed to practice medicine in the State of New York on or about August 9, 2007 under license number 245594, and is listed with the New York Departments of State and/or Education as the purported owner of Neuman PC, Neuman PLLC, Sedation Vacation, Centurion Midtown Anesthesia, Centurion Midtown Medical, and Centurion Anesthesia Surgical. In furtherance of the schemes to defraud alleged herein, Neuman was All City ASC's purported Director of Anesthesia.

310.    In furtherance of the schemes to defraud alleged herein, Neuman knowingly provided fraudulent medical and other healthcare services, including anesthesia services, to Covered Persons through Neuman PC, Neuman PLLC, Sedation Vacation, Centurion Midtown Anesthesia, Centurion Midtown Medical, and Centurion Anesthesia Surgical, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to All City ASC, Empire State ASC, North Queens ASC, Rockaway

ASC, Fifth Avenue ASC, and New Horizon ASC, and billed to American Transit through each of these entities.

311.    Defendant Avishai Neuman Medical P.C. ("Neuman PC") was incorporated on or about June 9, 2015, and purports to be a professional corporation authorized to do business in the State of New York, with its principal place of business located at 811 Wilson Street, Valley Stream, New York 11581. Defendant Neuman is the record owner of Neuman PC and purportedly provided anesthesia services to Covered Persons through Neuman PC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid for by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

312.    Defendant Avishai T. Neuman MD, PLLC d/b/a Centurion Anesthesia ("Neuman PLLC") was organized on or about August 31, 2010, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 811 Wilson Street, Valley Stream, New York 11581. Defendant Neuman is the record owner of Neuman PLLC and purportedly provided anesthesia services to Covered Persons through Neuman PLLC, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

313.     Defendant Sedation Vacation Perioperative Medicine, PLLC doing business as Centurion Anesthesia ("Sedation Vacation") was organized on or about November 14, 2016, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 811 Wilson Street, Valley Stream, New York 11581. Defendant Neuman is the record owner of Sedation Vacation and purportedly provided anesthesia services to Covered Persons through Sedation Vacation, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

314.     Defendant Centurion Midtown Anesthesia, PLLC ("Centurion Midtown Anesthesia") was organized on or about January 14, 2022, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 211 East 53rd Street Suite 3K, New York, York 10002. Defendant Neuman is the record owner of Centurion Midtown Anesthesia and purportedly provided anesthesia services to Covered Persons through Centurion Midtown Anesthesia, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled and operated by them and/or one or more of the John Does 1 through 20 or ABC Corporations 1 through 20.

315.    Defendant Centurion Midtown Medical, PLLC ("Centurion Midtown Medical") was organized on or about January 18, 2022, and purports to be a professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 211 East 53 Street Suite 3K, New York, York 10002. Defendant Neuman is one of the record owners of Centurion Midtown Medical along with Amigud and purportedly provided anesthesia services to Covered Persons through Centurion Midtown Medical, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20.

316.    Defendant Centurion Anesthesia Surgical Centers, LLC ("Centurion Anesthesia Surgical") was organized on or about September 24, 2021, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 411 Hackensack Avenue, 5th Floor, Hackensack, New Jersey 07601. Defendant Neuman is the record owner of Centurion Anesthesia Surgical and purportedly provided anesthesia services to Covered Persons through Centurion Anesthesia Surgical, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Centurion Anesthesia Surgical transacted business in New

York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

317. Defendant Athanasios Scinas, M.D. ("Scinas") is a natural person residing in the State of New Jersey and was licensed to practice medicine in the State of New Jersey on or about July 26, 1999 under license number 25MA06945500, and is listed with the New Jersey State Department of Treasury as the record owner of Roxbury Anesthesia. Public records indicate that Scinas had ownership interests in Journal Square Surgical Center, LLC (not named as a defendant herein) before its assets were acquired by Jersey City ASC. In furtherance of the schemes to defraud alleged herein, Defendant Scinas knowingly provided fraudulent medical and other healthcare services, including anesthesia services, to Covered Persons through Roxbury Anesthesia, which in exchange for kickbacks and/or other compensation, he purportedly performed at the Surgicore ASCs including but not limited to Jersey City ASC and Manalapan ASC, and billed to American Transit through each of these entities. Defendant Scinas transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

318. Defendant Roxbury Anesthesia, LLC ("Roxbury Anesthesia") was organized on or about December 27, 2006, and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 550 Newark Avenue 5th Floor, Jersey City, New Jersey 07306. Defendant Scinas is the record owner of Roxbury Anesthesia and purportedly provided anesthesia services to Covered Persons through Roxbury Anesthesia, and fraudulently billed American Transit for medical and other healthcare services, pursuant to a fraudulent predetermined treatment protocol irrespective of medical necessity in

exchange for kickbacks and/or other financial compensation paid by one or more of the Controllers and/or other entities owned, controlled, and operated by them and/or one or more of the John Does 2 through 20 or ABC Corporations 1 through 20. Defendant Roxbury Anesthesia transacted business in New York State, including but not limited to participating in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

## IX.    The Associated Companies/Individuals

319.    Defendant Advanced PMR Management Ltd Liability Co. ("Advanced PMR") was organized on or about February 13, 2017 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey with its principal place of business located at 46 Newman Springs Road East, Red Bank, New Jersey 07701. At all relevant times herein, Advanced PMR has been owned on paper by Harris Hafeez and Daniel Reizis. According to corporate filings, Hafeez and Reizis were Advanced PMR's sole members/managers. Public records indicate that, between approximately August 2019 and June 2021, either Advanced PMR or its principals, Hafeez and Reizis, collectively had approximately a 1.18 to 1.52 percent ownership interest in Manalapan ASC. In or about 2018, Advanced PMR was acquired by Defendant Health Plus Management and served, in part, as a feeder of Covered Persons to one or more of the Surgicore ASCs.  Defendant Advanced PMR transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent

insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

320. Defendant AEH Healthcare Management Consulting LLC ("AEH Healthcare Management") was organized on or about March 8, 2019 and purports to be a foreign limited liability company authorized to do business in the States of New Jersey and New York, with its principal place of business located at 709 Kingsland Avenue, Ridgefield, New Jersey 07657. At all relevant times herein, AEH Healthcare Management has been owned and controlled by Hoyle. Rockland and Bergen ASC represented to the New Jersey Department of Health ("NJDOH") that AEH Healthcare Management was owned solely by Hoyle. According to its corporate filings, Hoyle is AEH Healthcare Management's sole member/manager and registered agent. Public records indicate that, since approximately March of 2021, AEH Healthcare Management has had approximately a 0.4285 percent ownership interest in Rockland and Bergen ASC and AEH Healthcare Management continues to have an ownership interest in Rockland and Bergen ASC; since at least approximately 2023, AEH Healthcare Management has had an ownership interest in Empire State ASC (the percentage of which is presently unknown to Plaintiff) and AEH Healthcare Management continues to have an ownership interest in Empire State ASC; and since sometime after January 2019, AEH Healthcare Management has had an ownership interest in North Queens ASC (the percentage of which is presently unknown to Plaintiff) and AEH Healthcare Management continues to have an ownership interest in North Queens ASC.

321. Defendant ASC Investment Services LLC ("ASC Investment Services") was organized on or about February 23, 2011 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 2 Deer Trail Court, Ringwood, New Jersey 07465. At all relevant times herein, ASC Investment

Services has been owned on paper by Amanda Chavez and/or Maribel Ramirez. From 2013 through May 2020, New Horizon ASC represented to NJDOH that ASC Investment Services was owned solely by Chavez. New Horizon ASC represented to NJDOH that the registered owner of ASC Investment Services changed from Chavez to Ramirez on May 1, 2020. According to its corporate filings, in 2011, Chavez was ASC Investment Services' sole member/manager, and registered agent. In 2017, Ramirez replaced Chavez as ASC Investment Services' registered agent. Though New Horizon ASC and Saddlebrook ASC represented that ASC Investment Services was only owned only by Chavez or Ramirez, "Amaury," i.e., Romero was identified as ASC Investment Services' only owner in a record dated January 1, 2023 received from NJDOH that was presumably prepared by Saddlebrook ASC and/or prepared by NJDOH based on information provided by Saddlebrook ASC to NJDOH. Though he has not been identified as an owner of New Horizon ASC since at least as early as 2011, Romero repeatedly held himself out as a member/manager of New Horizon ASC on records submitted to NJDOH between at least 2016 and 2023. Public records indicate that, since approximately February of 2011, ASC Investment Services has had approximately a 6.19 percent ownership interest in New Horizon ASC and ASC Investment Services continues to have an ownership interest in New Horizon ASC; and since approximately February of 2017, ASC Investment Services has had approximately a 1.12 percent ownership interest in Saddlebrook ASC and ASC Investment Services continues to have an ownership interest in Saddlebrook ASC. At all relevant times herein, Chavez and/or Ramirez were nominal or straw owners of ASC Investment Services, which was actually owned and/or controlled by Romero and/or one or more of the John Does 2 through 20. Defendant ASC Investment Services transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and

control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

322.    Defendant ASAR Healthcare LLC ("ASAR Healthcare") was organized on or about November 16, 2012 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 680 Broadway, Suite 205, Paterson, New Jersey 07501. At all relevant times herein, ASAR Healthcare has been owned on paper by Beata Kogan, Alla Revutsky and/or Tylman. In 2013, New Horizon ASC represented to NJDOH that ASAR Healthcare was jointly and equally owned by B. Kogan and Revutsky. In 2013 and 2014, New Horizon ASC represented to NJDOH that B. Kogan and/or ASAR Healthcare owned fifty percent of New Horizon ASC. However, in December of 2019, Rockland and Bergen ASC represented to NJDOH that ASAR Healthcare was owned solely by Tylman. Additionally, in its November 2016 license application, Jersey City ASC represented to NJDOH that ASAR Healthcare was owned by Tylman. In UCC financing statements filed with the Delaware State Division of Corporations ("DSDC") on November 18, 2019, Ortuz LLC was identified as having an ownership interest in ASAR Healthcare. Public records indicate that, since approximately March of 2013, ASAR Healthcare has had approximately a 30.96 percent ownership interest in New Horizon ASC and ASAR Healthcare continues to have an ownership interest in New Horizon ASC. At all relevant times herein, B. Kogan and Revutsky were nominal or straw owners of ASAR Healthcare, which was actually owned and/or controlled by Tylman, including through Ortuz, and/or Kogan. Defendant ASAR Healthcare transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme

described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

323.    Defendant AS Med Invest LLC ("AS Med Invest") was organized on or about March 2, 2022 and purports to be a limited liability company authorized to do business in the State of New York, with its principal place of business located at 7009 Austin Street Suite 204, Forest Hills, New York 11375. At all relevant times herein AS Med Invest has been owned on paper by Albert Shakarov. According to the articles of organization filed with the New York Department of State ("NYDOS"), AS Med Invest was organized by Shakarov. Public records indicate that, since approximately November of 2022, AS Med Invest has had approximately a 1.26 to 1.3 percent ownership interest in New Horizon ASC and AS Med Invest continues to have an ownership interest in New Horizon ASC; since approximately March 2022, AS Med Invest has had approximately a 0.56 percent ownership interest in Saddlebrook ASC and AS Med Invest continues to have an ownership interest in Saddlebrook ASC; and since approximately February 2022, AS Med Invest has had approximately a 0.935 percent ownership interest in Jersey City ASC and AS Med Invest continues to have an ownership interest in Jersey City ASC. At all relevant times herein, Shakarov was a nominal or straw owner of AS Med Invest, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

324.    Defendant BDP Ventures Inc ("BDP Ventures Inc.") was incorporated on or about May 1, 2018 and purports to be a corporation authorized to do business in the States of New York and New Jersey, with its principal place of business located at 573 Remsens Lane, Oyster Bay,

New York 11753. At all relevant times herein, BDP Ventures Inc. has been owned on paper by Mary Hatami, Hatami and/or Degradi. According to its corporate filings, on May 1, 2018, the same date that BDP Ventures LLC was dissolved, BDP Ventures Inc was incorporated and listed M. Hatami as its registered agent. Per its 2024 annual report filed with NJDOT, M. Hatami is BDP Ventures Inc.'s CEO and director. In or around January 15, 2020, BDP Ventures Inc. filed a certificate of authority to conduct business in New Jersey with the New Jersey Department of Treasury ("NJDOT"), listing Hatami as its president. According to its annual reports filed with NJDOT, in 2021 and 2022, Degradi was listed as BDP Ventures Inc.'s director and manager, and in 2023 and 2024, M. Hatami was listed as BDP Ventures Inc.'s director and owner. Since approximately May 2018, BDP Ventures Inc. has had approximately a 6.25 to 7.74 percent ownership interest in New Horizon ASC and BDP Ventures Inc. continues to have an ownership interest in New Horizon ASC. At all relevant times herein, M. Hatami was a nominal or straw owner of BDP Ventures Inc., which was actually owned and/or controlled by Hatami and/or Degradi.

325. Defendant BDP Ventures LLC ("BDP Ventures LLC") was organized on or about November 4, 2014 and purported to be a domestic limited liability company authorized to do business in the State of New York, with its principal place of business located at 9 The Preserve, Woodbury, New York 11797, until its dissolution on or about May 1, 2018. At all relevant times herein, BDP Ventures LLC has been owned on paper by M. Hatami and/or Hatami. New Horizon ASC represented to NJDOH that BDP Ventures LLC was solely owned by M. Hatami. According to its corporate filings, BDP Ventures LLC was formed by M. Hatami and reported Hatami as its member in 2016. Public records indicate that, since approximately June 2015, BDP Ventures LLC has had approximately a 6.25 to 7.74 percent ownership interest in New Horizon ASC and BDP

Ventures LLC continues to have an ownership interest in New Horizon ASC, despite its dissolution on or about May 1, 2018. At all relevant times herein, M. Hatami was a nominal or straw owner of BDP Ventures LLC, which was actually owned and/or controlled by Hatami.

326. Defendant Blue Wall Management, LLC ("Blue Wall Management") was organized on or about June 12, 2012 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 4 Rose Haven Lane, Rockleigh, New Jersey 07647. At all relevant times herein, Blue Wall Management has been owned on paper by Seldes or Marla Seldes. According to its certificate of formation, Blue Wall Management provides "consulting services" and M. Seldes was its member/manager. New Horizon ASC also represented to NJDOH in 2013 that M. Seldes was Blue Wall Management's sole member. Since 2016, New Horizon ASC has represented that "Richard Seldes, MD c/o Blue Wall Management, LLC" is one of New Horizon ASC's owners. In 2013 and 2014, New Horizon ASC represented to NJDOH that Blue Wall Management and/or M. Seldes owned fifteen percent of New Horizon ASC. Public records indicate that, since approximately March of 2013, Blue Wall Management has had approximately a 13.62 to 15 percent ownership interest in New Horizon ASC and Blue Wall Management continues to have an ownership interest in New Horizon ASC. At all relevant times herein, M. Seldes was a nominal or straw owner of Blue Wall Management, which was actually owned and/or controlled by Seldes. Defendant Blue Wall Management transacted business in New York State, including but not limited to participating and/ or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of

the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

327. Defendant Boost HS LLC ("Boost HS") was organized on or about July 8, 2021 and purports to be a limited liability company authorized to do business in the State of New York, with its principal place of business located at 73-35 195th Street, Fresh Meadows, New York 11366. At all relevant times herein, Boost HS has been owned on paper by Roza Yadgarov. Saddlebrook ASC and Rockland and Bergen ASC represented to NJDOH that Boost HS is owned solely by Yadgarov. According to its corporate filings, Yadgarov was the organizer and registered agent for Boost HS. Public records indicate that, between approximately September 2021 and January 2024, Boost HS had approximately a 1.17 to 1.19 percent ownership interest in Saddlebrook ASC; and, since approximately May 2022, Boost HS had approximately a 0.8569 percent ownership interest in Rockland and Bergen ASC and Boost HS continues to have an ownership interest in Rockland and Bergen ASC.

328. Defendant Capleo Holdings, LLC ("Capleo Holdings") was organized on or about April 24, 2024 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey with its principal place of business located at 101 Bristol Drive, Woodbury, New York 11797. At all relevant times, Capleo Holdings has been owned and controlled by Jeffrey Rubin. Saddlebrook ASC represented to NJDOH that Capleo Holdings is owned solely by Rubin. According to its corporate filings, Rubin filed the certificate of formation for Capleo Holdings and was listed as its sole member/manager. Public records indicate that, since approximately June of 2024, Capleo Holdings has had approximately a 1.69 percent ownership interest in Saddlebrook ASC and Capleo Holdings continues to have an ownership interest in Saddlebrook ASC. Defendant Capleo Holdings transacted business in New York State, including but not limited to

participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

329.    Defendant Conte De Fees Inc ("Conte De Fees") was incorporated on or about July 27, 2015 and purports to be a corporation authorized to do business in the State of New York, with its principal place of business located at 253 Route 211 East Suite 201, Middletown, New York 10940, until its dissolution on or about September 16, 2024. At all relevant times herein, Conte De Fees was owned and controlled by Sergey Denevich. New Horizon ASC, Jersey City ASC, and Rockland and Bergen ASC reported that Conte De Fees was solely owned by Denevich. According to its corporate filings with NYDOS, Conte De Fees was incorporated by Denevich and reported Denevich as its sole officer/director. In a July 31, 2015 letter to NJDOH that Denevich apparently authored, Denevich represented to NJDOH that he was the sole owner of Conte De Fees and intended to remain its sole owner for an indefinite period of time. Public records indicate that, between approximately August 2015 and May 2024, Conte De Fees had approximately a 0.63 to 1.4 percent ownership interest in New Horizon ASC; between approximately December 2022 and February 2024, Conte De Fees had approximately a 0.93 percent ownership interest in Jersey City ASC; and since approximately April 2023, Conte De Fees has had approximately a 1.7832 to 2.5629 percent ownership interest in Rockland and Bergen ASC and Conte De Fees continues to have an ownership interest in Rockland and Bergen ASC.

330.    Defendant Fiaba LLC ("Fiaba") was organized on or about July 27, 2015 and purports to be a limited liability company authorized to do business in the State of New York, with

its principal place of business located at 253 Route 211 East, Suite 201, Middletown NY 10940. At all relevant times, Fiaba was owned and controlled by Denevich. New Horizon ASC and Jersey City ASC represented to NJDOH that Fiaba was owned solely by Denevich. According to its corporate filings, Denevich is the organizer and president of Fiaba. Public records indicate that, since approximately May of 2024, Fiaba has had approximately a 0.63 percent ownership interest in New Horizon ASC and Fiaba continues to have an ownership interest in New Horizon ASC; and, since approximately February of 2024, Fiaba has had approximately a 0.935 percent ownership interest in Jersey City ASC and Fiaba continues to have an ownership interest in Jersey City ASC.

331. Defendant 50 Franklin Ln Realty LLC ("50 Franklin Ln Realty") was formed on or about June 4, 2018, and is purported to be a domestic limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 50 Franklin Lane, Manalapan, New Jersey 07726. According to public records, 50 Franklin Ln Realty purchased 50 Franklin Lane, Manalapan, New Jersey, the location of Manalapan ASC, on or about October 25, 2018. At all relevant times herein, 50 Franklin Ln Realty has been owned by one or more of the Controllers. Public records identify Kogan and Tylman as members/managers of 50 Franklin Ln Realty. On information and belief, pursuant to the scheme to defraud as alleged herein, 50 Franklin Ln Realty is being used to conceal the full extent of the Controllers' ownership and control over Manalapan ASC, to funnel proceeds from Manalapan ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services. Defendant 50 Franklin Ln Realty transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or

engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

332.    Defendant FIWA 1049 Realty, LLC ("FIWA 1049 Realty") was formed on or about April 12, 2019, and is purported to be a domestic limited liability company authorized to do business in the State of New York, with its principal place of business located at 505 Park Avenue, 17th Floor, New York, New York, 10022. According to public records, FIWA 1049 Realty purchased 305 East 47th Street, Suite 1A, New York, NY 10017, the location of Fifth Avenue ASC), on or about September 26, 2019. Public records identify Kogan as the managing member of FIWA 1049 Realty. On information and belief, FIWA 1049 Realty is owned by one or more of the Controllers. On information and belief, pursuant to the scheme to defraud as alleged herein, FIWA 1049 Realty is being used to conceal the full extent of the Controllers' ownership and control over Fifth Avenue ASC, to funnel proceeds from Fifth Avenue ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

333.    Defendant FLBD Management LLC ("FLBD Management") was organized on or about August 16, 2016 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey with its principal place of business located at 444 Market Street, Saddlebrook, New Jersey 07663. At all relevant times herein, FLBD Management has been owned and controlled by Tylman and Kogan. Manalapan ASC, Jersey City ASC, and Saddlebrook ASC represented to NJDOH records that FLBD Management was owned solely by Tylman and Kogan. According to its certificate of formation filed by Tylman with NJDOT, Kogan, and Tylman

are the sole members/managers of FLBD Management. Public records indicate that, since approximately May 2017, FLBD Management has had approximately an 85.07 percent ownership interest in Manalapan ASC and FLBD Management continues to have an ownership interest in Manalapan ASC; since approximately February of 2017, FLBD Management has had approximately a 22.19 percent ownership interest in Saddlebrook ASC and FLBD Management continues to have an ownership interest in Saddlebrook ASC; and since approximately 2018, FLBD Management has had approximately a 27 to 38 percent ownership interest in Jersey City ASC and FLBD Management continues to have an ownership interest in Jersey City ASC. Defendant FLBD Management transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

334.    Defendant Four D Investments Inc ("Four D Investments Inc") was incorporated on or about May 2, 2018 and purports to be a foreign corporation authorized to do business in the State of New Jersey, with its principal place of business located at 444 Market Street, Saddlebrook, New Jersey 07663. At all relevant times herein, Four D Investments Inc has been owned and controlled by Degradi. According to its corporate filings with NJDOT, Degradi was the sole director and registered agent for Four D Investments Inc. Since approximately May 2018, Four D Investments Inc has had approximately a 9.69 percent ownership interest in Saddlebrook ASC and approximately a 14 to 23 percent ownership interest in Jersey City ASC, and Four D Investments Inc continues to have ownership interests in Saddlebrook ASC and Jersey City ASC. Defendant

Four D Investments Inc transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

335. Defendant Four D Investments LLC ("Four D Investments LLC") was organized on or about August 10, 2016 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 444 Market Street, Saddlebrook, New Jersey, 07663, until its dissolution on or about May 2, 2018. At all relevant times herein, Four D Investments LLC has been owned and controlled by Degradi. Saddlebrook ASC and Jersey City ASC represented to NJDOH that Degradi was the sole owner of Four D Investments LLC. According to corporate filings with NJDOT, Degradi was the sole director and registered agent for Four D Investments LLC. Public records indicate that, since approximately February of 2017, Four D Investments LLC has had approximately a 9.69 percent ownership interest in Saddlebrook ASC and Four D Investments LLC continues to have an ownership interest in Saddlebrook ASC, despite its dissolution on or about May 2, 2018; and since about 2018, Four D Investments LLC has had approximately a 14 to 23 percent ownership interest in Jersey City ASC and Four D Investments LLC continues to have an ownership interest in Jersey City ASC, despite its dissolution on or about May 2, 2018. Defendant Four D Investments LLC transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause

to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

336. Defendant Gesheft Associates LLC ("Gesheft Associates") was organized on or about January 12, 2018 and purports to be a limited liability company authorized to do business in the State of New York, with its principal place of business located at 80-02 Kew Gardens Road, 5th Floor, Kew Gardens, New York 11415. At all relevant times herein, Gesheft Associates has been owned and controlled by Berkowitz. New Horizon ASC and Rockland and Bergen ASC represented to NJDOH that Gesheft Associates was owned solely by Berkowitz. Public records indicate that, since sometime after August 2017, Gesheft Associates has had approximately a 14.496 to 25 percent ownership interest in Jersey City ASC and Gesheft Associates continues to have an ownership interest in Jersey City ASC; since approximately 2022, Gesheft Associates had approximately a 3.4775 percent ownership interest in Rockland and Bergen ASC through Surgicore RBSC and Gesheft Associates continues to have an ownership interest through Surgicore RBSC in Rockland and Bergen ASC; and since sometime after March 2017 and prior to November 2024, Gesheft Associates has had approximately a 0.9 to 3.1 percent ownership interest in Fifth Avenue ASC and Gesheft Associates continues to have an ownership interest in Fifth Avenue ASC.

337. Defendant HDS Investments, LLC ("HDS Investments") was formed on or about February 17, 2011, and is purported to be a domestic limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 680 Broadway, Paterson, New Jersey 07514. According to public records, HDS Investments purchased 680 Broadway, Unit 1U, Paterson, New Jersey, the location of New Horizon ASC, on or about January

23, 2018. Public records identify Hatami, Degradi, Kogan, Tylman, and R. Seldes as member/managers of HDS Investments. At all relevant times herein, HDS Investments has been owned and controlled by the Controllers. On information and belief, pursuant to the scheme to defraud as alleged herein, HDS Investments is being used to conceal the full extent of the Controllers' ownership and control over New Horizon ASC, to funnel proceeds from New Horizon ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services. Defendant HDS Investments transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

338.    Defendant Health Plus Management, LLC, formerly known as ACC Intermediate Holding Company I, LLC ("Health Plus Management") was formed on or about March 23, 2007, and purports to be a foreign limited liability company authorized to do business in the States of Delaware and New York, with its principal place of business located at 50 Charles Lindbergh Boulevard, Uniondale, New York 11553. According to public records, Stuart Blumberg, is Health Plus Management's president and CEO, Rubin, is its chief marketing officer, Salvatore Passanisi is its current director of property management and Gary Klein is or was its vice president of site operations and S. Passanisi is its vice president of site operations. On information and belief, one or more of the Controllers entered into a sham "investor" referral/kickback arrangements with the Health Plus Defendants (as defined herein), which includes Health Plus Management, by

which one or more of the Health Plus Defendants were provided with "investment" interests in Saddlebrook ASC, Jersey City, All City ASC, Empire State ASC, and North Queens ASC, in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. Pursuant to the Health Plus Defendants' direct or indirect "investment" interests in Saddlebrook ASC, Jersey City ASC, All City ASC, Empire State ASC, and/or North Queens ASC issued regular payments to or for the benefit of the Health Plus Defendants, which, in fact, were illegal kickbacks for referrals.

339. Defendant Kostanian Consulting Associates Inc ("Kostanian Consulting Associates") was incorporated on or about April 8, 2013 and purports to be a corporation authorized to do business in the State of New York, with its principal place of business located at 246 Broadway, Newburgh, New York 12550. At all relevant times herein, Kostanian Consulting Associates was owned and controlled by Arthur Kostanian. Jersey City ASC and Rockland and Bergen ASC reported that Kostanian Consulting Associates was solely owned by Denevich. According to its corporate filings with NYDOS, Kostanian Consulting Associates was incorporated by Kostanian and reported Kostanian as its sole officer/director. Public records indicate that, since approximately November 2022, Kostanian Consulting Associates has had approximately a 0.63 percent ownership interest in New Horizon ASC and Kostanian Consulting Associates continues to have an ownership interest in New Horizon ASC; since approximately December 2022, Kostanian Consulting Associates had approximately a 0.935 percent ownership interest in Jersey City ASC and Kostanian Consulting Associates continues to have an ownership interest in Jersey City ASC; and since approximately April 2023, Kostanian Consulting Associates has had approximately a 2.5629 percent ownership interest in Rockland and Bergen ASC and

Kostanian Consulting Associates continues to have an ownership interest in Rockland and Bergen ASC.

340.    Defendant Main Street Medical Management Inc. ("Main Street Medical") was incorporated on or about July 1, 1997 and purports to be a corporation authorized to do business in the State of New York, with its principal place of business located at 239 East Main Street, Patchogue, New York 11772. At all relevant times herein, Main Street Medical has been owned and controlled by Degradi. New Horizon ASC represented to NJDOH that Degradi was the sole owner of Main Street Medical. According to its corporate filings, Degradi was the sole president, owner and officer of Main Street Medical with the exception of 2013, when Kristen Degradi (identified therein by her alternate name, Kristen Laird) was also identified as a co-president with Degradi. Public records indicate that, since approximately October of 2015, Main Street Medical has had approximately a 7.74 to 25 percent ownership interest in New Horizon ASC and Main Street Medical continues to have an ownership interest in New Horizon ASC.

341.    Defendant MEDA Management, LLC ("MEDA Management") was organized on or about April 21, 2017 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at Princeton South Corporate Center, Suite 160, 100 Charles Ewing Blvd., Ewing, New Jersey 08628. At all relevant times herein, MEDA Management has been owned and controlled by Blumberg. Jersey City ASC represented to NJDOH that MEDA Management was owned solely by Blumberg. Public records indicate that, since approximately August of 2017, MEDA Management has had approximately a 1.87 percent ownership interest in Jersey City ASC and MEDA Management continues to have an ownership interest in Jersey City ASC. Defendant MEDA Management transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme

described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

342. Defendant Mega Group Solution, Inc. ("Mega Group Solution") was incorporated on or about August 18, 2020 and purports to be a foreign corporation authorized to do business in the State of New Jersey with its registered address located at 2667 Coney Island Avenue, Suite 2, Brooklyn, New York 11223. At all relevant times herein, Mega Group Solution has been owned on paper by Yura Yaguda. Fifth Avenue ASC represented to NYDOH that Mega Group Solution was owned solely by Yaguda. According to its corporate filings, Mega Group Solution was incorporated by Yaguda. Public records indicate that, since approximately 2022, Mega Group Solution has had approximately a 0.999 percent ownership interest in Empire State ASC and Mega Group Solution continues to have an ownership interest in Empire State ASC. Since approximately November of 2024, Mega Group Solution has had approximately a 1.3 to 2.3 percent ownership interest of Fifth Avenue ASC and continues to have ownership interests in Fifth Avenue ASC. At all relevant times herein, Yaguda was a nominal or straw owner of Mega Group Solution, which was actually owned and/or controlled by one or more of the John Does 2 through 20. Defendant Mega Group Solution transacted business in New York State, including but not limited to participating and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of

the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

343.    Defendant MEH Investments Inc ("MEH Investments") was incorporated on or about May 2, 2018 and purports to be a foreign corporation authorized to do business in the State of New Jersey with its principal place of business located at 444 Market Street, Saddlebrook, New Jersey 07663. At all relevant times herein, MEH Investments has been owned on paper by M. Hatami. Saddlebrook ASC and Jersey City ASC represented to NJDOH that MEH Investments was owned solely by M. Hatami. According to corporate filings, M. Hatami is the only member of MEH Investments' board of directors. Public records indicate that, since approximately February 2017, MEH Investments has had approximately a 9.69 percent ownership interest in Saddlebrook ASC and MEH Investments continues to have an ownership interest in Saddlebrook ASC; and since approximately 2018, MEH Investments has had approximately a 7.143 percent ownership interest in Jersey City ASC and MEH Investments continues to have an ownership interest in Jersey City ASC. At all relevant times herein, M. Hatami was a nominal or straw owner of MEH Investments, which was actually owned and/or controlled by Hatami. Defendant MEH Investments transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

344.    Defendant MK Med Invest LLC ("MK Med Invest") was organized on or about February 25, 2022 and purports to be a limited liability company authorized to do business in the

State of New York, with its principal place of business located at 7009 Austin Street Suite 204, Forest Hills, New York 11375. At all relevant times herein MK Med Invest has been owned on paper by Marina Keyserman. According to the articles of organization filed with NYDOS, MK Med Invest was organized by Keyserman. Public records indicate that, since approximately November 2022, MK Med Invest has had approximately a 1.89 to 1.95 percent ownership interest in New Horizon ASC and MK Med Invest continues to have an ownership interest in New Horizon ASC; since approximately March 2022, MK Med Invest has had approximately a 2.25 percent ownership interest in Saddlebrook ASC and MK Med Invest continues to have an ownership interest in Saddlebrook ASC; and since approximately February 2022, MK Med Invest has had approximately a 0.935 percent ownership interest in Jersey City ASC and MK Med Invest continues to have an ownership interest in Jersey City ASC. At all relevant times herein, Keyserman was a nominal or straw owner of MK Med Invest, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

345.    Defendant Midtown 305 Realty, LLC ("Midtown 305 Realty") was formed on or about June 10, 2019, and is purported to be a domestic limited liability company authorized to do business in the State of New York, with its principal place of business located at 505 Park Avenue, 17th Floor, New York, New York, 10022. According to public records, Midtown 305 Realty purchased 305 East 47th Street, Unit Nos. 1-B, C, B-8, B-2 and B-3, New York, New York 10017, the location of Fifth Avenue ASC (Midtown Extension), on or about September 27, 2019. At all relevant times, Midtown 305 Realty has been owned and controlled by one or more of the Controllers. Public records identify Kogan as the chief executive officer and member of Midtown 305 Realty and Hatami as its managing member. On information and belief, Midtown 305 Realty is being used to conceal the full extent of the Controllers' ownership and control over Fifth Avenue

ASC, to funnel proceeds from Fifth Avenue ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

346. Defendant Ortuz LLC ("Ortuz") was organized on or about January 19, 2007 and purports to be a foreign limited liability company authorized to do business in the States of Delaware and New Jersey, with its principal place of business located at 160 West 66th Street, Suite 34G, New York, New York 10023. At all relevant times herein, Ortuz has been owned and controlled by Tylman. On March 15, 2018, Ortuz filed a certificate of registration as a foreign business with the NJDOT identifying Tylman as a general partner, and on September 18, 2019, Tylman filed a certificate of revival for Ortuz with the DSDC. In UCC financing statements filed with the DSDC on November 18, 2019, Ortuz was identified as having an ownership interest in ASAR Healthcare. Public records indicate that, since at least as early as November 2019, Ortuz has had an ownership interest in New Horizon ASC through ASAR Healthcare (the percentage of which is presently unknown to Plaintiff) and Ortuz continues to have an ownership interest in New Horizon ASC through ASAR Healthcare.

347. Defendant Redy Ventures LLC ("Redy Ventures") was organized on or about June 1, 2020 and purports to be a limited liability company authorized to do business in the States of New Jersey and New York, with its principal place of business located at 65-24 Ellwell Crescent, Rego Park, New York 11374. At all relevant times herein, Redy Ventures has been owned and controlled by Jacob Katanov. Rockland and Bergen ASC represented to NJDOH in 2022 that Redy Ventures is solely owned by J. Katanov. Public records indicate that, since approximately January 2022, Redy Ventures has had approximately a 1.89 to 2.09 percent ownership interest in New Horizon ASC and Redy Ventures continues to have an ownership interest in New Horizon ASC;

since approximately July 2020, Redy Ventures has had approximately a 0.61 percent ownership interest in Saddlebrook ASC and Redy Ventures continues to have an ownership interest in Saddlebrook ASC; since approximately June 2020, Redy Ventures has had approximately a 2.806 percent ownership interest in Jersey City ASC and Redy Ventures continues to have an ownership interest in Jersey City ASC; and since approximately 2021, Redy Ventures has had approximately a 2.6161 percent ownership interest in Rockland and Bergen ASC and Redy Ventures continues to have an ownership interest in Rockland and Bergen ASC.

348.    Defendant SignMe, LLC ("SignMe") was organized on December 29, 2021 and purports to be a limited liability company authorized to do business in the State of New York with its principal place of business located at 6524 Ellwell Cress, Rego Park, New York 11374. At all relevant times herein, SignMe has been owned on paper by Svetlana Katanov. Fifth Avenue ASC represented to NYDOH that SignMe was owned solely by S. Katanov. According to its corporate filings, S. Katanov was the organizer of SignMe. Since approximately November 2024, SignMe has had approximately a 3.4 to 6.2 percent ownership interest in Fifth Avenue ASC and continues to have an ownership interest in Fifth Avenue ASC.

349.    Defendant SJ2 Ventures ("SJ2 Ventures") was organized on or about April 21, 2017 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at Princeton South Corporate Ctr, Ste 160, 100 Charles Ewing Blvd, Ewing, New Jersey 08628. At all relevant times herein, SJ2 Ventures has been owned and controlled by Blumberg. Jersey City ASC represented to NJDOH that SJ2 Ventures was owned solely by Blumberg. Public records indicate that, since approximately August 2017, SJ2 Ventures has had approximately a 0.935 percent ownership interest in Jersey City ASC and SJ2 Ventures continues to have an ownership interest in Jersey City ASC. Defendant SJ2

Ventures transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

350.    Defendant Surgicore 5th Avenue LLC ("Surgicore 5th Avenue") was organized on or about October 26, 2016 and purports to be a limited liability company authorized to do business in the State of New York, with its registered address located at 1049 Fifth Avenue, New York, New York 10028. At all relevant times herein, Surgicore 5th Avenue has been owned and controlled by the Controllers. According to public records, each of the Controllers had a 25 percent ownership interest in Surgicore 5th Avenue as its members/managers. Public records indicate that, since approximately December 2017, Surgicore 5th Avenue has had approximately a 60 percent ownership interest in Fifth Avenue ASC, since approximately November 2019 Surgicore 5th Avenue has had approximately a 70 percent ownership interest in Empire State ASC, and since approximately November 2019, Surgicore 5th Avenue has had approximately a 75 percent ownership interests in North Queens ASC, and Surgicore 5th Avenue continues to have ownership interests in Fifth Avenue ASC, Empire State ASC and North Queens ASC.

351.    Defendant Surgicore RBSC, LLC ("Surgicore RBSC") was organized on or about December 13, 2019 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 133 N. Kinderkamack Road, Montvale, New Jersey 07645. At all relevant times herein, Surgicore RBSC has been owned on paper by Degradi, Tylman, Kogan, and M. Hatami. According to its articles of organization,

Degradi and Kogan are Surgicore RBSC's sole members/managers. In March of 2020, Rockland and Bergen ASC represented to NJDOH that Surgicore RBSC was owned equally by Degradi, Tylman, Kogan, and M. Hatami. Rockland and Bergen ASC represented to NJDOH that in or around 2021, Degradi, Tylman, and M. Hatami collectively sold 3.62 percent of their ownership interests in Surgicore RBSC to Redy Ventures. In or around 2022, Degradi, Tylman, Kogan, and M. Hatami collectively sold 4.812 percent of their ownership interests in Surgicore RBSC to Gesheft Associates. Public records indicate that, since approximately March 2020, Surgicore RBSC has had approximately a 66.1742 to 94.413 percent ownership interest in Rockland and Bergen ASC and Surgicore RBSC continues to have an ownership interest in Rockland and Bergen ASC. At all relevant times herein, M. Hatami was a nominal or straw owner for Hatami, who was the actual owner of M. Hatami's ownership interest in Surgicore RBSC. Defendant Surgicore RBSC transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

352.    Defendant YCentury LLC ("YCentury") was organized on or about January 19, 2018 and purports to be a foreign limited liability company authorized to do business in the State of New Jersey, with its principal place of business located at 547 Asbury Street, New Milford, New Jersey 07646. At all relevant times herein, YCentury has been owned on paper by Yaguda. New Horizon ASC, Saddlebrook ASC, Jersey City ASC, and Rockland and Bergen ASC represented to NJDOH that Yaguda was the sole owner of YCentury. According to its corporate

160

filings, YCentury was formed by Yaguda who was also listed as its sole member/manager. Public records indicate that, between approximately March 2018 and January 2022, YCentury had approximately a 1.17 to 1.27 percent ownership interest in New Horizon ASC, approximately a 2.33 percent ownership interest in Saddlebrook ASC, and approximately a 3 percent ownership interest in Jersey City ASC; and since approximately March 2021, YCentury has had approximately a 4.2866 to 5 percent ownership interest in Rockland and Bergen ASC and YCentury continues to have an ownership interest in Rockland and Bergen ASC. At all relevant times herein, Yaguda was a nominal or straw owner for one or more of the John Does 2 through 20, who were the actual owners of YCentury. Defendant YCentury transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

353. Defendant Jonathan Arredondo-Calle ("Arredondo-Calle") is a natural person residing in the State of New York. According to public records, Arredondo-Calle is the president and CEO of YJH Marketing Consultants, LLC and the founder of MedLegal HQ (not named as defendants herein), two consulting companies that advertise referral services for legal and medical services and/or patients. In, 2019, Arredondo-Calle was charged with second-degree theft by unlawful taking by the Essex County prosecutor's office in New Jersey for stealing more than $75,000 from the Nutley Volunteer Emergency and Rescue Squad. On December 5, 2022, he was sentenced to probation for four years. Public record indicate that, since sometime after January of

2019, Arredondo-Calle has had ownership interests in North Queens ASC (the percentage of which is presently unknown to Plaintiff) and Arredondo-Calle continues to have an ownership interest in North Queens ASC. At all relevant times herein, Arredondo-Calle facilitated the scheme to defraud by engaging in the referral/kickback scheme between one or more of the Controllers, through North Queens ASC, as alleged herein.

354. Defendant Stuart Blumberg ("Blumberg") is a natural person residing in the State of New York, and is one of the Health Plus Defendants (as defined herein). According to its website, Blumberg has been Health Plus Management's president and CEO since at least 2017. At all relevant times herein, MEDA Management and SJ2 Ventures have been owned and controlled by one or more of the Health Plus Defendants including Blumberg. Public records and/or records produced by All City ASC indicate that, since approximately November 2017, Blumberg has had approximately a 7.22 percent ownership interest in All City ASC, as a voting shareholder and Blumberg continues to have ownership interests in All City ASC as a voting shareholder; since approximately 2023, Blumberg has had ownership interests in Empire State ASC (the percentage of which is presently unknown to Plaintiff) and Blumberg continues to have ownership interests in Empire State ASC; and since approximately 2019, Blumberg has had ownership interests in North Queens ASC (the percentage of which is presently unknown to Plaintiff) and Blumberg continues to have an ownership interest in North Queens ASC. Public records indicate that Blumberg also had ownership interests in Jersey City ASC through MEDA Management and/or SJ2 Ventures and Blumberg continues to have ownership interests in Jersey City ASC through MEDA Management and/or SJ2 Ventures. At all relevant times herein, Blumberg facilitated the scheme to defraud by engaging in the referral/kickback scheme between one or more of the Controllers, through All City ASC, Empire State ASC, North Queens ASC, and/or Jersey City

ASC, including through MEDA Management and/or SJ2 Ventures, and one or more of the Health Plus Defendants, as alleged herein.

355.     Defendant Amanda Chavez ("Chavez") is a natural person residing in the State of New Jersey. According to public records, Chavez is related to and/or otherwise closely associated with Romero and Ramirez, including through joint corporate ownership and real estate transactions, and is closely associated with Randolph, Esq., including through one or more of the Surgicore ASCs and multiple real estate transactions. According to New Horizon ASC's corporate filings, between 2010 to 2019, Chavez was an officer/director of New Horizon ASC. At all relevant times herein, ASC Investment Services has been owned on paper by Chavez and/or Ramirez. Public records indicate that Chavez had ownership interests in New Horizon ASC and Saddlebrook ASC through ASC Investment Services and Chavez continues to have ownership interests in New Horizon ASC and Saddlebrook ASC through ASC Investment Services. At all relevant times herein, Chavez was a nominal or straw owner of ASC Investment Services, which was actually owned and/or controlled by Romero and/or one or more of the John Does 2 through 20. At all relevant times, Chavez was a straw officer/director of New Horizon ASC for Romero, who was the actual officer/director for New Horizon ASC. At all relevant times mentioned herein, Chavez facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including New Horizon ASC and Saddlebrook ASC, in order to conceal Romero and/or one or more of the John Does 2 through 20's ownership interests in and/or control over New Horizon ASC and Saddlebrook ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC and/or Saddlebrook ASC, and Romero and/or one or more of the John Does 2 through 20, as alleged herein. Defendant Chavez transacted business in New York State, including but not limited to participating in and/or

facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

356. Defendant Kristen Degradi a/k/a Kristen Laird ("K. Degradi") is a natural person residing in the State of Florida. According to public records, K. Degradi is Degradi's wife. Public records indicate that, since approximately November 2017, K. Degradi has had ownership interests in All City ASC and K. Degradi continues to have ownership interests in All City ASC. Records produced by All City ASC indicate that, since approximately November 2017, K. Degradi has had approximately a 6.367 percent ownership interest in All City ASC and K. Degradi continues to have ownership interests in All City ASC. At all relevant times herein, K. Degradi facilitated the scheme to defraud by serving as a straw owner of one or more of the Surgicore ASCs, including All City ASC, in order to conceal the full extent of Degradi's ownership interests in and/or control over All City ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through All City ASC, and Degradi, as alleged herein.

357. Defendant Sergey Denevich ("Denevich") is a natural person residing in the State of New York. Kostanian and Denevich have a well-documented history of engaging in schemes to defraud insurance companies, including by unlawfully owning and operating medical PCs through which they submitted bills for fraudulent and/or medically unnecessary services. Public records indicate that, prior to August 2015, Denevich had approximately a 0.5 to 1.74 percent ownership interest in New Horizon ASC. At all relevant times herein, Conte De Fees has been owned and controlled by Denevich. At all relevant times, Fiaba was owned and controlled by Denevich, public

records indicate that Denevich also had ownership interests in New Horizon ASC, Jersey City ASC, and Rockland and Bergen ASC through Conte De Fees and/or Fiaba and Denevich continues to have ownership interests in New Horizon ASC, Jersey City ASC, and Rockland and Bergen ASC through Conte De Fees and/or Fiaba. At all relevant times mentioned herein, Denevich facilitated the scheme to defraud by engaging in the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, Jersey City ASC, and/or Rockland and Bergen ASC, as alleged herein.

358.    Defendant Harris Hafeez, M.D. ("Hafeez") is a natural person residing in the State of New Jersey. At all relevant times herein, Advanced PMR has been owned on paper by Hafeez and/or Reizis. Public records indicate that, between approximately August 2019 and June 2021, either Advanced PMR or its principals, Hafeez and Reizis, had ownership interests Manalapan ASC. At all relevant times herein, Hafeez and Reizis were nominal or straw owners of Advanced PMR, which was actually owned and/or controlled by one or more of the Health Plus Defendants. At all relevant times herein, Hafeez and Reizis were nominal or straw owners for the Health Plus Defendants, who were the actual owners of Hafeez and Reizis's ownership interests in Manalapan ASC. At all relevant times herein, Hafeez facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including Manalapan ASC, in order to conceal the Health Plus Defendants' ownership interests in and/or control over Manalapan ASC and to conceal the referral/kickback scheme between one or more of the Controllers, through Manalapan ASC, and the Health Plus Defendants as alleged herein. Defendant Hafeez transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause

to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

359. Defendant Mary Hatami ("M. Hatami") is a natural person residing in the State of New York. According to public records, M. Hatami is Hatami's wife. According to public records, in or about 2017, M. Hatami became the "treasurer" of New Horizon ASC. At all relevant times herein, BDP Ventures LLC and BDP Ventures Inc. have been owned on paper by M. Hatami and/or Hatami. At all relevant times herein, MEH Investments has been owned on paper by M. Hatami. At all relevant times herein, M. Hatami has been an owner on paper of Surgicore RBSC. Public records indicate that M. Hatami had ownership interests in New Horizon ASC, Saddlebrook ASC, Jersey City ASC, Rockland and Bergen ASC, All City ASC and Fifth Avenue ASC, through BDP Ventures LLC, BDP Ventures Inc., MEH Investments, and/or Surgicore RBSC and M. Hatami continues to have ownership interests in New Horizon ASC, Saddlebrook, Jersey City ASC, and Rockland and Bergen ASC through BDP Ventures LLC, BDP Ventures Inc., MEH Investments, and/or Surgicore RBSC. At all relevant times herein, M. Hatami was a nominal or straw owner of BDP Ventures LLC, BDP Ventures Inc. and MEH Investments, which were actually owned and/or controlled by Hatami. At all relevant times herein, M. Hatami was a nominal or straw owner for Hatami, who was the actual owner of M. Hatami's ownership interest in Surgicore RBSC. Records produced by All City ASC indicate that, since approximately November 2017, M. Hatami has had approximately a 6.367 percent ownership interest in All City ASC and M. Hatami continues to have ownership interests in All City ASC. At all relevant times mentioned herein, M. Hatami facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including New Horizon ASC, Saddlebrook

ASC, Jersey City ASC, Rockland and Bergen ASC, All City ASC, and Fifth Avenue ASC, in order to conceal Hatami's ownership interests in and/or control over New Horizon ASC, Saddlebrook ASC, Jersey City ASC, Rockland and Bergen ASC, All City ASC, and Fifth Avenue ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, Saddlebrook ASC, Jersey City ASC, Rockland and Bergen ASC, All City ASC, and/or Fifth Avenue ASC, and Hatami, as alleged herein.

360.    Defendant Svetlana Katanov, D.O. ("S. Katanov") is a natural person residing in the State of New York and was licensed to practice optometry in the State of New York on or about July 7, 2000 under license number 006255. According to public records, S. Katanov is Katanov's wife. Public records and/or records produced by All City ASC indicate that, since approximately 2012, S. Katanov had approximately a 2.05 percent ownership interest in New Horizon ASC and S. Katanov continues to have an ownership interest in New Horizon ASC; and since approximately June of 2020, S. Katanov had approximately 0.768 percent ownership interest in All City ASC and S. Katanov continues to have an ownership interest in All City ASC. Public records from November 2024 indicate that S. Katanov, is also a proposed owner of Fifth Avenue ASC, through a company that she purportedly solely owns, SignMe and S. Katanov is a current owner of Fifth Avenue ASC through SignMe. At all relevant times herein, S. Katanov was a nominal or straw owner of SignMe, which was actually owned and/or controlled by J. Katanov. At all relevant times mentioned herein, S. Katanov facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including New Horizon ASC and All City ASC, in order to conceal J. Katanov's ownership interests in New Horizon ASC and All City ASC, and to conceal the referral/kickback scheme between one or more

of the Controllers, through New Horizon ASC and/or All City ASC, and J. Katanov, as alleged herein.

361.     Defendant Jacob Katanov, P.A. ("J. Katanov") is a natural person residing in the State of New York and was licensed as a physician assistant in the State of New York on or about December 15, 2020 under license number 007935. According to public records, J. Katanov is S. Katanov's husband. At all relevant times herein, Redy Ventures has been owned and controlled by J. Katanov. Public records indicate that, between approximately 2018 and 2020, J. Katanov had approximately a 0.91 to 1.08 percent ownership interest in Saddlebrook ASC. Public records indicate that J. Katanov had ownership interests in New Horizon ASC, Saddlebrook ASC, Jersey City ASC, and Rockland and Bergen ASC through Redy Ventures and Surgicore RBSC and J. Katanov continues to have ownership interests in New Horizon ASC, Saddlebrook ASC, Jersey City ASC, and Rockland and Bergen ASC through Redy Ventures and Surgicore RBSC. At all relevant times mentioned herein, J. Katanov facilitated the scheme to defraud by engaging in the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, Saddlebrook ASC, Jersey City ASC, Rockland and Bergen ASC, All City ASC, Fifth Avenue ASC, and Rockaways ASC, as alleged herein.

362.     Defendant Marina Keyserman ("Keyserman") is a natural person residing in the State of New York. According to public records, Yaguda, Keyserman, Shakarov, and Yadgarov are associated with 7009 Austin Street and are related to and/or otherwise closely associated with the owners of several DME companies that operated from 7009 Austin and were sued for civil RICO violations and insurance fraud. At all relevant times herein, MK Med Invest has been owned on paper by Keyserman. Public records indicate that Keyserman had ownership interests in New Horizon ASC, Saddlebrook ASC, and Jersey City ASC through MK Med Invest and Keyserman

continues to have ownership interests in New Horizon ASC, Saddlebrook ASC, and Jersey City ASC through MK Med Invest. At all relevant times herein, Keyserman was a nominal or straw owner of MK Med Invest, which was actually owned and/or controlled by one or more of the John Does 2 through 20. At all relevant times mentioned herein, Keyserman facilitated the scheme to defraud by serving as a straw owner of one or more of the Surgicore ASCs, including New Horizon ASC, Saddlebrook ASC, and Jersey City ASC, in order to conceal one or more of the John Does 2 through 20's ownership interests in New Horizon ASC, Saddlebrook ASC, and Jersey City ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, Saddlebrook ASC, and/or Jersey City ASC, and one or more of the John Does 2 through 20, as alleged herein.

363.    Defendant Gary Klein ("Klein") is a natural person residing in the State of New York and is one of the Health Plus Defendants (as defined herein). According to public records, Klein was the vice president of site operations, for Health Plus Management Services L.L.C. Public records and/or records produced by All City ASC indicate that, since approximately November 2017, Klein has had approximately a 0.808 percent ownership interest in All City ASC and Klein continues to have ownership interests in All City ASC; since approximately 2023, Klein has had ownership interests in Empire State ASC (the percentage of which is presently unknown to Plaintiff) and Klein continues to have ownership interests in Empire State ASC; and since sometime after January 2019, Klein has had ownership interests in North Queens ASC (the percentage of which is presently unknown to Plaintiff) and Klein continues to have ownership interests in North Queens ASC. At all relevant times mentioned herein, Klein facilitated the scheme to defraud by engaging in the referral/kickback scheme between one or more of the

Controllers, through All City ASC, Empire State ASC, and/or North Queens ASC, and one or more of the Health Plus Defendants, as alleged herein.

364.    Defendant Beata Kogan ("B. Kogan") is a natural person residing in the State of New York. According to public records, B. Kogan is F. Kogan's wife. According to New Horizon ASC's corporate filings, between 2017 and 2022, B. Kogan served as the "secretary" of New Horizon ASC. At all relevant times herein, ASAR Healthcare has been owned on paper by B. Kogan, Revutsky, and/or Tylman. Records produced by All City ASC indicate that, since approximately November of 2017, B. Kogan has had approximately a 6.367 percent ownership interest in All City ASC and B. Kogan continues to have an ownership interest in All City ASC. Public records indicate that B. Kogan also had ownership interests in New Horizon ASC through ASAR Healthcare and B. Kogan continues to have ownership interests in New Horizon ASC through ASAR Healthcare. At all relevant times herein, B. Kogan was a nominal or straw owner of ASAR Healthcare, which was actually owned and/or controlled by Tylman, including through Ortuz and/or Kogan. At all relevant times, B. Kogan was a straw officer/director of New Horizon ASC for Kogan, who was the actual officer/director for New Horizon ASC. At all relevant times mentioned herein, B. Kogan facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including New Horizon ASC and All City ASC, in order to conceal Kogan's ownership interests in and/or control over New Horizon ASC and All City ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC and/or All City ASC, and Kogan, as alleged herein.

365.    Defendant Arthur Kostanian ("Kostanian") is a natural person residing in the State of New Jersey. Kostanian and Denevich have a well-documented history of engaging in schemes to defraud insurance companies, including by unlawfully owning and operating medical PCs

through which they submitted bills for fraudulent and/or medically unnecessary services. At all relevant times herein, Kostanian Consulting Associates has been owned and controlled by Kostanian. Public records indicate that Kostanian had ownership interests in New Horizon ASC, Jersey City ASC, and Rockland and Bergen ASC through Kostanian Consulting Associates and Kostanian continues to have ownership interests in New Horizon ASC, Jersey City ASC, and Rockland and Bergen ASC through Consulting Associates. At all relevant times mentioned herein, Kostanian facilitated the scheme to defraud by engaging in the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, Jersey City ASC, and/or Rockland and Bergen ASC, as alleged herein. Defendant Kostanian transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

366. Defendant Lisa Passanisi ("L. Passanisi") is a natural person residing in the State of New York and is one of the Health Plus Defendants (as defined herein). On information and belief, L. Passanisi is or was an employee of Health Plus Management and/or is otherwise associated with Health Plus Management. Records produced by All City ASC indicate that, since approximately November 2017, L. Passanisi has had approximately a 2.019 percent ownership interest in All City ASC and L. Passanisi continues to have an ownership interest in All City ASC. At all relevant times mentioned herein, L. Passanisi facilitated the scheme to defraud by engaging

in the referral/kickback scheme between one or more of the Controllers, through All City ASC, and one or more of the Health Plus Defendants, as alleged herein.

367. Defendant Salvatore Passanisi ("S. Passanisi") is a natural person residing in the State of New York and is one of the Health Plus Defendants (as defined herein). On information and belief, S. Passanisi is or was an employee of Health Plus Management and/or is otherwise associated with Health Plus Management. Public records and/or records produced by All City ASC indicate that, since approximately November 2017, S. Passanisi has had approximately a 0.808 percent ownership interest in All City ASC and S. Passanisi continues to have an ownership interest in All City ASC; and since at least approximately 2023, S. Passanisi has had an ownership interest (the percentage of which is presently unknown to Plaintiff) in Empire State ASC and S. Passanisi continues to have an ownership interest in Empire State ASC; and since sometime after January of 2019, S. Passanisi has had an ownership interest (the percentage of which is presently unknown to Plaintiff) in North Queens ASC and S. Passanisi continues to have an ownership interest in North Queens ASC. At all relevant times mentioned herein, S. Passanisi facilitated the scheme to defraud by engaging in the referral/kickback scheme between one or more of the Controllers, through All City ASC, and one or more of the Health Plus Defendants, as alleged herein.

368. Defendant Sharen Pyatetskaya ("Pyatetskaya") is a natural person residing in the State of New York. On information and belief, Pyatetskaya is an immediate family member or spouse of, and/or otherwise closely associated with, Tylman. Records produced by All City ASC indicate that, since approximately December 2020, Pyatetskaya has had approximately a 6.367 percent ownership interest in All City ASC and Pyatetskaya continues to have an ownership interest in All City ASC. At all relevant times herein, Pyatetskaya facilitated the scheme to defraud

by serving as a straw owner of one or more of the Surgicore ASCs, including All City ASC, in order to conceal Tylman's ownership interests in and/or control over All City ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through All City ASC, and Tylman, as alleged herein.

369.     Defendant Maribel Ramirez a/k/a Maribel Romero a/k/a Maribel Ramirez-Pimienta a/k/a Maribel Pimienta ("Ramirez") is a natural person residing in the State of New Jersey. According to public records, Ramirez is Romero's wife. According to public records, Ramirez is also related to and/or otherwise closely associated with Chavez, including through joint corporate ownership and real estate transactions, and is closely associated with Randolph, Esq., including through one or more of the Surgicore ASCs and multiple real estate transactions. According to New Horizon ASC's corporate filings, in or around 2019, Ramirez became an officer/director of New Horizon ASC. At all relevant times herein, ASC Investment Services has been owned on paper by Chavez and/or Ramirez. Public records indicate that Ramirez had ownership interests in New Horizon ASC and Saddlebrook ASC through ASC Investment Services and Ramirez continues to have ownership interests in New Horizon ASC and Saddlebrook ASC through ASC Investment Services. At all relevant times herein, Ramirez was a nominal or straw owner of ASC Investment Services, which was actually owned and/or controlled by Romero and/or one or more of the John Does 2 through 20. At all relevant times, Ramirez was a straw officer/director of New Horizon ASC for Romero, who was the actual officer/director for New Horizon ASC. At all relevant times mentioned herein, Ramirez facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including New Horizon ASC and Saddlebrook ASC, in order to conceal Romero and/or one or more of the John Does 2 through 20's ownership interests in and/or control over New Horizon ASC and Saddlebrook ASC,

and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC and/or Saddlebrook ASC, and Romero and/or one or more of the John Does 2 through 20, as alleged herein. Defendant Ramirez transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

370. Defendant Daniel Reizis, M.D. ("Reizis") is a natural person residing in the State of New Jersey. At all relevant times herein, Advanced PMR has been owned on paper by Reizis and/or Hafeez. Public records indicate that, between approximately August 2019 and June 2021, either Advanced PMR or its principals, Hafeez and Reizis, had ownership interests Manalapan ASC. At all relevant times herein, Hafeez and Reizis were nominal or straw owners of Advanced PMR, which was actually owned and/or controlled by one or more of the Health Plus Defendants. At all relevant times herein, Hafeez and Reizis were nominal or straw owners for the Health Plus Defendants, who were the actual owners of Hafeez and Reizis's ownership interests in Manalapan ASC. At all relevant times herein, Reizis facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including Manalapan ASC, in order to conceal the Health Plus Defendants' ownership interests in and/or control over Manalapan ASC and to conceal the referral/kickback scheme between one or more of the Controllers, through Manalapan ASC, and the Health Plus Defendants as alleged herein. Defendant Reizis transacted business in New York State, including but not limited to participating in and/or

facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

371. Defendant Alla Revutsky ("Revutsky") is a natural person residing in the State of California. On information and belief, Revutsky is Tylman's sister and/or otherwise closely associated with him. At all relevant times herein, ASAR Healthcare has been owned on paper by B. Kogan, Revutsky, and/or Tylman. According to Manalapan ASC's corporate filings, between 2015 and 2019, Revutsky was identified as an officer/director and general partner of Manalapan ASC, before she was replaced in 2020 by Tylman. Public records and/or records produced by All City ASC indicate that, between approximately February 2012 and 2015, Revutsky had approximately a 15 to 40 percent ownership interest in Manalapan ASC; and, between approximately November 2017 and December 2020, Revutsky had approximately a 6.367 percent ownership interest in All City ASC. Public records indicate that Revutsky also had an ownership interest in New Horizon ASC through ASAR Healthcare and Revutsky continues to have ownership interests in New Horizon ASC through ASAR Healthcare. At all relevant times herein, Revutsky was a nominal or straw owner of ASAR Healthcare, which was actually owned and/or controlled by Tylman, including through Ortuz and/or Kogan. At all relevant times, Revutsky was a straw officer/director of Manalapan ASC for Tylman, who was the actual officer/director for Manalapan ASC. At all relevant times herein, Revutsky facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including All City ASC, Manalapan ASC, and New Horizon ASC, in order to conceal Tylman's

ownership interests in and/or control over All City ASC, Manalapan ASC, and New Horizon ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through All City ASC, Manalapan ASC, and/or New Horizon ASC, and Tylman, as alleged herein.

372. Defendant Jeffrey Rubin ("Rubin") is a natural person residing in the State of New York, and is one of the Health Plus Defendants (as defined herein). According to its website, Rubin has been Health Plus Management's chief marketing officer, since at least 2018. At all relevant times herein, Capleo Holdings has been owned and controlled by one or more of the Health Plus Defendants including Rubin. Public records and/or records produced by All City ASC indicate that, since approximately November 2017, Rubin has had approximately a 1.615 percent ownership interest in All City ASC, as a voting shareholder and Rubin continues to have an ownership interest in All City ASC as a voting shareholder; since approximately 2023, Rubin has had ownership interests in Empire State ASC (the percentage of which is presently unknown to Plaintiff) and Rubin continues to have an ownership interest in Empire State ASC; and since sometime after January 2019, Rubin has had an ownership interest in North Queens ASC (the percentage of which is presently unknown to Plaintiff) and Rubin continues to have an ownership interest in North Queens ASC. Public records indicate that Rubin also had an ownership interest in Saddlebrook ASC through Capleo Holdings and Rubin continues to have an ownership interest in Saddlebrook ASC through Capleo Holdings. At all relevant times mentioned herein, Rubin facilitated the scheme to defraud by engaging in the referral/kickback scheme between one or more of the Controllers, through All City ASC, Empire State ASC, North Queens ASC, and/or Jersey City ASC, including through Capleo Holdings, and one or more of the Health Plus Defendants, as alleged herein.

373. Defendant Marla Seldes ("M. Seldes") is a natural person residing in the State of New Jersey. According to public records, M. Seldes is R. Seldes' wife. According to New Horizon ASC's corporate filings, M. Seldes replaced R. Seldes as an officer/director of New Horizon ASC in 2019. At all relevant times herein, Blue Wall Management has been owned on paper by R. Seldes and/or M. Seldes. Public records indicate that M. Seldes had an ownership interest in New Horizon ASC through Blue Wall Management and M. Seldes continues to have an ownership interest in New Horizon ASC through Blue Wall Management. At all relevant times herein, M. Seldes was a nominal or straw owner of Blue Wall Management, which was actually owned and/or controlled by R. Seldes. At all relevant times, M. Seldes was a straw officer/director of New Horizon ASC for R. Seldes, who was the actual officer/director for New Horizon ASC. At all relevant times herein, M. Seldes facilitated the scheme to defraud by serving as a straw owner and/or straw officer/director of one or more of the Surgicore ASCs, including New Horizon ASC, in order to conceal R. Seldes' ownership interests in and/or control over New Horizon ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, and R. Seldes, as alleged herein. Defendant M. Seldes transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

374. Defendant Albert Shakarov ("Shakarov") is a natural person residing in the State of New York. According to public records, Yaguda, Keyserman, Shakarov, and Yadgarov are

associated with 7009 Austin Street and are related to and/or otherwise closely associated with the owners of several DME companies that operated from 7009 Austin and were sued for civil RICO violations and insurance fraud. At all relevant times herein, AS Med Invest has been owned on paper by Shakarov. Public records indicate that Shakarov had ownership interests in New Horizon ASC, Saddlebrook ASC, and Jersey City ASC through AS Med Invest and Shakarov continues to have ownership interests in New Horizon ASC, Saddlebrook ASC, and Jersey City ASC through AS Med Invest. At all relevant times herein, Shakarov was a nominal or straw owner of AS Med Invest, which was actually owned and/or controlled by one or more of the John Does 2 through 20. At all relevant times mentioned herein, Shakarov facilitated the scheme to defraud by serving as a straw owner of one or more of the Surgicore ASCs, including New Horizon ASC, Saddlebrook ASC, and Jersey City ASC, in order to conceal one or more of the John Does 2 through 20's ownership interests in New Horizon ASC, Saddlebrook ASC, and Jersey City ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, Saddlebrook ASC, and/or Jersey City ASC, and one or more of the John Does 2 through 20, as alleged herein.

375. Defendant Roza Yadgarov ("Yadgarov") is a natural person residing in the State of New York. According to public records, Yaguda, Keyserman, Shakarov, and Yadgarov are associated with 7009 Austin Street and are related to and/or otherwise closely associated with the owners of several DME companies that operated from 7009 Austin and were sued for civil RICO violations and insurance fraud. At all relevant times herein, Boost HS has been owned on paper by Yadgarov. Public records indicate that Yadgarov had ownership interests in Saddlebrook ASC and Rockland and Bergen ASC through Boost HS, and Yadgarov continues to have an ownership interest in Saddlebrook ASC through Boost HS. Public records indicate that Yadgarov is also a

proposed owner of a forthcoming New York ASC, Bridge Street ASC, LLC (not named as a defendant herein), which will also be owned by one or more of the Controllers, through another company, LGL ASC Holding, LLC (not named as a defendant herein). At all relevant times herein, Yadgarov was a nominal or straw owner of Boost HS, which was actually owned and/or controlled by one or more of the John Does 2 through 20. At all relevant times mentioned herein, Yadgarov facilitated the scheme to defraud by serving as a straw owner of one or more of the Surgicore ASCs, including Saddlebrook ASC and Rockland and Bergen ASC, in order to conceal one or more of the John Does 2 through 20's ownership interests in Saddlebrook ASC and Rockland and Bergen ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through Saddlebrook ASC and/or Rockland and Bergen ASC, and one or more of the John Does 2 through 20, as alleged herein.

376.    Defendant Yura Yaguda ("Yaguda") is a natural person residing in the State of New Jersey. According to public records, Yaguda, Keyserman, Shakarov, and Yadgarov are associated with 7009 Austin Street and are related to and/or otherwise closely associated with the owners of several DME companies that operated from 7009 Austin and were sued for civil RICO violations and insurance fraud. At all relevant times herein, YCentury and Mega Group Solution have been owned on paper by Yaguda. Public records indicate that, since approximately July of 2019, Yaguda has had approximately a 1.536 percent ownership interests in All City ASC and Yaguda continues to have ownership interests in All City ASC. Public records indicate that Yaguda also had ownership interests in New Horizon ASC, Saddlebrook ASC, Rockland and Bergen ASC, Empire State ASC, and North Queens ASC through YCentury, Mega Group Solution, and/or one or more of the ABC Corporations 1 through 20, and Yaguda continues to have ownership interests in Rockland and Bergen ASC, Empire State ASC, and North Queens ASC through YCentury, Mega

Group Solution, and/or one or more of the ABC Corporations 1 through 20. Public records from November 2024 indicate that Yaguda is also a proposed owner of Fifth Avenue ASC through Mega Group Solution and, on information and belief, Yaguda is a current owner of Fifth Avenue ASC through Mega Group Solution. At all relevant times herein, Yaguda was a nominal or straw owner of YCentury, Mega Group Solution, and/or one or more of the ABC Corporations 1 through 20, which were actually owned and/or controlled by one or more of the John Does 2 through 20. At all relevant times mentioned herein, Yaguda facilitated the scheme to defraud by serving as a straw owner of one or more of the Surgicore ASCs, including New Horizon ASC, Saddlebrook ASC, Rockland and Bergen ASC, Empire State ASC, and North Queens ASC in order to conceal one or more of the John Does 2 through 20's ownership interests in New Horizon ASC, Saddlebrook ASC, Rockland and Bergen ASC, Empire State ASC, and North Queens ASC, and to conceal the referral/kickback scheme between one or more of the Controllers, through New Horizon ASC, Saddlebrook ASC, Rockland and Bergen ASC, Empire State ASC, and/or North Queens ASC, and one or more of the John Does 2 through 20, as alleged herein. Defendant Yaguda transacted business in New York State, including but not limited to participating in and/or facilitating the fraudulent scheme described herein to conceal the full extent of the Controllers' ownership and control and/or engaging in the referral/kickback scheme to steer or refer, or cause to be steered or referred, a steady stream of Covered Persons to one or more of the Surgicore ASCs, which resulted in the mailing of fraudulent insurance claims in New York State seeking reimbursement pursuant to the New York State No-Fault Law.

## X. The John Doe Defendants

377. John Doe 1 was employed by and/or associated with the Rockland and Bergen ASC Enterprise as its medical director and, at all times relevant herein, facilitated the fraudulent scheme

as a nominal, disengaged sham medical director by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, through the Rockland and Bergen ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law.

378. John Doe Defendants 2 through 20 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

## XI. The ABC Corporations

379. The Defendant ABC Corporations 1 through 20 are additional companies that conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These companies will be added as defendants when their names and the extent of their participation become known through discovery.

380. In addition to transacting business by their participation in the mailing of fraudulent claims to American Transit, each individual Defendant residing outside of the state of New York and business entity Defendant with a principle place of business outside the state of New York participated in the scheme to defraud alleged herein in carrying out their respective, defined roles alleged here knowing that bills for the Fraudulent Services would be mailed to American Transit.

## JURISDICTION AND VENUE

381. The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

382.     The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a) and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

383.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

384.     Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the district where one or more of the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

385.     For example, the Defendants submitted or caused to be submitted a massive amount of fraudulent billing to Plaintiff under New York automobile insurance policies, for treatment that they purported to provide to Plaintiff's New York-based Insureds. In reliance on the fraudulent claims, personnel at Plaintiff's office in the Eastern District of New York issued payments on the fraudulent claims.

386.     What is more, and as set forth herein, the Defendants transacted substantial business in New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York. Moreover, as set forth herein, the Defendants regularly committed tortious acts in New York and in New Jersey that caused injury to Plaintiff in New York.

**FACTUAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION**

387.     Plaintiff underwrites automobile insurance in New York State and participates as an insurer in New York State's No-Fault programs.

388. The Defendants' scheme as set forth herein implicates both New York and New Jersey law because, as detailed herein, the Fraudulent Services were provided by one or more of the Defendants in New York and New Jersey.

## I. Relevant Laws Governing No-Fault Reimbursement

### A. Relevant New York Laws and Regulations

389. Under the No-Fault Law, Plaintiff is required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by ,Covered Persons that arise from the use or operation of such motor vehicles in the state of New York (hereinafter, "PIP Benefits").

390. Personal line auto insurers that insure personal or private passenger vehicles are required to provide statutory mandated PIP Benefits up to $50,000.00 per Covered Person for necessary expenses that are, among other things, incurred for health care goods and services, including but not limited to physician services, diagnostic services, procedures, surgeries, pain management services, chiropractic care, physical therapy services, and acupuncture services.

391. Commercial automobile insurers, such as Plaintiff, that insure yellow cabs (picking up street-hailing passengers), livery cars, and ride-share vehicles operating in the City of New York are required to provide the statutory mandated PIP Benefits up to $200,000 per Covered Person. Each of the Defendant Surgicore Health Care Providers are ostensibly health care providers ("HCPs") that bill for medical services to, among others, Covered Persons. In exchange for their services, the Defendant Surgicore Health Care Providers accept assignments of benefits from Covered Persons and submit claims for payment to No-Fault insurance carriers, in general, and to Plaintiff, in particular.

392.     In accordance with the No-Fault Law and 11 N.Y.C.R.R. §§ 65 et seq., the Defendant Surgicore Health Care Providers submitted, and continue to submit, their claims to Plaintiff using the claim forms prescribed by the New York State Department of Financial Services f/k/a the Department of Insurance ("DFS"), including the "No-fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

393.     Pursuant to N.Y. Ins. Law § 403, all bills submitted by a HCP to Plaintiff and all other insurers must be verified by the HCP subject to—in substance—the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

394.     Under the No-Fault Law and implementing regulations, HCPs, including ambulatory surgical centers ("ASCs") governed by Article 28 of the New York Public Health Law ("N.Y. Pub. Health Law") are not eligible for reimbursement under § 5102(a)(1) of the New York Insurance Law ("N.Y. Ins. Law") if the HCP fails to meet any applicable New York or local licensing requirements necessary to perform such services in New York or fails to meet any applicable licensing requirements necessary to perform such services in any other state in which such service is performed.

395.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the N.Y. Ins. Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New

York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

 (Emphasis added).

396.    In New York, only licensed healthcare professionals (and not unlicensed individuals) may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) derive economic benefit from healthcare professional services, absent statutory exceptions not applicable in this case.

397.    New York law also requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. *See, e.g.*, N.Y. Business Corporation Law § 1507.

398.    New York law prohibits anyone from engaging in any for profit business or service that includes referring or recommending persons to any health related facility for any form of medical care or treatment, prohibits any facility delivering health care from splitting fees with a medical referral service, and prohibits licensed healthcare services providers from paying or accepting compensation in exchange for patient referrals. *See* N.Y. Pub. Health Law §§ 4501; 2811; New York Education Law §§ 6509-a; 6530(18); and 6531.

399.    New York law also prohibits unlicensed persons not authorized to practice a profession from practicing the profession and from sharing in the fees for professional services. *See, e.g.*, New York Education Law §§ 6512, 6530 (11), & (19).

400.    Similarly, under New York Education Law § 6530(17) it is unlawful for a medical professional to exercise undue influence on a patient, including the promotion or the sale of goods or services in such a manner as to exploit the patient for financial gain for the medical professional or a third party.

401.     Pursuant to New York Education Law § 6509(7), it is professional misconduct when an individual who has been licensed by New York to practice in a profession, permits, aides, or abets an unlicensed person to perform activities requiring a license. Thus, under the New York No-Fault Law, a HCP is not eligible to receive PIP Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful compensation in exchange for patient referrals.

402.     In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that HCPs that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

403.     In New York, insurers are allowed to seek affirmative recovery against individuals and entities who have violated the above statutes and/or regulations. *See State Farm v. Mallela*, 4 N.Y.3d 313 (2005); *Metroscan Imaging, P.C. v. GEICO*, 823 N.Y.S. 2d 818 (2d Dep't 2006); *see also Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389 (June 11, 2019) (reasoning that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient.").

     i.     Laws Governing ASCs in New York

404.     Article 28 of the N.Y. Pub. Health Law and its corresponding regulations govern the formation and operation of NY ASCs.

405.     N.Y. Pub. Health Law § 2801(1) defines "hospital," in pertinent part, to include any "facility or institution engaged principally in providing services by or under the supervision

of a physician. . .for the prevention, diagnosis or treatment of human disease, pain, injury, deformity or physical condition. . ."

406.    Unlike other medical practices in New York, non-physicians may own, control, or derive economic benefit from the operation of NY ASCs.

407.    While unlicensed non-physicians may own, control, and derive economic benefit from the operation of NY ASCs, the regulations promulgated pursuant to N.Y. Pub. Health Law § 2803 require that NY ASCs, such as the Surgicore NY ASCs, appoint a physician licensed in New York as a medical director to supervise patient care.

408.    10 N.Y.C.R.R. § 751.4 expressly requires that operators of NY ASCs "shall appoint a medical director who: (a) is qualified by training, experience and administrative ability to assume responsibility for the position; (b) is delegated the authority and is responsible to the operator for the professional, organizational and administrative aspects of the adequacy and quality of care provided to patients in the center; (c) is a physician licensed by and currently registered with the New York Education Department. . .; (d) develops and recommends to the operator policies and procedures governing patient care in accordance with generally accepted standards of professional practice; (e) develops and recommends to the operator policies and procedures concerning the appointment of medical and dental staff, the assignment of their clinical privileges and reviews of such appointments; and (f) is responsible for the supervision of the quality assurance program and for reporting the activities of the program to the operator."

409.    Pursuant to 10 N.Y.C.R.R. § 751.8, NY ASCs' quality assurance programs must include a "planned and systematic process for monitoring and assessing the quality and appropriateness of patient care and clinical performance on an ongoing basis."

410. Because NY ASCs are an exception to the general prohibition in New York against unlicensed non-physicians owning, controlling, or deriving economic benefit from a medical practice or the provision of physician services, medical directors of NY ASCs play an essential role in ensuring that patient care is not subordinated to the base, pecuniary interests of unlicensed laypersons.

411. Article 10 of N.Y.C.R.R. also sets forth certain requirements of operators and administrators of NY ASCs. Under 10 N.Y.C.R.R. § 751.2, operators of NY ASCs are "responsible for the establishment of policies and the management and operation of the center in compliance with all applicable laws, rules and regulations," including, among other things: appointing a medical director and administrator; "ensuring that all patients receive quality health care and services provided in accordance with generally accepted standards of professional practice"; reviewing the appointment of medical staff every two years"; "ensuring that all equipment is maintained in safe and working order"; ensuring "the provision of staff, space, facilities, supplies and equipment for all functions and services adequate to meet the health care and safety needs of its patient population and to facilitate the efficient operation of the center"; and prohibiting "splitting or sharing of fees between a referral agency and the [NY ASC]," and cannot "enter into any agreement limiting such responsibility." 10 N.Y.C.R.R. § 751.2. Additionally, subject to certain exceptions for sole proprietors not applicable here, operators of NY ASCs are required to establish committees and hold regular meetings at least on a quarterly basis. 10 N.Y.C.R.R. § 751.2(d)-(e). Additionally, operators of NY ASCs must ensure that certain documents, including meeting minutes, are retained on file. *See* 10 N.Y.C.R.R. § 751.2(f).

412.     Under 10 N.Y.C.R.R. § 751.3, administrators of NY ASCs must have "training and experience related to the services provided at the center" and "executive authority and responsibility for the operation of the center."

413.     Under New York law, NY ASCs must obtain written approval of the Public Health and Health Planning Council, a branch of the New York Department of Health ("NYDOH") in order to be established in New York. *See* N.Y. Pub. Health Law § 2801-a(1).

414.     Anyone seeking to own a hospital, even in part, must undergo a review of "character, competence and standing in the community" by the NYDOH. N.Y. Pub. Health Law § 2801-a(3).

415.     Additionally, any transfers, assignments or dispositions involving ten percent or more interest or voting rights in an NY ASC to a new partner or member require advanced approval, otherwise known as a certificate of need ("CON"). *See* N.Y. Pub. Health Law § 2801-a(4)(b)(i).

416.     In New York, CONs are also required for the establishment, construction or renovation of, or for any acquisitions of major medical equipment, adding or deleting services, or modifying services areas by, NY ASCs. *See* 10 N.Y.C.R.R. § 710.1(c).

417.     Transfers, assignments, or dispositions involving less than ten percent interest or voting rights in a NY ASC are not effective "unless at least ninety days prior to the intended effective date thereof, the [NY ASC] fully completes and files with the [NYDOH] notice on a form, to be developed by the [NYDOH], which shall disclose such information as may reasonably be necessary for the [NYDOH] to determine whether it should bar the transaction" because: (A) the equity position of the NY ASC would be reduced; (B) the transaction would result in the ownership by any persons convicted of a felony; (C) there are "reasonable grounds to believe that

the proposed transaction does not satisfy the character and competence criteria set forth in [N.Y. Pub. Health Law § 2801-a(3);]" or (D) "the transaction, together with all transactions during a five year period would, in the aggregate, involve twenty-five percent or more of the interest in the partnership." N.Y. Pub. Health Law § 2801-a(4)(b)(ii).

418. The NYDOH "shall not approve" an application for establishment of a NY ASC unless it is satisfied as to, among other things, "the public need for the existence of the institution at the time and place and under the circumstances proposed." *See* N.Y. Pub. Health Law § 2801-a(3).

419. In determining the public need for a NY ASC, the NYDOH is required to consider an applicant's submission regarding the need that the population served or to be served has for the services proposed to be offered or expanded, and the extent to which all residents in the area, and in particular low income persons, racial persons, and other underserved groups and the elderly, will have access to those services. *See* N.Y. Pub. Health Law § 2801-a(3); 10 N.Y.C.R.R. §§ 600.1, 670.1.

420. Once a NY ASC is approved for establishment, it still cannot operate without first obtaining a valid operating certificate. An operating certificate will not be issued unless it is determined that the premises, equipment, personnel, rules and by-laws, standards of medical care, and hospital service are fit and adequate and that the NY ASC will be operated in the manner required by Article 28 of the N.Y. Pub. Health Law and its rules and regulations. *See* N.Y. Pub. Health Law § 2805.

421. In keeping with the public need prerequisites for establishment of NY ASCs, and to ensure that community needs are served by NY ASCs operating in a given community, Article

28 facility operating certificates generally are site specific, and limit performance of services to the location designated in the certificate. *See* 10 N.Y.C.R.R. §§ 401.1, 401.2.

422.     Article 28 of the N.Y. Pub. Health Law specifically prohibits NY ASCs from paying for patient referrals. *See* N.Y. Pub. Health Law § 2811.

423.     10 N.Y.C.R.R. §600.5(a)(1) provides that the Public Health Council (hereinafter, also referred to as "NYDOH") may revoke, limit, or annul its approval of a NY ASC if, among other things, the established operator "has been guilty of fraud or deceit in procuring the approval[,]" "has transferred his ownership interest in the operation of the facility without [NYDOH's] approval, and that such person has terminated his participation in the operation of the facility[,]" or "the established operator has failed to comply fully with any condition, limitation or other requirement imposed as part of, or in conjunction with the approval. . .." 10 N.Y.C.R.R. §600.5(a)(1), (7), (10).

424.     On March 31, 2016, the New York Court of Appeals held that office based surgery centers (unlike hospitals or ASCs) were not entitled to reimbursement of facility fees, reasoning that there is no specific fee schedule that had been adopted by the Superintendent under the No-Fault Law that provided for reimbursement of facility fees for office based surgery centers. *See Gov't Emp. Ins. Co. v. Avanguard Med. Group, PLLC*, 27 N.Y. 3d 22 (N.Y. 2016). Since the New York Court of Appeals decision in *Avanguard Med. Group*, 27 N.Y. 3d 22, HCPs seeking to maximize their profits have been incentivized to perform procedures at ASCs so that they may bill for facility fees.

### ii.  Anti-Kickback Laws

425.     New York prohibits anyone from engaging in any for profit business or service that either in whole or in part includes the referring or recommending of persons to a physician,

hospital, ASC, health related facility, or dispensary for any form of medical care or treatment. *See* N.Y. Pub. Health Law § 4501.

426.     Under Article 28 of the N.Y. Pub. Health Law pertaining to NY ASCs, no hospital, ASC, or other facility delivering health care services shall in any manner split fees with a medical referral service. *See* N.Y. Pub. Health Law §2811.

427.     New York law also prohibits licensed healthcare services providers from paying or accepting compensation in exchange for patient referrals. *See, e.g.*, New York Education Law §§ 6509-a; 6530(18); and 6531.

428.     Therefore, under the No-Fault Law, a HCP is not eligible to receive PIP Benefits if, among other things, it engages in unlawful fee-splitting, or if it pays or receives unlawful kickbacks in exchange for patient referrals.

iii.     <u>Reimbursement under the No-Fault Law</u>

429.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

430.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

431.     Prior to January 23, 2018, providers rendering treatment outside of New York under a New York automobile insurance policy were permitted to bill at the prevailing fee in the geographic location of the health provider. In May 2017, the New York Department of Financial

Services ("DFS") announced amendments to the No-Fault Law to limit out-of-state charges for medical treatment rendered pursuant to a New York automobile insurance policy. These amendments, which became effective on January 23, 2018, limited such out-of-state treatment to the lowest of (a) the amount of the fee in the region in New York that has the highest applicable amount in the fee schedule for that service; (b) the amount charged by the provider; or (c) the prevailing fee in the geographic location of the provider. *See* 11 N.Y.C.R.R. 68.6(b). The "prevailing fee" is defined as "the amount prescribed in that jurisdiction's fee schedule." 11 N.Y.C.R.R. 68.6(c).

432.    As DFS explained, these amendments were promulgated to address "the ongoing exploitation of the no-fault system with respect to out-of-state providers who, taking advantage of current provisions in the regulation, submit grossly inflated bills for services rendered, thus quickly depleting the $50,000 No-Fault coverage limit available to an eligible injured party." N.Y. Dep't of Fin. Servs. Assessment of Public Cmts. to 33rd Amend. to 11 N.Y.C.R.R. 68.

### B.    Relevant New Jersey Laws and Regulations

433.    New Jersey, like New York, also has stringent licensing requirements for health care professions and their related professional entities. New Jersey, like New York, also has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.) (collectively referred to as the "New Jersey No-fault Law"), which require automobile insurers to pay, *inter alia*, for health services expenses that are reasonably incurred as a result of injuries suffered by Covered Persons that arise from the use or operation of such motor vehicles in New Jersey (also referred to as "PIP Benefits").

434.     As in New York, under the New Jersey No-Fault Law, a Covered Person can assign his or her right to PIP Benefits to HCPs in exchange for those services. Pursuant to a duly executed assignment, a HCP may submit claims directly to an automobile insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA-1500 form.

435.     In order for a HCP to be eligible to receive PIP Benefits, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey. Thus, a HCP is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, regardless of whether or not the underlying services were medically necessary. *See, e.g.*, *Liberty Mut. Ins. Co. v. Healthcare Integrated Servs.*, No. A-2174-05T3, 2008 WL 2595922 at *2 (N.J. Super. Ct. App. Div. July 2, 2008); *Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co.*, 366 N.J. Super. 1, 6 (N.J. Super. Ct. App. Div. Jan, 6, 2004) (HCP operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); *Allstate Ins. Co. v. Orthopedic Evaluations, Inc.*, 300 N.J. Super. 510, 515-519 (N.J. Super. Ct. App. Div. May 2, 1997) (HCP's non-compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary).

436.     Moreover, in order for a specific healthcare service to be eligible for reimbursement of PIP Benefits, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. *See, e.g.*, *Liberty Mut. Ins. Co. v. Healthcare Integrated Servs.*, No. A-2174-05T3, 2008 WL 2595922 at *2 (N.J. Super. Ct. App. Div. July 2, 2008); *Allstate Ins. Co. v. Orthopedic Evaluations, Inc.*, 300 N.J. Super. 510, 515-519 (N.J. Super. Ct. App. Div. May 2, 1997).

437.     Accordingly, insurers such as Plaintiff are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey or for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

438.     All of the bills submitted by the Defendants to Plaintiff seek reimbursement of PIP Benefits for medical services purportedly provided to Covered Persons under New York's No-Fault Law based on commercial automobile policies written in New York State that were issued to New York insureds.

439.     Pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), medical providers purporting to provide services outside of New York State, including the Surgicore NJ ASCs, seeking reimbursement of PIP Benefits under a New York insurance policy that "fails to meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed" is ineligible to recover such benefits.

 i. Laws Governing ASCs in New Jersey

440.     In New Jersey, Chapter 43A of the New Jersey Administrative Code ("N.J.A.C.") provides the standards for licensing of ambulatory care facilities in New Jersey ("NJ ASCs") (NY ASCs and NJ ASCs are collectively referred to as "ASCs"). The purpose of the N.J.A.C. regulations governing NJ ASCs "is to protect the health and safety of patients who receive ambulatory care services by establishing minimum rules and standards of care with which an ambulatory care facility must comply in order to be licensed to operate in New Jersey." N.J.A.C. § 8:43A-1.2.

441.     Pursuant to N.J.A.C. § 8:43A-3.2, NJ ASCs are required to comply with applicable state laws and regulations, including laws prohibiting patient referrals.

442.     Thus under New Jersey law, HCPs and NJ ASCs that pay or receive compensation in exchange for patient referrals in contravention of New Jersey law are not eligible to receive PIP Benefits.

443.     N.J.A.C. § 8:43A also sets forth various requirements regarding the licensure and operation of NJ ASCs, including for administrators, anesthesiologists, directors of nursing services and medical directors, among others. *See* N.J.A.C. § 8:43A-1.4-1.28.

444.     Among other things, NJ ASCs are required to have a physician on staff as medical director who is "responsible for the direction, provision, and quality of medical services provided to patients," including "[d]eveloping and maintaining written objectives, policies, a procedure manual, an organizational plan, and a quality assurance program for the medical service," and "[e]nsur[ing] that medical staffing patterns are implemented." The medical director also must develop, implement, and review "written medical policies, including medical staff bylaws, in cooperation with the medical staff." The medical director, or another physician designated by the medical director in writing, must be available to the ambulatory care facility "at all times." N.J.A.C. § 8:43A-7.2 - N.J.A.C. § 8:43A-7.4.

445.     In addition to having a medical director, every NJ ASC is required to have a registered professional nurse on staff as the director of nursing, "who shall be on the premises of the facility during its hours of operation," and who must be responsible for, among other things, "the direction, provision, and quality of nursing services provided to patients." N.J.A.C. § 8:43A-8.3.

446.     NJ ASCs must also have an administrator who has a "baccalaureate degree and two years of full-time, or full-time equivalent, administrative or supervisory experience in a health care facility." N.J.A.C. § 8:43A-1.4; *see* N.J.A.C. § 8:43A-5.1. Administrators (or designated alternatives) must be "availably in the facility during its hours of operation," N.J.A.C. § 8:43A-5.1, and are responsible for: "1. Ensuring the development, implementation, and enforcement of all policies and procedures, including patient rights; 2. Planning for, and administration of, the managerial, operational, fiscal, and reporting components of the facility; 3. Participating in the quality assurance program for patient care and staff performance; 4. Ensuring that all personnel are assigned duties based upon their education, training, competencies, and job descriptions; 5. Ensuring the provision of staff orientation and staff education; and 6. Establishing and maintaining liaison relationships and communication with facility staff and services, with support services and community resources, and with patients." N.J.A.C. § 8:43A-5.2.

447.     N.J.A.C. § 8:43A-3.5 requires every NJ ASC to "develop written job descriptions and ensure that personnel are assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions." Additionally, N.J.A.C. § 8:43A-9.3, 9.5 set forth certain requirements for NJ ASCs with respect to administration, control and storage of medications and N.J.A.C. § 8:43A-12.6 and N.J.A.C. § 8:43A-14.1 to N.J.A.C. § 8:43A-14.7 set forth certain requirements regarding surgical and anesthesia services, including for infection prevention and control.

448.     N.J.A.C. § 8:43A-3.3 also requires that licensees disclose ownership of the NJ ASCs and the property where they are located, and report "any proposed changes in ownership to the Director of the New Jersey Division of Certificate of Need and Licensing [("NJDOH")] in

writing at least 30 days prior to the change and in conformance with requirements for Certificate of Need applications."

449. Subject to certain exceptions for publicly held corporations not applicable here, NJ ASC applications for transfers of ownership "shall specify each and every principal in the entity which is the prospective owner and shall account for 100 percent of the ownership of the facility. . .." N.J.A.C. § 8:33-3.3(g).

450. New Jersey requires ASCs to obtain a certificate of need approval by the NJDOH in certain instances. *See* N.J.A.C. § 8:33-3.1, et seq. Transfers of ownership of a NJ ASC that result in an owner who previously did not have ten percent or more ownership interest in the NJ ASC, but which resulted in such owner acquiring ten percent or more ownership interests in the NJ ASC require a certificate of need approval from NJDOH. *See* N.J.A.C. § 8:33-3.3(h)(1).

451. "Each applicant for a certificate of need shall show how the proposed project shall promote access to low income persons, racial and ethnic minorities, women, disabled persons, the elderly, and persons with HIV infections and other persons who are unable to obtain care." N.J.A.C. § 8:33-4.10(a).

452. "In determining the extent to which the proposed service promotes access and availability to the aforementioned populations, the applicant, where appropriate, shall address in writing the following:"

> 1. The contribution of the proposed service in meeting the health related needs of members of medically underserved groups as may be identified in the applicant's service area;

> 2. The extent to which medically underserved populations currently use the applicant's service or similar services in comparison to the percentage of the population in the applicant's service area which is medically underserved, and the extent to which medically underserved populations are expected to use the proposed services if approved;

3. The performance of the applicant in meeting its obligation, if any, under any applicable State and Federal regulations requiring provision of uncompensated care, community services, or access by minorities and handicapped persons to programs receiving Federal financial assistance (including the existence of any civil rights access complaints against the applicant);

4. How and to what extent the applicant will provide services to the medically indigent, Medicare recipients, Medicaid recipients and members of medically underserved groups;

5. The extent to which the applicant offers a range of means by which its service (for example, outpatient services, admission by house staff, admission by personal physician) will be accessible and available to a person;

6. The amount of charity care, both free and below cost service, that will be provided by the applicant;

7. Access by public or private transportation to the proposed project, including applicant-sponsored transportation services;

8. As applicable, means of assuring effective communication between the staff of the proposed project and non-English speaking people and those with speech, hearing, or visual handicaps must be documented; and

9. Where applicable, the extent to which the project will eliminate architectural barriers to care for handicapped individuals.

N.J.A.C. § 8:33-4.10(b).

453.    Each applicant for a certificate of need also must "demonstrate character and competence, quality of care, and an acceptable track record of past and current compliance with State licensure requirements, applicable Federal requirements, and State certificate of need requirements. . .." N.J.A.C. § 8:33-4.10(d).

454.    N.J.A.C. § 8:33-3.3(h) sets forth various circumstances in which a certificate of need approval by NJDOH is not required, but which otherwise require "prior written notice to the Certificate of Need and Acute Care Licensure Program or Long Term Care Licensing and

Certification Program, as applicable, of any such sale and identification of ownership changes." N.J.A.C. § 8:33-3.3(h)(1).

455. Under N.J.A.C. § 8:33-3.3(h)(1), purchases or sales of less than 10 percent of the outstanding stock (preferred or common) in a business corporation that do not result in any individual holding 10 percent or more of the corporation's outstanding stock when such individual previously held less than 10 percent of the stock, do not require a certificate of need, but do require prior written notice.

456. Under N.J.A.C. § 8:33-3.3(h)(2), "purchases or sales of limited partnership interests in a limited partnership, where a written limited partnership agreement prohibiting participation in management of the partnership by limited partners has been submitted to" NJDOH do not require a certificate of need, but do require prior written notice. However, this exception does not apply to "general or managing partners or to any partner who participates in management." N.J.A.C. § 8:33-3.3(h)(2).

457. Under N.J.A.C. § 8:33-3.3(h)(3), changes in the membership of a nonprofit corporation, where the members are individuals or nonprofit corporations, and there is no purchase or sale of assets do not require a certificate of need, but do require prior written notice.

458. Under N.J.A.C. § 8:33-3.3(h)(4), "[a] change in ownership which does not involve acquisition of an ownership interest by a new principal; that is, the change involves only the percentage owned by the principals in the entity which is the licensed operator of the facility or involves withdrawal of one or more principals from ownership in the facility" does not require a certificate of need, but does require prior written notice.

459. Under N.J.A.C. § 8:33-3.3(h)(5), "[t]he death of a principal in a health care facility, which shall be reported to the Department's Certificate of Need and Acute Care Licensure Program

or Long-Term Care Licensing and Certification Program, as applicable, together with the identity of the heir(s) to the ownership interest of the deceased principal" does not require a certificate of need, but does require prior written notice. However, "[i]f the heir(s) intends to retain the ownership interest, the heir(s) shall be subject to investigation of licensure track record."

460. Under N.J.A.C. § 8:33-3.3(h)(6), "[a] transfer, which involves a change in the controlling legal entity, but not in individuals with ownership interests, including, but not limited to: i. A change in the type of organizational entity owning the facility only, with no change in the principals with ownership interests (for example, a change from a corporation to a partnership or vice versa); ii. The merger or consolidation of a corporation with or into its wholly-owned subsidiary; iii. The merger or consolidation of a corporation with or into a corporation with identical common ownership; iv. A transfer of assets to an entity with identical common ownership; v. A transfer of assets to a wholly-owned subsidiary corporation; vi. A transfer of assets from a wholly-owned subsidiary corporation to its parent; vii. A transfer of stock to a wholly-owned subsidiary; or viii. A transfer of stock to an entity with identical common ownership" does not require a certificate of need, but does require prior written notice.

461. NJ ASCs that fail to comply with these requirements, or the other significant regulatory requirements applicable to NJ ASCs, are not eligible to receive PIP Benefits.

ii. Anti-Kickback Laws

462. In New Jersey, individuals who are licensed by the New Jersey Board of Medical Examiners, which includes but are not limited to doctors of medicine, doctors of osteopathy, podiatrists, certified acupuncturists, and physician assistants, are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals. N.J.A.C. § 13:35-6.17; *see also* N.J.A.C. § 13:35-6.16.

463. N.J.A.C. § 13:35-6.17(c)(1) specifies, in pertinent part, that:

> A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. . ..

464. N.J.A.C. § 13:35-6.17(c)(1) is "construed broadly to effectuate its remedial intent." N.J.A.C. § 13:35-6.17(c)(1)(ii).

465. Consistent with broad anti-kickback prohibitions in N.J.A.C. § 13:35-6.17(c)(1), N.J.A.C. § 13:35-6.17(h) provides, in pertinent part, that "licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space or equipment."

iii. Prohibition on Self-Referrals

466. In New Jersey, physicians and other "practitioners" generally may not refer patients to a "healthcare service" in which they, or their immediate family, have a "significant beneficial interest." Specifically, N.J.S.A. § 45:9-22.5 (the "Codey Law") provides that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a healthcare service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest.

467. Pursuant to N.J.S.A. § 45:9-22.4:

> "Healthcare service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Healthcare service includes, but is not

limited to, a bioanalytical laboratory, pharmacy, home healthcare agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

468. Pursuant to N.J.S.A. § 45:9-22-5(c)(1), the Codey Law's restrictions on patient referrals do not apply to "medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office. . .."

469. Pursuant to N.J.S.A. § 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to referrals to an ambulatory care facility—such as an ambulatory surgery center—in which the referring physician has a significant beneficial interest, so long as certain conditions are met (the "NJ ASC Exception").

470. In particular, pursuant to the NJ ASC Exception set forth in N.J.S.A. § 45:9-22.5(c)(3), the Codey Law's restrictions do not apply to:

ambulatory surgery or procedures involving the use of any anesthesia performed at a surgical practice registered with the Department of Health. . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a) the practitioner who provided the referral personally performs the procedure;

(b) the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c) all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

(d) disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

471. Prior to January 16, 2019, the Codey Law's restrictions did not apply to "ambulatory surgery or procedures requiring anesthesia performed at a [NJ ASC]." Thus, prior to January 16, 2019, if a physician referred patients to an ambulatory care facility she owned, for procedures not "requiring anesthesia," the referrals would not receive the benefit of the ASC Exception to the Codey Law.

472. Thus, at all relevant times, if a physician self-referred a patient for a procedure to be performed at an ASC, the referral would not qualify for the ASC Exception, and therefore would violate the Codey Law, unless—among other things—the referring physician disclosed his/her (or immediate family member's) significant beneficial interest in the practice of facility to the patient in writing, at or prior to the time when the referral was made.

473. HCPs that operate in violation of the Codey Law are not eligible to receive PIP Benefits.

474. Physicians, ASCs, and hospitals which engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

475. Pursuant to N.J.S.A § 14A:17-5, a foreign professional entity cannot offer medical professional services in New Jersey without being properly organized or incorporated under New Jersey law.

476.     Therefore, insurers such as Plaintiff are not obligated to make any payments of PIP Benefits to healthcare services providers that unlawfully operate in New Jersey as foreign professional entities.

## II.     Backdrop and the Surgicore Health Care Providers' Submission of Fraudulent Bills

477.     In purported compliance with the No-Fault Law and 11 N.Y.C.R.R. 65, *et seq.*, the Surgicore Health Care Providers and/or Associated Health Care Providers submitted proof of their claims to Plaintiff, using the NF-3 and/or HCFA-1500 claim forms.

478.     Pursuant to § 403 of the N.Y. Ins. Law, the claim forms submitted to Plaintiff by the Surgicore Health Care Providers and/or Associated Health Care Providers contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

479.     To process and verify claims submitted by the Defendant Surgicore Health Care Providers, Plaintiff required, and the Defendants submitted, to the extent applicable, narrative reports, pre-operative and post-operative reports, test results, and other medical records relative to the purported medical services and treatment rendered to Covered Persons, for which the Defendant Surgicore Health Care Providers and/or Associated Health Care Providers were seeking payment from Plaintiff.

480.     Pursuant to the No-Fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff was (and is) required to promptly process claims within 30 days of receipt of proof of claim.

481. To fulfill its obligation to promptly process claims, Plaintiff justifiably relied upon the bills and documentation submitted by Defendants in support of their claims, and paid Defendants based on the representations and information that they mailed to Plaintiff.

482. At all relevant times mentioned herein, the Surgicore ASCs were ASCs in name only. For all practical and legal purposes, the ASCs were created and used to defraud insurers into paying fraudulent No-Fault claims.

483. On information and belief, the Defendant Surgicore Health Care Providers engaged in systematic and pervasive fraudulent practices that distinguished them from legitimate HCPs. By way of example and not limitation:

- Unlike legitimate ASCs, the Surgicore ASCs employed sham medical directors and administrators who did not implement or supervise any sort of legitimate quality assurance programs, did not fulfill the statutory or regulatory requirements applicable to them and/or permitted the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and ceded all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers and/or others unknown to Plaintiff acting under their direction and control who were not (and have never been) licensed physicians;

- Unlike legitimate ASCs operating in New Jersey, the Surgicore NJ ASCs employed a sham chief clinical officer/chief nursing officer, Hoyle, who ensured that the putative "directors of nursing" at the Surgicore ASCs did not fulfill the statutory and regulatory requirements applicable to them and/or permitted the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and ceded all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not (and have never been) licensed physicians;

- Unlike legitimate ASCs, the Surgicore ASCs paid kickbacks to one or more of the Surgicore Owners and/or other individuals or entities unknown to Plaintiff, which they frequently disguised as dividends or other cash distributions for their "investments" in the Surgicore ASCs, so that the Surgicore Owners would

supply a steady stream of persons purportedly involved in traffic accidents for treatment. The Surgicore ASCs paid the kickbacks knowing that they could recover the amount of the kickbacks many times over through fraudulent billing submitted to insurers, including Plaintiff;

- Unlike legitimate providers, the Defendant Surgicore Health Care Providers misrepresented the existence or severity of any injuries that Covered Persons may have had, to the extent they were injured at all, and the course of any treatments;

- Unlike legitimate providers, the Surgicore Health Care Providers routinely submitted claims for Fraudulent Services that were medically unnecessary, and/or performed below the required standard of care for the performance of such services and in a sub-standard manner from which no useful medical information could be derived, and submitted false medical reports in support of those services;

- Unlike legitimate providers, the Surgicore Health Care Providers submitted claims for Fraudulent Services pursuant to a predetermined fraudulent protocol;

- Unlike legitimate providers, rather than perform valid procedures, pain management services, treatment and/or tests according to prevailing standards of medical care as they must, or refer to a legitimate practitioner, the Defendant Surgicore Health Care Providers performed invalid, medically unnecessary, and bogus treatments and/or diagnostic tests that willfully misrepresented medical facts and potentially endangered the safety and health of Covered Persons;

- Unlike legitimate providers, the Surgicore Health Care Providers submitted bills, using NF-3s and HCFA-1500 forms wherein Defendants knowingly, with intent to deceive Plaintiff and induce payment as a result thereof, and falsely misrepresented the services reflected therein (the Fraudulent Services) were causally related to an accident and medically necessary when in fact they were not;

- Unlike legitimate providers, the Surgicore Health Care Providers submitted claims to Plaintiff for reimbursement in which they falsely represented that they were in compliance with all applicable laws governing their eligibility for reimbursement of No-Fault benefits, including under § 6530(18) of New York's Education Law, which prohibits "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services. . .," when in fact, they were not; and

- Unlike legitimate providers, the Surgicore ASCs submitted claims to Plaintiff for reimbursement in which they falsely represented that they were eligible for reimbursement for services purportedly rendered to Covered Persons under § 5102(a)(l) of the N.Y. Ins. Law, when in fact, the Surgicore ASCs failed to meet applicable New York State and local licensing requirements necessary to perform such service in New York.

484. In these and numerous other ways, Defendants sought to deceive Plaintiff into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

485. On information and belief, the Controllers, through the Surgicore ASCs, engaged in the illegal scheme alleged herein in numerous ways. By way of example and not limitation, in furtherance of the scheme to defraud, the Controllers:

- Recruited sham medical directors and administrators who the Controllers knew would not implement or supervise any sort of legitimate quality assurance programs, did not fulfill the statutory or regulatory requirements applicable to them and/or permitted the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and ceded all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not (and have never been) licensed physicians, and permitted the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care;

- Installed sham medical directors, including but not limited to the Defendant Medical Directors to allow them to conceal the fact that the Controllers were illegally exercising the oversight responsibilities charged to licensed physicians by applicable state laws and that the Surgicore ASCs were not eligible for No-Fault benefits;

- Recruited a sham chief clinical officer/chief nursing officer, who the Controllers knew would ensure that the putative "directors of nursing" at the Surgicore NJ ASCs would not fulfill the statutory and regulatory requirements applicable to them and/or would permit the Surgicore NJ ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and ceded all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not (and have never been) licensed physicians;

- Entered into secret, illegal referral/kickback arrangements with the Surgicore Owners and/or other individuals or entities unknown to Plaintiff, whereby the Surgicore ASCs paid the Surgicore Owners to steer or refer, or cause to be steered or referred, Covered Persons to the Surgicore ASCs, for one or more of the Fraudulent Services;

- Prepared or caused to be prepared fraudulent medical reports documenting test results and diagnoses submitted through the Surgicore ASCs that they knew contained materially false and misleading information;

- Prepared or caused to be prepared bills, through the Surgicore ASCs, for the Fraudulent Services and sending them to Plaintiff;

- Through the Surgicore ASCs, paying individuals that purportedly provided services for the Surgicore ASCs for services that they knew or should have known were not causally related to an automobile accident, provided as billed, and were medically unnecessary;

- Paid kickbacks to one or more of the Surgicore Owners and/or other individuals or entities unknown to Plaintiff to ensure a steady stream of Covered Persons upon which the Defendants could bill for one or more of the Fraudulent Services in connection with purported accidents involving minor impact that, if legitimate, resulted in soft-tissue injuries that did not require the performance of such services; and

- Prepared, or caused those acting under their direction, to prepare and mail bogus claims, knowing that they contained materially false and misleading information.

486. On information and belief, the Defendant Medical Directors and Defendant Administrators, acting in concert and in furtherance of the scheme to defraud alleged herein, participated in the fraudulent conduct in numerous ways. For example, by agreeing to serve and act as sham medical directors and administrators of the Surgicore ASCs, they abdicated to the Controllers their responsibilities to fulfill the statutory and regulatory requirements applicable to them and/or permit the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and by ceding medical decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not (and have never been) licensed physicians.

487. On information and belief, Hoyle engaged in the illegal scheme alleged herein in numerous ways, including by ensuring that the Surgicore NJ ASCs' putative "directors of nursing" did not fulfill the statutory and regulatory requirements applicable to them and/or permitted the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and ceded all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not (and have never been) licensed physicians.

488. At all relevant times mentioned herein, the Controllers knew that the Surgicore ASCs were not properly licensed and therefore were ineligible to recover No-Fault benefits due to their installation of the sham Defendant Medical Directors.

489. At all relevant times mentioned herein, the Controllers and the Surgicore Health Care Providers knew or should have known that the Fraudulent Services were not performed as billed, were provided, if at all, at, by and through the Surgicore ASCs that were not properly licensed in accordance with applicable state law; were provided pursuant to a predetermined fraudulent protocol and were not causally related to an automobile accident.

490. At all relevant times mentioned herein, the Controllers through the Surgicore ASCs, directly or through others acting under and pursuant to their directions, instructions, and control, submitted or caused to be submitted bills for Fraudulent Services, in furtherance of the scheme to defraud alleged herein, to obtain payment from Plaintiff.

491. At all relevant times mentioned herein, the Surgicore Orthopedic Providers, Surgicore Pain Management Providers, and the Surgicore Anesthesia Providers, through their respective professional corporations, directly or through others acting under and pursuant to their

directions, instructions, and control, submitted or caused to be submitted bills for Fraudulent Services, in furtherance of the scheme to defraud alleged herein, to obtain payment from Plaintiff.

492. The alleged fraudulent conduct attributed to the Defendants and described herein are part of a systematic attack on New York's No-Fault system by nefarious medical providers that compromises the ability of the No-Fault Law to fulfill its objectives, while compromising the health and safety of the general public.

493. As a result of the Defendants' fraudulent billing scheme, Plaintiff has paid Defendants in excess of $153,000,000.00 on fraudulent and unnecessary medical services.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

### I.      Overview of Defendants Fraudulent Scheme

494. Beginning in or around 2009, and continuing until the present day, the Controllers masterminded and implemented a massive fraudulent scheme whereby they excessively billed Plaintiff more than $63,000,000.00 through the Surgicore ASCs that they owned and/or controlled, but which were not eligible for payment under the No-Fault Law.

495. In furtherance of the scheme, the Controllers acquired majority ownership interests in and/or control over the Surgicore ASCs; devised an elaborate, unlawful referral/kickback scheme in order to ensure a steady stream of patients to the Surgicore ASCs and so that they could bill Plaintiff and other insurers for medically unnecessary medically unnecessary interventional pain management and/or arthroscopic procedures and/or surgeries including but not limited to trigger point injections, epidural steroid injections, epidurograms, discograms, percutaneous discectomies, and intradiscal electrothermoplasties (also known as annuloplasties) ("IDETs"), and/or shoulder, knee, wrist, and ankle arthroscopies, anesthesia services, and ASC facility fees (collectively referred to as the "Fraudulent Services"); and recruited individuals to serve as phony

"medical directors" and "administrators," and a phony "chief clinical officer" and/or "chief nursing officer" who oversaw phony "directors of nursing" for the Surgicore ASCs, when in fact it was the Controllers who exercised authority and control over the Surgicore ASCs and patient care in contravention of New York and New Jersey laws.

496.     The Controllers sought out, acquired, or formed multiple ASCs to own and control in order to obscure and maximize the volume of fraudulent PIP billing that was submitted to insurers without drawing unwanted attention by regulatory authorities, insurer investigative departments, law enforcement, or the general public.

497.     Towards that end, the Controllers initially formed and/or acquired majority ownership interests and/or control of ASCs in New Jersey, specifically, New Horizon ASC, Manalapan ASC, Saddlebrook ASC, Jersey City ASC, and Rockland and Bergen ASC (collectively, the "Surgicore NJ ASCs"). As detailed herein, after New Horizon ASC was sued in *Gov't Emp. Ins. Co., et al. v. Trnovski, et al.*, 16-cv-4662 (D.N.J.) and the DFS announced rulemaking limiting reimbursement of No-Fault health care services provided outside of New York, the Controllers formed and/or acquired additional majority ownership interests and/or control of ASCs in New Jersey, specifically, All City ASC, Fifth Avenue ASC, Empire State ASC, North Queens ASC, and Rockaways ASC (collectively, the "Surgicore NY ASCs").

498.     Upon acquiring control of the Surgicore ASCs, as a part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through the Surgicore ASCs entered into sham "investor" referral/kickback arrangements with the Controllers, Main Street Medical, ASAR Healthcare, BDP Ventures LLC, BDP Ventures Inc., ASC Investment Services, Ramirez, Chavez, Romero, Blue Wall Management, R. Seldes, M. Seldes, McCulloch, Redy Ventures, MK Med Invest, Keyserman, AS

Med Invest, Shakarov, Naik, S. Katanov, Fiaba, Kostanian Consulting Associates, Kostanian, Conte De Fees, Denevich, YCentury, Jones, Berkowitz, Non-Surgical Orthopedics, Elkholy, Dassa, Haar Orthopedics, Haar, FLBD Management, Anjani Sinha, Advanced PMR, Hafeez, Reizis, Revutsky, Weiner, Four D Investments LLC, Four D Investments Inc, MEH Investments, Ajoy Sinha, Vora, Capleo Holdings, J. Katanov, Xie, Upendra Sinha, MEDA Management, SJ2 Ventures, Wasserman, Gesheft Associates, M. Hatami, Jones, Kotkes, Richard, Surgicore RBSC, AEH Healthcare Management, Boost HS, Yadgarov, Kurtti, McCarthy, Health Plus Management, Blumberg, Rubin, Klein, S. Passanisi, L. Passanisi, K. Degradi, Pyatetskaya, B. Kogan, Apazidis, Shamalov, Katzman, Bursztyn, Zybin, Yaguda, Shabtian, Surgicore 5th Avenue, McMahon, SignMe, Mega Group Solution, Amigud, Aljian, Khakhar, Dassa, Graziosa, Hostin, Chan, Arredondo-Calle, Pacia, and one or more of the John Does 2 through 20 and/or one or more of the ABC Corporations 1 through 20 (collectively the "Surgicore Owners") who directly or indirectly purchased or otherwise acquired shares in the Surgicore ASC to make it appear that payments made by the Surgicore ASCs were dividends or other cash distributions for their "investments" in the Surgicore ASCs when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

499.    One or more of the Controllers, individually or through entities in which they or their family members or close associates maintained financial interests, also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

500.    The Surgicore Owners routinely steered or referred, or caused to be steered or referred, Covered Persons from the No-Fault Clinics in New York to the Surgicore ASCs through which the Fraudulent Services were purportedly provided.

501.    In exchange for their "investor" interests in the Surgicore ASCs, the Surgicore Owners engaged in the unlawful referral/kickback scheme by secretly agreeing to steer or refer those Covered Persons to the Surgicore ASCs for Fraudulent Services.

502.    To conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, the Surgicore ASCs, the Surgicore Owners purchased or otherwise acquired ownership interests in the Surgicore ASCs through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The Surgicore Owners, either directly or indirectly through their companies, family members, or close associates, or their family members' or close associates' companies, received payments from the Surgicore ASCs that were disguised as dividends or other cash distributions for their "investments" in the Surgicore ASCs, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

503.    In order to conceal the referral/kickback scheme and the full extent of their ownership and control over the Surgicore ASCs, the Controllers established, owned, maintained a financial interest in or otherwise derived financial benefit through the Surgicore ASCs from a web of associated companies, including Surgicore Management, Surgicore Management NY, HDS Investments, 50 Franklin Ln Realty, FIWA 1049 Realty, Midtown 305 Realty, and one or more of the ABC Corporations 1 through 20 (collectively referred to herein as the "Controller Ancillary Entities"), that purport to serve as landlord, management, and/or other financing companies and

which purported to enter into lease, management services, financing agreements and other contracts with one or more of the Surgicore ASCs, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over the Surgicore ASCs, to funnel proceeds from one or more of the Surgicore ASCs back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

504.    By way of example and not limitation, in *Allstate Ins. Co. v. Mendoza*, *D.C., et al.*, 608378/2018, ECF No. 28 (Nassau Cnty. Sup. Feb. 13, 2019), the plaintiffs credibly alleged that New Horizon ASC issued over half-a-million dollars in purported lease payments to PB & Goose LLC (not named as a defendant herein), a company owned by Degradi, which did not own the premises where New Horizon ASC operated, but instead owned 239 E. Main Street, Patchogue, New York ("239 E. Main Street").

505.    Towards that end, one or more of the Controllers formed Surgicore Management, which was incorporated on May 2, 2018. At all relevant times herein, Surgicore Management Inc has been owned and controlled by the Controllers. According to its certificate of incorporation, Surgicore Management's board of directors consisted of all four Controllers. According to its annual reports, Surgicore Management's main business address is Saddlebrook ASC's clinic location. Rockland and Bergen ASC represented to NJDOH that Degradi, Kogan, and Tylman have ownership interests in Surgicore Management. According to filings with NJDOH, Surgicore Management is the purported "management" company for New Horizon ASC, Saddlebrook ASC, Jersey City ASC, and Rockland and Bergen ASC.

506.    Surgicore Management was also identified as a creditor for Empire State ASC and North Queens ASC in UCC financing statements filed on December 31, 2019. According to its

UCC filings, Surgicore Management Inc indicated its address as Surgicore's headquarters at 505 Park Avenue, Suite 303, New York, New York.

507.   Additionally, barely three months after incorporating Surgicore Management, on August 3, 2018, Surgicore Management NY was formed and listed Degradi as its organizer. At all relevant times herein, Surgicore Management NY has been owned and controlled by the Controllers. According to its corporate filings, Kogan signed the certificate of amendment to Surgicore Management NY's articles of organization as its president, manager and member, which he filed on or about September 24, 2019. Surgicore Management NY's address for service of process was also listed as Surgicore's headquarters, located at 505 Park Avenue, New York, New York. In their applications to NYDOH, Empire State ASC and North Queens ASC represented that the Controllers each had a 25 percent ownership interest in Surgicore Management NY. According to filings with NJDOH and NYDOH, Surgicore Management NY is the purported "management" company for the Surgicore NY ASCs.

508.   In connection with Surgicore Management and/or Surgicore Management NY, one or more of the Controllers attested that the Surgicore ASCs would retain ultimate authority, responsibility, and control in all final decisions and would not illegally delegate any reserve powers that could not be delegated. In fact, in contravention of the laws of New York and/or New Jersey, the Controllers did improperly delegate reserve powers and ultimate decision making to Surgicore Management and Surgicore Management NY.

509.   Additionally, one or more of the Controllers formed one or more purported realty companies, including HDS Investments, 50 Franklin Ln Realty, FIWA 1049 Realty, and Midtown 305 Realty that purchased the properties where at least four of the Surgicore ASCs (New Horizon ASC, Manalapan ASC, and Fifth Avenue ASC's clinic located at 1049 Fifth Avenue, New York,

New York (the "Fifth Avenue ASC Manhattan")), and Fifth Avenue ASC's extension clinic located at E. 47th Street New York, New York ("Fifth Avenue ASC Midtown") are located.

510. In addition to the monies they received directly from the Surgicore ASCs, the Controllers also formed management service and real estate holding companies to funnel money from the Surgicore ASCs to companies that one or more of them owned and controlled.

511. Additionally, according to its corporate filings, on July 29, 2016, Degradi formed KTHD Investments LLC (not named as a defendant herein). KTHD Investments LLC is owned and controlled by one or more of the Controllers, including Degradi, Hatami and Kogan. Degradi, Hatami, and Kogan were identified as owners of KTHD Investments LLC on a UCC financing statement filed by ECRC Group M-2 LLC on March 8, 2023, in which their interests in KTHD Investments LLC were listed as collateral. On December 21, 2017 ECRC Group M-2 LLC filed another UCC financing statement identifying KTHD Investments LLC, Surgicore of Jersey City ASC, and Fifth Avenue ASC as co-debtors.

512. In the original complaint in *Roosevelt Road Re, Ltd. et al. v. Hajjar et al.*, 24-cv-1549, ECF No. 1 (E.D.N.Y. Mar. 1, 2024), the Controllers were alleged to created KTHD Investments LLC, which uses the acronym "KTHD" for their last names, in order to obtain millions of dollars in foreign funding through the "EB-5" visa program and specifically the East Coast Regional Center to expand their network of ASCs. Specifically, it was alleged that the Controllers, through one or more entities, had raised $7.5 million from 15 foreign investors to develop an ASC in Queens (believed to be North Queens ASC) and $6.5 million to acquire and operate ASCs in New Jersey (believed to be Jersey City ASC) and Fifth Avenue, New York City (believed to be Fifth Avenue ASC). On East Coast Regional Center's website, the acquisition of ASCs in Jersey City and Fifth Avenue Manhattan was identified as project "ECRC Group M-2."

513. In *Hajjar*, East Coast Regional Center's website was alleged to have stated that KTHD Investments LLC was an ASC operator that had been established by the Controllers for the purpose of acquiring distressed ASCs, that KTHD Investments LLC utilized a "proven-successful business model to turn-around its acquiring [ASCs]," and that its management team expected to achieve "not only substantially increased revenue but higher than industry-average rate of return for its equity owners."

514. On information and belief, the Controllers, through the Surgicore ASCs, disguised illegal payments to the Surgicore Owners for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs, either as dividends, cash distributions, salaries, or other compensation to or for their benefit, including as payments through one or more of the Controller Ancillary Entities.

515. In exchange for the purported returns on their "investments," the Surgicore Owners systematically steered or referred, or caused to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

516. The Surgicore Owners steered or referred, or caused to be steered or referred, Covered Persons to the Surgicore ASCs as part of a predetermined fraudulent medical protocol that they determined, without regard to medical necessity.

517. Thereafter, the Surgicore Orthopedic Providers and Surgicore Pain Management Providers, and others employed by the Surgicore ASCs, would purportedly render surgical, pain management and/or other medical services purportedly rendered at the Surgicore ASCs to as many Covered Persons as possible, for which the Surgicore Health Care Providers billed insurance companies in general and, Plaintiff in particular for the Fraudulent Services.

518.     To recruit orthopedists and pain management doctors to participate in the scheme to defraud, the Controllers, through the Surgicore ASCs' website (www.surgicoreasc.com), advertised and marketed "investment opportunities" to physicians as a "benefit" of working for the Surgicore ASCs.

519.     As alleged herein, KTHD Investments LLC, which is owned and controlled by one or more of the Controllers, including Degradi, Hatami, and Kogan, is associated with at least three of the Surgicore ASCs (Jersey City ASC, Fifth Avenue ASC, and New Horizon ASC).

520.     On information and belief, KTHD Investments LLC was an ASC operator that had been established by the Controllers for the purpose of acquiring distressed ASCs and maximizing returns for its equity owners. Unlike legitimate investments, the Controllers, through the Surgicore ASCs had no need for capital and generally offered the "investment" opportunity only to those individuals with the potential to direct (or cause to be directed) a large volume of referrals to the Surgicore ASCs (i.e., physicians, HPCs, and their affiliates). These "investments" were not available to ordinary investors or those who otherwise could not refer or cause a substantial number of referrals to the Surgicore ASCs.

521.     Unlike legitimate investments, on information and belief, the Surgicore Owners recouped their supposed investments within a matter of months, thereafter earning several times their original investment within a matter of a few months or years.

522.     Unlike legitimate investments, on information and belief, in some instances, the Surgicore Owners were allowed to borrow money from the Surgicore ASCs to finance their investment, but then began receiving payments from the Surgicore ASCs, before their payments were even due.

523.     Unlike legitimate investments, on information and belief, in some instances, the Surgicore Owners began receiving supposed returns on their investment before their ownership of the Surgicore ASCs had been approved by NJDOH or NYDOH. By way of example and not limitation, in *Allstate Ins. Co. v. Mendoza, D.C., et al.*, 608378/2018, ECF No. 28 (Nassau Cnty. Sup. Feb. 13, 2019), the plaintiffs credibly alleged that McCulloch was repaid his entire investment before NJDOH had even approved his ownership interest in New Horizon ASC.

524.     Unlike legitimate investments, on information and belief, once the Surgicore Owners ceased steering or referring, or causing to be steered or referred, a substantial number of Covered Persons to the Surgicore ASCs, they ceased receiving supposed returns on their investments, and returned their shares.

525.     To ensure a steady flow of Covered Persons upon which to perform one or more of the Fraudulent Services, under the terms of All City ASC's amended and restated shareholders' agreement, dated November 1, 2017, at least one-third of procedures performed by each physician-owner of All City ASC were required to be performed at All City ASC.

526.     By way of example and not limitation, in *Allstate Ins. Co. v. Mendoza*, 608378/2018, ECF No. 28 (Nassau Cnty. Sup. Feb. 13, 2019), the plaintiffs credibly alleged that Dassa, a former owner of New Horizon ASC, was receiving $13,000 per month in supposed returns on his investment in New Horizon ASC, when he returned his entire interest to New Horizon ASC for the original investment price of $30,000, despite that there appeared to be no sound economic reason for doing so.

527.     At all relevant times mentioned herein, the Surgicore Owners conspired with the Controllers, through the Surgicore ASCs, and knowingly participated in the scheme to defraud.

528. By way of example and not limitation, in exchange for their "investment" interests in one or more of the Surgicore ASCs and/or other improper financial arrangements, the Surgicore Owners knowingly steered or referred, or caused to be steered or referred, Covered Persons to the Surgicore ASCs for one or more of the Fraudulent Services; and performed one or more of the Fraudulent Services that were not medically necessary, were not causally related to automobile accidents, billed for such services that were provided (if at all) pursuant to a predetermined fraudulent protocol based on kickbacks or other improper financial arrangements with the Controllers, Surgicore ASCs, and No-Fault Clinics at which they purportedly initially examined Covered Persons.

529. The Controllers, through the Surgicore ASCs, knowingly submitted bills to insurers for the Fraudulent Services (including facility fees) that were the result of the unlawful referral/kickback scheme alleged herein.

530. Additionally, the Surgicore Owners knowingly billed for one or more of the Fraudulent Services for Covered Persons whom they had steered or referred, or caused to be steered or referred, to the Surgicore ASCs pursuant to the unlawful referral/kickback scheme, which were not medically necessary and submitted bills to insurers for those services.

531. At all relevant times mentioned herein, the Surgicore Owners and Controllers knew or should have known that Covered Persons were directed and/or steered to the Surgicore ASCs pursuant to a predetermined fraudulent medical protocol that resulted from the financial arrangement or unlawful referral/kickback scheme they agreed to participate in with one or more of the Controllers, through the Surgicore ASCs, irrespective of medical necessity.

532. Defendants entire artifice was predicated on the construction of an ASC empire that concealed the improper licensing and operation of the Surgicore ASCs; the concealment of the

Controllers use of sham medical directors, administrators, and Hoyle to operate the Surgicore ASCs in violation of applicable state laws and the referral network they created with the Surgicore Owners to bill for the Fraudulent Services as alleged herein.

533. At all relevant times mentioned herein, the Controllers knowingly caused the Surgicore ASCs, the Surgicore Orthopedic Providers and the Surgicore Pain Management Providers to submit bills seeking reimbursement for services purportedly rendered to the Covered Persons, that the Controllers or others, acting pursuant to their directions, instructions and control, directed and/or steered to the Surgicore ASCs, in furtherance of the scheme to defraud alleged herein.

534. At all relevant times mentioned herein, the Controllers, acting in concert with the Surgicore Owners and the Surgicore ASCs, participated in, conducted, controlled, conspired together, aided and abetted, and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers in general, and Plaintiff in particular, of money.

535. At all relevant times mentioned herein, the Surgicore Owners knew or should have known that the services they provided to the Covered Persons, referred to the Surgicore ASCs by one or more of the Controllers and/or others under the Controllers' supervision and control, were rendered pursuant to the unlawful "investor" referral/kickback arrangement.

536. At all relevant times mentioned herein, in furtherance of the scheme to defraud alleged herein, the Surgicore Owners knowingly allowed and provided the means for the Controllers, through the Surgicore ASCs, to submit or cause to be submitted fraudulent bills for medically unnecessary services rendered as a result of the unlawful "investor" referral/kickback arrangement in order to obtain payment in connection with fraudulent claims.

537. At all relevant times mentioned herein, the Surgicore Owners, acting in concert with the Controllers, one or more of the Defendant Surgicore Health Care Providers and/or others unknown to Plaintiff, participated in, conducted, controlled, conspired together, aided and abetted, and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers in general, and Plaintiff in particular, of money through the billing for the Fraudulent Services.

538. At all relevant times mentioned herein, the unlawful referral/kickback scheme pursuant to which the Surgicore Owners steered or referred, or caused to be steered and referred, Covered Persons to the Surgicore ASCs, together with the billing fraud scheme alleged herein, provided the essential means by which the Defendants were able to further their scheme to defraud as alleged in this Complaint.

539. At all relevant times mentioned herein, the Controllers knew that ASCs such as the Surgicore ASCs were required to have a qualified and legitimate medical director and administrator on staff, and were required to comply with the numerous statutory and regulatory requirements applicable to ASCs, which are designed to protect the public health and welfare by ensuring that patient care is entrusted to the qualified judgment, experience, and training of a licensed physicians, not laypersons who may be improperly incentivized to maximize profits at the expense of public safety.

540. Notwithstanding the statutory mandates with respect to the required installation of bona fide medical directors, the Controllers were concerned that, if they appointed legitimate physicians and personnel to serve as the Surgicore ASCs' medical directors and administrators, such individuals would impede the fraudulent and unlawful scheme described herein.

541.    Accordingly, upon acquiring control of the Surgicore ASCs, the Controllers recruited one or more of the Defendant Medical Directors and Defendant Administrators, who were willing to pose as the sham "medical directors" and "administrators" at the Surgicore ASCs.

542.    In furtherance of the scheme to defraud, the Controllers recruited Hoyle, who was willing to pose as the sham "chief clinical officer" and/or "chief nursing officer" overseeing the sham "directors of nursing" at one or more of the Surgicore ASCs.

543.    In order to circumvent New Jersey and New York law, and induce the NJDOH and NYDOH to maintain the Surgicore ASCs' licenses and permit them to operate as ASCs, the Controllers, through the Surgicore ASCs, entered into a secret scheme with the Defendant Surgicore Medical Directors and Administrators, whereby, in exchange for compensation (disguised as direct or indirect ownership interests in one or more of the Surgicore ASCs and/or as salaries), the Defendant Surgicore Medical Directors and Administrators agreed to falsely pose as the true medical directors and administrators of the Surgicore ASCs, without ever fulfilling the statutory and regulatory requirements applicable to them.

544.    In order to circumvent New Jersey and New York law, and induce the NJDOH and NYDOH to maintain the Surgicore ASCs' licenses and permit them to operate as ASCs, the Controllers, through the Surgicore ASCs, also entered into a secret scheme with Hoyle, whereby, in exchange for compensation (disguised as direct or indirect ownership interests in one or more of the Surgicore ASCs and/or as salaries), Hoyle agreed to serve as the sham "chief clinical officer" and/or "chief nursing officer" overseeing the sham "directors of nursing" at the Surgicore ASCs.

545.    The Controllers knew that the physicians that they recruited to serve as the Surgicore ASCs' putative "medical directors" would not implement or supervise any sort of legitimate quality assurance program and/or fulfill the statutory and regulatory requirements

applicable to them, and instead would cede all medical decision-making and policy-making authority relating to the medical operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not (and have never been) licensed physicians, and permit the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care.

546.    The Defendant Medical Directors agreed to relinquish responsibilities for the direction, provision, and quality of medical services provided to patients at the ASCs, and failed to develop, maintain, or implement written medical policies or quality assurance programs for the ASCs in accordance with applicable laws, and, instead, ceded all medical decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not licensed physicians.

547.    Often times, the Defendant Medical Directors could not legitimately have fulfilled their responsibilities as the Surgicore ASCs' medical directors, because, during the same period when they were purporting to serve as the medical director at one of the Surgicore ASCs, they were operating other medical clinics and/or maintaining extremely busy practices as treating physicians. These activities prevented the Defendant Medical Directors from being available to the Surgicore ASCs to fulfill their statutorily required duties as the Surgicore ASCs' medical directors. By way of example and not limitation:

- All City ASC's "administrator" Zybin testified during an EUO on March 12, 2024 and April 11, 2024, conducted by Plaintiff, that there is no requirement regarding how often its medical director must be onsite. She further testified that All City ASC's purported medical director, Shabtian, does not do any onsite supervision or monitoring of any of the surgeries or procedures, and does not do any anesthesiology peer reviews at All City ASC. Zybin testified that, in

addition to his medical director duties, Shabtian performed procedures at All City ASC on Wednesdays and Sundays and she did not know how he allocated his time between medical director and clinician. Zybin also refused to answer whether Shabtian or any of All City ASC's other medical directors did any assessments regarding the medical necessity and appropriateness of care for All City ASC's patients.

- All City ASC's "medical director" Shabtian testified during an examination under oath on August 15, 2024 and August 16, 2024, conducted by Plaintiff, that he is only at All City ASC two days per week (Wednesdays and Sundays) where he works all day doing injections or procedures (from around seven a.m. to about four or five p.m.). When he is not at All City ASC, he is running his anesthesia practice, Total Anesthesia, which has offices in Valley Stream, New York and around seven or eight satellite offices and employs another doctor and five physician assistants who Shabtian supervises. Shabtian works all day at Total Anesthesia on Mondays, Tuesdays and Thursdays, where he sees patients from nine a.m. to five or six p.m. and runs the day-to-day operations afterward until eight to ten p.m. He also performs procedures at North Queens ASC once per month and works at a plastic surgeon's office on Fridays from around 7 a.m. until the afternoon when he stops working to observe the Sabbath. Shabtian testified that he is a one percent owner of All City ASC, has no voting rights, but is required to perform a minimum number of services at one or more of the Surgicore ASCs. He further testified that he did not know who was on All City ASC's board of directors (other than Kogan), despite having served as its medical director since around 2022 and as one of its owners since 2021. He also did not know who owned the Surgicore ASCs (other than Kogan) and did not know any of the other owners of All City ASC. He also testified has is not on All City ASC's board of directors and has never gone to any of All City ASC's voting board sessions or meetings because he is running around six days a week and has no time. Shabtian further testified that he received his ownership interest in All City ASC when he began bringing cases there and that it is common practice for surgeons to be made part-owners when they bring cases to the Surgicore ASCs (and that there is a minimum required number of cases before a surgeon can be made a part-owner). Shabtian testified that he has been receiving distributions for his ownership interest since 2021 and also receives a salary as All City ASC's "medical director."

548. On information and belief, all of the Defendant Medical Directors were either unqualified to serve as medical directors due to their lack of experience and training and/or were otherwise engaged in busy practices of their own that prevented them from fulfilling the statutory requirements as medical directors for the Surgicore ASCs.

549.     Similarly, the Controllers knew that the personnel that they recruited to serve as the Surgicore ASCs' putative "administrators" did not have the requisite training and experience related to the services provided at the Surgicore NJ ASCs; would not ensure the development, implementation, and enforcement of all policies and procedures, including patient rights, would not ensure compliance with all applicable laws, rules, and regulations; would not ensure that all patients received quality healthcare services provided in accordance with generally accepted standards of professional practice; would not fulfill the statutory and regulatory requirements applicable to them; and/or would permit the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and ceded all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not (and have never been) licensed physicians.

550.     Likewise, the Controllers knew that Hoyle would ensure that the putative "directors of nursing" at the Surgicore ASCs did not fulfill the statutory and regulatory requirements applicable to them and/or permitted the Surgicore ASCs to be operated solely in the pecuniary interests of the Controllers without regard for patient care, and ensure that the putative "directors of nursing" at the Surgicore ASCs instead ceded all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers who were not licensed physicians.

551.     Moreover, in order to circumvent New Jersey and/or New York law, and induce the NJDOH and NYDOH to maintain the Surgicore ASCs' licenses and permit them to operate as ASCs, the Controllers, through the Surgicore ASCs, often, if not always, misrepresented the

percentage of their revenues that would come from No-Fault claims and the local communities that would be served, including by misrepresenting that the Surgicore NJ ASCs were intended to serve local communities in New Jersey, when, in fact, the Controllers knew that the vast majority of patients at the Surgicore NJ ASCs would be transported from New York.

552.    In addition to the sham "medical directors," "administrators," and Hoyle, in furtherance of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, the Controllers devised an elaborate, unlawful referral/kickback scheme whereby the Controllers, through the Surgicore ASCs, entered into secret, illegal referral/kickback arrangements (and created sham paperwork) with physicians, other HCPs, and unlicensed individuals (referred to herein as the Surgicore Owners) who purchased or otherwise acquired shares in the Surgicore ASCs to make it appear that payments made by the Surgicore ASCs were dividends or other cash distributions for their "investments" in the Surgicore ASCs when, in fact, the payments were illegal compensation for (and based on the volume of) referrals for medically unnecessary interventional pain management procedures, anesthesia services, and facility fees, which were pursuant to a predetermined medical protocol, irrespective of medical necessity, that resulted from the referral/kickback arrangement that they negotiated with the Controllers.

553.    The Defendant Surgicore Medical Directors, Defendant Surgicore Administrators, and Hoyle participated in the scheme to defraud by unlawfully ceding all decision-making and policy-making authority relating to the operation and management of the Surgicore ASCs, including decisions pertaining to the direction and quality of care of the medical services rendered at the Surgicore ASCs, to the Controllers, and by the Surgicore ASCs to funnel the proceeds of the fraud scheme, by making payments disguised as dividends or other cash distributions, management, marketing, rent, utilities and/or other payments, directly or indirectly to the

Surgicore Owners and the Controllers, and/or others under their supervision and control so that the Surgicore ASCs would continue to receive a steady stream of patients whom they could "treat" from the Surgicore Owners, Controllers, and/or their affiliates.

554.    Since acquiring ownership and/or control the Surgicore ASCs, the Controllers have operated one or more of the Surgicore ASCs in violation of the pertinent statutes and regulations as detailed herein.

555.    On information and belief, the Surgicore ASCs, the Controllers, and the Surgicore Owners regularly did not disclose their financial relationships to patients. The Surgicore ASCs, the Controllers, and the Surgicore Owners never disclosed the details of their financial relationships to patients including that their ownership in the Surgicore ASCs was in fact a sham, illegal referral/kickback arrangement. When provided, the ownership disclosures were often times, incomplete or not up to date and/or misreported owners' names. Ownership interests were also concealed through companies or family members, so patients were never aware of the actual owners or the extent of their ownership interests in the Surgicore ASCs.

556.    The Controllers and the Surgicore ASCs were aware that compensation to the Controllers and the Surgicore Owners could not vary by the number of referrals. Nevertheless, compensation did vary by referrals and the amount of shares was related to the referral activity and was adjusted up and down dependent upon volume. In order to conceal this fact, the Controllers, through the Surgicore ASCs, created sham paperwork to make it appear that ownership interests were being purchased as investments and that payments made were returns on investments. Thus, not only did these Defendants engage in illegal and unnecessary referrals/kickbacks, and not only were payments issued in consideration of the referrals, these

Defendants engaged in an elaborate scam to conceal and hide the actual arrangement in a knowing attempt to conceal their violations of the law.

557.     The referral of Covered Persons between these financially related entities and individuals was (and is) illegal under both New York and New Jersey law.

558.     In addition to the unlawful kickback and financial arrangements alleged herein with respect to the Surgicore Owners, the Controllers, through one or more of the Surgicore ASCs and/or others unknown to Plaintiff acting at their direction, also paid kickbacks to and/or entered into unlawful compensation arrangements with Bowen, Jimenez, Hall, Portal, Eltaki, Scinas, Khan, Kao, Eaton, Itzkovich, Neuman, and/or one or more of the John Does 2 through 20, who Plaintiff has not been able to confirm have any financial interest in the Surgicore ASCs. Such kickbacks and unlawful compensation were paid to these doctors in exchange for their agreement to steer or refer a high volume of Covered Persons to one or more of the Surgicore ASCs, for which they or others acting under their control then provided one or more of the Fraudulent Services and for which they and/or the Controllers, through the Surgicore ASCs, submitted fraudulent bills to Plaintiff for, among other things, facility fees.

## II.     The Documented Fraudulent History of the Surgicore ASCs

559.     The Surgicore ASCs have a long history of fraudulent conduct.

560.     According to press reports, in 2004, as a part of a settlement with the New York Attorney General, All City ASC agreed to repay taxpayers $6 million for false claims that it submitted and, as a part of the settlement, admitted that it knowingly operated its clinics and intentionally billed Medicaid for services it provided in violation of state regulations governing part-time clinics. As a part of the settlement, All City ASC also agreed to close its diagnostic treatment center and remaining part-time clinic, and employ a compliance officer to monitor the

operation of the ASC. Per press reports, its two owners collected $1.4 million in salaries in 2002 and one of the owners, Rossia Pokh ("Pokh") (not named as a defendant herein), identified therein as All City ASC's director and vice president, and who, as alleged herein, is Zybin's mother, pleaded guilty to grand larceny in connection with the case for knowingly causing All City ASC to submit thousands of reimbursement claims for services that it provided in violation of state regulations. The case also led to the criminal convictions of several other people at All City ASC, and the revocation of at least one physical therapist's license as a result of his criminal conviction for illegally billing Medicaid.

561.     In *Simon v. Francinvest, S.A.*, 162867/2014 (N.Y. Cnty. Sup. Sept, 24, 2018), Fifth Avenue ASC and its founding member, Charles Raab (not named as a defendant herein), were named as defendants in an alleged scheme to defraud. In *Simon v. Francinvest, S.A.*, Charles Raab was alleged to have left another ASC, French-American Surgery Center, Inc. (not named as a defendant herein), in 2007 in order to form Fifth Avenue ASC and secretly and illegally acquire French-American Surgery Center, Inc. in a below market-rate transaction which was ultimately deemed by NYDOH to be an "inside transaction." Fifth Avenue ASC Midtown and its property owner, JJS Group, Inc. (not named as a defendant herein), were alleged to have been misused to fill "personal coffers" and commit "corporate waste" and that Charles Raab, as JJS Group, Inc.'s principal, treasurer and "primary contact person," had "unfettered access" to its bank accounts. Additionally, Charles Raab was alleged to have formed three purported billing companies that fraudulently "triple-dipped" in billing fees received from Fifth Avenue ASC and/or French-American Surgery Center, Inc. Specifically, Charles Raab was alleged to have owned Empire Fiscal Management, Inc. (not named as a defendant herein) which received over $1.5 million in "billing" fees from French-American Surgery Center, Inc. between 2005 through 2010, despite the

fact that Empire Fiscal Management, Inc. had dissolved in 1993. Charles Raab was also alleged to have misrepresented to NYDOH that he was Empire Fiscal Management, Inc.'s current president in 2009. In 2007, Fifth Avenue ASC's managing board, which consisted of Charles Raab, Amigud, and Gregg Rock, DPM (not named as a defendant herein) was alleged to have created a second company, Madison Associates ASC Management, Inc. (not named as a defendant herein), which received $180,000 per year from Fifth Avenue ASC in "management" fees, as well as more than $1.2 million in additional billing fees between 2008 and 2010. In 2010, Charles Raab was also alleged to have created a third company, SEM Services, LLC (not named as a defendant herein), in order to bill ASC facility fees, for which SEM Services, LLC was to receive a fixed rate $535,000 per year from Fifth Avenue ASC, regardless of the number of patients or bills submitted.

562.     In *Gov't Emp. Ins. Co., et al. v. Trnovski, et al.*, 16-cv-4662 (D.N.J.), a civil RICO/insurance fraud action, New Horizon ASC was alleged to have received unlawful self-referrals from two of its members for medically unnecessary treatment, including medically unnecessary pain management injections that did not require anesthesia.

563.     In *Allstate Ins. Co., et al. v. Mendoza, et al.*, 608378/2018, ECF No. 28 (N.Y. Sup. Ct. [Nassau] Feb. 13, 2019), the plaintiffs credibly alleged that the defendants, which included New Horizon ASC, Degradi, Main Street Medical, Hatami, McCulloch, Seldes, Haar, NY Spine, and Haar Orthopaedics, among others, were a part of an illegal referral/kickback arrangement where patients were brought from New York to New Horizon ASC so that New Horizon ASC could bill insurers for medically unnecessary services, including unnecessary facility fees. The patients were credibly alleged to have been steered or referred to New Horizon ASC through a referral network that included New Horizon ASC's owners and their associated HCPs. New Horizon ASC's owners were alleged to have entered into sham "investment" relationships with

New Horizon ASC whereby their "investments" in New Horizon ASC were used as cover for kickbacks for the referrals, which were disguised as dividends or other cash distributions for their "investments" in New Horizon ASC. Degradi was alleged to be at the "center of the fraudulent and abusive claims" and "responsible for a network that [] made improper referrals to each other and ultimately to New Horizon" ASC. *Allstate Ins. Co., et al. v. Mendoza, et al.*, 608378/2018, Am. Compl. (N.Y. Sup. Ct. Nassau County Feb. 13, 2019).

564. In *Personal Service Ins. Co., et al. v. Monace, et al.*, ESX-L-002755-20 (N.J. Super. Ct. 2020), the plaintiffs credibly alleged that the defendants, which included New Horizon ASC and Manalapan ASC, among others, submitted claims and medical bills to plaintiffs for staged and fraudulent hit and run accidents.

565. In *State Farm Guaranty Ins. Co., et al. v. Kettia Dernier, et al.,* ESX-L-007323-19 (N.J. Super. Ct. 2019)., the plaintiffs credibly alleged that the defendants, which included Jersey City ASC, Manalapan ASC, Synergy Anesthesia, and Precision Anesthesia, among others, targeted the plaintiffs as part of a staged and caused motor vehicle accident ring involving predetermined low speed vehicular collisions that resulted in supposed soft tissue injuries followed by treatment from typically the same HCPs, which misrepresented treatment and made medically unnecessary referrals. The plaintiffs credibly alleged that many of the claimants in the staged accidents were connected through familial ties or prior staged accidents.

566. In *Allstate Ins. Co., et al. v. Matturro, D.C., et al.*, BER-L-002707-20 (N.J. Super. Ct. 2020), a qui tam civil RICO and insurance fraud action in which the New Jersey Commissioner of the Department of Banking and Insurance intervened, the plaintiffs credibly alleged that the defendants, which included Saddlebrook ASC, among others, engaged in a fraudulent referral/kickback scheme in which the treating providers performed steroid injections with the use

of medically unnecessary sedation anesthesia, which they used as a basis to perform the procedures at ASCs, such as Saddlebrook ASC and to bill the plaintiffs for unnecessary ASC facility fees, when such procedures required only a local anesthetic and, thus, could have been performed at the HCPs' private offices.

567.    In *Roosevelt Road Re, Ltd., et al. v. Wingate, Russotti, Shapiro, Moses, Halperin, LLP, et al.*, 24-06259 (E.D.N.Y. 2024), Saddlebrook ASC, Fifth Avenue ASC, and North Queens ASC, among others, were named as defendants for their roles in a widespread scheme to defraud involving staged construction accidents, fraudulent workers' compensation claims, and personal injury lawsuits, and medically unnecessary and excessive healthcare services. For their role in the scheme, Saddlebrook ASC, Fifth Avenue ASC, and North Queens ASC were alleged to have intentionally submitted fraudulent medical documentation for reimbursement for medical services that were unnecessary, excessive, unwarranted, costly, and/or were not causally related to the alleged accident, and provided such fraudulent documentation to law firms knowing that they would be used to falsely bolster and add value to claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits. Saddlebrook ASC, Fifth Avenue ASC, and North Queens ASC were alleged to have knowingly profited from reimbursements for the unnecessary medical services and the increased number of patients treated at their facilities as a part of the scheme. In the original complaint, filed on March 1, 2024 under Index No. 24-cv-1549, the Controllers, along with two physicians, were alleged to have rendered the fraudulent treatment protocol, along with several limited liability companies purporting to provide realty, management, anesthesia, and other services.

### III.    Illegal Operation of the Surgicore NJ ASCs

568.    Beginning in or around 2009, Degradi and one or more of the other Controllers, who did not have any prior experience operating ASCs, began acquiring ownership in ASCs located outside of New York and specifically in New Jersey that they could own and control and use to submit excessive billing for unnecessary medical treatment to insurers, including Plaintiff.

569.    The Controllers specifically sought out-of-state ASCs so that they could take advantage of the absence of specific fee schedules at the time, and submit excessive charges based on exaggerated claims that were well above the corresponding sections of the Fee Schedule applicable to those services, which led to available PIP benefits being depleted more quickly to Covered Persons' detriment. As a result of such abuses by out-of-state providers (and as further detailed herein), in 2016 DFS announced proposed rulemaking to limit reimbursement for such services, which was ultimately adopted and went into effect on January 23, 2018.

570.    Though the Surgicore NJ ASCs purported to serve their local communities in New Jersey, many of their patients resided in New York, often a significant distance from the Surgicore NJ ASCs, and were otherwise treated in New York for injuries purportedly suffered in automobile accidents that reportedly occurred in New York State pursuant to insurance policies issued in New York State to New York insureds who were covered under the New York No-Fault Law.

571.    The Surgicore NJ ASCs paid to transport these New York patients to New Jersey for medical treatment, even though such services could have otherwise been performed in an in-office setting in New York, so that the Surgicore NJ ASCs could bill under the New Jersey fee schedule, thus affording significantly higher reimbursement and avoiding limitations under New York's fee schedule, for, among other things, thousands of dollars in unnecessary facilities fees per procedure.

572.    The incentive to transport patients to the Surgicore NJ ASCs increased markedly after the New York Court of Appeals issued its decision in *Gov't Emp. Ins. Co. v. Avanguard Med. Group, PLLC*, 27 N.Y. 3d 22 (N.Y. 2016) that office based surgery centers (unlike hospitals or ASCs) were not entitled to reimbursement of facility fees.

573.    Thus, by way of example and not limitation, in *Allstate Ins. Co. v. Mendoza*, 608378/2018, ECF No. 28 (Nassau Cnty. Sup. Feb. 13, 2019), the plaintiffs credibly alleged that Haar had been performing in-office procedures in New York before he became an "investor" in New Horizon ASC and switched his surgeries to New Horizon ASC in or around November of 2016, where he billed for unnecessary facility fees.

574.    The Controllers ensured a steady stream of New York patients to the Surgicore NJ ASCs by entering into sham "investment," referral kickback relationships with the Surgicore Owners, including providers who primarily practiced in New York and/or others associated with HCPs in New York, and provided them with lucrative returns on their "investments" in the Surgicore NJ ASCs, and employed an extensive network of interrelated providers who referred patients to each other and to the Surgicore NJ ASCs.

575.    In many instances, the providers that steered and/or otherwise directed patients to the Surgicore NJ ASCs failed to inform those patients that services would be provided outside of New York, often advertising their services as being provided at their offices in New York.

576.    The free transportation offered by the Surgicore NJ ASCs to bring New York patients to New Jersey was an illegal gratuity designed to provide a patient population to the Surgicore NJ ASCs to allow them to bill for facility fees relating to the Fraudulent Services provided at, by, and through the Surgicore NJ ASCs.

577.     Additionally, the Surgicore NJ ASCs, Surgicore Orthopedic Providers and Surgicore Pain Management Providers never disclosed to the patients how much of their New York coverage was going to be depleted by their excessive charges and never disclosed that the Surgicore ASCs would be billing for unnecessary facility fees that would not be charged if the services were provided at the physician's offices in New York.

578.     Patients were not brought to New Jersey to provide better services or services that were not otherwise available in New York. Rather, patients were brought to New Jersey to allow the Surgicore NJ ASCs to bill for facility fees, which they could not do if the services were provided at an office based surgery center.

579.     The Surgicore NJ ASCs obtained their licenses from NJDOH without disclosing to NJDOH that the vast majority of their patients would be and are brought from New York to New Jersey with transportation paid for by the Surgicore NJ ASCs to allow the Surgicore NJ ASCs to "treat" them and bill for the Fraudulent Services under New York No-Fault Laws. Had the Surgicore NJ ASCs disclosed this scheme (and its systematic plan to import New York insureds without fulfilling any need for their services in New Jersey), the approval of their operating licenses by NJDOH would have been at risk.

580.     The Surgicore NJ ASCs are ineligible for reimbursement insofar as they have operated in violation of the New Jersey Standards for Licensing of ASCs, including the requirements for ASC medical directors, administrators, and directors of nursing, and prohibitions against kickbacks for medical referrals.

**A. The Illegal Operation of New Horizon ASC**

    i. The Fraudulent "Investor" Referral/Kickback Scheme

581.    In or around 2011, New Horizon ASC sought and obtained approval from NJDOH for Degradi to acquire a 60% ownership interest in the NJ ASC, New Horizon ASC.

582.    Despite not having been approved as an owner until 2011, on its 2010 annual report filed with the New Jersey Department of the Treasury ("NJDOT") (and all annual reports filed since then, through 2024), New Horizon ASC represented that Degradi was its CEO. According to NJDOH records, Degradi has been an owner of New Horizon ASC since at least 2011 or 2012. Between at least 2013 and around June 2015, Degradi had ownership interests in New Horizon ASC through Jamesport Equities, LLC (not named as a defendant herein). Since around October 2015, Degradi has had ownership interests in New Horizon ASC through Main Street Medical.

583.    At all relevant times herein, Jamesport Equities, LLC has been owned and controlled by Degradi. New Horizon ASC represented to NJDOH that Degradi was the sole owner of Jamesport Equities, LLC. According to its corporate filings, Jamesport Equities, LLC was organized by Degradi, Hatami, and Guy Mitchel Serbes (not named as a defendant herein) in 2009, and represented that Degradi was its president and/or member on all annual reports filed with the NJDOT since it was formed. On its certificate of formation and annual reports, the only address listed for Jamesport Equities, LLC is an residential property, located at 103 Waterview Drive, Sound Beach, New York ("103 Waterview Drive") in Nassau County, New York, owned solely by Degradi since 2007.

584.    At all relevant times herein, Main Street Medical has been owned and controlled by Degradi. New Horizon ASC represented to NJDOH that Degradi was the sole owner of Main Street Medical. According to its corporate filings, Degradi was the sole president, owner, and

officer of Main Street Medical, with the exception of 2013, when K. Degradi (identified therein by her alternate name, Kristen Laird) was also identified as a co-president with Degradi. In 2013, Main Street Medical changed its principal executive office from 475 E. Main Street, Patchogue, New York, to 239 E. Main Street.

585.     Degradi has a history of using Main Street Medical to perpetrate insurance fraud. In addition to other lawsuits filed against Degradi that are alleged herein, Degradi and Main Street Medical were also named as defendants in two RICO and/or insurance fraud actions.

586.     First, in *Allstate Ins. Co., et al. v. Payne, et al.*, 18-cv-3972 (E.D.N.Y. 2018) Degradi was alleged to have unlawfully managed and controlled three MRI facilities using his management companies, including Main Street Medical and PB & Goose LLC, to unlawfully operate one or more medical PC companies and unlawfully share in the professional physician fees and profits collected by them.

587.     Second, in *Farmington Cas. Co., et al. v. Patchogue Open MRI, P.C., et al.*, 22-cv-00999-HG-SIL (E.D.N.Y. 2022), the plaintiffs credibly alleged that the defendants, which included Degradi and Main Street Medical, among others, engaged in scheme to defraud via the facilitation and cover-up of Degradi's illegal and unlawful ownership and control of the corporate defendants, an illegal kick-back scheme, and the implementation of a pre-determined fraudulent treatment protocol. The plaintiffs credibly alleged that Degradi unlawfully operated and controlled the several medical PCs and conspired with other defendants through a series of agreements between the medical PCs and purported management companies that Degradi also owned and controlled, including PB & Goose LLC, Main Street Medical, Patchogue Open MRI, LLC, and JAVS Ventures Inc. Degradi was credibly alleged to have recruited physicians to act as the purported owners of the medical PCs that he unlawfully operated and controlled, and to have

unlawfully shared in the professional physician fees and profits collected by the medical PCs. The plaintiffs also credibly alleged that one or more of the medical PCs assigned their healthcare receivables to Main Street Medical despite the fact that it was not a professional healthcare service entity and therefore, had no legitimate or lawful reason for holding any rights to unpaid healthcare insurance receivables or health insurance proceeds.

588.    According to corporate filings, 239 E. Main Street is affiliated with several other companies owned and/or controlled by one or more of the Controllers, including KDH Consulting Group LLC, ASAR Healthcare, Jersey City ASC, WHAD Consulting Corp., and the billing company used by one or more of the Surgicore ASCs, Vcarve, LLC d/b/a MD Manage d/b/a ThoughtSpark (not named as defendants herein).

589.    According to public records, K. Degradi is Degradi's wife.

590.    Since 2012, PB & Goose LLC has owned 239 E. Main Street. PB & Goose LLC's registered agent on file with the New York Department of State ("NYDOS") is Degradi at 103 Waterview Drive.

591.    Degradi was also listed as a debtor with Jamesport Equities, LLC, Main Street Medical, and PB & Goose LLC on a 2017 UCC financing statement.

592.    New Horizon ASC filed its certificate of formation with the NJDOT on or about April 14, 2009 and represented that its managing members were Olga Sanchez-Pena (not named as a defendant herein) and Romero.

593.    According to NJDOH records, between at least 2010 and 2011, Jose Sanchez-Pena, M.D. (not named as a defendant herein) was New Horizon ASC's CEO.

594.    According to court filings, Jose Sanchez-Pena, M.D. is Romero's uncle and Olga Sanchez-Pena is Jose Sanchez-Pena, M.D.'s wife.

595.    According to NJDOH records, Romero has been New Horizon ASC's "administrator" since at least 2010. Corporate filings also identified Romero as New Horizon ASC's secretary in 2024.

596.    Romero had ownership interests in New Horizon ASC in or around 2009 through 2011, but was replaced either before or at the same time that Degradi acquired ownership interests in New Horizon ASC in or around 2011. NJDOH records indicate that Romero signed New Horizon ASC's amended license application, dated June 17, 2010, as its "member/manager," and also identified himself therein as New Horizon ASC's "administrator," registered agent and emergency contact.

597.    Though he was not identified in any records received from NJDOH as having any direct or indirect ownership interests in New Horizon ASC since at least as early as 2011, Romero repeatedly held himself out as a member/manager of New Horizon ASC on records submitted to NJDOH between at least 2016 and 2023, including on many of the purported membership unit purchase agreements for New Horizon ASC, including for Seldes, McCulloch, and Haar, wherein he signed as "managing member" on behalf of New Horizon ASC; on New Horizon ASC's license renewal application, dated March 13, 2013, wherein he signed as "administrator/managing partner" on behalf of New Horizon ASC; and on attestations as to New Horizon ASC's ownership dated December 18, 2017 and May 16, 2018, and purportedly submitted to meet the certification/attestation requirements for approval requested by NJDOH, in which Romero was identified as the "managing director" of New Horizon ASC and signed as an attorney-in-fact for New Horizon ASC's owners. Both attestations were also signed by Jeffrey Randolph, Esq. ("Randolph, Esq.") (not named as a defendant herein).

598. As alleged herein, according to NJDOH records, Romero was also the "administrator" for Manalapan ASC in or around 2015 and Saddlebrook ASC in or around 2017, and also held himself out as a managing partner/member of Saddlebrook ASC between at least 2016 and 2018.

599. Before 2012, Randolph, Esq. was identified on annual reports as New Horizon ASC's agent. According to NJDOH records, Randolph Esq. served as counsel for New Horizon ASC from at least 2012 through 2022, and prospective owners of New Horizon ASC were directed, per the terms of the purported "membership unit purchase agreements," to make their "investments" in New Horizon ASC payable to his law firm's trust account.

600. As alleged herein, according to NJDOH records, Randolph, Esq. also served as counsel for Manalapan ASC in or around 2015, and prospective owners of Manalapan ASC were directed, per the terms of the purported "membership unit purchase agreements," to make their "investments" in Manalapan ASC payable to his law firm's trust account.

601. As alleged herein, according to NJDOH records, Randolph, Esq. also served as counsel for Saddlebrook ASC in or around 2017, and prospective owners of Saddlebrook ASC were directed, per the terms of the purported "membership unit purchase agreements," to make their "investments" in Saddlebrook ASC payable to his law firm's trust account.

602. As alleged herein, according to NJDOH records, prospective owners of Jersey City ASC were directed, per the terms of the purported "membership unit purchase agreements," to make their "investments" in Jersey City ASC payable to Randolph, Esq.'s law firm's trust account.

603. Randolph, Esq. is a No-Fault defense attorney in New Jersey who has defended dozens of medical providers accused of insurance fraud in New York and New Jersey. In *Jackson v. North Jersey Center for Surgery, P.A.*, 08-cv-2526 (D.N.J. 2008), Randolph, Esq. was identified

as an owner/shareholder of another NJ ASC, North Jersey Center for Surgery, P.A., which was alleged to have been operated illegally without a license by the NJDOH.

604.    In *Allstate Ins. Co., et al. v. Matturro, D.C., et al.*, BER-L-002707-20 (N.J. Super. Ct. 2020), a qui tam civil RICO and insurance fraud action against Saddlebrook ASC, among others, in which the Commission of New Jersey Department of Banking and Insurance intervened, one of the orthopedist defendants admitted in his settlement agreement that "based upon the advice of [Randolph, Esq.] who held himself out improperly as counsel for Defendant, he unknowingly became involved in an unlawful business structure. . .in violation of the New Jersey Insurance Fraud Prevention Act."

605.    According to its annual reports filed with the NJDOT: (i) between 2010 and 2016, New Horizon ASC's officers/directors consisted of Degradi, Seldes, and Chavez; (ii) in 2017 and 2018, New Horizon ASC's officers/directors expanded to include M. Hatami, as treasurer, and B. Kogan, as secretary, respectively; (iii) in 2019, Ramirez replaced Chavez, and M. Seldes replaced R. Seldes, as New Horizon ASC's officer/directors; and (iv) in 2023, Romero replaced B. Kogan as New Horizon ASC's secretary.

606.    According to public records, Romero and Ramirez are related to and/or otherwise closely associated with each other including through joint corporate ownership and real estate transactions. According to public records, Chavez, Romero, and Ramirez are also closely associated with Randolph, Esq., including through one or more of the Surgicore ASCs and multiple real estate transactions.

607.    According to public records, Ramirez is or was Romero's wife.

608.    According to public records, M. Seldes is Seldes' wife.

609.    According to public records, M. Hatami is Hatami's wife.

610.     According to public records, B. Kogan is Kogan's wife.

611.     At all relevant times herein, M. Seldes was a straw officer/director of New Horizon ASC for Seldes, who was the actual officer/director for New Horizon ASC.

612.     At all relevant times herein, M. Hatami was a straw treasurer of New Horizon ASC for W. Hatami, who was the actual treasurer for New Horizon ASC.

613.     At all relevant times herein, B. Kogan was a straw secretary of New Horizon ASC for F. Kogan, who was the actual secretary for New Horizon ASC.

614.     At all relevant times herein, Chavez and Ramirez were straw officers/directors of New Horizon ASC for Romero, who was the actual officer/director for New Horizon ASC.

615.     On information and belief, the Controllers, Seldes, and Romero recruited their wives and Chavez to serve as straw officers/directors of New Horizon ASC in order to conceal the full extent of their control over New Horizon ASC.

616.     At all times as alleged herein, the Controllers, Romero, Ramirez, Chavez, S. Katanov, J. Katanov, Seldes, M. Seldes, R. Seldes, B. Kogan, Revutsky, M. Hatami, McCulloch, Haar, Naik, Keyserman, Shakarov, Denevich, Kostanian, Yaguda, Berkowitz, Dassa, Elkholy, and one or more of the John Does 2 through 20 (collectively, the "New Horizon ASC Owners") have had direct or indirect ownership interests in New Horizon ASC.

617.     At all relevant times while they were owners of New Horizon ASC, the New Horizon ASC Owners were responsible for the operation and control of New Horizon ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

618. At all relevant times since acquiring 60 percent ownership interest in New Horizon ASC in or around 2011, the Controllers have had a majority ownership interest in and/or otherwise controlled New Horizon ASC.

619. Upon acquiring control of New Horizon ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through New Horizon ASC entered into sham "investor" referral/kickback arrangements with the New Horizon ASC Owners who purchased or otherwise acquired shares in New Horizon ASC to make it appear that payments made by New Horizon ASC were dividends or other cash distributions for their "investments" in New Horizon ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

620. One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

621. In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, New Horizon ASC, the New Horizon ASC Owners purchased or otherwise acquired ownership interests in New Horizon ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The New Horizon ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from New Horizon ASC that were disguised as dividends or other cash distributions for their

"investments" in New Horizon ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

622.     In order to conceal the referral/kickback scheme and the full extent of their ownership and control over New Horizon ASC, the Controllers established, owned, maintained a financial interest in, or otherwise derived financial benefit from a web of associated companies, including Surgicore Management, which purports to be the "management" company for New Horizon ASC, HDS Investments, which purports to be the "landlord" of New Horizon ASC, and one or more of the ABC Corporations 1 through 20, that purport to serve as landlord, management, and/or other financing companies and which purported to enter into lease, management services, financing agreements, and other contracts with New Horizon ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over New Horizon ASC, to funnel proceeds from New Horizon ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

623.     Towards that end, according to the recorded deed, on or about February 14, 2018, HDS Investments purchased 680 Broadway, Unit 1U, Paterson, New Jersey, where New Horizon ASC is located. At all relevant times, HDS Investments has been owned and controlled by one or more of the Controllers. Hatami, acting as a member of HDS Investments, signed the deed for New Horizon ASC's office. According to the certificate of amendment filed with NJDOT on June 13, 2018, HDS Investments' members/managers consisted of the Controllers and Seldes.

624.     In addition to Degradi's ownership interests in New Horizon ASC, according to NJDOH records, ASC Investment Services has had ownership interests in New Horizon ASC since approximately February 2011.

625. At all relevant times herein, ASC Investment Services has been owned on paper by Chavez and/or Ramirez. From 2013 through May 2020, New Horizon ASC represented to NJDOH that ASC Investment Services was owned solely by Chavez. New Horizon ASC represented to NJDOH that the registered owner of ASC Investment Services changed from Chavez to Ramirez on May 1, 2020.

626. According to its corporate filings, in 2011, Chavez was ASC Investment Services' sole member/manager, and registered agent. In 2017, Ramirez replaced Chavez as ASC Investment Services registered agent and reported her address at 2 Deer Trail Ct. Ringwood New Jersey ("2 Deer Trail Ct.").

627. As alleged herein, ASC Investment Services is also an owner of Saddlebrook ASC.

628. On October 27, 2015, ASC Investment Services purchased 3-18 31st Street, Fair Lawn, NJ from Ramirez for a reported sale price of $175,000 (nearly $100,000 less than Ramirez paid for the same property in 2004).

629. In 2013, Chavez purchased 2 Deer Trail Ct. from Romero and Ramirez for a reported sale price of $505,000 (over $450,000 less than Romero and Ramirez paid for the same property in 2007). In 2019 (the same year that Ramirez replaced Chavez as one of New Horizon ASC's officers/directors), Chavez sold 2 Deer Trail Ct. to Ramirez for $1.00 subject to a life estate for the benefit of Randolph, Esq. Though not listed on the 2019 deed as an owner, Romero, along with Ramirez, took out a $500,000 home equity line of credit on 2 Deer Trail Ct. in 2022.

630. In *Allstate Ins. Co. v. Mendoza*, 608378/2018, ECF No. 28 (Nassau Cnty. Sup. Feb. 13, 2019), Romero (a defendant in the action) was credibly alleged to have been the "most common transportation provider" of patients from New York to New Horizon ASC, *i.e.*, a key facilitator of New Horizon ASC's scheme to defraud insurance companies by submitting grossly inflated

charges for medically unnecessary out-of-state services, including unnecessary ASC facility fees. Romero is the registered agent for Safe & Sound Transportation LLC (not named as a defendant herein), which shares the same address as New Horizon ASC.

631.　　Additionally, Romero was sued in two adversarial proceedings in Chapter 11 bankruptcy filed by his uncle, Jose Sanchez-Pena, M.D., in 2007, for his role as a "willing participant" in Jose Sanchez-Pena, M.D.'s scheme to defraud his creditors by transferring his assets to third-parties and family members. *See In re Jose R. Sanchez-Pena*, 07-br-15054 (E.D.N.Y. 2007); *Biase v. Surgical Center at Jersey City LLC, et al.*, 08-ap-1331 (E.D.N.Y. 2008); *Biase v. Surgical Center at Jersey City LLC, et al.*, 08-ap-1336 (E.D.N.Y. 2008). Specifically, Romero was alleged to have engaged in a conspiracy to deprive the bankruptcy estate and its creditors of the true value of Jose Sanchez-Pena, M.D.'s interest in Gregory Surgical Services LLC (not named as a defendant herein), which per public court filings operated an ASC at Jersey City ASC's clinic location, and to force the trustee to sell Jose Sanchez-Pena, M.D.'s interest in Gregory Surgical Services LLC at a reduced price. Romero, who was alleged to be Gregory Surgical Services LLC's administrator, CFO, and part-owner with Jose Sanchez-Pena, M.D., was alleged to have served as a "strawman" for Jose Sanchez-Pena, M.D. and was alleged, along with Jose Sanchez-Pena, M.D., to have used Gregory Surgical Services LLC's as his "personal piggybank," including by using Gregory Surgical Services LLC to loan himself $195,000. Gregory Surgical Services LLC's expenses and payroll were alleged to be "excessive and unusual for a surgical center" and "grossly disproportionate to the revenue" that it generated. The trustee further alleged that Romero's conduct demonstrated "a blatant and gross conflict of interest and gross mismanagement of Gregory Surgical [Services LLC]." *See Biase v. Surgical Center at Jersey City LLC, et al.*, 08-ap-1331 (E.D.N.Y. 2008). Additionally, Romero was alleged to have been involved

in the alleged intentionally fraudulent transfer for less than fair consideration of several suites located at Jersey City ASC's clinic location (550 Newark Avenue, Jersey City, New Jersey). *See Biase v. Surgical Center at Jersey City LLC, et al.*, 08-ap-1336 (E.D.N.Y. 2008). Specifically, Romero was alleged to have fraudulently purchased several of the suites at 550 Newark Avenue, Jersey City, New Jersey, through several companies that he owned, including Jersey City Investment Group, Inc. and Gregory Realty, LLC (not named as defendants herein). The trustee alleged that Romero "could not have accumulated funds necessary to pay fair consideration for the properties" and that the transfer of partial ownership of Gregory Realty, LLC to Romero was also done with actual intent to defraud and for less than fair consideration. The trustee also noted the suspicious nature of the purported loans that Romero obtained from Gregory Surgical Services LLC, which were made shortly after Romero purportedly purchased ownership interests in several properties including several suites at 550 Newark Avenue, Jersey City ASC, and a separate purported loan that Romero obtained from his other company, Gregory Anesthesia Services LLC (not named as a defendant herein). Romero was also alleged to have been "wrongfully collecting rent" from Gregory Surgical Services LLC for 550 Newark Avenue, Suite 501, Jersey City, New Jersey through his company Jersey City Investment Group, Inc. and to have refinanced the mortgage on 550 Newark Avenue, Suite 501, Jersey City, New Jersey, and to have derived substantial proceeds therefrom.

632.    According to public records, Gregory Anesthesia Services LLC, Jersey City Investment Group, Inc., Gregory Realty, LLC, and Comprehensive Imaging Center LLC (not named as a defendant herein), for which Romero is listed as the registered agent, share the same address as Jersey City ASC.

633. According to public records, Romero was also the owner/operator of Barnert Imaging Center, LLC (not named as a defendant herein), which shares the same address as New Horizon ASC.

634. Though New Horizon ASC and Saddlebrook ASC represented that ASC Investment Services was only owned by Chavez or Ramirez, "Amaury," *i.e.*, Romero was identified as ASC Investment Services' only owner in a record dated January 1, 2023 received from NJDOH that was presumably prepared by Saddlebrook ASC and/or prepared by NJDOH based on information provided by Saddlebrook ASC to NJDOH.

635. Additionally, as alleged herein, though he has not been identified as an owner of New Horizon ASC since at least as early as 2011, Romero repeatedly held himself out as a member/manager of New Horizon ASC on records submitted to NJDOH between at least 2016 and 2023.

636. At all relevant times herein, Chavez and/or Ramirez were nominal or straw owners of ASC Investment Services, which was actually owned and controlled by Romero and/or one or more of the John Does 2 through 20.

637. On information and belief, New Horizon ASC did not disclose to its patients that Romero and/or one or more of the John Does 2 through 20 had ownership interests in New Horizon ASC through ASC Investment Services, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to New Horizon ASC in order to ensure a steady stream of patients to New Horizon ASC, irrespective of medical need.

638. According to NYDOH records, S. Katanov has had ownership interests in New Horizon ASC since approximately 2012. Additionally, according to NJDOH records, Redy Ventures has had an ownership interest in New Horizon ASC since at least January 2022.

639. According to public records, S. Katanov is the wife of J. Katanov.

640. At all relevant times herein, Redy Ventures has been owned and controlled by J. Katanov. Rockland and Bergen ASC represented to NJDOH in 2022 that Redy Ventures is owned solely by Katanov. Redy Ventures' registered address is a residential property located at 65-24 Ellwell Crescent, Rego Park, NY, which in 2012 was sold by J. Katanov and S. Katanov to S. Katanov, as trustee, for a reported sale price of $0.00.

641. S. Katanov is also an owner of All City ASC and, on information and belief, Fifth Avenue ASC.

642. Redy Ventures is also an owner of Rockland and Bergen ASC.

643. In *Allstate Ins. Co. v. Mendoza*, 608378/2018, ECF No. 28 (Nassau Cnty. Sup. Feb. 13, 2019), the plaintiffs credibly alleged S. Katanov became an owner of New Horizon ASC in December 2014. However, according to historic archives for New Horizon ASC's website, S. Katanov was not reported as an owner on New Horizon ASC's website until sometime after July 2016.

644. In *Allstate Ins. Co. v. Mendoza*, 608378/2018, ECF No. 28 (Nassau Cnty. Sup. Feb. 13, 2019), the plaintiffs also credibly alleged that, after S. Katanov became an owner of New Horizon ASC, New Horizon ASC began billing for procedures in which Metropolitan Surgical Services and J. Katanov provided physician services, that Metropolitan Surgical Services then billed the plaintiffs for the same procedures, and that no disclosure of this financial relationship was made to patients.

645. At all relevant times herein, S. Katanov was a nominal or straw owner for J. Katanov, who was the actual owner of S. Katanov's ownership interest in New Horizon ASC.

646.	According to NJDOH records, Blue Wall Management and ASAR Healthcare has also had ownership interests in New Horizon ASC since approximately March 2013.

647.	At all relevant times herein, Blue Wall Management has been owned on paper by R. Seldes and/or M. Seldes. According to its certificate of formation, Blue Wall Management provides "consulting services" and M. Seldes was its member/manager. New Horizon ASC also represented to NJDOH in 2013 that M. Seldes was Blue Wall Management's sole member. Since 2016, New Horizon ASC has represented that "Richard Seldes, MD c/o Blue Wall Management, LLC" is one of New Horizon ASC's owners. In 2013 and 2014, New Horizon ASC represented to NJDOH that Blue Wall Management and/or M. Seldes owned 15 percent of New Horizon ASC.

648.	According to public records, M. Seldes is Seldes' wife.

649.	At all relevant times herein, M. Seldes was a nominal or straw owner of Blue Wall Management, which was actually owned and/or controlled by Seldes.

650.	At all relevant times herein, ASAR Healthcare has been owned on paper by B. Kogan, Revutsky, and/or Tylman. In 2013, New Horizon ASC represented to NJDOH that ASAR Healthcare, was jointly and equally owned by B. Kogan and Revutsky. In 2013 and 2014, New Horizon ASC represented to NJDOH that B. Kogan and/or ASAR Healthcare, owned 50 percent of New Horizon ASC. However, in December 2019, Rockland and Bergen ASC represented to NJDOH that ASAR Healthcare was owned solely by Tylman. Additionally, in its November 2016 license application, Jersey City ASC represented to NJDOH that ASAR Healthcare was owned by Tylman.

651.	At all relevant times herein, Ortuz has been owned and controlled by Tylman. On March 15, 2018, Ortuz filed a certificate of registration as a foreign business with the NJDOT, identifying Tylman as a general partner, and on September 18, 2019, Tylman filed a certificate of

revival for Ortuz with the State of Delaware. Ortuz was identified in corporate filings as a "management and consulting" company. In UCC financing statements filed with the Delaware State Division of Corporations on November 18, 2019, Ortuz was identified as having an ownership interest in ASAR Healthcare.

652.     On information and belief, Revutsky is Tylman's sister and/or otherwise closely associated with him.

653.     Revutsky was also an owner of Manalapan ASC between 2012 and 2015, and All City ASC through December 30, 2020.

654.     As alleged herein, B. Kogan is also a purported owner of All City ASC.

655.     Tylman, one of the Controllers, was named as a defendant in *Allstate Ins. Co., et al. v. Zhigun, et al.*, 603669/2003 (N.Y. Cnty. Sup. Ct. 2003), wherein he was credibly alleged to be the owner and operator of a durable medical equipment ("DME") company "whose operating procedure, patterns and practices mirrored" other DME companies, and was alleged to have forged illicit kickback relationships with" DME wholesalers and presided over two separate RICO enterprises (a DME network enterprise and a "criminal" medical network enterprise).

656.     At all relevant times herein, ASAR Healthcare has been owned and controlled by Tylman and/or Kogan, including through Ortuz.

657.     At all relevant times herein, B. Kogan and Revutsky were nominal or straw owners of ASAR Healthcare, which was actually owned and/or controlled by Tylman, including through Ortuz and/or Kogan.

658.     On information and belief, New Horizon ASC, did not disclose to its patients that Tylman and/or Kogan had ownership interests in New Horizon ASC through ASAR Healthcare and/or Ortuz, including that they were receiving compensation for steering or referring, or causing

to be steered or referred, Covered Persons to New Horizon ASC in order to ensure a steady stream of patients to New Horizon ASC, irrespective of medical need.

659. According to NJDOH records, BDP Ventures LLC and/or BDP Ventures Inc., and McCulloch have also had ownership interests in New Horizon ASC since approximately June 2015.

660. At all relevant times herein, BDP Ventures LLC has been owned on paper by M. Hatami and/or Hatami. New Horizon ASC represented to NJDOH that BDP Ventures, LLC was owned solely by M. Hatami. According to its corporate filings, BDP Ventures LLC was formed on November 4, 2014 by M. Hatami, reported Hatami as its member in 2016, and dissolved on May 1, 2018.

661. At all relevant times herein, BDP Ventures Inc. has been owned on paper by M. Hatami, Hatami, and/or Degradi. According to its corporate filings with NYDOS, on May 1, 2018, the same date that BDP Ventures LLC was dissolved, BDP Ventures Inc. was incorporated and listed M. Hatami as its registered agent. In or around January 15, 2020, BDP Ventures Inc. filed a certificate of authority to conduct business in New Jersey with the NJDOT, listing Hatami as its president. According to its annual reports filed with NJDOT, in 2021 and 2022, Degradi was listed as BDP Ventures Inc.'s director and manager, and in 2023 and 2024, M. Hatami was listed as BDP Ventures Inc's director and owner. Per its 2024 annual report filed with NYDOS, M. Hatami is BDP Ventures Inc.'s CEO and director.

662. In *Allstate Ins. Co. v. Mendoza*, 608378/2018, ECF No. 28 (Nassau Cnty. Sup. Feb. 13, 2019), the plaintiffs alleged that BDP Ventures LLC's ownership in New Horizon ASC was approved by NJDOH with an effective date of August 7, 2015. However, according to historic

archives for New Horizon ASC's website, BDP Ventures LLC was not reported as an owner on New Horizon ASC's website until sometime after July of 2016.

663.    On information and belief, BDP Ventures Inc. (and not BDP Ventures LLC) has been an owner of New Horizon ASC since BDP Ventures LLC was dissolved on May 1, 2018.

664.    According to records received from NJDOH for New Horizon ASC, New Horizon ASC did not provide NJDOH with any notice of the transfer of ownership interests from BDP Ventures LLC to BDP Ventures Inc.

665.    According to records received from NJDOH for New Horizon ASC, New Horizon ASC did not provide NJDOH with any prior notice of the transfer of ownership interests from BDP Ventures LLC to BDP Ventures Inc.

666.    On information and belief, New Horizon ASC misrepresented to its patients that BDP Ventures LLC had an ownership interests in New Horizon ASC after May 1, 2018.

667.    On information and belief, New Horizon ASC did not disclose to its patients that BDP Ventures Inc. had an ownership interest in New Horizon ASC after May 1, 2018.

668.    At all relevant times herein, M. Hatami was a nominal or straw owner of BDP Ventures LLC, which was actually owned and/or controlled by Hatami.

669.    At all relevant times herein, M. Hatami was a nominal or straw owner of BDP Ventures Inc., which was actually owned and/or controlled by Hatami and/or Degradi.

670.    As alleged herein, though Saddlebrook ASC and Jersey City ASC represented that M. Hatami was the sole owner of MEH Investments (another company through which she purportedly acquired ownership interests in one or more of the Surgicore ASCs), "Wayne," *i.e.*, Hatami, was identified as MEH Investments' owner in a record dated January 1, 2023 received

from NJDOH that was presumably prepared by Saddlebrook ASC and/or prepared by NJDOH based on information provided by Saddlebrook ASC to NJDOH.

671.    Moreover, as alleged herein, though M. Hatami (and not Hatami) was listed as a purported 25 percent owner, along with Degradi, Kogan, and Tylman, of Surgicore RBSC, which ultimately acquired over 94 percent ownership interests in Rockland and Bergen ASC in or around March 2020, in Rockland and Bergen ASC's December 2019 application for an amended license, Rockland and Bergen ASC submitted a fully executed binding term sheet, dated December 2, 2019, wherein Hatami (not M. Hatami) was listed as a purported 25 percent owner, along with Degradi, Kogan, and Tylman, of the company (identified therein as Newco, LLC (not named as a defendant herein)) that was to purchase 90 percent of Rockland and Bergen ASC. Hatami (and not M. Hatami) was also listed as a "buyer representative" on correspondence from NJDOH approving the transfer of 90 percent ownership interest in Rockland and Bergen ASC to Surgicore RBSC in February 2020.

672.    Additionally, as alleged herein, though M. Hatami (and not Hatami) was a purported owner of Surgicore RBSC, counsel for Rockland and Bergen ASC communicated with Hatami (and not M. Hatami) regarding Surgicore RBSC including regarding NJDOH's approval of Surgicore RBSC's acquisition of ownership interests in Rockland and Bergen ASC.

673.    On information and belief, New Horizon ASC did not disclose to its patients that Hatami had ownership interests in New Horizon ASC through BDP Ventures LLC and/or BDP Ventures Inc., including that he was receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to New Horizon ASC in order to ensure a steady stream of patients to New Horizon ASC, irrespective of medical need. According to NJDOH records,

Haar Orthopaedics also had ownership interests in New Horizon ASC between approximately November 2015 and March 2023.

674. At all relevant times herein, Haar Orthopaedics has been owned and controlled by Haar. New Horizon ASC represented to NJDOH that Haar Orthopaedics was owned solely by Haar.

675. According to NJDOH records, Naik has also had ownership interests in New Horizon ASC since approximately July 2018.

676. According to NJDOH records, MK Med Invest and AS Med Invest have had ownership interests in New Horizon ASC since approximately November 2022.

677. At all relevant times herein, MK Med Invest has been owned on paper by Keyserman. According to the articles of organization, which were filed with NYDOS by the Akbashev Tax Group Inc. ("Akbashev Tax Group") (not named as a defendant herein) on February 25, 2022, MK Med Invest was organized by Keyserman and reports an address located at 7009 Austin Street, Suite 204, Forest Hills, New York ("7009 Austin Street").

678. At all relevant times herein, AS Med Invest has been owned on paper by Shakarov. According to the articles of organization, which were also filed with NYDOS by the Akbashev Tax Group on March 2, 2022 (less than one week after MK Med Invest filed its articles of organization), AS Med Invest was organized by Shakarov and also reports an address located at 7009 Austin Street.

679. At all relevant times herein, Shakarov was also the record owner of the New York DME company, Med-Top Solutions Inc. (not named as a defendant herein) and is listed in public records as the incorporator and CEO of Priority Care Pharmacy Inc (not named as a defendant herein), which is also associated with 7009 Austin Street and/or the Akbashev Tax Group.

680.     In *LM Gen. Ins., et al. v. Franklin Square Services Inc., et al.*, 24-cv-4369, ECF No. 1 (E.D.N.Y. July 2, 2024), multiple DME companies, including Franklin Square Services Inc., Healing Services Inc., Flatbush Medworks Inc., SP One Services Inc., and Supply Choice NYC Inc (not named as defendants herein), which were operating out of and/or otherwise associated with 7009 Austin Street, and the Akbashev Tax Group, were credibly alleged to have engaged in a DME scheme to defraud in which they stole hundreds of thousands of dollars from New York No-Fault insurers through fraudulent billing practices, paid kickbacks to the same group of referring providers, and used the same wholesaler. The plaintiffs further credibly alleged that the record owners of those DME companies were straw or nominal owners for one or more individuals who were unknown to the plaintiffs in that case.

681.     More than 45 DME companies that submitted claims to Plaintiff in connection with claimants who purportedly received one or more of the Fraudulent Services at one or more of the Surgicore ASCs are associated with 7009 Austin Street.

682.     At all relevant times herein, Keyserman was a nominal or straw owner of MK Med Invest, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

683.     On information and belief, New Horizon ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in New Horizon ASC through MK Med Invest, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to New Horizon ASC in order to ensure a steady stream of patients to New Horizon ASC, irrespective of medical need.

684. At all relevant times herein, Shakarov was a nominal or straw owner of AS Med Invest, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

685. On information and belief, at all relevant times herein, New Horizon ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in New Horizon ASC through AS Med Invest, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to New Horizon ASC in order to ensure a steady stream of patients to New Horizon ASC, irrespective of medical need.

686. According to NJDOH records, Conte De Fees had an ownership interest in New Horizon ASC between approximately August 2015 and May 2024, at which point in time, its ownership interests were transferred to Fiaba. Prior to August 2015, Denevich had direct ownership interests in New Horizon ASC which he transferred in approximately August 2015 to Conte De Fees. In a letter that he apparently authored requesting the transfer, Denevich represented to NJDOH that he was the sole owner of Conte De Fees and intended to remain its sole owner for an indefinite period of time.

687. Though Conte De Fees has apparently been an owner of New Horizon ASC since approximately August 2015, and Denevich apparently had been an owner of New Horizon ASC prior to August of 2015, according to historic archives of New Horizon ASC's website, neither Denevich nor Conte De Fees were listed as an owner on New Horizon ASC's ownership disclosure on its website between October 2015 and at least January 2019, with Conte De Fees first appearing on New Horizon ASC's ownership disclosure on its website in or around September 2023.

688. On information and belief, New Horizon ASC did not disclose to its patients that Denevich, or any companies that he owns, had an ownership interest in New Horizon ASC between October 2015 and September 2023.

689. According to NJDOH records, Kostanian Consulting Associates has had an ownership interest in New Horizon ASC since approximately November 2022.

690. At all relevant times herein, Conte De Fees has been owned and controlled by Denevich. Jersey City ASC and Rockland and Bergen ASC reported that Conte De Fees was owned solely by Denevich. According to its corporate filings with NYDOS, Conte De Fees was incorporated by Denevich and was dissolved on August 21, 2024, and reported Sergey Denevich as its sole officer/director.

691. As alleged herein, Conte De Fees is also an owner of Rockland and Bergen ASC, and was also an owner of Jersey City ASC before its ownership interests were transferred to Fiaba, which, at all relevant times herein, has also been owned and controlled by Denevich.

692. At all relevant times, Fiaba was owned and controlled by Denevich. New Horizon ASC and Jersey City ASC represented to NJDOH that Fiaba was owned solely by Denevich. According to its corporate filings, Denevich is the organizer and president of Fiaba.

693. At all relevant times herein, Kostanian Consulting Associates has been owned and controlled by Kostanian. Jersey City ASC and Rockland and Bergen ASC reported that Kostanian Consulting Associates was owned solely by Denevich. According to its corporate filings with NYDOS, Kostanian Consulting Associates was incorporated by Kostanian and reported Kostanian as its sole officer/director.

694. As alleged herein, Kostanian Consulting Associates is also an owner of Jersey City ASC and Rockland and Bergen ASC.

695. Though the ownership disclosure on New Horizon ASC's website indicates that "Kostanian Consulting Services" (and not Kostanian Consulting Associates) has ownership interests in New Horizon ASC, no companies with such name have registered to do business in New Jersey or New York.

696. According to NJDOH records, Kostanian Consulting Associates (and not Kostanian Consulting Services), is an owner of New Horizon ASC.

697. According to NJDOH records, Kostanian Consulting Associates is also an owner of Jersey City ASC and Rockland and Bergen ASC.

698. On information and belief, New Horizon ASC misrepresented to its patients that Kostanian Consulting Services had an ownership interest in New Horizon ASC.

699. On information and belief, New Horizon ASC did not disclose to its patients that Kostanian Consulting Associates had an ownership interest in New Horizon ASC.

700. Kostanian and Denevich have a well-documented history of engaging in schemes to defraud insurance companies, including by unlawfully owning and operating medical PCs through which they submitted bills for fraudulent and/or medically unnecessary services.

701. In *Allstate Ins. Co., et al. v. Gabriel Dassa, D.O., et al.*, 23-cv-07515 (S.D.N.Y. 2023), the plaintiffs credibly alleged that the defendants, which included Dassa, Kostanian, Denevich, and Dassa Orthopedic, among others, conspired to exploit the benefits available to automobile accident victims under the No-Fault Law. Kostanian and Denevich were alleged to have unlawfully owned and operated three medical PCs, including Dassa Orthopedic, and were alleged to have owned and operated Skazka, LLC (not named as a defendant herein), through which they unlawfully operated and controlled several multidisciplinary medical clinics where Dassa Orthopedic purportedly treated patients. The HCP defendants, including Dassa Orthopedic,

were alleged to have provided medically unnecessary services to patients pursuant to an agreement between Dassa, and Kostanian and Denevich for management, marketing, administrative, and consulting services, which was a façade allowing Kostanian and Denevich to unlawfully control those entities and unlawfully siphon their profits. The plaintiffs also alleged that the scheme involved unlawful referrals by the multidisciplinary clinics to the medical PCs that Kostanian and Denevich were alleged to unlawfully own and operate.

702.    In *Dassa Orthopedic Med. Serv., P.C. v. Skazka LLC*, 801006/2023, Doc Nos. 1-2 (Bronx Cnty. Sup. Jan, 19, 2023), Denevich and Kostanian were credibly alleged to have owned and/or operated a management company (Skazka LLC), which was alleged to have entered into a license and administrative services agreement with Dassa's company, Dassa Orthopedic in 2011. Specifically, Denevich was alleged to be principal of and Kostanian was alleged to be affiliated with Skazka, LLC. NYDOH records also indicate that Denevich was the president of Skazka, LLC for over 11 years. In *Dassa Orthopedic Med. Serv., P.C. v. Skazka LLC*, 801006/2023, Doc Nos. 1-2 (Bronx Cnty. Sup. Jan, 19, 2023), the plaintiffs alleged that Denevich engaged in the unlawful practice of medicine by, among other things, forming two orthopedic medical services companies (Elite Orthopedics Partners LLC and Elite Orthopedics and Rehabilitation P.A. (not named as defendants herein)) and "poaching, steering and referring" patients to physicians employed by those companies, including Springer, the "medical director" for Fifth Avenue ASC Midtown, who was also named as a defendant therein.

703.    Additionally, in *Gov't Emp. Ins. Co., et al. v. Damien, M.D., et al.*, 10-cv-5409 (E.D.N.Y.), a RICO/insurance fraud action, Denevich was alleged to be the unlawful secret owner of several medical PCs, including through a purported management company (Alba Management, Inc. (not named as a defendant herein)).

704.     According to NJDOH records, YCentury had ownership interests in New Horizon ASC between approximately March 2018 and January 2022.

705.     At all relevant times herein, YCentury has been owned on paper by Yaguda. New Horizon ASC, Saddlebrook ASC, Jersey City ASC, and Rockland and Bergen ASC represented to NJDOH that Yaguda was the sole owner of YCentury. According to its corporate filings, YCentury was formed by Yaguda who was also listed as its sole member/manager.

706.     As alleged herein, according to NYDOH and NJDOH records, Yaguda is also a former owner of Saddlebrook ASC and Jersey City ASC (through YCentury), and a current owner of Rockland and Bergen ASC (through YCentury), All City ASC (directly) and Empire State ASC (through Mega Group Solution). Yaguda is also a proposed owner of Fifth Avenue ASC per NYDOH records from November 2024, through Mega Group Solution and, on information and belief, is a current owner of Fifth Avenue ASC through Mega Group Solution.

707.     According to its corporate filings, Mega Group Solution was incorporated by Yaguda and reports an address for process is 2667 Coney Island Avenue, Suite 2, Brooklyn, New York ("2667 Coney Island Avenue").

708.     At least four DME companies that submitted claims to Plaintiff in connection with claimants who purportedly received one or more of the Fraudulent Services at one or more of the Surgicore ASCs are associated with 2667 Coney Island Avenue.

709.     According to public records, Yaguda is related to and/or otherwise closely associated with the New York DME company, Right Choice Supply Inc. and/or its record owner Irene Yagudayev, and Medzanum Gulkarov, Lazar Yadgarov, and Rafo Yaguda a/k/a Rafail Yagudayev (not named as defendants herein), all of whom have been named as defendants in civil RICO and insurance fraud actions.

710. Yaguda, as a trustee, owns certain property located at 122 81st Avenue, Kew Gardens, New York, the principal place of business for Right Choice Supply Inc. (not named as a defendant herein), which was previously owned by Right Choice Supply Inc.'s record owner, Irene Yagudayev and Medzanum Gulkarov before it was sold in 2015 to a trust, with Yaguda as trustee, reportedly for no consideration.

711. Irene Yagudayev and Right Choice Supply Inc. were named as defendants in *Allstate Ins. Co. v. Right Choice Supply Inc*, 23-cv-5920 (E.D.N.Y.), a civil RICO and insurance fraud action based on the submission of more than $490,000 in fraudulent insurance claims for DME devices. Medzanum Gulkarov, who is Yagudayev's husband, was named as a defendant, along with Lazar Yadgarov in *Allstate Ins. Co. v. Yadgarov*, 11-cv-6187 (E.D.N.Y.) for their role in a $6.2 million civil RICO and insurance fraud scheme involving multiple DME companies.

712. Yaguda jointly owns at least two properties in New Jersey with Rafo Yaguda a/k/a Rafail Yagudayev. Rafo Yaguda was named as a defendant in two civil RICO and insurance fraud actions. *See Allstate Ins. Co., et al. v. New Century Pharmacy Inc., et al.*, 19-cv-5702 (E.D.N.Y.); *Gov't Emp. Ins. Co., et al. v. Direct RX Pharmacy Inc., et al.*, 19-cv-5876 (E.D.N.Y.). In *Gov't Emp. Ins. Co., et al. v. Direct RX Pharmacy Inc., et al.*, 19-cv-5876 (E.D.N.Y.), Rafo Yaguda was credibly alleged to have "spearheaded" a fraudulent scheme involving more than $2.6 million in fraudulent pharmaceutical billing, including through Rafo Yaguda's company, Direct RX Pharmacy Inc. (not named as a defendant herein). Specifically, Rafo Yaguda was credibly alleged to have engaged in illegal, collusive agreements with several prescribing HCPs who generated medically unnecessary prescriptions in violation of the law. In *Allstate Ins. Co., et al. v. New Century Pharmacy Inc., et al.*, 19-cv-5702 (E.D.N.Y.), Rafo Yaguda was credibly alleged to have

systematically defrauded the plaintiffs through dispensing of illegal bulk compounded products and other medications that were fraudulently billed and/or medically unnecessary.

713. On information and belief, Yaguda, Keyserman, Shakarov, and Yadgarov, who has an ownership interest in Rockland and Bergen ASC through her company Boost HS, are related to and/or otherwise closely associated with several DME companies that either have been sued for civil RICO violations and insurance fraud and/or are otherwise associated with 7009 Austin Street. *See LM Gen. Ins., et al. v. Franklin Square Services Inc., et al.*, 24-cv-4369, ECF No. 1 (E.D.N.Y. July 2, 2024).

714. As alleged herein, Boost HS is a former owner of Saddlebrook ASC and a current owner of Rockland and Bergen ASC and, at all relevant times, has been owned on paper by Yadgarov. Yadgarov was also identified in NYDOH records as a proposed owner of a forthcoming NY ASC, Bridge Street ASC, LLC (not named as a defendant herein), through another company, LGL ASC Holding, LLC (not named as a defendant herein). Degradi, Hatami, and Kogan are also seeking NYDOH's approval to become owners of Bridge Street ASC, LLC through a separate company, Dumbo 79 Management, LLC (not named as a defendant herein).

715. Yadgarov is associated through relatives, close associates, and/or corporate filings with 7009 Austin Street.

716. According to its corporate filings, Akbashev Tax Group, reporting its address at 7009 Austin Street, filed the articles of organization for Boost HS.

717. According to public records, Yadgarov also worked at Group Seven Capital LLC (not named as a defendant herein) in or around 2024, which reports its address at 7009 Austin Street. Public records also indicate that Yadgarov is associated with several other companies that appear to be related to Group Seven Capital LLC, including Capital 7 MD Funding LLC and

Capital 7 R.E. Funding LLC (not named as defendants herein), which report their addresses at 7009 Austin Street and previously reported their addresses at 73-35 195th Street, Fresh Meadows, New York ("73-35 195th Street), a residential property address in New York owned solely by Yadgarov since approximately 1999, and Capital 7 Claim Funding LLC, which reports Yadgarov as its registered agent.

718.    Yadgarov is also related to and/or otherwise associated with Lazar Yadgarov, who has used 73-35 195th Street as his mailing address and as the principal executive office for a company for which public records indicate he is the CEO. Yadgarov is also related to and/or otherwise associated through corporate filings with Radion Aminov (not named as a defendant herein), who was a co-defendant with Lazar Yadgarov in two lawsuits alleging fraud in connection with their joint real estate ventures, and also pled guilty to healthcare fraud and was ordered to pay $116,000 in restitution and serve two years imprisonment. *See US v. Vilshanetski*, 08-cr-00751 (S.D.N.Y. 2008).

719.    At all relevant times herein, Yaguda was a nominal or straw owner for one or more of the John Does 2 through 20, who were the actual owners of YCentury.

720.    On information and belief, at all relevant times herein, New Horizon ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in New Horizon ASC through YCentury, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to New Horizon ASC in order to ensure a steady stream of patients to New Horizon ASC, irrespective of medical need.

721.    According to NJDOH records, Berkowitz had an ownership interest in New Horizon ASC between approximately May 2017 and 2018.

722.    According to NJDOH records, Dassa had an ownership interest in New Horizon ASC between approximately August 2015 and August 2016.

723.    According to NJDOH records, Jones also had an ownership interest in New Horizon ASC between approximately April 2018 and January 2022.

724.    According to NJDOH records, Non-Surgical Orthopedics had an ownership interest in New Horizon ASC between approximately December 2015 and January 2022.

725.    At all relevant times herein, Non-Surgical Orthopedics has been owned and controlled by Vora. New Horizon ASC represented to NJDOH that Non-Surgical Orthopedics was owned solely by Vora.

726.    According to NJDOH records, Elkholy had an ownership interest in New Horizon ASC between approximately December 2014 and February 2018.

727.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Degradi either directly or indirectly through Main Street Medical and BDP Ventures Inc. Degradi was provided with a direct or indirect "investment" interest in New Horizon ASC through Main Street Medical and BDP Ventures Inc. in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Degradi's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Degradi, which, in fact, were illegal kickbacks for referrals.

728.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Romero and/or one or more of the John Does 2 through 20, through Ramirez and/or Chavez, and ASC Investment Services. Romero was

provided with an indirect "investment" interest in New Horizon ASC, through Ramirez and/or Chavez, and ASC Investment Services in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Romero and/or one or more of the John Does 2 through 20's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Romero and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

729.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with J. Katanov through S. Katanov and Redy Ventures. J. Katanov was provided with an indirect "investment" interest in New Horizon ASC through S. Katanov and Redy Ventures in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for J. Katanov's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of J. Katanov, which, in fact, were illegal kickbacks for referrals.

730.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Seldes through M. Seldes and Blue Wall Management. Seldes was provided with an indirect "investment" interest in New Horizon ASC through M. Seldes and Blue Wall Management in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Seldes' indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Seldes, which, in fact, were illegal kickbacks for referrals.

731.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Tylman and/or Kogan through B. Kogan, Revutsky, and ASAR Healthcare. Tylman and/or Kogan were provided with an indirect "investment" interest in New Horizon ASC through B. Kogan, Revutsky, and ASAR Healthcare in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Tylman's and/or Kogan's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Romero, which, in fact, were illegal kickbacks for referrals.

732.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Hatami through M. Hatami, and BDP Ventures LLC and/or BDP Ventures Inc. Hatami was provided with an indirect "investment" interest in New Horizon ASC through M. Hatami and BDP Ventures LLC and/or BDP Ventures Inc. in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Hatami's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Hatami, which, in fact, were illegal kickbacks for referrals.

733.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Keyserman and/or one or more of the John Does 2 through 20, through MK Med Invest. Keyserman and/or one or more of the John Does 2 through 20 were provided with an indirect "investment" interest in New Horizon ASC through MK Med Invest in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in

exchange for one or more of the John Does 2 through 20's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Keyserman and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

734.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Shakarov and/or one or more of the John Does 2 through 20, through AS Med Invest. Shakarov and/or one or more of the John Does 2 through 20 were provided with an indirect "investment" interest in New Horizon ASC through AS Med Invest in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Shakarov and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

735.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Denevich directly and indirectly through Conte De Fees and Fiaba. Denevich was provided with direct and indirect "investment" interests in New Horizon ASC through Conte De Fees and Fiaba in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Denevich's direct and indirect "investment" interests in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Denevich, which, in fact, were illegal kickbacks for referrals.

736.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Kostanian through Kostanian Consulting

Associates or Kostanian Consulting Services. Kostanian was provided with an indirect "investment" interest in New Horizon ASC through Kostanian Consulting Associates or Kostanian Consulting Services in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kostanian's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Kostanian, which, in fact, were illegal kickbacks for referrals.

737.     One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Yaguda and/or one or more of the John Does 2 through 20, through YCentury. Yaguda and/or one or more of the John Does 2 through 20 were provided with an indirect "investment" interest in New Horizon ASC through YCentury in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yaguda and/or one or more of the John Does 2 through 20's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Yaguda and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

738.     One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with McCulloch. McCulloch was provided with an "investment" interest in New Horizon ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for McCulloch's "investment" interest in New Horizon

ASC, New Horizon ASC issued regular payments to or for the benefit of McCulloch, which, in fact, were illegal kickbacks for referrals.

739. One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Naik. Naik was provided with an "investment" interest in New Horizon ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Naik's "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Naik, which, in fact, were illegal kickbacks for referrals.

740. One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Jones. Jones was provided with an "investment" interest in New Horizon ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Jones's "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Jones, which, in fact, were illegal kickbacks for referrals.

741. One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Berkowitz. Berkowitz was provided with an "investment" interest in New Horizon ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Berkowitz's "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Berkowitz, which, in fact, were illegal kickbacks for referrals.

742. One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Vora through Non-Surgical Orthopedics. Vora was provided with an indirect "investment" interest in New Horizon ASC through Non-Surgical Orthopedics in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Vora's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Vora, which, in fact, were illegal kickbacks for referrals.

743. One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Dassa. Dassa was provided with an "investment" interest in New Horizon ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Dassa's "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Dassa, which, in fact, were illegal kickbacks for referrals.

744. One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Haar through Haar Orthopaedics. Haar was provided with an indirect "investment" interest in New Horizon ASC through Haar Orthopaedics in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Haar's indirect "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Haar, which, in fact, were illegal kickbacks for referrals.

745.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with Elkholy. Elkholy was provided with an "investment" interest in New Horizon ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Elkholy's "investment" interest in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of Elkholy, which, in fact, were illegal kickbacks for referrals.

746.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in New Horizon ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interests in New Horizon ASC, New Horizon ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii.    The Sham "Medical Directors" and "Administrators"

747.    In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited Defendant Naik, Defendant Koplik, and one or more of the John Does 2 through 20 to serve as sham "medical directors" of New Horizon ASC in contravention of New Jersey law.

748.     Defendant Koplik, became New Horizon ASC's "medical director" sometime after 2013 and was New Horizon ASC's purported "medical director" through sometime in 2019. In 2019 Defendant Naik succeeded Defendant Koplik as New Horizon ASC's "medical director" and, according to NJDOH records, is New Horizon ASC's current "medical director."

749.     One or more of the Controllers, through New Horizon ASC, entered into sham "investor" or employment referral/kickback relationships with Defendant Naik, Defendant Koplik, and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in New Horizon ASC to make it appear that the shares were being purchased as investments and payments made by New Horizon ASC were dividends or other cash distributions for their "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Defendant Naik, Defendant Koplik, and/or one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Defendant Naik, Defendant Koplik, and/or one or more of the John Does 2 through 20 never intended to (and never did fulfill) their medical director duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the New Horizon ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

750.     In addition to the sham "medical directors," one or more of the Controllers recruited Romero to serve as sham "administrator" of Manalapan ASC in contravention of New Jersey law.

751.     As alleged herein, according to NJDOH records, Romero has been New Horizon ASC's "administrator" since around 2010.

752.    One or more of the Controllers, through New Horizon ASC, entered into a sham "investor" or employment referral/kickback relationship with Romero, who purchased or otherwise acquired shares in New Horizon ASC to make it appear that the shares were being purchased as investments and payments made by New Horizon ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Romero's agreement to serve as sham "administrator" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Romero never intended to (and never did fulfill) his administrator duties as required by law and the compensation he received was actually for permitting one or more of the Controllers to operate the New Horizon ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

**B.    Illegal Operation of Manalapan ASC**

i.    The Fraudulent "Investor" Referral/Kickback Scheme

753.    In or around February 2012, Kogan and Revutsky, who are not licensed physicians or HCP, acquired 40 percent ownership of the NJ ASC, Manalapan ASC.

754.    Manalapan ASC was first formed by Weiner and others (not named as defendants herein) in or around 2003 and was licensed as an NJ ASC in or around May 2005.

755.    Since acquiring ownership in or around February 2012, corporate filings and NJDOH records indicate that Kogan has served as Manalapan ASC's president and CEO.

756.    According to its annual reports, between 2015 and 2019, Revutsky was identified as an officer/director and general partner of Manalapan ASC. In 2020, Tylman replaced Revutsky

as an officer/director and general partner of Manalapan ASC. Since 2017, the only officers/directors of Manalapan ASC, as indicated in its annual reports filed with the NJDOT, have been Kogan, Revutsky, and/or Tylman.

757.    At all relevant times herein, Revutsky, who, as alleged herein is Tylman's sister and/or otherwise closely associated with him, was a straw officer/director of Manalapan ASC for Tylman, who was the actual officer/director for Manalapan ASC.

758.    On information and belief, Tylman recruited Revutsky to serve as a straw officer/director of Manalapan ASC in order to conceal the full extent of his control over Manalapan ASC.

759.    According to NJDOH records, Randolph, Esq. served as counsel for Manalapan ASC in or around 2015, and prospective owners of Manalapan ASC were directed, per the terms of the purported "membership unit purchase agreements," to make their "investments" in Manalapan ASC payable to his law firm's trust account.

760.    In or around 2015, according to NJDOH records, Revutsky transferred all of her interest in Manalapan ASC to Tylman.

761.    In or around May 2017, Kogan and Tylman transferred all of their ownership interests, which at the time amounted to over 85 percent of Manalapan ASC, to FLBD Management.

762.    At all relevant times herein, FLBD Management has been owned and controlled by Tylman and Kogan. Manalapan ASC, Jersey City ASC, and Saddlebrook ASC represented to NJDOH records that FLBD Management was owned solely by Tylman and Kogan. According to its certificate of formation, filed by Tylman with NJDOT, Kogan and Tylman are the sole members/managers of FLBD Management.

763.     NJDOH records indicate that FLBD Management is also an owner of Saddlebrook ASC and Jersey City ASC.

764.     According to the ownership disclosure on Manalapan ASC's website, FLBD, LLC (not named as a defendant herein) (and not FLBD Management) is an owner of Manalapan ASC.

765.     On information and belief, Manalapan ASC misrepresented to its patients that FLBD, LLC had an ownership interest in Manalapan ASC.

766.     On information and belief, Manalapan ASC did not disclose to its patients that FLBD Management had an ownership interest in Manalapan ASC.

767.     At all times as alleged herein, one or more of the Controllers, including Kogan and Tylman, Hafeez, Reizis, Revutsky, Elkholy, Anjani Sinha, Weiner, one or more of the Health Plus Defendants (as defined herein) and one or more of the John Does 2 through 20 (collectively, the "Manalapan ASC Owners") have had direct or indirect ownership interests in Manalapan ASC.

768.     At all relevant times while they were owners of Manalapan ASC, the Manalapan ASC Owners were responsible for the operation and control of Manalapan ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

769.     At all relevant times since they acquired ownership interests, in or around February 2012 and/or 2015, one or more of the Controllers, including Kogan and Tylman have had majority ownership interest in and/or otherwise controlled Manalapan ASC.

770.     Upon acquiring control of Manalapan ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through Manalapan ASC entered into sham "investor" referral/kickback arrangements with the Manalapan ASC Owners who purchased or otherwise acquired shares in Manalapan ASC to make

it appear that payments made by Manalapan ASC were dividends or other cash distributions for their "investments" in Manalapan ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

771.    In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to one or more of the Controllers, the full extent of their ownership and control of Manalapan ASC, the Manalapan ASC Owners purchased or otherwise acquired ownership interests in Manalapan ASC through companies that they owned and/or controlled, and/or through their family members or close associates and/or companies that they owned and/or controlled. The Manalapan ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from Manalapan ASC that were disguised as dividends or other cash distributions for their "investments" in Manalapan ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

772.    In order to conceal the referral/kickback scheme and the full extent of their ownership and control over Manalapan ASC, the Controllers established, owned, maintained a financial interest in, or otherwise derived financial benefit from a web of associated companies, including 50 Franklin Ln Realty and one or more of the ABC Corporations 1 through 20, that purport to serve as landlord, management, and/or other financing companies and which purported to enter into lease, management services, financing agreements, and other contracts with Manalapan ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over Manalapan ASC, to funnel additional proceeds from Manalapan ASC

back to the Controllers and/or to make payments for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

773. Towards that end, according to the recorded deed, on or about October 25, 2018, 50 Franklin Ln Realty purchased 50 Franklin Lane, Suite 101, Manalapan Township, New Jersey, where Manalapan ASC is located. At all relevant times herein, 50 Franklin Ln Realty has been owned by one or more of the Controllers. Tylman and Kogan, acting as members of 50 Franklin Ln Realty, signed the mortgage for Manalapan ASC's clinic location, dated October 25, 2018. 50 Franklin Ln Realty's certificate of formation also listed Kogan and Tylman as its sole members/managers.

774. In addition to Kogan and Tylman's ownership interest in Manalapan ASC, through FLBD Management, according to NJDOH records, Advanced PMR and/or its purported principals, Hafeez and Reizis, have been owners of Manalapan ASC since around August of 2019, when they collectively purchased or otherwise acquired approximately 1.28 percent interest in Manalapan ASC. According to NJDOH records, Manalapan ASC initially misreported that Advanced PMR purchased the ownership interest, when, according to Manalapan ASC, the ownership interest was purchased by Advanced PMR's purported principals, Hafeez and Reizis. According to NJDOH records, Advanced PMR and/or Hafeez and Reizis relinquished their ownership interest in Manalapan ASC in or around June of 2021.

775. According to Manalapan ASC's website, Advanced PMR (and not Hafeez and Reizis) is an owner of Manalapan ASC.

776. At all relevant times herein, Advanced PMR has been owned on paper by Hafeez and Reizis. According to corporate filings, Hafeez and Reizis were Advanced PMR's sole

members/managers and its purpose was "to provide specialized management services to businesses and other organizations operating within the healthcare industry. . .."

777.    According to press releases, Advanced PMR managed several physical therapy practices and, in or around June 2018, was acquired by Health Plus Management. According to press releases, Health Plus Management's acquisition of Advanced PMR "expanded Health Plus Management's footprint of managed practices from 24 to 30 locations and set[] the stage for Health Plus Management to build a regional presence in [New Jersey]."

778.    According to its website, Health Plus Management was founded in 1994 on Long Island, New York, "to advanced new and well-established musculoskeletal practices." Health Plus Management advertises itself on its website as "a physician support organization" for a growing network of top orthopedist, physical medicine and rehabilitation, and physical therapy practices. According to Health Plus Management's website, PM&R, which is owned by Khakhar, is part of its network of HCPs.

779.    According to its website, Blumberg has been Health Plus Management's president and CEO, and Rubin has been its chief marketing officer, since at least 2017 and 2018, respectively. Public records indicate that Blumberg was also the president of two companies (Health Plus Management Holdco, Inc. (now known as STBL Holdings, Inc.) and Health Plus Management Services, L.LC., which merged into Health Plus Management Holdco, Inc.) (not named as defendants herein).

780.    According to its website, Rubin also plays a "key role" in Health Plus Management's associated brand, Musculoskeletal Resources Concierge ("MSR Concierge") (not named as a defendant herein), which advertises itself as a concierge and support liaison to physical medicine and rehabilitation practices. According to public records, Blumberg is MSR Concierge's

president and CEO and Rubin is its chief marketing officer. According to MSR Concierge's website, PM&R, which is owned by Khakhar, is part of its network of HCPs.

781. According to public records, Klein is or was the vice president of site operations, for Health Plus Management Services L.L.C. On information and belief, Klein is or was the vice president of site operations, for Health Plus Management and not Health Plus Management Services, L.L.C., which was merged out of existence in 2011.

782. Blumberg, Rubin, and Klein were formerly licensed chiropractors in New York.

783. According to public records, S. Passanisi is the current director of property management at Health Plus Management and L. Passanisi is the current vice president of site operations at Health Plus Management Services, L.L.C. On information and belief, L. Passanisi is the current vice president of site operations at Health Plus Management and not Health Plus Management Services, L.L.C., which was merged out of existence in 2011.

784. As alleged herein, NYDOH records indicate that Blumberg, Rubin, Klein, and S. Passanisi have ownership interests in All City ASC, Empire State ASC, and North Queens ASC, and L. Passanisi has ownership interests in All City ASC. Health Plus Management, Blumberg, Rubin, Klein, S. Passanisi, L. Passanisi, and one or more of the John Does 2 through 20 are collectively referred to as the "Health Plus Defendants."

785. At all relevant times herein, Hafeez and Reizis were nominal or straw owners of Advanced PMR, which was actually owned and/or controlled by one or more of the Health Plus Defendants.

786. At all relevant times herein, Hafeez and Reizis were nominal or straw owners for the Health Plus Defendants, who were the actual owners of Hafeez and Reizis's ownership interests in Manalapan ASC.

787. On information and belief, at all relevant times herein, Manalapan ASC did not disclose to its patients that Hafeez and Reizis had ownership interests in Manalapan ASC.

788. On information and belief, Manalapan ASC did not disclose to its patients that one or more of the Health Plus Defendants had ownership interests in Manalapan ASC through Hafeez and Reizis and/or Advanced PMR, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Manalapan ASC in order to ensure a steady stream of patients to Manalapan ASC, irrespective of medical need.

789. On information and belief, Blumberg, Rubin, Klein, S. Passanisi, L. Passanisi, Hafeez, Reizis, and/or Advanced PMR, through Health Plus Management, caused and continue to cause one more of the No-Fault Clinics Health Plus Management purportedly manages to refer Covered Persons to one or more of the Surgicore ASCs for performance of one or more of the Fraudulent Services. Those No-Fault Clinics include, but are not limited to PM&R (whose owner, Khakhar, has ownership interests in one or more of the Surgicore ASCs), Advanced PMR and Interventional Physical Medicine & Rehabilitation, PC (not named as a defendant herein). Blumberg, Rubin, Klein, S. Passanisi, L. Passanisi, Hafeez, Reizis, and/or Advanced PMR were given their "investment" interests in one or more of the Surgicore ASCs as described herein by the Controllers in exchange for using Health Plus Management as a feeder of Covered Persons from one or more of the No-Fault Clinics they managed to one or more of the Surgicore ASCs. These Defendants, together with others acting under their direction and control, knowingly established a predetermined fraudulent protocol at the No-Fault Clinics managed by Health Plus Management to document the history necessary to create the false justification for referrals for Fraudulent Services to be provided at, by, and through one or more of the Surgicore ASCs from which they profited.

790.     According to NJDOH records, Anjani Sinha has had an ownership interest in Manalapan ASC since approximately December 2023.

791.     According to NJDOH records, Elkholy had an ownership interest in Manalapan ASC from around April 2015 through around November 2022. According to NJDOH records, prior to 2017, Elkholy had less than 7.5 percent ownership interest in Manalapan ASC. Prior to redeeming his shares in or around November 2022, Elkholy owned more than 14 percent of Manalapan ASC.

792.     According to NJDOH records, one or more of the Controllers, through Manalapan ASC, failed to submit the requisite change of ownership application for Elkholy in or around November 2017 when his interest exceeded 10 percent of Manalapan ASC.

793.     According to NJDOH records, Revutsky had an ownership interest in Manalapan ASC from around February 2012 through 2015.

794.     As alleged herein, on information and belief, Revutsky is Tylman's sister and/or otherwise closely associated with him.

795.     At all relevant times herein, Revutsky was a nominal or straw owner for Tylman, who was the actual owner of Revutsky's ownership interest in Manalapan ASC.

796.     On information and belief, Manalapan ASC did not disclose to its patients that Tylman had an ownership interest in Manalapan ASC between approximately 2012 and 2015.

797.     According to NJDOH records, Weiner had ownership interests in Manalapan ASC between approximately 2003 and 2019. As alleged herein, Weiner was also the purported "medical director" of Manalapan ASC in or around 2012, and was also identified in NJDOH records as Manalapan ASC's CEO prior to 2012. In or around 2012, Weiner transferred some or all of his ownership interests to Revutsky and Kogan.

798.     One or more of the Controllers, through Manalapan ASC, entered into a sham "investor" referral/kickback arrangement with Kogan, including through FLBD Management. Kogan was provided with direct and indirect "investment" interests in Manalapan ASC, including through FLBD Management in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kogan's direct and indirect "investment" interests in Manalapan ASC, Manalapan ASC issued regular payments to or for the benefit of Kogan, which, in fact, were illegal kickbacks for referrals.

799.     One or more of the Controllers caused Manalapan ASC to enter into a sham "investor" referral/kickback arrangement with Tylman, including through FLBD Management and Revutsky. Tylman was provided with direct and indirect "investment" interests in Manalapan ASC, including through FLBD Management and Revutsky in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Tylman's direct and indirect "investment" interest in Manalapan ASC, Manalapan ASC issued regular payments to or for the benefit of Tylman, which, in fact, were illegal kickbacks for referrals.

800.     One or more of the Controllers, through Manalapan ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the Health Plus Defendants through Hafeez and Reizis and/or Advanced PMR. One or more of the Health Plus Defendants were provided with an indirect "investment" interest in Manalapan ASC through Hafeez and Reizis and/or Advanced PMR, in exchange for their agreement to market, steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the Health Plus Defendants' indirect

"investment" interest in Manalapan ASC, Manalapan ASC issued regular payments to or for the benefit of one or more of the Health Plus Defendants, which, in fact, were illegal kickbacks for referrals.

801.    One or more of the Controllers, through Manalapan ASC, entered into a sham "investor" referral/kickback arrangement with Anjani Sinha. Anjani Sinha was provided with an "investment" interest in Manalapan ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Anjani Sinha's "investment" interest in Manalapan ASC, Manalapan ASC issued regular payments to or for the benefit of Anjani Sinha, which, in fact, were illegal kickbacks for referrals.

802.    One or more of the Controllers, through Manalapan ASC, entered into a sham "investor" referral/kickback arrangement with Elkholy. Elkholy was provided with an "investment" interest in Manalapan ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Elkholy's "investment" interest in Manalapan ASC, Manalapan ASC issued regular payments to or for the benefit of Elkholy, which, in fact, were illegal kickbacks for referrals.

803.    One or more of the Controllers, through Manalapan ASC, entered into a sham "investor" referral/kickback arrangement with Weiner. Weiner was provided with an "investment" interest in Manalapan ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Weiner's "investment" interest in Manalapan ASC,

Manalapan ASC issued regular payments to or for the benefit of Weiner, which, in fact, were illegal kickbacks for referrals.

804.    One or more of the Controllers, through Manalapan ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. One or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in Manalapan ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interest in Manalapan ASC, Manalapan ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii.    The Sham "Medical Directors" and "Administrators"

805.    In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited Weiner and/or one or more of the John Does 2 through 20 to serve as sham "medical directors" of Manalapan ASC in contravention of New Jersey law.

806.    According to NJDOH records, Weiner was Manalapan ASC's purported "medical director" in or around 2012 through approximately 2015.

807.    One or more of the Controllers, through Manalapan ASC, entered into sham "investor" or employment referral/kickback relationships with Weiner and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Manalapan ASC to make it appear that the shares being purchased as investments and payments made by Manalapan ASC were dividends or other cash distributions for their "investments" (or who otherwise

received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Weiner's and/or one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Weiner and/or one or more of the John Does 2 through 20 never intended to (and never did fulfill) their medical director duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Manalapan ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

808.   In addition to the sham "medical directors," one or more of the Controllers recruited Kogan to serve as sham "administrator" of Manalapan ASC in contravention of New Jersey law.

809.   According to NJDOH records, Kogan has been Manalapan ASC's "administrator" since approximately 2012. However, according to NJDOH records, Romero was also Manalapan ASC's "administrator" in or around July 2015 through November 2015, Santos was Manalapan ASC's "administrator" in or around May 2017, and Young was Manalapan ASC's "administrator" in or around July 2019 through May 2024.

810.   One or more of the Controllers, through Manalapan ASC, entered into a sham "investor" or employment referral/kickback relationship with Kogan, Romero, Santos, and/or Young who purchased or otherwise acquired shares in Manalapan ASC to make it appear that the shares were being purchased as investments and payments made by Manalapan ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Kogan, Romero, Santos, and/or Young's agreement to serve as sham

288

"administrator" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Kogan, Romero, Santos, and/or Young never intended to (and never did fulfill) their administrator duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Manalapan ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

## C. Illegal Operation of Saddlebrook ASC

### i. The Fraudulent "Investor" Referral/Kickback Scheme

811.    In February 2016, NJDOH approved the transfer of ownership of the NJ ASC, Market Street Surgical Center, LLC (not named as a defendant herein) to Saddlebrook ASC.

812.    According to its corporate filings, Degradi has been an owner of Saddlebrook ASC, and its sole officer, director, and president since it was formed on or about November 4, 2015. Degradi was also identified as Saddlebrook ASC's CEO on records submitted by Saddlebrook ASC to NJDOH.

813.    According to NJDOH records, Romero was Saddlebrook ASC's "administrator" in 2017.

814.    Though he was not identified in any records received from NJDOH as having any direct or indirect ownership interests in Saddlebrook ASC, Romero held himself out as a managing partner/member of Saddlebrook ASC between at least 2016 and 2020, including on many of the purported membership unit purchase agreements for Saddlebrook ASC, including for McCulloch and YCentury, wherein he signed as "managing member" on behalf of Saddlebrook ASC; and on

Saddlebrook ASC's license renewal application, dated January 22, 2017, wherein he signed as "managing director" on behalf of Saddlebrook ASC.

815.    According to NJDOH records, after the Controllers acquired ownership interests in Saddlebrook ASC, prospective owners of Saddlebrook ASC were directed, per the terms of the purported "membership unit purchase agreements," to make their "investments" in Saddlebrook ASC payable to his law firm's trust account. Randolph, Esq. also served as counsel for Saddlebrook ASC in or around 2017.

816.    Consistent with the allegations set forth herein, on May 7, 2020, Allstate Ins. Co. brought a civil action against Saddlebrook ASC and others alleging thirty-three causes of action, including for fraud, violations of New Jersey's civil RICO statute, and unlawful self- and other referrals. *See Allstate Ins. Co. v. Matturro, D.C.*, BERL002707-20 (Berg. Cnty. N.J. Sup. May 7, 2020). Specifically, chiropractors who had previously been indicted for their role in a scheme that involved bribing police officers to obtain police reports and then paying "runners" to solicit purported accident victims to treat at their facilities, were alleged to have formed multiple, No-Fault medical practices in order to operate an unlawful self-referral and insurance fraud scheme to maximize payment for PIP Benefits and increase the value of those patients' bodily injury cases for the benefit of defense counsel. The scheme involved referrals from defense counsel to the chiropractors and their various medical practices, and then to ASCs, including Saddlebrook ASC, which then billed for unnecessary facility, anesthesia, and other fees, and for which the chiropractors were alleged to receive kickbacks.

817.    At all times as alleged herein, the Controllers, M. Hatami, Chavez, Ramirez, Romero, McCulloch, Ajoy Sinha, J. Katanov, Keyserman, Shakarov, Rubin, Yaguda, Yadgarov, Vora, Xie, Upendra Sinha, Berkowitz, one or more of the Health Plus Defendants, and one or more

of the John Does 2 through 20 (collectively, the "Saddlebrook ASC Owners") have had direct or indirect ownership interests in Saddlebrook ASC.

818.    At all relevant times while they were owners of Saddlebrook ASC, the Saddlebrook ASC Owners were responsible for the operation and control of Saddlebrook ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

819.    At all relevant times since acquiring an ownership interests in Saddlebrook ASC in or around February of 2016, the Controllers have had a majority ownership interest in and/or otherwise controlled Saddlebrook ASC.

820.    NJDOH records indicate that, initially, ownership of Saddlebrook ASC was divided equally between Degradi, Kogan, Tylman, and M. Hatami.

821.    In or around February 2017, according to NJDOH records, Degradi's ownership interests in Saddlebrook ASC were transferred to Four D Investments LLC, Kogan and Tylman's ownership interests in Saddlebrook ASC were transferred to FLBD Management, and M. Hatami's purported ownership interests in Saddlebrook ASC were transferred to MEH Investments.

822.    At all relevant times herein, Four D Investments LLC has been owned and controlled by Degradi. Saddlebrook ASC and Jersey City ASC represented to NJDOH that Degradi was the sole owner of Four D Investments LLC. According to corporate filings with NJDOT, Degradi was the sole director and registered agent for Four D Investments LLC, which reported that its office was located at Saddlebrook ASC's clinic location, and reported Degradi's address at 239 E. Main Street.

823.    According to its corporate filings with NJDOH, Four D Investments LLC was dissolved on or about May 2, 2018, the same date that Four D Investments Inc was formed.

824. At all relevant times herein, Four D Investments Inc has been owned and controlled by Degradi. According to its corporate filings with NJDOT, Degradi is the sole director and registered agent for Four D Investments Inc, which reported that its office was located at Saddlebrook ASC's clinic location, and reported Degradi's address at 239 E. Main Street.

825. As alleged herein, Four D Investments LLC and/or Four D Investments Inc also have or had ownership interests in Jersey City ASC.

826. On information and belief, Four D Investments Inc (and not Four D Investments LLC) has had an ownership interest in Saddlebrook ASC since approximately May 2, 2018.

827. According to records received from NJDOH for Saddlebrook ASC, Saddlebrook ASC did not provide NJDOH with any notice of the transfer of ownership interests from Four D Investments LLC to Four D Investments Inc.

828. According to records received from NJDOH for Saddlebrook ASC, Saddlebrook ASC did not provide NJDOH with any prior notice of the transfer of ownership interests from Four D Investments LLC to Four D Investments Inc.

829. On information and belief, Saddlebrook ASC misrepresented to its patients that Four D Investments LLC had an ownership interests in Saddlebrook ASC after May 2, 2018.

830. On information and belief, Saddlebrook ASC did not disclose to its patients that Four D Investments Inc had an ownership interest in Saddlebrook ASC after May 2, 2018.

831. As alleged herein, at all relevant times herein, FLBD Management has been owned and controlled by Tylman and Kogan.

832. At all relevant times herein, MEH Investments has been owned on paper by M. Hatami. Saddlebrook ASC and Jersey City ASC represented to NJDOH that MEH Investments

was owned solely by M. Hatami. According to corporate filings, M. Hatami is the only member of MEH Investments' board of directors.

833.     As alleged herein, MEH Investments is also an owner of Jersey City ASC.

834.     Though Saddlebrook ASC and Jersey City ASC represented that M. Hatami was the sole owner of MEH Investments, "Wayne," *i.e.*, Hatami was identified as MEH Investments' only owner in a record dated January 1, 2023 received from NJDOH that, on information and belief, was prepared by Saddlebrook ASC and/or prepared by NJDOH based on information provided by Saddlebrook ASC to NJDOH.

835.     Additionally, in correspondence from Saddlebrook ASC to NJDOH, dated August 31, 2016, informing them of the proposed transfer of ownership interests to Four D Investments LLC, FLBD Management and MEH Investments, Saddlebrook ASC's referred to Hatami (and not M. Hatami) as one of the original owner.

836.     At all relevant times herein, M. Hatami was a nominal or straw owner of MEH Investments, which was actually owned and/or controlled by Hatami.

837.     On information and belief, Saddlebrook ASC did not disclose to its patients that Hatami had ownership interests in Saddlebrook ASC through MEH Investments, including that he was receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Saddlebrook ASC in order to ensure a steady stream of patients to Saddlebrook ASC, irrespective of medical need.

838.     Upon acquiring control of Saddlebrook ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through Saddlebrook ASC entered into sham "investor" referral/kickback arrangements with the Saddlebrook ASC Owners who purchased or otherwise acquired shares in Saddlebrook ASC to

make it appear that payments made by Saddlebrook ASC were dividends or other cash distributions for their "investments" in Saddlebrook ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

839.    One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

840.    In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, Saddlebrook ASC, the Saddlebrook ASC Owners purchased or otherwise acquired ownership interests in Saddlebrook ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The Saddlebrook ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from Saddlebrook ASC that were disguised as dividends or other cash distributions for their "investments" in Saddlebrook ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

841.    In order to conceal the referral/kickback scheme and the full extent of their ownership and control over Saddlebrook ASC, the Controllers established, owned, maintained a financial interest in, or otherwise derived financial benefit from a web of associated companies, including Surgicore Management, which purports to be the "management" company for Saddlebrook ASC and one or more of the ABC Corporations 1 through 20, that purport to serve

as landlord, management, and/or other financing companies and which purported to enter into lease, management services, financing agreements and other contracts with Saddlebrook ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over Saddlebrook ASC, to funnel proceeds from Saddlebrook ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

842. According to NJDOH records, in addition to the Controllers' ownership interests in Saddlebrook ASC, ASC Investment Services, McCulloch, and Ajoy Sinha have also had ownership interests in Saddlebrook ASC since approximately February 2017.

843. As alleged herein, Romero was also identified in NJDOH records that, on information and belief, were prepared by Saddlebrook ASC as the sole owner/contact for ASC Investment Services, despite that one or more of the Surgicore ASCs maintained that ASC Investment Services was owned solely either by Chavez or Ramirez.

844. At all relevant times herein, Chavez and/or Ramirez were nominal or straw owners of ASC Investment Services, which was actually owned and/or controlled by Romero and/or one or more of the John Does 2 through 20.

845. As alleged herein, though New Horizon ASC and Saddlebrook ASC represented that ASC Investment Services was only owned by Chavez or Ramirez, "Amaury," *i.e.*, Romero was identified as ASC Investment Services' only owner in a record dated January 1, 2023 received from NJDOH that was presumably prepared by Saddlebrook ASC and/or prepared based on information provided by Saddlebrook ASC to NJDOH.

846. On information and belief, Saddlebrook ASC did not disclose to its patients that Romero and/or one or more of the John Does 2 through 20 had ownership interests in Saddlebrook

ASC through ASC Investment Services, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Saddlebrook ASC in order to ensure a steady stream of patients to Saddlebrook ASC, irrespective of medical need.

847.    According to NJDOH records, J. Katanov has had ownership interests in Saddlebrook ASC since approximately December 2018, and Redy Ventures has had ownership interests in Saddlebrook ASC since approximately July 2020.

848.    As alleged herein, J. Katanov and/or S. Katanov, either directly or indirectly, also have ownership interests in New Horizon ASC, Jersey City ASC, Rockland and Bergen ASC, All City ASC, Fifth Avenue ASC, and Rockaways ASC.

849.    According to NJDOH records, Vora has had ownership interests in Saddlebrook ASC since approximately November 2019.

850.    According to NJDOH records, MK Med Invest and AS Med Invest have also had ownership interests in Saddlebrook ASC since approximately March 2022.

851.    As alleged herein, MK Med Invest and AS Med Invest also have ownership interests in New Horizon ASC and Jersey City ASC and, at all relevant times, were actually owned by one or more of the John Does 2 through 20.

852.    On information and belief, Saddlebrook ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in Saddlebrook ASC through MK Med Invest, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Saddlebrook ASC in order to ensure a steady stream of patients to Saddlebrook ASC, irrespective of medical need.

853.    On information and belief, Saddlebrook ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in Saddlebrook ASC through

AS Med Invest, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Saddlebrook ASC in order to ensure a steady stream of patients to Saddlebrook ASC, irrespective of medical need.

854.    According to NJDOH records, Capleo Holdings has had ownership interests in Saddlebrook ASC since approximately June 2024.

855.    At all relevant times, Capleo Holdings has been owned and controlled by Rubin. Saddlebrook ASC represented to NJDOH that Capleo Holdings is owned solely by Rubin. According to its corporate filings, Rubin filed the certificate of formation for Capleo Holdings and was listed as its sole member/manager.

856.    On information and belief, Blumberg was a nominal or straw owner of Capleo Holdings, which was actually owned by one or more of the Health Plus Defendants.

857.    According to NJDOH records, YCentury had ownership interests in Saddlebrook ASC between approximately March 2018 and January 2022.

858.    At all relevant times herein, Yaguda was a nominal or straw owner for one or more of the John Does 2 through 20, who were the actual owners of YCentury.

859.    On information and belief, Saddlebrook ASC did not disclose to its patients that one or more of the John Does 2 through 20 had ownership interests in Saddlebrook ASC through YCentury, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Saddlebrook ASC in order to ensure a steady stream of patients to Saddlebrook ASC, irrespective of medical need.

860.    According to NJDOH records, Boost HS had ownership interests in Saddlebrook ASC between approximately September 2021 and January 2024.

861. At all relevant times herein, Boost HS has been owned on paper by Yadgarov. Saddlebrook ASC and Rockland and Bergen ASC represented to NJDOH that Boost HS is owned solely by Yadgarov. According to its corporate filings, Yadgarov was the organizer and registered agent for Boost HS. As alleged herein, Akbashev Tax Group (the same company that filed the articles of organization for MK Med Invest and AS Med Invest), reporting its address at 7009 Austin Street, filed the articles of organization for Boost HS.

862. As alleged herein, Boost HS is also a current owner of Rockland and Bergen ASC.

863. At all relevant times herein, Yadgarov was a nominal or straw owner of Boost HS, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

864. On information and belief, Saddlebrook ASC did not disclose to its patients that one or more of the John Does 2 through 20 had ownership interests in Saddlebrook ASC through Boost HS, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Saddlebrook ASC in order to ensure a steady stream of patients to Saddlebrook ASC, irrespective of medical need.

865. According to NJDOH records, Xie had ownership interests in Saddlebrook ASC between approximately May 2017 and March 2018.

866. According to NJDOH records, Upendra Sinha had ownership interests in Saddlebrook ASC between approximately January 2020 and January 2023.

867. According to NJDOH records, Berkowitz had ownership interests in Saddlebrook ASC between approximately April 2017 and January 2019.

868. One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Degradi directly and indirectly through Four D Investments LLC and/or Four D Investments Inc. Degradi was provided with a direct and

indirect "investment" interest in Saddlebrook ASC through Four D Investments LLC and/or Four D Investments Inc in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Degradi's direct and indirect "investment" interests in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Degradi, which, in fact, were illegal kickbacks for referrals.

869.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Kogan directly and indirectly through FLBD Management. Kogan was provided with direct and indirect "investment" interests in Saddlebrook ASC through FLBD Management, in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kogan's direct and indirect "investment" interests in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Kogan, which, in fact, were illegal kickbacks for referrals.

870.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Tylman directly and indirectly through FLBD Management. Tylman was provided with direct and indirect "investment" interests in Saddlebrook ASC through FLBD Management in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Tylman's direct and indirect "investment" interests in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Tylman, which, in fact, were illegal kickbacks for referrals.

871.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Hatami through M. Hatami and MEH Investments. Hatami was provided with an indirect "investment" interest in Saddlebrook ASC through M. Hatami and MEH Investments in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Hatami's indirect "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Hatami, which, in fact, were illegal kickbacks for referrals.

872.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Romero and/or one or more of the John Does 2 through 20, through Ramirez and/or Chavez, and ASC Investment Services. Romero was provided with an indirect "investment" interest in Saddlebrook ASC through Ramirez and/or Chavez, and ASC Investment Services in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Romero and/or one or more of the John Does 2 through 20's indirect "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Romero and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

873.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with J. Katanov directly and indirectly through Redy Ventures. J. Katanov was provided with direct and indirect "investment" interests in Saddlebrook ASC through Redy Ventures in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs.

On information and belief, in exchange for J. Katanov's direct and indirect "investment" interests in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of J. Katanov, which, in fact, were illegal kickbacks for referrals.

874.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Keyserman and/or one or more of the John Does 2 through 20 through MK Med Invest. Keyserman and/or one or more of the John Does 2 through 20 were provided with an indirect "investment" interest in Saddlebrook ASC through MK Med Invest in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Keyserman and/or one or more of the John Does 2 through 20's indirect "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Keyserman and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

875.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Shakarov and/or one or more of the John Does 2 through 20 through AS Med Invest. Shakarov and/or one or more of the John Does 2 through 20 were provided with an indirect "investment" interest in Saddlebrook ASC through AS Med Invest in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Shakarov and/or one or more of the John Does 2 through 20's indirect "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Shakarov and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

876. One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the Health Plus Defendants through Rubin and Capleo Holdings. One or more of the Health Plus Defendants were provided with direct or indirect "investment" interests in Saddlebrook ASC through Rubin and Capleo Holdings in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the Health Plus Defendants' direct or indirect "investment" interests in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of one or more of the Health Plus Defendants, which, in fact, were illegal kickbacks for referrals.

877. One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Yaguda and/or one or more of the John Does 2 through 20, through YCentury. Yaguda and/or one or more of the John Does 2 through 20 was provided with an indirect "investment" interest in Saddlebrook ASC through YCentury in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yaguda and/or one or more of the John Does 2 through 20's indirect "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Yaguda and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

878. One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Yadgarov and/or one or more of the John Does 2 through 20, through Boost HS. Yadgarov and/or one or more of the John Does 2 through 20 was provided with an indirect "investment" interest in Saddlebrook ASC through Boost HS in

exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yadgarov and/or one or more of the John Does 2 through 20's indirect "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Yadgarov and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

879.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with McCulloch. McCulloch was provided with an "investment" interest in Saddlebrook ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for McCulloch's "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of McCulloch, which, in fact, were illegal kickbacks for referrals.

880.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Ajoy Sinha. Ajoy Sinha was provided with an "investment" interest in Saddlebrook ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Ajoy Sinha's "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Ajoy Sinha, which, in fact, were illegal kickbacks for referrals.

881.    One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Xie. Xie was provided with an "investment" interest in Saddlebrook ASC in exchange for his agreement to steer or refer, or cause to be steered

or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Xie's "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Xie, which, in fact, were illegal kickbacks for referrals.

882. One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Upendra Sinha. Upendra Sinha was provided with an "investment" interest in Saddlebrook ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Upendra Sinha's "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Upendra Sinha, which, in fact, were illegal kickbacks for referrals.

883. One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with Berkowitz. Berkowitz was provided with an "investment" interest in Saddlebrook ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Berkowitz's "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of Berkowitz, which, in fact, were illegal kickbacks for referrals.

884. On information and belief, one or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in Saddlebrook ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or

refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interest in Saddlebrook ASC, Saddlebrook ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii. The Sham "Medical Directors" and "Administrators"

885. In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited Defendant Cocoziello to serve as sham "medical director" of Saddlebrook ASC in contravention of New Jersey law.

886. According to NJDOH records, Defendant Cocoziello has been Jersey City ASC's "medical director" since March 2015.

887. One or more of the Controllers, through Saddlebrook ASC, entered into a sham "investor" or employment referral/kickback relationship with Defendant Cocoziello, who purchased or otherwise acquired shares in Saddlebrook ASC to make it appear that the shares were being purchased as investments and that payments made by Saddlebrook ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Defendant Cocoziello's agreement to serve as sham "medical director" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Defendant Cocoziello never intended to (and never did fulfill) his medical director duties as required by law and the compensation he received was actually for permitting one or more of the Controllers to operate the Saddlebrook

ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

888. In addition to the sham "medical directors," one or more of the Controllers recruited Lucero, Lopez, Morris, Aminova, and Romero to serve as sham "administrators" of Saddlebrook ASC in contravention of New Jersey law.

889. According to NJDOH records, Lucero has been Saddlebrook ASC's "administrator" since September 2022.

890. According to NJDOH records, Lopez was Saddlebrook ASC's "administrator" between approximately May 2021 and September 2022.

891. According to NJDOH records, Morris was Saddlebrook ASC's "administrator" in or around 2016 and between approximately January 2019 and May 2021. According to public records, Morris is Kilroy's wife.

892. According to NJDOH records, Aminova was Saddlebrook ASC's "administrator" in or around September 2020. In 2023, Aminova signed verifications for complaints filed in New York by New Horizon ASC, Manalapan ASC, Saddlebrook ASC, Jersey City ASC, and the New York DME company, PRC Supplies, Inc. (not named as a defendant herein), which, per public records, lists its address at a different suite at New Horizon ASC's clinic location.

893. According to NJDOH records, Romero was Saddlebrook ASC's "administrator" in or around 2017.

894. One or more of the Controllers, through Saddlebrook ASC, entered into sham "investor" or employment referral/kickback relationships with Lucero, Lopez, Morris, Aminova, and/or Romero, who purchased or otherwise acquired shares in Saddlebrook ASC to make it appear that the shares were being purchased as investments and that payments made by

Saddlebrook ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Lucero, Lopez, Morris, Aminova, and/or Romero's agreement to serve as sham "administrators" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Lucero, Lopez, Morris, Aminova, and/or Romero never intended to (and never did fulfill) their administrator duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Saddlebrook ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

**D.** **Illegal Operation of Jersey City ASC**

i. The Fraudulent "Investor" Referral/Kickback Scheme

895. In or around March 2017, NJDOH approved the transfer of ownership of the NJ ASC, Journal Square Surgical Center, LLC (not named as a defendant herein) to Jersey City ASC.

896. According to its corporate filings, Degradi has been an owner of Jersey City ASC, and its sole officer, director, and president since it was formed on or about August 16, 2016. According to NYDOH records, the Controllers acquired ownership interests in Jersey City ASC in September 2016.

897. According to the Surgicore ASCs' website, in September 2016, Jersey City ASC entered into an "asset purchase agreement" to acquire 100 percent of Journal Square Surgical Center, LLC.

898. According to court filings, Gregory Surgical Services, LLC, which, as alleged herein, previously operated an ASC at Jersey City ASC's clinic location and was owned by New

Horizon ASC's founding members, Jose Sanchez-Pena, M.D. and Romero, and the subject of a fraudulent conveyance-adversarial proceeding in Jose Sanchez-Pena, M.D.'s bankruptcy proceeding, sold its assets to Journal Square Surgical Center, LLC in or around 2009. According to NJDOH records, Scinas had ownership interests in Journal Square Surgical Center, LLC before it was sold to Jersey City ASC.

899. As alleged herein, in addition to his connections with New Horizon ASC, Romero owned and/or was affiliated with several additional companies that operated out of and/or owned suites at Jersey City ASC's clinic location, including Gregory Anesthesia Services LLC, Jersey City Investment Group, Inc., Gregory Realty, LLC, and Comprehensive Imaging Center LLC.

900. According to NJDOH records, after the Controllers acquired ownership interests in Jersey City ASC, prospective owners of Jersey City ASC were directed, per the terms of the purported "membership unit purchase agreements," to make their "investments" in Jersey City ASC payable to Randolph, Esq.'s law firm's trust account.

901. At all times as alleged herein, the Controllers, M. Hatami, Blumberg, Berkowitz, J. Katanov, Keyserman, Shakarov, Kostanian, Denevich, Yaguda, Wasserman, Jones, Kotkes, Richard, one or more of the Health Plus Defendants, and one or more of the John Does 2 through 20 (collectively, the "Jersey City ASC Owners") have had direct or indirect ownership interests in Jersey City ASC.

902. At all relevant times while they were owners of Jersey City ASC, the Jersey City ASC Owners were responsible for the operation and control of Jersey City ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

903.     At all relevant times since acquiring an ownership interests in Jersey City ASC in or around September 2016, the Controllers have had a majority ownership interest in and/or otherwise controlled Jersey City ASC.

904.     NJDOH records indicate that, initially, ownership of Jersey City ASC was divided equally between Degradi, Kogan, Tylman, and M. Hatami.

905.     In or around 2018, according to NJDOH records, Degradi's ownership interests in Jersey City ASC were transferred to Four D Investments LLC, Kogan and Tylman's ownership interests in Jersey City ASC were transferred to FLBD Management, and M. Hatami's purported ownership interests in Jersey City ASC were transferred to M. Hatami MEH Investments.

906.     As alleged herein, at all relevant times Degradi owned and controlled Four D Investments LLC, which dissolved on or about May 2, 2018.

907.     As alleged herein, at all relevant times Degradi owned and controlled Four D Investments Inc.

908.     On information and belief, Four D Investments Inc (and not Four D Investments LLC) has had an ownership interest in Jersey ASC since approximately May 2, 2018.

909.     According to records received from NJDOH for Jersey City ASC, Jersey City ASC did not provide NJDOH with any notice of the transfer of ownership interests from Four D Investments LLC to Four D Investments Inc.

910.     According to records received from NJDOH for Jersey City ASC, Jersey City ASC did not provide NJDOH with any prior notice of the transfer of ownership interests from Four D Investments LLC to Four D Investments Inc.

911.     On information and belief, Jersey City ASC misrepresented to its patients that Four D Investments LLC had an ownership interests in Jersey City ASC after May 2, 2018.

912.     On information and belief, Jersey City ASC did not disclose to its patients that Four D Investments Inc had an ownership interest in Jersey City ASC after May 2, 2018.

913.     As alleged herein, at all relevant times Kogan and Tylman owned and controlled FLBD Management.

914.     At all relevant times herein, M. Hatami was a nominal or straw owner of MEH Investments, which was actually owned and/or controlled by Hatami.

915.     On information and belief, Jersey City ASC did not disclose to its patients that Hatami had ownership interests in Jersey City ASC through MEH Investments, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Jersey City ASC in order to ensure a steady stream of patients to Jersey City ASC, irrespective of medical need.

916.     Upon acquiring control of Jersey City ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through Jersey City ASC entered into sham "investor" referral/kickback arrangements with the Jersey City ASC Owners who purchased or otherwise acquired shares in Jersey City ASC to make it appear that payments made by Jersey City ASC were dividends or other cash distributions for their "investments" in Jersey City ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs. One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

917. In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, Jersey City ASC, the Jersey City ASC Owners purchased or otherwise acquired ownership interests in Jersey City ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The Jersey City ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from Jersey City ASC that were disguised as dividends or other cash distributions for their "investments" in Jersey City ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

918. In order to conceal the referral/kickback scheme and the full extent of their ownership and control over Jersey City ASC, the Controllers established, owned, maintained a financial interest in, or otherwise derived financial benefit from a web of associated companies, including Surgicore Management, which purports to be the "management" company for Jersey City ASC, and one or more of the ABC Corporations 1 through 20 that purport to serve as landlord, management and/or other financing companies and which purported to, enter into lease, management services, financing agreements, and other contracts with Jersey City ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over Jersey City ASC, to funnel proceeds from Jersey City ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

919. According to NJDOH records, in addition to the Controllers' ownership interests in Saddlebrook ASC, MEDA Management, and SJ2 Ventures have also had ownership interests in Jersey City ASC since approximately August 2017.

920. At all relevant times herein, MEDA Management has been owned and controlled by one or more of the Health Plus Defendants including Blumberg. Jersey City ASC represented to NJDOH that MEDA Management was owned solely by Blumberg.

921. At all relevant times herein, SJ2 Ventures has been owned and controlled by one or more of the Health Plus Defendants including Blumberg. Jersey City ASC represented to NJDOH that SJ2 Ventures was owned solely by Blumberg.

922. According to NJDOH records, Berkowitz has had ownership interests in Jersey City ASC since approximately August 2017 and, sometime thereafter, transferred his ownership interests in Jersey City ASC to Gesheft Associates.

923. At all relevant times herein, Gesheft Associates has been owned and controlled by Berkowitz. New Horizon ASC and Rockland and Bergen ASC represented to NJDOH that Gesheft Associates was owned solely by Berkowitz.

924. As alleged herein, Gesheft Associates has also been an owner of Rockland and Bergen ASC and continues to be an owner of Rockland and Bergen ASC through Surgicore RBSC.

925. According to NJDOH records, Redy Ventures has also had ownership interests in Jersey City ASC since approximately June 2020.

926. According to NJDOH records, MK Med Invest and AS Med Invest also have had ownership interests in Jersey City ASC since approximately February 2022.

927.     As alleged herein, MK Med Invest and AS Med Invest also have ownership interests in New Horizon ASC and Saddlebrook ASC and, on information and belief, at all relevant times were actually owned by one or more of the John Does 2 through 20.

928.     On information and belief, Jersey City ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in Jersey City ASC through MK Med Invest, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Jersey City ASC in order to ensure a steady stream of patients to Jersey City ASC, irrespective of medical need.

929.     On information and belief, Jersey City ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in Jersey City ASC through AS Med Invest, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Jersey City ASC in order to ensure a steady stream of patients to Jersey City ASC, irrespective of medical need.

930.     According to NJDOH records, Kostanian Consulting Associates has also had ownership interests in Jersey City ASC since approximately December 2022.

931.     As alleged herein, Kostanian Consulting Associates, which is owned solely by Kostanian, is also an owner of Saddlebrook ASC and Rockland and Bergen ASC.

932.     According to NJDOH records, Conte De Fees also had ownership interests in Jersey City ASC from approximately December 2022 through February 2024, at which point in time, its ownership interests were transferred to Fiaba.

933.     As alleged herein, at all relevant times herein, Conte De Fees and Fiaba were owned and controlled by Denevich. As alleged herein, Conte De Fees was also an owner of New Horizon

ASC and is a current owner for Rockland and Bergen ASC. As alleged herein, Fiaba is also an owner of New Horizon ASC.

934. According to NJDOH records, YCentury also had ownership interests in Jersey City ASC between approximately March 2018 and February 2022.

935. As alleged herein, YCentury, which is owned solely by Yaguda, is also an owner of New Horizon ASC and Rockland and Bergen ASC, and a former owner of Saddlebrook ASC. As alleged herein, Yaguda is also an owner of All City ASC (directly) and Empire State ASC (through Mega Group Solution), and was a proposed owner as of November 2024 of Fifth Avenue ASC (through Mega Group Solution) and, on information and belief, is a current owner of Fifth Avenue ASC (through Mega Group Solution).

936. At all relevant times herein, Yaguda was a nominal or straw owner for one or more of the John Does 2 through 20, who were the actual owners of YCentury.

937. On information and belief, Jersey City ASC did not disclose to its patients that one or more of the John Does 2 through 20 had ownership interests in Jersey City ASC through YCentury, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Jersey City ASC in order to ensure a steady stream of patients to Jersey City ASC, irrespective of medical need.

938. According to NJDOH records, Wasserman has had ownership interests in Jersey City ASC since approximately December 2017.

939. According to NJDOH records, Jones had ownership interests in Jersey City ASC between approximately February 2018 and January 2024.

940. According to NJDOH records, Kotkes had ownership interests in Jersey City ASC between approximately August 2020 and November 2023.

941.     According to NJDOH records, Richard had ownership interests in Jersey City ASC between approximately 2017 and 2020. As alleged herein, Richards has also been Jersey City ASC's purported "medical director" since 2019.

942.     One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Degradi directly and indirectly through Four D Investments LLC and/or Four D Investments Inc. Degradi was provided with direct and indirect "investment" interests in Jersey City ASC through Four D Investments LLC and/or Four D Investments Inc in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Degradi's direct and indirect "investment" interests in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Degradi, which, in fact, were illegal kickbacks for referrals.

943.     One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Kogan directly and indirectly through FLBD Management. Kogan was provided with direct and indirect "investment" interests in Jersey City ASC through FLBD Management, in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kogan's direct and indirect "investment" interests in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Kogan, which, in fact, were illegal kickbacks for referrals.

944.     One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Tylman directly and indirectly through FLBD Management. Tylman was provided with direct and indirect "investment" interests in Jersey

City ASC through FLBD Management in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Tylman's direct and indirect "investment" interests in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Tylman, which, in fact, were illegal kickbacks for referrals.

945.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Hatami through M. Hatami and MEH Investments. Hatami was provided with an indirect "investment" interest in Jersey City ASC through M. Hatami and MEH Investments in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Hatami's indirect "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Hatami, which, in fact, were illegal kickbacks for referrals.

946.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the Health Plus Defendants through Blumberg, MEDA Management, and SJ2 Ventures. One or more of the Health Plus Defendants were provided with direct or indirect "investment" interests in Jersey City ASC through Blumberg, MEDA Management, and SJ2 Ventures in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the Health Plus Defendants' direct or indirect "investment" interests in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of one or more of the Health Plus Defendants, which, in fact, were illegal kickbacks for referrals.

947.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with J. Katanov through Redy Ventures. J. Katanov was provided with an indirect "investment" interest in Jersey City ASC through Redy Ventures in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for J. Katanov's indirect "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of J. Katanov, which, in fact, were illegal kickbacks for referrals.

948.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Keyserman and/or one or more of the John Does 2 through 20 through MK Med Invest. Keyserman and/or one or more of the John Does 2 through 20 were provided with an indirect "investment" interest in Jersey City ASC through MK Med Invest in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Keyserman and/or one or more of the John Does 2 through 20's indirect "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Keyserman and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

949.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Shakarov and/or one or more of the John Does 2 through 20 through AS Med Invest. Shakarov and/or one or more of the John Does 2 through 20 was provided with an indirect "investment" interest in Jersey City ASC through AS Med Invest in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange

for Shakarov and/or one or more of the John Does 2 through 20's indirect "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Shakarov and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

950. One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Kostanian through Kostanian Consulting Associates. Kostanian was provided with an indirect "investment" interest in Jersey City ASC through Kostanian Consulting Associates in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kostanian's indirect "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Kostanian, which, in fact, were illegal kickbacks for referrals.

951. One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Denevich through Conte De Fees and Fiaba. Denevich was provided with an indirect "investment" interest in Jersey City ASC through Conte De Fees and Fiaba in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Denevich's indirect "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Denevich, which, in fact, were illegal kickbacks for referrals.

952. One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Yaguda and/or one or more of the John Does 2 through 20, through YCentury. Yaguda and/or one or more of the John Does 2 through 20 were

provided with an indirect "investment" interest in Jersey City ASC through YCentury in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yaguda and/or one or more of the John Does 2 through 20's indirect "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Yaguda and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

953.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Berkowitz directly and indirectly through Gesheft Associates. Berkowitz was provided with direct and indirect "investment" interests in Jersey City ASC through Gesheft Associates in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Berkowitz's direct and indirect "investment" interests in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Berkowitz, which, in fact, were illegal kickbacks for referrals.

954.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Wasserman. Wasserman was provided with an "investment" interest in Jersey City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Wasserman's "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Wasserman, which, in fact, were illegal kickbacks for referrals.

955.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Jones. Jones was provided with an "investment"

interest in Jersey City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Jones's "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Jones, which, in fact, were illegal kickbacks for referrals.

956.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Kotkes. Kotkes was provided with an "investment" interest in Jersey City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kotkes's "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Kotkes, which, in fact, were illegal kickbacks for referrals.

957.    One or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with Richard. Richard was provided with an "investment" interest in Jersey City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Richard's "investment" interest in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of Richard, which, in fact, were illegal kickbacks for referrals.

958.    On information and belief, one or more of the Controllers, through Jersey City ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in Jersey City ASC through one

or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interests in Jersey City ASC, Jersey City ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii.     The Sham "Medical Directors" and "Administrators"

959.     In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited Defendant Richard and/or one or more of the John Does 2 through 20 to serve as sham "medical directors" of Jersey City ASC in contravention of New Jersey law.

960.     Jersey City ASC represented to NJDOH that Defendant Richard was Jersey City ASC's "medical director" as of May 1, 2019.

961.     One or more of the Controllers, through Jersey City ASC, entered into sham "investor" or employment referral/kickback relationships with Defendant Richard and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Jersey City ASC to make it appear that the shares were being purchased as investments and that payments made by Jersey City ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Defendant Richard and/or one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Defendant Richard and/or one or more of the John Does 1 through 2 never intended to (and never did fulfill) their medical director duties as required

321

by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Jersey City ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

962. In addition to the sham "medical directors," one or more of the Controllers recruited Aminova and/or one or more of the John Does 2 through 20 to serve as sham "administrators" of Jersey City ASC in contravention of New Jersey law.

963. According to NJDOH records, Aminova is Jersey City ASC's current "administrator."

964. One or more of the Controllers, through Jersey City ASC, entered into sham "investor" or employment referral/kickback relationships with Aminova and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Jersey City ASC to make it appear that the shares were being purchased as investments and that payments made by Jersey City ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Aminova's agreement to serve as sham "administrator" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Aminova never intended to (and never did fulfill) her administrator duties as required by law and the compensation she received was actually for permitting one or more of the Controllers to operate the Jersey City ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

### E. Illegal Operation of Rockland and Bergen ASC

#### i. The Fraudulent "Investor" Referral/Kickback Scheme

965.    In or around March 2020, according to NJDOH records, NJDOH approved Surgicore RBSC's acquisition of over 94 percent ownership interest in Rockland and Bergen ASC.

966.    Surgicore RBSC initially acquired 90 percent ownership interest in Rockland and Bergen ASC, which was approved by NJDOH in or around February 2020.

967.    At all relevant times since around March 13, 2020, Surgicore RBSC has had a majority and/or controlling interest in Rockland and Bergen ASC.

968.    At all relevant times as alleged herein, Surgicore RBSC has been owned on paper by Degradi, Tylman, Kogan, and M. Hatami.

969.    According to its corporate filings, Surgicore RBSC was formed on December 13, 2019, and reported Degradi and Kogan as its sole members/managers.

970.    In March 2020, Rockland and Bergen ASC represented to NJDOH that Surgicore RBSC was owned equally by Degradi, Tylman, Kogan, and M. Hatami.

971.    In Rockland and Bergen ASC's application for an amended license, dated December 19, 2019, Rockland and Bergen ASC represented to NJDOH that a separate company, Newco, LLC (and not Surgicore RBSC), which would be jointly owned and controlled by the Controllers, with each as 25 percent owners, would purchase 90 percent interest in Rockland and Bergen ASC, and submitted a fully executed binding term sheet, dated December 2, 2019, regarding the purchase. Hatami (and not M. Hatami) was also listed as a "buyer representative" on correspondence from NJDOH approving the transfer of 90 percent ownership interests in Rockland and Bergen ASC to Surgicore RBSC in February of 2020.

972.    On information and belief, though M. Hatami (and not Hatami) was a purported owner of Surgicore RBSC, counsel for Rockland and Bergen ASC communicated with Hatami (and not M. Hatami) regarding Surgicore RBSC including regarding NJDOH's approval of Surgicore RBSC's acquisition of ownership interests in Rockland and Bergen ASC.

973.    At all relevant times herein, M. Hatami was a nominal or straw owner for Hatami, who was the actual owner of M. Hatami's ownership interest in Surgicore RBSC.

974.    On information and belief, Rockland and Bergen ASC did not disclose to its patients that Hatami had an ownership interest in Rockland and Bergen ASC, including that he was receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Rockland and Bergen ASC in order to ensure a steady stream of patients to Rockland and Bergen ASC, irrespective of medical need.

975.    Rockland and Bergen ASC represented to NJDOH that in or around 2021, Degradi, Tylman, and M. Hatami collectively sold 3.62 percent of their ownership interests in Surgicore RBSC to Redy Ventures. In or around 2022, Degradi, Tylman, Kogan, and M. Hatami collectively sold 4.812 percent of their ownership interests in Surgicore RBSC to Gesheft Associates.

976.    As alleged herein, at all relevant times herein, Redy Ventures has been owned and controlled by Katanov.

977.    As alleged herein, at all relevant times herein, Gesheft Associates has been owned and controlled by Berkowitz.

978.    With its March 13, 2020 application for approval of the proposed change of ownership in Rockland and Bergen ASC, Kogan, acting as President of Rockland and Bergen ASC, attested that Rockland and Bergen ASC would "own, operate and manage Rockland and Bergen [ASC] in accordance with applicable regulations," that he "read, understand, and will

comply with the requirements set forth in [N.J.A.C.] 8:43A Manual for Standards for Licensing of [NJ ASCs], including those incorporated by reference, as well as other applicable State and Federal requirements," and that Rockland and Bergen ASC "understands its responsibility as a licensee to adhere to the applicable regulations…." Kogan further attested that all information contained in the application and any attachments submitted were "true and correct."

979. Since 2020, according to its corporate filings, Rockland and Bergen ASC's officers/directors have consisted of Kogan, Degradi, Tylman, and M. Hatami, with Kogan serving as its CEO.

980. At all relevant times herein, M. Hatami, who, as alleged herein is Hatami's wife, was a straw officers/directors of Rockland and Bergen ASC for Hatami, who was the actual officer/director for Rockland and Bergen ASC.

981. On information and belief, Hatami recruited M. Hatami to serve as a straw officer/director of Rockland and Bergen ASC in order to conceal the full extent of his control over Rockland and Bergen ASC.

982. At all times as alleged herein, the Controllers, M. Hatami, J. Katanov, Berkowitz, Yaguda, Hoyle, Yadgarov, Kostanian, Denevich, Naik, Kotkes, Kurtti, McCarthy, and one or more of the John Does 2 through 20 (collectively, the "Rockland and Bergen ASC Owners") have had direct or indirect ownership interests in Rockland and Bergen ASC.

983. On information and belief, at all relevant times while they were owners of Rockland and Bergen ASC, the Rockland and Bergen ASC Owners were responsible for the operation and control of Rockland and Bergen ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

984. At all relevant times since acquiring ownership interests in Rockland and Bergen ASC, through Surgicore RBSC, in or around March of 2020, the Controllers have had a majority ownership interest in and/or otherwise controlled Rockland and Bergen ASC.

985. Upon acquiring control of Rockland and Bergen ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through Rockland and Bergen ASC entered into sham "investor" referral/kickback arrangements with the Rockland and Bergen ASC Owners who purchased or otherwise acquired shares in Rockland and Bergen ASC to make it appear that payments made by Rockland and Bergen ASC were dividends or other cash distributions for their "investments" in Rockland and Bergen ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

986. One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

987. In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, Rockland and Bergen ASC, the Rockland and Bergen ASC Owners purchased or otherwise acquired ownership interests in Rockland and Bergen ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The Rockland and Bergen ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from Rockland and Bergen ASC that were disguised as dividends

or other cash distributions for their "investments" in Rockland and Bergen ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

988.    In order to conceal the referral/kickback scheme and the full extent of their ownership and control over Rockland and Bergen ASC, the Controllers established, owned, maintained a financial interest in or otherwise derived financial benefit from a web of associated companies, including Surgicore Management, which purports to be the "management" company for Rockland and Bergen ASC and one or more of the ABC Corporations 1 through 20, that purport to serve as landlord, management, and/or other financing companies and which purported to enter into lease, management services, financing agreements, and other contracts with Rockland and Bergen ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over Rockland and Bergen ASC, to funnel proceeds from Rockland and Bergen ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

989.    In addition to the Controllers, J. Katanov and Berkowitz have had ownership interests in Rockland and Bergen ASC, through Surgicore RBSC, Redy Ventures and Gesheft Associates; Rockland and Bergen ASC also represented to NJDOH that YCentury and AEH Healthcare Management have also had ownership interests in Rockland and Bergen ASC since around March of 2021. According to NYDOH records, Yaguda has had an indirect ownership interest in Rockland Bergen ASC since 2020.

990.    At all relevant times herein, Yaguda was a nominal or straw owner of YCentury, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

991.     At all relevant times herein, AEH Healthcare Management has been owned and controlled by Hoyle. Rockland and Bergen ASC represented to NJDOH that AEH Healthcare Management was owned solely by Hoyle. According to its corporate filings, Hoyle is AEH Healthcare Management's sole member/manager and registered agent. As alleged herein, Hoyle was recruited by one or more of the Controllers to falsely pose as the "chief clinical officer" and/or "chief nursing officer" overseeing the sham "directors of nursing" at the Surgicore ASCs.

992.     Rockland and Bergen ASC also represented to NJDOH that Boost HS has also had ownership interests in Rockland and Bergen ASC since around May of 2022.

993.     Rockland and Bergen ASC represented to NJDOH that Boost HS was owned solely by Yadgarov and, according to its corporate filings, Yadgarov was Boost HS's organizer and registered agent. As alleged herein, Akbashev Tax Group, reporting its address at 7009 Austin Street, filed the articles of organization for Boost HS.

994.     At all relevant times herein, Yadgarov was a nominal or straw owner of Boost HS, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

995.     On information and belief, Rockland and Bergen ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in Rockland and Bergen ASC through Boost HS, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Rockland and Bergen ASC in order to ensure a steady stream of patients to Rockland and Bergen ASC, irrespective of medical need.

996.     In addition, Rockland and Bergen ASC also represented to NJDOH that Conte De Fees and Kostanian Consulting Associates also have had ownership interests in Rockland and Bergen ASC since around April of 2023.

997.    Rockland and Bergen ASC also represented to NJDOH that Naik had ownership interests in Rockland and Bergen ASC through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC (not named as defendants herein) from around 2012 through around April 2023. As alleged herein, Naik is also the purported "medical director" of New Horizon ASC.

998.    According to NJDOH records, Kotkes had ownership interests in Rockland and Bergen ASC between approximately November 2012 and March 2020.

999.    According to NJDOH records, Kurtti had ownership interests in Rockland and Bergen ASC through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC between approximately May 2012 and April 2022.

1000.   According to NJDOH records, McCarthy had ownership interests in Rockland and Bergen ASC through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC approximately September 2009 and April 2022.

1001.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with the Controllers through Surgicore RBSC. The Controllers were provided with indirect "investment" interests in Rockland and Bergen ASC through Surgicore RBSC in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for the Controllers' indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of one or more of the Controllers, which, in fact, were illegal kickbacks for referrals.

1002.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with J. Katanov through Redy Ventures and Surgicore RBSC. J. Katanov was provided with an indirect "investment" interest in Rockland

and Bergen ASC through Redy Ventures and Surgicore RBSC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for J. Katanov's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of J. Katanov, which, in fact, were illegal kickbacks for referrals.

1003.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Berkowitz through Gesheft Associates and Surgicore RBSC. Berkowitz was provided with an indirect "investment" interest in Rockland and Bergen ASC through Gesheft Associates and Surgicore RBSC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Berkowitz's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Berkowitz, which, in fact, were illegal kickbacks for referrals.

1004.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Yaguda and/or one or more of the John Does 2 through 20 through YCentury. Yaguda and/or one or more of the John Does 2 through 20 were provided with an indirect "investment" interest in Rockland and Bergen ASC through YCentury in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yaguda and/or one or more of the John Does 2 through 20's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Yaguda and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

1005.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Hoyle through AEH Healthcare Management. Hoyle was provided with an indirect "investment" interest in Rockland and Bergen ASC through AEH Healthcare Management in exchange for her agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Hoyle's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Hoyle, which, in fact, were illegal kickbacks for referrals.

1006.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Yadgarov and/or one or more of the John Does 2 through 20 through Boost HS. Yadgarov and/or one or more of the John Does 2 through 20 were provided with an indirect "investment" interest in Rockland and Bergen ASC through Boost HS in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yadgarov and/or one or more of the John Does 2 through 20's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Yadgarov and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

1007.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Denevich through Conte De Fees. Denevich was provided with an indirect "investment" interest in Rockland and Bergen ASC through Conte De Fees in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and

belief, in exchange for Denevich's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Denevich, which, in fact, were illegal kickbacks for referrals.

1008. one or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Kostanian through Kostanian Consulting Associates or Kostanian Consulting Services. Kostanian was provided with an indirect "investment" interest in Rockland and Bergen ASC through Kostanian Consulting Associates or Kostanian Consulting Services in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kostanian's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Kostanian, which, in fact, were illegal kickbacks for referrals.

1009. One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Naik through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC (not named as defendants herein). Naik was provided with an indirect "investment" interest in Rockland and Bergen ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Naik's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Naik, which, in fact, were illegal kickbacks for referrals.

1010. One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Kotkes. Kotkes was provided with an "investment" interest in Rockland and Bergen ASC in exchange for his agreement to steer or

refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kotkes's "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Kotkes, which, in fact, were illegal kickbacks for referrals.

1011.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with Kurtti through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC (not named as defendants herein). Kurtti was provided with an indirect "investment" interest in Rockland and Bergen ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kurtti's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of Kurtti, which, in fact, were illegal kickbacks for referrals.

1012.   One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with McCarthy through Ramapo ASC Holdings, LLC and Rockland and Bergen ASC Holdings, LLC (not named as defendants herein). McCarthy was provided with an indirect "investment" interest in Rockland and Bergen ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for McCarthy's indirect "investment" interest in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of McCarthy, which, in fact, were illegal kickbacks for referrals.

1013.   On information and belief, one or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" referral/kickback arrangement with one or

more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in Rockland and Bergen ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interests in Rockland and Bergen ASC, Rockland and Bergen ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii.     The Sham "Medical Directors" and "Administrators"

1014.   In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited one or more of the John Does 2 through 20 to serve as sham "medical directors" of Rockland and Bergen ASC in contravention of New Jersey law.

1015.   One or more of the Controllers, through Rockland and Bergen ASC, entered into sham "investor" or employment referral/kickback relationships with one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Rockland and Bergen ASC to make it appear that the shares were being purchased as investments and that payments made by Rockland and Bergen ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, one or more of the John Does 2 through 20 never intended to (and never did fulfill) their

medical director duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Rockland and Bergen ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

1016.  In addition to the sham "medical directors," one or more of the Controllers recruited Finnegan to serve as sham "administrator" of Rockland and Bergen ASC in contravention of New Jersey law.

1017.  According to NJDOH records, Finnegan has been Rockland and Bergen ASC's "administrator" since around 2020 and around the same time or shortly after the Controllers acquired majority ownerships in Rockland and Bergen ASC through Surgicore RBSC.

1018.  One or more of the Controllers, through Rockland and Bergen ASC, entered into a sham "investor" or employment referral/kickback relationship with Finnegan, who purchased or otherwise acquired shares in Rockland and Bergen ASC to make it appear that the shares were being purchased as investments and that payments made by Rockland and Bergen ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Finnegan's agreement to serve as sham "administrator" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Finnegan never intended to (and never did fulfill) her administrator duties as required by law and the compensation she received was actually for permitting one or more of the Controllers to operate the Rockland and Bergen ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

## IV.     Illegal Operation of the Surgicore NY ASCs

1019.   On August 2, 2016, GEICO brought a civil action alleging RICO and other claims against New Horizon ASC and other HCPs to recover more than $3 million in damages arising out of activity at New Horizon's clinic location. *See Gov't Emp. Ins. Co., et al. v. Trnovski, et al.*, 16-cv-4662 (D.N.J.). The complaint alleged, among other things, that co-owners of New Horizon ASC submitted inflated charges for medically unnecessary services and that many of those charges were the product of illegal self-referrals between and among the defendants under New Jersey law.

1020.   Additionally, on September 28, 2016, DFS announced proposed rulemaking to amend section 68.6 (Regulation 83) of Title 11 N.Y.C.R.R. in order address abuses by certain out-of-state providers by "[l]imit[ing] reimbursement of No-fault health care services provided outside." New York. XXXVIII N.Y. Reg. 66-67 (Sept. 28, 2016). Thereafter on May 24, 2017, DFS announced proposed revised rulemaking for 11 N.Y.C.R.R. 68.6. XXXIX N.Y. Reg. 30-32 (May 24, 2017). DFS explained that the rule change was "necessary because under the current regulation, there has been a marked increase in the submission of over-inflated claims from out-of-state providers…." XXXIX N.Y. Reg. 31 (May 24, 2017). DFS went on to explain that "[n]o-fault claimants [we]re being referred to certain health care providers outside New York, usually in New Jersey, who take advantage of the absence of specific fee schedules and submit excessive charges under exaggerated claims, well above the corresponding New York State fee schedules applicable to those health care services rendered," which resulted in available PIP Benefits "being depleted more quickly, to [injured persons'] detriment." XXXIX N.Y. Reg. 31 (May 24, 2017). After a public comment period was held, on October 10, 2017 DFS announced that it had finalized the new regulations, which went into effect on January 9, 2018. *See* Press Release, *New York Department of Financial Services, DFS Announces New Regulation to Strengthen New York No-*

*fault Insurance Law* (Oct. 10, 2017), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1710101; 11 N.Y.C.R.R. 68.6.

1021.  Following commencement of a lawsuit by GEICO in the matter of *Gov't Emp. Ins. Co., et al. v. Trnovski, et al.*, 16-cv-4662 (D.N.J.) and the forthcoming regulatory changes for out-of-state medical providers proposed by DFS, in furtherance of the scheme to defraud alleged herein, the Controllers acquired ASCs within New York that they could use as vehicles to submit inflated charges under the No-Fault Law, and undertook additional efforts to further conceal the full extent of their ownership and control of the Surgicore ASCs.

1022.  Towards that end, on October 26, 2016 the Controllers formed Surgicore 5th Avenue in which they each had 25 percent ownership interests and through which they acquired majority ownership interests in at least three of the Surgicore NY ASCs, as represented in their CON applications to NYDOH.

1023.  In connection with the CON applications submitted to NYDOH, the Controllers represented that they each had 25 percent ownership interests in Surgicore Management NY.

1024.  Public records on file with the NYDOS list the address for service of process for Surgicore Management NY at 505 Park Avenue, New York, New York, an address that is also associated with several other healthcare and related companies owned and/or affiliated with the Controllers and/or the Surgicore ASCs.

1025.  By way of example and not limitation, Surgicore Midtown, LLC (not named as a defendant herein), which, according to its corporate filings, is owned by Kogan and was listed as a co-debtor with Surgicore 5th Avenue on UCC records on file with NYDOS, and Surgicore Far Rockaway LLC (not named as a defendant herein), which, according to its corporate filings, was

formed by Degradi and lists Kogan as its agent for service of process, list their addresses at 505 Park Avenue, New York, New York.

1026.   At all relevant times herein, Surgicore 5th Avenue and Surgicore Management NY are owned and/or controlled by one or more of the Controllers and, on information and belief, were used to conceal the full extent of the Controllers' illegal control over the Surgicore NY ASCs and billing for Fraudulent Services, to funnel proceeds from one or more of the Surgicore ASCs back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

1027.   As with the Surgicore NJ ASC, the Controllers ensured a steady stream of patients to the Surgicore NY ASCs by entering into sham "investment," referral kickback relationships with providers who primarily practiced in New York and provided them with lucrative returns on their "investments" in the Surgicore NY ASCs, and employed an extensive network of interrelated providers who referred patients to each other and to the Surgicore NY ASCs.

1028.   The Surgicore NY ASCs are ineligible for reimbursement insofar as they have operated in violation of the New York laws and regulations governing ASCs, including the requirements for ASC medical directors and administrators, and prohibitions against kickbacks for medical referrals.

### A.  Illegal Operation of All City ASC

#### i.  The Fraudulent "Investor" Referral/Kickback Scheme

1029.   In or around November of 2017, less than one month after DFS announced its adoption of new regulations governing out-of-state providers, the Controllers acquired an ownership interest in All City ASC.

1030. Specifically, on November 1, 2017, All City ASC and the Controllers, among others, entered into a purported amended and restated shareholders' agreement. Under the amended and restated shareholders' agreement, Nasser Hassan, the Controllers, Blumberg, and Rubin were deemed "investor" or "voting" shareholders of All City ASC with authority to nominate individuals, which could include themselves, to serve on the six-member board of directors for All City ASC.

1031. Under the amended and restated shareholders' agreement, each of the Controllers had 17.30 voting shares, Hasan had 30 voting shares, Blumberg had 19 shares, and Rubin had 4.25 voting shares, in All City ASC, thus totaling 122.45 or a majority of the shares issued by All City ASC.

1032. The amended and restated shareholders' agreement provided that the Controllers' shares in All City ASC were encumbered by security interests granted under a certain Security and Pledge Agreement by and among the Controllers and Nasser Hassan.

1033. Additionally, under the terms of the amended and restated shareholders' agreement, Nasser Hassan and the Controllers each had authority to nominate one person as a director, and Blumberg and Rubin collectively had authority to nominate one person as director.

1034. In addition to "investor" or "voting" shares, the amended and restated shareholders' agreement deemed six individuals to possess "non-voting" shares, specifically Klein (2.13 shares), S. Passanisi (2.13 shares), L. Passanisi (5.31 shares), M. Hatami (17 shares), K. Degradi (17 shares), B. Kogan (17 shares) and Revutsky (17 shares).

1035. On information and belief, S. Passanisi and L. Passanisi are or were employees of, or otherwise associated with, Health Plus Management.

1036.  Under the terms of the amended and restated shareholders' agreement, the Controllers, M. Hatami, K. Degradi, B. Kogan, and Revutsky collectively possessed 137.2, or a majority of, the approximate 200 shares issued by All City ASC.

1037.  On December 30, 2020, Revutsky transferred her shares in All City ASC to Pyatetskaya.

1038.  On information and belief, Pyatetskaya is an immediate family member and/or spouse of, or otherwise closely associated with Tylman.

1039.  At all relevant times herein, K. Degradi was a nominal or straw owner for Degradi, who was the actual owner of K. Degradi's ownership interest in All City ASC.

1040.  At all relevant times herein, M. Hatami was a nominal or straw owner for Hatami, who was the actual owner of M. Hatami's ownership interest in All City ASC.

1041.  At all relevant times herein, B. Kogan was a nominal or straw owner for Kogan, who was the actual owner of Kogan's ownership interest in All City ASC.

1042.  At all relevant times herein, Revutsky and Pyatetskaya were nominal or straw owners for Tylman, who was the actual owner of Revutsky and Pyatetskaya's ownership interest in All City ASC.

1043.  At all relevant times herein, Blumberg, Klein, Rubin, S. Passanisi and L. Passanisi have collectively owned more than 12 percent of All City ASC.

1044.  On information and belief, Blumberg, Klein, Rubin, S. Passanisi and L. Passanisi were nominal or straw owners for one or more of the Health Plus Defendants, who were the actual owners of Blumberg's, Rubin's, S. Passanisi's and L. Passanisi's ownership interests in All City ASC.

1045. At all relevant times herein, the Controllers and their family members have owned more than 50 percent of All City ASC.

1046. At all relevant times herein, the Controllers, Nasser, Blumberg and Rubin have been the only All City ASC shareholders with authority to nominate individuals as All City ASC's directors.

1047. According to its corporate filings, All City ASC was incorporated by Pokh and Nasser Hassan in or around December 15, 1996, and operated thereafter as a purported NY ASC. In 1997, Zybin was identified as All City ASC's president and "administrator" on a certificate of change of agent filed with the NYDOS. Until 2017, Nasser Hassan was listed as the CEO of All City ASC on all of its annual reports, at which point in time Degradi replaced Nasser Hassan.

1048. According to press reports and as alleged herein, in or around 2004, Pokh, who was All City ASC's director and vice president, pled guilty to grand larceny in connection with a criminal case against All City ASC for false claims that it submitted and for which it ultimately agreed to pay $6 million

1049. At the EUO of All City ASC, Zybin testified that Pokh is her mother, and that they are longtime friends of Tylman.

1050. At all times as alleged herein, the Controllers, K. Degradi, M. Hatami, B. Kogan, Revutsky, Pyatetskaya, Blumberg, Rubin, Klein, S. Passanisi, L. Passanisi, Zybin, S. Katanov. J. Katanov, Yaguda, Shabtian, Apazidis, Ajoy Sinha, Shamalov, Katzman, Bursztyn, Berkowitz, one or more of the Health Plus Defendants and one or more of the John Does 2 through 20 (collectively, the "All City ASC Owners") have had direct or indirect ownership interests in All City ASC.

1051. On information and belief, at all relevant times while they were owners of All City ASC, the All City ASC Owners were responsible for the operation and control of All City ASC

and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

1052.   At all relevant times since acquiring ownership interests in All City ASC in or around November 2017, the Controllers have had a majority ownership interest in and/or otherwise controlled All City ASC.

1053.   Upon acquiring control of All City ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through All City ASC entered into sham "investor" referral/kickback arrangements with the All City ASC Owners who purchased or otherwise acquired shares in All City ASC to make it appear that payments made by All City ASC were dividends or other cash distributions for their "investments" in All City ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

1054.   One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

1055.   In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, All City ASC, the All City ASC Owners purchased or otherwise acquired ownership interests in All City ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The All City ASC Owners, either directly or indirectly through their companies, family members or close associates, or their

family members' or close associates' companies, received payments from All City ASC that were disguised as dividends or other cash distributions for their "investments" in All City ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

1056.    In order to conceal the referral/kickback scheme and the full extent of their ownership and control over All City ASC, the Controllers established, owned, maintained a financial interest in or otherwise derived financial benefit from a web of associated companies, including Surgicore Management NY, which purports to be the "management" company for All City ASC and one or more of the ABC Corporations 1 through 20, that purport to serve as landlord, management and/or other financing companies and which purported to enter into lease, management services, financing agreements and other contracts with All City ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over All City ASC, to funnel proceeds from All City ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

1057.    Towards that end, Surgicore Management NY purportedly entered into an administrative services agreement ("ASA") with All City ASC on or about May 1, 2019, under which, Surgicore Management NY would receive an annual fee of $600,000 (or $50,000 per month). The ASA further provided that All City ASC "retains all authority and responsibility" over all final decisions associated with the services.

1058.    According to NJDOH records, with respect to Surgicore Management NY, one or more of the Controllers also submitted an executed attestation to NYDOH "acknowledging

understanding of the reserve powers that cannot be delegated, and that they w[ould] not willingly engage in any such illegal delegations of authority."

1059.  In addition to the owners mentioned above, since entering into the amended and restated shareholders' agreement in or around November 2017, approximately nine health care professionals and six other individuals have been added as owners of All City ASC, including Defendants Apazidis, Shamalov, Ajoy Sinha, Katzman, Bursztyn and Berkowitz, All City ASC's "administrator," Zybin, Yaguda, S. Katanov, and All City's "medical director," Shabtian, with Apazidis, Ajoy Sinha, Shamalov, Katzman and Bursztyn acquiring ownership interests on or about August 30, 2018, Berkowitz acquiring ownership interests on or about November 1, 2018, Zybin acquiring approximately 3.839 percent interest on or about April 18, 2019, Yaguda acquiring approximately 1.536 percent interest on or about July 9, 2019, S. Katanov acquiring approximately 0.768 interest on or about June 7, 2020, and Shabtian acquiring approximately 0.768 percent interest on or about September 10, 2021.

1060.  Though the ownership disclosure provided by All City ASC reported that Zybin did not acquire an ownership interest in All City ASC until 2019, Zybin testified at All City ASC's EUO that she became an owner of All City ASC in or around October of 2017.

1061.  At all relevant times herein, Yaguda was a nominal or straw owner for one or more of the John Does 2 through 20, who were the actual owners of Yaguda's ownership interest in All City ASC.

1062.  On information and belief, All City ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in All City ASC, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered

Persons to All City ASC in order to ensure a steady stream of patients to All City ASC, irrespective of medical need.

1063.  At all relevant times herein, S. Katanov was a nominal or straw owner for J. Katanov, who was the actual owner of S. Katanov's ownership interest in All City ASC.

1064.  On information and belief, All City ASC did not disclose to its patients that J. Katanov had an ownership interest in All City ASC, including that he was receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to All City ASC in order to ensure a steady stream of patients to All City ASC, irrespective of medical need.

1065.  One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Degradi, including through K. Degradi. Degradi was provided with direct and indirect "investment" interests in All City ASC through K. Degradi, in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Degradi's direct and indirect "investment" interests in All City ASC, All City ASC issued regular payments to or for the benefit of Degradi, which, in fact, were illegal kickbacks for referrals.

1066.  One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Hatami, including through M. Hatami. Hatami was provided with direct and indirect "investment" interests in All City ASC including through M. Hatami, in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Hatami's direct and indirect "investment" interests in All City ASC, All City ASC

issued regular payments to or for the benefit of Hatami, which, in fact, were illegal kickbacks for referrals.

1067. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Kogan, including through B. Kogan. Hatami was provided with direct and indirect "investment" interests in All City ASC including through B. Kogan, in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Kogan's direct and indirect "investment" interests in All City ASC, All City ASC issued regular payments to or for the benefit of Kogan, which, in fact, were illegal kickbacks for referrals.

1068. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Tylman, including through Revutsky and Pyatetskaya. Tylman was provided with direct and indirect "investment" interests in All City ASC including through Revutsky and Pyatetskaya, in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Tylman's direct and indirect "investment" interests in All City ASC, All City ASC issued regular payments to or for the benefit of Tylman, which, in fact, were illegal kickbacks for referrals.

1069. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the Health Plus Defendants through Blumberg, Rubin, Klein, S. Passanisi and/or L. Passanisi. One or more of the Health Plus Defendants were provided with direct or indirect "investment" interests in All City ASC through Blumberg, Rubin, Klein, S. Passanisi and/or L. Passanisi, in exchange for their agreement

to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the Health Plus Defendants' direct or indirect "investment" interests in All City ASC, All City ASC issued regular payments to or for the benefit of one or more of the Health Plus Defendants, which, in fact, were illegal kickbacks for referrals.

1070.  One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Zybin. Zybin was provided with an "investment" interest in All City ASC, in exchange for her agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Zybin's "investment" interest in All City ASC, All City ASC issued regular payments to or for the benefit of Zybin, which, in fact, were illegal kickbacks for referrals.

1071.  One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Yaguda and/or one or more of the John Does 2 through 20. Yaguda and/or one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in All City ASC, including through Yaguda, in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yaguda and/or one or more of the John Does 2 through 20's direct or indirect "investment" interests in All City ASC, All City ASC issued regular payments to or for the benefit of Yaguda and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

1072. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with S. Katanov and/or J. Katanov through S. Katanov. S. Katanov and/or J. Katanov was provided with direct or indirect "investment" interests in All City ASC through S. Katanov in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for S. Katanov and/or J. Katanov's direct or indirect "investment" interests in All City ASC, All City ASC issued regular payments to or for the benefit of S. Katanov and/or J. Katanov, which, in fact, were illegal kickbacks for referrals.

1073. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Shabtian. Shabtian was provided with an "investment" interest in All City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Shabtian's "investment" interest in All City ASC, All City ASC issued regular payments to or for the benefit of Shabtian, which, in fact, were illegal kickbacks for referrals.

1074. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Apazidis. Apazidis was provided with an "investment" interest in All City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Apazidis' "investment" interest in All City ASC, All City ASC issued regular payments to or for the benefit of Apazidis, which, in fact, were illegal kickbacks for referrals.

1075. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Shamalov. Shamalov was provided with an "investment" interest in All City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Shamalov's "investment" interest in All City ASC, All City ASC issued regular payments to or for the benefit of Shamalov, which, in fact, were illegal kickbacks for referrals.

1076. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Ajoy Sinha. Ajoy Sinha was provided with an "investment" interest in All City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Ajoy Sinha's "investment" interest in All City ASC, All City ASC issued regular payments to or for the benefit of Ajoy Sinha, which, in fact, were illegal kickbacks for referrals.

1077. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Katzman. Katzman was provided with an "investment" interest in All City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Katzman's "investment" interest in All City ASC, All City ASC issued regular payments to or for the benefit of Katzman, which, in fact, were illegal kickbacks for referrals.

1078. One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Bursztyn. Bursztyn was provided with an

"investment" interest in All City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Bursztyn's "investment" interest in All City ASC, All City ASC issued regular payments to or for the benefit of Bursztyn, which, in fact, were illegal kickbacks for referrals.

1079.  One or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with Berkowitz. Berkowitz was provided with an "investment" interest in All City ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Berkowitz's "investment" interest in All City ASC, All City ASC issued regular payments to or for the benefit of Berkowitz, which, in fact, were illegal kickbacks for referrals.

1080.  On information and belief, one or more of the Controllers, through All City ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in All City ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interests in All City ASC, All City ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii.  The Sham "Medical Directors" and "Administrators"

1081.   In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited Shabtian and one or more of the John Does 2 through 20 to serve as sham "medical directors" of All City ASC in contravention of New York law.

1082.   According to records received from All City ASC, Shabtian became All City ASC's "medical director" on or about November 1, 2022. According to the terms of the purported, employment agreement, Shabtian was to earn $80,000 per year as All City ASC's "medical director." On information and belief, Shabtian is All City ASC's current "medical director."

1083.   One or more of the Controllers, through All City ASC, entered into sham "investor" or employment referral/kickback relationships with Shabtian and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in All City ASC to make it appear that the shares were being purchased as investments and that payments made by All City ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Shabtian and/or one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Shabtian and/or one or more of the John Does 2 through 20 never intended to (and never did fulfill) their medical director duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the All City ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

1084.   By way of example and not limitation, as alleged herein, Shabtian testified that he is only at All City ASC two days per week (Wednesdays and Sundays) where he works all day doing injections or procedures (from around seven a.m. to about four or five p.m.). When he is not at All City ASC, he is running his anesthesia practice, Total Anesthesia, which has offices in Valley Stream, New York and around seven or eight satellite offices and employs another doctor and five physician assistants who Shabtian supervises. Shabtian works all day at Total Anesthesia on Mondays, Tuesdays and Thursdays, where he sees patients from nine a.m. to five or six p.m. and runs the day-to-day operations afterward until eight to ten p.m. He also performs procedures at North Queens ASC once per month and works at a plastic surgeon's office on Fridays from around 7 a.m. until the afternoon when he stops working to observe the Sabbath. Shabtian testified that he is a one percent owner of All City ASC, has no voting rights, but is required to perform a minimum number of services at one or more of the Surgicore ASCs. He further testified that he did not know who was on All City ASC's board of directors (other than Kogan), despite having served as its medical director since around 2022 and as one of its owners since 2021. He also did not know who owned the Surgicore ASCs (other than Kogan) and did not know any of the other owners of All City ASC. He also testified has is not on All City ASC's board of directors and has never gone to any of All City's voting board sessions or meetings because he is running around six days a week and has no time. Shabtian further testified that he received his ownership interest in All City ASC when he began bringing cases there and that it is common practice for surgeons to be made part-owners when they bring cases to the Surgicore ASCs (and that there is a minimum required number of cases before a surgeon can be made a part-owner). Shabtian testified that he has been receiving distributions for his ownership interest since 2021 and also receives a salary as All City ASC's "medical director."

1085. In addition to the sham "medical directors," one or more of the Controllers recruited Zybin to serve as sham "administrator" of All City ASC in contravention of New York law.

1086. At All City ASC's EUO, Zybin testified that she has "been running All City [ASC] for 20 years" and was promoted to "administrator" by Nasser Hassan in or around 2012 of 2013. Ms. Zybin testified that she has also been the "administrator" of North Queens ASC since August of 2022 and that she was paid through her consulting company, IEE Consulting, Inc. (not named as a defendant herein).

1087. One or more of the Controllers, through All City ASC, entered into a sham "investor" or employment referral/kickback relationship with Zybin, who purchased or otherwise acquired shares in All City ASC to make it appear that the shares were being purchased as investments and payments made by All City ASC were dividends or other cash distributions for her "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Zybin's agreement to serve as sham "administrator" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Zybin never intended to (and never did fulfill) her administrator duties as required by law and the compensation she received (including through one or more of the ABC Corporations 1 through 20 that she owned and/or controlled) was actually for permitting one or more of the Controllers to operate the All City ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

### B.     Illegal Operation of Fifth Avenue ASC

#### i.     The Fraudulent "Investor" Referral/Kickback Scheme

1088.   According to NJDOH records, in or around March of 2017, Fifth Avenue ASC requested approval from the NYDOH to transfer 60 percent of its ownership interest from nine health care professionals to Surgicore 5th Avenue, which NYDOH approved in or around December of 2017.

1089.   In or around March of 2017, Fifth Avenue ASC had one clinic located at 1049 Fifth Avenue, New York, New York (the Fifth Avenue ASC Manhattan).

1090.   At all relevant times herein, Surgicore 5th Avenue has been owned and controlled by the Controllers. In their March 2017 application, Fifth Avenue ASC represented to NYDOH that Surgicore 5th Avenue was wholly owned by the Controllers, with each possessing 25 percent interest. According to its corporate filings, Surgicore 5th Avenue was organized by the Controllers, and Kogan is its president.

1091.   In or around 2019, the Controllers sought out a location to open the Fifth Avenue ASC Midtown extension clinic located at E. 47th Street New York, New York.

1092.   Thereafter, in or around July of 2020, Fifth Avenue ASC requested approval to certify Fifth Avenue ASC Midtown, which NYDOH approved in or around October of 2020.

1093.   At all relevant times herein, the Controllers have had a controlling ownership interest in and/or otherwise controlled Fifth Avenue ASC.

1094.   In their March 2017 application to NYDOH, Fifth Avenue ASC and the Controllers reported that, at that time, approximately 5% of Fifth Avenue ASC's revenues came from workers' compensation, private pay and No-fault claims, with the remaining 95 percent coming from commercial, Medicare and Medicaid claims.

1095.  In their March 2017 application to NYDOH, Fifth Avenue ASC and the Controllers reported that Fifth Avenue ASC's revenues were projected to increase by more than 250 percent in the year after Surgicore 5th Avenue acquired of 60 percent ownership interest in Fifth Avenue ASC.

1096.  On information and belief, Fifth Avenue ASC and the Controllers represented to NYDOH that, upon approval of their March 2017 application, Fifth Avenue ASC would "implement a policy to reflect its commitment to bring in greater numbers of Medicaid and charity care patients."

1097.  In their March 2017 application, Fifth Avenue ASC and the Controllers falsely represented to NYDOH that approximately one-third of its revenues would come from workers' compensation, private pay and No-fault claims in the first year following Surgicore 5th Avenue's acquisition of 60 percent ownership interest in Fifth Avenue ASC.

1098.  In their July 2020 application to NYDOH, Fifth Avenue ASC and the Controllers falsely represented that it projected utilizing 3 percent Medicaid and 5.1 percent Charity Care by year three.

1099.  Fifth Avenue ASC and the Controllers knew that these representations were false when they were made, and made the false representations solely for the purpose of inducing NYDOH to permit Surgicore 5th Avenue to acquire 60 percent ownership interest in Fifth Avenue ASC and/or to permit Fifth Avenue ASC to operate.

1100.  Notwithstanding its disclosures to the NYDOH, since Surgicore 5th Avenue acquired 60 percent ownership interest in Fifth Avenue ASC, Fifth Avenue ASC has primarily served No-fault patients, and receives a substantial percent of its revenue from No-Fault insurance payments.  Fifth Avenue ASC routinely gives Covered Persons preferential access to the Fifth

Avenue ASC Manhattan, regardless of medical need, in order to maximize profits and because catering to No-fault claims is more profitable.

1101. At all times as alleged herein, the Controllers, Ajoy Sinha, McMahon, Katzman, McCulloch, Berkowitz, Amigud and, on information and belief, Yaguda, S. Katanov, J. Katanov and one or more of the John Does 2 through 20 (collectively, the "Fifth Avenue ASC Owners") have had direct or indirect ownership interests in Fifth Avenue ASC.

1102. At all relevant times while they were owners of Fifth Avenue ASC, the Fifth Avenue ASC Owners were responsible for the operation and control of Fifth Avenue ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

1103. At all relevant times since acquiring 60 percent ownership interest in Fifth Avenue ASC through Surgicore 5th Avenue in or around December of 2017, the Controllers have had a majority ownership interest in and/or otherwise controlled Fifth Avenue ASC.

1104. Upon acquiring control of Fifth Avenue ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through Fifth Avenue ASC entered into sham "investor" referral/kickback arrangements with the Fifth Avenue ASC Owners who purchased or otherwise acquired shares in Fifth Avenue ASC to make it appear that payments made by Fifth Avenue ASC were dividends or other cash distributions for their "investments" in Fifth Avenue ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

1105. One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the

Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

1106.  In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, Fifth Avenue ASC, the Fifth Avenue ASC Owners purchased or otherwise acquired ownership interests in Fifth Avenue ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The Fifth Avenue ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from Fifth Avenue ASC that were disguised as dividends or other cash distributions for their "investments" in Fifth Avenue ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

1107.  In order to conceal the referral/kickback scheme and the full extent of their ownership and control over Fifth Avenue ASC, the Controllers established, owned, maintained a financial interest in or otherwise derived financial benefit from a web of associated companies, including Surgicore Management NY, which purports to be the "management" company for Fifth Avenue ASC, FIWA 1049 Realty, which purports to be the "landlord" of Fifth Avenue ASC Manhattan, Midtown 305 Realty, which purports to be the "landlord" of Fifth Avenue ASC Midtown, and one or more of the ABC Corporations 1 through 20, that purport to serve as landlord, management and/or other financing companies and which purported to enter into lease, management services, financing agreements and other contracts with Fifth Avenue ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over Fifth Avenue ASC, to funnel proceeds from Fifth Avenue ASC back to the Controllers and/or to

make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

1108.  Towards that end, according to the recorded deed, on or about September 26, 2019, FIWA 1049 Realty purchased 1049 Fifth Avenue, Suite 1A, New York, New York where all or a portion of Fifth Avenue ASC Manhattan is located. At all relevant times herein, FIWA 1049 Realty has been owned and/or controlled by one or more of the Controllers. Kogan, acting as managing member of FIWA 1049 Realty, signed the deed for 1049 Fifth Avenue, Suite 1A, New York, New York.

1109.  According to the recorded deed, on or about September 27, 2019, Midtown 305 Realty purchased E. 47th Street New York, New York, which ultimately served as the location for Fifth Avenue ASC's extension clinic (hereinafter, "Fifth Avenue ASC Midtown"). On information and belief, at all relevant times herein, Degradi Hatami and Kogan have been the sole members of Midtown 305 Realty. Hatami, acting as manager/member of Midtown 305 Realty, signed the deed for Fifth Avenue ASC Midtown.

1110.  In addition to the Controllers' ownership interest in Fifth Avenue ASC through Surgicore 5th Avenue, Fifth Avenue ASC represented to NYDOH that, at some time after March of 2017 and prior to November of 2024, Ajoy Sinha, McMahon, Katzman, McCulloch and Gesheft Associates acquired ownership interests in Fifth Avenue ASC.

1111.  According to NYDOH records, Amigud had ownership interests in Fifth Avenue ASC since at least March of 2017 through sometime prior to November of 2024.

1112.  In or around November of 2024, Fifth Avenue ASC also represented to NYDOH that S. Katanov and Yaguda were proposed owners of Fifth Avenue ASC through SignMe and

Mega Group Solution, respectively and, on information and belief, S. Katanov and Yaguda are current owners of Fifth Avenue ASC through SignMe and Mega Group Solution, respectively.

1113.  At all relevant times herein, Mega Group Solution has been owned on paper by Yaguda. Fifth Avenue ASC represented to NYDOH that Mega Group Solution was owned solely by Yaguda. According to its corporate filings, Mega Group Solution was incorporated by Yaguda. As alleged herein, according to its corporate filings, Mega Group Solution was incorporated by Yaguda.

1114.  At all relevant times herein, Yaguda was the nominal or straw owner of Mega Group Solution, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

1115.  On information and belief, Fifth Avenue ASC did not disclose to its patients that one or more of the John Does 2 through 20 had an ownership interest in Fifth Avenue ASC through Mega Group Solution, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Fifth Avenue ASC in order to ensure a steady stream of patients to Fifth Avenue ASC, irrespective of medical need.

1116.  At all relevant times herein, SignMe has been owned on paper by S. Katanov. Fifth Avenue ASC represented to NYDOH that SignMe was owned solely by S. Katanov. According to its corporate filings, S. Katanov was the organizer of SignMe and the articles of organization were filed by the Akbashev Tax Group at 7009 Austin Street, the same company that filed the articles of organization for MK Med Invest and AS Med Invest.

1117.  At all relevant times herein, S. Katanov was a nominal or straw owner of SignMe, which was actually owned and/or controlled by J. Katanov and/or one or more of the John Does 2 through 20 through SignMe.

1118.   On information and belief, Fifth Avenue ASC did not disclose to its patients that J. Katanov and/or one or more of the John Does 2 through 20 had an ownership interest in Fifth Avenue ASC, including that they were receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Fifth Avenue ASC in order to ensure a steady stream of patients to Fifth Avenue ASC, irrespective of medical need.

1119.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with the Controllers through Surgicore 5th Avenue. the Controllers were provided with an indirect "investment" interest in Fifth Avenue ASC through Surgicore 5th Avenue in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for the Controllers' indirect "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of the Controllers, which, in fact, were illegal kickbacks for referrals.

1120.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with Ajoy Sinha. Ajoy Sinha was provided with an "investment" interest in Fifth Avenue ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Ajoy Sinha's "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of Ajoy Sinha, which, in fact, were illegal kickbacks for referrals.

1121.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with McMahon. McMahon was provided with an "investment" interest in Fifth Avenue ASC in exchange for his agreement to steer or refer, or

cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for McMahon's "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of McMahon, which, in fact, were illegal kickbacks for referrals.

1122.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with Katzman. Katzman was provided with an indirect "investment" interest in Fifth Avenue ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Katzman's "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of Katzman, which, in fact, were illegal kickbacks for referrals.

1123.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with McCulloch. McCulloch was provided with an indirect "investment" interest in Fifth Avenue ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for McCulloch's "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of McCulloch, which, in fact, were illegal kickbacks for referrals.

1124.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with Berkowitz through Gesheft Associates. Berkowitz was provided with an indirect "investment" interest in Fifth Avenue ASC through Gesheft Associates in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and

belief, in exchange for Berkowitz's indirect "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of Berkowitz, which, in fact, were illegal kickbacks for referrals.

1125.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with Amigud. Amigud was provided with an "investment" interest in Fifth Avenue ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Amigud's "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of Amigud, which, in fact, were illegal kickbacks for referrals.

1126.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with Yaguda and/or one or more of the John Does 2 through 20, through Mega Group Solution. Yaguda and/or one or more of the John Does 2 through 20 was provided with an indirect "investment" interest in Fifth Avenue ASC through Mega Group Solution in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for the Controllers' indirect "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of Yaguda and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

1127.   One or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with S. Katanov and/or J. Katanov through SignMe. S. Katanov and/or J. Katanov was provided with an indirect "investment" interest in Fifth Avenue ASC through SignMe in exchange for their agreement to steer or refer, or cause to be

steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for S. Katanov and/or J. Katanov's indirect "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of S. Katanov and/or J. Katanov, which, in fact, were illegal kickbacks for referrals.

1128.   On information and belief, one or more of the Controllers, through Fifth Avenue ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in Fifth Avenue ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interest in Fifth Avenue ASC, Fifth Avenue ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii.      The Sham "Medical Directors" and "Administrators"

1129.   In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited one or more of the John Does 2 through 20 to serve as sham "medical directors" of Fifth Avenue ASC Manhattan in contravention of New York law.

1130.   One or more of the Controllers, through Fifth Avenue ASC, entered into sham "investor" or employment referral/kickback relationships with one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Fifth Avenue ASC to make it appear that the shares were being purchased as investments and that payments made by Fifth Avenue

363

ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, one or more of the John Does 2 through 20 never intended to (and never did fulfill) their medical director duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Fifth Avenue ASC Manhattan without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

1131.    On information and belief, one or more of the Controllers recruited Springer and/or one or more of the John Does 2 through 20 to serve as sham "medical directors" of Fifth Avenue ASC Midtown in contravention of New York law.

1132.    One or more of the Controllers, through Fifth Avenue ASC, entered into sham "investor" or employment referral/kickback relationships with Springer and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Fifth Avenue ASC to make it appear that the shares were being purchased as investments and that payments made by Fifth Avenue ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Springer and/or one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Springer and/or one or more of the John Does 2 through 20 never

intended to (and never did fulfill) their medical director duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Fifth Avenue ASC Midtown without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

1133.   In addition to the sham "medical directors," one or more of the Controllers recruited one or more of the John Does 2 through 20 to serve as sham "administrators" of Fifth Avenue ASC Manhattan and Fifth Avenue ASC Midtown in contravention of New York law.

1134.   On information and belief, one or more of the Controllers, through Fifth Avenue ASC, entered into sham "investor" or employment referral/kickback relationships with one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Fifth Avenue ASC to make it appear that the shares were being purchased as investments and that payments made by Fifth Avenue ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for one or more of the John Does 2 through 20's agreement to serve as sham "administrator" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, one or more of the John Does 2 through 20 never intended to (and never did fulfill) their administrator duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Fifth Avenue ASC Manhattan without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

1135. On information and belief, one or more of the Controllers, through Fifth Avenue ASC, entered into sham "investor" or employment referral/kickback relationships with one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Fifth Avenue ASC to make it appear that the shares were being purchased as investments and that payments made by Fifth Avenue ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for one or more of the John Does 2 through 20's agreement to serve as sham "administrator" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, one or more of the John Does 2 through 20 never intended to (and never did fulfill) their administrator duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Fifth Avenue ASC Midtown without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

**C.      Illegal Operation of Empire State ASC**

i.      The Fraudulent "Investor" Referral/Kickback Scheme

1136. According to NJDOH records, in or around January of 2019, Empire State ASC requested approval to transfer 70 percent of its ownership interest from various HCPs to Surgicore 5th Avenue, which NYDOH approved in or around November of 2019.

1137. According to historic archives for Empire State ASC's website, despite having acquiring their ownership interests in or around November of 2019 through Surgicore 5th Avenue, neither the Controllers nor Surgicore 5th Avenue were listed as owners of Empire State ASC on the ownership disclosure posted on its website until sometime after October of 2021.

1138. On information and belief, Empire State ASC did not disclose to its patients that the Controllers or Surgicore 5th Avenue had an ownership interest in Empire State ASC until sometimes after October of 2021.

1139. In their January 2019 application to NYDOH, Empire State ASC represented to NYDOH that, upon NYDOH's approval, the managers of Empire State ASC would include the Controllers and three other individuals.

1140. In their January 2019 application to NYDOH, Empire State ASC and the Controllers falsely represented that Empire State's revenues were projected to increase by more than 135 percent in the year after Surgicore 5th Avenue acquired 70 percent ownership interest in Empire State ASC, with more than $4 million (or over 40 percent) of its revenues coming from commercial, Medicare and Medicaid claims.

1141. Empire State ASC and the Controllers knew that these representations were false when they were made, and made the false representations solely for the purpose of inducing NYDOH to permit Surgicore 5th Avenue to acquire 60 percent ownership interest in Empire State ASC and/or to permit Empire State ASC to operate.

1142. In reliance on the misrepresentations by Empire State ASC and the Controllers, the NYDOH permitted Surgicore 5th Avenue to acquire 60 percent ownership interest in Empire State ASC and permitted Empire State ASC to operate.

1143. Instead, since Surgicore 5th Avenue acquired 70 percent ownership interest in Empire State ASC, Empire State ASC has primarily served No-fault patients, and receives a substantial percent of its revenues through PIP Benefits. Empire State ASC routinely gives Covered Persons preferential access to their clinic location, regardless of medical need, in order to maximize profits and because catering to No-fault claims is more profitable.

1144.   At all times as alleged herein, the Controllers, Aljian, Khakhar, Dassa, Grazioso and Hostin, Yaguda, Blumberg, Rubin, Klein, S. Passanisi, Hoyle, one or more of the Health Plus Defendants and one or more of the John Does 2 through 20 (collectively, the "Empire State ASC Owners") have had direct or indirect ownership interests in Empire State ASC.

1145.   On information and belief, at all relevant times while they were owners of Empire State ASC, the Empire State ASC Owners were responsible for the operation and control of Empire State ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

1146.   At all relevant times since acquiring 70 percent ownership interest in Empire State ASC in or around November of 2019, the Controllers have had a majority ownership interest in and/or otherwise controlled Empire State ASC.

1147.   Upon acquiring control of Empire State ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through Empire State ASC entered into sham "investor" referral/kickback arrangements with the Empire State ASC Owners who purchased or otherwise acquired shares in Empire State ASC to make it appear that payments made by Empire State ASC were dividends or other cash distributions for their "investments" in Empire State ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

1148.   One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

1149.  In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, Empire State ASC, the Empire State ASC Owners purchased or otherwise acquired ownership interests in Empire State ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The Empire State ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from Empire State ASC that were disguised as dividends or other cash distributions for their "investments" in Empire State ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

1150.  In order to conceal the referral/kickback scheme and the full extent of their ownership and control over Empire State ASC, the Controllers established, owned, maintained a financial interest in or otherwise derived financial benefit from a web of associated companies, including Surgicore Management NY, which purports to be the "management" company for Empire State ASC and one or more of the ABC Corporations 1 through 20, that purport to serve as landlord, management and/or other financing companies and which purported to enter into lease, management services, financing agreements and other contracts with Empire State ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over Empire State ASC, to funnel proceeds from Empire State ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

1151.  Towards that end, In their January 2019 application to NYDOH, Empire State ASC and the Controllers reported that Empire State ASC would enter into an ASA with Surgicore

Management NY upon NYDOH's approval of the application, under which Surgicore Management NY would receive an annual fee of $300,000 (or $25,000 per month).

1152. The proposed ASA further provided that Empire State ASC "retains ultimate authority, responsibility, and control in all final decisions associated with the services and acknowledges the reserve powers that must not be delegated."

1153. Empire State ASC and/or the Controllers also submitted an executed attestation to NYDOH "acknowledging understanding of the reserve powers that cannot be delegated, and that they w[ould] not willingly engage in any such illegal delegations of authority."

1154. In addition to the Controllers ownership interests through Surgicore 5th Avenue, according to historic archives for Empire State ASC's website, Aljian, Khakhar, Dassa, Grazioso and Hostin have had ownership interests in Empire State ASC since at least 2016.

1155. According to NYDOH records, Mega Group Solution has had ownership interests in Empire State ASC since 2022.

1156. At all relevant times herein, Mega Group Solution has been owned on paper by Yaguda. At all relevant times herein, Yaguda was the nominal or straw owner of Mega Group Solution, which was actually owned and/or controlled by one or more of the John Does 2 through 20.

1157. Though she has apparently been an owner of Empire State ASC, through Mega Group Solution, since 2022, neither Yaguda, nor any of her known companies including Mega Group Solution, are listed as owners on Empire State ASC's ownership disclosure on its website.

1158. On information and belief, Empire State ASC did not disclose to its patients that Yaguda or any companies that she owns had an ownership in Empire State ASC.

1159.   According to historic archives of Empire State's website, Blumberg, Rubin, Klein S. Passanisi and AEH Healthcare Management have had ownership interests in Empire State ASC since at least 2023.

1160.   On information and belief, Blumberg, Rubin, Klein and S. Passanisi were nominal or straw owners for one or more of the Health Plus Defendants, who were the actual owners of Blumberg, Rubin, Klein and S. Passanisi's ownership interests in Empire State ASC.

1161.   As alleged herein, at all relevant times herein, AEH Healthcare Management has been owned and controlled by Hoyle.

1162.   One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with the Controllers through Surgicore 5th Avenue. The Controllers were provided with an indirect "investment" interest in Empire State ASC through Surgicore 5th Avenue in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for the Controllers' indirect "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of the Controllers, which, in fact, were illegal kickbacks for referrals.

1163.   One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with Aljian. Aljian was provided with an "investment" interest in Empire State ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Aljian's "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of Aljian, which, in fact, were illegal kickbacks for referrals.

1164. One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with Khakhar. Khakhar was provided with an "investment" interest in Empire State ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Khakhar's "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of Khakhar, which, in fact, were illegal kickbacks for referrals.

1165. One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with Dassa. Dassa was provided with an "investment" interest in Empire State ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Dassa's "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of Dassa, which, in fact, were illegal kickbacks for referrals.

1166. One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with Graziosa. Graziosa was provided with an "investment" interest in Empire State ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Graziosa's "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of Graziosa, which, in fact, were illegal kickbacks for referrals.

1167. One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with Hostin. Hostin was provided with an

"investment" interest in Empire State ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Hostin's "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of Hostin, which, in fact, were illegal kickbacks for referrals.

1168.    One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with Yaguda and/or one or more of the John Does 2 through 20, through Mega Group Solution. Yaguda and/or one or more of the John Does 2 through 20 was provided with an indirect "investment" interest in Empire State ASC through Mega Group Solution in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yaguda's indirect "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of Yaguda and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

1169.    One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the Health Plus Defendants through Blumberg, Rubin, Klein and/or S. Passanisi. One or more of the Health Plus Defendants were provided with an indirect "investment" interest in Empire State ASC through Blumberg, Rubin, Klein and/or S. Passanisi, in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the Health Plus Defendants' indirect "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for

the benefit of one or more of the Health Plus Defendants, which, in fact, were illegal kickbacks for referrals.

1170. One or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with Hoyle through AEH Healthcare Management. Hoyle was provided with an indirect "investment" interest in Empire State ASC through AEH Healthcare Management in exchange for her agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Hoyle's indirect "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of Hoyle, which, in fact, were illegal kickbacks for referrals.

1171. On information and belief, one or more of the Controllers, through Empire State ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in Empire State ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interest in Empire State ASC, Empire State ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

1172.   In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited Aljian and one or more of the John Does 2 through 20 to serve as sham "medical directors" of Empire State ASC in contravention of New York law.

1173.   According to NJDOH records, Aljian has been Empire State's "medical director" since in or around 2019.

1174.   One or more of the Controllers, through Empire State ASC, entered into sham "investor" or employment referral/kickback relationships with Aljian and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Empire State ASC to make it appear that the shares were being purchased as investments and that payments made by Empire State ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Aljian and/or one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Aljian and/or one or more of the John Does 2 through 20 never intended to (and never did fulfill) their medical director duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Empire State ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

1175.   In addition to the sham "medical directors," one or more of the Controllers recruited Lopez to serve as sham "administrator" of Empire State ASC in contravention of New York law.

1176. According to NYDOH records, Lopez was also Empire State ASC's "administrator" in 2019.

1177. One or more of the Controllers, through Empire State ASC, entered into sham "investor" or employment referral/kickback relationships with Lopez and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Empire State ASC to make it appear that the shares were being purchased as investments and that payments made by Empire State ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Lopez and/or one or more of the John Does 2 through 20's agreement to serve as sham "administrators" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Lopez and/or one or more of the John Does 2 through 20 never intended to (and never did fulfill) their administrator duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Empire State ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

### D.    Illegal Operation of North Queens ASC

#### i.    The Fraudulent "Investor" Referral/Kickback Scheme

1178. According to NYDOH records, in or around January of 2019, North Queens ASC requested approval to transfer 75 percent of its ownership interest from various HCPs and other individuals to Surgicore 5th Avenue, which NYDOH approved in or around November of 2019.

1179. In their January 2019 application to NYDOH, North Queens ASC and the Controllers represented that, upon NYDOH's approval, the managers of Empire State ASC would include the Controllers and three other individuals.

1180. In their January 2019 application to NYDOH, North Queens ASC and the Controllers represented that North Queen's revenues were projected to increase by more than 120 percent in the year after Surgicore 5th Avenue acquired of 75 percent ownership interest in North Queens ASC.

1181. In their January 2019 application to NYDOH, North Queens ASC and the Controllers represented that North Queen ASC's more than $4.2 million (or over 40 percent) of its revenues would come from commercial, Medicare and Medicaid claims in the year after Surgicore 5th Avenue acquired of 75 percent ownership interest in North Queens ASC.

1182. North Queens ASC and the Controllers knew that these representations were false when they were made, and made the false representations solely for the purpose of inducing NYDOH to permit Surgicore 5th Avenue to acquire 75 percent ownership interest in North Queens ASC and/or to permit North Queens ASC to operate.

1183. In reliance on the misrepresentations by North Queens ASC and the Controllers, the NYDOH permitted Surgicore 5th Avenue to acquire 75 percent ownership interest in North Queens ASC and permitted North Queens ASC to operate.

1184. Instead, since Surgicore 5th Avenue acquired 75 percent ownership interest in North Queens ASC, North Queens ASC has primarily served No-fault patients, and receives a substantial percent of its revenues through PIP Benefits. North Queens ASC routinely gives Covered Persons preferential access to their clinic location, regardless of medical need, in order to maximize profits and because catering to No-fault claims is more profitable.

1185. In their subsequent application to NYDOH for an indefinite life operating certificate in or around March of 2020, North Queens ASC and the Controllers represented that North Queen ASC's revenues were projected to increase by more than 165 percent in the year after North Queens ASC acquired an indefinite life operating certificate, with an increase from 13.6 percent to 55.3 percent in revenue from workers' compensation, self-pay and No-fault claims.

1186. In their March 2020 application to NYDOH, North Queens ASC and the Controllers represented that North Queen's projected increased revenues were "a result of the affiliation with Surgicore 5th Avenue" and that "[a]dditional cases projected as a result of affiliation with Surgicore 5th Avenue w[ould] put [North Queens ASC] in a stronger financial position."

1187. At all times as alleged herein, the Controllers, Blumberg, Rubin, Klein, S. Passanisi, Hoyle, Arredondo-Calle, Chan, Yaguda, Khakhar, one or more of the Health Plus Defendants and one or more of the John Does 2 through 20 (collectively, the "North Queens ASC Owners") have had direct or indirect ownership interests in North Queens ASC.

1188. On information and belief, at all relevant times while they were owners of North Queens ASC, the North Queens ASC Owners were responsible for the operation and control of North Queens ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

1189. At all relevant times since acquiring 75 percent ownership interest in North Queens ASC in or around November of 2019, the Controllers have had a majority ownership interest in and/or otherwise controlled North Queens ASC.

1190. Upon acquiring control of North Queens ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers,

through North Queens ASC entered into sham "investor" referral/kickback arrangements with the North Queens ASC Owners who purchased or otherwise acquired shares in North Queens ASC to make it appear that payments made by North Queens ASC were dividends or other cash distributions for their "investments" in North Queens ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

1191. One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

1192. In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, North Queens ASC, the North Queens ASC Owners purchased or otherwise acquired ownership interests in North Queens ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The North Queens ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from North Queens ASC that were disguised as dividends or other cash distributions for their "investments" in North Queens ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

1193. In order to conceal the referral/kickback scheme and the full extent of their ownership and control over North Queens ASC, the Controllers established, owned, maintained a financial interest in or otherwise derived financial benefit from a web of associated companies,

including Surgicore Management NY, which purports to be the "management" company for North Queens ASC and one or more of the ABC Corporations 1 through 20, that purport to serve as landlord, management and/or other financing companies and which purported to enter into lease, management services, financing agreements and other contracts with North Queens ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over North Queens ASC, to funnel proceeds from North Queens ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

1194.   In that regard, in their January 2019 application to NYDOH, North Queens ASC and the Controllers reported that North Queens ASC would enter into an ASA with Surgicore Management NY upon NYDOH's approval of the application, under which Surgicore Management NY would receive an annual fee of $450,000 (or $37,500 per month).

1195.   On information and belief, the proposed ASA further provided that North Queens ASC "retains ultimate authority, responsibility, and control in all final decisions associated with the services including authority over the appointment/dismissal of management level employees, the right to approve operating/capital budgets, control over books/records and possession of all medical records and facility databases."

1196.   North Queens ASC and/or the Controllers also submitted an executed attestation to NYDOH "acknowledging understanding of the reserve powers that cannot be delegated, and that they w[ould] not willingly engage in any such illegal delegations of authority," in accordance with NYDOH's policy effective December 13, 2016.

1197.   In addition to the Controllers' ownership interest in North Queens ASC through Surgicore 5th Avenue, Fifth Avenue ASC represented to NYDOH that Yaguda has also had an indirect ownership interest in North Queens ASC since 2022.

1198.   At all relevant times herein, Yaguda was the nominal or straw owner of one or more of the ABC Corporations 1 through 20, which were actually owned and/or controlled by one or more of the John Does 2 through 20.

1199.   Though she has apparently been an owner of North Queens ASC since 2022, neither Yaguda, nor any of her known companies, are listed as an owner on North Queens ASC's ownership disclosure on its website.

1200.   On information and belief, North Queens ASC did not disclose to its patients that Yaguda or any companies that she owns had an ownership in North Queens ASC.

1201.   According to the ownership disclosure on the Surgicore ASC's website for North Queens ASC, Blumberg, Rubin, Klein, S. Passanisi, AEH Healthcare Management, Arredondo-Calle, Chan and Khakhar also have ownership interests in North Queens ASC, which, according to NYDOH records, they acquired sometime after January of 2019.

1202.   Blumberg, Rubin, Klein and S. Passanisi were nominal or straw owners for one or more of the Health Plus Defendants, who were the actual owners of Blumberg, Rubin, Klein and S. Passanisi's ownership interests in North Queens ASC.

1203.   As alleged herein, at all relevant times herein, AEH Healthcare Management has been owned and controlled by Hoyle.

1204.   According to public records, Arredondo-Calle is the president and CEO of YJH Marketing Consultants, LLC and the founder of MedLegal Hq (not named as defendants herein). According to public records, YJH Marketing Consultants, LLC is a consulting company that

advertises itself as a "referral service and lead generation for physicians and law firms." According to its website, MedLegal Hq advertises itself as a consulting firm and "one-stop-shop for all legal and medical resources," with a network of personal injury attorneys and car accident doctors. MedLegal Hq's website also advertises "courtesy medical transportation" to patients' medical appointments. In, 2019, Arredondo-Calle was charged with second-degree theft by unlawful taking by the Essex County prosecutor's office in New Jersey for stealing more than $75,000 from the Nutley Volunteer Emergency and Rescue Squad, of which he was the president, from May 1, 2019, to August 31, 2020. *See New Jersey v. Arredondo-Calle, Jonathan*, Indictment No. 21-05-00698-I (N.J. Super. Ct. Essex Cty. Dec. 5, 2022). Arredondo-Calle was indicted by a grand jury on May 6, 2021 and pled guilty on July 11, 2022. On December 5, 2022, he was sentenced to probation for four years.

1205.   One or more of the Controllers, through North Queens ASC, entered into a sham "investor" referral/kickback arrangement with the Controllers through Surgicore 5th Avenue. The Controllers were provided with an indirect "investment" interest in North Queens ASC through Surgicore 5th Avenue in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for the Controllers' indirect "investment" interest in North Queens ASC, North Queens ASC issued regular payments to or for the benefit of the Controllers, which, in fact, were illegal kickbacks for referrals.

1206.   One or more of the Controllers, through North Queens ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the Health Plus Defendants through Blumberg, Rubin, Klein and S. Passanisi. One or more of the Health Plus Defendants were provided with an indirect "investment" interest in North Queens ASC through Blumberg,

Rubin, Klein and S. Passanisi, in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the Health Plus Defendants' indirect "investment" interest in North Queens ASC, North Queens ASC issued regular payments to or for the benefit of the Health Plus Defendants, which, in fact, were illegal kickbacks for referrals.

1207.  One or more of the Controllers, through North Queens ASC, entered into a sham "investor" referral/kickback arrangement with Hoyle through AEH Healthcare Management. Hoyle was provided with an indirect "investment" interest in North Queens ASC through AEH Healthcare Management in exchange for her agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Hoyle's indirect "investment" interest in North Queens ASC, North Queens ASC issued regular payments to or for the benefit of Hoyle, which, in fact, were illegal kickbacks for referrals.

1208.  One or more of the Controllers, through North Queens ASC, entered into a sham "investor" referral/kickback arrangement with Arredondo-Calle. Arredondo-Calle was provided with an "investment" interest in North Queens ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Arredondo-Calle's "investment" interest in North Queens ASC, North Queens ASC issued regular payments to or for the benefit of Arredondo-Calle, which, in fact, were illegal kickbacks for referrals.

1209.  One or more of the Controllers, through North Queens ASC, entered into a sham "investor" referral/kickback arrangement with Chan. Chan was provided with an "investment" interest in North Queens ASC in exchange for his agreement to steer or refer, or cause to be

steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Chan's "investment" interest in North Queens ASC, North Queens ASC issued regular payments to or for the benefit of Chan, which, in fact, were illegal kickbacks for referrals.

1210.   One or more of the Controllers, through North Queens ASC, entered into a sham "investor" referral/kickback arrangement with Khakhar. Khakhar was provided with an "investment" interest in North Queens ASC in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Khakhar's "investment" interest in North Queens ASC, North Queens ASC issued regular payments to or for the benefit of Khakhar, which, in fact, were illegal kickbacks for referrals.

1211.   One or more of the Controllers, through North Queens ASC, entered into a sham "investor" referral/kickback arrangement with Yaguda and/or one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20. Yaguda and/or one or more of the John Does 2 through 20 was provided with an indirect "investment" interest in North Queens ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Yaguda and/or one or more of the John Does 2 through 20's "investment" interest in North Queens ASC, North Queens ASC issued regular payments to or for the benefit of Yaguda and/or one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

1212.   On information and belief, one or more of the Controllers, through North Queens ASC, entered into a sham "investor" referral/kickback arrangement with one or more

of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in North Queens ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interest in North Queens ASC, North Queens ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii.    The Sham "Medical Directors" and "Administrators"

1213.  In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited Menger, Chan and one or more of the John Does 2 through 20 to serve as sham "medical directors" of North Queens ASC in contravention of New Jersey law.

1214.  According to public records, Menger is North Queens ASC's current "medical director." According to NYDOH records, Chan was North Queens ASC's "medical director" in or around 2019 and 2020.

1215.  One or more of the Controllers, through North Queens ASC, entered into sham "investor" or employment referral/kickback relationships with Menger, Chan and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in North Queens ASC to make it appear that the shares were being purchased as investments and that payments made by North Queens ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Menger, Chan and/or one or more of the John Does

2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Menger, Chan and/or one or more of the John Does 2 through 20 never intended to (and never did fulfill) their medical director duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the North Queens ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

1216.   In addition to the sham "medical directors," one or more of the Controllers recruited Zybin, Spina and Santora and one or more John Does 2 through 20 to serve as sham "administrators" of North Queens ASC in contravention of New Jersey law.

1217.   As alleged herein, Zybin testified that she became North Queens ASC's "administrator" in or around August of 2022. According to her testimony at All City ASC's EUO, she was paid through her consulting company, IEE Consulting, Inc. (not named as a defendant herein). According to public records, Santora was North Queens ASC's "administrator" between November of 2019 and October of 2021, and Spina was North Queens ASC's "administrator" before Zybin.

1218.   One or more of the Controllers, through North Queens ASC, entered into sham "investor" or employment referral/kickback relationships with Zybin, Spina, Santora and/or one or more John Does 2 through 20, who purchased or otherwise acquired shares in North Queens ASC to make it appear that the shares were being purchased as investments and that payments made by North Queens ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Zybin, Spina, Santora and/or one or more John Does

2 through 20's agreement to serve as sham "administrators" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Zybin, Spina, Santora and/or one or more John Does 2 through 20 never intended to (and never did fulfill) their administrator duties as required by law and the compensation they received (including through one or more of the ABC Corporations 1 through 20 that they owned and/or controlled) was actually for permitting one or more of the Controllers to operate the North Queens ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

E.    **Illegal Operation of Rockaways ASC**

i.    The Fraudulent "Investor" Referral/Kickback Scheme

1219.  On information and belief, in or around 2021 or 2022, the Controllers acquired control of Rockaways ASC.

1220.  According to historic archives of the website for the Surgicore ASCs (www.surgicoreasc.com), Rockaways ASC has been listed as one of the Surgicore ASCs on their website and referred to therein as "an affiliate of Surgicore Surgical Centers" since at least 2021.

1221.  According to NJDOH records, the Controllers, Berkowitz and S. Katanov were proposed owners of Rockaways ASC in or around 2022 or 2023. Additionally, according to NYDOH records, Pacia has had ownership interests in Rockaways ASC since at least 2012.

1222.  At all relevant times herein, S. Katanov was a nominal or straw owner for J. Katanov, who was the actual owner of S. Katanov's ownership interest in Rockaways ASC.

1223.   At all relevant times herein, S. Katanov was a nominal or straw owner for one or more of the John Does 2 through 20, who were the actual owners of S. Katanov's ownership interest in Rockaways ASC.

1224.   On information and belief, Rockaways ASC did not disclose to its patients that J. Katanov had an ownership interest in Rockaways ASC, including that he was receiving compensation for steering or referring, or causing to be steered or referred, Covered Persons to Rockaways ASC in order to ensure a steady stream of patients to Rockaways ASC, irrespective of medical need.

1225.   At all times as alleged herein, the Controllers, S. Katanov, J. Katanov Berkowitz, Pacia and one or more of the John Does 2 through 20 (collectively, the "Rockaways ASC Owners") have had direct or indirect ownership interests in Rockaways ASC.

1226.   On information and belief, at all relevant times while they were owners of Rockaways ASC, the Rockaways ASC Owners were responsible for the operation and control of Rockaways ASC and its compliance with State and Federal laws, as well as its own policies and procedures in making employment-related decisions.

1227.   At all relevant times since acquiring ownership interests in Rockaways ASC, the Controllers have had a majority ownership interest in and/or otherwise controlled Rockaways ASC.

1228.   Upon acquiring control of Rockaways ASC, as part of the scheme to defraud and in order to ensure a steady stream of patients to the Surgicore ASCs, one or more of the Controllers, through Rockaways ASC entered into sham "investor" referral/kickback arrangements with the Rockaways ASC Owners who purchased or otherwise acquired shares in Rockaways ASC to make it appear that payments made by Rockaways ASC were dividends or other cash distributions for

their "investments" in Rockaways ASC when, in fact, the payments were compensation for illegally and/or unnecessarily steering or referring Covered Persons to one or more of the Surgicore ASCs.

1229. One or more of the Controllers also participated in the scheme to defraud by steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services in exchange for illegal compensation from the Surgicore ASCs.

1230. In order to conceal the referral/kickback scheme and their ownership interests in, and, with respect to the Controllers, the full extent of their ownership and control of, Rockaways ASC, the Rockaways ASC Owners purchased or otherwise acquired ownership interests in Rockaways ASC through companies that they owned and/or controlled, and/or their family members or close associates and/or companies that they owned and controlled. The Rockaways ASC Owners, either directly or indirectly through their companies, family members or close associates, or their family members' or close associates' companies, received payments from Rockaways ASC that were disguised as dividends or other cash distributions for their "investments" in Rockaways ASC, when in fact, the payments were compensation for steering or referring, or causing to be steered or referred, patients to one or more of the Surgicore ASCs.

1231. In order to conceal the referral/kickback scheme and the full extent of their ownership and control over Rockaways ASC, the Controllers established, owned, maintained a financial interest in or otherwise derived financial benefit from a web of associated companies, including Surgicore Management NY, which purports to be the "management" company for Rockaways ASC, and one or more of the ABC Corporations 1 through 20, that purport to serve as landlord, management and/or other financing companies and which purported to enter into lease,

management services, financing agreements and other contracts with Rockaways ASC, but which, in fact, were used to conceal the full extent of the Controllers ownership and control over Rockaways ASC, to funnel proceeds from Rockaways ASC back to the Controllers and/or to make payments for steering or referring Covered Persons to one or more of the Surgicore ASCs for Fraudulent Services.

1232. one or more of the Controllers, through Rockaways ASC, entered into a sham "investor" referral/kickback arrangement with the Controllers either directly or indirectly through one or more of the ABC Corporations 1 through 20. The Controllers were provided with a direct or indirect "investment" interest in Rockaways ASC through one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for the Controllers' direct or indirect "investment" interests in Rockaways ASC, Rockaways ASC issued regular payments to or for the benefit of the Controllers, which, in fact, were illegal kickbacks for referrals.

1233. One or more of the Controllers, through Rockaways ASC, entered into a sham "investor" referral/kickback arrangement with Pacia either directly or indirectly through one or more of the ABC Corporations 1 through 20. Pacia was provided with a direct or indirect "investment" interest in Rockaways ASC through one or more of the ABC Corporations 1 through 20 in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Pacia's direct or indirect "investment" interest in Rockaways ASC, Rockaways ASC issued regular payments to or for the benefit of Pacia, which, in fact, were illegal kickbacks for referrals.

1234.   One or more of the Controllers, through Rockaways ASC, entered into a sham "investor" referral/kickback arrangement with J. Katanov through S. Katanov and/or one or more of the ABC Corporations 1 through 20. J. Katanov was provided with an indirect "investment" interest in Rockaways ASC through S. Katanov and/or one or more of the ABC Corporations 1 through 20 in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for J. Katanov's indirect "investment" interest in Rockaways ASC, Rockaways ASC issued regular payments to or for the benefit of J. Katanov, which, in fact, were illegal kickbacks for referrals.

1235.   One or more of the Controllers, through Rockaways ASC, entered into a sham "investor" referral/kickback arrangement with Berkowitz either directly or indirectly through one or more of the ABC Corporations 1 through 20. Berkowitz was provided with a direct or indirect "investment" interest in Rockaways ASC through one or more of the ABC Corporations 1 through 20 in exchange for his agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for Berkowitz's direct or indirect "investment" interest in Rockaways ASC, Rockaways ASC issued regular payments to or for the benefit of Berkowitz, which, in fact, were illegal kickbacks for referrals.

1236.   On information and belief, one or more of the Controllers, through Rockaways ASC, entered into a sham "investor" referral/kickback arrangement with one or more of the John Does 2 through 20, either directly or indirectly through one or more of the ABC Corporations 1 through 20. On information and belief, one or more of the John Does 2 through 20 were provided with direct or indirect "investment" interests in Rockaways ASC through

one or more of the ABC Corporations 1 through 20 in exchange for their agreement to steer or refer, or cause to be steered or referred, a steady stream of patients to one or more of the Surgicore ASCs. On information and belief, in exchange for one or more of the John Does 2 through 20's direct or indirect "investment" interest in Rockaways ASC, Rockaways ASC issued regular payments to or for the benefit of one or more of the John Does 2 through 20, which, in fact, were illegal kickbacks for referrals.

ii.    The Sham "Medical Directors" and "Administrators"

1237.   In addition to the sham "investor" referral/kickback scheme, one or more of the Controllers recruited Pacia and one or more of the John Does 2 through 20 to serve as sham "medical directors" of Rockaways ASC in contravention of New Jersey law.

1238.   According to NYDOH records, Pacia was Rockaways ASC's "medical director" in or around 2012.

1239.   One or more of the Controllers, through Rockaways ASC, entered into sham "investor" or employment referral/kickback relationships with Pacia and/or one or more of the John Does 2 through 20, who purchased or otherwise acquired shares in Rockaways ASC to make it appear that the shares were being purchased as investments and that payments made by Rockaways ASC were dividends or other cash distributions for their "investments" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for Pacia and/or one or more of the John Does 2 through 20's agreement to serve as sham "medical directors" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, Pacia and/or one or more of the John Does 2 through 20 never intended to (and never did fulfill) their medical director duties as required by law and the compensation they

392

received was actually for permitting one or more of the Controllers to operate the Rockaways ASC without the required medical director oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

1240.   In addition to the sham "medical directors," one or more of the Controllers recruited one or more John Does 2 through 20 to serve as sham "administrators" of Rockaways ASC in contravention of New Jersey law.

1241.   On information and belief, one or more of the Controllers, through Rockaways ASC, entered into sham "investor" or employment referral/kickback relationships with one or more John Does 2 through 20, who purchased or otherwise acquired shares in Rockaways ASC to make it appear that the shares were being purchased as investments and that payments made by Rockaways ASC were dividends or other cash distributions for his "investment" (or who otherwise received payments disguised as legitimate salary or other compensation) when, in fact, the payments were compensation for one or more of the John Does 2 through 20's agreement to serve as sham "administrators" and, in some instances, for steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs. In fact, one or more of the John Does 2 through 20 never intended to (and never did fulfill) their administrator duties as required by law and the compensation they received was actually for permitting one or more of the Controllers to operate the Rockaways ASC without the required administrator oversight and/or steering or referring, or causing to be steered or referred, Covered Persons to one or more of the Surgicore ASCs.

## V.   The Illegal Kickback and Referral Relationships

1242.   In addition to the foregoing illicit financial relationships and in furtherance of the scheme to defraud alleged herein, the Defendant Surgicore Orthopedic Providers and Defendant

Surgicore Pain Management Providers referred Covered Persons to the Surgicore ASCs for one or more of the Fraudulent Services purportedly performed by the Surgicore Orthopedic Providers, Surgicore Pain Management Providers, and or other doctors and healthcare professionals under their direction or control, in exchange for kickbacks or other financial arrangements.

1243.  As stated above, in order to ensure a steady stream of patients to the Surgicore ASCs, the Controllers devised an elaborate, unlawful referral scheme whereby the Surgicore ASCs through one or more of the Controllers and one or more and/or other entities controlled by the Controllers, entered into secret, illegal "investor" referral, kickback arrangements, whereby the Surgicore ASCs paid many of the Surgicore Orthopedists, Surgicore Pain Management Doctors and hundreds of thousands of dollars, if not millions of dollars, to steer or refer, or cause to be steered or referred, Covered Persons to the Surgicore ASCs, often times for the Fraudulent Services.

1244.  The Controllers, Surgicore ASCs, Surgicore Orthopedists, and Surgicore Pan Management Doctors were all aware that compensation to patient referrals could not vary based on the volume of referrals. Nevertheless, the number of shares and compensation varied based on the volume of referrals, and the referring providers, including orthopedists and pain management doctors, were required to give up their shares when their referrals ceased.

1245.  In furtherance of the scheme to defraud, the Controllers and the Surgicore ASCs engaged in an elaborate scam to conceal and hide the actual arrangement in a knowing attempt to conceal their violations of the law.

1246.  In that regard, in order to create a facade that the Surgicore ASCs were not paying for referrals and to make it appear these were arm's-length reasonable transactions, the Controllers, through the Surgicore ASCs, created sham paperwork in which they offered referring providers

ownership as "investors" who purchased or were given shares in the Surgicore ASCs to make it appear that the shares were being purchased as investments and payments were made as returns on investment. The entire arrangement was a scam designed to conceal illegal payments for referrals from Plaintiff and other insurers, and not to meet any pecuniary need of the Surgicore ASCs.

1247.   Defendant Apazidis, record owner of Defendant Apazidis PC entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Apazidis, through Apazidis PC and other practices in which Apazidis is associated with, would refer Covered persons to the Surgicore ASCs.

1248.   In that regard, Apazidis with the purported assistance of one or more physicians assistants, purportedly performs one or more of the Fraudulent Services, at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, and Fifth Avenue ASC.

1249.   Apazidis, and one or more other orthopedists and other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Apazidis PC, and other practices in which Apazidis is associated, at the Surgicore ASCs, including but limited to Defendants All City ASC and Fifth Avenue ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in All City ASC.

1250.   In exchange for receiving referrals from Apazidis, through Apazidis PC, and other practices in which Apazidis is associated, the Controllers gave Apazidis the opportunity to "purchase" a nominal ownership or "investment interest" in All City ASC.

1251.   In actuality, the "investment interest," reflective of nominal ownership shares in All City ASC, was a kickback paid by the Controllers, through All City ASC, in which Apazidis'

purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his nominal "investment interest" in All City ASC.

1252.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Apazidis' ownership interest in one or more of the Surgicore ASCs, including All City ASC.

1253.   Apazidis was provided with an "investment interest" in All City ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner or otherwise associated with, including Defendant Apazidis PC to the Surgicore ASCs.

1254.   On information and belief, All City ASC and/or other entities controlled by the Controllers issued regular payments to Apazidis purporting to be returns on his "investment interest" in All City ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Apazidis, for medically unnecessary surgeries and procedures performed, if at all, on Covered Persons pursuant to a predetermined fraudulent protocol.

1255.   Defendant Berkowitz, record owner of Advanced Orthopaedics entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Berkowitz, through Advanced Orthopaedics would refer Covered persons to the Surgicore ASCs.

1256.   In that regard, Berkowitz and/or other orthopedists and healthcare professionals working under his direction and control purportedly performs one or more of the Fraudulent

Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, North Queens ASC, and Jersey City ASC.

1257. Berkowitz, and one or more other orthopedists and healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Advanced Orthopedics, at the Surgicore ASCs, including but limited to City Family Healthcare, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, North Queens ASC, and Jersey City ASC, in exchange for receiving kickbacks from the Controllers in the form of ownership or "investment interests" in All City ASC, Fifth Avenue ASC, Jersey City ASC, and Rockland and Bergen ASC.

1258. In exchange for receiving referrals from Berkowitz, through Advanced Orthopedics, the Controllers provided Berkowitz with the opportunity to "purchase" a 2.3% ownership or "investment interest" in All City ASC, an ownership or "investment interest" in Fifth Avenue ASC through Gesheft Associates last reported to be 2.1%, an ownership or "investment interest" in Jersey City ASC last reported to be 14.5%, a 4.8% ownership or "investment interest" in Rockland and Bergen ASC's once 80% majority shareholder, Surgicore RBSC, ultimately receiving a 3.5% interest in Rockland and Bergen ASC directly through Gesheft Associates, and retaining a 4.8% interest in Rockland and Bergen ASC's parent, Surgicore RBSC, now a roughly 66% shareholder.

1259. In actuality, the "investment interests" in All City ASC, Fifth Avenue ASC, Jersey City ASC, and Rockland and Bergen ASC, were kickbacks paid by the Controllers, through All City ASC, Fifth Avenue ASC, Jersey City ASC, and Rockland and Bergen ASC, respectively, in which Berkowitz's purported investments were quickly repaid and thereafter he received

kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his "investment interests" in All City ASC, Fifth Avenue ASC, Jersey City ASC, and Rockland and Bergen ASC.

1260. As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Berkowitz's ownership interest in one or more of the Surgicore ASCs, including All City ASC, Fifth Avenue ASC, Jersey City ASC, and Rockland and Bergen ASC.

1261. Berkowitz was provided with an "investment interests" in All City ASC, Fifth Avenue ASC, Jersey City ASC, and Rockland and Bergen ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant Advanced Orthopaedics to the Surgicore ASCs.

1262. On information and belief, All City ASC, Fifth Avenue ASC, Jersey City ASC, Rockland and Bergen ASC and/or other entities controlled by the Controllers issued regular payments to Berkowitz purporting to be returns on his "investment interests" in All City ASC, Fifth Avenue ASC, Jersey City ASC, and Rockland and Bergen ASC, when in fact such payments, in excess of his "investment interests," were kickbacks based on the volume of referrals from (and/or caused by) Berkowitz, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1263. Defendant Bursztyn, associated with Defendants NYSJ, McCulloch Orthopaedic, and Advanced Orthopaedics, entered into a secret, illegal referral kickback relationship with one

or more of the Controllers in exchange for which Bursztyn, NYSJ, McCulloch Orthopaedic and Advanced Orthopaedics, would refer Covered persons to the Surgicore ASCs.

1264.  In that regard, Bursztyn purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Jersey City ASC, and Saddlebrook ASC.

1265.  Bursztyn purportedly performed one or more of the Fraudulent Services through Defendants NYSJ, McCulloch Orthopaedic and Advanced Orthopaedics, including but limited to All City ASC, Jersey City ASC, and Saddlebrook ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in All City ASC.

1266.  In exchange for receiving referrals from Bursztyn, and/or Bursztyn performing one or more Fraudulent Services referred to the Surgicore ASC, through NYSJ, McCulloch Orthopaedic and Advanced Orthopaedics, the Controllers provided Bursztyn with the opportunity to "purchase" an ownership or "investment interest" in All City ASC last known to be 2.3%

1267.  In actuality, the "investment interest" was a kickback paid by the Controllers, through All City ASC, in which Bursztyn's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his 2.3% "investment interest" in All City ASC.

1268.  As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Bursztyn's ownership interest in one or more of the Surgicore ASCs, including All City ASC.

1269.  On information and belief, Bursztyn was provided with an "investment interest" in All City ASC in exchange for his agreement to perform the Fraudulent Services in connection with

a steady stream of referrals from medical practices in which he is associated, including Defendants NYSJ, McCulloch Orthopaedic and Advanced Orthopaedics, to the Surgicore ASCs.

1270. On information and belief, All City ASC and/or other entities controlled by the Controllers issued regular payments to Bursztyn purporting to be returns on his "investment interest" in All City ASC when in fact such payments, in excess of his "investment interest," were kickbacks for the performance of Fraudulent Services referred from NYSJ, McCulloch Orthopaedic and Advanced Orthopaedics, based on the volume of his purported performance of the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1271. Defendant Dassa, record owner of Defendant Dassa Orthopedic entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Dassa, through Dassa Orthopedic would refer Covered persons to the Surgicore ASCs.

1272. In that regard, Dassa, with the assistance of one or more physician assistants or other healthcare professionals working under his direction and control purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants Empire State ASC and New Horizon ASC.

1273. Dassa, assisted by and one or more physician assistants other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Dassa Orthopedic, at the Surgicore ASCs, including but limited to Empire State ASC and New Horizon ASC in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Empire State ASC.

1274.  In exchange for receiving referrals from Dassa, through Dassa Orthopedic, the Controllers provided Dassa with the opportunity to "purchase" an ownership or "investment interest" in Empire State ASC, last known to be 1.6%

1275.  In actuality, the "investment interest" was a kickback paid by the Controllers, through Empire State ASC, in which Dassa's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his "investment interest" in Empire State ASC.

1276.  As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Dassa' ownership interest in one or more of the Surgicore ASCs, including Empire State ASC.

1277.  On information and belief, Dassa was provided with an "investment interest" in Empire State ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant Dassa Orthopedic to the Surgicore ASCs.

1278.  On information and belief, Empire State ASC and/or other entities controlled by the Controllers issued regular payments to Dassa purporting to be returns on his "investment interest" in Empire State ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Dassa, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1279.   Defendant Graziosa, record owner of Defendant Graziosa PC entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Graziosa, through Graziosa PC would refer Covered persons to the Surgicore ASCs.

1280.   In that regard, Graziosa, with the assistance of one or more physician assistants or other healthcare professionals working under his direction and control purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Empire State ASC, North Queens ASC, and Rockaways ASC.

1281.   Graziosa, assisted by and one or more physician assistants other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Graziosa PC, at the Surgicore ASCs, including but limited to All City ASC, Empire State ASC, North Queens ASC, and Rockaways ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Empire State ASC.

1282.   In exchange for receiving referrals from Graziosa, through Graziosa PC, the Controllers provided Graziosa with the opportunity to "purchase" an ownership or "investment interest" in Empire State ASC, which has fluctuated over time between 1% and 2%.

1283.   In actuality, the "investment interest" was a kickback paid by the Controllers, through Empire State ASC, in which Graziosa's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his less than 2% "investment interest" in Empire State ASC.

1284.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which

402

American Transit relied, the Controllers were able to conceal from American Transit, Graziosa's ownership interest in one or more of the Surgicore ASCs, including Empire State ASC.

1285.   Graziosa was provided with an "investment interest" in Empire State ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant Graziosa PC to the Surgicore ASCs.

1286.   On information and belief, Empire State ASC and/or other entities controlled by the Controllers issued regular payments to Graziosa purporting to be returns on his "investment interest" in Empire State ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Graziosa, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1287.   Defendant Haar, record owner of Defendant Haar Orthopaedics, entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Haar, through Haar Orthopaedics, would refer Covered persons to the Surgicore ASCs.

1288.   In that regard, Harr purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants New Horizon ASC and Jersey City ASC.

1289.   Haar, assisted by and one or more physician assistants and other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Haar Orthopaedics, at the Surgicore ASCs, including but limited to New Horizon ASC and Jersey City ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in New Horizon ASC.

1290. In exchange for receiving referrals from Haar, through Haar Orthopaedics, the Controllers provided Harr through Haar Orthopaedics, the opportunity to "purchase" an ownership or "investment interest" in New Horizon ASC last reported to be 3.7%.

1291. In actuality, the "investment interest" was a kickback paid by the Controllers, through New Horizon ASC, in which Haar's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his 3.7% "investment interest" in New Horizon ASC.

1292. As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Haar's ownership interest in one or more of the Surgicore ASCs, including New Horizon ASC.

1293. On information and belief, Haar was provided with an "investment interest" in New Horizon ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Haar Orthopaedics to the Surgicore ASCs.

1294. On information and belief, New Horizon ASC and/or other entities controlled by the Controllers issued regular payments to Haar purporting to be returns on his "investment interest" in New Horizon ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Haar, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1295.   Defendant Hostin, record owner of Defendant Hostin Orthopaedics entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Hostin, through Hostin Orthopaedics would refer Covered persons to the Surgicore ASCs.

1296.   In that regard, Hostin, with the assistance of one or more physician assistants or other healthcare professionals working under his direction and control purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants Empire State ASC and Fifth Avenue ASC.

1297.   Hostin, assisted by and one or more physician assistants other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Hostin Orthopaedics, at the Surgicore ASCs, including but limited to Empire State ASC and Fifth Avenue ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Empire State ASC.

1298.   In exchange for receiving referrals from Hostin, through Hostin Orthopaedics, the Controllers provided Hostin with the opportunity to "purchase" an ownership or "investment interest" in Empire State ASC, last known to be roughly 1%.

1299.   In actuality, the "investment interest" was a kickback paid by the Controllers, through Empire State ASC, in which Hostin's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his less than 2% "investment interest" in Empire State ASC.

1300.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which

American Transit relied, the Controllers were able to conceal from American Transit, Hostin's ownership interest in one or more of the Surgicore ASCs, including Empire State ASC.

1301. On information and belief, Hostin was provided with an "investment interest" in Empire State ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant Hostin Orthopaedics to the Surgicore ASCs.

1302. On information and belief, Empire State ASC and/or other entities controlled by the Controllers issued regular payments to Hostin purporting to be returns on his "investment interest" in Empire State ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Hostin, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1303. Defendant Katzman, record owner of Katzman PC entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Katzman, through Katzman PC, would refer Covered persons to the Surgicore ASCs.

1304. In that regard, Katzman and/or other orthopedists and physician assistants or other healthcare professionals working under his direction and control purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Fifth Avenue ASC and North Queens ASC.

1305. Katzman, and one or more other orthopedists and other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Katzman PC, at the Surgicore ASCs, including but limited to All City ASC, Fifth Avenue ASC and North Queens ASC, in exchange for receiving kickbacks from the

Controllers in the form of ownership or "investment interests" in All City ASC and Fifth Avenue ASC.

1306. In exchange for receiving referrals from Katzman, through Katzman PC, the Controllers provided Katzman with the opportunity to "purchase" an "investment interest" in All City ASC last known to be 1.5% and an ownership or "investment interest" in Fifth Avenue ASC last reported to be 1.2%.

1307. In actuality, the "investment interests were kickbacks paid by the Controllers, through All City ASC and Fifth Avenue ASC, in which Katzman's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his 1.5% "investment interest" in All City ASC and 1.2% "investment interest" in Fifth Avenue ASC.

1308. As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Katzman's ownership interest in one or more of the Surgicore ASCs, including All City ASC and Fifth Avenue ASC.

1309. On information and belief, Katzman was provided with an "investment interest" in All City ASC and Fifth Avenue ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner or otherwise associated, including Defendant Katzman PC to the Surgicore ASCs.

1310. On information and belief, All City ASC, Fifth Avenue ASC, and/or other entities controlled by the Controllers issued regular payments to Katzman purporting to be returns on his "investment interests" in All City ASC and Fifth Avenue ASC when in fact such payments, in

excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Katzman, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1311.  Defendant McCulloch, record owner of Defendants McCulloch Orthopaedic and NYSJ entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which McCulloch, through McCulloch Orthopaedic and/or NYSJ would refer Covered persons to the Surgicore ASCs.

1312.  In that regard, McCulloch, and/or one or more other health care professionals under McCulloch's direction and control, purportedly performs one or more of the Fraudulent Services, through McCulloch Orthopaedic and/or NYSJ, at one or of the Defendant Surgicore ASCs, including but not limited to Defendants Empire State ASC, Fifth Avenue ASC, Jersey City ASC, New Horizon ASC, North Queens ASC, Rockland and Bergen ASC, and Saddlebrook ASC.

1313.  McCulloch, and one or more other orthopedists and other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant McCulloch Orthopaedic, at the Surgicore ASCs, including but limited to Empire State ASC, Fifth Avenue ASC, Jersey City ASC, New Horizon ASC, North Queens ASC, Rockland and Bergen ASC, and Saddlebrook ASC, in exchange for receiving kickbacks from the Controllers in the form of ownership or "investment interests" in Fifth Avenue ASC, New Horizon ASC and Saddlebrook ASC.

1314.  In exchange for receiving referrals from McCulloch, through McCulloch Orthopaedic and/or NYSJ, the Controllers provided McCulloch with the opportunity to "purchase"

ownership or "investment interests" in Fifth Avenue ASC last reported to be 3.4%, New Horizon ASC last reported to be 14.8%, and Saddlebrook ASC last reported to be 12.9%.

1315.   In actuality, the "investment interests" were kickbacks paid by the Controllers, through Fifth Avenue ASC, New Horizon ASC, and Saddlebrook ASC, respectively, in which McCulloch's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his "investment interests" in Fifth Avenue ASC, New Horizon ASC, and Saddlebrook ASC.

1316.   On information and belief, McCulloch was provided with an "investment interests" in Fifth Avenue ASC, New Horizon ASC, and Saddlebrook ASC, in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant McCulloch Orthopaedic and/or NYSJ to the Surgicore ASCs.

1317.   On information and belief, Fifth Avenue ASC, New Horizon ASC, Saddlebrook ASC, and/or other entities controlled by the Controllers issued regular payments to McCulloch purporting to be returns on his "investment interest" in Fifth Avenue ASC, New Horizon ASC, and Saddlebrook ASC when in fact such payments, in excess of his "investment interest," were kickbacks for referrals from (and/or caused by) McCulloch, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1318.   Defendant McMahon, record owner of Defendant McMahon PC entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for

which McMahon individually and/or, through McMahon PC would refer Covered persons to the Surgicore ASCs.

1319. In that regard, McMahon, and/or one or more other health care professionals under McMahon's direction and control, purportedly performs one or more of the Fraudulent Services, through McMahon PC at one or of the Defendant Surgicore ASCs, including but not limited to Defendants Fifth Avenue ASC and Rockaways ASC.

1320. McMahon, and one or more other orthopedists and other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant McMahon PC, at the Surgicore ASCs, including but limited to Fifth Avenue ASC and Rockaways ASC, in exchange for receiving kickbacks from the Controllers in the form of ownership or "investment interest" in Fifth Avenue ASC.

1321. In exchange for receiving referrals from McMahon, through McMahon PC, the Controllers provided McMahon PC with the opportunity to "purchase" ownership or "investment interests" in Fifth Avenue ASC last reported to be 1.2%.

1322. In actuality, the "investment interest" was a kickback paid by the Controllers, through Fifth Avenue ASC, in which McMahon's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his "investment interest" in Fifth Avenue ASC.

1323. On information and belief, McMahon was provided with an "investment interest" in Fifth Avenue ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant McMahon PC to the Surgicore ASCs.

1324.  On information and belief, Fifth Avenue ASC and/or other entities controlled by the Controllers issued regular payments to McMahon purporting to be returns on his "investment interest" in Fifth Avenue ASC, when in fact such payments, in excess of his "investment interest," were kickbacks for referrals from (and/or caused by) McMahon, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1325.  Defendant Seldes, record owner of Defendants Seldes PC, NYC Orthopedic, and Passaic Orthopedic entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Seldes through Seldes PC, NYC Orthopedic, and/or Passaic Orthopedic would refer Covered persons to the Surgicore ASCs.

1326.  In that regard, Seldes, with the purported assistance of one or more physicians assistants, purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants New Horizon ASC and Empire State ASC.

1327.  Seldes, assisted by one or more physician assistants and other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendants Seldes PC, NYC Orthopedic, and/or Passaic Orthopedic, at the Surgicore ASCs, including but limited to New Horizon ASC and Empire State ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in New Horizon ASC.

1328.  In exchange for receiving referrals from Seldes, through Seldes PC, NYC Orthopedic, and/or Passaic Orthopedic, the Controllers provided Seldes, through his control of

Blue Wall Management, the opportunity to "purchase" a an ownership or "investment interest" in New Horizon ASC, last reported to be 10.6%.

1329.   In actuality, the "investment interest," reflective of 10.6% ownership shares in New Horizon ASC, was a kickback paid by the Controllers, through New Horizon ASC, in which Seldes's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his 10.6% "investment interest" in New Horizon ASC.

1330.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Seldes' ownership interest in one or more of the Surgicore ASCs, including New Horizon ASC.

1331.   On information and belief, Seldes was provided with an "investment interest" in New Horizon ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendants Seldes PC, NYC Orthopedic, and Passaic Orthopedic to the Surgicore ASCs.

1332.   On information and belief, New Horizon ASC and/or other entities controlled by the Controllers issued regular payments to Seldes and/or Blue Wall Management purporting to be returns on his "investment interest" in New Horizon ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Seldes, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1333. Ajoy Sinha, record owner of Defendants MSJR and Sinha Orthopedics, entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Ajoy Sinha, through MSJR and Sinha Orthopedics, and one or more other practices in which Ajoy Sinha was associated, would refer Covered persons to the Surgicore ASCs.

1334. In that regard, Ajoy Sinha and/or other orthopedists, with the assistance of one or more physician assistants or other healthcare professionals working under his direction and control purportedly performed one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Fifth Avenue ASC, and Saddlebrook ASC.

1335. Ajoy Sinha, and one or more other orthopedists, assisted by one or more physician assistants and other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendants MSJR and Sinha Orthopedics, and other medical practices he was associated with, at the Surgicore ASCs, including but limited to All City ASC, Fifth Avenue ASC, and Saddlebrook ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interests" in All City ASC, Fifth Avenue ASC, and Saddlebrook ASC.

1336. In exchange for receiving referrals from Ajoy Sinha, through MSJR and Sinha Orthopedics, and other medical practices he was associated with, the Controllers provided Ajoy Sinha with the opportunity to "purchase" ownership or "investment interests" in All City ASC last known to be 1.5%, in Fifth Avenue ASC last reported to be 0.8%, and in Saddlebrook ASC, last reported to be 1.7%

1337. In actuality, the "investment interests" were a kickback paid by the Controllers, through All City ASC, Fifth Avenue ASC and Saddlebrook ASC, in which Ajoy Sinha's purported

investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his "investment interests" in All City ASC, Fifth Avenue ASC, and Saddlebrook ASC.

1338.  As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Ajoy Sinha's ownership interest in one or more of the Surgicore ASCs, including All City ASC, Fifth Avenue ASC, and Saddlebrook ASC.

1339.  On information and belief, Ajoy Sinha was provided with "investment interests" in All City ASC, Fifth Avenue ASC, and Saddlebrook ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner or otherwise associated with, including Defendants MSJR and Sinha Orthopedics to the Surgicore ASCs.

1340.  On information and belief, All City ASC, Fifth Avenue ASC, Saddlebrook ASC and/or other entities controlled by the Controllers issued regular payments to Ajoy Sinha purporting to be returns on his "investment interests" in All City ASC, Fifth Avenue ASC, and Saddlebrook ASC, when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Ajoy Sinha, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1341.  Defendant Sinha, record owner of Defendant Anjani PC entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Anjani Sinha, through Anjani PC, would refer Covered persons to the Surgicore ASCs.

1342.  In that regard, Sinha, with the assistance of one or more physician assistants or other healthcare professionals working under his direction and control purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Fifth Avenue ASC, Rockaway ASC, and Manalapan ASC.

1343.  Anjani Sinha, assisted by and one or more physician assistants other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Anjani PC, at the Surgicore ASCs, including but limited to All City ASC, Fifth Avenue ASC, Rockaways ASC, and Manalapan ASC in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Manalapan ASC.

1344.  In exchange for receiving referrals from Anjani Sinha, through Anjani PC, the Controllers provided Sinha with the opportunity to "purchase" an ownership or "investment interest" in Manalapan ASC last reported to be 0.6%.

1345.  In actuality, the "investment interest" was a kickback paid by the Controllers, through Manalapan ASC, in which Sinha's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his 0.6% "investment interest" in Manalapan ASC.

1346.  As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Anjani Sinha's ownership interest in one or more of the Surgicore ASCs, including Manalapan ASC.

1347.  On information and belief, Sinha was provided with an "investment interest" in Manalapan ASC in exchange for his agreement to provide (or cause to be provided) a steady stream

of referrals from medical practices in which he was the record owner, including Defendant Anjani PC to the Surgicore ASCs.

1348.   On information and belief, Manalapan ASC and/or other entities controlled by the Controllers issued regular payments to Sinha purporting to be returns on his "investment interest" in Manalapan ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Sinha, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1349.   Defendant Upendra Sinha, record owner of Defendant U.K. PC entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Upendra Sinha, through U.K. PC would refer Covered persons to the Surgicore ASCs.

1350.   In that regard, Upendra Sinha and one or more physician assistants working under Upendra Sinha's direction and control, purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, and Rockaways ASC.

1351.   Upendra Sinha and physician assistants working under Upendra Sinha's direction and control, purportedly performed one or more of the Fraudulent Services in his individual capacity and/or through Defendant U.K. PC, at the Surgicore ASCs, including but limited to All City ASC, Empire State ASC, Fifth Avenue ASC, and Rockaways ASC, in exchange for receiving kickbacks from the Controllers in the form of ownership or "investment interests" in Saddlebrook ASC.

1352.   In exchange for receiving referrals from Upendra Sinha through U.K. PC, the Controllers gave Upendra Sinha the opportunity to "purchase" a roughly 1.3% ownership or "investment interest" in Saddlebrook ASC, held until January 2023.

1353.   In actuality, the "investment interests" was a kickback paid by the Controllers, through Saddlebrook ASC, in which Upendra Sinha's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his nominal "investment interest" in Saddlebrook ASC.

1354.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Upendra Sinha's ownership interest in one or more of the Surgicore ASCs, including Saddlebrook ASC.

1355.   On information and belief, Upendra Sinha was provided with "investment interest" in Saddlebrook ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant U.K. PC to the Surgicore ASCs. On information and belief, in exchange for Upendra Sinha's "investment interest" in Saddlebrook ASC, Saddlebrook ASC, and/or other entities controlled by the Controllers issued regular payments to Upendra Sinha purporting to be returns on his "investment interest" in Saddlebrook ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Upendra Sinha for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1356. Defendant Wasserman, record owner of Defendant BW Orthopedics entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Wasserman, through BW Orthopedics would refer Covered persons to the Surgicore ASCs.

1357. In that regard, Wasserman, with the assistance of one or more physician assistants or other healthcare professionals working under his direction and control purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendant Surgicore ASC.

1358. Wasserman, assisted by and one or more physician assistants other healthcare professionals working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant BW Orthopedics, at the Surgicore ASCs, including but limited to Jersey City ASC in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Jersey City ASC.

1359. In exchange for receiving referrals from Wasserman, through BW Orthopedics, the Controllers provided Wasserman with the opportunity to "purchase" an ownership or "investment interest" in Jersey City ASC, last reported to be roughly 0.9%.

1360. In actuality, the "investment interest" was a kickback paid by the Controllers, through Jersey City ASC, in which Wasserman's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his less than 0.9% "investment interest" in Jersey City ASC.

1361. As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which

American Transit relied, the Controllers were able to conceal from American Transit, Wasserman's ownership interest in one or more of the Surgicore ASCs, including Jersey City ASC.

1362.   On information and belief, Wasserman was provided with an "investment interest" in Manalapan ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant BW Orthopedics to the Surgicore ASCs.

1363.   On information and belief, Jersey City ASC and/or other entities controlled by the Controllers issued regular payments to Wasserman purporting to be returns on his "investment interest" in Jersey City ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Wasserman, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1364.   Defendant Shamalov entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which he would purportedly assist in one or more physicians performance of Fraudulent Services purportedly performed on Covered Persons at the Surgicore ASCs.

1365.   In that regard, Shamalov purportedly assisted in the performance of one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Fifth Avenue ASC and Rockaways ASC.

1366.   Shamalov, assisted in the purported performance of one or more of the Fraudulent Services through one or more medical practices, at the Surgicore ASCs, including but limited to All City ASC, Fifth Avenue ASC and Rockaways ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in All City ASC.

1367.  In exchange for assisting one or more referring providers in the performance of one or more of the Fraudulent Services, the Controllers gave Shamalov the opportunity to "purchase" an ownership or "investment interest" in All City ASC, most recently set at roughly 0.4%.

1368.  In actuality, the "investment interest" was a kickback paid by the Controllers, through All City ASC, in which Shamalov's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his 0.4% "investment interest" in All City ASC.

1369.  As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Shamalov's ownership interest in one or more of the Surgicore ASCs, including All City ASC.

1370.  On information and belief, notwithstanding his "investment interest" in All City ASC, nearly half of the Fraudulent Services assisted by Shamalov, were performed at a Surgicore ASC other than All City ASC.

1371.  On information and belief, Shamalov was provided with an "investment interest" in All City ASC in exchange for his agreement to assist in the provision of the Fraudulent Services to a steady stream of Covered Persons referred to the Surgicore ASCs.

1372.  On information and belief, All City ASC and/or other entities controlled by the Controllers issued regular payments Shamalov purporting to be returns on his "investment interest" in All City when in fact such payments, in excess of his "investment interest," were kickbacks for Shamalov's provision of assistance in orthopedic surgeons' performance of the

Fraudulent Services, based on the volume of Fraudulent Services assisted, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1373. Defendant Jones, record owner of Defendant Phoenix Medical, entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Jones, through Phoenix Medical would refer Covered persons to the Surgicore ASCs.

1374. In that regard, one or more pain management physicians and physician assistants working under Jones' direction and control, purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants Fifth Avenue ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, and Jersey City ASC.

1375. Pain management physicians and physician assistants working under Jones' direction and control, purportedly performed one or more of the Fraudulent Services through Phoenix Medical, at the Surgicore ASCs, including but limited to Fifth Avenue ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, and Jersey City ASC, in exchange for receiving kickbacks from the Controllers in the form of ownership or "investment interests" in New Horizon ASCs and Jersey City ASC.

1376. In exchange for receiving referrals from Jones and other pain management physicians under his control, through Phoenix Medical PC, the Controllers gave Jones the opportunity to "purchase" a roughly 1% ownership or "investment interest" in Jersey City ASC, held until January 2024, and the opportunity to "purchase" an ownership or "investment interest" in New Horizon ASC last reported to be 1.9%.

1377. In actuality, the "investment interests" was a kickback paid by the Controllers, through New Horizon ASC and Jersey City ASC, in which Jones' purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were

disguised as dividends or other cash distributions disproportionate with his nominal "investment interests" in New Horizon ASC and Jersey City ASC.

1378.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Jones' ownership interest in one or more of the Surgicore ASCs, including New Horizon ASC and Jersey City ASC.

1379.   On information and belief, Jones was provided with "investment interests" in New Horizon ASC and Jersey City ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant Phoenix Medical to the Surgicore ASCs. On information and belief, in exchange for Jones' "investment interests" in New Horizon ASC and Jersey City ASC, New Horizon ASC, Jersey City ASC, and/or other entities controlled by the Controllers issued regular payments to Jones purporting to be returns on his "investment interests" in New Horizon ASC and Jersey City ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Jones for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1380.   Defendant Khakhar, record owner of Defendant PM&R entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Khakhar, through PM&R would refer Covered persons to the Surgicore ASCs.

1381.   In that regard, one or more pain management physicians and physician assistants working under Khakhar's direction and control, purportedly performs one or more of the

Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants Fifth Avenue ASC, and North Queens ASC.

1382.   Pain management physicians and physician assistants working under Khakhar's direction and control, purportedly performed one or more of the Fraudulent Services through Defendant PM&R, at the Surgicore ASCs, including but limited to Fifth Avenue ASC, and North Queens ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Empire State ASC and North Queens ASC.

1383.   In exchange for receiving referrals from Khakhar and other pain management physicians under his control, through PM&R, the Controllers gave Khakhar the opportunity to "purchase" a nominal ownership or "investment interest" in Empire State ASC and North Queens ASC.

1384.   In actuality, the "investment interest" were kickbacks paid by the Controllers, through Empire State ASC and North Queens ASC, in which Khakhar's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his nominal "investment interest" in Empire State ASC and North Queens ASC.

1385.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Khakhar's ownership interest in one or more of the Surgicore ASCs, including Empire State ASC and North Queens ASC.

1386.   On information and belief, Khakhar was provided with an "investment interest" in Empire State ASC and North Queens ASC in exchange for his agreement to provide (or cause to

be provided) a steady stream of referrals from medical practices in which he was the record owner, including PM&R, to the Surgicore ASCs. On information and belief, in exchange for Khakhar's "investment interest" in Empire State ASC and North Queens ASC, Empire State ASC, North Queens ASC, and/or other entities controlled by the Controllers issued regular payments to Khakhar purporting to be returns on his "investment interest" in Empire State ASC and North Queens ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Khakhar for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1387. Defendant Kotkes, record owner of Defendant Kotkes PC entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Kotkes, through Kotkes PC would refer Covered persons to the Surgicore ASCs.

1388. In that regard, one or more pain management physicians and physician assistants working under Kotkes's direction and control, purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Rockaways ASC, North Queens ASC, and Jersey City ASC.

1389. Pain management physicians and physician assistants working under Kotkes's direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Kotkes PC, at the Surgicore ASCs, including but limited to All City ASC, Rockaways ASC, North Queens ASC, and Jersey City ASC, in exchange for receiving kickbacks from the Controllers in the form of ownership or "investment interests" in Rockland and Bergen ASC and Jersey City ASC.

1390.	In exchange for receiving referrals from Kotkes and other pain management physicians under his control, through Kotkes PC, the Controllers gave Kotkes the opportunity to "purchase" a roughly 1% ownership or "investment interest" in Rockland and Bergen ASC, held until January 2020, and an ownership or "investment interest" in Jersey City ASC fluctuating between 0.25% and 0.5%, held until September 2023.

1391.	In actuality, the "investment interests" were kickbacks paid by the Controllers, through Rockland and Bergen ASC and Jersey City ASC, in which Kotkes' purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his nominal "investment interests" in Rockland and Bergen ASC and Jersey City ASC.

1392.	As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Kotkes' ownership interest in one or more of the Surgicore ASCs, including Rockland and Bergen ASC and Jersey City ASC.

1393.	On information and belief, Kotkes was provided with "investment interests" in Rockland and Bergen ASC and Jersey City ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant Kotkes PC to the Surgicore ASCs. On information and belief, in exchange for Kotkes' "investment interest" in Rockland and Bergen ASC and Jersey City ASC, Rockland and Bergen ASC, Jersey City ASC, and/or other entities controlled by the Controllers issued regular payments to Kotkes purporting to be returns on his "investment interest" in Rockland and Bergen ASC and Jersey City ASC when in fact such payments, in excess of his

"investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Kotkes for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1394.   Defendant Shabtian, record owner of Defendant Total Anesthesia entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Shabtian, through Total Anesthesia would refer Covered persons to the Surgicore ASCs.

1395.   In that regard, Shabtian and other pain management physicians and physician assistants working under his direction and control, purportedly performs one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants All City ASC, Fifth Avenue ASC, North Queens ASC, and Rockaways ASC.

1396.   Shabtian and other pain management physicians and physician assistants working under his direction and control, purportedly performed one or more of the Fraudulent Services through Defendant Total Anesthesia, at the Surgicore ASCs, including but limited to All City ASC, Fifth Avenue ASC, North Queens ASC, and Rockaways ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in All City ASC.

1397.   In exchange for receiving referrals from Shabtian, through Total Anesthesia, the Controllers gave Shabtian the opportunity to "purchase" an ownership or "investment interest" in All City ASC.

1398.   In actuality, the "investment interest" was a kickback paid by the Controllers, through All City ASC, in which Shabtian's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his 0.8% "investment interest" in All City ASC.

1399.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Shabtian's ownership interest in one or more of the Surgicore ASCs, including All City ASC, Fifth Avenue ASC, North Queens ASC, and Rockaways ASC.

1400.   On information and belief, Shabtian was provided with an "investment interest" in All City ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant Total Anesthesia to the Surgicore ASCs.

1401.   On information and belief, in exchange for Shabtian's "investment interest" in All City ASC, All City ASC and/or other entities controlled by the Controllers issued regular payments to Shabtian purporting to be returns on his "investment interest" in All City ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Shabtian, for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1402.   Defendant Vora, record owner of Defendants KDV Medical, KV Medical, NJ Vora, Ketan PC, and Non-Surgical Orthopedics, entered into a secret, illegal referral kickback relationship with one or more of the Controllers in exchange for which Vora, through KDV Medical, KV Medical, NJ Vora, Ketan PC, and Non-Surgical Orthopedics would refer Covered persons to the Surgicore ASCs.

1403.   In that regard, one or more pain management physicians and physician assistants working under Vora's direction and control, purportedly performs one or more of the Fraudulent

Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, and Saddlebrook ASC.

1404. Pain management physicians and physician assistants working under Vora's direction and control, purportedly performed one or more of the Fraudulent Services through KDV Medical, KV Medical, NJ Vora, Vora PC, and/or Non-Surgical Orthopedics, at the Surgicore ASCs, including but limited to Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, and Saddlebrook ASC, in exchange for receiving kickbacks from the Controllers in the form of ownership or "investment interests" in New Horizon ASC and Saddlebrook ASC.

1405. In exchange for receiving referrals from Vora and other pain management physicians under his control, through KDV Medical, KV Medical, NJ Vora, Vora PC, and/or Non-Surgical Orthopedics, the Controllers gave Vora the opportunity to "purchase" a roughly 1% ownership or "investment interest" in New Horizon ASC, held through December 2020, through Non-Surgical Orthopedics, and an ownership or "investment interest" in Saddlebrook ASC, last reported to be roughly 1.8%.

1406. In actuality, the "investment interests" was a kickback paid by the Controllers, through New Horizon ASC and Saddlebrook ASC, in which Vora's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his "investment interests" in New Horizon ASC and Saddlebrook ASC.

1407. As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which

428

American Transit relied, the Controllers were able to conceal from American Transit, Vora's ownership interest in one or more of the Surgicore ASCs, including New Horizon ASC.

1408. On information and belief, Vora was provided with an "investment interest" in New Horizon ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of referrals from medical practices in which he was the record owner, including Defendant through KDV Medical, KV Medical, NJ Vora, Vora PC, and/or Non-Surgical Orthopedics to the Surgicore ASCs. On information and belief, in exchange for Vora's "investment interests" in New Horizon ASC and Saddlebrook ASC, New Horizon ASC, Saddlebrook ASC, and/or other entities controlled by the Controllers issued regular payments to Vora purporting to be returns on his "investment interests" in New Horizon ASC and Saddlebrook ASC, when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of referrals from (and/or caused by) Vora for performing, or causing to be performed, the Fraudulent Services, if at all, on Covered Persons at one or more of the Surgicore ASCs pursuant to a predetermined fraudulent protocol.

1409. In addition to the foregoing, in furtherance of the scheme to defraud alleged herein, the Surgicore Orthopedists and Surgicore Pain Management Doctors that do not have a known ownership interest in one or more of the Surgicore ASCs, including but not limited to Defendants Baum, through Bay Ridge PC, Ackerman, in his individual capacity and/or through Contemporary Orthopedics, Bowen, in his individual capacity and/or through Alexander Bowen PLLC and/or Bowen PLLC, Jimenez, through J Sports and/or Dev Healthcare, Hall, in his individual capacity, and or through Hall PLLC, Portal, through Portal Medical, and Xie through Integrated Management, referred Covered Persons to the Surgicore ASCs for one or more of the Fraudulent Services purportedly performed by the Surgicore Orthopedists, Surgicore Pain Management

Doctors, and or other doctors and healthcare professionals under their direction or control, in exchange for kickbacks or other financial arrangements.

1410. In furtherance of the scheme to defraud alleged herein, the Surgicore Anesthesiologists, in exchange for kickbacks or other financial arrangements, purportedly performed anesthesia services at one or more of the Surgicore ASCs, during the purported performances of the Fraudulent Services by Surgicore Orthopedists, Surgicore Pain Management Doctors, and or other doctors and healthcare professionals under their direction or control, providing the Controllers an essential means, without which the Controllers would not be able to carry out the scheme to defraud alleged herein.

1411. Defendant Amigud, record owner of Defendants Amigud PC and Fifth Avenue Anesthesia, and until May 2023, record co-owner of Centurion Midtown Medical, and until May 2023, Centurion Midtown Anesthesia, entered into a secret, illegal kickback relationship with one or more of the Controllers in exchange for which Amigud, through Amigud PC, Fifth Avenue Anesthesia, Centurion Midtown Medical, and Centurion Midtown Anesthesia, would provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs.

1412. In that regard, Amigud and other anesthesiologists or nurse anesthetists under his direction and control, purportedly performs anesthesia services in connection with one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendant Fifth Avenue ASC.

1413. Amigud and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly perform anesthesia services Amigud, through Amigud PC, Fifth Avenue Anesthesia, Centurion Midtown Medical, and Centurion Midtown Anesthesia, in

connection with one or more of the Fraudulent Services at the Surgicore ASCs, including but limited to Fifth Avenue ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Fifth Avenue ASC.

1414.   In exchange for the provision of anesthesia services by Amigud, through Amigud, through Amigud PC, Fifth Avenue Anesthesia, Centurion Midtown Medical, and Centurion Midtown Anesthesia, in connection with the Fraudulent Services referred by the Surgicore Orthopedic Providers and/or Surgicore Pain Management Providers, the Controllers gave Amigud the opportunity to "purchase" an 8% ownership or "investment interest" in Fifth Avenue ASC.

1415.   In actuality, the "investment interest" was a kickback paid by the Controllers, through Fifth Avenue ASC, in which Amigud's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his 8% "investment interest" in Fifth Avenue ASC.

1416.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Amigud's ownership interest in one or more of the Surgicore ASCs, including Fifth Avenue ASC.

1417.   On information and belief, Amigud was provided with an "investment interest" in Fifth Avenue ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of anesthesia services through, medical practices in which he was the record owner or otherwise associated with, including Defendants Amigud, through Amigud PC, Fifth Avenue Anesthesia, Centurion Midtown Medical, and Centurion Midtown Anesthesia to Covered Persons at the Surgicore ASCs, providing Controllers the essential means for the Surgicore ASCs,

Surgicore Orthopedic Providers and Surgicore Pain Management Providers to continue to purportedly perform, and bill for the Fraudulent Services pursuant to a predetermined fraudulent protocol. On information and belief, in exchange for Amigud's "investment interest" in Fifth Avenue ASC, Fifth Avenue ASC and/or other entities controlled by the Controllers issued regular payments to Amigud purporting to be returns on his "investment interest" in Fifth Avenue ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of anesthesia services attendant to the Fraudulent Services, in which Amigud provided (or caused to be provided), if at all, on Covered Persons at one or more of the Surgicore ASCs, in excess of the fair market value for the purported staffing of anesthesiologists or nurse anesthetists.

1418.   Defendant Elkholy, record owner of Defendant Precision Anesthesia, PC, entered into a secret, illegal kickback relationship with one or more of the Controllers in exchange for which Elkholy, through Precision Anesthesia, PC, would provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs.

1419.   In that regard, Elkholy and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly performs anesthesia services in connection with one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendant All City ASC, New Horizon ASC, Manalapan ASC, and Saddlebrook ASC.

1420.   Elkholy and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly performed purportedly performs anesthesia services through Precision Anesthesia, PC, in connection with one or more of the Fraudulent Services at the Surgicore ASCs, including but limited to All City ASC, New Horizon ASC, Manalapan ASC, and Saddlebrook ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Manalapan ASC.

1421.   In exchange for the provision of anesthesia services by Elkholy, through Precision Anesthesia, PC in connection with the Fraudulent Services referred by the Surgicore Orthopedic Providers and/or Surgicore Pain Management Providers, the Controllers gave Elkholy the opportunity to "purchase" an ownership or "investment interest" in Manalapan ASC, fluctuating over time and reaching 14% in 2022.

1422.   In actuality, the "investment interest" was a kickback paid by the Controllers, through Manalapan ASC, in which Elkholy's purported investment was quickly repaid and thereafter he received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with his "investment interest" in Manalapan ASC.

1423.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Elkholy's ownership interest in one or more of the Surgicore ASCs, including Manalapan ASC.

1424.   On information and belief, Elkholy was provided with an "investment interest" in Manalapan ASC in exchange for his agreement to provide (or cause to be provided) a steady stream of anesthesia services through medical practices in which he was the record owner or otherwise associated with, including Precision Anesthesia, PC to Covered Persons at the Surgicore ASCs, providing Controllers the essential means for the Surgicore ASCs, Surgicore Orthopedic Providers and Surgicore Pain Management Providers to continue to purportedly perform, and bill for the Fraudulent Services pursuant to a predetermined fraudulent protocol. On information and belief, in exchange for Elkholy's "investment interest" in Manalapan ASC, Manalapan ASC and/or other entities controlled by the Controllers issued regular payments to Elkholy purporting to be returns

on his "investment interest" in Manalapan ASC when in fact such payments, in excess of his "investment interest," were kickbacks based on the volume of anesthesia services attendant to the volume of Fraudulent Services, in which Elkholy provided (or caused to be provided), if at all, on Covered Persons at one or more of the Surgicore ASCs, in excess of the fair market value for the purported staffing of anesthesiologists or nurse anesthetists.

1425. Defendants Kurtti, McCarthy, and Eltaki record owners of Defendant Quality Anesthesia, entered into a secret, illegal kickback relationship with one or more of the Controllers in exchange for which Quality Anesthesia, would provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs.

1426. In that regard, Kurtti, McCarthy, Eltaki, and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly performs anesthesia services in connection with one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendant Rockland and Bergen ASC.

1427. Kurtti, McCarthy, Eltaki, and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly performed purportedly performs anesthesia services through Quality Anesthesia, in connection with one or more of the Fraudulent Services at the Surgicore ASCs, including but limited to Rockland and Bergen ASC, in exchange for receiving kickbacks from the Controllers in the form of an ownership or "investment interest" in Rockland and Bergen ASC, or some other form of financial compensation.

1428. On information and belief, in exchange for the provision of anesthesia services by Kurtti, McCarthy, and Eltaki, through Quality Anesthesia, in connection with the Fraudulent Services referred by the Surgicore Orthopedists and/or Surgicore Pain Management Physicians, the Controllers gave Kurtti and McCarthy the opportunity to "purchase" fractional ownership or

"investment interests" in Rockland and Bergen ASC through fractional interests in one of a string of shell corporations controlled by the Controllers.

1429.   In actuality, the "investment interest" was a kickback paid by the Controllers, through Rockland and Bergen ASC, in which Kurtti's and McCarthy's purported investment was quickly repaid and thereafter they received kickbacks in the form of substantial payments that were disguised as dividends or other cash distributions disproportionate with the value of their "investment interests" in Rockland and Bergen ASC.

1430.   As the ownership interests in an ASC are made in corporate records not provided to American Transit as part of the Surgicore ASC's facially valid billing submissions upon which American Transit relied, the Controllers were able to conceal from American Transit, Kurtti's and McCarthy's ownership interest in one or more of the Surgicore ASCs, including Rockland and Bergen ASC.

1431.   On information and belief, Kurtti and McCarthy were provided with an "investment interest" in one in a string of shell corporations with stake in Rockland and Bergen ASC, and Eltaki, kickbacks in some other form of financial compensation, in exchange for their agreement to provide (or cause to be provided) a steady stream of anesthesia services through medical practices in which he was the record owner or otherwise associated with, including Quality Anesthesia to Covered Persons at the Surgicore ASCs, providing Controllers the essential means for the Surgicore ASCs, Surgicore Orthopedic Providers and Surgicore Pain Management Providers to continue to purportedly perform, and bill for the Fraudulent Services pursuant to a predetermined fraudulent protocol. On information and belief, in exchange for Kurtti's and McCarthy 's "investment interest" in shell company shareholders of Rockland and Bergen ASC, Rockland and Bergen ASC and/or other entities controlled by the Controllers issued regular

payments to Kurtti and McCarthy purporting to be returns on their "investment interest" in shell company shareholders of Rockland and Bergen ASC, when in fact such payments, in excess of their "investment interest," were kickbacks based on the volume of anesthesia services attendant to Fraudulent Services, in which Quality Anesthesia provided (or caused to be provided), if at all, on Covered Persons at one or more of the Surgicore ASCs.

1432.   On information and belief, such payments to Kurtti and McCarthy, and additional kickbacks in the form of other financial compensation to Eltaki were in excess of the fair market value for the purported staffing of anesthesiologists or nurse anesthetists.

1433.   In addition to the foregoing, one or more Surgicore Anesthesiologists who do not hold an ownership interest in one or more of the Surgicore ASCs, provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs, in exchange for illegal kickbacks or other financial compensation, often disguised as compensation pursuant to staffing agreements.

1434.   Defendant Neuman, record owner of Defendants Neuman PC, Neuman PLLC, Sedation Vacation, Centurion Midtown Anesthesia, Centurion Midtown Medical, and Centurion Anesthesia, entered into a secret, illegal kickback relationship with one or more of the Controllers in exchange for which Neuman, through Neuman PC, Neuman PLLC, Sedation Vacation, Centurion Midtown Anesthesia, Centurion Midtown Medical, and Centurion Anesthesia would provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs.

1435.   In that regard, Neuman and other anesthesiologists or nurse anesthetists under his direction and control, purportedly performs anesthesia services in connection with one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to

Defendants All City ASC, Empire State ASC, North Queens ASC, Rockaways ASC, and Fifth Avenue ASC.

1436. On information and belief, to bill for the Fraudulent Services purportedly performed at, by, and through the Surgicore ASCs, the Controllers required anesthesiologists to be staffed at sufficient levels at each of the Surgicore ASCs.

1437. On information and belief, in exchange for the payment of kickbacks, Defendant Neuman, and or one or more of the corporate entities under his control, purportedly exclusively staffed one or more Surgicore ASCs, including but not limited to Defendants All City ASC, Empire State ASC, North Queens ASC, Rockaways ASC, for which Neuman, through Neuman PC, Neuman PLLC, Sedation Vacation, Centurion Midtown Anesthesia, Centurion Midtown Medical, and Centurion Anesthesia, bills the insurers directly, and in which Neuman received kickback payments by the Surgicore ASCs, Controllers, and/or other entities under their control. Such payments were disguised as sham exclusive staffing agreements in which Neuman, through Neuman PC, Neuman PLLC, Sedation Vacation, Centurion Midtown Anesthesia, and Centurion Midtown Medical, and would staff the operating rooms with anesthesiologists or nurse anesthetists at one or more Surgicore ASCs, in which the Surgicore ASC and one of the anesthesia practices for which Neuman is the record owner, would bill for one or more of the Fraudulent Services.

1438. On information and belief, Neuman and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly perform anesthesia services through Neuman PC, Neuman PLLC, Sedation Vacation, Centurion Midtown Anesthesia, Centurion Midtown Medical, and Centurion Anesthesia, in connection with one or more of the Fraudulent Services at the Surgicore ASCs, including but limited to All City ASC, Empire State ASC, North Queens ASC, Rockaways ASC, and Fifth Avenue ASC, in exchange for receiving

kickbacks or other financial compensation from the Surgicore ASCs, Controllers, and/or other entities controlled by the Controllers.

1439.   On information and belief, the kickbacks and/or other financial compensation paid to Neuman were based on the volume of anesthesia services attendant to the Fraudulent Services, in which Neuman provided (or caused to be provided), if at all, on Covered Persons at one or more of the Surgicore ASCs, in excess of the fair market value for the purported staffing of anesthesiologists or nurse anesthetists.

1440.   Defendant Scinas, record owner of Defendant Roxbury Anesthesia, entered into a secret, illegal kickback relationship with one or more of the Controllers in exchange for which Scinas, through Roxbury Anesthesia would provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs.

1441.   In that regard, Scinas and other anesthesiologists or nurse anesthetists under his direction and control, purportedly performs anesthesia services in connection with one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendants Jersey City ASC and Manalapan ASC.

1442.   On information and belief, Scinas and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly perform anesthesia services through Roxbury Anesthesia, in connection with one or more of the Fraudulent Services at the Surgicore ASCs, including but limited to Jersey City ASC and Manalapan, in exchange for receiving kickbacks or other financial compensation from the Surgicore ASCs, Controllers, and/or other entities controlled by the Controllers.

1443.   On information and belief, to bill for the Fraudulent Services purportedly performed at, by, and through the Surgicore ASCs, the Controllers required anesthesiologists to

be staffed at sufficient levels at each of the Surgicore ASCs. In exchange for the payment of kickbacks Defendant Scinas, through Roxbury Anesthesia, staffed one or more Surgicore ASCs, including but not limited to Defendants Jersey City ASC and Manalapan ASC, for which Scinas, through Roxbury Anesthesia, bills the insurers directly, and in which Scinas received kickback payments by the Surgicore ASCs, Controllers, and/or other entities under their control. Such payments were disguised as a sham staffing agreement, in which Scinas, through Roxbury Anesthesia would staff the operating rooms with anesthesiologists or nurse anesthetists at one or more Surgicore ASCs, in which both Roxbury Anesthesia and the Surgicore ASC would bill for one or more of the Fraudulent Services.

1444. On information and belief, Scinas was provided with kickbacks or other financial compensation in exchange for his agreement to provide (or cause to be provided) a steady stream of anesthesia services through, medical practices in which he was the record owner or otherwise associated with, including through Defendant Roxbury Anesthesia, to Covered Persons at the Surgicore ASCs, providing Controllers the essential means for the Surgicore ASCs, Surgicore Orthopedic Providers and Surgicore Pain Management Providers to continue to purportedly perform, and bill for the Fraudulent Services pursuant to a predetermined fraudulent protocol.

1445. On information and belief, the kickbacks and/or other financial compensation paid to Scinas were based on the volume of anesthesia services attendant to the Fraudulent Services, in which Scinas provided (or caused to be provided), if at all, on Covered Persons at one or more of the Surgicore ASCs, in excess of the fair market value for the purported staffing of anesthesiologists or nurse anesthetists.

1446. Defendant Khan, record owner of Anesthesia Professionals, entered into a secret, illegal kickback relationship with one or more of the Controllers in exchange for which Khan,

through Anesthesia Professionals would provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs.

1447. In that regard, Khan and other anesthesiologists or nurse anesthetists under his direction and control, purportedly performs anesthesia services in connection with one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendant Manalapan ASC.

1448. On information and belief, Khan and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly perform anesthesia services through Anesthesia Professionals, in connection with one or more of the Fraudulent Services at the Surgicore ASCs, including but limited to Manalapan ASC, in exchange for receiving kickbacks or other financial compensation from the Surgicore ASCs, Controllers, and/or other entities controlled by the Controllers.

1449. On information and belief, to bill for the Fraudulent Services purportedly performed at, by, and through the Surgicore ASCs, the Controllers required anesthesiologists to be staffed at sufficient levels at each of the Surgicore ASCs. In exchange for the payment of kickbacks Defendant Khan, through Anesthesia Professionals staffed one or more Surgicore ASCs, including but not limited to Defendant Manalapan ASC, for which Khan, through Anesthesia Professionals bills the insurers directly, and in which Khan received kickback payments by the Surgicore ASCs, Controllers, and/or other entities under their control. Such payments were disguised as a sham staffing agreement, in which Khan, through Anesthesia Professionals would staff the operating rooms with anesthesiologists or nurse anesthetists at one or more Surgicore ASCs, in which both Anesthesia Professionals and the Surgicore ASC would bill for one or more of the Fraudulent Services.

1450. On information and belief, Khan was provided with kickbacks or other financial compensation in exchange for his agreement to provide (or cause to be provided) a steady stream of anesthesia services through, medical practices in which he was the record owner or otherwise associated with, including through Defendant Anesthesia Professionals, to Covered Persons at the Surgicore ASCs, providing Controllers the essential means for the Surgicore ASCs, Surgicore Orthopedic Providers and Surgicore Pain Management Providers to continue to purportedly perform, and bill for the Fraudulent Services pursuant to a predetermined fraudulent protocol.

1451. On information and belief, the kickbacks and/or other financial compensation paid to Khan were based on the volume of anesthesia services attendant to the Fraudulent Services, in which Khan provided (or caused to be provided), if at all, on Covered Persons at one or more of the Surgicore ASCs, in excess of the fair market value for the purported staffing of anesthesiologists or nurse anesthetists.

1452. Defendant Kao, record owner of Defendant Progressive-Hudson, entered into a secret, illegal kickback relationship with one or more of the Controllers in exchange for which Kao, through Progressive-Hudson would provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs.

1453. In that regard, Kao and other anesthesiologists or nurse anesthetists under his direction and control, purportedly performs anesthesia services in connection with one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendant Saddlebrook ASC.

1454. On information and belief, Kao and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly perform anesthesia services through Progressive-Hudson, in connection with one or more of the Fraudulent Services at the Surgicore

ASCs, including but limited to Saddlebrook ASC, in exchange for receiving kickbacks or other financial compensation from the Surgicore ASCs, Controllers, and/or other entities controlled by the Controllers.

1455. On information and belief, to bill for the Fraudulent Services purportedly performed at, by, and through the Surgicore ASCs, the Controllers required anesthesiologists to be staffed at sufficient levels at each of the Surgicore ASCs. In exchange for the payment of kickbacks Defendant Kao, Progressive-Hudson, staffed one or more Surgicore ASCs, including but not limited to Defendant Saddlebrook ASC, for which he bills the insurers directly, and in which Kao received kickback payments by the Surgicore ASCs, Controllers, and/or other entities under their control. Such payments were disguised as a sham staffing agreement, in which Kao, through Progressive-Hudson would staff the operating rooms with anesthesiologists or nurse anesthetists at one or more Surgicore ASCs, in which both Progressive-Hudson and the Surgicore ASC would bill for one or more of the Fraudulent Services.

1456. On information and belief, Kao was provided with kickbacks or other financial compensation in exchange for his agreement to provide (or cause to be provided) a steady stream of anesthesia services through, medical practices in which he was the record owner or otherwise associated with, including through Defendant Progressive-Hudson, to Covered Persons at the Surgicore ASCs, providing Controllers the essential means for the Surgicore ASCs, Surgicore Orthopedic Providers and Surgicore Pain Management Providers to continue to purportedly perform, and bill for the Fraudulent Services pursuant to a predetermined fraudulent protocol.

1457. On information and belief, the kickbacks and/or other financial compensation paid to Kao were based on the volume of the anesthesia services attendant to the Fraudulent Services, in which Kao provided (or caused to be provided), if at all, on Covered Persons at one or more of

the Surgicore ASCs, in excess of the fair market value for the purported staffing of anesthesiologists or nurse anesthetists.

1458. Defendants Eaton and Itzkovich, record owners of Defendant Synergy Anesthesia, entered into a secret, illegal kickback relationship with one or more of the Controllers in exchange for which Eaton and Itzkovich, through Synergy Anesthesia would provide anesthesia services attendant to the Fraudulent Services for which Covered Persons were referred to the Surgicore ASCs.

1459. In that regard, Eaton, Itzkovich and other anesthesiologists or nurse anesthetists under his direction and control, purportedly performs anesthesia services in connection with one or more of the Fraudulent Services at one or of the Defendant Surgicore ASCs, including but not limited to Defendant New Horizon ASC and Rockland and Bergen ASC.

1460. On information and belief, Eaton, Itzkovich and other anesthesiologists or nurse anesthetists working under his direction and control, purportedly perform anesthesia services through Synergy Anesthesia, in connection with one or more of the Fraudulent Services at the Surgicore ASCs, including but limited to Saddlebrook ASC, in exchange for receiving kickbacks or other financial compensation from the Surgicore ASCs, Controllers, and/or other entities controlled by the Controllers.

1461. On information and belief, to bill for the Fraudulent Services purportedly performed at, by, and through the Surgicore ASCs, the Controllers required anesthesiologists to be staffed at sufficient levels at each of the Surgicore ASCs. In exchange for the payment of kickbacks Defendants Eaton and Itzkovich, through Synergy Anesthesia, staffed one or more Surgicore ASCs, including but not limited to Defendants New Horizon ASC and Rockland and Bergen ASC, for which Eaton and Itzkovich, through Synergy Anesthesia bills the insurers

directly, and in which Eaton and Itzkovich received kickback payments by the Surgicore ASCs, Controllers, and/or other entities under their control. Such payments were disguised as a sham staffing agreement, in which Eaton and Itzkovich, through Synergy Anesthesia, would staff the operating rooms with anesthesiologists or nurse anesthetists at one or more Surgicore ASCs, in which both Synergy Anesthesia and the Surgicore ASC would bill for one or more of the Fraudulent Services.

1462.   On information and belief, Eaton and Itzkovich were provided with kickbacks or other financial compensation in exchange for his agreement to provide (or cause to be provided) a steady stream of anesthesia services through, medical practices in which he was the record owner or otherwise associated with, including through Defendant Synergy Anesthesia, to Covered Persons at the Surgicore ASCs, providing Controllers the essential means for the Surgicore ASCs, Surgicore Orthopedic Providers and Surgicore Pain Management Providers to continue to purportedly perform, and bill for the Fraudulent Services pursuant to a predetermined fraudulent protocol.

1463.   On information and belief, the kickbacks and/or other financial compensation paid to Eaton and Itzkovich were based on the volume of anesthesia services attendant to the Fraudulent Services, in which Eaton and Itzkovich provided (or caused to be provided), if at all, on Covered Persons at one or more of the Surgicore ASCs, in excess of the fair market value for the purported staffing of anesthesiologists or nurse anesthetists.

## VI.   No-Fault Fraudulent Billing Scheme

### A.  The No-Fault Clinics Exist to Advance Insurance Fraud

1464.   Separate and apart from and in addition to the illegal licensing violations and illegal financial arrangements alleged herein, Defendants engaged in a fraudulent billing scheme in which

Covered Persons purportedly underwent a predetermined course of treatment irrespective of medical necessity or risk to covered persons.

1465. In furtherance of the scheme to defraud alleged herein, individuals who were purportedly involved in low-impact automobile collisions and purportedly sustained soft-tissue injuries would present to one of the numerous No-Fault Clinics in the New York metropolitan area, which would automatically trigger treatment protocols designed to fraudulently bill insurance companies, in general, and American Transit, in particular, for inter alia, medical evaluations, diagnostic tests, pain management injections, chiropractic treatment, and physical therapy, irrespective of medical necessity.

1466. As part of a fraudulent protocol of treatment, after purportedly receiving a standard battery of medical treatment, many of the Covered Persons are eventually referred for orthopedic surgical evaluations and/or pain management evaluations at the No-Fault Clinics, resulting in referral for and purported performance of the Fraudulent Services at the Surgicore ASCs and other ASCs located in New York and New Jersey. Covered Persons were then often instructed to return to the same No-Fault Clinics for post-operative follow-up care.

1467. Though seemingly organized to provide a range of healthcare services from a single location, virtually all the No-Fault Clinics at which Covered Persons presented for purported treatment and were referred to the Surgicore Orthopedic Providers and Surgicore Pain Management Providers were in actuality pay to play medical mills, that were established to provide one-stop shops for a wide range of multi-disciplinary medical services, irrespective of medical necessity and for the purpose of committing fraud.

1468. In keeping with the fact that unlicensed laypersons controlled many of the No-Fault Clinics and that the Surgicore ASCs paid illegal kickbacks in exchange for patient referrals, several

of the No-Fault Clinics, from which the referrals to the Surgicore ASCs originated are identified in criminal prosecutions as clinics owned and controlled by laypersons and engaged in illegal "pay to play" No-Fault fraud schemes, involving, among other things, the payment of kickbacks and illegal referral arrangements. By way of example and not limitation, clinic locations identified during the investigation and prosecution of *United States v. Anthony Rose, et al.*, 19-cr-00789 (PGG) (S.D.N.Y.) ("USA v. Rose") as being controlled by laypersons and as receiving patients as a result of illegal kickback and referral arrangements, including but not limited to No-Fault Clinics located at 1353 Utica Avenue Brooklyn NY 11203, 145 East 98th Street Brooklyn NY 11212, 2 Wilson Place 3rd Floor Mt Vernon NY 10550, 2273 65th Street Brooklyn NY 11204, 2426 Eastchester Road Bronx NY 10469, 2625 Atlantic Avenue Brooklyn NY 11207, 6937 Myrtle Avenue Glendale NY 11385, and 7909 Northern Boulevard Jackson Heights NY 11372, supplied one or more of the Surgicore ASCs, including but not limited to All City ASC, Empire State ASC, Fifth Avenue ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC and Saddlebrook ASC, with referrals for one or more of the Fraudulent Services.

1469.  Similarly, clinic locations associated with Alex Gulkarov, who, in *United States v. Gulkarov, et al.*, 1:22-cr-00020 (S.D.N.Y. 2022), was prosecuted for engaging in complex No-Fault insurance schemes, including fraudulent lay-ownership of healthcare practices and unlawful referrals, including those located at 10510 Flatlands Avenue Brooklyn NY 11236, 20412 Hillside Avenue Hollis NY 11423, 6555 Woodhaven Boulevard Rego Park NY 11374, identified supplied one or more of the Surgicore ASCs, including but not limited to All City ASC, Empire State ASC, Fifth Avenue ASC, New Horizon ASC, Jersey City ASC and Saddlebrook ASC with referrals for one or more of the Fraudulent Services.

1470. In addition to the foregoing, No-Fault clinics where Covered Persons were purported treated by Rutland Medical PC (not named as a defendant herein), owned on paper by Marvin Moy MD (not named as a defendant herein), who was prosecuted for engaging in a complex No-Fault insurance scheme, involving both the fraudulent incorporation of medical practices and unlawful referrals of claimants in *United States v. Pierre*, 1:22-cr-00019 (S.D.N.Y. 2022), including those clinics located at 135-25 79th Street, Suite 2A Howard Beach NY 11414, 145 East 98th Street Brooklyn NY 11212, 145-25 79th Street Suite 2A Howard Beach NY 11414, 71 South Central Avenue Suite 101 Valley Stream NY 11580, 951 Brook Avenue Bronx NY 10451, supplied one or more of the Surgicore ASCs, including but not limited to North Queens ASC, Rockaways ASC, Fifth Avenue ASC, Empire State ASC, Jersey City ASC, All City ASC, Rockland and Bergen ASC, New Horizon ASC and Manalapan ASC with referrals for one or more of the Fraudulent Services.

1471. In addition to the foregoing, in furtherance of the scheme to defraud, many of the referrals for one or more of the Fraudulent Services, resulting in claims submitted by one or more of the Surgicore ASC's to Plaintiff, were issued from No-Fault Clinics, including but not limited to those located at 55 East 115th Street, New York NY 10029; 332 East 149 NY Street, Bronx, NY 10451; 951 Brook Avenue, Bronx, NY 10451; 14 Bruckner Boulevard, Bronx, 10454; 599-601 Southern Boulevard, Bronx, NY 10455; 1320 Louis Nine Boulevard, Bronx, NY 10459; 3626 Bailey Avenue, Bronx, NY 10463; 4250 White Plains Road, Bronx, NY 10466; 2558 Holland Avenue, Bronx, NY 10467; 3407 White Plains Road, Bronx, NY 10467; 665 Pelham Pkwy N, Bronx, NY 10467; 2386 Jerome Avenue, Bronx, NY 10468; 647 Bryant Avenue, Bronx, NY 10474; 3910 Church Avenue, Brooklyn, NY 11203; 632 Utica Avenue, Brooklyn, NY 11203; 108 Kenilworth Place, Brooklyn, NY 11210; 409 Rockaway Avenue, Brooklyn, NY 11212; 513

Church Avenue, Brooklyn, NY 11218; 611 East 76th Street, Brooklyn, NY 11236; 5127 Queens Blvd, Woodside, NY 11377; 10748 Guy R Brewer Boulevard, Jamaica, NY 11433; 13742 Guy R Brewer Boulevard, Jamaica, NY 11434; 219 Hempstead Turnpike, West Hempstead NY 11552; and 71 South Central Avenue, Valley Stream, NY 11580, where healthcare professionals purportedly provided medical services through Atlantic Medical & Diagnostic PC (not named as a defendant herein), a professional corporation in which Jonathan Landow ("Landow") (not named as a defendant herein) is listed as the record owner.

1472.   Landow and several professional corporations in which he is listed as the record owner, including Atlantic Medical & Diagnostic, P.C. were sued by multiple No-Fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See Allstate Ins. Co., et al v. Landow, M.D., et al.*, 24-cv-02010 (E.D.N.Y.); *Gov't Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y.); *Gov't Emp. Ins. Co., et al. v. Urban Medical, P.C., M.D., et al.*, 18-cv-02956 (E.D.N.Y.); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. Cty.).

1473.   By way of further example but not limitation, numerous fraudulent referrals for the Fraudulent Services, resulting in claims submitted by the Surgicore ASCs to Plaintiff, were also issued from No-Fault Clinics including but not limited to those located at 1767 Southern Boulevard, Bronx, NY 10460; 409 Rockaway Avenue, Brooklyn, NY 11212; 3041 Avenue U, Brooklyn, NY 11229; 10510 Flatlands Avenue, Brooklyn, NY 11236; 20412 Hillside Avenue, Hollis, NY 11423; and 16059 Rockaway Boulevard, Jamaica, NY 11434, where healthcare professionals that purportedly provided medical services through Tri-Borough NY Medical

Practice, P.C. (not named as a defendant herein), a professional corporation in which Leonid Shapiro ("Shapiro") (not named as a defendant herein) is the record owner.

1474.   Shapiro, and several professional corporations in which he is listed as the record owner, including Tri-borough NY Medical Practice, P.C. have been sued by multiple No-Fault insurance carriers for allegedly engaging in various multimillion-dollar fraud schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See Gov't Emp. Ins. Co., et al. v. Moshe, et al.,* 20-cv-1098 (FB)(RER) (E.D.N.Y. 2020); *State Farm Mut. Auto. Ins. Co. et al. v. Metro Pain Specialists P.C., et al,* 21-cv-5523 (MKB)(PK) (E.D.N.Y. 2021); *Allstate Ins. Co. et al v. Metro Pain Specialists Professional Corporation et al,* 21-cv-5586 (DG)(RER) (E.D.N.Y. 2021).

1475.   By way of further example but not limitation, numerous fraudulent referrals for the Fraudulent Services, resulting in claims submitted by the Surgicore ASCs to Plaintiff, were also issued from No-Fault Clinics including but not limited to those located at 719 Southern Boulevard, Bronx, NY 10455; 4014A Boston Road, Bronx, NY 10475; 1655 Richmond Avenue, Staten Island, NY 10314; 6269 99th Street, Rego Park, NY 11374; 441 Willis Avenue, Bronx, NY 10455; 2354 Westchester Avenue, Bronx, NY 10462; 9208 Liberty Avenue, Jamaica, NY 11417; and 7945 Metropolitan Avenue, Middle Village, NY 11379, where healthcare professionals that purportedly provided medical services through Bronx County Medical Care PC (not named as a defendant herein) and/or Far Rockaway Medical PC (not named as a defendant herein), professional corporations in which Jean-Pierre Georges Barakat ("Barakat") (not named as a defendant herein) is the record owner.

1476. Barakat, and several professional corporations in which he is listed as the record owner, have been sued by multiple No-Fault insurance carriers for allegedly engaging in various fraudulent billing schemes involving, among other things, rendering healthcare services and/or issuing prescriptions pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See Gov't Emp. Ins. Co., et al. v. Barakat, et al.*, 22-cv-0753 (E.D.N.Y. 2022); *Gov't Emp. Ins. Co., et al. v. Barakat, et al.*, 17-cv-1066 (E.D.N.Y 2017); *Gov't Emp. Ins. Co., et al. v. Direct RX Pharmacy Inc. d/b/a Sharonas Pharmacy, et al.*, 19-cv-05876 (E.D.N.Y. 2019); *Allstate Ins. Co. et al. v. New Century Pharmacy, et, al*, 19-cv-05702 (E.D.N.Y. 2019).

1477. By way of further example but not limitation, a numerous fraudulent referrals for the Fraudulent Services, resulting in claims submitted by the Surgicore ASCs to Plaintiff, were also issued from No-Fault Clinics including but not limited to those located at 1647 Macombs Road, Bronx, NY 10453; 560 Prospect Avenue, Bronx, NY 10455; 145 East 98th Street, Brooklyn, NY 11212; 1568 Ralph Avenue, Brooklyn, NY 11234; 10520 Northern Boulevard, Corona, NY 11368; 11247 Queens Boulevard, Forest Hills, NY 11375; and 24351 Merrick Blvd, Rosedale, NY 11422, where healthcare professionals that purportedly provided medical services through Metropolitan Medical & Surgical PC (not named as a defendant herein), a professional corporation in which Mark Gladstein ("Gladstein") (not named as a defendant herein) is the record owner.

1478. Gladstein has been sued by multiple No-Fault insurance carriers for allegedly engaging in various fraudulent billing schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See Liberty Mutual Mid. Atlantic Ins. Co. et al. v. Advanced Comprehensive Laboratory, LLC, et al,*

22-cv-3541 (E.D.N.Y. 2022); *State Farm Mut. Auto. Ins. Co., et al. v. Metro Pain Specialists, P.C.*, 21-cv-5523 ((E.D.N.Y. 2021); *Gov't Emp. Ins. Co., et al. v. Advanced Comprehensive Laboratory, LLC, et al.,* 20-cv-2391 (E.D.N.Y. 2020).

1479.   By way of further example but not limitation, a numerous fraudulent referrals for the Fraudulent Services, resulting in claims submitted by the Surgicore ASCs to Plaintiff, were issued from No-Fault Clinics including but not limited to those located at 599-601 Southern Boulevard, Bronx, NY 10455; 607 Westchester Avenue, Bronx, NY 10455; 717 Southern Boulevard, Bronx, NY 10455; 1894 Eastchester Road, Bronx, NY 10461; 1894 Eastchester Road, Bronx, NY 10461; 3432 East Tremont Avenue, Brooklyn, NY 10465; 150 Graham Avenue Brooklyn, NY 11206; 1611 East New York Avenue, Brooklyn, NY 11212; 282-284 Avenue X, Brooklyn, NY 11223; 146 Empire Boulevard, Brooklyn, NY 11225; 2088 B Flatbush Avenue, Brooklyn, NY 11234; 5414 Avenue N, Brooklyn, NY 11234; 3703 92nd Street, Jackson Heights, NY 11372; 7945 Metropolitan Avenue, Middle Village, NY 11379; 615 Seneca Avenue, Ridgewood, NY 11385; 9701 101st Avenue, Ozone Park, NY 11416; and 9208 Jamaica Avenue, Woodhaven, NY 11421, at which Joseph Raia MD (not named as a defendant herein) purportedly treated Covered Persons.

1480.   Raia has been sued multiple times for allegedly engaging in various fraudulent billing schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See, e.g., Gov't Emp. Ins. Co., et al. v. Badia, M.D., et al*, 13-cv-01720 (E.D.N.Y. 2013); *Gov't Emp. Ins. Co., et al. v. Prescott, et al*, 14-cv-00057 (E.D.N.Y. 2014).

1481.   By way of further example but not limitation, a numerous fraudulent referrals for the Fraudulent Services, resulting in claims submitted by the Surgicore ASCs to Plaintiff, were issued from No-Fault Clinics including but not limited to those located at 2598 Third Avenue, Bronx, NY 10454; 4226A Third Avenue, Bronx, NY 10457; 900 B East Tremont Avenue, Bronx, New York 10460; and 3703 92nd Street, Jackson Heights, NY 11372, at which Colin Clarke MD (not named as a defendant herein) purportedly treated Covered Persons.

1482.   Clarke has been sued multiple times for allegedly engaging in various multimillion-dollar fraud schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, in actions that remain pending or that ultimately settled. *See, e.g., Gov't Emp. Ins. Co., et al. v. Clarke, M.D., et, al*, 23-cv-04605 (E.D.N.Y. 2023); *Allstate Ins. Co. v. Rose, Sr. et al.*, 22-cv-00279 (E.D.N.Y. 2022); *Gov't Emp. Ins. Co., et al. v. Exon Medical Equipment, Inc., et, al*, 20-cv-02457 (E.D.N.Y. 2020); *Allstate Ins. Co., et al. v. Halima, M.D.*, 06-cv-01316 (E.D.N.Y. 2006).

1483.   By way of further example but not limitation, a numerous fraudulent referrals for the Fraudulent Services, resulting in claims submitted by the Surgicore ASCs to Plaintiff, were also issued from No-fault Clinics located at 10408 Roosevelt Avenue, Corona, NY 11368; and 10704 Jamaica Avenue, Jamaica, NY 11418, the locations of a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant through fraudulently incorporated healthcare practices pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements, and the subject of numerous RICO actions that ultimately settled. *See, e.g. State Farm Ins. Co. v. Corona Medical Plaza, P.C.,* 17-cv-258 (FB)(VMS) (E.D.N.Y. 2017); *Allstate Ins. Co. v. Avellini,* 21-cv-4951 (BMC) (E.D.N.Y. 2021).

1484.	Notwithstanding that legitimate treatment plans for patients with non-specific neck and back pain, such as was reported by Covered Persons during their emergency room visits, and/or upon the Covered Persons' first appearance at the No-Fault Clinics, may be limited to rest, over-the-counter pain medications, and application of heat or cold packs, or involve no treatment at all, Covered Persons purportedly treated at the No-Fault Clinics were routinely assessed similar general diagnoses and subjected to similar pre-determined treatments irrespective of medical necessity.

1485.	On information and belief, the protocols of treatment in operation at the No-Fault Clinics failed to take into account the needs of any particular Covered Person, and rarely, if ever, varied based upon a Covered Person's age, medical history, circumstances of alleged accident, physical condition, symptoms, prior treatment or severity or location of alleged injury and/or the treatment provided was medically unnecessary, improperly performed, and/or was of diagnostic and/or treatment value.

1486.	Rather than taking into account the needs of individual Covered Persons, the No-fault Clinic implemented and/or participated in a fraudulent treatment apparatus through which they, as a matter of pattern, practice and protocol, provided Covered Persons with, and billed American Transit for, among other things, initial and follow-up examinations, chiropractic, physical therapy, diagnostic imaging, electrodiagnostic testing, and durable medical equipment.

1487.	Exhibit "1" in the Compendium of exhibits contains a representative sample of claims demonstrating the near uniformity of reported diagnoses, No-Fault Clinic treatments, pain management procedures, and surgeries purportedly performed on Covered Persons referred to the Surgicore ASCs to undergo the Fraudulent Services.

1488.  In furtherance of the scheme to defraud alleged herein, Covered Persons, who during the course of receiving a battery of reoccurring modalities consisting of chiropractic, physical therapy, acupuncture treatments, as well as various other diagnostic services pursuant to a predetermined fraudulent protocol at a No-Fault Clinic, would ultimately be referred for surgeries and/or pain management procedures at one or more of the Defendant Surgicore ASCs.

1489.  Indicative that the Fraudulent Services were provided at the Surgicore ASCs, if at all, pursuant to the illegal kickback and/or self-referral scheme alleged herein and pursuant to a predetermined treatment protocol irrespective of medical necessity, let alone the safety of the Covered Persons, the vast majority of Covered Persons were involved in minor impact (if any) automobile collisions in which they reported suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require emergent transportation by paramedics to a hospital for emergent care immediately following the purported collision.

1490.  In many instances, following the purported collision, Covered Persons did not seek emergency medical attention. By way of example and without limitation:

- Despite purportedly being involved in an automobile collision involving a minor impact on November 7, 2022, Covered Person C.V., claim number 1121406-01, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting November 8, 2022, C.V. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 11 East Hawthorne Avenue, 3rd Street, Valley Stream, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Sanford R. Wert, MD (not named as a defendant herein) through Sanford R. Wert, MD PC (not named as a defendant herein) on April 24, 2023, at defendant All City ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on November 7, 2022, Covered Person K.S., claim number 1121738-02, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting the next day, K.S. underwent a predetermined course of evaluations and purported treatment at a No-fault

Clinic located at 119-60 Metropolitan Avenue, Kew Gardens, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Defendant Ackerman through Compassion Medical Care PLLC (not named as a defendant herein) on January 26, 2023, at Defendant Rockaways ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on May 6, 2022, Covered Person S.Y., claim number 1113673-01, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting May 7, 2022, S.Y. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 29-36 Union Street, Flushing, NY, and was ultimately referred for pain management injections purportedly performed by David R. Adin, DO (not named as a defendant herein) on June 27, 2022, and for an arthroscopic knee surgery purportedly performed by Daniel Feghhi, MD (not named as a defendant herein), all through New York Spine & Pain Care PC (not named as a defendant herein), at Defendant Rockland and Bergen ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on February 6, 2022, Covered Person C.Z., claim number 1109439-02, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting February 10, 2022, C.Z. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 3227 East Tremont Avenue, Bronx, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by David R. Capiola, MD (not named as a defendant herein) through Defendant McCulloch Orthopaedic, on March 29, 2023, at Defendant New Horizon ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on December 20, 2021, Covered Person J.C.R., claim number 1107122-01, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting December 27, 2021, J.C.R. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 86-01 101 Avenue, Ozone Park, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by William M. King, MD (not named as a defendant herein) on January 21, 2022, at Defendant Rockaways ASC.

- Despite purportedly being involved in an automobile collision on August 2, 2021, Covered Person J.L., claim number 1101534-08, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room.

Nonetheless, starting August 10, 2021, J.L. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 552 East 180th Street, Bronx, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Defendant Haar through Defendant Haar Orthopaedics, on October 5, 2021, at Defendant New Horizon ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on August 1, 2021, Covered Person M.P., claim number 1100952-01, refused medical attention to scene of the reported incident, and subsequently did not seek medical attention at an emergency room. Nonetheless, starting August 2, 2021, M.P. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 86-01 101 Avenue, Ozone Park, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by William L. King, MD (not named as a defendant herein) on October 9, 2021, at Defendant North Queens ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on April 20, 2021, Covered Person S.L., claim number 1096921-01, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting April 23, 2024, S.L. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 154-08 Northern Boulevard, Jamaica, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Neofitos Stefanides, MD (not named as a defendant herein) through Neofitos Stefanides, MD PC (not named as a defendant herein) on July 22, 2021, at Defendant All City ASC, and pain management injections purportedly performed by Michael Ko, MD (not named as a defendant herein) through Pain Physicians NY, PLLC (not named as a defendant herein) on September 10, 2021, and October 22, 2021, at Defendant North Queens ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on January 15, 2021, Covered Person F.J., claim number 1093897-01, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting February 8, 2021, F.J. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 217-04 Northern Boulevard, Bayside, NY, and was ultimately referred for a percutaneous discectomy purportedly performed by Elbaz Tamer, MD (not named as a defendant herein) through Pain Physicians NY PLLC (not named as a defendant herein) at Defendant Jersey City ASC, as well as, an arthroscopic right knee surgery on April 25, 2023, an arthroscopic left knee surgery on May 16, 2023, and an arthroscopic

shoulder surgery on August 29, 2023, all three purported performed by Defendant McMahon, at Defendant Fifth Avenue Surgery Center.

- Despite purportedly being involved in an automobile collision involving a minor impact on November 11, 2020, Covered Person B.M., claim number 1091218-02, refused medical attention to scene of the reported incident, and subsequently did not seek medical attention at an emergency room. Nonetheless, starting December 2, 2020, B.M. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 188 Montague Street, Brooklyn, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Defendant Seldes, through Defendant Passaic Orthopedic, on March 29, 2021, at Defendant New Horizon ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on August 31, 2020, Covered Person C.P., claim number 1087807-02, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting September 1, 2020, C.P. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 51-27 Queens Boulevard, Woodside, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Laxmidhar Diwan, MD (not named as a defendant herein) through Queens Arthroscopy & Sports Medicine (not named as a defendant herein) on November 9, 2020, at Defendant Jersey City ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on July 17, 2020, Covered Person C.C., claim number 1086270-03, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting July 28, 2020, C.C. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2510 Westchester Avenue, Bronx, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Mark Kramer, MD (not named as a defendant herein) through Cohen & Kramer, MD PC (not named as a defendant herein) on October 8, 2020, at defendant Empire State ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on June 24, 2020, Covered Person S.B., claim number 1085949-02, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting July 6, 2020, S.B. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 279 Burnside Avenue, Lawrence, NY, and was ultimately referred for arthroscopic knee surgery purportedly performed by Hank Ross, MD (not named as a defendant herein) through Hank Ross MD PC

(not named as a defendant herein) on December 14, 2020, at Defendant North Queens ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on June 16, 2020, Covered Person T.T., claim number 1085337-04, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, following a week of initial treatment from June 22, 2024 through July 1, 2024, at a No-fault clinic located at 55 East 115th Street, New York, NY, on July 8, 2024, T.T. ultimately presented for evaluation and an extended predetermined course of purported treatment at a No-fault Clinic located at 1894 Eastchester Road, Bronx, NY 10461, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Defendant Graziosa through Defendant Graziosa PC on February 9, 2021, at Defendant Empire State ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on May 23, 2020, Covered Person A.M., claim number 1084559-02, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting June 4, 2020, A.M. underwent a predetermined course of evaluations and purported treatment at a fraudulently incorporated No-fault Clinic located at 145 East 98 Street, Brooklyn, NY, in which Bradley Pierre, a layperson who is not licensed to practice any healthcare profession and was its true owner was recently convicted in the United State District Court for the Southern District of New York on health insurance fraud related charges, and was ultimately referred for pain management injections purportedly performed by Defendant Vora, at Defendant Rockland and Bergen ASC on July 25, 2020, and at Defendant North Queens ASC on August 18, 2020 and September 22, 2020.

- Despite purportedly being involved in an automobile collision involving a minor impact on May 11, 2020, Covered Person A.L., claim number 1084119-02, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting May 15, 2020, A.L. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 4720 Avenue N, Brooklyn, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Harvey Manes, MD (not named as a defendant herein) through Harvey Manes MD PC (not named as a defendant herein) on July 22, 2020, at Defendant North Queens ASC.

- Despite purportedly being involved in an automobile collision on January 16, 2020, Covered Person S.A., claim number 1078121-01, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room.

Nonetheless, starting January 21, 2020, S.A. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 1314 Coney Island Avenue, Brooklyn, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Defendant Upendra Sinha through Defendant Sinha Orthopedics on May 30, 2020, at Defendant Saddlebrook ASC, and subsequently for an arthroscopic shoulder surgery also purportedly performed by Defendant Upendra Sinha, through Defendant MSJR on October 23, 2020, at Defendant Fifth Avenue Surgery Center.

- Despite purportedly being involved in an automobile collision involving a minor impact on January 6, 2020, Covered Person F.N., claim number 1076407-02, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting January 27, 2020, F.N. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 1115 Ocean Parkway, Brooklyn, NY, and was ultimately referred for an arthroscopic knee surgery on February 25, 2020, and an arthroscopic shoulder surgery on September 25, 2020, both purported performed Defendant McMahon at Defendant Fifth Avenue Surgery Center.

- Despite purportedly being involved in an automobile collision involving a minor impact on August 23, 2019, Covered Person E.G., claim number 1067733-01, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting September 12, 2010, E.G. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 82-25 Queens Boulevard, Elmhurst, NY, and was ultimately referred for manipulation of the spine under anesthesia, purportedly performed by Defendant Jimenez, through City Pain Docs PC (not named as a defendant herein) on October 23, 2019 and October 27, 2019, at Defendant Manalapan ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on August 19, 2019, Covered Person N.C., claim number 1066106-01, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting August 29, 2019, N.C. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 68-60 Austin Street, Forest Hills, NY, and was ultimately referred for pain management injections purportedly provided by Defendant Vora through Defendant Non-Surgical Orthopedics on November 23, 2019, at defendant Saddlebrook ASC, a percutaneous discectomy purportedly performed by Defendant Vora through Defendant NJ Vora on January 4, 2020 at Defendant Saddlebrook ASC, pain management injections purportedly performed by Michael R. Jurkowich, MD (not named as a

defendant herein) through Defendant NJ Vora on February 29, 2020 at Defendant Saddlebrook ASC, and pain management injections purportedly performed by Defendant Vora. through Defendant NJ Vora on March 14, 2020, at Defendant New Horizon ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on May 26, 2019, Covered Person M.M., claim number 1061412-02, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting May 30, 2019, M.M. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2940 Grand Concourse, Bronx, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Aron D. Rovner, MD (not named as a defendant herein) through Aron Rovner M.D., PLLC (not named as a defendant herein) on September 19, 2019, at Defendant Rockaways ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on December 17, 2018, Covered Person A.G., claim number 1049176-03, was neither transported to the emergency room from the scene of the reported incident, nor subsequently sought medical attention at an emergency room. Nonetheless, starting that same day, A.G. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 3432 East Tremont Avenue, Bronx, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Defendant Berkowitz through Defendant Advanced Orthopaedics on January 18, 2023, at Defendant Jersey City ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on September 29, 2018, Covered Person J.R., claim number 1039993-03, refused medical attention to scene of the reported incident, and subsequently did not seek medical attention at an emergency room. Nonetheless, starting October 3, 2018, J.R. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 82-25 Queens Boulevard, Elmhurst, NY, and was ultimately referred for manipulation of the spine under anesthesia, purportedly performed by Moore Harris, DC (not named as a defendant herein on December 2, 2018, by Diana Vavikova, DC (not named a Defendant in the Complaint) on December 8, 2018, and by Anthony Riotto, DC (not named as a defendant herein) on December 16, 2019, all through Sufficient Chiropractic Care PC (not named as a defendant herein), at Defendant Manalapan ASC.

- Despite purportedly being involved in an automobile collision involving a minor impact on July 3, 2018, Covered Person G.Z., claim number 1032903-03, refused medical attention to scene of the reported incident, and subsequently did not seek medical attention at an emergency room. Nonetheless, starting July 17, 2018, G.Z. underwent a predetermined course

of evaluations and purported treatment at a No-fault Clinic located at 80-12 Jamaica Avenue, Woodhaven, NY, and was ultimately referred for pain management injections on August 16, 2018, a cervical percutaneous discectomy on November 1, 2018, and a lumbar percutaneous discectomy, on November 29, 2018, all purportedly performed by Defendant Xie through Defendant Integrated Pain Management at Defendant Manalapan ASC.

1491. Fraudulent No-Fault claims submitted in connection with the Covered Persons mentioned in Paragraph 1490 are identified in the Appendix to the Complaint which sets forth a representative sample of fraudulent No-Fault claims mailed by the Defendants to Plaintiff, that were if at all, pursuant to the fraudulent protocol of treatment described herein, in violation of state licensing requirements, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the No-fault Law to maximize the charges they could submit to Plaintiff.

1492. By way of further example and without limitation, attached as Exhibit "6," in the accompanying Compendium of Exhibits, is a spreadsheet listing a representative sample of Covered Persons who, following a predetermined fraudulent protocol of medically unnecessary services at a No-Fault Clinic, did not seek emergency medical attention on the day of or shortly following their involvement in a minor impact automobile collision who ultimately received one or more of the identified Fraudulent Services at one or more of the Surgicore ASCs.

1493. In addition to the numerous Covered Persons receiving one or more of the Fraudulent Services at one or more of the Surgicore ASCs following reportedly being involved in low-impact automobile collisions in which they received no emergent care, the vast majority of Covered Persons who did report to a hospital following such a collision, with complaints of what can best be described as soft tissue injuries were discharged within a few hours without any objective finding of serious injury. By way of example and without limitation:

- Following their purported involvement in an automobile collision on March 30, 2023, Covered Person H.L., claim number 1127969-02 was taken from the scene of the reported incident to the emergency room at Maimonides Medical Center (not named as a defendant herein) on March 30, 2023, and discharged the same day without any objective finding of serious injury. Nonetheless, starting April 3, 2023, H.L. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 5314 7th Avenue, Brooklyn, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Milan K. Sen, MD (not named as a defendant herein) through Leviathan Wellness PLLC (not named as a defendant herein) on June 6, 2023, at Defendant Empire State ASC.

- Following their purported involvement in an automobile collision involving a minor impact on March 3, 2023, Covered Person J.P, claim number 1127839-02 went on their own to the emergency room at Bellevue Hospital (not named as a defendant herein) on March 3, 2023, and discharged the same day without any objective finding of serious injury. Nonetheless, starting March 9, 2023, J.P. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 12 West 32 Street, New York, NY, and was ultimately referred for pain management injections on May 27, 2023, and a cervical percutaneous discectomy on October 7, 2023, at Defendant Manalapan ASC and for pain management injections on July 15, 2023 and September 16, 2023 at Defendant Saddlebrook ASC, all purportedly performed by Defendant Xie through Defendant Integrated Pain Management.

- Following their purported involvement in an automobile collision involving a minor impact on January 4, 2023, Covered Person A.P., claim number 1124202-01 was taken from the scene of the reported incident to the emergency room at Elmhurst Hospital (not named as a defendant herein) on January 4, 2023, and discharged within a few hours without any objective finding of serious injury. Nonetheless, starting January 6, 2023, A.P. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 193-02 Northern Boulevard, Flushing, NY, and was ultimately referred for pain management injections purportedly performed by Jignyasa Desai, DO (not named as a defendant herein) through NY Interventional Pain PLLC (not named as a defendant herein) on February 25, 2023, at Defendant New Horizon ASC, and for an arthroscopic knee surgery purportedly performed by Peter A. Tomasello, DO (not named as a defendant herein) through Cross Bay Orthopedic Surgery P.C. (not named as a defendant herein) on April 17, 2023, at Defendant Fifth Avenue Surgery Center.

- Following their purported involvement in an automobile collision involving a minor impact on November 16, 2022, Covered Person C.S., claim number 1121836-02 was taken from the scene of the reported incident to the emergency room at NYU Langone Hospital Long Island (not named as a

defendant herein), and discharged the same day without any objective finding of serious injury. Nonetheless, starting November 30, 2022, C.S. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 600 Hempstead Turnpike, West Hempstead, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Peter A. Tomasello, DO (not named as a defendant herein) through Cross Bay Orthopedic Surgery P.C. (not named as a defendant herein) on January 28, 2023, at Defendant Fifth Avenue Surgery Center.

- Following their purported involvement in an automobile collision involving a minor impact on May 13, 2022, Covered Person H.A., claim number 1113717-04, was taken from the scene of the reported incident to the emergency room at Montefiore Medical Center (not named as a defendant herein), and discharged the same day without any objective finding of serious injury. Nonetheless, starting May 18, 2022, H.A. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 12 East 44 Street, 6th Fl, New York, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Peter A. Tomasello, DO (not named as a defendant herein) through Cross Bay Orthopedic Surgery P.C. (not named as a defendant herein) on January 25, 2023, at Defendant Fifth Avenue Surgery Center.

- Following their purported involvement in an automobile collision involving a minor impact on April 16, 2022, Covered Person I.L., claim number 1112746-02 was taken from the scene of the reported incident to the emergency room at St. Barnabas Hospital (not named as a defendant herein), and discharged within a few hours without any objective finding of serious injury. Nonetheless, starting May 10, 2022, I.I. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 3815 Putnam Avenue, Bronx, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Defendant Baum through Defendant Bay Ridge PC on September 16, 2022, at Defendant Empire State ASC.

- Following their purported involvement in an automobile collision involving a minor impact on March 9, 2022, Covered Person N.H., claim number 1110280-01 was taken from the scene of the reported incident to the emergency room at Elmhurst Hospital (not named as a defendant herein), and discharged the same day without any objective finding of serious injury. Nonetheless, starting March 10, 2022, N.H. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 41-09 108th Street, Corona, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Ajoy Sinha, MD through Defendant Sinha Orthopaedics on June 13, 2022 at Defendant Saddlebrook ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 1, 2021, Covered Person D.R., claim number 1105880-02 went on their own to the emergency room at Flushing Hospital Medical Center (not named as a defendant herein) on November 1, 2021, and discharged the same day without for any objective finding of serious injury. Nonetheless, starting November 11, 2021, D.R. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 95-20 Queens Boulevard, Rego Park, NY, and was ultimately referred for an arthroscopic surgery of the right knee on February 2, 2022, at Defendant Jersey City ASC, and both an arthroscopic shoulder surgery on March 15, 2022, and an arthroscopic surgery on the left knee on April 19, 2022, at Defendant Manalapan ASC, all purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics.

- Following their purported involvement in an automobile collision involving a minor impact on October 3, 2021, Covered Person R.R., claim number 1103438-02 was taken from the scene of the reported incident to the emergency room at Jamaica Hospital (not named as a defendant herein), and discharged without any objective finding of serious injury. Nonetheless, starting October 7, 2021, R.R. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 86-01 101 Avenue, Ozone Park, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Defendant Berkowitz through Defendant Advanced Orthopaedics on November 16, 2021, at Defendant Manalapan ASC.

- Following their purported involvement in an automobile collision involving a minor impact on March 7, 2021, Covered Person K.F., claim number 1096069-02 went on their own to the emergency room at Brooklyn Hospital, and discharged the same day without any objective finding of serious injury. Nonetheless, starting March 19, 2021, K.F. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 865 Cypress Avenue, Ridgewood, NY, and was ultimately referred for pain management injections purportedly performed by Jared Rosenberg, MD (not named as a defendant herein) through Multi-specialty Pain Management PC (not named as a defendant herein) on November 15, 2021, at Defendant Fifth Avenue Surgery Center, and for a shoulder arthroscopy purportedly performed by Daniel Yoo MD (not named as a defendant herein) through Advanced Shoulder Knee Orthopedic PC (not named as a defendant herein) on January 27, 2023, at Rockland and Bergen ASC.

- Following their purported involvement in an automobile collision involving a minor impact on December 11, 2020, Covered Person K.D., claim number 1091911-03 was taken from the scene of the reported incident to the emergency room at Ji Medical Center (not named as a defendant herein), and discharged the same day without any objective finding of serious injury.

Nonetheless, starting December 14, 2020, K.D. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 3350 White Plains Road, Bronx, NY, and was ultimately referred for an arthroscopic surgery of the left knee on March 8, 2021, and an arthroscopic surgery of the right knee on December 20, 2021, both purportedly performed by John A. Mitamura, MD (not named as a defendant herein), at Defendant Rockland and Bergen ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 11, 2020, Covered Person A.P., claim number 1092375-02 was taken from the scene of the reported incident to the emergency room at St. Barnabas Hospital (not named as a defendant herein), on November 11, 2020, and discharged the same day without any objective finding of serious injury. Nonetheless, starting December 4, 2020, A.P. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 1320 Louis Nine Boulevard, Bronx, NY, and was ultimately referred for pain management injections on April 2, 2021, a percutaneous discectomy on April 23, 2021, and further pain management injections on March 11, 2022, and July 29, 2022, all purportedly performed by Elbaz Tamer, MD (not named as a defendant herein) through Pain Physicians NY, PLLC (not named as a defendant herein), at Defendant Jersey City ASC.

- Following their purported involvement in an automobile collision involving a minor impact on October 29, 2020, Covered Person T.M., claim number 1090230-02 was taken from the scene of the reported incident to the emergency room at Montefiore Medical Center (not named as a defendant herein), and discharged the same day without any objective finding of serious injury. Nonetheless, starting November 6, 2020, T.M. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2488 Grand Concourse, Bronx, NY, and was ultimately referred for trigger point injections purportedly performed by Timothy J. Canty, MD (not named as a defendant herein) through Tim Canty MD PLLC (not named as a defendant herein) on May 5, 2021 and May 27, 2021, at Defendant Empire State ASC.

- Following their purported involvement in an automobile collision involving a minor impact on October 16, 2020, Covered Person C.L., claim number 1090085-01 was taken from the scene of the reported incident to the emergency room at Jamaica Hospital (not named as a defendant herein), and discharged within a few hours without any objective finding of serious injury. Nonetheless, starting November 25, 2020, C.L. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 144 East 98 Street, Brooklyn, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Laxmidhar Diwan, MD (not named as a defendant herein) through Queens

Arthroscopy & Sports Medicine (not named as a defendant herein) on February 3, 2021, at Defendant Rockaways ASC.

- Following their purported involvement in an automobile collision involving a minor impact on August 30, 2020, Covered Person E.A., claim number 1088186-03 went on their own to the emergency room at Coney Island Hospital (not named as a defendant herein) on August 30, 2020, and discharged the same day without any objective finding of serious injury. Nonetheless, starting September 3, 2020, E.A. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 3003 Ocean Parkway, Brooklyn, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Harvey Manes, MD (not named as a defendant herein) through Harvey Manes MD PC (not named as a defendant herein) on March 24, 2021, at Defendant North Queens ASC.

- Following their purported involvement in an automobile collision involving a minor impact on July 30, 2020, Covered Person M.L., claim number 1087394-01 went on their own to the emergency room at North Shore LIJ Hospital (not named as a defendant herein) on July 30, 2020, and discharged the same day without any objective finding of serious injury. Nonetheless, starting July 31, 2020, M.L. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 175 Fulton Avenue, Hempstead, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Peter A. Tomasello, DO (not named as a defendant herein) through Cross Bay Orthopedic Surgery P.C. (not named as a defendant herein) on January 23, 2021, at Defendant Fifth Avenue Surgery Center.

- Following their purported involvement in an automobile collision involving a minor impact on July 28, 2020, Covered Person D.C., claim number 1087056-02 was taken from the scene of the reported incident to the emergency room at Coney Island Hospital (not named as a defendant herein) on July 28, 2020, and discharged the same day without any objective finding of serious injury. Nonetheless, starting August 4, 2020, D.C. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 611 East 76th Street, Brooklyn, NY, and was ultimately referred for manipulations of the spine, hip, and shoulder under anesthesia purportedly performed by Dominic E Onyema, MD (not named as a defendant herein) through Healthwise Medical Associates PC (not named as a defendant herein) on September 9, 2020, September 10, 2020, and September 22, 2020, at Defendant All City ASC.

- Following their purported involvement in an automobile collision involving a minor impact on June 4, 2020, Covered Person M.I.S., claim number 1084811-01 presented to the emergency room at Coney Island Hospital (not named as a defendant herein), and discharged the same day without any

objective finding of serious injury. Nonetheless, starting June 12, 2020, M.I.S. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 3857 Kings Highway, Brooklyn, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Sean Thompson, MD (not named as a defendant herein) through Thompson Medical PC (not named as a defendant herein) on January 8, 2021, at Defendant Rockland and Bergen ASC.

- Following their purported involvement in an automobile collision involving a minor impact on May 19, 2020, Covered Person A.S.C., claim number 1084567-04 went on their own to the emergency room at New York Presbyterian-Lawrence Hospital (not named as a defendant herein), and discharged the same day without any objective finding of serious injury. Nonetheless, starting June 8, 2020, A.S.C. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2273 65th Street, Brooklyn, NY, and was ultimately referred for manipulation of the spine, shoulder, hip, and knee under anesthesia purportedly performed by Abdalla Adam, MD (not named as a defendant herein) on July 19, 2020, August 8, 2020, and August 9, 2020, at Defendant Rockaways ASC.

- Following their purported involvement in an automobile collision involving a minor impact on January 7, 2020, Covered Person M.C., claim number 1078217-01 was taken from the scene of the reported incident to the emergency room at St. Barnabas Hospital (not named as a defendant herein) on January 7, 2020, and discharged the same day without any objective finding of serious injury. Nonetheless, starting January 13, 2020, M.C. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2488 Grand Concourse, Bronx, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Defendant Dassa through Defendant Dassa Orthopedic, on December 2, 2020, at Defendant New Horizon ASC.

- Following their purported involvement in an automobile collision involving a minor impact on October 31, 2019, Covered Person K.M., claim number 1074190-05 was taken from the scene of the reported incident to the emergency room at Kings County Hospital (not named as a defendant herein), and discharged the same day without any objective finding of serious injury. Nonetheless, starting December 3, 2019, K.M. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 1765 Broadway, Brooklyn, NY, and was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Defendant Bursztyn through Defendant NYSJ on January 19, 2019, at Defendant Saddlebrook ASC.

- Following their purported involvement in an automobile collision involving a minor impact on September 22, 2019, Covered Person J.E., claim number

1069497-02 was taken from the scene of the reported incident to the emergency room at Bellevue Hospital Center (not named as a defendant herein), and discharged the same day without any objective finding of serious injury. Nonetheless, starting October 1, 2019, J.E. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 84 Linden Boulevard, Brooklyn, NY, and was ultimately referred for pain management injections purportedly performed by Defendant Shabtian through Defendant Total Anesthesia on January 28, 2020, February 17, 2020, February 24, 2020, and March 6, 2020, at Defendant North Queens ASC.

- Following their purported involvement in an automobile collision involving a minor impact on February 14, 2019, Covered Person T.M.D.A., claim number 1052644-02 was taken from the scene of the reported incident to the emergency room at St. Barnabas Hospital (not named as a defendant herein) on February 14, 2019, and discharged the same day without any objective finding of serious injury. Nonetheless, starting March 6, 2019, T.M.D.A. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2386 Jerome Avenue, Bronx, NY, and was ultimately referred for manipulation of the spine and shoulder under anesthesia, purportedly performed by Rytis Valskys, MD (not named as a defendant herein) through Amazing Anesthesia (not named as a defendant herein) on July 22, 2019, July 24, 2019, and July 26, 2019, at Defendant Jersey City ASC.

- Following their purported involvement in an automobile collision involving a minor impact on January 29, 2019, Covered Person L.K., claim number 1051117-02 was taken from the scene of the reported incident to the emergency room at Jamaica Hospital Medical Center (not named as a defendant herein) on January 29, 2019, and discharged the same day without any objective finding of serious injury. Nonetheless, starting February 4, 2019, L.K. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 1220 East New York Avenue, Brooklyn, NY, and was ultimately referred for an arthroscopic knee surgery purportedly performed by Defendant McCulloch through Defendant McCulloch Orthopaedic on January 9, 2020, at Defendant New Horizon ASC.

- Following their purported involvement in an automobile collision involving a minor impact on February 12, 2018, Covered Person R.W., claim number 1019827-02 refused medical attention at the reported incident and subsequently went on their own to the emergency room at Brookdale Hospital (not named as a defendant herein) on February 13, 2018, and discharged the same day without any objective finding of serious injury. Nonetheless, starting February 19, 2018, R.W. underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 10510 Flatlands Avenue, Brooklyn, NY, and was ultimately referred for

arthroscopic wrist surgery purportedly performed by Defendant Apazidis on September 20, 2019, at Defendant All City ASC.

1494.   Fraudulent No-Fault claims submitted in connection with the Covered Persons mentioned in Paragraph 1493 are identified in the Appendix to the Complaint which sets forth a representative sample of fraudulent No-Fault claims mailed by the Defendants to Plaintiff, that were if at all, pursuant to the fraudulent protocol of treatment described herein, in violation of state licensing requirements, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the No-Fault Law to maximize the charges that they could submit to Plaintiff.

1495.   By way of further example and without limitation, attached as Exhibit "7," in the accompanying Compendium of Exhibits, is a spreadsheet listing a representative sample of Covered Persons who, following a predetermined fraudulent protocol of medically unnecessary services at a No-Fault Clinic, presented at hospital emergency rooms on the day of or shortly following their involvement in a minor impact automobile collision, yet despite no objective proof of any serious injuries demonstrated at the emergency rooms, ultimately received one or more of the identified Fraudulent Services at one or more of the Surgicore ASCs.

1496.   Among the numerous Covered Persons who sought to document their subjective complaints of pain at an emergency room on the day of or shortly following their involvement in a minor impact automobile collision, despite the absence of any objective evidence of serious injury, on numerous occasions, numerous Covered Persons receiving one or more of the Fraudulent Services at one or more of the Surgicore ASCs, received such services on parts of their body for which they did not complain of any injury during their emergency room visit. By way of example and not limitation:

- Following their purported involvement in an automobile collision involving a minor impact on September 1, 2022, Covered Person D.R., claim number

118679-02, was taken from the scene of the reported incident to the emergency room at Mount Sinai Beth Israel Hospital (not named as a defendant herein) on September 1, 2022, where D.R. complained of *left* neck, *lower* back, *left* wrist, and *left* thigh pain. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 265 Madison Avenue, 4th Floor, New York, NY, D.R. was ultimately referred for an arthroscopic surgery on the *right* knee purportedly performed by Defendant McCulloch, through Defendant McCulloch Orthopaedic, on July 27, 2023, at Defendant New Horizon ASC.

- Following their purported involvement in an automobile collision involving a minor impact on May 20, 2022, Covered Person E.R., claim number 1113727-03, was taken from the scene of the reported incident to the emergency room at Ji Medical Center (not named as a defendant herein) on May 20, 2022, where E.R. complained of neck pain but denied pain in the extremities. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2510 Westchester Avenue, Bronx, NY, E.R. was ultimately referred for an arthroscopic knee surgery purportedly performed by Mark M. Kramer, MD (not named as a defendant herein), on September 19, 2022, at Defendant All City ASC.

- Following their purported involvement in an automobile collision involving a minor impact on February 17, 2022, Covered Person J.T., claim number 1110111-03, was taken from the scene of the reported incident to the emergency room at Jamaica Hospital Medical Center (not named as a defendant herein) on February 17, 2022, where J.T. complained of lower back pain and spasms, but no injury to the extremities. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 137-42 Guy R Brewer Boulevard, Jamaica, NY, J.T. was ultimately referred for arthroscopic knee surgery purportedly performed by Azriel Benaroya, MD (not named as a defendant herein), through Anarefena Medical PLLC (not named as a defendant herein), on January 7, 2023, at Defendant North Queens ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 21, 2021, Covered Person K.H., claim number 1105697-02, was taken from the scene of the reported incident to the emergency room at Montefiore Medical Center (not named as a defendant herein) on November 21, 2021, where K.H. complained of head, neck, and thoracic back pain, but no injuries in the extremities. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 552 East 180 Street, Bronx, NY, K.H. was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Ronald A. Daly, MD (not named as a defendant herein), on February 26, 2020, at Defendant Jersey City ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 19, 2021, Covered Person E.P., claim number 1105751-01, went on his own to the emergency room at Jamaica Hospital Medical Center (not named as a defendant herein) on November 20, 2020, where E.P. complained of lower back pain and pain in the torso, but denied all other injuries. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 86-01 101 Avenue, Ozone Park, NY, E.P. was ultimately referred for an arthroscopic shoulder purportedly performed by William King, MD (not named as a defendant herein), through William L. King, MD, PC (not named as a defendant herein), on January 30, 2022, at Defendant All City ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 8, 2021, Covered Person J.A., claim number 1105535-01, was taken from the scene of the reported incident to the emergency room at NYU Langone Hospital (not named as a defendant herein) on November 8, 2021, where J.A. complained of chest pain, back pain and left leg pain, but did not complaint of pain in either shoulder. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 69-37 Myrtle Avenue, Glendale, NY, A.Q. was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Defendant Graziosa, through Defendant Graziosa PC, on January 25, 2020, at Defendant Empire State ASC.

- Following their purported involvement in an automobile collision involving a minor impact on March 11, 2021, Covered Person P.A., claim number 1095162-03, P.A. went on her own to the emergency room at Montefiore Medical Center (not named as a defendant herein) on March 11, 2021, where P.A. complained of head and neck pain but did not complain about either shoulder. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 599-601 Southern Boulevard, Bronx, NY, P.A. was ultimately referred for an arthroscopic shoulder surgery purportedly performed by William L. King, MD (not named as a defendant herein), through William L. King, MD, PC (not named as a defendant herein), on March 28, 2022, at Defendant Fifth Avenue Surgery Center.

- Following their purported involvement in an automobile collision involving a minor impact on February 4. 2021, Covered Person S.T., claim number 1094531-02, went to the emergency room at Montefiore Mount Vernon Hospital (not named as a defendant herein) on February 4. 2021, where S.T. complained of a headache and back pain, but no injuries to the extremities. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 704 Locust Street, Mount Vernon, NY, S.T. was ultimately referred for an arthroscopic knee surgery purportedly performed by Edward Feliciano, MD (not named as a defendant

herein), through Newburgh Primary Care, PC. (not named as a defendant herein), on May 26, 2022, at Defendant Rockland and Bergen ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 11, 2020, Covered Person A.Q., claim number 1091406-01, was taken from the scene of the reported incident to the emergency room at New York Presbyterian Hospital (not named as a defendant herein) on November 11, 2020, where A.Q. complained of chest and back pain, but no injuries in the extremities. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 69-37 Myrtle Avenue, Glendale, NY, A.Q. was ultimately referred for an arthroscopic knee surgery purportedly performed by Defendant Graziosa, through Defendant Graziosa PC, on April 6, 2021, at Defendant Rockaways ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 3, 2020, Covered Person K.R., claim number 1091174-02, was taken from the scene of the reported incident to the emergency room at Mount Sinai West (not named as a defendant herein) on November 3, 2020, where K.R. complained of neck and upper back pain but no injury to the extremities. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 27-51 27 Street, Astoria, NY, K.R. was ultimately referred for bilateral arthroscopic shoulder surgeries, purportedly performed at Defendant All City ASC on April 13, 2021 and May 18, 2021, and bilateral knee surgeries, purportedly performed by Defendant Berkowitz, on February 3, 2021 and February 24, 2021, at Defendant Jersey City ASC.

- Following their purported involvement in an automobile collision involving a minor impact on September 21, 2020, Covered Person A.J., claim number 1088627-03, was taken from the scene of the reported incident to the emergency room at Interfaith Medical Center (not named as a defendant herein) on September 21, 2020, where A.J. complained of neck pain, but no injuries in the extremities. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2132 Ralph Avenue, Brooklyn, NY, A.J. was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, on November 17, 2020, at Defendant Manalapan ASC.

- Following their purported involvement in an automobile collision involving a minor impact on May 20, 2020, Covered Person A.B., claim number 1084296-01, was taken from the scene of the reported incident to the emergency room at Bronx Care Hospital Center (not named as a defendant herein) on May 20, 2020, where A.B. complained of neck and back pain, but no pain in the arms or legs. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 1963

Grand Concourse, Bronx, NY, A.B. was ultimately referred for an arthroscopic shoulder surgery purportedly performed by Sean Thompson, MD (not named as a defendant herein), through Thompson Medical PC (not named as a defendant herein), on November 23, 2020, at Defendant Rockland and Bergen ASC.

- Following their purported involvement in an automobile collision involving a minor impact on January 13, 2020, Covered Person M.B., claim number 1078077-02, was taken from the scene of the reported incident to the emergency room at North Central Bronx Hospital (not named as a defendant herein) on January 13, 2020, where M.B. complained of back pain, abdominal pain, and later nausea, but no injury to any of her limbs. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 3227 East Tremont Avenue, Bronx, NY, M.B. was ultimately referred for an arthroscopic shoulder surgery purportedly performed by David Capiola, MD (not named as a defendant herein), through Defendant McCulloch Orthopaedic, on June 10, 2020, at Defendant New Horizon ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 25, 2019, Covered Person M.S., claim number 1075080-02, went on their own to the emergency room at Montefiore Medical Center (not named as a defendant herein) on November 25, 2019, where M.S. complained of head pain but denied any other injury. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2386 Jerome Avenue, Bronx, NY, M.S. was ultimately referred for manipulation of the spine and hip joints under anesthesia purportedly performed by Natalia Hershkowitz, MD (not named as a defendant herein), through Professional Medical Care PC (not named as a defendant herein), on March 1, 2020 and March 10, 2020, at Defendant Rockaways ASC.

- Following their purported involvement in an automobile collision involving a minor impact on November 11, 2019, Covered Person E.K., claim number 1074099-04, was taken from the scene of the reported incident to the emergency room at Staten Island University Hospital (not named as a defendant herein) on November 11, 2019, where E.K. complained of an exacerbation of her chronic lower back pain, but no other injuries. Nonetheless, during a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 318 Seguine Avenue, Staten Island, NY, E.K. was ultimately referred for an arthroscopic knee surgeries on both the right and left knees, both purportedly performed by Andrew J. Dowd, MD (not named as a defendant herein), on January 30, 2020, and August 1, 2020, respectively, both at Defendant Fifth Avenue Surgery Center.

1497. Fraudulent No-Fault claims submitted in connection with the Covered Persons mentioned in Paragraph 1496 are identified in the Appendix to the Complaint which sets forth a representative sample of fraudulent No-Fault claims mailed by the Defendants to Plaintiff, that were if at all, pursuant to the fraudulent protocol of treatment described herein, in violation of state licensing requirements, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the No-Fault Law to maximize the charges that they could submit to Plaintiff.

1498. By way of further example and without limitation, attached as Exhibit "8," in the accompanying Compendium of Exhibits, is a spreadsheet listing a representative sample of Covered Persons who, following a predetermined fraudulent protocol of medically unnecessary services at a No-Fault Clinic, presented at hospital emergency rooms on the day of or shortly following their involvement in a minor impact automobile collision, making subjective complaints of pain to certain parts of their body, yet ultimately received one or more of the identified Fraudulent Services at one or more of the Surgicore ASCs on parts of their body not complained of at their emergency room visit.

1499. In addition to the foregoing, based on the findings of biomechanical engineers review of at least 450 reported automobile collisions involving Covered Persons, including the force of the impact, the Covered Persons' positioning in the vehicle, and the loads and mechanisms on the Covered Persons' bodies, to the extent such collisions occurred at all, for vast majority of Covered Persons, the reported injuries were not causally related to the reported incidents. Nevertheless, Covered Persons sought treatment at one or more No-fault Clinics and were referred for one or more of the Fraudulent Services at one or more of the Surgicore ASCs. By way of example but not limitation:

- Following their purported involvement in an automobile collision involving a minor impact on March 30, 2022, Covered Person A.D., claim number 1112486-02, starting April 25, 2022, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 548 Howard Avenue, Brooklyn, NY. As part of the treatment protocol, A.D. was referred for an arthroscopic shoulder surgery, purportedly performed by Defendant Amigud, on May 24, 2022, at Defendant Fifth Avenue Surgery Center, and a percutaneous discectomy, purportedly performed by Defendant Jimenez, through Defendant J Sports, on September 3, 2022, at Defendant Saddlebrook ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's back and shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on March 27, 2022, Covered Person S.R., claim number 1111207-01, starting March 29, 2022, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 615 Seneca Avenue, Ridgewood, NY. As part of the treatment protocol, S.R. was referred for a percutaneous discectomy on July 30, 2022, and pain management injections on both June 28, 2022, and August 9, 2022, purportedly performed by Defendant Vora, through Defendant KDV Medical, at Defendant North Queens ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's spine not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on January 26, 2022, Covered Person A.M., claim number 1109882-02, starting February 3, 2022, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 64 Nagle Avenue, New York, NY. As part of the treatment protocol, A.M. was referred for an arthroscopic shoulder surgery purportedly performed by Aleksandr Khaimov, DO (not named as a defendant herein) through Quality Orthopedics & Complete Joint Care PC (not named as a defendant herein) on April 28, 2022, at Defendant All City ASC, pain management injections on June 18, 2022, July 9, 2022, July 23, 2022, August 6, 2022, October 1, 2022, and October 15, 2022, and percutaneous discectomy on September 17, 2022, purportedly performed by Yvette R. Abraham, MD (not named as a defendant herein), through Trinity Pain Management of Staten Island PLLC (not named as a defendant herein), at Defendant Jersey City ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulders and spine not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on November 25, 2021, Covered Person A.R., claim number 1105961-02, starting November 30, 2021, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 8. As part of the treatment protocol, A.R. was referred for an arthroscopic knee surgery, purportedly performed by William L. King, MD (not named as a defendant herein), on December 17, 2021, and for a percutaneous discectomy on March 2, 2022, and pain management injections on February 16, 2022 and March 23, 2022, purportedly performed by Matthew R. Kohler, MD (not named as a defendant herein), through Defendant Bowen PLLC, all at Defendant Rockaways ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's knee, shoulders, and spine not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on November 18, 2021, Covered Person J.H., claim number 1106524-05, starting November 23, 2021, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 137-42 Guy R Brewer Boulevard, Jamaica, NY. As part of the treatment protocol, J.H. was referred for an arthroscopic shoulder surgery, purportedly performed by William King, MD (not named as a defendant herein), on January 9, 2022, at Defendant All City ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on July 3, 2021, Covered Person R.G., claim number 1100447-02, starting July 8, 2021, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 107-15 Northern Boulevard, Corona, NY. As part of the treatment protocol, R.G. was referred for an arthroscopic knee surgery, purportedly performed by William King, MD (not named as a defendant herein), on September 12, 2021, at Defendant All City ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's knee not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on May 3, 2021, Covered Person R.C., claim number 1097540-02, starting June 16, 2021, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2510 Westchester Avenue, Bronx, NY. As part of the treatment protocol, R.C. was referred for an arthroscopic shoulder surgery, purportedly performed

by Mark M. Kramer, MD (not named as a defendant herein), through Cohen & Kramer MD PC (not named as a defendant herein), on August 23, 2021, at Defendant Empire State ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on April 24, 2021, Covered Person M.G.P., claim number 1096770-01, starting April 24, 2021, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 69-37 Myrtle Avenue, Glendale, NY. As part of the treatment protocol, M.G.P was referred for an arthroscopic knee surgery, purportedly performed by Defendant Graziosa, through Defendant Graziosa PC, on July 27, 2021, at Defendant Empire State ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's knee not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on March 18, 2021, Covered Person L.M., claim number 1095487-03, starting March 29, 2021, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 3040 Nostrand Avenue, Brooklyn, NY. As part of the treatment protocol, L.M. was referred for an arthroscopic shoulder surgery, purportedly performed by Defendant Baum, through Defendant Bay Ridge PC, on May 21, 2021, at Defendant All City ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on February 1, 2021, Covered Person S.P., claim number 1093791-01, starting February 24, 2021, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 188 Montague Street, Brooklyn, NY. As part of the treatment protocol, S.P. was referred for an arthroscopic shoulder surgery, purportedly performed by Defendant Seldes, through Defendant Seldes PC, on April 19, 2021, at Defendant New Horizon ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on November 28, 2020, Covered Person E.V.P., claim number 1091975-01, starting December 7, 2020, underwent a predetermined course of evaluations and purported treatment at a No-fault

Clinic located at 3432 East Tremont Avenue, Bronx, NY. As part of the treatment protocol, E.V.P. was referred for an arthroscopic knee surgery, purportedly performed by Sharma Siddhartha (not named as a defendant herein), through Defendant McCulloch Orthopaedic, on July 30, 2021, at Defendant Saddlebrook ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's ankle not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on November 10, 2020, Covered Person K.D., claim number 1090665-02, starting November 11, 2020, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 60 Belmont Avenue, Brooklyn, NY. As part of the treatment protocol, K.D. was referred for cervical and lumbar percutaneous discectomies on February 7, 2021 and September 26, 2021, purportedly performed by Defendant Jimenez, through Defendant JS Sports, at Defendant Rockaways ASC, and an arthroscopic shoulder surgery, purportedly performed by Ronald A. Daly, MD (not named as a defendant herein), on May 22, 2021, at Defendant Jersey City ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulders and spine not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on November 12, 2020, Covered Person S.N., claim number 1091037-01, starting November 16, 2020, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 37-03 92 Street, Jackson Heights, NY. As part of the treatment protocol, S.N. was referred for an arthroscopic shoulder surgery, purportedly performed by Peter A. Tomasello, DO (not named as a defendant herein), through Cross Bay Orthopedic Surgery P.C. (not named as a defendant herein), on July 31, 2021, at Defendant Fifth Avenue Surgery Center, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on November 3, 2020, Covered Person A.R., claim number 1090347-02, starting November 5, 2020, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 95-25 Jamaica Avenue, Woodhaven, NY. As part of the treatment protocol, A.R. was referred for an arthroscopic shoulder surgery, purportedly performed by Peter A. Tomasello, DO (not named as a defendant herein), through Cross Bay Orthopedic Surgery P.C. (not named as a defendant herein), on January 23, 2021, at Defendant Fifth Avenue Surgery Center, despite the

loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on August 14, 2020, Covered Person A.B., claim number 1087420-02, starting August 19, 2020, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 31-09 Newton Avenue, Astoria, NY. As part of the treatment protocol, A.B. was referred for arthroscopic surgeries on the left shoulder on August 19, 2021, and on the right shoulder on October 21, 2021, both purportedly performed by Defendant McCulloch, through Defendant McCulloch Orthopaedic, at Defendant New Horizon ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injuries to the Covered Person's shoulders not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on June 24, 2020, Covered Person E.P., claim number 1085172-01, starting the same day as the incident, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 647 Bryant Avenue, Brooklyn, NY. As part of the treatment protocol, E.P. was referred for a series of pain management injections on August 6, 2020, August 25, 2020, August 27, 2020, and October 1, 2020, and a percutaneous discectomy on August 31, 2020, at Rockaways ASC, and a pain management injection at All City ASC, all purportedly performed by Defendant Kotkes through Defendant Kotkes PC, and a knee arthroscopy, purportedly performed by Hank Ross, MD (not named as a defendant herein), through Hank Ross Medical PC (not named as a defendant herein), on October 5, 2020, at Defendant North Queens, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's knee and spine not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on June 23, 2020, Covered Person C.P., claim number 1085037-01, starting June 25, 2020 underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 401 Ditmas Avenue, Brooklyn, NY. As part of the treatment protocol, C.P. was referred for an arthroscopic knee surgery, purportedly performed by Stanislav Avshalumov, DO (not named as a defendant herein), through Advanced Orthopedics and Joint Preservation PC (not named as a defendant herein), on August 6, 2020, at Defendant Rockaways ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported

injury to the Covered Person's knee not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on June 16, 2020, Covered Person L.D., claim number 1085337-02, starting June 24, 2020, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 1894 Eastchester Road, Bronx, NY. As part of the treatment protocol, L.D. was referred for an arthroscopic knee surgery, purportedly performed by Defendant Graziosa, through Defendant Graziosa PC, on April 13, 2021, at Defendant Empire State ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's knee not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on May 28, 2020, Covered Person A.H., claim number 1084656-01, starting May 28, 2020, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 632 Utica Avenue, Brooklyn, NY. As part of the treatment protocol, A.H. was referred for an arthroscopic knee surgery, purportedly performed by Laxmidhar Diwan, MD (not named as a defendant herein), on August 19, 2020, at Defendant Rockaways ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's knee not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on April 8, 2019, Covered Person Y.S.S., claim number 1055401-03, starting April 10, 2019, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 208-01 Northern Boulevard, Bayside, NY. As part of the treatment protocol, Y.S.S. was referred for an arthroscopic shoulder surgery, purportedly performed by Boris Khaimov, DO (not named as a defendant herein), through Passaic Orthopedic on August 19, 2019, at Defendant New Horizon ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on April 6, 2019, Covered Person R.R., claim number 1055339-01, starting May 22, 2019, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 200 Madison Avenue, New York, NY. As part of the treatment protocol, R.R. was referred for an arthroscopic knee surgery, purportedly performed by Steven Struhl, MD (not named a Defendant in the Complaint), on August

26, 2019, at Defendant Jersey City ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's knee not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on February 10, 2019, Covered Person C.O.A., claim number 1051654-02, starting February 12, 2019, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 2379 Ralph Avenue, Brooklyn, NY. As part of the treatment protocol, C.O.A. was referred for an arthroscopic shoulder surgery, purportedly performed by Christopher Durant, MD (not named as a defendant herein), on April 27, 2019, at Defendant North Queens ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on June 27, 2018, Covered Person D.S., claim number 1032542-02, starting July 2, 2018, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 41-08 108 Street, Corona, NY. As part of the treatment protocol, D.S. was referred for an arthroscopic shoulder surgery, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, on September 12, 2018, at Defendant Manalapan ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulders not being causally related to the collision.

- Following their purported involvement in an automobile collision involving a minor impact on May 10, 2018, Covered Person K.M., claim number 1028065-01, starting May 11, 2018, underwent a predetermined course of evaluations and purported treatment at a No-fault Clinic located at 193-02 Northern Boulevard, Flushing, NY. As part of the treatment protocol, K.M. was referred for an arthroscopic shoulder surgery, purportedly performed by Ajoy Sinha, through Defendant Sinha Orthopedics, on October 15, 2018, at Defendant Saddlebrook ASC, despite the loads and mechanism required to cause an acute traumatic injury of the affected area not being present at the time of the purported collision, and the reported injury to the Covered Person's shoulder not being causally related to the collision.

1500. Fraudulent No-Fault claims submitted in connection with the Covered Persons

mentioned in Paragraph 1499 are identified in the Appendix to the Complaint which sets forth a

representative sample of fraudulent No-fault claims mailed by the Defendants to Plaintiff, that

were if at all, pursuant to the fraudulent protocol of treatment described herein, in violation of state licensing requirements, as part of a kickback or other financial compensation scheme, in order to exploit and manipulate the payment formulas under the No-Fault Law to maximize the charges that they could submit to Plaintiff.

1501.   By way of further example and without limitation, attached as Exhibit "5," in the accompanying Compendium of Exhibits, is a spreadsheet listing 450 Covered Persons who, following a predetermined fraudulent protocol of medically unnecessary services at a No-Fault Clinic, ultimately received one or more of the identified Fraudulent Services at one or more of the Surgicore ASCs despite a biomechanical review of the purported automobile collision revealing that the loads and mechanisms on the purportedly injured parts of the Covered Persons' bodies caused by the purported automobile collision were insufficient to cause traumatic injury and/or the reported injuries were not causally related to the automobile collision.

1502.   Demonstrative of the fact that Covered Persons were referred to the Surgicore ASCs for orthopedic surgeries irrespective of medical necessity, in many instances, multiple individuals who were purportedly involved in the same low-impact collision in the same car, and who were different ages, weight, height, and physical condition, sought treatment at one of the numerous No-Fault Clinics in the New York metropolitan area through which they were ultimately referred to one or more of the Surgicore ASCs and/or other ASCs not named defendants in the Complaint, for orthopedic surgeries in furtherance of scheme to fraudulently enrich one or more Defendants, while subjecting Covered Persons to dangerous services and procedures without regard to their well-being.

1503.  It is improbable that two or more Covered Persons in the same low-impact automobile collision would each require surgical intervention, let alone, in some instances, multiple surgeries as a result of a minor automobile collision.

1504.  In furtherance of the scheme to defraud alleged herein, pursuant to a fraudulent protocol of treatment, the Surgicore Orthopedic Providers routinely referred to two or more Covered Persons who were involved in the same low-impact collision to one or more of the Surgicore ASCs for one or more arthroscopic surgeries, at times on the same day, notwithstanding that the minor impact collisions are unlikely to result in injuries requiring arthroscopic surgery on one passenger, let alone multiple passengers. By way of example and not limitation:

- Following a purported low-impact automobile collision on March 11, 2022, Covered Persons E.Z., claim no. 1098852-01, J.M., claim no. 1098852-02, and M.O., claim no. 1098852-04, E.Z. and J.M. were taken to and M.O. went to the emergency room at Maimonides Medical Center, and were discharged the same day with reported diagnoses of no more than soft tissue injuries. Thereafter, E.Z., J.M., and M.O. purportedly underwent a predetermined course of treatment at the same No-fault Clinic at 410 Ditmas Avenue, Brooklyn, NY, resulting in referrals for each for one or more arthroscopic surgeries. On July 8, 2021, J.M. purportedly underwent arthroscopic surgery on his right shoulder, purportedly performed by Stanislav Avshalumov, DO (not named as a defendant herein), through Advanced Orthopedics and Joint Preservation PC (not named as a defendant herein), at Defendant Jersey City ASC. Nearly a month later on August 5, 2021, both E.Z. and M.O. purportedly underwent arthroscopic surgeries on their left and right knees, respectively, both purportedly performed by Dr. Avshalumov, through Advanced Orthopedics and Joint Preservation PC, at Jersey City ASC. Finally, J.M. purportedly underwent an arthroscopic surgery of his right knee, purportedly performed by Dr. Avshalumov, through Advanced Orthopedics and Joint Preservation PC, at Jersey City ASC. Ultimately, Plaintiff was billed for in excess of $51,000.00 by the Surgicore ASCs and Surgicore Orthopedists in connection with 4 surgeries on three people purportedly involved in a single low-impact automobile collision.

- Following a purported low- impact automobile collision on March 11, 2022, Covered Persons S.D., claim no. 1082264-01, M.B. 1082264-02, and R.W. 1082264-03, were taken to the emergency room at Jamaica Hospital Medical Center, and ultimately released within a few hours with reported

diagnoses of no more than headaches, neck pain, and back pain. Thereafter passengers S.D. and M.B. purportedly underwent a predetermined course of treatment at a No-fault Clinic at 188 Montague Street, Brooklyn, NY, and the driver insured R.W., purportedly underwent a predetermined course of treatment at a No-fault Clinic at 381 Sunrise Highway, Lynbrook, NY, each resulting in referrals for one or more arthroscopic surgeries. On June 19, 2020, M.B. purportedly underwent arthroscopic surgery on her left shoulder, purportedly performed by Defendant Seldes through Defendant Passaic Orthopedic at Defendant New Horizon ASC. Less than two months later, on August 10, 2020, S.D. also purportedly underwent arthroscopic surgery on her left shoulder, purportedly performed by Seldes at Defendant New Horizon ASC. Thereafter, on January 28, 2021, R.W. purportedly underwent arthroscopic surgery on his right shoulder, purportedly performed by Stanislav Avshalumov, DO (not named as a defendant herein), through Advanced Orthopedics and Joint Preservation PC (not named as a defendant herein) at Defendant Jersey City ASC. Finally, on March 18, 2021, R.W. purportedly underwent arthroscopic surgery on his right knee, purportedly performed by Dr. Avshalumov through Advanced Orthopedics and Joint Preservation PC at Defendant Jersey City ASC. Ultimately, Plaintiff was billed for in excess of $64,000.00 by the Surgicore ASCs and Surgicore Orthopedists in connection with 4 surgeries on three people purportedly involved in a single low-impact automobile collision.

- Following a purported low impact automobile collision on February 11, 2020, Covered Person X.E., claim number 1079840-01 was taken, and Covered Person E.G. went on his own, to the emergency room at Jamaica Hospital Medical Center, and were ultimately discharged the same day with reported diagnoses for X.E. of neck and lower back pain, and for E.G. of neck pain and pain in his left and right shoulder. Thereafter, X.E. and G.E. both purportedly underwent a predetermined course of treatment at a No-fault Clinic at 107-15 Northern Boulevard, Corona NY, resulting in referrals for multiple arthroscopic surgeries for both Covered Persons. On May 31, 2020, both X.E. and E.G. purportedly underwent arthroscopic surgery on their right shoulders, purportedly performed by Peter A. Tomasello, DO (not named as a defendant herein) through Vital Anesthesia Services PLLC d/b/a Vital Medical of Forest Hills ("Vital Medical") (not named as a defendant herein) at Defendant All City ASC. A week later on August 8, 2020, X.E. purportedly underwent arthroscopic surgery on her left shoulder, purportedly performed by Dr. Tomasello through Vital Medical at Defendant All City ASC. Two weeks later, on August 23, 2020, E.G. purportedly underwent arthroscopic surgery on his left shoulder, purportedly performed by Dr. Tomasello through Vital Medical at Defendant All City ASC. Finally, on November 7, 2020, X.E. purportedly underwent an arthroscopic shoulder on her left knee, purportedly performed by Dr. Tomasello through Vital Medical at Defendant Fifth Avenue ASC. Ultimately, Plaintiff was billed for in excess of $89,000.00 by the Surgicore

ASCs and Surgicore Orthopedists in connection with 5 surgeries on two people purportedly involved in a single low-impact automobile collision.

- Following a purported low-impact automobile collision on December 27, 2019, in which Covered Persons P.G., claim no. 1077130-01, was the driver, and Covered Persons S.R., claim no. 1077130-02, A.C., claim no. 1077130-03, and L.T., claim no. 1077130-05, were passengers, P.G. and S.R. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 332 East 149th Street, Bronx, New York, and Covered Persons A.C., and L.T. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 79-09 Northern Boulevard, Jackson Heights, NY, resulting in referrals for multiple arthroscopic surgeries. On February 22, 2020, S.R., A.C., and L.T., each purportedly underwent arthroscopic surgeries on their right shoulders, each purportedly performed by Peter A. Tomasello, DO (not named as a defendant herein) through Vital Medical (not named as a defendant herein) at Defendant All City ASC. Thereafter, on June 5, 2020, S.R. also purportedly underwent an arthroscopic surgery on his right knee each purportedly performed by Dr. Tomasello through Vital Medical at Defendant All City ASC. On December 29, 2020, P.G. purportedly underwent an arthroscopic surgery on his right knee, and on March 11, 2021, an arthroscopic surgery on his left shoulder, both purportedly performed by Stanislav Avshalumov, DO (not named as a defendant herein), through Advanced Orthopedics & Joint Preservation PC (not named as a defendant herein) at Defendant Jersey City ASC. Ultimately, Plaintiff was billed for in excess of $92,000.00 by the Surgicore ASCs and Surgicore Orthopedists in connection with 6 surgeries on four people purportedly involved in a single low-impact automobile collision.

- Following a purported low-impact automobile collision on November 22, 2019, Covered Persons G.L., claim no. 1074602-03, and C.S., claim no. 1074602-05, did not seek medical attention, and instead purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 60 Belmont Avenue, Brooklyn, NY, resulting in referrals for multiple arthroscopic surgeries. On June 3, 2020, C.S. purportedly underwent an arthroscopic surgery of the right knee, and on August 19, 2020, purportedly underwent an arthroscopic surgery of the left shoulder, both purportedly performed by Richard Pearl, MD (not named as a defendant herein), through HMP Orthopaedics PC (not named as a defendant herein), at Defendant All City ASC. On August 19, 2020, G.L. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Dr. Pearl, through HMP Orthopaedics PC, at Defendant All City ASC. Finally, on November 24, 2020, G.L. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant McMahon, at Defendant Fifth Avenue ASC. Ultimately, Plaintiff was billed for in excess of $67,000.00 by the Surgicore ASCs and Surgicore Orthopedists in connection with 4 surgeries on two people purportedly involved in a single low-impact automobile collision.

- Following a purported low-impact automobile collision on October 3, 2019, Covered Persons H.J., claim number 1070584-02, and W.R., claim number 1070584-05, refused emergency medical treatment at the scene of the incident, and thereafter purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 607 Westchester Avenue, Bronx, NY, resulting in referrals for multiple arthroscopic surgeries. On December 12, 2019, H.J. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Apazidis, at Defendant All City ASC. A week later, on December 20, 2019, W.R. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant Apazidis, at Defendant All City ASC. Thereafter, on January 17, 2020, both H.J. and W.R. purportedly underwent arthroscopic surgeries of their right shoulders, purportedly performed by Defendant Apazidis, at Defendant All City ASC. Ultimately, Plaintiff was billed for in excess of $64,000.00 by the Surgicore ASCs and Surgicore Orthopedists in connection with 4 surgeries on two people purportedly involved in a single low-impact automobile collision.

- Following a purported low-impact automobile collision on November 14, 2018, covered persons R.N., claim no. 1045895-01, J.P., claim no. 1045895-03, S.V., claim no. 1045895-03, and J.A., claim no. 1045895-04, were taken to the emergency room at Mount Sinai Hospital Queens, which reported diagnoses of strains and sprains of the neck, back, and limbs. Thereafter, R.N., J.P., S.V., and J.A., all purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 104-08 Roosevelt Avenue, Corona, NY, which resulted in referrals for arthroscopic surgeries. On January 25, 2019, J.P. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Defendant Apazidis, at Defendant All City ASC. on April 5, 2019, J.A. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant Apazidis at Defendant All City ASC. R.N. and S.V. purportedly underwent arthroscopic surgeries of the left knee, purportedly performed by Defendant Apazidis, at Defendant All City ASC, on February 8, 2019, and April 12, 2019, respectively. Ultimately, Plaintiff was billed for in excess of $55,000.00 by the Surgicore ASCs and Surgicore Orthopedists in connection with 4 surgeries on two people purportedly involved in a single low-impact automobile collision.

1505.    By way of further example and without limitation, attached as Exhibit "12," in the accompanying Compendium of Exhibits, is a spreadsheet listing a representative sample of claims where the Surgicore Orthopedic Providers referred two or more Covered Persons who were involved in the same low-impact collision to one or more of the Surgicore ASCs for one or more arthroscopic surgeries, at times on the same day, notwithstanding that the minor impact collisions

are unlikely to result in injuries requiring arthroscopic surgery on one passenger, let alone multiple passengers.

1506. In addition to the foregoing, demonstrative of the fact that Covered Persons were referred to the Surgicore ASCs for orthopedic surgeries irrespective of medical necessity, in many instances, multiple individuals who were purportedly involved in the same low-impact collision in the same car, and who were different ages, weight, height, position in the vehicle and physical condition, were referred to one or more of the Surgicore ASCs for orthopedic surgeries on the same limb. By way of example but not limitation:

- On or about September 30, 2022, Covered Persons S.B., claim no. 1120268-01, and A.N., claim no. 1120268-03, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at No-fault Clinics located at 3250 Westchester Avenue, Bronx, NY, which resulted in each Covered Person being referred for arthroscopic surgeries of the left knee. On November 30, 2022, S.B. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, at Defendant Jersey City ASC. that Same day, A.N. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, at Defendant Jersey City ASC. Thereafter, A.N. also purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, at Defendant Jersey City ASC.

- On or about April 15, 2021, Covered Persons N.I., claim no. 1096609-02 and E.R., claim no. 1096609-03, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at No-fault Clinics located at 282-284 Avenue X, Brooklyn, NY, and 352 Neptune Avenue, Brooklyn, NY, respectively, which resulted in each Covered Person being referred for arthroscopic surgeries on both their right and left knees. N.I. purportedly underwent arthroscopic surgery on the right knee on July 1, 2021, and on the left knee on September 23, 2021, both purportedly performed by Aleksandr Khaimov, DO (not named as a defendant herein), through

Quality Orthopedics and Complete Joint Care PC (not named as a defendant herein) at Defendant All City ASC. E.R. purportedly underwent arthroscopic surgery on the right knee on July 2, 2021, and on the left knee on July 30, 2021, both also purportedly performed by Defendant Baum, through Defendant Bay Ridge Orthopedic at Defendant All City ASC.

- On or about March 18, 2021, Covered Persons M.R., claim no. 1095487-02 and L.M., claim no. 1095487-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 1122 Coney Island Avenue, Brooklyn, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their right shoulders. L.M. purportedly underwent an arthroscopic surgery on the right shoulder on May 21, 2019, purportedly performed by Defendant Baum, through Defendant Bay Ridge PC at Defendant All City ASC. M.R. purportedly underwent an arthroscopic surgery on the right shoulder on July 19, 2021 purportedly performed by Defendant Upendra Sinha, through Defendant MSJR, at Defendant All City ASC.

- On or about May 22, 2021, Covered Persons T.L., claim no. 1097393-01, and R.L., claim no. 1097393-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at No-fault Clinics located at 2017-2019 Williamsbridge Road, Bronx, NY, which resulted in each Covered Person being referred for arthroscopic surgeries of the left shoulder. On September 11, 2021, R.L. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by William L. King, MD (not named as a defendant herein, at Defendant North Queens ASC. Thereafter, on January 21, 2021, T.L. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Defendant Anjani Sinha, through Defendant Anjani PC, at Defendant All City ASC.

- On or about November 3, 2020, Covered Persons A.R., claim no. 1090347-02 and A.M., claim no. 1090347-04, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 95-25 Jamaica Avenue, Woodhaven, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their left shoulders. On January 23, 2021, Both A.R. and A.M. underwent arthroscopic surgeries of their left shoulders, purportedly performed the same day by Peter A.

Tomasello, DO (not named as a defendant herein) through Vital Anesthesia Services PLLC d/b/a Vital Medical of Forest Hills (not named as a defendant herein) at Defendant Fifth Avenue ASC.

- On or about August 22, 2020, Covered Persons J.W., claim no. 1087348-01 and R.W., claim no. 1087348-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 2 East 86th Street, New York, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on both their right and left shoulders. R.W. purportedly underwent arthroscopic surgery on her right shoulder on November 6, 2020, and on her left shoulder on April 30, 2021, both purportedly performed by Steven Struhl, MD (not named as a defendant herein), through Steven Struhl MD PC (not named as a defendant herein) at Defendant Jersey City ASC. J.W. purportedly underwent arthroscopic surgery on her left shoulder on January 29, 2021, and on her right shoulder on March 5, 2021, both also purportedly performed by Steven Struhl, MD (not named as a defendant herein), through Steven Struhl MD PC (not named as a defendant herein) at Defendant Jersey City ASC.

- On or about August 17, 2020, Covered persons R.W., claim no. 1087441-02, and C.S., claim no. 1087441-04, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 2132 Ralph Avenue, Brooklyn, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on among other limbs, both of their right shoulders. On November 8, 2022, R.W. purportedly underwent an arthroscopic surgery on the left knee, purportedly performed by Darren Friedman, MD (not named as a defendant herein), through New York Spine Specialists (not named as a defendant herein) at Defendant New Horizon ASC. On December 4, 2020, C.S., also purportedly underwent an arthroscopic surgery on the left knee, purportedly performed by Defendant Baum, through Defendant Bay Ridge Orthopedic, at Defendant All City ASC. That same day, R.W. purportedly underwent an arthroscopic surgery on the right shoulder, also, purportedly performed by Defendant Baum, through Defendant Bay Ridge Orthopedic, at Defendant All City ASC.

- On or about June 14, 2020, Covered Persons C.P., claim no. 1084884-01 and M.E., claim no. 1084884-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located

at 3432 East Tremont Avenue, Bronx, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their right shoulders. M.E. purportedly underwent arthroscopic surgery on the right shoulder on September 22, 2020, purportedly performed by Defendant Graziosa, through Defendant Graziosa PC, at Defendant Empire State ASC. C.P. purportedly underwent arthroscopic surgery on the right shoulder on October 26, 2020 purportedly performed by Laxmidhar Diwan, MD (not named as a defendant herein), through Health Choice NY Medical PC (not named as a defendant herein), at Defendant Jersey City ASC.

- On or about May 14, 2020, Covered Persons V.L., claim no. 1084594-02 and E.S., claim no. 1084594-03, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 332 East 149 Street, New York, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their right shoulders. E.S. purportedly underwent arthroscopic surgery on the right shoulder on September 4, 2020, purportedly performed by Sean Thompson, MD (not named as a defendant herein), through Thompson Medical PC (not named as a defendant herein) at Defendant Saddlebrook ASC. V.L. purportedly underwent arthroscopic surgery on the right shoulder on November 17, 2020 purportedly performed by Richard Pearl, MD (not named as a defendant herein), through HMP Orthopaedics PC (not named as a defendant herein), at Defendant All City ASC.

- On or about March 3, 2020, Covered Persons J.R., claim no. 1081815-02, O.E., claim no. 1081515-04, and M.A., claim no. 1081815-05, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, all three purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 900-B East Tremont Avenue, Bronx, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their right knee. J.R. purportedly underwent an arthroscopic surgery on the right knee on August 7, 2020 at Defendant All City ASC, O.E. purportedly underwent an arthroscopic surgery on the right knee on August 20, 2020, at Defendant Fifth Avenue ASC, and M.A. purportedly underwent an arthroscopic surgery on the right knee, on August 27, 2020, at Defendant North Queens ASC. All three surgeries were purportedly performed by Neofitos Stefanides, MD (not named as a defendant herein) through Neofitos Stedanides, MD, PC (not named as a defendant herein).

- On or about November 13, 2019, Covered Persons R.P., claim no 1073428-01, and J.S., claim no. 1073428-02, were purportedly involved in the same

low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 37-03 92nd Street, Jackson Heights, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their right knees. J.S. purported underwent an arthroscopic surgery on the right knee on January 16, 2020, purportedly performed by Defendant Sinha through Defendant Anjani Sinha PC at Defendant All City ASC. Months later, R.P. also purportedly underwent an arthroscopic surgery on the right knee on May 21, 2020, also purportedly performed by Defendant Sinha through Defendant Anjani Sinha PC at Defendant All City ASC.

- On or about October 12, 2019, Covered Persons J.P., claim no. 1072272-02, and T.C., claim no. 1072272-04, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 60 Belmont Avenue, Brooklyn, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their left shoulders. On April 13, 2021, J.P. purportedly underwent an arthroscopic shoulder on the left shoulder, purportedly performed by Defendant McMahon, at Defendant Fifth Avenue ASC. Five weeks later, on May 18, 2021, T.C. also purportedly underwent an arthroscopic shoulder on the left shoulder, purportedly performed by Defendant McMahon, at Defendant Fifth Avenue ASC.

- On or about April, Covered Persons J.R., claim no. 1054877-01, and J.P., claim no. 1054877-03, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 409 Rockaway Avenue, Brooklyn, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their right shoulders. On June 18, 2019, J.R. purportedly underwent an arthroscopic shoulder on the right shoulder, purportedly performed by Defendant McMahon, through Defendant McMahon PC, at Defendant Fifth Avenue ASC. Thereafter, on September 16, 2019, J.P. also purportedly underwent an arthroscopic shoulder on the right shoulder, purportedly performed by Defendant McCulloch, through Defendant McCulloch Orthopaedic, at Defendant Fifth Avenue ASC.

- On or about October 12, 2018, Covered Persons C.A., claim no. 1042294-01, M.V., claim no. 1042294-02, W.V., claim no. 1042294-03, and J.P., claim no. 1042294-04, were purportedly involved in the same low-impact

automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they C.A., M.V., and W.V. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 104-08 Roosevelt Avenue, Corona, and J.P., at a No-fault Clinic located at 900-B East Tremont Avenue, Bronx, NY, which resulted in each Covered Person being referred for arthroscopic surgeries on their right knee. W.V., M.V., and P.A., purportedly underwent arthroscopic surgeries on their right knees, each purportedly performed by Defendant Apazidis, through Defendant Apazidis PC, at Defendant All City ASC, on January 18, 2019, January 25, 2019, and February 1, 2019, respectively. J.P. purportedly underwent arthroscopic surgery on his right knee on November 18, 2018, purportedly performed by Defendant Katzman, through Defendant Katzman PC, at Defendant Fifth Avenue Surgery Center.

1507. Exhibit 13 in the Compendium of Exhibits is a spreadsheet containing a representative sample of claims where two or more Covered Persons purportedly involved in the same low-impact automobile collision were referred for orthopedic surgeries purportedly performed at the Surgicore ASCs, including instances where two or more Covered Persons purportedly underwent orthopedic surgeries on the same limb, at times, on the same day.

1508. Demonstrative of the fact that Covered Persons were referred to the Surgicore ASCs for percutaneous discectomies irrespective of medical necessity, in many instances, multiple individuals who were purportedly involved in the same low-impact collision in the same car, and who were different ages, weight, height, positions in the vehicle and physical condition, sought treatment at one of the numerous No-Fault Clinics in the New York metropolitan area through which they were ultimately referred to one or more of the Surgicore ASCs and/or other ASCs not named defendants in the Complaint, for one or more percutaneous discectomies, at time each, in furtherance of the scheme to fraudulently enrich one or more Defendants, while subjecting Covered Persons to dangerous services and procedures without regard to their well-being. By way of example and not limitation:

- On or about January 20, 2024, Covered Persons D.P., claim no. 1143101-01, and B.P., claim no. 1143101-02, were purportedly involved in the same

low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 55 East 115th Street, New York, NY, which resulted in each Covered Person being referred for multiple percutaneous discectomies. On April 9, 2024, both D.P., and B.P., purportedly underwent cervical percutaneous discectomies, both purportedly performed by Metul K. Shah, MD (not named as a defendant herein) through 5th Avenue Wellness Medicine, P.C. (not named a defendant at the Complaint) at Defendant North Queens. Thereafter, on July 28, 2024, both D.P. and B.P. purportedly underwent lumbar percutaneous discectomies, both purportedly performed by Anil Patil, MD (not named as a defendant herein) through 5th Avenue Wellness Medicine PC (not named as a defendant herein) at Defendant Empire State ASC.

- On or about November 27, 2023, Covered Persons D.W., claim no. 1139740-03, and M.A., claim no. 1139740-04, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 4250 White Plains Road, Bronx, NY, which resulted in each Covered Person being referred for multiple percutaneous discectomies. On March 10, 2024, and May 20, 2024, M.A. purportedly underwent a lumbar percutaneous discectomy, and a cervical percutaneous discectomy, respectively, purportedly performed by Defendant Shabtian and Defendant Portal, respectively, both through Defendant Total Anesthesia at Defendant All City ASC. Concurrently, on March 20, 2024 and again on April 14, 2024, D.W. purportedly underwent a lumbar percutaneous discectomy and a cervical percutaneous discectomy, respectively, purportedly performed by Defendant Shabtian, through Defendant Total Anesthesia at Defendant All City ASC.

- On or about July 30, 2023, Covered Persons M.F., claim no. 1133666-01 and A.H., claim no. 1133666-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 164-06 Northern Boulevard, Flushing, NY, which resulted in each Covered Person being referred for a percutaneous discectomy. On December 6, 2023, M.F. and A.H. purportedly underwent a cervical percutaneous discectomy and lumbar percutaneous discectomy, respectively, purportedly performed on the same day by Defendant Shabtian, through Defendant Total Anesthesia at Defendant All City ASC.

- On or about December 27, 2022, Covered Persons O.R., claim no. 1124002-01, and E.A., claim no. 1124002-03, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 86-01 101 Avenue, Ozone Park, NY, which resulted in each Covered Person being referred for percutaneous discectomies. On March 29, 2023, E.A. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Bowen, through Defendant Bowen PLLC, at Defendants Rockaways ASC. Less than two weeks later, O.R., purportedly underwent a cervical percutaneous discectomy, also purportedly performed by Defendant Bowen, through Defendant Bowen PLLC, at Defendants Rockaways ASC.

- On or about November 23, 2022, Covered Persons C.M., claim no. 1122619-02, and I.D., claim no. 1122619-03, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 2558 Holland Avenue, Bronx, NY, which resulted in each Covered Person being referred for percutaneous discectomies on the same region of their backs. On April 24, 2023, C.M. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant All City ASC. Less than two weeks later, on May 4, 2023, I.D. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Rockaways ASC.

- On or about January 26, 2023, Covered Persons D.B., claim no. 1125458-02 and R.B., claim no. 1125458-04, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 4015 Boston Road, Bronx, NY, which resulted in each Covered Person being referred for percutaneous discectomies on the same region of the spine. On May 25, 2023, both D.B. and R.B. purportedly underwent lumbar percutaneous discectomies, purportedly performed on the same day by Baruch Kim, DO (not named a Defendant in the Complaint), through Baruch Medical PLLC (not named as a defendant herein) at Defendant Fifth Avenue ASC.

- On or about July 29, 2022, Covered Persons J.L., claim no. 1117329-02 and N.M., claim no. 1117329-04, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons

were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 719 Southern Boulevard, Bronx, NY, which resulted in each Covered Person being referred for percutaneous discectomies on the same region of the spine. On October 27, 2022, both J.L. and N.M. purportedly underwent lumbar percutaneous discectomies, purportedly performed on the same day by Defendant Kotkes, through Defendant Kotkes PC at Defendant Rockaways ASC.

• On or about June 2, 2022, Covered Persons M.P., claim no. 1115491-01, and J.Q., claim no. 1115491-04, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 102-05 Northern Boulevard, Corona, NY, which resulted in each Covered Person being referred for percutaneous discectomies on the same region of the spine. On October 16, 2022, J.Q., purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Matthew R. Kholer, MD (not named as a defendant herein) through Defendant Bowen PLLC, at Defendant Rockaways ASC. On November 6, 2022, M.P. also purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Portal, through Defendant Bowen PLLC, at Defendant Rockaways ASC.

• On or about May 17, 2022, Covered Persons E.K., claim no. 1114475-01 and T.B., claim no. 1114475-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 1339 East Gun Hill Rd, Bronx, NY, which resulted in each Covered Person being referred for percutaneous discectomies on the same region of the spine. On February 16, 2023, both E.K. and T.B. purportedly underwent lumbar percutaneous discectomies, purportedly performed on the same day by Defendant Shabtian, through Defendant Total Anesthesia at Defendant North Queens ASC.

• On or about November 6, 2021, Covered Persons E.C., claim no. 1105285-07, R.T., claim no. 1105285-07, and M.C., claim no. 1105285-10, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they all purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 82-17 Woodhaven Boulevard, Ridgewood, NY, which resulted in each Covered Person being referred for one or more

percutaneous discectomies. On May 26, 2022, M.C. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC at Defendant Rockaways ASC. On June 13, 2022, R.T. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC at Defendant All City ASC. On July 14, 2022, E.C. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC at Defendant Rockaways ASC. Finally, on July 28, 2022, R.T. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, this time at Defendant Rockaways ASC.

- On or about April 8, 2021, Covered Persons L.J., claim no. 1098288-05, and J.S., claim no. 1098288-05, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they all purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 607 Westchester Avenue, Bronx, NY, which resulted in each Covered Person being referred for one or more percutaneous discectomies. On October 8, 2021, L.J. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Hall, through Defendant Hall PLLC, at defendant Rockaways ASC. Thereafter, J.S. purportedly underwent a cervical percutaneous discectomy on December 3, 2021, and a lumbar percutaneous discectomy on February 11, 2022, both purportedly performed by Defendant Hall, through Defendant Hall PLLC, at Defendant Rockaways ASC.

- On or about June 24, 2020, Covered Persons E.P., claim no. 1085172-01 and E.A., claim no. 1085172-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 647 Bryant Avenue, Bronx, NY, which resulted in each Covered Person being referred for multiple percutaneous discectomies. E.P. purportedly underwent a cervical percutaneous discectomy on August 25, 2020, and a lumbar percutaneous discectomy six days later on August 31, 2020, both purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant Rockaways ASC. Starting eight days later, E.A. purportedly underwent a lumbar percutaneous discectomy on September 9, 2020, and a cervical percutaneous discectomy on September 10, 2020, both purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant Rockaways ASC. Finally, E.A. also underwent another lumbar percutaneous discectomy, purportedly performed by Arden M. Kaisman, MD (not named as a defendant herein), through Metropolitan

Medical and Surgical P.C. (not named as a defendant herein) at Triborough ASC (not named as a defendant herein) on March 22, 2021.

- On or about January 10, 2020, Covered Persons C.S., claim no. 1078303-01 and N.S., claim no. 1078303-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 69-37 Myrtle Avenue, Glendale, NY, which resulted in each Covered Person being referred for multiple percutaneous discectomies. N.S. purportedly underwent a lumbar percutaneous discectomy on January 26, 2021, and a cervical percutaneous discectomy on March 18, 2021, both purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant Rockaways ASC. Contemporaneously, C.S. purportedly underwent a lumbar percutaneous discectomy on February 22, 2021, and a cervical percutaneous discectomy on March 15, 2021, both also purportedly performed by Kotkes, through Defendant Kotkes PC, but performed instead at Defendant All City ASC.

- On or about November 19, 2019, Covered Persons A.F., claim no. 1074670-01, E.E., claim no. 1074670-03, and F.L., claim no. 1074670-04, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 34-09 Murray Street, Flushing, NY, which resulted in each Covered Person being referred for multiple percutaneous discectomies. A.F. purportedly underwent a lumbar percutaneous discectomy on September 4, 2020, and a cervical percutaneous discectomy on November 14, 2020, both purportedly performed by Tamer M. Elbaz, MD (not named as a defendant herein), through NY Anesthesia Pain Management PLLC and Pain Physicians NY PLLC, respectively, at Defendant Jersey City ASC. Thereafter, on January 3, 2021, E.E. and F.L., both purportedly underwent lumbar percutaneous discectomies on the same day, both purportedly performed by Defendant Shabtian, through Defendant Total Anesthesia, at Defendant Rockaways ASC.

- On or about August 19, 2019, Covered Persons N.C., claim no. 1066106-01 and C.C., claim no. 1066106-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 68-60 Austin Street, Forest Hills, NY, which resulted in each Covered Person being referred for percutaneous discectomies. On January 4, 2020,

both N.C. and C.C. purportedly underwent lumbar percutaneous discectomies, purportedly performed on the same day by Defendant Vora, through Defendant NJ Vora, at Defendant Saddlebrook ASC. Months later, on September 9, 2020, N.C. purportedly underwent another lumbar percutaneous discectomy, purportedly performed by Dr. Johnathan Simhaee (not named as a defendant herein) through Jonathan Lewin MD PC (not named as a defendant herein) at Bergenfield Surgical Center (not named as a defendant herein).

- On or about November 22, 2018, Covered Persons S.Z., claim no. 1045476-02, Q.C., claim no. 1045476-04, X.C., claim no. 1045476-06, and Y.L., claim no. 1045476-07, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they S.Z., Q.C., and Y.L. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 839 57th Street, Brooklyn, NY, and X.C. at 823 56th Street, Brooklyn, NY, which resulted in each Covered Person being referred for multiple percutaneous discectomies. Starting February 16, 2019, S.Z. and Y.L. both purportedly underwent cervical percutaneous discectomies, purportedly performed by Defendant Xie, through Defendant Integrated Pain Management on the same day at Defendant Manalapan ASC. on March 28, 2019, Q.C., purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Xie through Defendant Integrated Pain Management at Jersey City ASC. On April 4, 2019, Y.L. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Xie through Defendant Integrated Pain Management at Defendant Manalapan ASC. Finally, on April 16, 2019, X.C. purportedly underwent a cervical discectomy, purportedly performed by Dr. Didier Demesmin (not named as a defendant herein) through University Pain Medicine Center (not named as a defendant herein) at Stemmee Surgery Center (not named as a defendant herein).

1509. By way of further example and without limitation, attached as Exhibit "14," in the accompanying Compendium of Exhibits, is a spreadsheet listing a representative sample of claims where the Surgicore Orthopedic Providers referred two or more Covered Persons who were involved in the same low-impact collision to one or more of the Surgicore ASCs for one or more percutaneous discectomies irrespective of medical necessity subjecting Covered Persons to dangerous services and procedures without regard to their well-being.

## VII.    The Fraudulent Billing And Treatment Protocol

1510.    Defendants' scheme to defraud was predicated on the purported performance of the Fraudulent Services on Covered Persons, the vast majority of whom were involved in minor impact automobile accidents in which they suffered soft-tissue injuries, if they were injured at all.

1511.    The Fraudulent Services were purportedly performed to financially enrich Defendants, without regard to medical necessity.

1512.    Virtually every aspect of Defendants' fraudulent scheme was motivated by money and greed, and without regard to the grave harm inflicted on the public at large by holding themselves out as providing legitimate medical services when in fact they were providing, if anything, unnecessary services that exposed Covered Persons to invasive procedures in which they were put at further risk through the administration of anesthesia.

1513.    In furtherance of the scheme to defraud, Defendants' purportedly subjected Covered Persons to invasive, high risk, interventional pain management and arthroscopic procedures and/or surgeries purportedly performed at the Surgicore ASCs pursuant to a predetermined fraudulent protocol that was designed to maximize the billing that the Defendants submitted or cause to be submitted to insurers including, Plaintiff, rather than to properly treat or otherwise benefit the Covered Persons who were purportedly subjected to the procedures and/or surgeries.

1514.    The Predetermined Protocol required that, irrespective of medical need, aggressive interventional pain management and arthroscopic procedures and/or surgeries be performed on virtually all of the Covered Persons for which Defendants submitted bills to Plaintiff, all in

furtherance of the scheme to fraudulently enrich one or more Defendants, while subjecting Covered Persons to dangerous services and procedures without regard to their actual well-being.

1515. The Defendants' Predetermined Protocol includes: (a) failing to legitimately examine Covered Persons to determine the true nature and extent of their injuries; (b) documenting a series of predetermined diagnoses for each Covered Person to justify a predetermined course of medically unnecessary interventional pain management and/or arthroscopic procedures and/or surgeries; (c) recommending and performing, or causing to be performed, some combination of pain management injections, including but not limited to trigger point injections, and epidural steroid injections, as well as epidurograms, discograms, percutaneous discectomies and IDETs, and/or arthroscopic procedures, including but not limited to shoulder, knee, wrist, and ankle arthroscopies; (d) unlawfully referring, performing, and/or causing the Fraudulent Services to be performed at one or more of the Surgicore ASCs which the Defendants knowingly used to submit fraudulent charges for facility fees and other attendant services relating to the Predetermined Protocol, including but not limited to fraudulent charges for anesthesia that was unnecessary; (e) administering sedation concomitant to interventional pain management injections that was not required; and (f) submitting bills and documents to American Transit falsely representing that the aforementioned Fraudulent Services were medically necessary, within the standard of care, and lawfully rendered when, in fact, they were not.

1516. As fully alleged herein, many of the Covered Persons did not seek any treatment at any hospital as a result of their purported accidents. To the limited extent that the Covered Persons did report to a hospital after their purported accidents, typically each was briefly observed on an outpatient basis and discharged after a few hours with nothing more serious than a soft tissue diagnosis.

1517.   Furthermore, in many cases, contemporaneous police reports indicated that the Covered Persons' purported accidents involved low-impact automobile collisions, that the Covered Persons' vehicles were drivable following the accident, and that no one was seriously injured in the accident and/or injured at all.

1518.   Notwithstanding the foregoing, the Defendants purported to provide the Fraudulent Services to Covered Persons regardless of the nature or severity of any automobile accident, regardless of the Covered Person's individual symptoms arising from any reported automobile collision and in most cases, regardless of the total absence of any serious medical issue arising from any actual accident.

1519.   Though the Fraudulent Services were allocated among multiple Surgicore Pain Management Providers and Surgicore Orthopedic Providers, the fraudulent Pre-Determined Protocol was the same.

1520.   In view of the health risks presented by the invasive procedures (the Fraudulent Services) alleged herein, no legitimate physician, medical practice, or other healthcare provider would permit the fraudulent treatment and billing protocol undertaken by the Defendants to proceed under their direction.

1521.   Nonetheless, the Surgicore Pain Management Providers and Surgicore Orthopedic Providers, acting in concert with the Controllers and Surgicore ASCs purported to perform, or caused to be performed, on Covered Persons one or more of the Fraudulent Services for Defendants' financial benefit and represented such services were medically necessary when in fact they were not.

1522.   The Surgicore Pain Management Providers and Surgicore Orthopedic Providers ordered and performed and/or caused to be performed one or more of the Fraudulent Services on

Covered Persons for their financial benefit, signed and/or authorized bills to be submitted to Plaintiff under their names and/or their respective professional corporations that contained false representations as to the nature of the purported injuries; that such purported injuries were causally related to automobile collisions; that the bill for Fraudulent Services were not provided pursuant to an unlawful kickback or other financial arrangement scheme and that the services were medically necessary when in fact they were not.

1523.  The Surgicore Pain Management Providers and Surgicore Orthopedic Providers ordered and performed and/or caused to be performed one or more of the Fraudulent Services on Covered Persons for their financial benefit, signed and/or authorized medical records and reports to be submitted to Plaintiff under their names and/or their respective professional corporations that falsely represented that such services were medically necessary when in fact they were not.

1524.  The interventional pain management and arthroscopic procedures and/or surgeries generate up to four separate and distinct fees, which result in the mailing of bills to Plaintiff by: 1) the Surgicore Pain Management Provider and/or Surgicore Orthopedic Provider for the purported performance of the procedure and/or surgery by the doctor, which sometimes also includes a separate bill for services purportedly performed by a physician assistant, 2) the Surgicore ASC for its purported facility fee, and 3) the Surgicore Anesthesia Provider for anesthesia concomitant to the pain management and/arthroscopic procedure or surgery.

1525.  The bills and medical records and reports submitted or caused to be submitted by the Defendants through the Surgicore Pain Management Providers and Surgicore Orthopedic Providers, intentionally misrepresented, exaggerated and falsified the medical condition and needs of the Covered Persons and contained pervasive and non-credible findings and diagnoses designed

to justify the performance of medically unnecessary interventional pain management and/or arthroscopic procedures and/or surgeries, rather than to legitimately treat the Covered Persons.

1526.   The rate and uniformity of Surgicore Pain Management Providers' and Surgicore Orthopedic Providers' recommend interventional pain management services and/or arthroscopic procedures and/or surgeries for the ambulatory Covered Persons, who make up the vast majority of individuals upon whom the Fraudulent Services were performed, is greatly at variance with the experience of legitimate medical practices and implausible.

1527.   The bills and supporting documentation submitted or caused to be submitted by the Defendants through the Surgicore Pain Management Providers and Surgicore Orthopedic Providers are fraudulent because they falsely represent the services were medically necessary and lawfully rendered, when they were not.

## A.  No-Fault Billing Regulations In The State Of New York

1528.   The American Medical Association ("AMA") is the publisher of the Current Procedural Terminology ("CPT"), a uniform code set for medical procedures and services, which is the definitive medical source used by licensed medical professionals to accurately describe, among other things, medical, diagnostic, and surgical services performed and billed to third-party payors, such as insurance companies.

1529.   Pursuant to Section 5108 of the Insurance Law, the New York Department of Financial Services (formerly the Department of Insurance) has adopted the fee schedule published by the New York Workers' Compensation Board (the "Fee Schedule"), which sets forth the charges for professional health services that are reimbursable under the No-Fault Law. The Fee Schedule incorporates the CPT codes published by the AMA, and the coding rules and regulations set forth by the AMA.

1530.    A fundamental requirement for the use of CPT codes is that the provider is required to choose the most appropriate CPT code. Procedures should be billed with the CPT codes that most comprehensively describe the services performed. Only the single CPT code most accurately describing the procedure performed or service rendered may be used. If no such specific code exists, the provider must report the service using the appropriate unlisted procedure or service code (i.e. a "999" code).

1531.    The Fee Schedule delineates services by their CPT code, and also includes the CPT procedure codes modifiers and descriptors.

1532.    When a provider bills for a service using one of the CPT codes, that provider makes a representation that the services were provided according to the methods and restrictions established by AMA, as well as the reasonableness and necessity of the services. This representation presumes that the provider is following and abiding by these restrictions on the use of the codes. If the provider knowingly presents bills under these CPT codes and is not abiding by these restrictions, that provider willfully and materially misrepresents the nature of the services rendered and/or the reasonableness and necessity of the billed for services.

**B.    Misrepresentations Concerning CPT Codes**

1533.    The Surgicore Pain Management Providers and Surgicore Orthopedic Providers purport to examine, diagnose, and treat Covered Persons who have been reportedly involved in automobile accidents, with purported complaints of generalized spine and joint pain (neck, back, shoulder, knee, ankle, and wrist).

1534.    A detailed history and a legitimate examination must be performed by a licensed healthcare professional to arrive at a legitimate diagnosis for Covered Persons with spine and/or joint pain resulting from automobile accidents.

1535.   Based upon a legitimate diagnosis, the healthcare professional must engage in medical decision-making to determine a legitimate treatment plan tailored to the unique circumstances of each Covered Person. Over the course of treatment, treatment plans should be periodically reassessed and modified based upon the unique circumstances of each Covered Person and their response (or lack thereof) to existing treatment.

1536.   The decision of which, if any, types of medical treatment is appropriate for each Covered Person, as well as the level, frequency, and duration of the treatment, should vary depending on the unique circumstances of each Covered Person, including but not limited to their: (a) age, social, family, and medical history; (b) physical condition, limitations, and abilities; (c) the location, nature, and severity of injury and symptoms; and (d) response to existing treatment.

1537.   When an ambulatory patient presents with a soft tissue, disc or joint injury after an automobile accident, such as neck, back, shoulder, and/or knee pain, sprain, strain, disc bulge, or herniation, treatment should generally start with conservative care that is not invasive, such as rest, ice, anti-inflammatory medications, chiropractic care, and/or physical therapy, which may benefit patients by healing their injuries and relieving their symptoms with minimal associated risks and costs.

1538.   If the Covered Person's symptoms are not relieved through conservative care (or no treatment at all, since these injuries often heal on their own) other forms of treatment may be appropriate to relieve their symptoms, including various kinds of injections and other procedures designed to reduce pain and other symptoms. As with any other treatment option, whether to perform any kind of procedure or surgery should be tailored to the unique circumstances of each Covered Person.

1539. In a legitimate clinical setting, neither interventional pain management nor arthroscopic procedures and/or surgery should be administered until a Covered Person has exhausted and/or failed conservative treatment, especially since invasive pain management treatments, such as injections, percutaneous discectomies, and IDETs, and surgical procedures such as arthroscopy entail a high degree of risk to Covered Persons which is absent in conservative forms of treatment.

1540. Covered Persons should be discharged from treatment when they have reached maximum medical improvement, which means no further treatment is likely to benefit them.

1541. The above-described process of examination, diagnosis, and treatment must be adequately documented for the benefit of: (a) the licensed healthcare professionals involved in the Covered Person's care; (b) other licensed professionals who may treat the Covered Person contemporaneously or subsequently; (c) the Covered Persons themselves whose care and condition necessarily depends on the documentation of this information; and (d) payors such as Plaintiff so they can evaluate, and if appropriate, pay for reasonable and medically necessary treatment.

1542. The Covered Persons were not legitimately examined, diagnosed or treated by the Surgicore Pain Management Providers and the Surgicore Orthopedic Providers. Furthermore, the documentation of the examinations, diagnoses, and treatment is fraudulent because the documentation reflects that either the services were not medically necessary because they were performed pursuant to a Pre-Determined Protocol and not to benefit Covered Persons, and/or were not provided as billed.

C.     The Fraudulent Initial Examinations

1543. In furtherance of Defendants' fraudulent scheme, the Surgicore Pain Management Providers and Surgicore Orthopedic Providers purportedly performed initial examinations on

Covered Persons for no other reason than to create the false justification for the referral of Covered Persons for interventional pain management and/or arthroscopic procedures and/or surgeries to be performed at the Surgicore ASCs.

1544. The initial examinations purportedly performed by the Surgicore Pain Management Providers and Surgicore Orthopedic Providers routinely failed to document any causal relationship between the reported accident and purported injuries and misrepresented the severity of Covered Persons' injuries in order to create the false justification for the referral of Covered Persons for interventional pain management and/or arthroscopic procedures and/or surgeries to be performed at the Surgicore ASCs.

1545. As a matter of practice, pattern, and protocol, the vast majority of the Surgicore Pain Management Providers and Surgicore Orthopedic Providers initial examination reports ("Initial Exam Reports") contain pre-determined complaints and findings used to support pre-determined diagnoses and treatment plans without specifically documenting how a particular Covered Person might benefit from a particular procedure and/or surgery, any indications that certain Covered Persons were not candidates for certain medical procedures or any discussion as to the likelihood of success of the treatment.

1546. The Initial Exam Reports do not reflect legitimate examinations but are part of Defendants' Predetermined-Protocol. Defendants created the Initial Exam Reports to create the false justification to support interventional pain management and/or arthroscopic procedures and/or surgeries to be performed at the Surgicore ASCs that are not medically necessary and are prescribed without regard to the substantially undue risks and costs to the patients.

**i. The Surgicore Pain Management Providers' Fraudulent Initial Exams**

1547.   By way of example and not limitation, virtually all the Surgicore Pain Management Providers' Initial Exam Reports document that Covered Persons purportedly complained of both neck and low back pain (among other ailments) due to their reported involvement in automobile collisions.

1548.   Although their scheme intentionally created slight variations in the complaints and findings, the vast majority of Surgicore Pain Management Providers' Initial Exam Reports routinely describe the Covered Persons' complaints as including neck and back pain, with correlating radiating pain in the same region(s).

1549.   The Surgicore Pain Management Providers intentionally used generalized terms to describe Covered Persons' purported injuries that could be of no value in legitimate medical decision making and were sufficiently broad to provide the false justification and pretext for performing the Fraudulent Services.

1550.   By way of example and not limitation, many of the Initial Exam Reports broadly identify pain in the entire region (e.g., L3-S1 or C3-C7) and describe the pain in general terms such as "referred to the lower extremity" or "referred to the bilateral buttocks," "radiating to right upper extremity," without any accompanying detail such as which extremity (e.g., right knee, left ankle, left big toe, right arm, left wrist, left hand). By way of example and not limitation:

- Bowen PLLC in which Defendant Bowen is the record owner, mailed bills and an Initial Exam Report to Plaintiff relating to Covered Person I.J. Jackson, claim number 1120701-01, date of service 03-03-23, that documented complaints of cervical spine pain radiating bilaterally into the head and lumbar spine pain radiating to the left lower extremity. Examination purportedly revealed bilateral pain and tenderness in multiple regions of the cervical spine (C3-C7) and bilateral pain in multiple regions of the lumbar spine (L3-S1);

- Hall PLLC in which Defendant Hall is the record owner, mailed bills and an Initial Exam Report relating to Covered Person, J.S., claim number

1098288-05, date of service 10-04-21, that documented complaints of low back pain radiating to the bilateral lower extremity and neck pain radiating to the bilateral shoulders. Examination purportedly revealed bilateral pain and tenderness in multiple regions of the cervical spine (C3-C7) and bilateral pain in multiple regions of the lumbar spine (L3-S1);

- J Sports in which Defendant Jimenez is the record owner, mailed bills and an Initial Exam Report relating to Covered Person P.P, claim number 1124866-03, date of service 08-07-23, that documented complaints of neck pain radiating down the left arm, mid back pain and low back pain radiating into the lower extremities. Examination did not reveal any specific problematic level of the spine.

- Phoenix Medical in which Defendant Jones is the record owner, mailed bills and an Initial Exam Report relating to Covered Person L.M.R, claim number 1054922-01, date of service 06-26-19, that documented chief complaints of neck pain radiating to the upper extremities, upper back pain radiating bilaterally and lower back pain with correlating pain scores that did not reveal any specific problematic level of the spine;

- Kotkes PC in which Defendant Kotkes is the record owner, mailed bills and an Initial Exam Report relating to relating to Covered Person S.K., claim number 1049538-04, date of service 07-25-19, that documented complaints of neck pain radiating to both shoulders, and low back pain radiating to the bilateral lower extremity and buttock region. Examination purportedly revealed bilateral pain in multiple regions of the cervical spine (C3-C7) and bilateral pain in multiple regions of the lumbar spine (L3-S1);

- Total Anesthesia in which Defendant Shabtian is the record owner, mailed bills and an Initial Exam Report relating to Covered Person S.N., claim number 1136698-02, date of service 09-25-23, that documented complaints of neck pain, mid back pain and lower back pain radiating to bilateral lower extremities and complaints of neck pain radiating to both upper extremities. Examination purportedly revealed diffuse tenderness in lower back and sacroiliac region, spinous process (L3-S1);

- Portal Medical in which Defendant Portal is the record owner, mailed bills and an Initial Exam Report relating to Covered Person J.W., claim number 1125330-01, date of service 03-08-23, that documented complaints of low back pain radiating to the right lower extremity and neck pain radiating to the left upper extremity. Examination purportedly revealed Examination purportedly revealed bilateral pain and tenderness in multiple regions of the cervical spine (C3-C7) and bilateral pain in multiple regions of the lumbar spine (L3-S1).

1551. On information and belief, pinpointing and recording the precise location of the

Covered Persons' radiating pain, as well as specifying whether the pain is localized or radiating,

is critical to medical decision making and to create an appropriate treatment plan with targeted and medically necessary treatment options designed to improve the Covered Persons' condition. Such specific clinical information is a prerequisite to the administration of interventional pain management procedures and/or surgeries.

1552.   In furtherance of the scheme to defraud, the Surgicore Pain Management Providers' Initial Exam Reports are based on boilerplate pre-determined complaints and findings that are not tailored to reflect the unique circumstances of each Covered Person to allow Defendants to falsely document and justify the Fraudulent Services that followed.

1553.   To create the false impression of serious injuries and justification for unnecessary interventional pain management procedure, the Surgicore Pain Management Providers' Initial Exam Reports intentionally and routinely indicated that Covered Persons had high pain scores; described the Covered Persons' pain levels as "constant," or "frequent"; and documented positive results to cervical and/or lumbar orthopedic tests purportedly performed on Covered Persons during the Initial Exams.

1554.   The uniformity of non-specific symptoms and findings reflected in the Initial Exam Reports in which the Surgicore Pain Management Providers routinely ignored the vast differences in each Covered Persons' unique medical history and background, and the nature and severity of their purported injuries, reflect the fact that the initial examinations were intended to create the false justification for the Fraudulent Services.

1555.   In addition to the Initial Examination Reports in which virtually all Covered Persons reportedly had substantially similar symptoms and findings, irrespective of their individualized conditions and medical need, the vast majority of Surgicore Pain Management Providers' Initial Exam Reports routinely document a laundry list of diagnoses codes which

include generic and non-specific radiculopathies and disc injuries, without identifying any specific location of the purported condition or description or explanation of the Covered Persons' condition.

1556. By way of example and not limitation, such instances where the Surgicore Pain Management Doctors and their respective professional corporations' Initial Exam Reports contained generic diagnoses are found in reports and bills mailed and submitted by Defendants to Plaintiff in connection with the following claims:

- Total Anesthesia in which Defendant Shabtian is the record owner, mailed bills and an Initial Exam Report relating to Covered Person S.N. claim number 1136698-02, date of service 09-25-23;

- Hall PLLC in which Defendant Hall is the record owner, mailed bills and an Initial Exam Report relating to Covered Person, J.S., claim number 1098288-05, date of service 10-04-21;

- Phoenix Medical in which Defendant Jones is the record owner, mailed bills and an Initial Exam Report relating to Covered Person L.M.R., claim number 1054922-01, date of service 06-26-19;

- J Sports in which Defendant Jimenez is the record owner, mailed bills and an Initial Exam Report relating to Covered Person P.P., claim number 1124866-03, date of service 08-07-23;

- Portal Medical in which Defendant Portal is the record owner, mailed bills and an Initial Exam Report relating to Covered Person J.W., claim number 1125330-01, date of service 03-08-23;

- Kotkes PC in which Defendant Kotkes is the record owner, mailed bills and an Initial Exam Report relating to Covered Person S.K. Sekina Kedar, claim number 1049538-04, date of service 07-25-19;

- Bowen PLLC in which Defendant Bowen is the record owner, mailed bills and an Initial Exam Report relating to Covered Person I.J., claim number 1120701-01, date of service 03-03-23.

1557. Evident of the fact that the Surgicore Pain Management Providers' diagnoses are not only predetermined but also fabricated, a majority of Covered Persons are frequently diagnosed with cervical or lumbar or both cervical and lumbar radiculopathy, despite the fact that, according

to accepted medical literature and published studies, radiculopathies at one or more levels of the spine are rare in motor vehicle accidents, even where there is a positive disc herniation.

1558.    According to a large-scale, peer-reviewed 2009 study conducted by Dr. Randall Braddom, Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the American Association of Neuromuscular & Electrodiagnostic Medicine, at most, only 19% of ambulatory post-motor vehicle accident patients suffer from radiculopathy. Since this study was conducted at a major university teaching hospital, the accident patients upon which it is based likely represented a more severely injured group of patients than the Covered Persons purportedly treated by the Surgicore Pain Management Providers.

1559.    Notwithstanding the foregoing, the vast majority of Covered Persons who were purportedly treated by one or more of the Surgicore Pain Management Providerss and underwent interventional pain management procedures at one or more of the Surgicore ASCs were diagnosed with cervical, lumbar and/or both cervical and lumbar radiculopathy. By way of example and not limitation:

- Approximately all the of Covered Persons who were purportedly treated by Defendant Vora, the record owner of NJ Vora, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both radiculopathy through NJ Vora;

- Approximately 99% of Covered Persons who were purportedly treated by Defendant Jones, the record owner of Phoenix Medical, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both radiculopathy through Phoenix Medical;

- Approximately 98% of Covered Persons who were purportedly treated by Defendant Kotkes, the record owner of Kotkes PC, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both radiculopathy through Hershel Kotkes PC;

- Approximately 97% of Covered Persons who were purportedly treated by Defendant Bowen PLLC, the record owner of Bowen PLLC, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both radiculopathy through Bowen PLLC;

- Approximately 96% of Covered Persons who were purportedly treated by Defendant Jimenez, the record of owner of J Sports, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both cervical and lumbar radiculopathy through J Sports;

- Approximately 93% of Covered Persons who were purportedly treated by Defendant Kotkes, the record owner of Kotkes PC, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both radiculopathy through Kotkes PC;

- Approximately 92% of Covered Persons who were purportedly treated by Defendant Xie, the record owner of Integrated Pain Management, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both radiculopathy through Integrated Pain Management;

- Approximately 85% of Covered Persons who were purportedly treated by Defendant Shabtian the record owner of Total Anesthesia, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or cervical and lumbar radiculopathy through Total Anesthesia;

- Approximately 77% of Covered Persons who were purportedly treated by Defendant Portal, the record owner of Portal Medical, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both radiculopathy through Portal Medical;

- Approximately 74% of Covered Persons who were purportedly treated by Defendant Hall, the record owner of Hall PLLC, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or both radiculopathy through Hall PLLC;

- Approximately 66% of Covered Persons who were purportedly treated by Defendant Vora, the record owner of KV Medical, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or cervical and lumbar radiculopathy through KV Medical;

- Approximately 64% of Covered Persons who were purportedly treated by Defendant Vora, the record owner of KDV Medical, and underwent interventional pain management procedures at one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or cervical and lumbar radiculopathy through KDV Medical; and

- Approximately 59% of Covered Persons who were purportedly treated by Defendant Khakhar, the record owner of PM&R, and underwent interventional pain management procedures through one or more of the Surgicore ASCs, were diagnosed with cervical, lumbar and/or cervical and lumbar radiculopathy through PM&R.

1560. In addition to the foregoing, attached as Exhibit "15" is a representative list of claims in which Covered Persons who were purportedly treated by one or more of the Defendant Surgicore Pain Management Providers were over-diagnosed with cervical, lumbar and/or both cervical and lumbar radiculopathy.

1561. As indicated in the preceding paragraphs, contrary to the published reports concerning ambulatory post motor vehicle accident patients diagnosed with radiculopathy, the Surgicore Pain Management Providers' rate of diagnoses of radiculopathy was grossly above what would be expected under such circumstances and is greatly at variance with the expected rate found in published studies.

1562. The difference in the frequency of radiculopathy between what is typically found in ambulatory post-motor vehicle accident patients and the radiculopathy rate found by Defendants is indicative of fraud and an intentional misrepresentation of the diagnoses to justify the pain management services for which Defendants billed Plaintiff.

1563. The systematic false diagnosis of radiculopathy by the Surgicore Pain Management Providers and other Defendants reflect a disregard for the welfare of the Covered Persons, since the wrong diagnosis could result in selection of the wrong treatment plan and exposes them to unnecessary invasive services that place them at risk.

1564. The high rate of frequency of radiculopathy diagnoses by the Surgicore Pain Management Providers which significantly deviates from well recognized peer reviewed studies undermines the credibility of the Surgicore Pain Management Providers diagnoses and is indicative of fraud and intentional misrepresentation of the clinical condition of the Covered Persons that was used by the Defendants to justify the fraudulent interventional pain management services.

1565. What is more, the generic nature of the bills and supporting documents to Plaintiff where Defendants assume a "one size fits all approach," is reflecting the fact that many of the Surgicore Pain Management Providers' Initial Exam Reports do not even link the specific anatomic location of the Covered Persons alleged complaints of radiating pain to a precise anatomic defect. By way of example and not limitation:

- Bowen PLLC, in which Defendant Bowen is the record owner, mailed bills and a 03-06-23 Initial Exam Report relating to a Covered Person I.J. under claim number 1120701-01, in which the Covered Person I.J. was diagnosed with (among other things) cervical radiculopathy and a corresponding cervical invertebral disc displacement without specifying the cervical region to which this diagnosis applied. This Covered Person was also diagnosed with lumbar radiculopathy and a corresponding lumbar invertebral disc displacement without specifying the lumbar region to which this diagnosis applied;

- J Sports in which Defendant Jimenez is the record owner, mailed bills and a 08-07-23 Initial Exam Report relating to Covered Person P.P., claim number 1124866-03, in which the Covered Person P.P was diagnosed with (among other things) cervical radiculopathy and a corresponding cervical invertebral disc displacement without specifying the cervical region to which this diagnosis applied. This Covered Person was also diagnosed with lumbar radiculopathy without specifying the lumbar region to which this diagnosis applied;

- Phoenix Medical in which Defendant Jones is the record owner mailed bills and a 06-26-19 Initial Exam Report relating to Covered Person L.M.R., claim number 1054922-01, in which the Covered Person L.M.R. was diagnosed with (among other things) lumbosacral radiculopathy and a corresponding lumbar invertebral disc displacement without specifying the lumbar region to which this diagnosis applied. This Covered Person was

also diagnosed with cervical radiculopathy and a corresponding cervical invertebral disc displacement without specifying the cervical region to which this diagnosis applied;

- Portal Medical in which Defendant Portal is the record owner mailed bills and a 03-08-23 Initial Exam Report relating to Covered Person J.W., claim number 1125330-01, in which the Covered Person J.W. was diagnosed with (among other things) lumbosacral radiculopathy and a corresponding lumbar invertebral disc displacement without specifying the lumbar region to which this diagnosis applied. This Covered Person was also diagnosed with cervical radiculopathy and a corresponding cervical invertebral disc displacement without specifying the cervical region to which this diagnosis applied;

- Kotkes PC in which Defendant Kotkes is the record owner mailed bills and a 07-25-29 Initial Exam Report relating to Covered Person S.K. claim number 1049538-04, in which Covered Person S.K. was diagnosed with (among other things) lumbar radiculopathy and a corresponding lumbar invertebral disc displacement without specifying the lumbar region to which this diagnosis applied. This Covered Person was also diagnosed with cervical radiculopathy and a corresponding cervical invertebral disc displacement without specifying the cervical region to which this diagnosis applied; and

- Hall PLLC in which Defendant Hall is the record owner mailed bills and a 10-04-21 Initial Exam Report relating Covered Person, J.S., claim number 1098288-05, in which Covered Person J.S. was diagnosed with (among other things) lumbar radiculopathy and a corresponding lumbar invertebral disc displacement without specifying the lumbar region to which this diagnosis applied. This Covered Person was also diagnosed with cervical radiculopathy and a corresponding cervical invertebral disc displacement without specifying the cervical region to which this diagnosis applied.

1566. On information and belief, obtaining the necessary clinical information that links the specific anatomic location of the Covered Persons' alleged complaint of radiating pain to a precise anatomic defect is required for the administration of injections and/or to perform surgical procedures because spinal procedures are typically directed to a specific spinal region.

1567. Notwithstanding that such clinical information is typically required to administer injections and/or perform surgical procedures, the Surgicore Pain Management Providers routinely eschewed accepted medical practices because they were administering and/or performing the

Fraudulent Services pursuant to a predetermined fraudulent protocol that Defendants adopted where they knew or should have known the Covered Persons did not require the Fraudulent Services.

1568. In furtherance of the scheme to defraud alleged herein, the Surgicore Pain Management Providers' Initial Exam Reports documented pre-determined, non-specific and false diagnoses to fabricate the severity of the Covered Persons injuries and to justify advancing the Covered Persons beyond conservative treatment to medically unnecessary interventional pain management procedures, including injections, procedures, and surgeries performed at the Surgicore ASCs.

1569. Further evidencing that the diagnoses contained in many of the Surgicore Pain Management Providers' Initial Exam Reports were pre-determined, did not reflect the actual physical conditions of the Covered Persons and did not result in individualized care, in numerous instances two Covered Persons purportedly involved in the same low impact collision in same car, and who were different ages, weight, height, physical condition, and sometimes different genders, sitting in different positions in the car, purportedly received the same course of medically unnecessary interventional pain management procedures from the same Surgicore Pain Management Provider on or about the same date at one or more of the Surgicore ASCs. By way of example and not limitation:

- On or about May 17, 2022, Covered Persons E.K., claim no. 1114475-01, and T.B., claim no. 1114475-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, different genders, in different physical conditions and sitting in different locations within the vehicle, approximately nine months later on the exact same date, February 6, 2023 they both purportedly received initial examinations at Total Anesthesia of which Defendant Shabtian is the record owner. Ten days later, on the exact same date, February 16, 2023, they both purportedly underwent lumbar

percutaneous discectomy and IDET purportedly performed by Defendant Shabtian through Total Anesthesia at North Queens ASC;

- On or about August 19, 2019, Covered Persons N.C., claim no. 1066106-01, and C.C., claim no. 1066106-02, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, different genders, in different physical conditions and sitting in different locations within the vehicle, approximately nine months later on the exact same date, August 29, 2019 they both purportedly received initial examinations at Ketan PC of which Defendant Vora is the record owner. They both continued to purportedly undergo virtually identical courses of treatment at Ketan PC during which time they also purportedly underwent the same predetermined protocol of unnecessary interventional pain management procedures and surgery through various other PCs of which Defendant Vora is the record owner at one or more of the Surgicore ASCs, to wit. On the exact same date, November 23, 2019, both Covered Persons, N.C. and C.C., purportedly underwent epidural steroid injection with epidurograpy, epidurogram, and trigger point injections with ultrasound guidance purportedly performed by Defendant Vora through Non-Surgical Orthopedics of which Defendant Vora is the record owner, at Saddlebrook ASC. Approximately a month and a half later, on the exact same date, January 4, 2020, both Covered Persons, N.C. and C.C., purportedly underwent epidural steroid injection with epidurography, trigger point injection with ultrasound guidance, lumbar percutaneous discectomy, IDET and discogram purportedly performed by Defendant Vora through NJ Vora of which Defendant Vora is the record owner, at Saddlebrook ASC. On the exact same date, February 29, 2020, Covered Person N.C. purportedly underwent facet and trigger point injections purportedly performed by Defendant Vora through NJ Vora at Saddlebrook ASC. While, Covered Person C.C. purportedly underwent epidural steroid injection with epidurography, and trigger point injection with ultrasound guidance purportedly performed by Defendant Vora through NJ Vora at Saddlebrook ASC. On the exact same date, March 14, 2020, Covered Person N.C. purportedly underwent epidural steroid injection with epidurography, and trigger point injection with ultrasound guidance purportedly performed by Defendant Vora through NJ Vora at New Horizon ASC. While, Covered Person C.C. purportedly underwent facet and trigger point injections purportedly performed by Defendant Vora through NJ Vora at New Horizon ASC;

- On or about November 23, 2022, Covered Persons C.M., claim no. 1122619-02, and I.D., claim no. 1122619-03, were purportedly involved in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions and sitting in different locations within the vehicle, they both purportedly underwent virtually the same predetermined protocol of unnecessary interventional pain management procedures and surgery,

weeks apart, by Defendant Kotkes through Kotkes PC at both Rockaways ASC and All City ASC. On February 8, 2023 Covered Person C.M. purportedly received an initial examination at Kotkes PC. Thereafter, on February 16, 2023, Covered Person C.M. purportedly underwent epidural steroid injection with epidurography, and trigger point injection with ultrasound guidance purportedly performed by Defendant Kotkes through Kotkes PC at Rockaway ASC. Thereafter, on April 24, 2023, Covered Person C.M. purportedly underwent a lumbar percutaneous discectomy and IDET purportedly performed by Defendant Kotkes through Kotkes PC at All City ASC. Around the same time, on February 22, 2023, Covered Person I.D. purportedly received an initial examination at Kotkes PC. Thereafter, on February 27, 2023, Covered Person I.D. purportedly underwent epidural steroid injection with epidurography, and trigger point injection with ultrasound guidance purportedly performed by Defendant Kotkes through Kotkes PC at All City ASC. Thereafter, on May 4, 2023, Covered Person I.D. purportedly underwent a lumbar percutaneous discectomy and IDET purportedly performed by Defendant Kotkes through Kotkes PC at Rockaways ASC;

- On or about February 27, 2023, Covered Persons A.V., claim no. 1127000-02, and D.V., claim no. 1127000-04, were purportedly in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, different fenders, in different physical conditions, and sitting in different locations within the vehicle, approximately two months later, on the same date, April 26, 2023, they both purportedly underwent an initial examination at Defendant Portal Medical, of which Defendant Portal is the record owner. Two days later, on the exact same date, April 28, 2023, A.V. and D.V. both underwent epidural steroid injections with epidurography, and trigger point injections with ultrasonic guidance, purportedly performed by Defendant Portal through Defendant Portal Medical, at Defendant Rockaways ASC. Less than two weeks later, on May 9, 2023, A.V. purportedly underwent a lumbar percutaneous discectomy with IDET, purportedly performed by Defendant Portal through Defendant Portal Medical, at Medex Diagnostic & Treatment Center (not named a Defendant in the Complaint). Three days later, on May 12, 2023, D.V. purportedly underwent a lumbar percutaneous discectomy with IDET, purportedly performed by Defendant Portal through Defendant Portal Medical, at Defendant Rockaways ASC. Finally, on May 22, 2023, A.V. purportedly underwent a second round of epidural steroid injections with epidurography, and trigger point injections with ultrasonic guidance, purportedly performed by Defendant Portal through Defendant Portal Medical, at Defendant Rockaways ASC;

- On or about November 22, 2018, Covered Persons S.Z., claim no. 1045476-02, Q.C., claim no. 1045476-04, and Y.Q., claim no. 1045476-07, were purportedly in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, different

genders, in different physical conditions, and sitting in different locations within the vehicle, they purportedly underwent nearly identical interventional pain management services. On February 12, 2019, S.Z., Q.C., and Y.Q., on the same day, purportedly underwent an initial examination and trigger point injections under ultrasonic guidance, all purportedly performed by Defendant Xie through Defendant Integrated Pain Management. Thereafter, on February 16, 2019, less than a week later, S.Z. and Y.Q. purportedly underwent cervical percutaneous discectomies, purportedly performed by Defendant Xie through Defendant Integrated Pain Management, at Defendant Manalapan ASC. Just over a month later, on March 28, 2019, Q.C. also purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Xie, through Defendant Integrated Pain Management, but instead at Defendant Jersey City ASC. Finally, On April 4, 2019, Y.Q. purportedly underwent a lumbar percutaneous discectomy with IDET, purportedly performed by Defendant Xie through Defendant Integrated Pain Management, at Defendant Manalapan ASC; and

- On or about May 4, 2022, Covered Persons V.R., claim no. 1113762-02 and R.V., claim no. 1113762-04 were purportedly in the same low-impact automobile collision. Despite the fact that these Covered Persons were different ages, different sizes, in different physical conditions, and sitting in different locations within the vehicle, they purportedly underwent nearly identical interventional pain management services. On July 28, 2022, both V.R. and R.V. on the same day, purportedly underwent an initial examination purportedly performed by Defendant Hall PLLC. A week later, on August 5, 2022, both V.R. and R.V. on the same day, purportedly underwent epidural steroid injections, and trigger point injections with ultrasonic guidance, purportedly performed by Defendant Hall, through Defendant Hall PLLC, at Defendant Rockaways ASC. On August 26, 2022, V.R. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Portal through Defendant Hall PLLC, at Defendant Rockaways ASC. That same day, R.V. purportedly underwent a second round of epidural steroid injections, this round with epidurography, and a second round and trigger point injections with ultrasonic guidance, performed by Defendant Portal through Defendant Hall PLLC, at Defendant Rockaways ASC. On September 12, 2022, R.V. purportedly underwent his lumbar percutaneous discectomy, purportedly performed by Defendant Hall through Defendant Hall PLLC, at Defendant Rockaways ASC. That same day, V.R. purportedly underwent his second round of epidural steroid injections, this round with epidurography, and a second round and trigger point injections with ultrasonic guidance, performed by Defendant Hall through Defendant Hall PLLC, at Defendant Rockaways ASC. Finally, on September 30, 2022, both V.R. and R.V. purportedly underwent a final round of epidural steroid injections with epidurography and trigger point injections with ultrasonic guidance,

purportedly performed on the same day by Defendant Hall through Defendant Hall PLLC at Defendant Rockaways ASC.

1570. It is improbable that two or more Covered Persons in the same low-impact automobile collision that is unlikely to result in injuries requiring treatment on one passenger, let alone multiple passengers, would each require treatment beyond perhaps a course of conservative care.

1571. The blatantly similar, if not identical courses of aggressive interventional pain management treatments purportedly rendered to both Covered Persons allegedly involved in the same single accident reflects the fact that the billed for pain management services were rendered to Covered Persons through the Surgicore Pain Management Providers at the Surgicore ASCs, if at all, pursuant to Defendants' Pre-Determined Protocol.

1572. As a matter of practice, procedure, and protocol, the vast majority of the Surgicore Pain Management Providers' Initial Exam Reports routinely included boilerplate pre-determined causality statements concluding that each of the Covered Persons' injuries were purportedly caused by their respective car accidents when in fact they made little to no such inquiry of the Covered Persons or determination as to causality, all with the intent of inducing Plaintiff into making payment for services that were not eligible for reimbursement. In the vast majority of such reports, the Surgicore Pain Management Providers through their respective professional corporations included a variation of the generalized statement that "the patient's injuries. . .to a degree of medical certainty, are causally related to the accident. . . ."

1573. By way of example and not limitation, such instances where the Surgicore Pain Management Providers and their respective professional corporations' Initial Exam Reports contained boilerplate, predetermined causality statements are found in such reports mailed and submitted by Defendants to Plaintiff in connection with the following claims:

- Bowen PLLC's Initial Exam Report, dated 03/06/23, relating to Covered Person I.J. under claim number 1120701-01;

- Hall PLLC's Initial Exam Report, dated 10-04-21 relating to Covered Person, J.S. under claim number 1098288-05;

- J Sports Initial Exam Report, dated 08-07-23 relating to Covered Person P.P, claim number 1124866-03;

- Portal Medical Initial Exam Report dated 03-08-23 relating to Covered Person J.W., claim number 1125330-01; and

- Kotkes PC's Initial Exam Report dated 07-25-19 relating to Covered Person S.K., claim number 1049538-04.

1574. The Surgicore Pain Management Doctors and their respective professional corporations routinely misrepresented that Covered Persons' purported injuries were causally related to automobile accidents when in fact they made little to no such inquiry of the Covered Persons or determination, as the Initial Exam Reports are devoid of any statements that would support any such finding. Such misrepresentations were intended, and did in fact, induce Plaintiff to issue payment to the Surgicore Pain Management Providers for the Fraudulent Services.

### ii. The Surgicore Orthopedic Providers' Fraudulent Initial Exams

1575. Like the Surgicore Pain Management Providers' Initial Exam Reports, the Surgicore Orthopedic Providers' Initial Exam Reports do not reflect the Covered Persons' true subjective complaints, actual examination findings, legitimate diagnoses, or medically necessary treatment plans.

1576. To create the false impression of serious injuries and thereby provide false justification for unnecessary arthroscopic procedures, the vast majority of the Surgicore Orthopedic Providers' Initial Exam Reports document complaints and/or injuries that reflect a substantial escalation of the Covered Persons' complaints and/or injuries between the time of their alleged accident, their initial and subsequent treatment at the No-Fault Clinics, and their initial

visit with the Surgicore Orthopedic Providers, which are far beyond the type of injuries that would be expected following low impact automobile collisions.

1577. As alleged in paragraph 1490, on numerous instances, Covered Persons who did not seek emergency treatment ultimately underwent arthroscopic surgeries with their complaints having evolved over time to what was reported in the Surgicore Orthopedic Providers' Initial Exam Reports to create the false justification for medically unnecessary procedures and surgeries.

1578. Similarly, as alleged herein in paragraph 1496, Covered Persons reporting to the emergency room did not report pain to parts of the body in which they ultimately underwent arthroscopic surgeries. Thereafter, in numerous instances, Covered Persons' complaints evolved from what was reported in the emergency room to what was recorded in the Surgicore Orthopedic Providers' Initial Exam Reports, in order to justify referrals for arthroscopic surgeries.

1579. Notwithstanding that the vast majority of Covered Persons were involved in minor automobile collisions where they suffered soft tissue injuries, if suffering any injury at all, in order to create the false impression of serious injuries and thereby provide false justification for excessive, unnecessary, arthroscopic surgeries, many of the Surgicore Orthopedic Providers' Initial Exam Reports routinely describe Covered Persons as complaining of multiple joint injuries. By way of example and not limitation:

- McCulloch Orthopaedic Initial Exam Report, dated 02-12-17, relating to Covered Person S.F., under claim number 666463-03, documented complaints of left shoulder pain and dysfunction with right knee mechanic symptoms;

- Apazidis PC Initial Exam Report, dated 11-26-19, relating to Covered Person H.P. under claim number 1070584-02, documented complaints of right shoulder and left knee pain;

- Apazidis PC Initial Exam Report, dated 12-10-19, relating to Covered Person W.V.R., under claim number 1070584-05, documented complaints of right shoulder and right knee pain;

- McMahon PC Initial Exam Report, dated 12-11-19, relating to Covered Person J.P., under claim number 1072272-04, documented complaints of left shoulder and right knee pain;

- Bay Ridge PC Initial Exam Report, dated 12-29-20, relating to Covered Person C.S.H. under claim number 1086023-10, documented complaints of left wrist, left shoulder and left knee pain;

- Bay Ridge PC Initial Exam Report, dated 12-29-20, relating to Covered Person F.S.H. under claim number 1086023-10, documented bilateral shoulder and right knee complaints;

- Advanced Orthopaedics Initial Exam Report, dated 11-11-21, relating to Covered Person D.R. under, claim number 1105880-02, documented complaints of both shoulders and both knees;

- Advanced Orthopaedics Initial Exam Report, dated 11-02-22, relating to Covered Person A.N. under claim number 1102268-01, documented complaints of both knees;

- Graziosa PC Initial Exam Report, dated 02-02-22, relating to Covered Person M.P. under claim number 1102268-01, documented complaints of left shoulder, left knee, left ankle;

- MSJR, Initial Exam Report dated 12-08-21 relating to Covered Person L.E. under, claim number 1089433-02, documented complaints of bilateral shoulder and bilateral knee pain;

- Ronald Daly, MD (not named a Defendant in the Complaint) Initial Exam Report, dated 06-10-21, relating to Covered Person E.D. under claim number 1098936-03, documented complaints of bilateral shoulder and right knee pain;

- William King, MD, PC (not named a Defendant in the Complaint) Initial Exam Report, dated 06-21-21, relating to Covered Person U.J.L. under claim number 1098288-02, documented complaints of bilateral shoulder and right shoulder, right wrist/hand, right knee and left knee;

- Steven Struhl, MD, LLC (not named a Defendant in the Complaint) Initial Exam Report, dated 11-09-17, relating to Covered Person S.S. under claim number 921568-03, documented complaints of bilateral knee and bilateral shoulder pain; and

- Steven Struhl, MD, LLC (not named a Defendant in the Complaint) Initial Exam Report, dated 10-23-19, relating to Covered Person T.B. under claim number 1064495-02, documented complaints of bilateral knee pain.

1580. In addition to the Initial Examination Reports in which virtually all Covered Persons reportedly complained of multiple joint pain, the vast majority of the Surgicore Orthopedic Providers' Initial Exam Reports routinely diagnose multiple joint injuries, including but not limited to knee and shoulder injuries.

1581. By way of example and not limitation, such instances where the Surgicore Orthopedists and their respective professional corporations' Initial Exam Reports contained multiple joint diagnoses are found in reports and bills mailed and submitted by Defendants to Plaintiff in connection with the following claims:

- Apazidis PC of which Surgicore Orthopedist Apazidis is the record owner, mailed bills and an Initial Exam Report, dated 11-26-19, relating to Covered Person, Covered Person H.P. under claim number 1070584-02;

- Apazidis PC of which Surgicore Orthopedist Apazidis is the record owner, mailed bills and an Initial Exam Report, dated 12-10-19, relating to Covered Person, Covered Person W.V.R. under claim number 1070584-05;

- McMahon PC of which Surgicore Orthopedist McMahon is the record owner mailed bills and an Initial Exam Report, dated 12-11-19, relating to Covered Person J.P, under claim number 1072272-04;

- Bay Ridge PC of which Surgicore Orthopedist Baum is the record owner mailed bills and an Initial Exam Report, dated 12-29-20, relating to Covered Person C.S.H. under claim number 1086023-10;

- Bay Ridge PC of which Surgicore Orthopedist Baum is the record owner mailed bills and an Initial Exam Report, dated 12-29-20, relating to Covered Person F.S.H. under claim number 1086023-10;

- Advanced Orthopaedics of which Surgicore Orthopedist Berkowitz is the record owner mailed bills and an Initial Exam Report, dated 11-11-21, relating to Covered Person D.R. under claim number 1105880-02;

- Advanced Orthopaedics of which Surgicore Orthopedist Berkowitz is the record owner mailed bills and an Initial Exam Report, dated 11-02-22, relating to Covered Person A.N. under claim number 1102268-01;

- Graziosa PC of which Surgicore Orthopedist Graziosa is the record owner mailed bills and an Initial Exam Report, dated 02-02-22, relating to Covered Person M.P. under claim number 1102268-01;

- MSJR of which Surgicore Orthopedist Ajoy Sinha is the record owner mailed bills and an Initial Exam Report, dated 12-08-21, relating to Covered Person L.E. under, claim number 1089433-02;

- Ronald Daly, MD (not named a Defendant in the Complaint) mailed bills and an Initial Exam Report, dated 06-10-21, relating to Covered Person E.D. under claim number 1098936-03;

- William King, MD, PC (not named a Defendant in the Complaint) mailed bills and an Initial Exam Report, dated 06-21-21, relating to Covered Person U.J.L. under claim number 1098288-02;

- Steven Struhl, MD, LLC (not named a Defendant in the Complaint) mailed bills and an Initial Exam Report, dated 11-09-17, relating to Covered Person S.S. under claim number 921568-03; and

- Steven Struhl, MD, LLC (not named a Defendant in the Complaint) mailed bills and an Initial Exam Report, dated 10-23-19, relating to Covered Person T.B. under claim number 1064495-02.

1582. Contrary to the Surgicore Orthopedic Providers' routine findings, multiple knee and shoulder injuries are unlikely to result from minor impact automobile collisions across a large volume of Covered Persons.

1583. The Surgicore Orthopedic Providers' routine findings of multiple injuries to disparate body parts of Covered Persons was to document the justification for the performance of the Fraudulent Services at, by, and through the Surgicore ASCs.

1584. What is more, like the Surgicore Pain Management Providers, several of the Surgicore Orthopedic Providers' Initial Exam Reports routinely included boilerplate pre-determined causality statements concluding that each of the Covered Persons' injuries were purportedly caused by their respective car accidents when in fact they made little to no such inquiry, of the Covered Persons or determination as to causality, all with the intent of inducing Plaintiff into making payment for services that were not eligible for reimbursement. In the vast majority of such reports, the Surgicore Orthopedist and their respective professional entities included a variation of the boilerplate statement that "Based on my history, physical examination,

review of diagnostic testing and of the available medical records, patient's injuries, limitations, restrictions, to a reasonable degree of medical certainty, are causally related to the accident. . .."

1585. By way of example and not limitation, such instances where the Surgicore Orthopedist and their respective professional corporations' Initial Exam Reports contained boilerplate, predetermined causality statements are found in such reports mailed and submitted by Defendants to Plaintiff in connection with the following claims:

- Apazidis PC Initial Exam Report, dated 11-26-19, relating to Covered Person H.P. under claim number 1070584-02;

- Apazidis PC Initial Exam Report, dated 12-10-19, relating to Covered Person W.V.R under claim number 1070584-05;

- McCulloch Orthopaedic Initial Exam Report, dated 02-12-17, relating to Covered Person S.F. under claim number 666463-03;

- Graziosa PC Initial Exam Report, dated 02-02-22, relating to Covered Person M.P. under claim number 1102268-01;

- Ronald Daly, MD (not named a Defendant in the Complaint) Initial Exam Report, dated 06-10-21, relating to Covered Person E.D. under claim number 1098936-03; and

- William King, MD, PC (not named a Defendant in the Complaint) Initial Exam Report, dated 06-21-21, relating to Covered Person U.J.L. under claim number 1098288-02.

1586. The Surgicore Orthopedist and their respective professional corporations routinely misrepresented that Covered Persons' purported injuries were causally related to automobile accidents when in fact they made little to no such inquiry of the Covered Persons, or determination, as the Initial Exam Reports are devoid of any statements that would support any such finding. Such misrepresentations were intended, and did in fact, induce Plaintiff to issue payment to the Surgicore Orthopedic Providers for the Fraudulent Services.

1587. In addition to falsely documenting that automobile accidents caused injuries to Covered Persons, many of the Surgicore Orthopedic Providers used their diagnoses as a pretext to

surgery, routinely recommending surgeries based on diagnoses, including but not limited to shoulder impingement syndrome, meniscal pathology, and rotator cuff pathology, contrary to the expected rate at which these injuries are considered traumatic and/or related to a low impact collision and notwithstanding that these diagnoses are typically reflective of a degenerative and pre-existing condition, especially in middle age individuals, a common age in the subset of Covered Persons.

1588. The Surgicore Orthopedic Providers diagnosed Covered Persons with shoulder impingement syndrome, meniscal pathology, and/or rotator cuff pathology (among other things) to falsely document the medical justification for their recommendation and performance of shoulder arthroscopy at, by, and through the Surgicore ASCs when in fact they knew such surgeries were medically unnecessary and unrelated to any trauma suffered from automobile accidents.

1589. Further evidencing that the Surgicore Orthopedic Providers referred Covered Persons for medically unnecessary arthroscopies to be performed at the Surgicore ASCs as stated above in paragraph 1504, in many instances, the Surgicore Orthopedic Providers referred two or more Covered Persons who were involved in the same low-impact collision to one or more of the Surgicore ASCs for one or more arthroscopic surgeries, at times on the same day, notwithstanding that the minor impact collisions are unlikely to result in injuries requiring arthroscopic surgery on one passenger, let alone multiple passengers.

1590. In addition to the foregoing, demonstrative of the fact that Covered Persons were referred to the Surgicore ASCs for arthroscopic surgeries irrespective of medical necessity, as stated in paragraph 1505 above, in many instances, multiple individuals who were purportedly involved in the same low-impact collision in the same car, and who were different ages, weight,

height, and physical condition, were referred to one or more of the Surgicore ASCs for multiple surgeries on the same limb.

1591. It is improbable that two or more Covered Persons in the same low-impact automobile collision would each require surgical intervention, let alone, in some instances, multiple surgeries as a result of a minor automobile collision.

1592. The blatantly similar, if not identical arthroscopies purportedly rendered to more than one Covered Person allegedly involved in the same single accident reflects the fact that the billed for arthroscopies were rendered to Covered Persons through the Surgicore Orthopedic Providers at the Surgicore ASCs, if at all, pursuant to Defendants' Pre-Determined Protocol

### iii. The Surgicore Pain Management Providers' And Surgicore Orthopedic Providers' Failure To Evaluate Or Document Prior Or Concurrent Conservative Care

1593. In order to proceed with medically unnecessary procedures and/or surgeries, the Surgicore Pain Management Providers and Surgicore Orthopedic Providers frequently used their initial consultations to support recommendations for interventional pain management and/or orthopedic procedures and/or surgeries without regard to the Covered Persons' prior or concurrent conservative care.

1594. In accordance with accepted medical practices, in a legitimate clinical setting, referrals for interventional pain management and/or orthopedic procedures are generally considered to be improper unless the Covered Person has failed or been intolerant of a minimum of six weeks (and, generally, at least three months) of conservative therapy. This is because soft tissue injuries from low impact automobile collisions virtually always resolve after a short course of conservative treatment or no treatment at all, and because interventional pain management procedures and/or arthroscopic surgeries tend to be invasive and pose increased risks to Covered Persons.

1595.   The Surgicore Pain Management Providers' and Surgicore Orthopedic Providers' Initial Exam Reports plainly state failure of conservative care as a basis for proceeding with interventional pain management and/or arthroscopic procedures and/or surgeries, thereby admitting that an adequate course of conservative treatment prior to these procedures and/or surgeries is the standard of care.

1596.   Notwithstanding, not only do the Surgicore Pain Management Providers and Surgicore Orthopedic Providers routinely fail to meaningfully evaluate and/or document the specifics of each Covered Persons' conservative care, and incorporate those findings into the diagnosis or treatment plans of the Covered Persons, procedures and surgeries are often performed on a majority of patients absent an adequate trial of time and/or conservative care.

1597.   On information and belief, review and documentation of prior conservative care is essential to determine, for example, how a Covered Person responded to (or did not respond to) certain treatments directed at specific areas of the body (i.e., patient had pain when doing physical therapy on the lumbar region or the shoulder) and whether the Covered Person is an appropriate candidate for a specific interventional and/or surgical treatment.

1598.   Notwithstanding the importance of considering prior conservative care, the Surgicore Pain Management Providers' and Surgicore Orthopedic Providers' Initial Exam Reports document only a minimal assessment, if any of the Covered Persons' response to conservative care.

1599.   Contrary to accepted medical practices, the vast majority of Surgicore Pain Management Providers' and Surgicore Orthopedic Providers' Initial Exam Reports fail to document the Covered Persons': (1) length of physical therapy, chiropractic, or acupuncture treatment, if any; (2) the specific types, dosage, or duration of anti-inflammatory or pain

medication taken by the Covered Persons or any success exhibited by the intake of medication; and/or (3) whether the Covered Persons positively responded to any specific portion of the prior conservative treatment. The Initial Exam Reports further fail to document any meaningful review or analysis of prior medical records, diagnostic tests (other than sometimes noting MRI findings), or other information in connection with the Covered Persons' prior treatment.

1600.   Without any analysis or consideration of the Covered Persons' prior conservative care and absent the failure of a minimum of six weeks (and, generally, at least three months) of legitimate conservative care, the initiation of interventional pain management and/ arthroscopic procedures and/or surgeries is excessive and contrary to the standard of care and was not considered because Defendants were going to be provided Fraudulent Services irrespective of medical need.

### iv. Prematurely Proceeding with Surgeries

1601.   Notwithstanding the foregoing, pursuant to their Pre-Determined Protocol, in many instances the Surgicore Pain Management Providers and Surgicore Orthopedic Providers purportedly proceeded with procedures and/or surgeries at an accelerated pace, early in the treatment of Covered Persons and before there was an opportunity to determine if the Covered Persons recovered through a course of time and conservative care, or to allow the Covered Persons to have the benefit of an adequate trial of conservative care, much less fail conservative care, prior to being subjected to the procedures and/or surgeries. By way of example and not limitation:

- On January 26, 2023, Covered Person K.B., claim no. 1125318-02, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On February 24, 2023, only twenty-nine days later, K.B. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Hostin, through Defendant Hostin Orthopaedics, at Defendant Empire State ASC, which failed to allow sufficient opportunity to determine if K.B. would recover though a course of time or care or to allow K.B. to have the benefit of an

adequate trial of conservative care, much less fail conservative care prior to being subjected to an arthroscopic surgery;

- On January 2, 2023, Covered Person Y.C., claim no. 1124714-02, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On February 10, 2023, only thirty-nine days later, Y.C. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Hostin, through Defendant Hostin Orthopaedics, at Defendant Empire State ASC, which failed to allow sufficient opportunity for Hostin to determine if Y.C. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On September 18, 2022, Covered Person P.R., claim no. 1119135-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On October 28, 2022, only forty days later, P.R. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Hall, through Defendant Hall PLLC, at Defendant Rockaways ASC, which failed to allow sufficient opportunity for Hall to determine if P.R. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an interventional pain management procedure;

- On October 25, 2021, Covered Person W.W., claim no. 1104446-03, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On December 7, 2021, only forty-three days later, W.W. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant Rockaways ASC, which failed to allow sufficient opportunity for Kotkes to determine if W.W. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an interventional pain management procedure;

- On October 3, 2021, Covered Person R.R., claim no. 1103438-02, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On November 16, 2021, only forty-four days later, R.R. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, at Defendant Manalapan ASC, which failed to allow sufficient opportunity for Berkowitz to determine if R.R. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On February 12, 2021, Covered Person B.K., claim no. 1094157-01, was purportedly involved in a low-impact automobile collision of the type that

would cause no more than soft tissue injuries. On March 11, 2021, only twenty-seven days later, B.K. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Defendant Ackerman, through Defendant Contemporary Orthopedics, at Defendant All City ASC, which failed to allow sufficient opportunity for Ackerman to determine if B.K. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On June 27, 2020, Covered Person R.M., claim no. 1085232-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On August 10, 2020, only forty-four days later, R.M. purportedly underwent epidural steroid injections, purportedly performed by Defendant Vora, through Defendant KV Medical of NY PC, at Defendant Rockaways ASC, which failed to allow sufficient opportunity for Vora to determine if R.M. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an interventional pain management procedure;

- On August 3, 2020, Covered Person M.R., claim no. 1086993-02, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On September 10, 2020, only thirty-eight days later, M.R. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant Anjani Sinha, through Defendant Anjani PC, at Defendant All City ASC which failed to allow sufficient opportunity for Anjani Sinha to determine if M.R. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On January 6, 2020, Covered Person J.A., claim no. 1077803-02, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On February 11, 2020, only thirty-six days later, J.A. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant Graziosa, through Defendant Graziosa PC, at Defendant Empire State ASC, which failed to allow sufficient opportunity for Graziosa to determine if J.A. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On January 6, 2020, Covered Person E.M., claim no. 1077803-03, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On February 18, 2020, only forty-three days later, E.M. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Graziosa, through Defendant Graziosa PC, at Defendant North Queens ASC, which failed to allow sufficient opportunity for Graziosa to determine if E.M.

would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On December 30, 2019, Covered Person S.J., claim no. 1077389-02, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On February 4, 2020, only thirty-six days later, S.J. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Defendant McMahon, at Defendant Fifth Avenue ASC. A week later, on February 11, 2020, only forty-three days following the incident, S.J. also purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant McMahon, at Defendant Fifth Avenue ASC. In both instances, Defendant McMahon failed to allow sufficient opportunity to determine if S.J. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to arthroscopic surgeries;

- On December 27, 2019, Covered Person F.C., claim no. 1078054-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On February 6, 2020, only forty-one days later, F.C. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Defendant Anjani Sinha, through Defendant Anjani PC, at Defendant All City ASC which failed to allow sufficient opportunity for Anjani Sinha to determine if F.C. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On June 5, 2019, Covered Person J.J., claim no. 1059974-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On July 19, 2019, only forty-four days later, J.J. purportedly underwent epidural steroid injections, purportedly performed by Defendant Kotkes, at Defendant All City ASC, which failed to allow sufficient opportunity for Kotkes to determine if J.J. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an interventional pain management procedure;

- On April 2, 2019, Covered Person A.G., claim no. 1055054-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On May 3, 2019, only thirty-one days later, A.G. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Baum, through Defendant Bay Ridge Orthopedic, at Defendant All City ASC, which failed to allow sufficient opportunity for Baum to determine if A.G. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On April 1, 2019, Covered Person L.C., claim no. 1055149-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On May 4, 2019, only thirty-three days later, L.C. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Xie, through Defendant Integrated Pain Management, at Defendant Jersey City ASC, which failed to allow sufficient opportunity for Xie to determine if L.C. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an interventional pain management procedure;

- On March 26, 2019, Covered Person J.S., claim no. 1054268-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On May 3, 2019, only thirty-eight days later, J.S. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Apazidis, at Defendant All City ASC, which failed to allow sufficient opportunity for Apazidis to determine if J.S. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On March 10, 2019, Covered Person J.C., claim no. 1054157-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On April 16, 2019, only thirty-seven days later, J.C. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Defendant McMahon, at Defendant Fifth Avenue ASC. A week later, on April 23, 2019, only forty-four days following the incident, J.C. also purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant McMahon, at Defendant Fifth Avenue ASC. In both instances, Defendant McMahon failed to allow sufficient opportunity to determine if J.C. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to arthroscopic surgeries;

- On February 24, 2019, Covered Person D.V., claim no. 1051820-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On April 1, 2019, only thirty-six days later, D.V. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Ajoy Sinha, through Defendant Sinha Orthopedics, at Defendant Saddlebrook ASC, which failed to allow sufficient opportunity for Dr. Sinha to determine if D.V. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On February 16, 2019, Covered Person M.B., claim no. 1051250-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On March 29, 2019, only

forty-one days later, M.B. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Defendant Apazidis, at Defendant All City ASC, which failed to allow sufficient opportunity for Apazidis to determine if M.B. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery;

- On January 6, 2019, Covered Person J.Z., claim no. 1049536-05, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On February 14, 2019, only thirty-nine days later, J.Z. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant All City ASC, which failed to allow sufficient opportunity for Kotkes to determine if J.Z. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an interventional pain management procedure;

- On December 19, 2018, Covered Person B.D., claim no. 1047103-01, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On February 1, 2019, only forty-four days later, B.D. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Ackerman, through Spruce Medical & Diagnostic PC, at Defendant North Queens ASC, which failed to allow sufficient opportunity for Ackerman to determine if B.D. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery; and

- On May 12, 2018, Covered Person A.B., claim no. 1029727-02, was purportedly involved in a low-impact automobile collision of the type that would cause no more than soft tissue injuries. On June 13, 2018, only thirty-two later, A.B. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, at Defendant Jersey City ASC, which failed to allow sufficient opportunity for Berkowitz to determine if A.B. would recover though a course of time, or undergo, much less fail an adequate course of conservative care prior to being subjected to an arthroscopic surgery.

1602. As the Fraudulent Services were predicated on Defendants' greed, not the need of the Covered Persons, in the claims identified in Exhibit "16," the Surgicore Pain Management Providers and Surgicore Orthopedic Providers routinely proceeded with procedures and/or surgeries early in the treatment of Covered Persons without regard to the conservative treatment

that was purportedly provided at, by, and through the No-Fault Clinics that were carrying out their own fraudulent scheme.

1603. Reflective that the Fraudulent Services were being provided pursuant to a predetermined fraudulent protocol and irrespective of medical necessity, Defendants routinely subjected Covered Persons to interventional pain management and/or orthopedic procedures and/or surgeries without considering whether they may benefit from continued conservative treatment or determining that conservative treatment had failed.

1604. Further evidencing that the treatment of the Covered Persons did not follow the standard medically accepted pathway of conservative care before proceeding with surgical intervention, in some cases the Surgicore Orthopedic Providers recommended multiple surgeries as opposed to recommending and/or proceeding with conservative options such as joint injections and/or subacromial injections, which runs contrary to the generally accepted standard of care of individuals with non-urgent conditions in the shoulder and/or knee, such as impingement syndrome, rotator cuff tendinitis/bursitis, and/or meniscal pathology that might be degenerative and/or acute in nature.

1605. By way of example and not limitation, Defendant Berkowitz recommended multiple surgeries as opposed to conservative care such as injections falsely citing that the risk of surgery and predictability of surgical outcomes were such that surgery was the appropriate choice versus the inherent risk of an isolated injection, when, in fact, surgery was often no more predictable than proceeding with conservative care:

- In Advanced Orthopaedics' Initial Exam Report, dated 01-22-21, relating to Covered Person K.R. under claim number 1091174-02, Defendant Berkowitz recommended arthroscopic surgery to Covered Person K.R.'s right knee stating that "cortisone injection is not recommended because it can initiate an articular cartilage degradation to the right knee." Defendant

Berkowitz purportedly performed right knee arthroscopy on Covered Person K.R. less than two weeks later, on 02-03-21, at Jersey City ASC;

- In Advanced Orthopaedics' follow-up exam report, dated 02-11-21, relating to Covered Person K.R., claim number 1091174-02, Defendant Berkowitz recommended arthroscopic surgery to Covered Person K.R., left knee, similarly stating that "she is not a candidate for a cortisone injection as it would further delay to the articular cartilage." Defendant Berkowitz purportedly performed left knee arthroscopy on Covered Person K.R. less than two weeks later, on 02-24-21, at Jersey City ASC;

- In Advanced Orthopaedics' examination report dated 02-10-22, relating to Covered Person D.R, claim number 1105880-02, Defendant Berkowitz recommended bilateral shoulder and left knee arthroscopic surgeries, stating that "she is not a candidate for a cortisone injection to the right shoulder or the left knee as that could cause further degradation of the articular cartilage of the joint and impede soft tissue healing." Defendant Berkowitz purportedly performed left shoulder arthroscopy on Covered Person D.R. on 03-15-22 at Manalapan ASC. Defendant Berkowitz purportedly performed left knee arthroscopy on Covered Person D.R. on 04-19-22 at Manalapan ASC; and

- In Advanced Orthopaedics' Initial Exam Report, dated 11-02-22, relating to Covered Person A.N., claim number 1102268-01, Defendant Berkowitz recommended right and left knee arthroscopies to both of Covered Person A.N.'s knees stating that "the patient is not a candidate for cortisone injection to either of the knees as that could cause further degradation of the articular cartilage of the joint. Defendant Berkowitz purportedly performed right knee arthroscopy on Covered Person A.N. on November 30, 2022 at Jersey City ASC and left knee arthroscopy on Covered Person A.N on April 19, 2023 at Jersey City.

1606.  These recommendations run contrary to the generally accepted care of individuals with non-urgent conditions in the shoulder and knee such as those supposedly suffered by the Covered Persons, were medically unnecessary and were performed pursuant to a predetermined protocol of treatment created by Defendants to carry out the overarching scheme to defraud to maximize reimbursement of No-Fault benefits.

   D.   **The Surgicore Pain Management Providers' And Surgicore Orthopedic Providers' Medically Unnecessary Procedures And/Or Surgeries**

1607.  Pursuant to the Defendants' Pre-Determined Protocol, following the Surgicore Pain Management Providers and Surgicore Orthopedic Providers purported examinations, virtually all

Covered Persons were recommended some combination of interventional treatments including but not limited to trigger point injections and epidural steroid injections, as well as epidurograms, discographies, percutaneous discectomies and IDETs, and/or arthroscopic procedures, including but not limited to shoulder, knee, ankle, and wrist arthroscopies.

1608.  The medical necessity of these treatments in such a large percentage is not plausible because, as alleged herein, the types of injuries purportedly suffered by the Covered Persons often heal without any intervention or treatment; or are corrected through conservative care such as pain and/or anti-inflammatory medications, time, physical therapy, or chiropractic treatment.

1609.  On information and belief, only a small percentage of patients who fail to improve from conservative treatment should be considered potential candidates for the interventional pain management and/or arthroscopic procedures and/or surgeries the Surgicore Pain Management Providers and Surgicore Orthopedic Providers consistently recommended to Covered Persons.

1610.  As alleged herein, the Surgicore Pain Management Providers and Surgicore Orthopedic Providers typically gave recommendations to Covered Persons to proceed with interventional pain management and arthroscopic procedures and/or surgeries regardless of whether they responded to conservative care.

1611.  The uniformity of recommendations for interventional pain management and arthroscopic procedures and/or surgeries without medical justification reveals that the treatments were not part of an individualized plan. The Surgicore Pain Management Providers and Surgicore Orthopedic Providers did not recommend and/or purportedly perform the procedures and/or surgeries because they were medically necessary, and as a result, the procedures and/or surgeries were not legitimately or lawfully rendered and not provided as billed.

**i. Multiple Surgeries Purportedly Performed on a Single Covered Person**

1612.   The interventional pain management and arthroscopic procedures and/or surgeries were part of Defendants' Pre-Determined Protocol designed to inflate billing through multiple providers to exploit the quadruple coverage amounts of $200,000 that, as a commercial insurer, Plaintiff is required to provide under its No-Fault insurance policies.

1613.   In furtherance thereof, Defendants routinely subjected Covered Persons to multiple surgeries to both their spine and joints, despite Covered Persons being involved in low impact automobile collisions and suffering little to no injury. By way of example and not limitation:

- On May 17, 2023, Covered Person J.P., claim no. 1130512-01 was purportedly involved in a low-impact automobile collision. Following the incident as a part of a predetermined course of treatment irrespective of medical necessity, J.P. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On June 27, 2023, J.P. purportedly underwent an arthroscopic shoulder surgery of the left shoulder, purportedly performed by Defendant McMahon, through Defendant McMahon PC, at Defendant Fifth Avenue ASC. Thereafter, on September 28, 2023, J.P. purportedly underwent a cervical discectomy, purportedly performed by Defendant Jimenez, through Defendant J Sports, at Defendant Empire State ASC. On September 9, 2023, J.P. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Ackerman, at Defendant All City ASC. Plaintiff was ultimately billed in excess of $51,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On April 8, 2022, Covered Person S.S., claim no. 1112011-01, was purportedly involved in a low-impact automobile collision. Following the incident as part of a predetermined course of treatment irrespective of medical necessity, S.S. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On June 12, 2022, S.S. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Shabtian, through Defendant Total Anesthesia, at Defendant All City ASC. Six weeks later, on July 19, 2022, S.S. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Graziosa, through Defendant Graziosa PC, at Defendant North Queens ASC. Less than three weeks following his shoulder surgery, on August 3, 2022, S.S. purportedly underwent a cervical discectomy, also purportedly performed by Defendant Shabtian, through Defendant Total Anesthesia, at Defendant All City ASC.

Plaintiff was ultimately billed in excess of $44,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On March 5, 2022, Covered Person R.V., claim no. 1111487-02, was purportedly involved in a low-impact automobile collision. Following the incident as part of a predetermined course of treatment irrespective of medical necessity, R.V. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On May 20, 2022, R.V. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Portal, through Defendant Hall PLLC, at Defendant Rockaways ASC. On June 16, 2022, R.V. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant Upendra Sinha, through Defendant U.K. PC, at Defendant All City ASC. Thereafter, on June 18, 2024, R.V. purportedly underwent a cervical discectomy, purportedly performed by Defendant Portal, through Defendant Hall PLLC, at Defendant Rockaways ASC. Plaintiff was ultimately billed in excess of $36,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On December 6, 2021, Covered Person E.A., claim no. 1106368-02, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, E.A. was referred for at least four different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On February 7, 2022, E.A. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant Rockaways ASC. Only a week later, on February 14, 2022, E.A. purportedly underwent a cervical discectomy, also purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant Rockaways ASC. Only nine days after his second back surgery, on February 23, 2022, E.A. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics PLLC, at Defendant Jersey City ASC. Finally on April 27, 2022, E.A. purportedly underwent an arthroscopic surgery of the right shoulder, also purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics PLLC, at Defendant Jersey City ASC. Plaintiff was ultimately billed in excess of $65,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On July 12, 2021, Covered Person R.S., claim no. 1100204-04, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, R.S. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On September 9, 2021, R.S. purportedly underwent an arthroscopic surgery

of the left knee, purportedly performed by Defendant Ackerman at Defendant All City ASC. Just over six weeks later, on October 10, 2021, R.S. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Bowen through Defendant Bowen PLLC, at Defendant All City ASC. On December 9, 2021, R.S. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Ackerman at Defendant All City ASC. Plaintiff was ultimately billed in excess of $44,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On September 26, 2020, Covered Person C.C., claim no. 1088653-01, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermine course of treatment irrespective of medical necessity, C.C. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On December 15, 2020, C.C. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by defendant McMahon at Defendant Fifth Avenue ASC. Thereafter, on January 29, 2021, C.C. purportedly underwent a cervical discectomy, purportedly performed by Defendant Shabtian through Defendant Total Anesthesia, at Defendant North Queens ASC. Finally, on March 7, 2021, C.C. purportedly underwent a lumbar percutaneous discectomy, also purportedly performed by Defendant Shabtian through Defendant Total Anesthesia, but at Defendant All City ASC. Plaintiff was ultimately billed in excess of $33,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On September 14, 2020, Covered Person V.T., claim no. 1088557-01, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, V.T. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On January 14, 2021, V.T. purportedly performed an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Anjani Sinha, through Defendant Anjani PC, at Rockaways ASC. Less than a month later, on February 11, 2021, V.T. purportedly underwent an arthroscopic surgery of the left shoulder, also purportedly performed by Defendant Anjani Sinha, through Defendant Anjani PC, at Rockaways ASC. Finally, on August 25, 2022, V.T. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant Rockaways ASC. Plaintiff was ultimately billed in excess of $46,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On August 3, 2020, Covered Person C.M., claim no. 1086902-01, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of

medical necessity, C.M. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On October 2, 2020, Defendant Vora purportedly performed a cervical discectomy at Rockaways ASC. Two weeks after spinal surgery, on October 16, 2020, C.M. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Christopher Durant, MD (not named as a defendant herein), through Olympic Orthopedics PC (not named as a defendant herein, at Defendant Rockaways ASC. Six weeks later, on November 11, 2020, C.M. purportedly underwent an lumbar percutaneous discectomy, purportedly performed by Defendant Vora, through Defendant KV Medical of NY, at Defendant North Queens ASC. Plaintiff was ultimately billed in excess of $36,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On March 10, 2020, Covered Person A.F., claim no. 1082018-02, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, A.F. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On August 10, 2020, A.F. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, at Defendant All City ASC. Thereafter, on September 21, 2020, A.F. purportedly underwent a cervical discectomy, purportedly performed by Defendant Kotkes through Kotkes PC, at Defendant Rockaways ASC. Only three days later, A.F. purportedly underwent a cervical discectomy, also purportedly performed by Defendant Kotkes through Kotkes PC, at Defendant Rockaways ASC. Plaintiff was ultimately billed in excess of $35,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On June 29, 2019, Covered Person E.G., claim no. 1062437-02, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, E.G. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On December 3, 2019, E.G. purportedly performed an arthroscopic surgery of the left shoulder, purportedly performed by Defendant Harr, through Defendant Harr Orthopedics & Sports Medicine, at Defendant New Horizon ASC. Later, on February 18, 2020, E.G. purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Harr, through Defendant Haar Orthopaedics, at Defendant New Horizon ASC. Less than a month after her second arthroscopic surgery, E.G. underwent a lumbar percutaneous discectomy, purportedly performed by Richard J. Apple, MD (not named as a defendant herein), through Happy Medical Services PC (not named as a defendant herein) at Defendant Rockaways ASC. Plaintiff was ultimately billed in excess of $34,000.00 in

connection with such surgical interventions arising from a low-impact automobile collision.

- On June 8, 2019, Covered Person Z.M., claim No. 1060382-02, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, Z.M. was referred for at least four different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On September 27, 2019, Z.M. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Apazidis, through Defendant Apazidis PC, at Defendant All City ASC. On November 7, 2019, M.Z. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant All City ASC. Two weeks later, on November 21, 2019, M.Z. purportedly underwent a cervical discectomy, also purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant All City ASC. Just over two weeks after M.Z.'s second spinal surgery, M.Z, purportedly underwent an arthroscopic surgery of the left knee, purportedly performed by Defendant Apazidis, through Defendant Apazidis PC, at Defendant All City ASC. Plaintiff was ultimately billed in excess of $47,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On April 20, 2019, Covered Person K.N., claim no. 1057213-01, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, K.N. was referred for at least four different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On July 12, 2019, K.N. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant Baum, through Defendant Bay Ridge Orthopedic, at Defendant All City ASC. On August 23, 2019, KN. purportedly underwent an arthroscopic surgery of the right knee, also purportedly performed by Defendant Baum, through Defendant Bay Ridge Orthopedic, at Defendant All City ASC. Less than two weeks after K.N.'s second arthroscopic surgery, K.N. purportedly underwent a cervical discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant All City ASC. Finally, only a week after K.N.'s first spinal surgery, K.N. purportedly underwent a lumbar percutaneous discectomy, also purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant All City ASC. Plaintiff was ultimately billed in excess of $49,000.00 in connection with surgical interventions arising from a low-impact automobile collision.

- On October 18, 2018, Covered Person R.H., claim no. 1041614-01, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, R.H. was referred for at least three different surgical

procedures, purportedly performed at, by and through the Surgicore ASCs. On March 4, 2019, R.H. purportedly underwent an arthroscopic surgery of the right knee, purportedly performed by Defendant McCulloch, through Defendant McCulloch Orthopaedic Surgical Services PC, at Defendant Fifth Avenue ASC. Less than a month later, on March 29, 2019, R.H. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Michael Ko, MD (not named as a defendant herein) through Pain Physicians NY PLLC (not named a Defendant in the Complaint) at Defendant North Queens ASC. Finally, on May 20, 2019, R.H. purportedly underwent an arthroscopic surgery of the right shoulder, purportedly performed by Defendant McCulloch, through Defendant McCulloch Orthopaedic Surgical Services PC, at Defendant Fifth Avenue ASC. Plaintiff was ultimately billed in excess of $36,000.00 in connection with such surgical interventions arising from a low-impact automobile collision.

- On May 14, 2018, Covered Person T.D., claim no. 1028111-01, was purportedly involved in a low-impact automobile collision. Following the incident, as part of a predetermined course of treatment irrespective of medical necessity, T.D. was referred for at least three different surgical procedures, purportedly performed at, by and through the Surgicore ASCs. On June 30, 2018, T.D. purportedly underwent a cervical discectomy, purportedly performed by Defendant Xie, through Defendant Integrated Pain Management PLLC, at Defendant Manalapan ASC. Two weeks later, on July 14, 2019, T.D. purportedly underwent a lumbar percutaneous discectomy, also purportedly performed by Defendant Xie, through Defendant Integrated Pain Management PLLC, at Defendant Manalapan ASC. Thereafter, on August 20, 2018, T.D. purportedly underwent an arthroscopic surgery of the left shoulder, purportedly performed by Aron D. Rovner, MD (not named as a defendant herein), through Aron Rovner MD PLLC (not named as a defendant herein) at Defendant All City ASC. Plaintiff was ultimately billed in excess of $44,000.00 in connection with such surgical interventions arising from of a low-impact automobile collision.

1614.  Attached as Exhibit "17," is a representative list of claims in which Covered Persons received multiple surgeries to both the spine and joints from one or more of the Surgicore Orthopedic Providers and/or Surgicore Pain Management Providers that were purportedly performed at, by, and through one or more of the Surgicore ASCs.

1615.  Even though only a small percentage of persons in low impact collisions who fail conservative treatment require a single surgery, let alone multiple surgical procedures, Defendants routinely subjected Covered Persons to multiple percutaneous discectomies and/or arthroscopies

pursuant to a predetermined protocol that were not based on the Covered Persons' individual needs and were medically unnecessary.

1616. What is more, Defendants often performed multiple surgeries within a compressed time period, despite the fact that such a regimen was not only medically unnecessary, but also placed the Covered Persons at risk for complications inherent to undergoing multiple surgical procedures in an accelerated time frame.

1617. On information and belief, there are a number of factors that doctors should consider in determining how much time is advisable between surgeries for a given individual, including the patient's overall health, age, rate of healing, blood loss and time under anesthesia.

1618. Notwithstanding that accepted medical practices dictate that doctors consider various factors when performing multiple surgeries on a given individual, the Surgicore Pain Management Providers' and Surgicore Orthopedic Providers' reports are devoid of any indication that such factors were considered before quickly proceeding with the multiple surgeries on Covered Persons.

1619. The failure to document and/or consider factors that may militate against performing multiple surgeries within a short time span is reflective that the Fraudulent Services are performed pursuant to a predetermined protocol irrespective of medical need of Covered Persons and driven by Defendants' profit motive to exploit the No-Fault system.

### ii. The Purported Provision of Treatment Modalities and Surgeries on the Same Day

1620. Further reflecting that the Fraudulent Services were provided, if at all, pursuant to a predetermined protocol of treatment irrespective of medical necessity or patient safety and well-being, on numerous occasions, Covered Persons purportedly underwent one or more treatment modalities, including but not limited to chiropractic, physical therapy, and/or acupuncture, on the

same day they purportedly underwent a percutaneous discectomy or arthroscopic surgery at one or more of the Surgicore ASCs.

1621.   Subjecting Covered Persons to purported treatment modalities such as chiropractic, physical therapy, and/or acupuncture on the same day they purportedly undergo surgical procedures are contrary to accepted medial practices that militate against doing so to avoid excess stress on the body.

1622.   In accordance with accepted medical practices, subjecting Covered Persons to purported treatment modalities such as chiropractic, physical therapy, and/or acupuncture on the same day they purportedly undergo surgical procedures should be avoided to allow for proper healing and avoid potential post-surgery complications.

1623.   Subjecting Covered Persons to purported treatment modalities such as chiropractic, physical therapy, and/or acupuncture on the same day they purportedly undergo surgical procedures would also be inconsistent with, if not contravene pre-operative and/or post-operative instructions provided to Covered Persons by the Surgicore ASCs.

1624.   Notwithstanding the foregoing, on numerous occasions Covered Persons purportedly subjected to percutaneous discectomy and/or arthroscopic surgeries by the Surgicore Pain Management Providers at one of the Surgicore ASCs also purportedly underwent one or more treatment modalities at one of the No-Fault Clinics, at times in a different county, if not a different state, where travel would also be an exacerbating factor to Covered Person's safety, wellbeing and recovery. By way of example but not limitation:

- On March 2, 2022, Covered Person D.T., claim no. 1110238-02, was purportedly involved in a low-impact automobile collision, after which D.T. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 54A Motor Avenue, Farmingdale, NY. On May 18, 2022, D.T. purportedly underwent chiropractic manipulation at 5 regions and manual therapy, and physical therapy therapeutic exercises, electric

stimulation and hot/cold packs at the aforementioned No-fault Clinic. That same day, D.T. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Shabtian, through Defendant Total Anesthesia, at Defendant All City ASC, located at 3632 Nostrand Avenue, Brooklyn, NY. Thereafter, on September 14, 2022, D.T. purportedly underwent physical therapy therapeutic exercises, electric stimulation and hot/cold packs at the aforementioned No-fault Clinic. That same day, D.T. purportedly underwent a lumbar percutaneous discectomy, also purportedly performed by Defendant Shabtian, through Defendant Total Anesthesia, at Defendant All City ASC, located at 3632 Nostrand Avenue, Brooklyn, New York.

- On January 6, 2019, Covered Person J.Z., claim no. 1049536-05, was purportedly involved in a low-impact automobile collision, after which J.Z. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 1650 Eastern Parkway, Brooklyn, NY. On February 14, 2019, J.Z. purportedly underwent chiropractic manipulation at 3-4 regions, and traction, physical therapy, and acupuncture with electric stimulation at the aforementioned No-fault Clinic. That same day, J.Z. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Kotkes, at Defendant All City ASC, located at 3632 Nostrand Avenue, Brooklyn, New York.

- On March 28, 2019, Covered Person S.L., claim no. 1056349-02, was purportedly involved in a low-impact automobile collision, after which S.L. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 615 Seneca Avenue, Ridgewood, NY. On July 22, 2019, S.L. purportedly underwent chiropractic manipulation at 3-4 regions, acupuncture with electric stimulation, and infrared treatments at the aforementioned No-fault Clinic. That same day, S.L. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant All City ASC, located at 3632 Nostrand Avenue, Brooklyn, New York.

- On November 16, 2019, Covered Person G.C., claim no. 1074007-01, was purportedly involved in a low-impact automobile collision, after which G.C. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 34-09 Murray Street, Flushing, NY. On September 30, 2020, G.C. purportedly underwent chiropractic manipulation at 3-4 regions, physical therapy exercises, electric stimulation, and manual therapy, and acupuncture with electric stimulation at the aforementioned No-fault Clinic. That same day, G.C. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Tamer Elbaz, MD (not named as a defendant herein), through Pain Physicians NY, PLLC (not named as a defendant herein) at Rockaways ASC, located at 105-20 Rockaway Beach Blvd, Rockaway Park, New York.

- On November 19, 2019, Covered Person J.O., claim no. 1074012-01, was purportedly involved in a low-impact automobile collision, after which J.O. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 34-09 Murray Street, Flushing, NY. On July 10, 2020, J.O. purportedly underwent chiropractic manipulation at 3-4 regions, physical therapy therapeutic exercises, electric stimulation, and manual therapy, and acupuncture with electric stimulation at the aforementioned No-fault Clinic. That same day, J.O. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Michael Ko, MD (not named as a defendant herein), through Pain Physicians NY PLLC (not named as a defendant herein) at Defendant North Queens ASC, located at 45-64 Francis Lewis Boulevard, Bayside, New York.

- On January 22, 2021, Covered Person L.L., claim no. 1094219-02, was purportedly involved in a low-impact automobile collision, after which L.L. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 3907 Prince Street, Flushing, NY. On November 27, 2021, L.L. purportedly underwent physical therapy therapeutic exercises, therapeutic massage, manual therapy, and electric stimulation at the aforementioned No-fault Clinic. That same day, L.L. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Xie, through Defendant Integrated Pain Management, at Defendant Saddlebrook ASC, located at 444 Market Street, Saddlebrook, New Jersey.

- On March 31, 2021, Covered Person I.K., claim no. 1095974-02, was purportedly involved in a low-impact automobile collision, after which I.K. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 4226A Third Avenue, Bronx, NY. On June 25, 2021, I.K. purportedly underwent chiropractic manipulation at 3-4 regions, and physical therapy, electric stimulation and hot/cold pack treatments at the aforementioned No-fault Clinic. That same day, I.K. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Hall, through Defendant Hall PLLC at Defendant Rockaways ASC, located at 105-20 Rockaway Beach Blvd, Rockaway Park, New York.

- On September 3, 2022, Covered Person L.K., claim no. 1122600-02, was purportedly involved in a low-impact automobile collision, after which L.K. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 1201 Nostrand Avenue, Brooklyn, NY. On January 24, 2023, L.K. purportedly underwent chiropractic manipulation at 3-4 regions, physical therapy therapeutic exercises, therapeutic massage, electric stimulation, and hot/cold packs, and acupuncture treatments at the aforementioned No-fault Clinic. That same day, L.K. purportedly underwent a cervical percutaneous discectomy, purportedly performed by Defendant Kotkes, through Defendant Kotkes PC, at Defendant Rockaways ASC, located at 105-20 Rockaway Beach Blvd, Rockaway Park, New York.

- On June 5, 2023, Covered Person B.F., claim no. 1132149-01, was purportedly involved in a low-impact automobile collision, after which B.F. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 2422 Knapp Street, Brooklyn, NY 11235. On October 4, 2023, B.F. purportedly underwent ultrasound treatment, physical therapy therapeutic exercises, electric stimulation and hot/cold packs, and acupuncture treatments at the aforementioned No-fault Clinic. That same day, B.F. purportedly underwent a lumbar percutaneous discectomy, purportedly performed by Defendant Shabtian, through Defendant Total Anesthesia, at Defendant All City ASC, located at 3632 Nostrand Avenue, Brooklyn, New York.

- On January 6, 2022, Covered Person Y.B., claim no. 1108510-03, was purportedly involved in a low-impact automobile collision, after which Y.B. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 14 Bruckner Boulevard, Bronx, NY. On April 22, 2022, Y.B. purportedly underwent chiropractic manipulation at 3-4 regions and manual therapy, and physical therapy modalities including therapeutic exercise, electric stimulation, and hot/cold packs at the aforementioned No-fault Clinic. That same day, Y.B. purportedly underwent a knee arthroscopy, purportedly performed by Defendant Baum, through Defendant Bay Ridge PC, at Defendant All City ASC, located at 3632 Nostrand Avenue, Brooklyn, New York.

- On July 12, 2019, Covered Person L.L., claim no. 1063254-02, was purportedly involved in a low-impact automobile collision, after which L.L. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 1894 Eastchester Road, Bronx, NY. On October 2, 2019, L.L. purportedly underwent chiropractic manipulation at 3-4 regions, physical therapy modalities including manual therapy, electric stimulation, and hot/cold packs, and acupuncture without stimulation, at the aforementioned No-fault Clinic. That same day, L.L. purportedly underwent a knee arthroscopy, purportedly performed by Defendant Berkowitz, through Defendant Advanced Orthopaedics, at Defendant Jersey City ASC, located at 550 Newark Avenue, Jersey City, New Jersey.

- On March 22, 2019, Covered Person B.C., claim no. 1055096-01, was purportedly involved in a low-impact automobile collision, after which B.C. purportedly underwent a predetermined course of treatment at a No-fault Clinic located at 2598 Third Avenue, Bronx, NY, NY. On June 14, 2019, B.C. purportedly underwent chiropractic manipulation at 3-4 regions and manual therapy, and acupuncture without electric stimulation at the aforementioned No-fault Clinic. That same day, B.C. purportedly underwent a knee arthroscopy, purportedly performed by Ajoy Sinha, through MSJR, at Defendant Fifth Avenue ASC, located at 1049 Fifth Avenue, New York, New York.

1625. The purported provision of treatment modalities and surgeries on the same day were not only medically unnecessary but are highly implausible, especially given the different locations at which the same day modalities and surgeries were purportedly rendered, the risks attendant to same day modalities and surgeries, and the contradictions of same day modalities and surgeries to pre and/or post-op instructions, reflecting that at least one or more of the same day services were not provided as billed.

1626. Moreover, even assuming that at least one or more of the same-day services were purportedly rendered to the Covered Persons, they were not performed to treat or benefit the Covered Persons but rather as part of Defendants Pre-Determined Protocol to increase billing and maximize financial gain.

1627. Additional representative examples of Defendants performing surgeries and/or procedures on the same day that treatment modalities were provided at the No-Fault Clinics is attached as Exhibit "18."

1628. Not only did the Defendants fraudulently submit inflated charges for medically unnecessary and illusory services, more specifically, the following interventional pain management and arthroscopic procedures and surgeries purportedly performed under anesthesia by the Surgicore Pain Management Providers, Surgicore Orthopedic Providers, and Surgicore Anesthesia Providers at the Surgicore ASCs were part of a Pre-Determined Protocol that were not indicated, not medically necessary, of no diagnostic or treatment value, and not rendered as billed.

**E.  The Fraudulent Percutaneous Discectomies**

1629. As part of the Defendants' Pre-Determined Protocol, one or more of the Surgicore Pain Management Providers routinely subjected Covered Persons to lumbar and/or cervical percutaneous discectomies purportedly performed at the Surgicore ASCs, when in fact such

services were medically unnecessary, not rendered as billed and/or of no diagnostic or treatment value, for no other reason than to fraudulently bill American Transit.

1630. Defendants billed the percutaneous discectomies through the Surgicore Pain Management Providers and their respective professional corporations, billed concomitant anesthesia services through the Surgicore Anesthesiologists and their respective professional corporations, and billed separate facility fees for the percutaneous discectomies through the Surgicore ASCs.

1631. The Defendants' charges for the percutaneous discectomies, concomitant anesthesia, and facility fees were fraudulent because the percutaneous discectomies and anesthesia services were medically unnecessary and were provided, to the extent that they were provided at all, pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Covered Persons who were purportedly subjected to percutaneous discectomy procedures.

1632. Furthermore, the Defendants' charges for percutaneous discectomies, the related anesthesia services, and facility fees also were fraudulent because they were the product of illegal referrals.

1633. A percutaneous discectomy is a surgical procedure for patients with radicular pain stemming from a contained disc protrusion (nucleus pushes against the disc, through the annulus and causes the disc to protrude into the spinal column), which is a specific type of disc herniation.

1634. In general, a percutaneous discectomy is performed by placing a needle into the middle of the problematic spinal disc and removing a small amount of disc tissue to create empty space inside the disc to allow the disc to collapse on itself (i.e., allow the disc to decompress).

1635. A single discectomy procedure performed by an experienced medical practitioner takes between 10 and 30 minutes in total from the time the needle is inserted until the time it is removed.

1636. Material from the periphery of the disc is not removed during this procedure and given that the only part of a disc that can be in direct contact with and compress the spinal nerve (thereby causing pain) is the periphery of the disc, percutaneous discectomy has not been universally recognized by the medical community to result in any meaningful decompression or pain relief.

1637. Despite the fact that there is no generally accepted evidence that percutaneous discectomy improves patients' results, as a matter of practice, procedure and protocol, the Surgicore Pain Management Providers regularly recommended, purportedly performed and billed for percutaneous discectomies on Covered Persons' lumbar and/or cervical spine as part of their Pre-Determined Protocol.

1638. The Surgicore Pain Management Providers recommended and purportedly performed lumbar and cervical percutaneous discectomies on Covered Persons which they knew or should have known had little if any proven treatment value for no other reason than to exponentially increase their billing and maximize their financial gain.

1639. The Surgicore Pain Management Providers routinely misrepresented that the purported performance of percutaneous discectomies which have little to no proven treatment value were medically necessary and provided as billed when in fact they were not.

1640. The performance of medically unnecessary percutaneous discectomies by one or more of the Surgicore Pain Management Providers endangered the health and safety of Covered

Persons by unnecessarily exposing them to the risks of invasive procedures in and around spinal structures, including paralysis and death.

1641. The Surgicore Pain Management Providers failed to document medically sufficient rationales to justify the risks to the Covered Persons when purportedly performing percutaneous discectomies.

1642. Even assuming that percutaneous discectomies may be effective in limited circumstances, percutaneous discectomies would be less indicated in the cervical spine than in the lumbar spine because the anatomy of the cervical spine and of the cervical discs themselves makes percutaneous access riskier.

1643. On information and belief, cervical percutaneous discectomy surgery is considered a high risk, low reward procedure that should rarely be performed and only in the most unique of patient circumstances.

1644. Nonetheless, in addition to recommending and purportedly performing lumbar percutaneous discectomies, the Surgicore Pain Management Providers routinely recommended and purportedly performed percutaneous discectomies on the Covered Persons' cervical spine further exposing them to undue and serious health risks.

1645. By way of example and not limitation:

- Approximately 54% percent of Covered Persons who purportedly received percutaneous discectomies through Total Anesthesia at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff;

- Approximately 38% percent of Covered Persons who purportedly received percutaneous discectomies through Kotkes PC at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff;

- Approximately 33% percent of Covered Persons who purportedly received percutaneous discectomies through Bowen PLLC at, by, and through one or

more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff;

- Approximately 35% percent of Covered Persons who purportedly received percutaneous discectomies through Hall PLLC at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff;

- Approximately 44% percent of Covered Persons who purportedly received percutaneous discectomies through Portal Medical at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff;

- Approximately 32% percent of Covered Persons who purportedly received percutaneous discectomies through Phoenix Medical at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff;

- Approximately 39% percent of Covered Persons who purportedly received percutaneous discectomies through KDV Medical at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff;

- Approximately 35% percent of Covered Persons who purportedly received percutaneous discectomies through KV Medical at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff.

- Approximately 27% percent of Covered Persons who purportedly received percutaneous discectomies through J Sports at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff; and

- Approximately 58% percent of Covered Persons who purportedly received percutaneous discectomies through Integrated Pain Management at, by, and through one or more of the Surgicore ASCs purportedly received cervical percutaneous discectomies for which Defendants billed Plaintiff.

1646. Notwithstanding their general lack of medical efficacy in most instances, candidates for percutaneous discectomies should first be treated conservatively to alleviate pain through the use and combination of pain and anti-inflammatory medication, physical therapy, chiropractic treatment, and time.

1647. On information and belief, patients who fail to respond to conservative care may become candidates for epidural injections. If the pain persists 10 to 14 days after the administration

of an epidural injection (the time in which improvement, or lack thereof, would be exhibited), then a percutaneous discectomy may be indicated if both the stringent clinical and radiographic criteria are met.

1648.   On information and belief clinical criteria for percutaneous discectomy consists of the existence of radicular back pain (i.e., pain radiating down the leg with or without localized back pain). "Radiographic" consists of focal herniation in a location corresponding directly to the radicular pain.

1649.   As alleged in paragraphs 1601-1602 above, many of the lumbar and cervical percutaneous discectomies were purportedly performed on Covered Persons prematurely, if at all, before an adequate passage of time to allow for healing and/or before they had tried and/or failed any course of legitimate conservative care.

1650.   Performing percutaneous discectomies on Covered Persons before they have had the opportunity to recover though a course of time or care or to allow them to have the benefit of an adequate trial of conservative care, much less fail care is further evidence that the percutaneous discectomies purportedly performed by the Surgicore Pain Management Providers were excessive, medically unnecessary, and contrary to the standard of care.

1651.   In addition, many of the Surgicore Pain Management Doctors purportedly performed lumbar and cervical discectomies without satisfying the requisite clinical and radiographic criteria.

1652.   As alleged in paragraph 1565 above, many of the Surgicore Pain Management Providers' reports do not specify the anatomic location where the surgery will be performed or connect the spinal level being operated on to a precise anatomic defect prior to the surgery.

1653.   Percutaneous discectomy should never be ordered without first identifying and defining the levels on which the surgery is to be performed, prior to the procedure.

1654.   The Surgicore Pain Management Providers did not perform percutaneous discectomies, to the extent they were performed at all, to treat or benefit the Covered Persons but rather as a matter of course to increase billing and maximize financial gain.

1655.   The Surgicore Pain Management Providers misrepresented that the purported performance of percutaneous discectomies were medically necessary and provided as billed when in fact they were not.

1656.   Attached as Exhibit "19" is a representative list of claims in which in which Covered Persons who purportedly treated at one or more of the Defendant Surgicore Pain Management Providers were subjected to dangerous, unproven, medically unnecessary percutaneous discectomies as part of the Defendants Pre-Determined Protocol.

1657.   In addition to the Defendant Surgicore Pain Management Providers fraudulently submitting bills to American Transit for dangerous, unproven, medically unnecessary percutaneous discectomies, numerous other pain medical doctors and their purported professional corporations, who and which are not named as defendants in this Complaint but billed for such services at, by, and through the Surgicore ASCs, also submitted bills to American Transit pursuant to the same predetermined fraudulent protocol. Attached as Exhibit "20" is a representative list of Covered Persons who purportedly treated at one or more of the pain management doctors and their purported professional corporations not named as Defendants, and were subjected to dangerous, unproven, medically unnecessary percutaneous discectomies as part of the Defendants Pre-Determined Protocol.

**i. The Surgicore Pain Management Providers' Fraudulent Billing Related to Percutaneous Discectomy Procedures**

1658.  In addition to improperly recommending and performing medically unnecessary percutaneous discectomies, in order to inflate their billing and exploit the No-Fault system, many of the Surgicore Pain Management Providers and many of the Surgicore ASCs submitted bills to American Transit using CPT codes that intentionally and materially misrepresented to Plaintiff that open spine surgeries were performed on Covered Persons' cervical spine when in fact the Surgicore Pain Management Providers performed the procedures, if at all, percutaneously via needle puncture through the skin and not by using an open approach.

1659.  As alleged above, a fundamental condition for the use of CPT codes is that the provider is required to choose the most appropriate CPT code. Procedures should be billed with the CPT codes that most comprehensively describe the services performed. Only the single CPT code most accurately describing the procedure performed or service rendered should be used. If no such specific code exists, the provider must report the service using the appropriate unlisted procedure or service code (i.e. a "999" code).

1660.  According to the American Academy of Professional Coders, CPT Codes 63075 (discectomy, anterior, with decompression of spinal cord and/or nerve root(s), including osteophytectomy) and 63076 (Under Anterior or Anterolateral Approach for Extradural Exploration/Decompression Procedures on the Spine and Spinal Cord) describe traditional/open discectomies, and CPT Code 62287 applies only to percutaneous discectomies performed on the lumbar spine.

1661.  There is no CPT Code for a cervical percutaneous discectomy, and as such, a cervical percutaneous discectomy should be billed using an unlisted procedure code 64999 (unlisted procedure, nervous system).

1662.  Both CPT codes 63075 and 63076 describe traditional, open discectomy surgeries, and not percutaneous procedures.

1663.  The surgical decompression procedures defined by CPT codes 63075 and 63076 are completely different procedures than the cervical percutaneous discectomies purportedly performed by the Surgicore Pain Management Providers, and are reimbursable at a higher rate.

1664.  On information and belief, open discectomies are invasive, more complex procedures than cervical percutaneous discectomies and completely different than the procedures purportedly performed by the Surgicore Pain Management Providers.

1665.  On information and belief, open discectomies are used for true surgical decompression with direct visualization. Whereas, a percutaneous discectomy is a "blind" procedure done under the direction of fluoroscopy without an open incision and no direct visualization of the disc.

1666.  On information and belief, in an open discectomy, the surgeon decompresses the nerve roots/spinal cord by removing the herniated portion of the disc. Grafts are used to fill the empty space created by the removal of the disc. After removing the disc materials and relieving the pressure, the doctor closes the wound in layers.

1667.  On information and belief, open discectomies may require inpatient hospital stays while percutaneous discectomies are typically an outpatient procedure.

1668.  Instead of properly billing for cervical percutaneous discectomies using CPT Code 64999, the vast majority of the Surgicore Pain Management Providers grossly misrepresented the services purportedly rendered by billing under CPT Codes 63075 and/or 63076, which represent an open spine (or traditional) discectomy procedure, not a percutaneous (or non-invasive) discectomy procedure. By way of example and not limitation:

- On February 23, 2024, Covered Person J.C., Claim no. 1134614-05, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Portal Medical billed Plaintiff under CPT 63075, in the amount of $3,617.86 for the surgeon's services and $387.11, for a physician assistant, intentionally and materially misrepresenting that an open spine surgery was performed on J.C.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy. Similarly, Defendant Fifth Avenue ASC billed Plaintiff a facility fee charge of $6,402.03 under CPT 63075 intentionally and materially misrepresenting that an open spine surgery was performed on J.C.'s cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy

- On February 23, 2024, Covered Person H.C., Claim no. 1139581-01, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Hall PLLC billed Plaintiff under CPT 63075, in the amount of $3,617.86 for the surgeon's services, and $387.11 for a physician assistant, and under CPT 63076, in the amount of $1,214.35 for the surgeon's services, and $129.94 for a physician assistant, intentionally and materially misrepresenting that an open spine surgery was performed on H.C.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy. Similarly, Defendant Fifth Avenue ASC billed Plaintiff a facility fee charge of $6,402.03 under CPT 63075, and of $3,160.34 under CPT 63076, intentionally and materially misrepresenting that an open spine surgery was performed on H.C.'s cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

- On November 12, 2023, Covered Person T.D., Claim no. 1125861-02, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant J Sports billed Plaintiff under CPT 63075 in the amount of $3,617.85 for the surgeon's services and $578.85 for a physician assistant, intentionally and materially misrepresenting that an open spine surgery was performed on T.D.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy. Similarly, Defendant Empire State ASC billed Plaintiff under CPT 63075 a facility fee charge of $6,402.03, intentionally and materially misrepresenting that an open spine surgery was performed on T.D's cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

- On June 26, 2022, Covered Person N.B., Claim no. 1113182-02, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Total Anesthesia billed Plaintiff under CPT 63075 in the amount of $3,617.86 intentionally and materially misrepresenting that an open spine surgery was performed on N.B.'s, cervical spine, when in fact the procedure purportedly performed was a

cervical percutaneous discectomy. Similarly, Defendant All City ASC billed Plaintiff a facility fee charge of $6,402.03 under CPT 63075 intentionally and materially misrepresenting that an open spine surgery was performed on N.B.'s cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

- On January 29, 2021, Covered Person C.C., Claim no. 1088653-01, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Total Anesthesia billed Plaintiff under CPT 63075, in the amount of $3,617.86, intentionally and materially misrepresenting that an open spine surgery was performed on C.C.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy. Similarly, Defendant North Queens ASC billed Plaintiff a facility fee charge of $5,292.93 under CPT 63075 intentionally and materially misrepresenting that an open spine surgery was performed on C.C.'s cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

- On August 27, 2020, Covered Person J.P., Claim no. 1063270-01, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Kotkes PC billed Plaintiff under CPT 63075, in the amount of $3,289.01 for the surgeon's services, and $328.90 for a physician assistant, intentionally and materially misrepresenting that an open spine surgery was performed on J.P.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy. Similarly, Defendant Rockaways ASC billed Plaintiff a facility fee charge of $5,292.93 under CPT 63075 intentionally and materially misrepresenting that an open spine surgery was performed on J.P.'s cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

- On December 3, 2018, Covered Person N.C., Claim no. 1022333-02, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Phoenix Medical billed Plaintiff under CPT 63075 in the amount of $3,289.01, and under CPT 63076 in the amount of $1,103.97 intentionally and materially misrepresenting that an open spine surgery was performed on N.C.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy. Similarly, Defendant New Horizon ASC billed Plaintiff under CPT 63075 a facility fee charge of $5,827.43, and under CPT 63076 a facility fee charge of $2,873.04 intentionally and materially misrepresenting that an open spine surgery was performed on N.C.'s cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

- On November 3, 2018, Covered Person Z.Z., Claim no. 1031180-01, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Integrated Pain Management billed

Plaintiff under CPT 63075 in the amount of $10,012.99, and under CPT 63076 in the amount of $1,837.46 intentionally and materially misrepresenting that an open spine surgery was performed on Z.Z.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy. Similarly, Defendant Manalapan ASC billed Plaintiff under CPT 63075 a facility fee charge of $5,827.43, and under CPT 63076 a facility fee charge of $2,873.04 intentionally and materially misrepresenting that an open spine surgery was performed on Z.Z.'s cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

- On June 25, 2018, Covered Person M.M., Claim no. 680527-02, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Phoenix Medical billed Plaintiff under CPT 63075, in the amount of $10,012.99, intentionally and materially misrepresenting that an open spine surgery was performed on M.M.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy. Similarly, Defendant Jersey City ASC billed Plaintiff a facility fee charge of $5,827.43 under CPT 63075 intentionally and materially misrepresenting that an open spine surgery was performed on M.M.'s cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

- On April 13, 2022, Covered Person L.R., Claim no. 1101804-02, purportedly underwent a cervical percutaneous discectomy. In connection with this Fraudulent Service, Defendant Bowen PLLC billed Plaintiff under CPT 63075, in the amount of $3,617.86 for the surgeon's services, and $387.11 for a physician assistant, and under CPT 63076, in the amount of $1,214.35 for the surgeon's services, and $129.94 for a physician assistant, intentionally and materially misrepresenting that an open spine surgery was performed on L.R.'s, cervical spine, when in fact the procedure purportedly performed was a cervical percutaneous discectomy.

1669. Defendants knew or should have known that CPT Codes 63075 and/or 63076, represent an open spine (or traditional) discectomy procedure, not a percutaneous (or non-invasive) discectomy procedure.

1670. In fact, during his Examination Under Oath with American Transit on August 15, 2024, Defendant Shabtian (All City ASC's part owner and purported medical director) who purportedly performed and billed for cervical percutaneous discectomy through Total Anesthesia

at one or more of the Surgicore ASCs admitted that cervical and lumbar percutaneous discectomy is not an open discectomy surgery. Defendant Shabtian stated as follows:

> Q Percutaneous discectomy is not an open
> surgery, correct?
> A Again, it's without any big cuts, or
> incisions. That's correct, it's not an open
> discectomy.
> Q So it's a closed procedure?
> A Yes.
>
> 111:9-15
>
> Q A percutaneous discectomy, when we are
> talking about the fact that it's not an open
> discectomy and that it's a closed procedure, that's
> the same for both a cervical percutaneous discectomy
> and a lumbar percutaneous discectomy, correct?
> A Yes.
>
> 111:22-1112:3
>
> Q If you look at the procedure that's
> described, on the highlighted paragraph marked
> "procedure" in the second column on the first page
> of Exhibit 11, do you see where I'm referring to?
> It says, "percutaneous cervical
> discectomy and annuloplasty with fluoroscopy,
> anterior approach at the C5, C6 level."
> What does "anterior approach" mean?
> A It means to go from the front of the neck.
> Q That's just where the device is inserted
> into the skin, correct?
> A That is correct.
> Q Am I correct that using an anterior
> approach to a percutaneous discectomy does not make
> it an open surgery, it's still a closed procedure?
> A Yes, that is correct.
>
> 172:3-14

1671. During his examination under oath with American Transit Solomon Halioua, MD (who is not named as a Defendant herein) who purportedly performs interventional pain

management services through one or more of the Surgicore ASCs, including percutaneous discectomies similarly admitted that percutaneous discectomy is not an open surgery. Dr. Halioua stated as follows:

> Q. Percutaneous discectomy, is that one
> of the needle-based procedures that you're
> talking about that you provide?
> A. It's close to needle-based. I mean,
> it's a little bigger than needle-based, but it's
> smaller than full-on endoscopic. I mean, the
> probes are about two, three millimeters, so I
> don't know what you call that. You could have
> big needles or you could have very small.
> Q. But percutaneous discectomy is not
> an open surgery, correct?
> A. Correct. That is what percutaneous
> means, it means through the skin.
>
> 105:13-25

1672.   The Surgicore Pain Management Providers' and Surgicore ASCs' practice of intentionally billing for open surgeries that were never performed intentionally misrepresented the services provided to inflate the Covered Persons' bills mailed to Plaintiff and causing it to overpay for procedures that were not provided as billed.

1673.   Each of the charges for open surgery misrepresented that the Surgicore Pain Management Providers and Surgicore ASCs were entitled to be reimbursed for the charge, when in fact they were not.

**F.      The Fraudulent IDETS**

1674.   When billing for lumbar and cervical percutaneous discectomies, the vast majority of the Surgicore Pain Management Providers intentionally inflated their bills by routinely billing for medically unnecessary, invalid Intradiscal Electrothermoplasty also known as annuloplasty (IDET) and discography (purportedly performed along with virtually every percutaneous discectomy).

1675.  As part of the Defendants' Pre-Determined Protocol, the Surgicore Pain Management Providers routinely subjected Covered Persons to medically unnecessary IDET procedures purportedly performed and billed along with virtually every percutaneous discectomy performed at the Surgicore ASCs.

1676.  Like the Defendants' charges for percutaneous discectomy, the charges for IDET procedures were fraudulent in that IDET was medically unnecessary and performed, to the extent that it was performed at all, pursuant to the Defendants' pre-determined fraudulent treatment, referral, and billing protocol, not to treat or otherwise benefit the Covered Persons.

1677.  On information and belief, an IDET is a minimally invasive procedure once thought to treat low back pain caused by either a disc injury where the nucleus moved to the outer layers of the disc (thereby irritating the outer layers), or where nerve fibers that have grown out from the outer layers into the disc interior as a result of degeneration of the annulus. IDETs (or annuloplasties) use thermal energy to disrupt the nerve endings within the disc, destroy the nerve fibers and toughen the disc tissue, sealing any small tears.

1678.  Before an IDET procedure, the patient is given a sedative and a local anesthetic. Then, using fluoroscopy, a physician inserts a hollow needle containing a catheter and heating element into the disc, positioned in a circle in the annulus, and then slowly heats the needle. In total, a single disc procedure performed by an experienced medical practitioner takes approximately 25 minutes from the time the needle is inserted until the time it is removed.

1679.  IDETs have not been evaluated in large studies and there are no recent widely accepted peer-reviewed studies suggesting it is medically efficacious. As a result, the vast majority of the medical community abandoned the IDET procedure more than a decade ago.

1680.  In 2008, the Centers for Medicare & Medicaid Services ("CMS") issued a national coverage determination ruling IDET procedures are not reasonable and necessary for the treatment of low back pain performed on Medicare beneficiaries. Since that time, private insurance companies have adopted similar coverage recommendations, and IDET is not a commonly performed medical procedure for any indication or any patient. It is also not a covered procedure, and as such, hospitals largely do not perform the procedure.

1681.  Despite the fact that IDET procedures are not generally accepted by the medical community and not proven to improve health outcomes, as a matter of practice, procedure, and protocol, the Surgicore Pain Management Providers regularly recommended, purportedly performed, and billed for IDET on Covered Persons' lumbar and/or cervical spine, even though IDET is outdated and lacks medical efficacy.

1682.  As part of their Pre-Determined Protocol, the Surgicore Pain Management Providers recommended and purportedly performed IDET on Covered Persons which they knew or should have known was outdated and lacks medical efficacy, for no other reason than to increase their billing and maximize their financial gain.

1683.  The Surgicore Pain Management Providers purported performance of, and billing for, IDET procedures which are outdated and lack medical efficacy were not medically necessary, not provided as billed and materially misrepresented to Plaintiff the services purportedly rendered. Attached as Exhibit "21" is a representative list of claims in which Covered Persons who were purportedly treated at one or more of the Defendant Surgicore Pain Management Providers were subjected to outdated, ineffective, medically unnecessary IDET as part of the Defendants Pre-Determined Protocol.

1684.   In addition to the Defendant Surgicore Pain Management Providers fraudulently submitting bills to American Transit for outdated, ineffective, medically unnecessary IDET, numerous other pain medical doctors and their purported professional corporations, who and which are not named as defendants in this Complaint but billed for such services at, by, and through the Surgicore ASCs, also submitted bills to American Transit pursuant to the same predetermined fraudulent protocol. Attached as Exhibit "22" is a representative list of Covered Persons who were purportedly treated at one or more of the pain management doctors and their purported professional corporations not named as Defendants, and were subjected to outdated, ineffective, medically unnecessary IDET as part of the Defendants Pre-Determined Protocol.

1685.   In addition to improperly recommending and performing outdated and ineffective IDET procedures, in most instances the Surgicore Pain Management Providers purportedly performed the IDET procedures on Covered Persons, in conjunction with percutaneous discectomies, though the medical indications for percutaneous discectomies and IDETs render them mutually exclusive procedures.

1686.   On information and belief, if a patient has radicular back pain and a focal disc herniation he/she may be a candidate for percutaneous discectomy, but not for IDET. Prior to the procedure being abandoned a decade ago for its lack of medical efficacy, if a patient has chronic and localized discogenic low back pain they may have been a candidate for IDET, but not for percutaneous discectomy. As such, cases where both procedures are indicated would be non-existent, or at least extraordinarily uncommon.

1687.   Nonetheless, many of the Surgicore Pain Management Providers regularly performed percutaneous discectomies in conjunction with IDET to Covered Persons. By way of example and not limitation:

- Approximately all of the Covered Persons who received a percutaneous discectomy by Phoenix Medical, also received IDET at the same time;

- Approximately all of the Covered Persons who received a percutaneous discectomy by Bowen PLLC, also received IDET at the same time;

- Approximately all of the Covered Persons who received a percutaneous discectomy by J Sports, also received IDET at the same time;

- Approximately all of the Covered Persons who received a percutaneous discectomy by at KV Medical, also received IDET at the same time;

- Approximately all of the Covered Persons who received a percutaneous discectomy by NJ Vora, also received IDET at the same time;

- Approximately all of the Covered Persons who received a percutaneous discectomy by Portal Medical, also received IDET at the same time;

- Approximately all of the Covered Persons who received a percutaneous discectomy by Integrated Pain Management/Xie, also received IDET at the same time;

- Approximately 98% of the Covered Persons who received a percutaneous discectomy by Hall PLLC, also received IDET at the same time;

- Approximately 96% of the Covered Persons who received a percutaneous discectomy by at KDV Medical also received IDET at the same time; and

- Approximately 86% of the Covered Persons who received a percutaneous discectomy by Total Anesthesia, also received IDET at the same time.

1688. In fact, during the examination under oath of Bowen PLLC with American Transit on July 25, 2023, Defendant Bowen admitted that it is his practice to perform percutaneous discectomy and annuloplasty together. Though, Bowen conceded that they are not typically performed together. He stated as follows:

> Q. So is it your practice and
> procedure, then, when performing a percutaneous
> discectomy, to always perform an annuloplasty on
> the patient?
> A. Yeah. I mean, I'm not -- I'm not
> gonna say "always," but I would say it, it --
> yes, it benefits the patient and I have better
> outcomes. And there are better outcomes in
> terms of as the things I've already mentioned,
> to do the annuloplasty while I'm already inside

the disc, yes.
Q. So if you won't say "always," will
you say "most of the time?" It's your practice
and procedure most of the time?
A. Yeah, I would say most of the time;
yes…
255:19-23

Q. Are percutaneous discectomy, nucleus
ablation and/or annuloplasty typically performed
together or based on specific findings for each
patient?
A. It -- no, it's not typically done
together, but it has been shown that adding the
annuloplasty to the percutaneous discectomy does
actually improve outcome.
253:25-254:6.

1689.   Similarly, during Total Anesthesia's EUO with American Transit on August 15,

2024, Defendant Shabtian admitted that it is his practice to perform percutaneous discectomy and

annuloplasty together. However, he conceded that at the percutaneous discectomy courses he

attended, he was not taught to do them together. He stated as follows:

Q Is it the practice of Total Anesthesia to
perform percutaneous discectomy and annuloplasty
together?
A Yes.
Q For every patient that has a percutaneous
discectomy, right?
A Yes.
178:8-14
Q How is it taught when you go to these
percutaneous discectomy courses, is it taught to do
the percutaneous discectomy alone or do them
together?
A They teach them separately.
180:9-13

1690.   In addition to the foregoing, attached as Exhibit "23" is a representative list of

claims in which one or more of the Defendant Surgicore Pain Management Providers and their

purported professional corporations improperly submitted bills to American Transit for

percutaneous discectomy and IDET on the same day pursuant to a predetermined fraudulent protocol.

1691. In addition to the Defendant Surgicore Pain Management Providers fraudulently submitting bills to American Transit for percutaneous discectomy and IDET on the same day, numerous other pain management doctors and their purported professional corporations, who and which are not named as defendants in this Complaint but billed for such services at, by, and through the Surgicore ASCs, also submitted bills to American Transit pursuant to the same predetermined fraudulent protocol. Attached as Exhibit "24" is a representative list of claims in which non-defendant pain management doctors improperly billed percutaneous discectomy and IDET on the same day.

1692. To the extent both percutaneous discectomy and IDET are somehow indicated, the clinical rationale for performing IDETs and percutaneous discectomies simultaneously should be described in the Covered Persons' medical records, which it is not.

1693. The Surgicore Pain Management Providers purportedly performed IDETs and percutaneous discectomies simultaneously for no other reason than to increase their billing and maximize their financial gain.

1694. The Surgicore Pain Management Providers purported dual performance of percutaneous discectomies and IDET which are not medically indicated to be performed together and in and of themselves lack medical efficacy were not medically necessary, and therefore not provided as billed and constitute material misrepresentations of the services rendered.

1695. Even more troubling, the implausibly short duration of the purported dual percutaneous discectomy and IDET procedures purportedly performed by the Surgicore Pain

Management Providers make it highly unlikely that the procedures were medically necessary and/or were performed at all.

1696. While a percutaneous discectomy and IDET performed together would be expected to take approximately 35 minutes from the time of the first insertion to the time the last needle is taken out, the procedures administered by many of the Surgicore Pain Management Providers took less than 15 minutes, and some as little as 3 minutes. By way of example and not limitation:

- Covered Person I.P., claim number 1113092-01 lumbar percutaneous discectomy and IDET procedure (along with discogram, epidural steroid and trigger point injection) purportedly performed on 09-10-2022 by Defendant Vora through KDV Medical at North Queens ASC took only 12 minutes from the time of incision until surgery end;

- Covered Person D.C., claim number 1120181-01 lumbar percutaneous discectomy and IDET procedure (along with discogram, epidural steroid and trigger point injection) purportedly performed on 10-07-2022 by Defendant Vora through KDV Medical at North Queens ASC took only 14 minutes from the time of incision until surgery end;

- Covered Person I.R. claim number 1122619-03 lumbar percutaneous discectomy and IDET purportedly performed on 05-04-23 by Defendant Kotkes through Kotkes PC at Rockaways ASC took only 3 minutes from the time of incision until surgery end;

- Covered Person S.W. claim number 1090180-02 cervical percutaneous discectomy and IDET purportedly performed on 02-08-21 by Defendant Kotkes through Kotkes PC at All City ASC took only 5 minutes, and the lumbar percutaneous and IDET purportedly performed on 02-23-21 by Defendant Kotkes through Kotkes PC at Rockaways ASC took only 4 minutes from the time of incision until surgery end;

- Covered Person J.S. claim number 1098288-05 cervical percutaneous discectomy and IDET purportedly performed on 12-03-21 by Defendant Hall through Hall PLLC at Rockaways ASC took only 14 minutes and the and the lumbar percutaneous and IDET purportedly performed on 02-11-22 by Defendant Hall through Hall PLLC at Rockaways ASC took only 4 minutes from the time of incision until surgery end;

- Covered Person A.C. claim number 1101437-02 cervical percutaneous discectomy and IDET purportedly performed on 11-14-21 by Defendant Jimenez through J Sports at Rockaways ASC took only 7 minutes from the time of incision until surgery end;

- Covered Person A.A. claim number 1099557-01 lumbar percutaneous discectomy and IDET purportedly performed on 01-30-22 by Defendant Jimenez through J Sports at Rockaways ASC took only 10 minutes from the time of incision until surgery end;

- Covered Person E.K., claim number 1114475-01 lumbar percutaneous discectomy and IDET purportedly performed on 02-16-23 by Defendant Shabtian through Total Anesthesia at North Queens ASC took only 7 minutes from the time of incision until surgery end;

- Covered Person T.B., claim number 1114475-02 lumbar percutaneous discectomy and IDET purportedly performed on 02-16-23 by Defendant Shabtian through Total Anesthesia at North Queens ASC took only 8 minutes from the time of incision until surgery end;

- Covered Person E.A.O. claim number 1124002-03 lumbar percutaneous discectomy and IDET purportedly performed on 03-29-23 by Defendant Bowen through Bowen PLLC at Rockaways ASC took only 3 minutes from the time of incision until surgery end; and

- Covered Person R.O., claim number 1124002-01 cervical percutaneous discectomy and IDET procedure (along with discogram) purportedly performed on 04-11-23 by Defendant Bowen through Bowen PLLC at Rockaways ASC took only 5 minutes from the time of incision until surgery end.

## G. The Fraudulent Discograms

1697. As part of the Defendants' predetermined fraudulent protocol, the vast majority of the Surgicore Pain Management Providers also routinely subjected Covered Persons to medically unnecessary discograms (attendant to the percutaneous discectomies) performed at, by, and through one or more of the Surgicore ASCs, that are not actually being used as diagnostic tools to advance the Covered Persons' treatment.

1698. Like the Defendants' charges for percutaneous discectomy, the charges for discograms were fraudulent in that discograms were medically unnecessary and performed, to the extent they were performed at all, pursuant to the Defendants' pre-determined fraudulent treatment, referral, and billing protocol, not to properly treat or otherwise benefit the Covered Persons.

1699.   On information and belief, a discogram is an invasive procedure used to ascertain if a disc is symptomatic and responsible for the pain reported by the patient.

1700.   On information and belief, a discogram provides a radiographical evaluation of the integrity of the nucleus and annular rings to determine tears or other lesions that could be the cause of the pain.

1701.   On information and belief, a discogram should be performed diagnostically for the purpose of obtaining information to help determine whether to perform a percutaneous discectomy, not merely in conjunction with one as a matter of course.

1702.   A discogram evaluates disc pathology in persons with persistent, severe pain and abnormalities on MRIs where other diagnostic tests have failed to reveal clear confirmation of a suspected disc as the source of pain. Discograms should only be considered for patients who, despite extensive conservative treatment, have disabling pain.

1703.   A discogram is performed by inserting a needle into the center of a spinal disc (using fluoroscopic guidance to ensure the needle is accurately placed) and injecting radiographic contrast dye, followed by computed tomography to examine the disc abnormality.

1704.   On information and belief, a discogram should be performed using control injections at the adjacent levels to make certain they do not reproduce the same pain. Three discs (including control discs) should be injected and included on a study to be completed contemporaneously by the physician performing the discogram.

1705.   When performing a discogram, each disc should be "pressurized" slowly one at a time with a manometer to evaluate any pain reproduction. Pressurization consists of injecting small amounts of a sterile liquid (usually contrast material or x-ray dye) into the center of the disc. After each level is pressurized, pictures are taken with the fluoroscopic unit and the needles are removed.

1706.   The patient is awake and alert during the discogram so that he or she can report any pain or pressure experienced from the injection. A normal disc should not cause pain when injected. If the injection recreates the patient's back pain, that disc is verified as the pain source (a positive result), so long as control injections at the adjacent levels do not reproduce the same pain. A negative result occurs when the discogram causes no pain or only mild pressure, indicating the disc is not the source of the pain.

1707.   The medical utility of a discogram is heavily debated, with a portion of the medical community of the opinion that pain provoked by a discogram performed on a normal appearing disc (on MRI) was likely due to increased pain sensitivity and false positives, such that discograms are not diagnostically reliable and the clinical results are often inconclusive.

1708.   On information and belief, there are also concerns regarding the safety of discograms. Specifically, risks to Covered Persons subjected to discograms include increased pain from the puncture and injection of contrast into the disc, accelerated disc degeneration, disc herniation, and loss of disc height and signal intensity in the disc.

1709.   Despite the concerns regarding the reliability, utility, and safety of discograms, as a matter of practice, procedure, and protocol, the Surgicore Pain Management Providers regularly recommended, purportedly performed and billed for discograms on Covered Persons' lumbar and/or cervical spine.

1710.   As part of their Pre-Determined Protocol, the Surgicore Pain Management Providers recommended and purportedly performed discograms on Covered Persons which they knew or should have known lacked diagnostic reliability and utility and posed safety risks to Covered Persons, for no other reason than to exponentially increase their billing and maximize their financial gain.

1711.  Attached as Exhibit "25" is a representative list of claims in which Covered Persons who were purportedly treated at one or more of the Defendant Surgicore Pain Management Providers were subjected to unreliable, unsafe, medically unnecessary discograms as part of the Defendants Pre-Determined Protocol.

1712.  In addition to the Defendant Surgicore Pain Management Providers fraudulently submitting bills to American Transit for outdated, ineffective, medically unnecessary IDET, numerous other pain management doctors and their purported professional corporations, who and which are not named as defendants in this Complaint but billed for such services at, by, and through the Surgicore ASCs, also submitted bills to American Transit pursuant to the same predetermined fraudulent protocol. Attached as Exhibit "26" is a representative list of Covered Persons who were purportedly treated at one or more of the pain management doctors and their purported professional corporations not named as Defendants, and were subjected to unreliable, unsafe, medically unnecessary discograms as part of the Defendants Pre-Determined Protocol.

1713.  The Surgicore Pain Management Providers' purported performance of discograms was not medically necessary, not provided as billed, and materially misrepresented the services rendered.

1714.  In addition to improperly recommending and performing medically unnecessary discograms, the vast majority of Surgicore Pain Management Providers failed to perform discogram in a valid manner violating the standard of care.

1715.  Many of the Surgicore Pain Management Providers' procedure reports contain the same boilerplate language purporting to describe the discogram procedure, which fail to document the Covered Persons' pain responses, undermining the reliability, validity and credibility of the discograms they purported to perform. By way of example and not limitation:

- J Sports' Operative Report, dated 12-13-20, for a purported discogram procedure submitted to Plaintiff that relates to Covered Person T.B. under claim number 1074360-04 on that was purportedly performed at Fifth Avenue Surgical Center fails to document the Covered Person's pain response.

- Bowen PLLC's Operative Report dated 09-23-21 for a purported discogram procedure submitted to Plaintiff that relates to Covered Person B.J.R. under, claim number 1097264-01 that was purportedly performed at North Queens Surgical Center fails to document the Covered Person's pain response.

- Hall PLLC's Operative Report dated 02-11-22 for a purported discogram procedure submitted to Plaintiff that relates to Covered Person J.S. under claim number 1098288-05 that was purportedly performed at Rockaways ASC fails to document the Covered Person's pain response, and is notably identical to Bowen PLLC's report description.

- Kotkes PC's Operative Report dated 06-24-19 for a purported discogram procedure submitted to Plaintiff that relates to Covered Person S.L. under, claim number 1056349-02 that was purportedly performed at All City ASC fails to document the Covered Person's pain response.

- Portal Medical's Operative Report dated 03-20-23 for a purported discogram procedure submitted to Plaintiff that relates to Covered J.W., under claim number 1125330-01 that was purportedly performed at Rockaways ASC fails to document the Covered Person's pain response.

- PM&R's Operative Report dated 02-13-23 for a purported discogram procedure submitted to Plaintiff that relates to Covered Person C.H. under claim number 1121368-01 that was purportedly performed at Fifth Avenue ASC fails to document the Covered Person's pain response.

1716. The above are only representative examples. The Surgicore Pain Management Providers' procedure reports (or other medical records) virtually all lack evidence that the Surgicore Pain Management Providers actually performed valid discograms or that any diagnostic information was obtained for patient diagnosis by simply injecting contrast material in conjunction with a scheduled discectomy.

1717. The Surgicore Pain Management Providers did not perform discograms in an effort to diagnose the location of any disc pain or to assist in performing percutaneous discectomies but rather as a matter of course to increase billing and maximize financial gain.

1718.  Therefore, the Surgicore Pain Management Providers purported performance of discograms was medically unnecessary, not provided as billed and materially misrepresented the services rendered.

**H.    The Fraudulent Epidural Steroid Injections**

1719.  As part of the Defendants' fraudulent Pre-Determined Protocol, many of the Surgicore Pain Management Providers routinely subjected Covered Persons to medically unnecessary epidural steroid injections performed at, by, and through one or more of the Surgicore ASCs.

1720.  Like the Defendants' charges for the other fraudulent interventional pain management services alleged above, the charges for epidural steroid injections were fraudulent in that epidural steroid injections were medically unnecessary and performed, to the extent they were performed at all, pursuant to the Defendants' pre-determined fraudulent treatment, referral, and billing protocol, not to properly treat or otherwise benefit the Covered Persons.

1721.  On information and belief, an epidural steroid injection (ESI) is a nerve block injection designed to target a specific nerve root and relieve radicular complaints (i.e., radial pain) in the arm, shoulder, buttocks, thigh, or leg that results from a nerve root getting inflamed or pinched. ESIs are designed to treat discogenic pain that impacts a larger region or area (including the back) and are commonly used in legitimate pain management practices on patients who are appropriate candidates for the injection.

1722.  On information and belief, due to the risks presented by ESIs, including but not limited to Covered Persons' exposure to radiation associated with the fluoroscopy, the potential side effects and complications from steroids, the direct procedure risks of bleeding, infection, nerve injury, paralysis and death, and the side effects and complications of sedation, ESIs should

only be performed when appropriate indications are present, and when medically necessary to diagnose and/or treat pain, to alleviate pain to facilitate conservative care, or to alleviate pain after conservative care has failed or is not an option.

1723. On information and belief, before recommending and performing an ESI on Covered Persons, a thorough physical examination must be conducted involving orthopedic and neurological testing. This testing is required to evaluate for associated sensory, motor, or reflex deficits in the involved limb(s), to help guide treatment, and to establish a baseline status before initiating an invasive treatment such as injections. The clinical findings and indications must be correlated with radiologic evidence of nerve-root irritation, inflammation, or compression at spinal levels that are consistent with the distribution of the patients' nerve-related pain, and/or physical examination findings and that may be attributable to pathologies in and around the nerve roots.

1724. As alleged above, many of the Surgicore Pain Management Providers' cursory Initial Exam Reports failed to document legitimate symptoms or findings to advance Covered Persons to ESIs.

1725. The Surgicore Pain Management Providers also routinely failed to document their reasoning or otherwise included boilerplate language in their Initial Exam Reports to attempt to justify the performance of ESIs.

1726. The Surgicore Pain Management Providers' assessment and plan sections of their Initial Exam Reports included generic language that routinely failed to detail what specific segments of the spine were involved and thus considered for ESI. By way of example and not limitation:

- Bowen PLLC's Initial Exam Report dated 06-08-21 submitted to Plaintiff that relates to Covered Person B.J.R. under claim number 1097264-01, generally states "Epidural Injections," and fails to detail the specific segment of the spine to be injected.

- Hall PLLC's Initial Exam Report dated 10-04-21 submitted to Plaintiff that relates to Covered Person, J.S. under claim number 1098288-05, generally states "Epidural Injections" and fails to detail the specific segment of the spine to be injected.

- Total Anesthesia's Initial Exam Report dated 09-25-23 submitted to Plaintiff that relates to Covered Person, S.N. under claim number 1136698-02, generally states that "Lumbar Epidural Steroid is indicated" and fails to detail the specific segment of the spine to be injected.

- Total Anesthesia's Initial Exam Report dated 10-16-23 submitted to Plaintiff that relates to Covered Person, S.C. under claim number 1134645-01, generally states that "Cervical Epidural Steroid is indicated" and fails to detail the specific segment of the spine to be injected.

- 

- Integrated Pain Management's Initial Exam Report dated 07-31-18 submitted to Plaintiff that relates to Covered Person G.Z. under claim number 1032903-03, generally states only Cervical Interlaminar Epidural and fails to detail the specific segment of the spine to be injected.

1727. An interventional procedure such as an ESI should never be authorized without defining the specific levels on which they are to be performed prior to the procedure (i.e., L3-L4). Nonetheless, many of the Surgicore Pain Management Providers purportedly performed ESIs without specifying the anatomic location in which the injection would be performed.

1728. Even more troubling, many of the Surgicore Pain Management Providers' Epidural Steroid Injection Reports fail to document the specific location of the purported injection and thus do not accurately reflect the services purportedly performed. By way of example and not limitation:

- Bowen PLLC's operative report for a purported lumbar epidural steroid injection submitted to Plaintiff that relates to Covered Person J.F. under claim number 1102308-01, that was purportedly performed at Rockaways ASC fails to specify the location of the purported injection.

- Bowen PLLC's operative report dated 03-19-23 for a purported lumbar epidural steroid injection submitted to Plaintiff that relates to Covered Person I.J. under claim number 1120701-01, that was purportedly performed at Rockaways ASC fails to specify the location of the purported injection.

- Kotkes PC's operative report dated 12-02-19 for a purported lumbar epidural steroid injection submitted to Plaintiff that relates to Covered Person S.K. under claim number, that was purportedly performed at All City ASC fails to specify the location of the purported injection and appears to be nothing more than a template virtually identical to Bowen PLLC's report.

1729. The Surgicore Pain Management Providers' operative reports' failure to set forth any detailed description of the injection procedure supports that the injections were not performed and/or that the injections were not provided as billed to Plaintiff.

1730. Some of the Surgicore Pain Management Providers' Epidural Steroid Injection Reports further purport to perform injections at more than one level (i.e. C4-C5 and C5-C6), but contain nothing more than a single paragraph of boilerplate language that fails to sufficiently document the procedure at each different level. These reports do not accurately reflect the services purportedly performed and suggests that the injections were not provided as billed to Plaintiff.

1731. By way of example and not limitation, Phoenix Medical's operative report dated 01-17-19 for a purported cervical epidural steroid injections at levels C4-C5 and C5-C6 submitted to Plaintiff that relate to Covered Person D.B. under claim number 1033148-03, purportedly performed at New Horizon ASC, fails to sufficiently document the procedure at each different level.

1732. As set forth above, the Surgicore Pain Management Providers did not perform ESIs, to the extent they were performed at all, to properly treat or benefit the Covered Persons but rather as a matter of course to increase billing and maximize financial gain.

1733. In many instances, ESIs were administered to Covered Persons solely in furtherance of Defendants' fraudulent treatment protocol designed to provide a false justification for percutaneous discectomies.

1734. During Total Anesthesia 's examination under oath with American Transit on 08-15-24 (116:2-18), Shabtian stated that a failed epidural steroid is necessary before proceeding with a percutaneous discectomy and annuloplasty.

> Q Do you need a failed injection in order to
> say a percutaneous discectomy and annuloplasty are
> necessary?
> A Most of the time, yes.
> Q When wouldn't you need a failed injection?
> A What is the question, ma'am?
> Q You said most of time you need a failed
> injection to say that a percutaneous discectomy and
> annuloplasty are necessary?
> A Yes.
> Q What would be those times where you would
> not need a failed injection?
> A If the patient is allergic to steroid
> medication or if they absolutely refuse any type of
> injections, saying that they have had it in the past
> and they don't want any injection going into their
> body, but they are very far and few in between.

1735. Defendant Shabtian's testimony agrees that the Surgicore Pain Management Providers' purported performance of ESIs was medically unnecessary, not provided as billed and materially misrepresented to Plaintiff the services rendered.

### I.    The Fraudulent Epidurograms

1736. In order to maximize their fraudulent charges for medically unnecessary pain management injections purportedly provided to Covered Persons the vast majority of Surgicore Pain Management Providers frequently submitted separate charges for epidurograms, purportedly performed concurrently with epidural steroid injections, that were not actually being used as diagnostic tools to advance the Covered Persons' treatment.

1737. Like the Defendants' charges for the epidural steroid injections, the charges for epidurograms were fraudulent in that the epidurograms were medically unnecessary and performed, to the extent that they were performed at all, pursuant to the Defendants' pre-

determined fraudulent treatment, referral, and billing protocol, not to properly treat or otherwise benefit the Covered Persons.

1738.  On information and belief, epidurography is performed to assess the structure of the epidural space in the spine. This outpatient procedure is done (without sedation) before epidural steroids are administered, to ensure accurate delivery of the therapeutic material to the pain source.

1739.  On information and belief, to perform an epidurogram, a physician or radiologist uses x-ray-guidance (fluoroscopy) to insert a thin needle into the skin and directs the needle toward the epidural space at the desired location (i.e., level) in the spine. Once the needle is inserted, the doctor injects dye. The x-ray allows the physician or radiologist to document the dispersion of the contrast dye, providing an outline of compressed nerve roots which enables the medical provider to make an informed diagnosis as to the source of pain.

1740.  A physician can only bill CPT Code 72275 (epidurogram) if a separate diagnostic study is performed, including a permanent radiologic image of the epidural space along with interpretation and written report. The written report must support the medical necessity for the test and offer a description of the findings. For example, the written report should show the physician injected contrast into the epidural space under direct fluoroscopy for a diagnostic study. The report should also indicate the observed direction of the flow—noting any obstructions of the contrast dye in the space around the nerves—to help the medical provider diagnose compressive lesions, narrowing and swelling around the nerve or nerve roots, and/or intervertebral disc herniations.

1741.  On information and belief, mapping the epidural space to determine needle placement through the use of an epidurogram is not medically necessary each time a medical provider performs an ESI.

1742. Notwithstanding, the Surgicore Pain Management Providers purported to administer epidurograms every time they purportedly performed an epidural injection as a matter of course and without appropriate medical justification. Attached as Exhibit "27" is a representative list of claims in which one or more of the Defendant Surgicore Pain Management Providers and their purported professional corporations improperly submitted bills to American Transit for epidurograms purportedly administered concomitant to epidural steroid injections purportedly performed pursuant to a predetermined fraudulent protocol.

1743. In addition to the Defendant Surgicore Pain Management Providers fraudulently submitting bills to American Transit for epidurograms purportedly administered concomitant to epidural steroid injections purportedly performed, numerous other pain management doctors and their purported professional corporations, who and which are not named as defendants in this Complaint but billed for such services at, by, and through the Surgicore ASCs, also submitted bills to American Transit pursuant to the same predetermined fraudulent protocol. Attached as Exhibit "28" is a representative list of claims in which non-defendant pain management doctors improperly billed for epidurograms purportedly administered concomitant to epidural steroid injections purportedly performed.

1744. Virtually all of the Surgicore Pain Management Providers' documentation of the epidurograms purportedly performed on Covered Persons were also deficient in that the reports failed to indicate the specific levels on which epidurograms were purportedly performed on each Covered Person, but simply referenced the general location of the procedure (i.e., lower lumber interlaminar rather than L3) and failed to include any discussion of the results of the purported epidurogram. By way of example and not limitation:

- Bowen PLLC's epidurogram report dated 11-21-21 for an epidurogram, submitted to Plaintiff that relates Covered Person J.F. under claim number

1102308-01 that was purportedly performed at Rockaways ASC only references the general location of the procedure at the "low lumbar interlaminar space" and fails to include any discussion of the results of the epidurogram.

- Hall PLLC's epidurogram report dated 12-17-21 for an epidurogram, submitted to Plaintiff that relates Covered Person J.S. under claim number 1098288-05 that was purportedly performed at Rockaways ASC only references the general location of the procedure at the "low lumbar interlaminar space" and fails to include any discussion of the results of the epidurogram.

1745. The above demonstrates the Surgicore Pain Management Providers did not perform epidurograms as a medically necessary diagnostic test to aid in the Patient's recovery, but rather performed the test (if at all) as part of the Defendants Pre-Determined protocol aimed at maximizing charges to American Transit.

### i. The Fraudulent Charges For Epidurogram

1746. In that regard, not only did the Surgicore Pain Management Doctors routinely bill for medically unnecessary epidurograms but many of the Surgicore Pain Management Doctors also routinely and fraudulently unbundled separate charges for epidurography from underlying injection charges, in a calculated effort to increase their billing and maximize financial gain.

1747. The Fee Schedule describes CPT 62321 as Injection(s), of diagnostic or therapeutic substance(s) (e.g., anesthetic, antispasmodic, opioid, steroid, other solution), not including neurolytic substances, including needle or catheter placement, interlaminal epidural or subarachnoid, cervical or thoracic, with imaging guidance (i.e., fluoroscopy or CT).

1748. The Fee Schedule describes CPT 62323 as Injection(s), of diagnostic or therapeutic substance(s) (e.g., anesthetic, antispasmodic, opioid, steroid, other solution), not including neurolytic substances, including needle or catheter placement, interlaminal epidural or subarachnoid, lumbar or sacral (caudal);, with imaging guidance (i.e., fluoroscopy or CT).

1749. The Fee Schedule describes CPT 72275 as radiological supervision and interpretation of epidurography.

1750. Pursuant to the CPT code, epidurography (CPT 72275) should not have been billed when the contrast injection was part of the fluoroscopic guidance and contrast injection to confirm correct needle placement that was integral to the epidural injections.

1751. As a result, the Surgicore Pain Management Doctors are not entitled to be reimbursed separately for epidurography under CPT code 72275 when billing for pain management injections under CPT codes 62321, and/or 62323.

1752. CPT 72275 was deleted from the CPT code effective January 1, 2022 and as of the effective date of the deletion was no longer considered a CPT code and thus would not be valid for billing purposes. Nor would the Surgicore Pain Management Doctors be entitled to reimbursement under CPT code 72275.

1753. Nevertheless, many of the Surgicore Pain Management Doctors routinely unbundled billing for epidurography from the underlying injection charges and/or billed for epidurograhy using the deleted CPT, so as to maximize the amount of fraudulent billing they could submit to American Transit. By way of example and not limitation:

- On October 17, 2023, Covered Person I.S., Claim no. 1133556-02, purportedly underwent epidural steroid injections, purportedly performed with an epidurography at Defendant All City ASC, for which, Defendant Portal Medical unbundled a separate charge of $460.86 for epidurography under CPT code 72275 from a charge under CPT code 62323 for epidural steroid injections.

- On March 5, 2024, Covered Person V.J., Claim no. 1077803-04, purportedly underwent epidural steroid injections, purportedly performed with an epidurography at Defendant New Horizon ASC, for which, Defendant Xie unbundled a separate charge of $182.38 for epidurography under CPT code 72275 from a charge under CPT code 62321 for epidural steroid injections.

- On March 25, 2023, Covered Person N.P., Claim no. 1121572-01, purportedly underwent epidural steroid injections, purportedly performed with an epidurography at Defendant Saddlebrook ASC, for which, Defendant J Sports unbundled a separate charge of $460.86 for epidurography under CPT code 72275 from a charge under CPT code 62323 for epidural steroid injections.

- On December 11, 2021, Covered Person K.D., Claim no. 1104234-02, purportedly underwent epidural steroid injections, purportedly performed with an epidurography at Defendant New Horizon ASC, for which, Defendant Integrated Pain Management unbundled a separate charge of $572.53 for epidurography under CPT code 72275 from a charge under CPT code 62321 for epidural steroid injections.

- On November 19, 2021, Covered Person B.G., Claim no. 1103173-01, purportedly underwent epidural steroid injections, purportedly performed with an epidurography at Defendant Rockaways ASC, for which, Defendant Hall PLLC unbundled a separate charge of $460.86 for epidurography under CPT code 72275 from a charge under CPT code 62323 for epidural steroid injections.

- On October 14, 2021, Covered Person J.A., Claim no. 1096252-01, purportedly underwent epidural steroid injections, purportedly performed with an epidurography at Defendant Rockaways ASC, for which, Defendant Kotkes PC unbundled a separate charge of $460.86 for epidurography under CPT code 72275 from a charge under CPT codes 62321 for epidural steroid injections. Thereafter, on November 4, 2021, J.A. purportedly underwent another round of epidural steroid injections, purportedly performed with an epidurography at Defendant Rockaways ASC, for which, Defendant Kotkes PC unbundled a separate charge of $460.86 for epidurography under CPT code 72275 from a charge under CPT codes 62323 for epidural steroid injections.

- On September 18, 2021 and February 19, 2022, Covered Person J.L., Claim no. 1100512-01, purportedly underwent rounds of epidural steroid injections, purportedly performed with an epidurography at Defendant North Queens ASC, for which, on both occasions, Defendant KDV Medical unbundled a separate charge of $460.86 for epidurography under CPT code 72275 from a charge under CPT code 62323 for epidural steroid injections.

- On October 31, 2020, and November 8, 2020, Covered Person A.M., Claim no. 1088558-01, purportedly underwent epidural steroid injections, in both instances purportedly performed with an epidurography at Defendant Fifth Avenue ASC, for which, on both occasions, Defendant Bowen unbundled a separate charges of $460.86 for epidurography under CPT code 72275 from charges under CPT code 62323 for epidural steroid injections.

- On September 22, 2022, Covered Person A.M., Claim no. 1084559-02, purportedly underwent epidural steroid injections, purportedly performed with an epidurography at Defendant North Queens ASC, for which, Defendant Vora PC unbundled a separate charge of $572.53 for epidurography under CPT code 72275 from a charge under CPT code 62321 for epidural steroid injections.

- On January 28, 2020, Covered Person V.V., Claim no. 1067343-01, purportedly underwent epidural steroid injections, purportedly performed with an epidurography at Defendant North Queens ASC, for which, Defendant Total Anesthesia unbundled a separate charge of $460.86 for epidurography under CPT code 72275 from a charge under CPT codes 62323 for epidural steroid injections. Thereafter, on February 17, 2020, V.V. purportedly underwent another round of epidural steroid injections, purportedly performed with an epidurography at Defendant North Queens ASC, for which, Defendant Total Anesthesia unbundled a separate charge of $460.86 for epidurography under CPT code 72275 from a charge under CPT code 62321 for epidural steroid injections.

1754.  In addition to the foregoing, a representative sample of claims in which the Surgicore Pain Management Doctors routinely unbundled billing for epidurography from the underlying injection charges and/or billed for epidurograhy using the deleted CPT, is included in Exhibit "27" in the compendium of exhibits. Each of the unbundled charges for epidurography constitute a misrepresentation that the Surgicore Pain Management Doctors were entitled to be reimbursed for the charge, when in fact they were not.

**J.      Fraudulent Trigger Point Injections**

1755.  As part of the Defendants' Pre-Determined Protocol, one or more of the Surgicore Pain Management Providers routinely subjected Covered Persons to medically unnecessary trigger point injections performed at one or more of the Surgicore ASCs.

1756.  Like the Defendants' charges for pain management injections, the charges for trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and performed, to the extent that they were performed at all, pursuant to the

Defendants' pre-determined fraudulent treatment, referral, and billing protocol, not to properly treat or otherwise benefit the Covered Persons.

1757. Trigger points also known as trigger sites or muscle knots are typically characterized by a tender and painful spot in a tight band of skeletal muscle that can be detected by muscle palpation.

1758. A trigger point injection involves inserting a needle into the muscle knot and injecting a small amount of medication, typically a local anesthetic and sometimes a corticosteroid, into the affected area with the goal of reducing localized pain by relaxing the affected muscles and/or reducing referred pain by interrupting the nerve signaling pathways that cause referred pain.

1759. On information and belief, there is no generally accepted evidence that injecting medication into trigger points improves patients' results.

1760. On information and belief, trigger point injections should not be used for acute neck pain but can be used adjunctively with other therapies in non-acute (chronic) neck pain.

1761. On information and belief, trigger point injections are considered medically necessary only when the trigger point is presently causing tenderness and/or weakness, restricting motion, and/or causing referred pain when compressed.

1762. On information and belief, trigger point injections should only be utilized either as a second or third options for non-acute pain that is not resolving with more conservative means (*e.g.*, NSAIDs, exercises) within a six-week time frame.

1763. On information and belief, administering trigger point injections before the patient has completed a minimum of six weeks (and, generally, at least three months) of conservative therapy is excessive and medically unnecessary.

1764. Even so, similar to the other interventional pain management procedures discussed herein, the Surgicore Pain Management Providers purportedly performed trigger point injections to Covered Persons before the Covered Persons had pain symptoms that persisted for more than three months, and/or before the Covered Persons had failed or been intolerant of more conservative therapies for at least six weeks. By way of example and not limitation:

- On January 25, 2023, Covered Person J.W., Claim no. 1125330-01, was purportedly involved in a low-impact automobile collision. Notwithstanding that, starting on or about February 1, 2023, J.W. purportedly underwent a predetermined treatment protocol at a No-fault Clinic located at 82-25 Queens Blvd, Elmhurst, NY, disguised as a legitimate conservative course of treatment, J.W. purportedly underwent trigger point injections on March 10, 2023, purportedly performed by Defendant Portal, through Defendant Portal Medical at Defendant Rockaways ASC, only 44 days following the purported collision and only 37 days into J.W.'s purported course of treatment.

- On September 18, 2022, Covered Person P.R., Claim no. 1119135-01, was purportedly involved in a low-impact automobile collision. Thereafter, starting on or about September 21, 2022, P.R. purportedly underwent a predetermined treatment protocol at a No-fault Clinic located at 607 Westchester Avenue, Bronx, NY, disguised as a legitimate conservative course of treatment. Notwithstanding the foregoing, P.R. purportedly underwent trigger point injections on October 14, 2022, and October 21, 2022, purportedly performed by Defendant Hall, through Defendant Hall PLLC, at Defendant Rockaways ASC, only 26 days and 33 days, respectively, following the purported collision, and only 23 days and 30 days, respectively, into P.R.'s purported course of treatment.

- On August 18, 2021, Covered Person G.Z., Claim no. 1101612-01, was purportedly involved in a low-impact automobile collision. Notwithstanding that, starting on or about August 19, 2021, G.Z. purportedly underwent a predetermined treatment protocol at a No-fault Clinic located at 86-01 101 Avenue, Ozone Park, NY, disguised as a legitimate conservative course of treatment, G.Z. purportedly underwent trigger point injections on September 19, 2021, purportedly performed by Rajivan Maniam (not named as a defendant herein), through Defendant Bowen PLLC at Defendant Rockaways ASC, only 32 days following the purported collision and only 31 days into G.Z.'s purported course of treatment.

- On July 11, 2021, Covered Person R.W., Claim no. 1101163-03, was purportedly involved in a low-impact automobile collision.

Notwithstanding that, starting on or about July 19, 2021, R.W. purportedly underwent a predetermined treatment protocol at a No-fault Clinic located at 12 West 32nd Street, New York, NY, disguised as a legitimate conservative course of treatment, R.W. purportedly underwent trigger point injections on August 21, 2021, purportedly performed by Defendant Xie, through Defendant Integrated Pain Management, at Defendant Saddlebrook ASC, only 41 days following the purported collision, and only 33 days into R.W.'s purported course of treatment.

- On December 20, 2020, Covered Person L.G., Claim no. 1092728-01, was purportedly involved in a low-impact automobile collision. Notwithstanding that, starting on or about December 29, 2020, L.G. purportedly underwent a predetermined treatment protocol at a No-fault Clinic located at 607 Westchester Avenue, Bronx, NY, disguised as a legitimate conservative course of treatment, L.G. purportedly underwent trigger point injections on February 6, 2021, purportedly performed by Defendant Vora, through Defendant KDV Medical at Defendant North Queens ASC, only 48 days following the purported collision and only 39 days into L.G.'s purported course of treatment.

- On November 10, 2020, Covered Person K.D., Claim no. 1090665-02, was purportedly involved in a low-impact automobile collision. Notwithstanding that, starting on or about November 11, 2020, K.D. purportedly underwent a predetermined treatment protocol at a No-fault Clinic located at 60 Belmont Avenue, Brooklyn, NY, disguised as a legitimate conservative course of treatment, K.D. purportedly underwent trigger point injections on December 13, 2020, purportedly performed by Defendant Jimenez, through Defendant J Sports, at Defendant Rockaways ASC, only 33 days following the purported collision and only 32 days into K.D.'s purported course of treatment.

- On June 5, 2019, Covered Person J.J., Claim no. 1059974-01, was purportedly involved in a low-impact automobile collision. Notwithstanding that, starting on or about June 12, 2019, J.J. purportedly underwent a predetermined treatment protocol at a No-Fault Clinic located at 381 Sunrise Highway, Lynbrook, NY, disguised as a legitimate conservative course of treatment, J.J. purportedly underwent trigger point injections on July 19, 2019, purportedly performed by Defendant Kotkes, at Defendant All City ASC, only 44 days following the purported collision, and only 37 days into J.C.'s purported course of treatment.

- On March 23, 2019, Covered Person H.D., Claim no. 1055559-02, was purportedly involved in a low-impact automobile collision. Notwithstanding that, starting on or about April 5, 2019, H.D. purportedly underwent a predetermined treatment protocol at a No-Fault Clinic located at 12 West 32nd Street, New York, NY, disguised as a legitimate conservative course of treatment, H.D. purportedly underwent trigger point injections on May 9, 2019, purportedly performed by Defendant Xie,

through Defendant Integrated Pain Management, at Defendant Jersey City ASC, 47 days following the purported collision, but only 34 days into R.W.'s purported course of treatment.

- On March 3, 2019, Covered Person N.L., Claim no. 1052409-01, was purportedly involved in a low-impact automobile collision. Notwithstanding that, starting on or about March 5, 2019, N.L. purportedly underwent a predetermined treatment protocol at a No-Fault Clinic located at 360-A West Merrick Road, Valley Stream, NY, disguised as a legitimate conservative course of treatment, N.L. purportedly underwent trigger point injections on April 12, 2019, purportedly performed by Nirmal V. Patel, MD (not named as a defendant herein), through Professional Pain Management, PC (not named as a defendant herein), at Defendant New Horizon ASC, only 40 days following the purported collision, and only 38 days into N.L.'s purported course of treatment.

1765.   The Defendants purported to administer trigger point injections to the Covered Persons despite the fact that such injections, to the extent that they actually were performed, placed the Covered Persons' health and safety at risk.

1766.   On information and belief, potential side effects from trigger point injections involving the use of local anesthetics include blood disorders, paralysis, lung failure, seizures, major cardiac and central nervous system effects, and local anesthetic systemic toxicity.

1767.   On information and belief, in addition to potential side effects and/or complications resulting from injecting local anesthetics, risks involved from the trigger point injections include serious bacterial skin infection, soreness, bruising, hemorrhages, fainting, fatigue, damage to the central nervous system and major organ puncture.

1768.   Many of the Surgicore Pain Management Providers' Initial Exam Reports failed to note any palpable trigger points in areas ultimately injected, fail to specify the trigger points to be injected and/or the medical reasoning for administering the trigger point injections.

1769.   Instead, the plan sections of the Initial Reports generally state "Trigger Point Injections." By way of example and not limitation,

- Bowen PLLC's Initial Exam Report, dated 06-08-21 submitted to Plaintiff that relates to Covered Person B.J.R. under claim number 1097264-01 generally states "Trigger Point Injections," and fails to detail the specific location to be injected;

- Hall PLLC's Initial Exam Report dated 10-04-21 submitted to Plaintiff that relates to Covered Person, J.S. under claim number 1098288-05 generally states "Trigger Point Injections," and fails to detail the specific location to be injected; and

- Integrated Pain Management's Initial Exam Report dated 07-31-18 submitted to Plaintiff relating to Covered Person G.Z. under claim number 1032903-03, generally states "Trigger Point Injections," and fails to detail the specific location to be injected.

1770. What is more, the medical reasoning for the administration of trigger point injections is typically omitted in the vast majority of Surgicore Pain Management Providers' Trigger Point Reports purportedly documenting the procedure itself.

1771. The failure to document the items set forth above is consistent with the fact that the Surgicore Pain Management Providers did not perform trigger point injections, to the extent they were performed at all, to properly treat or benefit the Covered Persons but rather as a matter of course to increase billing and maximize financial gain.

1772. The Surgicore Pain Management Providers' submission of bills and supporting documents for purported performance of trigger point injections materially misrepresented to Plaintiff that the services rendered was medically necessary, provided as billed, and/or rendered at all.

### i. Fraudulent Billing Related To Trigger Point Injections

1773. In addition to billing for medically unnecessary trigger points, in order to maximize payments, many of the Surgicore Pain Management Doctors purportedly administered both trigger point and ESIs on the same date of service contrary to accepted medical practices and the standard of care.

1774. On information and belief, administering both trigger point and ESIs on the same day is medically unnecessary because the purpose of a trigger point injection is to alleviate isolated back pain caused by muscle spasms and the spasm would be secondary to the underlying condition causing the pain, which the ESI is meant to treat. As such, the standard of care requires that one procedure be performed prior to the other, with time taken in between to determine if the first procedure reduces pain prior to performing the second procedure.

1775. The practice of subjecting Covered Persons to both trigger point injections and ESIs on the same date of service is meant to inflate the billing rather than assist in patient recovery.

1776. Attached as Exhibit "29" is a representative list of claims in which one or more of the Defendant Surgicore Pain Management Doctors and their purported professional corporations improperly submitted bills to American Transit for trigger point injections and ESIs on the same day pursuant to a predetermined fraudulent protocol.

1777. In addition to the Defendant Surgicore Pain Management Doctors fraudulently submitting bills to American Transit for trigger point injections and ESIs on the same day, numerous other pain medical doctors and their purported professional corporations, who and which are not named as defendants in this Complaint but billed for such services at, by and through the Surgicore ASCs, also submitted bills to American Transit pursuant to the same predetermined fraudulent protocol. Attached as Exhibit "30" is a representative list of claims in which non-defendant pain medical doctors improperly billed trigger point injections and ESIs on the same day.

1778. To further increase the billing for each round of unnecessary trigger point injections, the vast majority of the Surgicore Pain Management Doctors and Surgicore ASCs

routinely billed a separate charge for unnecessary ultrasound guidance purportedly used in connection with the trigger point injections administered to Covered Persons.

1779. The Surgicore Pain Management Doctors' use of ultrasound guidance for trigger point injections was not medically necessary because: (i) trigger points are easily palpated as ropy knots in superficial muscles, and they cannot be separately identified from the rest of the muscle on ultrasound; (ii) trigger point injections are best done with careful palpation of the trigger point, and then careful insertion of the hypodermic needle into the trigger point (when done carefully there is no danger to the pleura or other structures); and (iii) trigger points typically contain the same small veins or arterioles that are present in other muscle tissue. Preventing injection of the medication intravascularly is best assured by simply pulling back on the syringe plunger before injecting to make certain that no blood returns.

1780. The use of ultrasonic guidance in connection with trigger point injections purportedly performed on Covered Persons by the Surgicore Pain Management Doctors was not medically necessary and performed, if at all, pursuant to a fraudulent protocol designed to maximize Defendants' reimbursement.

1781. Attached as Exhibit "31" is a representative list of claims in which one or more of the Defendant Surgicore Pain Management Doctors and their purported professional corporations improperly submitted bills to American Transit unnecessary ultrasound guidance purportedly used in connection with trigger point injections pursuant to a predetermined fraudulent protocol.

1782. In addition to the Defendant Surgicore Pain Management Doctors fraudulently submitting bills to American Transit for unnecessary ultrasound guidance purportedly used in connection with trigger point injections, numerous other pain medical doctors and their purported professional corporations, who and which are not named as defendants in this Complaint but billed

for such services at, by and through the Surgicore ASCs, also submitted bills to American Transit pursuant to the same predetermined fraudulent protocol. Attached as Exhibit "32" is a representative list of claims in which non-defendant pain medical doctors improperly billed for unnecessary ultrasound guidance purportedly used in connection with the trigger point injections pursuant to a predetermined fraudulent protocol.

**K.     Medically Unnecessary Anesthesia Services**

1783.   As stated above, as part of Defendants' Pre-Determined Protocol, the Surgicore Anesthesia Providers purportedly performed and billed for anesthesia concomitant to the interventional pain management and arthroscopic procedures or surgeries.

1784.   As the interventional pain management and arthroscopic procedures and/or surgeries performed through the Surgicore Pain Management Providers and Surgicore Orthopedic Providers at the Surgicore ASCs (discussed above) were medically unnecessary and performed, to the extent that they were performed at all, pursuant to the Defendants' pre-determined fraudulent treatment, referral, and billing protocol, and not to treat or otherwise benefit the Covered Persons, the attendant anesthesia services purportedly performed in connection with those procedures were similarly medically unnecessary and fraudulent.

1785.   At all relevant times mentioned herein, the Surgicore Anesthesia Providers knew or should have known that the anesthesia services they were administering was in connection with Defendants' scheme to defraud; that the procedures and surgeries purportedly performed by the Surgicore Orthopedic Providers and Surgicore Pain Management Providers at, by, and through the Surgicore ASCs were pursuant to a predetermined fraudulent protocol and were not medically necessary, to the extent that the services were provided as billed or performed at all.

1786.   Attached as Exhibit "33" is a representative list of claims in which one or more of the Defendant Surgicore Anesthesia Providers and their purported professional corporations improperly submitted bills to American Transit for medically unnecessary anesthesia pursuant to Defendants' predetermined fraudulent protocol.

1787.   Furthermore, as part of the Defendants fraudulent Pre-Determined Protocol, interventional pain management injections, including but not limited to ESI and trigger point injections (discussed herein), purportedly performed by the Surgicore Pain Management Providers at the Surgicore ASCs frequently were administered under anesthesia, specifically sedation, that was not required, and was billed through the Surgicore Anesthesia Providers.

1788.   Like the Defendants' charges for ESIs and trigger point injections, the charges for anesthesia accompanying these injections were fraudulent in that the anesthesia attendant to the injections was medically unnecessary and performed, to the extent it was performed at all, pursuant to the Defendants' pre-determined fraudulent treatment, referral, and billing protocol, not to treat or otherwise benefit the Covered Persons.

1789.   In a legitimate clinical setting, pain management injections, including ESI and trigger point injections generally do not require sedation.

1790.   An article published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, observed that "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures." *See* Smith, Howard, M.D., *An Update of Evaluation of Intravenous Sedation on Diagnostic Spinal Injection Procedures*, Pain Physician (2013).

1791.   The American Society of Anesthesiologists has similarly concluded that "interventional pain procedures generally only require local anesthesia." *See* American Society of

Anesthesiologists, "Statement on Anesthetic Care during Interventional Pain Procedures for Adults," October 13, 2021.

1792.   On information and belief, sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient. What is more, the risk of spinal injury increases with the administration of sedation such as propofol, which is often used in connection with the injections purportedly provided to Covered Persons.

1793.   On information and belief, not only can sedation itself induce adverse events, including death, but patients receiving pain management injections should remain awake and alert to warn the treating physician of adverse events relating to the underlying injections.

1794.   As patients need to be awake and alert when receiving pain management injections, a Covered Person's anxiety or apprehension regarding an injection procedure is an insufficient basis to warrant sedation.

1795.   Notwithstanding, virtually all Covered Persons who purportedly received pain management injections at the Surgicore ASCs purportedly were provided with unjustified, medically unnecessary and dangerous sedation concomitant to the injections.

1796.   Attached as Exhibit "34" is a representative list of claims in which one or more of the Defendant Surgicore Anesthesia Providers and their purported professional corporations improperly submitted bills to American Transit for unjustified, medically unnecessary, and dangerous sedation concomitant to pain management injections pursuant to Defendants' predetermined fraudulent protocol.

1797.   The Surgicore Pain Management Providers, Surgicore Anesthesia Providers and Surgicore ASCs knew or should have known that sedation generally is unwarranted in the context

of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

1798.   The Surgicore Pain Management Providers, Surgicore Anesthesia Providers and Surgicore ASCs routinely recommended and administered sedation to the Covered Persons in order to increase the amount of fraudulent billing that they could submit to American Transit.

1799.   Each and every one of the anesthesia services attendant to pain management and trigger point injections was medically unnecessary, in that the anesthesia services: (i) were provided, to the extent that they were provided at all, pursuant to a Pre-Determined Protocol primarily for the benefit of Defendants, and not to properly treat or otherwise benefit the Covered Persons; and (ii) were not the most appropriate standard of care in accordance with standards of good practice and standard professional treatment protocols.

**L.      Fraudulent Charges For Arthroscopy**

1800.   Not only did the Surgicore Orthopedic Providers routinely bill for medically unnecessary arthroscopic surgeries but in order to maximize payments, in virtually every instance of billing submitted to Plaintiff for reimbursement, the Surgicore Orthopedic Providers knowingly and intentionally engaged in unbundling, using multiple procedure codes to bill separately for individual components parts of a single procedure, which constitutes fraudulent billing.

1801.   By way of example and not limitation, many of the Surgicore Orthopedic Providers routinely and fraudulently unbundled charges for debridement/shaving of articular cartilage (chrondroplasty) under CPT coder 29877, as well as a separate charge for CPT 29874 arthroscopic removal of loose and/or foreign bodies from underlying knee arthroscopy charges in an effort to increase their billing for the medically unnecessary arthroscopies.

1802. The Fee Schedule describes CPT 29880 as Arthroscopy, knee, surgical; with meniscectomy (medial AND lateral, including any meniscal shaving) including debridement/shaving of articular cartilage (chondroplasty), same of separate compartment(s), when performed.

1803. The Fee Schedule describes CPT 29877 as Arthroscopy, knee, surgical; debridement/shaving of articular cartilage (chondroplasty).

1804. The Fee Schedule describes CPT 29874 as Arthroscopy, knee, surgical; for removal of loose body or foreign body (e.g., osteochondritis dissecans fragmentation, chondrol fragmentation)

1805. Debridement/shaving of articular cartilage (chrondroplasty) is a component part of and included in charges of knee arthroscopy (CPT 29880). Similarly, removal of loose bodies is a component part of and included in charges of knee arthroscopy (CPT 29880).

1806. As a result, healthcare service providers are not allowed to be reimbursed separately for debridement and/or removal of loose bodies when billing for arthroscopy.

1807. Nevertheless, many of the Surgicore Orthopedic Providers routinely unbundled billing for debridement and/or loose bodies from the underlying knee arthroscopy charge so as to maximize the amount of fraudulent and unlawful billing they could submit to American Transit. By way of example and not limitation:

- On August 1, 2024, Covered Person T.B., Claim no. 1149704-02, purportedly underwent a knee arthroscopy at Defendant All City ASC. In connection with this surgery, Defendant Contemporary Orthopedics unbundled a separate charge of $1,791.29 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy. On the same bill, Defendant Contemporary Orthopedics unbundled a separate charge of $1,720.00 for removal of a loose or foreign body under CPT 29874 from the charge under CPT 29880.

- On June 19, 2024, Covered Person M.M., Claim no. 1144011-01, purportedly underwent a knee arthroscopy at Defendant Jersey City ASC.

In connection with this surgery, Defendant Advanced Orthopaedics unbundled a separate charge of $946.03 for removal of a loose or foreign body under CPT 29874 from a charge under CPT 29880 for the knee arthroscopy.

- On October 26, 2023, Covered Person T.B., Claim no. 1133658-01, purportedly underwent a knee arthroscopy at Defendant All City ASC. In connection with this surgery, Defendant U.K.P.C. unbundled a separate charge of $1,791.29 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy. On the same bill, Defendant U.K.P.C. unbundled a separate charge of $1,892.07 for removal of a loose or foreign body under CPT 29874 from the charge under CPT 29880.

- On July 15, 2023, Covered Person M.M., Claim no. 1130311-01, purportedly underwent a knee arthroscopy at Defendant Manalapan ASC. In connection with this surgery, Defendant Anjani PC unbundled a separate charge of $1,791.29 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy. On the same bill, Defendant Anjani PC unbundled a separate charge of $1,892.07 for removal of a loose or foreign body under CPT 29874 from the charge under CPT 29880.

- On May 19, 2023, Covered Person S.J., Claim no. 1118101-02, purportedly underwent a knee arthroscopy at Defendant All City ASC. In connection with this surgery, Defendant Bay Ridge P.C. unbundled a separate charge of $1,892.07 for removal of a loose or foreign body under CPT 29874 from a charge under CPT 29880 for the knee arthroscopy.

- On July 14, 2021, Covered Person T.W., Claim no. 1100803-02, purportedly underwent a knee arthroscopy at Defendant Jersey City ASC. In connection with this surgery, Defendant BW Orthopedics unbundled a separate charge of 3,398.38 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy. On the same bill, Defendant BW Orthopedics unbundled a separate charge of $2,898.06 for removal of a loose or foreign body under CPT 29874 from the charge under CPT 29880.

- On March 9, 2021, Covered Person B.R., Claim no. 1080045-02, purportedly underwent a knee arthroscopy at Defendant Empire State ASC. In connection with this surgery, Defendant Graziosa PC unbundled a separate charge of 1,791.29 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy. On the same bill, Defendant Graziosa PC unbundled a separate charge of $1,892.07 for removal of a loose or foreign body under CPT 29874 from the charge under CPT 29880.

- On October 20, 2020, Covered Person R.O., Claim no. 1080858-03, purportedly underwent a knee arthroscopy at Defendant New Horizon ASC. In connection with this surgery, Defendant Haar Orthopaedics unbundled a

separate charge of 1,628.47 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy. On the same bill, Defendant Haar Orthopaedics unbundled a separate charge of $1,720.09 for removal of a loose or foreign body under CPT 29874 from the charge under CPT 29880.

- On December 3, 2020, Covered Person C.B., Claim no. 1088928-02, purportedly underwent a knee arthroscopy at Defendant Empire State ASC. In connection with this surgery, Defendant McCulloch Orthopaedic unbundled a separate charge of 1,791.29 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy. On the same bill, Defendant McCulloch Orthopaedic unbundled a separate charge of $1,892.07 for removal of a loose or foreign body under CPT 29874 from the charge under CPT 29880.

- On March 13, 2020, Covered Person A.M., Claim no. 1066455-01, purportedly underwent a knee arthroscopy at Defendant All City ASC. In connection with this surgery, Defendant Apazidis unbundled a separate charge of $1,628.47 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy.

- On April 16, 2019, Covered Person J.M., Claim no. 1051667-01, purportedly underwent a knee arthroscopy at Defendant Fifth Avenue ASC. In connection with this surgery, Defendant McMahon unbundled a separate charge of $1,628.47 for debridement under CPT 29877 from a charge under CPT 29880 for the knee arthroscopy. On the same bill, Defendant McMahon unbundled a separate charge of $1,720.09 for removal of a loose or foreign body under CPT 29874 from the charge under CPT 29880.

1808. In addition to the foregoing, a representative sample of claims in which the Surgicore Orthopedic Providers routinely unbundled billing for debridement/shaving of articular cartilage (chrondroplasty) and removal of loose bodies from the underlying knee arthroscopies is included in Exhibit "35." Each of the unbundled charges for debridement and/or removal of loose bodies were material misrepresentations that the Surgicore Orthopedic Providers were entitled to be reimbursed for the charge, when in fact they were not.

1809. By way of further example and not limitation, to maximize their fraudulent charges for medically unnecessary arthroscopies, many of the Surgicore Orthopedic Providers routinely

submitted separate charges for CPT code 29999, which under the Fee Schedule is described as unlisted arthroscopy procedures.

1810. The use of unlisted procedure codes are known as a last resort and are typically used when a physician performs an unusual or variable procedure that is not described by any CPT code.

1811. Nevertheless, many of the Surgicore Orthopedic Providers routinely billed CPT 29999 along with their billing for underlying arthroscopy procedures to maximize the amount of fraudulent and unlawful billing they could submit to American Transit. A representative sample of claims in which the Surgicore Orthopedic Providers routinely billed CPT 29999 along with their billing for underlying arthroscopy procedures is included in Exhibit "36."

1812. The prevalence and uniformity in which the Surgicore Orthopedic Providers bill CPT 29999, despite the fact that it is reserved for unusual or variable procedures is not credible.

1813. Even assuming that the Surgicore Orthopedic Providers' extensive use of CPT 29999 was plausible (which it was not), many of the Surgicore Orthopedic Providers fraudulently unbundled charges for "coblation" under CPT 29999 when "coblation" is a technique used to perform chondroplasty, which as stated above is inclusive to CPT 29880 and therefore cannot be reported separately. By way of example and not limitation:

- On June 15, 2022, Covered Person S.B., Claim no. 1109140-02, purportedly underwent a knee arthroscopy at Defendant Jersey City ASC. In connection with this surgery, Defendant Advanced Orthopaedics unbundled a separate charge of $1,957.57 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy.

- On May 19, 2022, Covered Person J.R., Claim no. 1104504-01, purportedly underwent a knee arthroscopy at Defendant All City ASC. In connection with this surgery, Anjani PC unbundled a separate charge of $1,957.57 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy.

- On April 19, 2022, Covered Person D.R., Claim no. 1105880-02, purportedly underwent a knee arthroscopy at Defendant Manalapan ASC. In connection with this surgery, Defendant Advanced Orthopaedics unbundled a separate charge of $1,957.57 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy.

- On January 5, 2022, Covered Person L.V., Claim no. 1102616-02, purportedly underwent a knee arthroscopy at Defendant New Horizon ASC. In connection with this surgery, Defendant Dassa Orthopedic unbundled a separate charge of $2,448.43 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy.

- On October 21, 2021, Covered Person J.R., Claim no. 1044413-01, purportedly underwent a knee arthroscopy at Defendant Empire State ASC. In connection with this surgery, Defendant McCulloch Orthopaedic unbundled a separate charge of $1,957.57 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy.

- On December 16, 2020, Covered Person P.L., Claim no. 1080232-02, purportedly underwent a knee arthroscopy at Defendant New Horizon ASC. In connection with this surgery, Defendant Dassa Orthopedic unbundled a separate charge of $2,448.43 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy.

- On January 9, 2020, Covered Person L.K., Claim no. 1051117-02, purportedly underwent a knee arthroscopy at Defendant New Horizon ASC. In connection with this surgery, Defendant McCulloch Orthopaedic unbundled a separate charge of $1,779.64 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy.

- On February 15, 2019, Covered Person Y.R., Claim no. 1076568-02 purportedly underwent a right knee arthroscopy at Defendant All City ASC. In connection with this surgery, Defendant Bay Ridge PC unbundled a separate charge of $2,000.00 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy. Thereafter, on March 6, 2020, Y.R. purportedly underwent a left knee arthroscopy at Defendant All City ASC. In connection with this surgery, Defendant Bay Ridge PC again unbundled a separate charge of $2,000.00 for purported coblation under CPT 29999 from a charge under CPT 29880 for the knee arthroscopy.

1814. On information and belief, "coblation" is not a procedure. It is a technique using a coblation wand to purportedly perform chondroplasty, a procedure that repairs damaged cartilage in the joint.

1815.   Other techniques to perform chondroplasty utilize a motorized shaver to address cartilage damage.

1816.   On information and belief, the technique or equipment used to perform the chondroplasty does not change the nature of the procedure performed and in turn should not change the coding of the procedure itself.

1817.   Pursuant to the New York State Workers' Compensation Fee Schedule Surgery Ground Rule 1B, "Payment is for the procedure coded and described irrespective of the method or appliances used to perform the procedure."

1818.   Under the applicable Fee Schedule and Ground Rule 1B, the Surgicore Orthopedic Providers are not entitled to be reimbursed separately for coblation which would be defined as chodroplasty and, as stated above, would be considered part of the underlying arthroscopic procedure.

1819.   Each of the unbundled charges for "coblation" constituted a misrepresentation that the Surgicore Orthopedic Providers were entitled to be reimbursed for the charge, when in fact they were not.

**DISCOVERY OF THE FRAUD**

1820.   To induce Plaintiff to promptly reimburse their claims, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- The Controllers, Surgicore Management Companies, Surgicore Medical Directors/Administrators, and other entities owned and/or controlled by the Controllers, through the Surgicore ASCs, knowingly and deliberately concealed that No-Fault claims submitted to Plaintiff for the Fraudulent Services purportedly performed at Surgicore ASCs were performed at ASCs which were fraudulently and improperly licensed and operated in violation of the substantive licensing, regulatory and applicable operating laws and requirements of New York and New Jersey;

- The Controllers, Surgicore Management Companies, and other entities owned and/or controlled by the Controllers, knowingly and deliberately

concealed the extent of their ownership interests in the Surgicore ASCs through a complex web of corporate entities and through subterfuge in the granting of straw or nominal ownership interests to family members directly or through such corporate entities;

- The Controllers, Surgicore Management Companies, and other entities owned and/or controlled by the Controllers knowingly and deliberately concealed the extent to which they offered purported nominal ownership interests in the Surgicore ASCs to numerous orthopedists and pain management doctors performing medically unnecessary procedures at the ASCs as well as to their family members, close associates and strategic partners such as the Health Plus Defendants, as a kickback in exchange for referrals and supposed marketing services to provide a patient population to the Surgicore ASCs, irrespective of medical need;

- The Controllers and Surgicore Medical Directors, through the Surgicore ASCs, the Surgicore Orthopedic Providers, Surgicore Pain Management Provider, and Surgicore Anesthesia Providers, their respective professional corporations and professional limited liability companies, routinely and deliberately concealed that their No-Fault claims were submitted pursuant to an unlawful referral, illicit kickback, and/or other financial compensation arrangement between and among one or more of the Defendants and the No-Fault Clinics in order to maximize reimbursement;

- The Controllers and Surgicore Medical Directors, through the Surgicore ASCs, and the Surgicore Orthopedic Providers, Surgicore Pain Management Providers and Surgicore Anesthesia Providers and their respective professional corporations and professional limited liability companies, routinely and deliberately concealed that they were submitting facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity; and

- The Controllers and Surgicore Medical Directors, through the Surgicore ASCs, and the Surgicore Orthopedic Providers, Surgicore Pain Management Providers and Surgicore Anesthesia Providers, and their respective professional corporations and professional limited liability companies, knowingly and deliberately concealed the amounts Defendants was entitled to be reimbursed in the bills submitted to Plaintiff by misrepresenting the codes, services, and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable Fee Schedule in order to maximize the charges that they could submit to Plaintiff and other insurers.

1821. Plaintiff is under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiff in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent

concealment described above, were designed to, and did cause Plaintiff to justifiably rely on them. As a proximate result, Plaintiff has incurred damages based upon the fraudulent bill submissions by the Surgicore ASCs; Surgicore Orthopedic Providers, Surgicore Pain Management Providers, Surgicore Anesthesia Providers individually and/or through their respective professional corporations or professional limited liability companies; and Associated Health Care Providers.

1822. Based upon Defendants' material misrepresentations and their serial efforts to conceal the various components to their scheme to defraud, Plaintiff did not discover and could not have reasonably discovered the injury alleged herein any earlier than April 2024, when Defendant All City ASC appeared for a continued examination under oath in connection with and in response to Plaintiff's request for additional verification of All City ASC's No-Fault claims for reimbursement of facility fees related to surgical and interventional pain management services purportedly performed on Covered Persons.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

## [RICO, pursuant to 18 U.S.C. § 1962(c)]

1823. The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

1824. The Surgicore Medical Network Enterprise (consisting of All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC; Saddlebrook ASC, (collectively the "Surgicore ASCs"); Degradi, Hatami, Kogan, Tylman, (collectively the "Controllers"); Surgicore Management, Surgicore Management NY, (collectively the "Surgicore Management

Companies"); Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, (collectively the "Surgicore Medical Directors"); Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, (collectively the "Surgicore Administrators"); Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, (collectively the "Surgicore Orthopedic Providers"); Bowen, Alexander Bowen PLLC, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, (collectively the "Surgicore Pain Management Providers"); Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, (collectively the "Surgicore Anesthesia Providers"); Advanced PMR, AEH Healthcare Management, ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures Inc, BDP Ventures LLC, Blue Wall Management, Boost HS, Capleo Holdings, Conte De Fees, Fiaba, 50 Franklin Ln Realty, FIWA 1049 Realty, FLBD Management, Four D Investments Inc, Four D Investments LLC, Health Plus Management, HDS Investments, Kostanian Consulting Associates,

Main Street Medical, Mega Group Solution, MEDA Management, MEH Investments, Midtown 305 Realty, MK Med Invest, Ortuz, Redy Ventures, SignMe, SJ2 Ventures, Surgicore 5th Avenue, Surgicore RBSC, YCentury, Arredondo-Calle, Blumberg, Chavez, K. Degradi, Denevich, M. Hatami, Hafeez, J. Katanov, S. Katanov, Keyserman, Klein, B. Kogan, Kostanian, L. Passanisi, S. Passanisi, Pyatetskaya, Ramirez, Reizis, Revutsky. Rubin, M. Seldes, Shakarov, Yadgarov, Yaguda, (collectively the "Associated Companies/Individuals"); John Doe 1, John Does 2 through 20, and ABC Corporations 1 Through 20), is an Enterprise as that term is defined by 18 U.S.C § 1961(4), and within the meaning of 18 U.S.C. § 1962(c). The Surgicore Medical Network Enterprise engaged in activities, including defrauding insurers that are based outside of New York, that affect interstate commerce.

1825. From in or about 2009 through the present, each of the Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC; Saddlebrook ASC, (collectively the "Surgicore ASCs"); Degradi, Hatami, Kogan, Tylman, (collectively the "Controllers"); Surgicore Management, Surgicore Management NY, (collectively the "Surgicore Management Companies"); Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, (collectively the "Surgicore Medical Directors"); Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, (collectively the "Surgicore Administrators"); Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as

administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, (collectively the "Surgicore Orthopedic Providers"); Bowen, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, (collectively the "Surgicore Pain Management Providers"); Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, (collectively the "Surgicore Anesthesia Providers"); Advanced PMR, AEH Healthcare Management, ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures Inc., BDP Ventures LLC, Blue Wall Management, Boost HS, Capleo Holdings, Conte De Fees, Fiaba, 50 Franklin Ln Realty, FIWA 1049 Realty, FLBD Management, Four D Investments Inc, Four D Investments LLC, Health Plus Management, HDS Investments, Kostanian Consulting Associates, Main Street Medical, Mega Group Solution, MEDA Management, MEH Investments, Midtown 305 Realty, MK Med Invest, Ortuz, Redy Ventures, SignMe, SJ2 Ventures, Surgicore 5th Avenue, Surgicore RBSC, YCentury, Arredondo-Calle, Blumberg, Chavez, K. Degradi, Denevich, M. Hatami, Hafeez, J. Katanov, S. Katanov, Keyserman, Klein, B. Kogan, Kostanian, L. Passanisi, S. Passanisi, Pyatetskaya, Ramirez, Reizis, Revutsky. Rubin, M. Seldes, Shakarov, Yadgarov, Yaguda, (collectively the "Associated Companies/Individuals"); John Doe 1, John Doe 1, John Does 2 through 20, and ABC Corporations 1 Through 20 were each a "person" as defined in the RICO statute and each

knowingly conducted and participated in the affairs of the Surgicore Medical Network Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1826.  The component parts of the Surgicore Medical Network Enterprise are and have been joined in a common purpose, namely to defraud Plaintiff, and other insurance companies by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for services that were not provided, were not medically necessary, and/or were not legitimately entitled to reimbursement for patients purportedly treated at or through various No-Fault Clinics and the Surgicore ASCs. Although different component parts have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose—to defraud Plaintiff through fraudulent insurance claims—with sufficient longevity to accomplish that common purpose.

1827.  Defendants Degradi, Hatami, Kogan, Tylman, (collectively the "Controllers"), and one or more of the John Doe Defendants, at all relevant times, each exerted control over, and directed the operations of the Surgicore Medical Network Enterprise and each of its component parts. The Controllers utilized that control to conduct the affairs of the Surgicore Medical Network Enterprise through a pattern of racketeering activities that included thousands of acts of mail fraud over a period of approximately 15 years. The acts of mail fraud consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiff seeking payments that the Defendant Surgicore ASCs, Surgicore Orthopedic Providers, Surgicore Pain Management Providers, and/or Surgicore Anesthesia Providers were ineligible to receive because the bills were the result of (i) fraudulently and improperly licensed ASCs that are operated in

violation of the substantive licensing, regulatory, and applicable operating laws and requirements of New York and New Jersey; (ii) an illegal kickback and/or unlawful referral relationship for medically unnecessary services; (iii) a predetermined fraudulent protocol designed to justify and maximize expensive, medically unnecessary services to Covered Persons; and/or (iv) charges for medical services that were fraudulently billed in excess of the amounts that the Defendants would be entitled to receive pursuant to the No-Fault Law, if the related services were legitimately provided.

1828. Defendants Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, (collectively the "Surgicore Medical Directors"); Aminova, Hoyle, Finnegan, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, (collectively the "Surgicore Administrators") and John Doe 1, John Doe 1 and John Does 2 through 20 each were employed by or associated with the Surgicore Medical Network Enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity. The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, though the Surgicore Medical Network Enterprise, to form and operate bogus ASCs in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through the Surgicore ASCs to No-Fault insurers in general and American Transit in particular. The Surgicore Administrators oversaw, among other things, the "marketing" for the Surgicore ASCs and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by, and through the Surgicore ASCs.

1829.   Defendants Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC,  Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, (collectively the "Surgicore Orthopedic Providers; Bowen, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, (collectively the "Surgicore Pain Management Providers"); and Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, (collectively the "Surgicore Anesthesia Providers") each were employed by or associated with the Surgicore Medical Network Enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendant Surgicore Orthopedic Providers, Surgicore Pain Management Providers, and Surgicore Anesthesia Providers facilitated the Surgicore Medical Network Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing Defendant Controllers with referrals of Covered Persons for medically unnecessary procedures, including

referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through the Surgicore ASCs to No-Fault insurers in general and American Transit in particular.

1830. Defendants Advanced PMR, AEH Healthcare Management, ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures Inc., BDP Ventures LLC, Blue Wall Management, Boost HS, Capleo Holdings, Conte De Fees, Fiaba, 50 Franklin Ln Realty, FIWA 1049 Realty, FLBD Management, Four D Investments Inc, Four D Investments LLC, Health Plus Management, HDS Investments, Kostanian Consulting Associates, Main Street Medical, Mega Group Solution, MEDA Management, MEH Investments, Midtown 305 Realty, MK Med Invest, Ortuz, Redy Ventures, SignMe, SJ2 Ventures, Surgicore 5th Avenue, Surgicore RBSC, YCentury, Arredondo-Calle, Blumberg, Chavez, K. Degradi, Denevich, M. Hatami, Hafeez, J. Katanov, S. Katanov, Keyserman, Klein, B. Kogan, Kostanian, L. Passanisi, S. Passanisi, Pyatetskaya, Ramirez, Reizis, Revutsky. Rubin, M. Seldes, Shakarov, Yadgarov, Yaguda, each were employed by or associated with the Surgicore Medical Network Enterprise and its component parts, and participated in the conduct of its affairs through a pattern of racketeering activity. In addition, Defendants Advanced PMR, AEH Healthcare Management, ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures Inc., BDP Ventures LLC, Blue Wall Management, Boost HS, Capleo Holdings, Conte De Fees, Fiaba, 50 Franklin Ln Realty, FIWA 1049 Realty, FLBD Management, Four D Investments Inc, Four D Investments LLC, Health Plus Management, HDS Investments, Kostanian Consulting Associates, Main Street Medical, Mega Group Solution, MEDA Management, MEH Investments, Midtown 305 Realty, MK Med Invest, Ortuz, Redy Ventures, SignMe, SJ2 Ventures, Surgicore 5th Avenue, Surgicore RBSC, YCentury, Arredondo-Calle, Blumberg, Chavez, K. Degradi, Denevich, M. Hatami, Hafeez, J. Katanov, S. Katanov,

Keyserman, Klein, B. Kogan, Kostanian, L. Passanisi, S. Passanisi, Pyatetskaya, Ramirez, Reizis, Revutsky. Rubin, M. Seldes, Shakarov, Yadgarov, and/or Yaguda each participated in the conduct of the Surgicore Medical Network through a pattern of racketeering activity by, among other things, steering or referring, or causing to be steered or referred, Covered Persons to the Surgicore ASCs; facilitating the operation and control of Surgicore ASCs in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1831.   On information and belief, one or more of John Does 2 through 20 each were associated with the Surgicore Medical Network Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1832.   On information and belief, one or more of the ABC Corporations 1 through 20 each were associated with the Surgicore Medical Network Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1833.   As a whole, Defendants acted hand-in-hand, with well-defined ongoing roles in the organization, to achieve the common goal of defrauding Plaintiff into paying bills for medical services and other healthcare services that were not supplied at all, or, if supplied, were provided by fraudulently and improperly licensed ASCs, were of no diagnostic and/or treatment value, and/or provided pursuant to a predetermined treatment protocol irrespective of medical necessity in connection with unlawful kickback, referral, fraudulent billing, and/or illegal fee-splitting schemes.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

1834.   The racketeering acts set forth herein were carried out over a fifteen-year period, were related and similar, and were committed as part of Defendants' scheme to use their control of the Surgicore Medical Network Enterprise to defraud insurers.

1835.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the component parts of the Surgicore Medical Network Enterprise continue to submit and pursue collection on fraudulent bills to the present day.

1836.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the component parts of the Surgicore Medical Network Enterprise based upon materially false and misleading information.

1837.   Through the Surgicore Medical Network Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1838.   A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1839. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1840. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

1841. By reason of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business or property, and has been damaged in the aggregate amount presently in excess of $153,000,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Surgicore Medical Network Enterprise, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to the Surgicore ASCs, including but not limited to payments made to the Surgicore Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM, and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the Surgicore Medical Network Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1842. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants, jointly and severally, treble damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, SHABTIAN, ZYBIN, ACKERMAN, ADVANCED ORTHOPAEDICS, ANJANI PC, HALL PLLC, APAZIDIS, APAZIDIS PC, BAUM, BAY RIDGE PC, BERKOWITZ, BURSZTYN, CONTEMPORARY ORTHOPEDICS, ELKHOLY, HALL, HOSTIN, HOSTIN**

**ORTHOPAEDICS, JIMENEZ, J SPORTS, KATZMAN, KATZMAN PC, KOTKES, KOTKES PC, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, NYSJ, NEUMAN, NEUMAN PC, NEUMAN PLLC, PORTAL, PORTAL MEDICAL, PRECISION ANESTHESIA, SEDATION VACATION, SHAMALOV, SINHA, UPENDRA SINHA, TOTAL ANESTHESIA, U.K. PC, VINAYAK SINHA AS ADMINISTRATOR OF THE ESTATE OF AJOY SINHA, M.D., MSJR, BLUMBERG, K. DEGRADI, HEALTH PLUS MANAGEMENT, M. HATAMI, S. KATANOV, B. KOGAN, KLEIN, L. PASSANISI, S. PASSANISI, PYATETSKAYA, REVUTSKY, RUBIN, SURGICORE 5TH AVENUE, SURGICORE MANAGEMENT NY, YAGUDA, JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

1843.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

1844.   At all times relevant herein, All City Family Healthcare Center, Inc. ("All City ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1845.   From in or about 2008 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Shabtian, Zybin, Ackerman, Advanced Orthopaedics, Anjani PC, Hall PLLC, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Bursztyn, Contemporary Orthopedics, Elkholy, Hall, Hostin, Hostin Orthopaedics, Jimenez, J Sports, Katzman, Katzman PC, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, NYSJ, Neuman, Neuman PC, Neuman PLLC, Portal, Portal Medical, Precision Anesthesia, Sedation Vacation, Shamalov, Sinha, Upendra Sinha, Total Anesthesia, U.K. PC, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., MSJR, Blumberg, K. Degradi, Health Plus Management, M. Hatami, S. Katanov, B. Kogan, Klein, L. Passanisi, S. Passanisi, Pyatetskaya, Revutsky, Rubin, Surgicore 5th Avenue, Surgicore Management NY, Yaguda, John Doe Defendants 2 through 20, and ABC Corporations 1 through 20 were each a "person" as defined under the RICO statute and knowingly conducted and

participated in the affairs of the All City ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1846.   At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and directed the operations of the All City ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that All City ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided to Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1847.   At all relevant times herein, Defendant Shabtian and Zybin were employed by and/or associated with the All City ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, through the All City ASC Enterprise, to form and operate a bogus ASC in violation

of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through All City ASC to No-Fault insurers in general and Plaintiff in particular. The Administrators oversaw, among other things, the "marketing" for All City ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by, and through All City ASC.

1848. At all relevant times herein, Defendants Ackerman, Advanced Orthopaedics, Anjani PC, Hall PLLC, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Bursztyn, Contemporary Orthopedics, Elkholy, Hall, Hostin, Hostin Orthopaedics, Jimenez, J Sports, Katzman, Katzman PC, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, NYSJ, Neuman, Neuman PC, Neuman PLLC, Portal, Portal Medical, Precision Anesthesia, Sedation Vacation, Shamalov, Sinha, Upendra Sinha, Total Anesthesia, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D. and MSJR facilitated the All City ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through All City ASC to No-Fault insurers in general and American Transit in particular.

1849. At all relevant times herein, Defendants Blumberg, K. Degradi, Health Plus Management, M. Hatami, S. Katanov, B. Kogan, Klein, L. Passanisi, S. Passanisi, Pyatetskaya, Revutsky, Rubin, Surgicore 5th Avenue, Surgicore Management NY, and Yaguda, participated in the conduct of the All City ASC Enterprise through a pattern of racketeering activity by, among

other things, steering or referring, or causing to be steered or referred, Covered Persons to All City ASC; facilitating the operation and control of All City ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1850.  On information and belief, one or more of John Does 2 through 20 were associated with the All City ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1851.  On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the All City ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

1852.  The racketeering acts set forth herein were carried out over at least a sixteen year period, were related and similar, and were committed as part of Defendants' scheme to use their control of All City ASC to defraud insurers.

1853.  On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as All City ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1854.  As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the All City ASC Enterprise based upon materially false and misleading information.

1855.  Through the All City ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1856.  A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1857.  Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1858.  Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## <u>DAMAGES</u>

1859.  By reason of the foregoing, violation of 18 U.S.C. § 1962(c), Plaintiff American Transit has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $6,300,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the All City ASC Enterprise and Surgicore Health Care Providers, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to All City ASC, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM, and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the All City

ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1860. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Shabtian, Zybin, Ackerman, Advanced Orthopaedics, Anjani PC, Hall PLLC, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Bursztyn, Contemporary Orthopedics, Elkholy, Hall, Hostin, Hostin Orthopaedics, Jimenez, J Sports, Katzman, Katzman PC, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, NYSJ, Neuman, Neuman PC, Neuman PLLC, Portal, Portal Medical, Precision Anesthesia, Sedation Vacation, Shamalov, Sinha, Upendra Sinha, Total Anesthesia, U.K. PC, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., MSJR, Blumberg, K. Degradi, Health Plus Management, M. Hatami, S. Katanov, B. Kogan, Klein, L. Passanisi, S. Passanisi, Pyatetskaya, Revutsky, Rubin, Surgicore 5th Avenue, Surgicore Management NY, Yaguda, John Does 2 through 20, and ABC Corporations 1 through 20, jointly and severally, treble damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, ALJIAN, HOYLE, LOPEZ, ADVANCED ORTHOPAEDICS, HALL PLLC, BAUM, BAY RIDGE PC, BERKOWITZ, DASSA, DASSA ORTHOPEDIC, GRAZIOSA, GRAZIOSA PC, HALL, HOSTIN, HOSTIN ORTHOPAEDICS, JIMENEZ, J SPORTS, KHAKHAR, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, NEUMAN, NEUMAN PC, NEUMAN PLLC, NYC ORTHOPEDIC, PM&R, PORTAL, PORTAL MEDICAL, SEDATION VACATION, SELDES, UPENDRA SINHA, U.K. PC, AEH HEALTHCARE MANAGEMENT, BLUMBERG, HEALTH PLUS MANAGEMENT, KLEIN, MEGA GROUP SOLUTION, S. PASSANISI, RUBIN, SURGICORE 5TH AVENUE, SURGICORE MANAGEMENT NY, YAGUDA, JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

1861. The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

**THE RICO ENTERPRISE**

1862.  At all times relevant herein, Bronx SC, LLC (doing business as Empire State Ambulatory Surgery Center) ("Empire State ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1863.  From in or about 2010 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Aljian, Hoyle Lopez, Advanced Orthopaedics, Hall PLLC, Baum, Bay Ridge PC, Berkowitz, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Hall, Hostin, Hostin Orthopaedics, Jimenez, J Sports, Khakhar, McCulloch, McCulloch Orthopaedic, Neuman, Neuman PC, Neuman PLLC, NYC Orthopedic, PM&R, Portal, Portal Medical, Sedation Vacation, Upendra Sinha, U.K. PC, AEH Healthcare Management, Blumberg, Health Plus Management, Klein, Mega Group Solution, S. Passanisi, Rubin, Seldes, Surgicore 5th Avenue, Surgicore Management NY, Yaguda, John Doe Defendants 2 through 20, and ABC Corporations 1 through 20 were each a "person" as defined under the RICO statue and knowingly conducted and participated in the affairs of the Empire State ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1864.  At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and directed the operations of the Empire State ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that Empire State ASC was ineligible to receive under the New York No-Fault insurance laws because it (a)

submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangements between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided to Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1865.   At all relevant times herein, Defendant Aljian, Hoyle, and Lopez were employed by and/or associated with the Empire State ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, though the Empire State ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through Empire State ASC to No-Fault insurers in general and Plaintiff in particular. The Administrators oversaw, among other things, the "marketing" for Empire State ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by and through Empire State ASC.

1866.   At all relevant times herein, Defendants Advanced Orthopaedics, Hall PLLC, Baum, Bay Ridge PC, Berkowitz, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Hall, Hostin, Hostin Orthopaedics, Jimenez, J Sports, Khakhar, McCulloch, McCulloch Orthopaedic, Neuman, Neuman PC, Neuman PLLC, NYC Orthopedic, PM&R, Portal, Portal Medical, Sedation Vacation,

Seldes, and Upendra Sinha, U.K. PC facilitated the Empire State ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through Empire State ASC to No-Fault insurers in general and American Transit in particular.

1867. At all relevant times herein, Defendants AEH Healthcare Management, Blumberg, Health Plus Management, Klein, Mega Group Solution, S. Passanisi, Rubin, Surgicore 5th Avenue, Surgicore Management NY, and Yaguda, participated in the conduct of the Empire State ASC Enterprise through a pattern of racketeering activity by, among other things, steering or referring, or causing to be steered or referred, Covered Persons to Empire State ASC; facilitating the operation and control of Empire State ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1868. On information and belief, one or more of John Does 2 through 20 were associated with the Empire State ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1869. On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Empire State ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

1870.  The racketeering acts set forth herein were carried out over at least a 14 year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Empire State ASC to defraud insurers.

1871.  On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Empire State ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1872.  As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Empire State ASC Enterprise based upon materially false and misleading information.

1873.  Through the Empire State ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1874.  A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1875.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1876.   Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

1877.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $1,100,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Empire State ASC Enterprise, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to Empire State ASC and Surgicore Health Care Providers, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM, and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the Empire State ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1878.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Aljian, Hoyle, Lopez, Advanced Orthopaedics, Hall PLLC, Baum, Bay Ridge PC, Berkowitz, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Hall, Hostin, Hostin Orthopaedics, Jimenez, J Sports, Khakhar, McCulloch, McCulloch Orthopaedic, Neuman, Neuman PC, Neuman PLLC, NYC Orthopedic, PM&R, Portal, Portal Medical, Sedation Vacation, Seldes, Upendra Sinha, U.K. PC, AEH Healthcare Management, Blumberg, Health Plus Management, Klein, Mega Group Solution, S. Passanisi, Rubin, Surgicore 5th Avenue, Surgicore

Management NY, Yaguda PM&R, John Does 2 through 20, and ABC Corporations 1 through 20, jointly and severally, treble damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, SPRINGER, ADVANCED ORTHOPAEDICS, AMIGUD, AMIGUD PC, ANJANI PC, HALL PLLC, ALEXANDER BOWEN PLLC, APAZIDIS, APAZIDIS PC, BERKOWITZ, BOWEN, BOWEN PLLC, CENTURION MIDTOWN ANESTHESIA, CENTURION MIDTOWN MEDICAL, FIFTH AVENUE ANESTHESIA, HALL, HOSTIN, HOSTIN ORTHOPAEDICS, JIMENEZ, JONES, J SPORTS, KATZMAN, KATZMAN PC, KHAKHAR, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, MCMAHON, MCMAHON PC, NEUMAN, PHOENIX MEDICAL, PM&R, PORTAL, PORTAL MEDICAL, SEDATION VACATION, SHABTIAN, SINHA, SINHA ORTHOPEDICS, TOTAL ANESTHESIA, UPENDRA SINHA, U.K. PC, VINAYAK SINHA AS ADMINISTRATOR OF THE ESTATE OF AJOY SINHA, M.D., MSJR, FIWA 1049 REALTY, GESHEFT ASSOCIATES, M. HATAMI, J. KATANOV, S. KATANOV, MEGA GROUP SOLUTION, MIDTOWN 305 REALTY, SIGNME, SURGICORE 5TH AVENUE, SURGICORE MANAGEMENT NY, YAGUDA, JOHN DOES 1 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

1879.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## <u>THE RICO ENTERPRISE</u>

1880.   At all times relevant herein, Fifth Avenue Surgery Center, LLC (formerly known as Fifth Avenue ASC Acquisition, LLC) ("Fifth Avenue ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1881.   From in or about 2009 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Springer, Advanced Orthopaedics, Amigud, Amigud PC, Anjani PC, Hall PLLC, Alexander Bowen PLLC, Apazidis, Apazidis PC, Berkowitz, Bowen, Bowen PLLC, Centurion Midtown Anesthesia, Centurion Midtown Medical, Fifth Avenue Anesthesia, Hall, Hostin, Hostin

Orthopaedics, Jimenez, Jones, J Sports, Katzman, Katzman PC, Khakhar, McCulloch, McCulloch Orthopaedic, McMahon, McMahon PC, Neuman, Phoenix Medical, PM&R, Portal, Portal Medical, Sedation Vacation, Shabtian, Sinha, Sinha Orthopedics, Total Anesthesia, Upendra Sinha, U.K. PC, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., MSJR, FIWA 1049 Realty, Gesheft Associates, M. Hatami, J. Katanov, S. Katanov, Mega Group Solution, Midtown 305 Realty, SignMe, Surgicore 5th Avenue, Surgicore Management NY, Yaguda, John Doe Defendants 1 through 20, and ABC Corporations 1 through 20 were each a "person" as defined in the RICO statute and knowingly conducted and participated in the affairs of the Fifth Avenue ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1882.   At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and directed the operations of the Fifth Avenue ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that Fifth Avenue ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangements between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly

provided to Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1883.   At all relevant times herein, Defendant Springer was employed by and/or associated with the Fifth Avenue ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, through the Fifth Avenue ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through Fifth Avenue ASC to No-Fault insurers in general and American Transit in particular. The Administrators oversaw, among other things, the "marketing" for Fifth Avenue ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by, and through Fifth Avenue ASC.

1884.   At all relevant times herein, Defendants Advanced Orthopaedics, Amigud, Amigud PC, Anjani PC, Hall PLLC, Alexander Bowen PLLC, Apazidis, Apazidis PC, Berkowitz, Bowen, Bowen PLLC, Centurion Midtown Anesthesia, Centurion Midtown Medical, Fifth Avenue Anesthesia, Hall, Hostin, Hostin Orthopaedics, Jimenez, Jones, J Sports, Katzman, Katzman PC, Khakhar, McCulloch, McCulloch Orthopaedic, McMahon, McMahon PC, Neuman, Phoenix Medical, PM&R, Portal, Portal Medical, Sedation Vacation, Shabtian, Sinha, Sinha Orthopedics, Total Anesthesia, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., and MSJR facilitated the Fifth Avenue ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether

the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through Fifth Avenue ASC to No-Fault insurers in general and American Transit in particular.

1885.    At all relevant times herein, Defendants FIWA 1049 Realty, Gesheft Associates, M. Hatami, J. Katanov, S. Katanov, Mega Group Solution, Midtown 305 Realty, SignMe, Surgicore 5th Avenue, Surgicore Management NY, and Yaguda, participated in the conduct of the Fifth Avenue ASC Enterprise through a pattern of racketeering activity by, among other things, steering or referring, or causing to be steered or referred, Covered Persons to Fifth Avenue ASC; facilitating the operation and control of Fifth Avenue ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1886.    On information and belief, one or more of John Does 2 through 20 were associated with the Fifth Avenue ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1887.    On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Fifth Avenue ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

1888.   The racketeering acts set forth herein were carried out over at least a 15 year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Fifth Avenue ASC to defraud insurers.

1889.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Fifth Avenue ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1890.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Fifth Avenue ASC Enterprise based upon materially false and misleading information.

1891.   Through the Fifth Avenue ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1892.   A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1893.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1894.   Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

1895.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $4,200,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Fifth Avenue ASC Enterprise, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to Fifth Avenue ASC and Surgicore Health Care Providers, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM, and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the Fifth Avenue ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1896.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Springer, Advanced Orthopaedics, Amigud, Amigud PC, Anjani PC, Hall PLLC, Alexander Bowen PLLC, Apazidis, Apazidis PC, Berkowitz, Bowen, Bowen PLLC, Centurion Midtown Anesthesia, Centurion Midtown Medical, Fifth Avenue Anesthesia, Hall, Hostin, Hostin Orthopaedics, Jimenez, Jones, J Sports, Katzman, Katzman PC, Khakhar, McCulloch, McCulloch Orthopaedic, McMahon, McMahon PC, Neuman, Phoenix Medical, PM&R, Portal, Portal Medical, Sedation Vacation, Shabtian, Sinha, Sinha Orthopedics,

Total Anesthesia, Upendra Sinha, U.K. PC, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., Mega Group Solution, MSJR, FIWA 1049 Realty, Gesheft Associates, M. Hatami, J. Katanov, S. Katanov, Mega Group Solution, Midtown 305 Realty, SignMe, Surgicore 5th Avenue, Surgicore Management NY, Yaguda, Katzman PC, John Does 2 through 20, and ABC Corporations 1 through 20, jointly and severally, treble damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, WEINER, ROMERO, SANTOS, YOUNG, ADVANCED ORTHOPAEDICS, ANESTHESIA PROFESSIONALS, ANJANI PC, BERKOWITZ, ELKHOLY, KHAN, NON-SURGICAL ORTHOPEDICS, INTEGRATED PAIN MANAGEMENT, PRECISION ANESTHESIA, ROXBURY ANESTHESIA, SCINAS, SINHA, VORA, XIE, 50 FRANKLIN LN REALTY, ADVANCED PMR, BLUMBERG, HAFEEZ, KLEIN, L. PASSANISI, S. PASSANISI, RUBIN, FLBD MANAGEMENT, HEALTH PLUS MANAGEMENT, REIZIS, REVUTSKY,  JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

1897.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## <u>THE RICO ENTERPRISE</u>

1898.   At all times relevant herein, Manalapan Surgery Center, Inc. (formerly known as Manalapan Surgery Center, P.A.) ("Manalapan ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1899.   From in or about 2012 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Weiner, Romero, Santos, Young, Advanced Orthopaedics, Anesthesia Professionals, Anjani PC, Berkowitz, Elkholy, Khan, Non-Surgical Orthopedics, Integrated Pain Management, Precision Anesthesia, Roxbury Anesthesia, Scinas, Sinha, Vora, Xie, 50 Franklin Ln Realty,

Advanced PMR, Blumberg, Hafeez, Klein, L. Passanisi, S. Passanisi, Rubin, FLBD Management, Health Plus Management, Reizis, Revutsky, John Doe Defendants 2 through 20, and ABC Corporations 1 through 20 were each a "person" as defined under the RICO statute and knowingly conducted and participated in the affairs of the Manalapan ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1900.   At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and directed the operations of the Manalapan ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that Manalapan ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangements between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided to Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1901.   At all relevant times herein, Defendant Weiner, Kogan, Romero, Santos, and Young were employed by and/or associated with the Manalapan ASC Enterprise and participated in the conduct of affairs through a pattern of racketeering activity. The Surgicore Medical Directors

facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, though the Manalapan ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through Manalapan ASC to No-Fault insurers in general and Plaintiff in particular. The Administrators oversaw, among other things, the "marketing" for Manalapan ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by, and through Manalapan ASC.

1902.   At all relevant times herein, Defendants Advanced Orthopaedics, Anesthesia Professionals, Anjani PC, Berkowitz, Elkholy, Khan, Non-Surgical Orthopedics, Integrated Pain Management, Precision Anesthesia, Roxbury Anesthesia, Scinas, Sinha, Vora, and Xie, facilitated the Manalapan ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through Manalapan ASC to No-Fault insurers in general and American Transit in particular.

1903.   At all relevant times herein, Defendants 50 Franklin Ln Realty, Advanced PMR, Blumberg, Hafeez, Klein, L. Passanisi, S. Passanisi, Reizis, Rubin, Elkholy, FLBD Management, Health Plus Management, Revutsky, and Weiner, participated in the conduct of the Manalapan ASC Enterprise through a pattern of racketeering activity by, among other things, steering or

referring, or causing to be steered or referred, Covered Persons to Manalapan ASC; facilitating the operation and control of Manalapan ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1904. On information and belief, one or more of John Does 2 through 20 were associated with the Manalapan ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1905. On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Manalapan ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

1906. The racketeering acts set forth herein were carried out over at least a twelve year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Manalapan ASC to defraud insurers.

1907. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Manalapan ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1908. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Manalapan ASC Enterprise based upon materially false and misleading information.

1909. Through the Manalapan ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1910. A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1911. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1912. Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## <u>DAMAGES</u>

1913. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $300,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Manalapan ASC Enterprise, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to Manalapan ASC and Surgicore Health Care Providers, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM, and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the

Manalapan ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1914.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Weiner, Romero, Santos, Young, Advanced Orthopaedics, Anesthesia Professionals, Anjani PC, Berkowitz, Elkholy, Khan, Non-Surgical Orthopedics, Integrated Pain Management, Precision Anesthesia, Roxbury Anesthesia, Scinas, Sinha, Vora, Xie, 50 Franklin Ln Realty, Advanced PMR, Blumberg, Hafeez, Klein, L. Passanisi, S. Passanisi, Reizis, Rubin, FLBD Management, Health Plus Management, Revutsky, John Does 2 through 20, and ABC Corporations 1 through 20, jointly and severally, treble damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SIXTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, KOPLIK, NAIK, ROMERO, ADVANCED ORTHOPAEDICS, BERKOWITZ, CENTURION ANESTHESIA, DASSA, DASSA ORTHOPEDIC, EATON, ELKHOLY, HAAR, HAAR ORTHOPAEDICS, HOSTIN, HOSTIN ORTHOPAEDICS, INTEGRATED PAIN MANAGEMENT, ITZKOVICH, JONES, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, NEUMAN, NEUMAN PC, NEUMAN PLLC, NON-SURGICAL ORTHOPEDICS, NJ VORA, NYC ORTHOPEDIC, PASSAIC ORTHOPEDIC, PHOENIX MEDICAL, PRECISION ANESTHESIA, SEDATION VACATION, SELDES, SELDES PC, VINAYAK SINHA AS ADMINISTRATOR OF THE ESTATE OF AJOY SINHA, M.D., SINHA ORTHOPEDICS, NEUMAN, SYNERGY ANESTHESIA, VORA, XIE, ASC INVESTMENT SERVICES, ASAR HEALTHCARE, AS MED INVEST, BDP VENTURES LLC, BDP VENTURES INC., BERKOWITZ, BLUE WALL MANAGEMENT, CHAVEZ, CONTE DE FEES, DENEVICH, FIABA, HDS INVESTMENTS, KOSTANIAN CONSULTING ASSOCIATES, MAIN STREET MEDICAL, M. HATAMI, J. KATANOV, S. KATANOV, KEYSERMAN, B. KOGAN, KOSTANIAN, MK MED INVEST, ORTUZ, RAMIREZ, REVUTSKY, REDY VENTURES, M. SELDES, SHAKAROV, SURGICORE MANAGEMENT, YAGUDA, YCENTURY, JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20**

## [RICO, pursuant to 18 U.S.C. § 1962(c)]

1915.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

1916.  At all times relevant herein, New Horizon Surgical Center LLC ("New Horizon ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1917.  From in or about 2009 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Koplik, Naik, Romero, Advanced Orthopaedics, Berkowitz, Centurion Anesthesia, Dassa, Dassa Orthopedic, Eaton, Elkholy, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Integrated Pain Management, Itzkovich, Jones, McCulloch, McCulloch Orthopaedic, Neuman, Neuman PC, Neuman PLLC, Non-Surgical Orthopedics, NJ Vora, NYC Orthopedic, Passaic Orthopedic, Phoenix Medical, Precision Anesthesia, Sedation Vacation, Seldes, Seldes PC, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., Sinha Orthopedics, Synergy Anesthesia, Vora, Xie, ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures LLC, BDP Ventures Inc., Blue Wall Management, Chavez, Conte De Fees, Denevich, Fiaba, HDS Investments, Kostanian Consulting Associates, Main Street Medical, M. Hatami, J. Katanov, S. Katanov, Keyserman, B. Kogan, Kostanian, MK Med Invest, Ortuz, Redy Ventures, Ramirez, Revutsky, M. Seldes, Shakarov, Surgicore Management, Yaguda, YCentury, John Doe Defendants 2 through 20, and ABC Corporations 1 through 20 were each a "person" as defined under the RICO statute and knowingly conducted and participated in the affairs of the New Horizon ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1918.  At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and

directed the operations of the New Horizon ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that New Horizon ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided to Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1919.   At all relevant times herein, Defendant Koplik, Naik, and Romero were employed by and/or associated with the New Horizon ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, through the New Horizon ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through New Horizon ASC to No-Fault insurers in general and Plaintiff in particular. The Administrators oversaw, among other things, the "marketing" for New Horizon ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by, and through New Horizon ASC.

1920.  At all relevant times herein, Defendants Advanced Orthopaedics, Berkowitz, Centurion Anesthesia, Dassa, Dassa Orthopedic, Eaton, Elkholy, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Integrated Pain Management, Itzkovich, Jones, McCulloch, McCulloch Orthopaedic, Neuman, Non-Surgical Orthopedics, NJ Vora, NYC Orthopedic, Passaic Orthopedic, Phoenix Medical, Precision Anesthesia, Sedation Vacation, Seldes, Seldes PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., Sinha Orthopedics, Synergy Anesthesia, Vora, and Xie facilitated the New Horizon ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through New Horizon ASC to No-Fault insurers in general and American Transit in particular.

1921.  At all relevant times herein, Defendants ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures LLC, BDP Ventures Inc., Blue Wall Management, Chavez, Conte De Fees, Denevich, Fiaba, HDS Investments, Kostanian Consulting Associates, Main Street Medical, M. Hatami, J. Katanov, S. Katanov, Keyserman, B. Kogan, Kostanian, MK Med Invest, Ortuz, Redy Ventures, Ramirez, Revutsky, M. Seldes, Shakarov, Surgicore Management, Yaguda, and YCentury, participated in the conduct of the New Horizon ASC Enterprise through a pattern of racketeering activity by, among other things, steering or referring, or causing to be steered or referred, Covered Persons to New Horizon ASC; facilitating the operation and control of New Horizon ASC in violation of regulatory requirements governing

healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1922.   On information and belief, one or more of John Does 2 through 20 were associated with the New Horizon ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1923.   On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the New Horizon ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

1924.   The racketeering acts set forth herein were carried out over at least a 15 year period, were related and similar, and were committed as part of Defendants' scheme to use their control of New Horizon ASC to defraud insurers.

1925.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as New Horizon ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1926.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the New Horizon ASC Enterprise based upon materially false and misleading information.

1927.   Through the New Horizon ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to

Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1928.   A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1929.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1930.   Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

1931.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $1,100,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the New Horizon ASC Enterprise and Surgicore Health Care Providers, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to New Horizon ASC, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM, and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the New Horizon ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1932.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Koplik, Naik, Romero, Advanced Orthopaedics, Berkowitz, Centurion Anesthesia, Dassa, Dassa Orthopedic, Eaton, Elkholy, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Integrated Pain Management, Itzkovich, Jones, McCulloch, McCulloch Orthopaedic, Neuman, Non-Surgical Orthopedics, NJ Vora, NYC Orthopedic, Passaic Orthopedic, Phoenix Medical, Precision Anesthesia, Sedation Vacation, Seldes, Seldes PC, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., Sinha Orthopedics, Synergy Anesthesia, Vora, Xie, ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures LLC, BDP Ventures Inc., Blue Wall Management, Chavez, Conte De Fees, Denevich, Fiaba, HDS Investments, Kostanian Consulting Associates, Main Street Medical, M. Hatami, J. Katanov, S. Katanov, Keyserman, B. Kogan, Kostanian, MK Med Invest, Ortuz, Redy Ventures, Ramirez, Revutsky, M. Seldes, Shakarov, Surgicore Management, Yaguda, YCentury, John Does 2 through 20, and ABC Corporations 1 through 20, jointly and severally, treble damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## SEVENTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, CHAN, HOYLE, LUCERO, MENGER, SANTORA, SPINA, ZYBIN, ACKERMAN, ADVANCED ORTHOPAEDICS, ANJANI PC, HALL PLLC, BERKOWITZ, BOWEN, BOWEN PLLC, CONTEMPORARY ORTHOPEDICS, GRAZIOSA, GRAZIOSA PC, HALL, JIMENEZ, JONES, J SPORTS, KATZMAN, KATZMAN PC, KDV MEDICAL, KV MEDICAL, KETAN PC, KHAKHAR, KOTKES, KOTKES PC, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, NYSJ, NEUMAN, NEUMAN PC, PHOENIX MEDICAL, SHABTIAN, SINHA, TOTAL ANESTHESIA, VORA, AEH HEALTHCARE MANAGEMENT, ARREDONDO-CALLE, BLUMBERG, HEALTH PLUS MANAGEMENT, KLEIN, L. PASSANISI, S. PASSANISI, RUBIN, SURGICORE 5TH AVENUE, SURGICORE MANAGEMENT NY, YAGUDA, JOHN DOES 2 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

1933.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

1934.   At all times relevant herein, NYEEQASC, LLC doing business as North Queens Surgical Center ("North Queens ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1935.   From in or about 2011 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Chan, Hoyle, Lucero, Menger, Santora, Spina, Zybin, Ackerman, Advanced Orthopaedics, Anjani PC, Hall PLLC, Berkowitz, Bowen, Bowen PLLC, Contemporary Orthopedics, Graziosa, Graziosa PC, Hall, Jimenez, Jones, J Sports, Katzman, Katzman PC, KDV Medical, KV Medical, Vora PC, Khakhar, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, NYSJ, Neuman, Neuman PC, Phoenix Medical, Shabtian, Sinha, Total Anesthesia, Vora, AEH Healthcare Management, Arredondo-Calle, Blumberg, Health Plus Management, Klein, L, Passanisi, S. Passanisi, Rubin, Surgicore 5th Avenue, Surgicore Management NY, Yaguda, John Doe Defendants 2 through 20, and ABC Corporations 1 through 20 were each a "person" as defined under the RICO statute and knowingly conducted and participated in the affairs of the North Queens ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1936.   At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and

directed the operations of the North Queens ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that North Queens ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangements between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided to Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1937.  At all relevant times herein, Defendants Chan, Hoyle, Lucero, Menger, Santora, Spina and Zybin were employed by and/or associated with the North Queens ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, through the North Queens ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through North Queens ASC to No-Fault insurers in general and Plaintiff in particular. The Administrators oversaw, among other things, the "marketing" for North Queens ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by, and through North Queens ASC.

1938. At all relevant times herein, Defendants Ackerman, Advanced Orthopaedics, Anjani PC, Hall PLLC, Berkowitz, Bowen, Bowen PLLC, Contemporary Orthopedics, Graziosa, Graziosa PC, Hall, Jimenez, Jones, J Sports, Katzman, Katzman PC, KDV Medical, KV Medical, Vora PC, Khakhar, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, NYSJ, Neuman, Neuman PC, Phoenix Medical, Shabtian, Sinha, Total Anesthesia, and Vora facilitated the North Queens ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through North Queens ASC to No-Fault insurers in general and American Transit in particular.

1939. At all relevant times herein, Defendants AEH Healthcare Management, Arredondo-Calle, Blumberg, Health Plus Management, Klein, L, Passanisi, S. Passanisi, Rubin, Surgicore 5th Avenue, Surgicore Management NY, and Yaguda, participated in the conduct of the North Queens ASC Enterprise through a pattern of racketeering activity by, among other things, for steering or referring, or causing to be steered or referred, Covered Persons to North Queens ASC; facilitating the operation and control of North Queens ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1940. On information and belief, one or more of John Does 2 through 20 were associated with the North Queens ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1941.  On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the North Queens ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

1942.  The racketeering acts set forth herein were carried out over at least a 13 year period, were related and similar, and were committed as part of Defendants' scheme to use their control of North Queens ASC to defraud insurers.

1943.  On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as North Queens ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1944.  As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the North Queens ASC Enterprise based upon materially false and misleading information.

1945.  Through the North Queens ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1946.   A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1947.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1948.   Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

1949.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $1,400,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the North Queens ASC Enterprise and Surgicore Health Care Providers, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to North Queens ASC, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM, and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the North Queens ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1950.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Chan, Hoyle, Lucero, Menger, Santora, Spina, Zybin, Ackerman, Advanced Orthopaedics, Anjani PC, Hall PLLC, Berkowitz, Bowen, Bowen PLLC, Contemporary Orthopedics, Graziosa, Graziosa PC, Hall, Jimenez, Jones, J Sports, Katzman,

Katzman PC, KDV Medical, KV Medical, Vora PC, Khakhar, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, NYSJ, Neuman, Neuman PC, Phoenix Medical, Shabtian, Sinha, Total Anesthesia, Vora, AEH Healthcare Management, Arredondo-Calle, Blumberg, Health Plus Management, Klein, L, Passanisi, S. Passanisi, Rubin, Surgicore 5th Avenue, Surgicore Management NY, Yaguda, John Does 2 through 20, and ABC Corporations 1 through 20, jointly and severally, treble damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, PACIA, ACKERMAN, ANJANI PC, HALL PLLC, BOWEN PLLC, CONTEMPORARY ORTHOPEDICS, DEV HEALTHCARE, GRAZIOSA, GRAZIOSA PC, HALL, JIMENEZ, JONES, J SPORTS, KV MEDICAL, KETAN PC, KOTKES, KOTKES PC, NEUMAN, PHOENIX MEDICAL, PORTAL, PORTAL MEDICAL, SEDATION VACATION, SHAMALOV, SINHA, UPENDRA SINHA, TOTAL ANESTHESIA, U.K. PC, VORA, BERKOWITZ, M. HATAMI, J. KATANOV, S. KATANOV, SURGICORE 5TH AVENUE, SURGICORE MANAGEMENT NY, JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

1951.  The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

1952.  At all times relevant herein, Rockaways ASC Development, LLC ("Rockaways ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1953.  From in or about 2012 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Pacia, Ackerman, Anjani PC, Hall PLLC, Bowen PLLC, Contemporary Orthopedics, Dev Healthcare, Graziosa, Graziosa PC, Hall, Jimenez, Jones J Sports, KV Medical, Vora PC, Kotkes, Kotkes PC, Neuman, Phoenix Medical, Portal, Portal Medical, Sedation Vacation, Shamalov,

Sinha, Upendra Sinha, Total Anesthesia, U.K. PC, Vora, Berkowitz, M. Hatami, J. Katanov, S. Katanov, Surgicore 5th Avenue, Surgicore Management NY, John Doe Defendants 2 through 20, and ABC Corporations 1 through 20 were each a "person" as defined under the RICO statute and knowingly conducted and participated in the affairs of the Rockaways ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1954.   At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and directed the operations of the Rockaways ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that Rockaways ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided to Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1955.   At all relevant times herein, Defendant Pacia was employed by and/or associated with the Rockaways ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  The Surgicore Medical Directors facilitated the fraudulent scheme as

nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, though the Rockaways ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through Rockaways ASC to No-Fault insurers in general and Plaintiff in particular. The Administrators oversaw, among other things, the "marketing" for Rockaways ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by and through Rockaways ASC.

1956.  At all relevant times herein, Defendants Ackerman, Anjani P.C., Hall PLLC, Bowen PLLC, Dev Healthcare, Graziosa, Graziosa PC, Hall, Jimenez, Jones, J Sports, KV Medical, Vora PC, Kotkes, Kotkes PC, Neuman, Phoenix Medical, Portal, Portal Medical, Sedation Vacation, Shamalov, Sinha, Upendra Sinha, Total Anesthesia, U.K. PC, and Vora facilitated the Rockaways ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through Rockaways ASC to No-Fault insurers in general and American Transit in particular

1957.  At all relevant times herein, Defendants Berkowitz, M. Hatami, J. Katanov, S. Katanov, Surgicore 5th Avenue and Surgicore Management NY, participated in the conduct of the Rockaways ASC Enterprise through a pattern of racketeering activity by, among other things, for steering or referring, or causing to be steered or referred, Covered Persons to Rockaways ASC;

facilitating the operation and control of Rockaways ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1958.   On information and belief, one or more of John Does 2 through 20 were associated with the Rockaways ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1959.   On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Rockaways ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

1960.   The racketeering acts set forth herein were carried out over at least a twelve year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Rockaways ASC to defraud insurers.

1961.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Rockaways ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1962.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Rockaways ASC Enterprise based upon materially false and misleading information.

1963.   Through the Rockaways ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1964.   A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1965.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1966.   Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

1967.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $3,100,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Rockaways ASC Enterprise and Surgicore Health Care Providers, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to Rockaways ASC, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services

provided at, by and through the Rockaways ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1968.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Pacia, Ackerman, Anjani PC, Hall PLLC, Bowen PLLC, Contemporary Orthopedics, Dev Healthcare, Graziosa, Graziosa PC, Hall, Jimenez, J Sports, Jones, KV Medical, Vora PC, Kotkes, Kotkes PC, Neuman, Phoenix Medical, Portal, Portal Medical, Sedation Vacation, Shamalov, Sinha, Upendra Sinha, Total Anesthesia, U.K. PC, Vora, Berkowitz, M. Hatami, J. Katanov, S. Katanov, Surgicore 5th Avenue, Surgicore Management NY, John Does 2 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## NINTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, FINNEGAN, BERKOWITZ, DASSA, DASSA ORTHOPEDIC, ELTAKI, KOTKES, KURTTI, MCCARTHY, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, NJ VORA, QUALITY ANESTHESIA, VORA, AEH HEALTHCARE MANAGEMENT, ASAR HEALTHCARE, BOOST HS, CONTE DE FEES, DENEVICH, FLBD MANAGEMENT, FOUR D INVESTMENTS INC., GESHEFT ASSOCIATES, M. HATAMI, HOYLE, J. KATANOV, KOSTANIAN, KOSTANIAN CONSULTING, MEH INVESTMENTS, NAIK, REDY VENTURES, SURGICORE MANAGEMENT, SURGICORE RBSC, YAGUDA, YADGAROV, YCENTURY, JOHN DOE 1, JOHN DOES 2 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

1969.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## THE RICO ENTERPRISE

1970.   At all times relevant herein, Rockland and Bergen Surgery Center LLC ("Rockland and Bergen ASC") was an "enterprise" engaged in, or the activities of which affect, interstate

commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1971.  From in or about 2009 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Finnegan, Berkowitz, Dassa, Dassa Orthopedic, Eltaki, Kotkes, Kurtti, McCarthy, McCulloch, McCulloch Orthopaedic, NJ Vora, Quality Anesthesia, Vora, AEH Healthcare Management, ASAR Healthcare, Boost HS, Conte De Fees, Denevich, FLBD Management, Four D Investments Inc., Gesheft Associates, M. Hatami, Hoyle, J. Katanov, Kostanian, Kostanian Consulting, MEH Investments, Naik, Redy Ventures, Surgicore Management, Surgicore RBSC, Yaguda, Yadgarov, YCentury, John Doe 1, John Doe Defendants 2 through 20 and ABC Corporations 1 through 20 were each a "person" as defined under the RICO statute and knowingly conducted and participated in the affairs of the Rockland and Bergen ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1972.  At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and directed the operations of the Rockland and Bergen ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that Rockland and Bergen ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or

financial arrangement(s) between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1973. At all relevant times herein, Defendant John Doe 1 Finnegan were employed by and/or associated with the Rockland and Bergen ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity. The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, though the Rockland and Bergen ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through Rockland and Bergen ASC to No-fault insurers in general and Plaintiff in particular. The Administrators oversaw, among other things, the "marketing" for Rockland and Bergen ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by and through Rockland and Bergen ASC.

1974. At all relevant times herein, Berkowitz, Dassa, Dassa Orthopedic, Eltaki, Kotkes, Kurtti, McCarthy, McCulloch, McCulloch Orthopaedic, NJ Vora, Quality Anesthesia, and Vora facilitated the Rockland and Bergen ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements,

which the Controllers required in order to submit fraudulent claims through Rockland and Bergen ASC to No-fault insurers in general and American Transit in particular.

1975.  At all relevant times herein, Defendants AEH Healthcare Management, ASAR Healthcare, Boost HS, Conte De Fees, Denevich, FLBD Management, Four D Investments Inc., Gesheft Associates, M. Hatami, Hoyle, J. Katanov, Kostanian, Kostanian Consulting, MEH Investments, Naik, Redy Ventures, Surgicore Management, Surgicore RBSC, Yaguda, Yadgarov, and YCentury, participated in the conduct of the Rockland and Bergen ASC Enterprise through a pattern of racketeering activity by, among other things, for steering or referring, or causing to be steered or referred, Covered Persons to Rockland and Bergen ASC; facilitating the operation and control of Rockland and Bergen ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1976.  On information and belief, one or more of John Does 2 through 20 were associated with the Rockland and Bergen ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1977.  On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Rockland and Bergen ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

### THE PATTERN OF RACKETEERING ACTIVITY
### (RACKETEERING ACTS)

1978.  The racketeering acts set forth herein were carried out over at least a fifteen year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Rockland and Bergen ASC to defraud insurers.

1979.  On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Rockland and Bergen ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1980.  As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Rockland and Bergen ASC Enterprise based upon materially false and misleading information.

1981.  Through the Rockland and Bergen ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

1982.  A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1983.  Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

1984.  Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

1985.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $300,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Rockland and Bergen ASC Enterprise, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to Rockland and Bergen ASC and Surgicore Health Care Providers, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by and through the Rockland and Bergen ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

1986.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Finnegan, Berkowitz, Dassa, Dassa Orthopedic, Eltaki, Kotkes, Kurtti, McCarthy, McCulloch, McCulloch Orthopaedic, NJ Vora, Quality Anesthesia, Vora, AEH Healthcare Management, ASAR Healthcare, Boost HS, Conte De Fees, Denevich, FLBD Management, Four D Investments Inc., Gesheft Associates, M. Hatami, Hoyle, J. Katanov, Kostanian, Kostanian Consulting, MEH Investments, Naik, Redy Ventures, Surgicore Management, Surgicore RBSC, Yaguda, Yadgarov, YCentury, John Does 2 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## TENTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, RICHARD, AMINOVA, COCOZIELLO, ACKERMAN, ADVANCED ORTHOPAEDICS, BERKOWITZ, BW ORTHOPEDICS, CONTEMPORARY ORTHOPEDICS, DEV HEALTHCARE, HAAR, HAAR ORTHOPEDICS, HOSTIN, HOSTIN ORTHOPAEDICS, INTEGRATED PAIN MANAGEMENT, JIMENEZ, JONES, KOTKES, KOTKES PC, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, PHOENIX MEDICAL, ROXBURY ANESTHESIA, SCINAS, WASSERMAN, XIE, AS MED INVEST, ASAR, BERKOWITZ, BLUMBERG, CONTE DE FEES, DENEVICH, FIABA, FLBD MANAGEMENT, FOUR D INVESTMENTS INC., FOUR D INVESTMENTS LLC, GESHEFT, M. HATAMI, J. KATANOV, KEYSERMAN, KILROY, KLEIN, B. KOGAN, KOSTANIAN, KOSTANIAN CONSULTING, MEDA MANAGEMENT, MEH INVESTMENTS, MK MED INVEST, L. PASSANISI, S. PASSANISI, REDY VENTURES, RICHARD, ROMERO, RUBIN, SHAKAROV, SJ2 VENTURES, SURGICORE MANAGEMENT, WASSERMAN, YAGUDA, YCENTURY, JOHN DOES 2 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20**

### [RICO, pursuant to 18 U.S.C. § 1962(c)]

1987.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

### <u>THE RICO ENTERPRISE</u>

1988.   At all times relevant herein, Surgicore of Jersey City LLC ("Jersey City ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1989.   From in or about 2016 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Richard, Aminova, Cocoziello, Ackerman, Advanced Orthopaedics, Berkowitz, BW Orthopedics, Contemporary Orthopedics, Dev Healthcare, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Integrated Pain Management, Jimenez, Jones, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, Phoenix Medical, Roxbury Anesthesia, Scinas, Wasserman, Xie, AS Med Invest, ASAR, Berkowitz, Blumberg, Conte De Fees, Denevich, Fiaba, FLBD Management, Four D Investments Inc., Four D Investments LLC, Gesheft Associates, M. Hatami, J. Katanov, Keyserman, Kilroy, Klein, B. Kogan, Kostanian, Kostanian Consulting, MEDA

Management, MEH Investments, MK Med Invest, L. Passanisi, S. Passanisi, Redy Ventures, Richard, Romero, Rubin, Shakarov, SJ2 Ventures, Surgicore Management, Wasserman, Yaguda, YCentury, John Doe Defendants 2 through 20 and ABC Corporations 1 through 20 were each a "person" as defined under the RICO statute and knowingly conducted and participated in the affairs of the Jersey City ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1990.   At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and directed the operations of the Jersey City ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that Jersey City ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

1991.   At all relevant times herein, Defendant Richard and Aminova were employed by and/or associated with the Jersey City ASC Enterprise and participated in the conduct of its affairs

through a pattern of racketeering activity.  The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, though the Jersey City ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through Jersey City ASC to No-fault insurers in general and Plaintiff in particular.  The Administrators oversaw, among other things, the "marketing" for Jersey City ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by and through Jersey City ASC.

1992.  At all relevant times herein, Defendants Ackerman, Advanced Orthopaedics, Berkowitz, BW Orthopedics, Contemporary Orthopedics, Dev Healthcare,  Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Integrated Pain Management, Jimenez, Jones, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, Phoenix Medical, Roxbury Anesthesia, Scinas, Wasserman, and Xie facilitated the Jersey City ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through Jersey City ASC to No-fault insurers in general and American Transit in particular.

1993.  At all relevant times herein, Defendants AS Med Invest, ASAR, Berkowitz, Blumberg, Conte De Fees, Denevich, Fiaba, FLBD Management, Four D Investments Inc., Four

D Investments LLC, Gesheft Associates, M. Hatami, J. Katanov, Keyserman, Kilroy, Klein, B. Kogan, Kostanian, Kostanian Consulting, MEDA Management, MEH Investments, MK Med Invest, L. Passanisi, S. Passanisi, Redy Ventures, Richard, Romero, Rubin, Shakarov, SJ2 Ventures, Surgicore Management, Wasserman, Yaguda, YCentury, participated in the conduct of the Jersey City ASC Enterprise through a pattern of racketeering activity by, among other things, for steering or referring, or causing to be steered or referred, Covered Persons to Jersey City ASC; facilitating the operation and control of Jersey City ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

1994.   On information and belief, one or more of John Does 2 through 20 were associated with the Jersey City ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

1995.   On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Jersey City ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

**THE PATTERN OF RACKETEERING ACTIVITY**
**(RACKETEERING ACTS)**

1996.   The racketeering acts set forth herein were carried out over at least a eight year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Jersey City ASC to defraud insurers.

1997.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Jersey City ASC continues to submit and pursue collection on the fraudulent bills to the present day.

1998.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Jersey City ASC Enterprise based upon materially false and misleading information.

1999.   Through the Jersey City ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

2000.   A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

2001.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

2002.   Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**DAMAGES**

2003.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $3,400,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Jersey City ASC Enterprise and Surgicore Health Care Providers, Plaintiff was defrauded and incurred

damages that well-exceeded the amount paid to Jersey City ASC, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by and through the Jersey City ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

2004.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Richard, Aminova, Cocoziello, Ackerman, Advanced Orthopaedics, Berkowitz, BW Orthopedics, Contemporary Orthopedics, Dev Healthcare, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Integrated Pain Management, Jimenez, Jones, Kotkes, Kotkes PC, McCulloch, McCulloch Orthopaedic, Phoenix Medical, Roxbury Anesthesia, Scinas, Wasserman, Xie, AS Med Invest, ASAR, Berkowitz, Blumberg, Conte De Fees, Denevich, Fiaba, FLBD Management, Four D Investments Inc., Four D Investments LLC, Gesheft Associates, M. Hatami, J. Katanov, Keyserman, Kilroy, Klein, B. Kogan, Kostanian, Kostanian Consulting, MEDA Management, MEH Investments, MK Med Invest, L. Passanisi, S. Passanisi, Redy Ventures, Richard, Romero, Rubin, Shakarov, SJ2 Ventures, Surgicore Management, Wasserman, Yaguda, YCentury, John Does 2 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### ELEVENTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS DEGRADI, HATAMI, KOGAN, TYLMAN, AMINOVA, COCOZIELLO, LOPEZ, LUCERO, MORRIS, ROMERO, ELKHOLY, HOSTIN, HOSTIN ORTHOPAEDICS, INTEGRATED PAIN MANAGEMENT, JIMENEZ, J SPORTS, KAO, KETAN PC, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, NYSJ,**

**MSJR, NON-SURGICAL ORTHOPEDICS, NJ VORA, PRECISION ANESTHESIA, PROGRESSIVE-HUDSON, SINHA ORTHOPEDICS, U.K. PC, UPENDRA SINHA, VINAYAK SINHA AS ADMINISTRATOR OF THE ESTATE OF AJOY SINHA, M.D., VORA, XIE, ADVANCED ORTHOPAEDICS, ASC INVESTMENT SERVICES, AS MED INVEST, BERKOWITZ, BOOST HS, CAPLEO HOLDINGS, CHAVEZ, FLBD MANAGEMENT, FOUR D INVESTMENTS INC., FOUR D INVESTMENTS LLC, M. HATAMI, HEALTH PLUS, J. KATANOV, S. KATANOV, KEYSERMAN, MEH INVESTMENTS, MK MED INVEST, RAMIREZ, REDY VENTURES, ROMERO, RUBIN, SHAKAROV, SURGICORE MANAGEMENT, YAGUDA, YADGAROV, YCENTURY, JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20**

**[RICO, pursuant to 18 U.S.C. § 1962(c)]**

2005.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

**THE RICO ENTERPRISE**

2006.   At all times relevant herein, Surgicore, LLC (also known as Surgicore Surgical Center) ("Saddlebrook ASC") was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

2007.   From in or about 2015 through the present, Defendants Degradi, Hatami, Kogan, Tylman, Aminova, Cocoziello, Lopez, Lucero, Morris, Romero, Elkholy, Hostin, Hostin Orthopaedics, Integrated Pain Management, Jimenez, J Sports, Kao, Vora PC, McCulloch, McCulloch Orthopaedic, NYSJ, MSJR, Non-Surgical Orthopedics, NJ Vora, Precision Anesthesia, Progressive-Hudson, Sinha Orthopedics, U.K. PC, Upendra Sinha, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., Vora, Xie, Advanced Orthopaedics, ASC Investment Services, AS Med Invest, Berkowitz, Boost HS, Capleo Holdings, Chavez, FLBD Management, Four D Investments Inc., Four D Investments LLC, M. Hatami, Health Plus Management, J. Katanov, S. Katanov, Keyserman, MEH Investments, MK Med Invest, Ramirez, Redy Ventures, Romero, Rubin, Shakarov, Surgicore Management, Yaguda, Yadgarov, YCentury,

John Doe Defendants 2 through 20 were each a "person" as defined under the RICO statute and ABC Corporations 1 through 20 knowingly conducted and participated in the affairs of the Saddlebrook ASC Enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein, in the representative list of predicate acts set forth in the accompanying Appendix, which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

2008.   At all relevant times mentioned herein, Degradi, Hatami, Kogan, Tylman, and one or more John Doe Defendants 2 through 20 were the Controllers of, exerted control over, and directed the operations of the Saddlebrook ASC Enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff seeking payments that Saddlebrook ASC was ineligible to receive under the New York No-Fault insurance laws because it (a) submitted claims for medically unnecessary medical services; (b) submitted claims performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted claims for reimbursement pursuant to unlawful referral and/or financial arrangement(s) between the Defendants and/or others without regard to medical necessity; (d) submitted claims for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided Covered Persons; and (e) was not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws.

2009.   At all relevant times herein, Defendant Aminova, Cocoziello, Lopez, Lucero, Morris, and Romero were employed by and/or associated with the Saddlebrook ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.  The Surgicore Medical Directors facilitated the fraudulent scheme as nominal, disengaged sham

medical directors by failing to perform the duties enumerated by law for medical directors of an ASC and provided the essential means for the Controllers, though the Saddlebrook ASC Enterprise, to form and operate a bogus ASC in violation of New York and New Jersey law. In doing so, the sham Surgicore Medical Directors further provided the Controllers with the essential means to submit fraudulent claims through Saddlebrook ASC to No-fault insurers in general and Plaintiff in particular. The Administrators oversaw, among other things, the "marketing" for Saddlebrook ASC and managed the kickback relationships with various health care professionals providing medically unnecessary services at, by and through Saddlebrook ASC.

2010. At all relevant times herein, Defendants Elkholy, Hostin, Hostin Orthopaedics, Integrated Pain Management, Jimenez, J Sports, Kao, Vora PC, McCulloch, McCulloch Orthopaedic, NYSJ, MSJR, Non-Surgical Orthopedics, NJ Vora, Precision Anesthesia, Progressive-Hudson, Sinha Orthopedics, U.K. PC, Upendra Sinha, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., Vora and Xie facilitated the Saddlebrook ASC Enterprise by performing medically unnecessary services pursuant to a pre-determined protocol of treatment, irrespective of whether the purported injuries were related to an automobile accident, and/or providing the Controllers with referrals of Covered Persons for medically unnecessary procedures, including referrals in violation of New Jersey's Codey Law, in exchange for unlawful kickbacks and/or other financial arrangements, which the Controllers required in order to submit fraudulent claims through Saddlebrook ASC to No-fault insurers in general and American Transit in particular.

2011. At all relevant times herein, Defendants Advanced Orthopaedics, ASC Investment Services, AS Med Invest, Berkowitz, Boost HS, Capleo Holdings, Chavez, FLBD Management, Four D Investments Inc., Four D Investments LLC, M. Hatami, Health Plus Management, J.

Katanov, S. Katanov, Keyserman, MEH Investments, MK Med Invest, Ramirez, Redy Ventures, Romero, Rubin, Shakarov, Surgicore Management, Yaguda, Yadgarov, YCentury, participated in the conduct of the Saddlebrook ASC Enterprise through a pattern of racketeering activity by, among other things, for steering or referring, or causing to be steered or referred, Covered Persons to Saddlebrook ASC; facilitating the operation and control of Saddlebrook ASC in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme back to the Controllers in exchange for kickbacks and/or other financial compensation.

2012.   On information and belief, one or more of John Does 2 through 20 were associated with the Saddlebrook ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

2013.   On information and belief, one or more of the ABC Corporations 1 through 20 were associated with the Saddlebrook ASC Enterprise and participated in the conduct of its affairs through a pattern of racketeering activity.

## THE PATTERN OF RACKETEERING ACTIVITY
## (RACKETEERING ACTS)

2014.   The racketeering acts set forth herein were carried out over at least a nine year period, were related and similar, and were committed as part of Defendants' scheme to use their control of Saddlebrook ASC to defraud insurers.

2015.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Saddlebrook ASC continues to submit and pursue collection on the fraudulent bills to the present day.

2016.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Defendants caused mailings to be made

through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Saddlebrook ASC Enterprise based upon materially false and misleading information.

2017.   Through the Saddlebrook ASC Enterprise, Defendants submitted or caused to be submitted fraudulent claim forms seeking payment for healthcare services purportedly provided to Covered Persons. The bills and supporting documents that were sent by Defendants, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud.

2018.   A sample list of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

2019.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

2020.   Each submission of a fraudulent claim constitutes part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## DAMAGES

2021.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $1,300,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Saddlebrook ASC Enterprise and Surgicore Health Care Providers, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to Saddlebrook ASC, including but not

limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not necessary, as well as payments on bodily injury, SUM and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were intended to, and did in fact, falsely justify the Fraudulent Services provided at, by and through the Saddlebrook ASC Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

2022.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Degradi, Hatami, Kogan, Tylman, Aminova, Cocoziello, Lopez, Lucero, Morris, Romero, Elkholy, Hostin, Hostin Orthopaedics, Integrated Pain Management, Jimenez, J Sports, Kao, Vora PC, McCulloch, McCulloch Orthopaedic, NYSJ, MSJR, Non-Surgical Orthopedics, NJ Vora, Precision Anesthesia, Progressive-Hudson, Sinha Orthopedics, U.K. PC, Upendra Sinha, Vinayak Sinha as Administrator of the Estate of Ajoy Sinha, M.D., Vora, Xie, Advanced Orthopaedics, ASC Investment Services, AS Med Invest, Berkowitz, Boost HS, Capleo Holdings, Chavez, FLBD Management, Four D Investments Inc., Four D Investments LLC, M. Hatami, Health Plus Management, J. Katanov, S. Katanov, Keyserman, MEH Investments, MK Med Invest, Ramirez, Redy Ventures, Romero, Rubin, Shakarov, Surgicore Management, Yaguda, Yadgarov, YCentury, John Does 2 through 20 and ABC Corporations 1 through 20, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## TWELFTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### [Conspiracy to Violate RICO, pursuant to 18 U.S.C. § 1962(d)]

2023.  The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

## THE RACKETEERING CONSPIRACY

2024. From approximately 2009 through the date of the filing of this Complaint, Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC; Saddlebrook ASC, Degradi, Hatami, Kogan, Tylman, Surgicore Management, Surgicore Management NY, Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, Bowen, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, Advanced PMR, AEH Healthcare Management, ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures Inc, BDP Ventures LLC, Blue Wall Management, Boost HS, Capleo

Holdings, Conte De Fees, Fiaba, 50 Franklin Ln Realty, FIWA 1049 Realty, FLBD Management, Four D Investments Inc, Four D Investments LLC, Health Plus Management, HDS Investments, Kostanian Consulting Associates, Main Street Medical, Mega Group Solution, MEDA Management, MEH Investments, Midtown 305 Realty, MK Med Invest, Ortuz, Redy Ventures, SignMe, SJ2 Ventures, Surgicore 5th Avenue, Surgicore RBSC, YCentury, Arredondo-Calle, Blumberg, Chavez, K. Degradi, Denevich, M. Hatami, Hafeez, J. Katanov, S. Katanov, Keyserman, Klein, B. Kogan, Kostanian, L. Passanisi, S. Passanisi, Pyatetskaya, Ramirez, Reizis, Revutsky. Rubin, M. Seldes, Shakarov, Yadgarov, Yaguda, John Doe 1, John Does 2 through 20, and ABC Corporations 1 Through 20, were each a "person" as defined under the RICO statute and knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Surgicore Medical Network Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute 18 U.S.C. § 1341, based upon the use of the United States mail to submit to insurers, and Plaintiff in particular, the fraudulent bills and supporting documents seeking payments that Defendants were ineligible to receive under the New York No-Fault Laws because the claims were (a) for medically unnecessary medical services; (b) performed pursuant to a predetermined course of treatment, designed solely to maximize reimbursement; (c) submitted for reimbursement pursuant to unlawful referral and/or financial arrangements between the Defendants and/or others without regard to medical necessity; (d) submitted for reimbursement under billing codes that misrepresent and/or exaggerate the services purportedly provided to Covered Persons; and (e) were not in compliance with all statutory and regulatory requirements governing healthcare practice and/or licensing laws in violation of 18 U.S.C. §§ 1961(1) and (5), through the commission, as principals or as aids and abettors, of

multiple racketeering acts (mail fraud), as set forth at length herein, all in violation of 18 U.S.C. § 1962(d).

2025.   Each Defendant knew of, agreed to, and acted in furtherance of the common and overall objectives of the conspiracy by facilitating the submission of bills and supporting documentation for the Fraudulent Services, steering or referring, or causing to be steered or referred, Covered Persons to the Surgicore ASCs; facilitating the operation and control of Surgicore ASCs in violation of regulatory requirements governing healthcare practice and/or licensing laws; and/or illegally funneling proceeds from the fraudulent scheme in exchange for kickbacks and/or other financial compensation. By their acts in furtherance of the fraudulent scheme, Defendants falsely induced and caused millions of dollars in claims to be paid by Plaintiff.

2026.   In furtherance of the racketeering conspiracy and to effect the objects thereof, the Defendants committed, and caused to be committed as overt acts, among others, the racketeering predicate acts alleged above.

## DAMAGES

2027.   By reason of the foregoing violation of 18 U.S.C. § 1962(d), Plaintiff American Transit has been injured in their business and property and have been damaged in the aggregate amount presently in excess of $153,000,000.00, the exact amount to be determined at trial. As a direct and proximate result of the Fraudulent Services provided through the Surgicore Medical Network Enterprise, Plaintiff was defrauded and incurred damages that well-exceeded the amount paid to the Surgicore ASCs, including but not limited to payments made to the Associated Health Care Providers, paying higher settlement amounts for alleged medical services that were not medically necessary, as well as payments on bodily injury, SUM, and UM claims that were predicated on fraudulent medical records generated by and through the No-Fault Clinics that were

intended to, and did in fact, falsely justify the Fraudulent Services provided at, by, and through the Surgicore Medical Network Enterprise, inducing Plaintiff to compromise and settle claims that it would not have but for the fraudulent acts alleged herein.

2028.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC; Saddlebrook ASC, Degradi, Hatami, Kogan, Tylman, Surgicore Management, Surgicore Management NY, Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, Bowen, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, Advanced PMR, AEH Healthcare

Management, ASC Investment Services, ASAR Healthcare, AS Med Invest, BDP Ventures Inc, BDP Ventures LLC, Blue Wall Management, Boost HS, Capleo Holdings, Conte De Fees, Fiaba, 50 Franklin Ln Realty, FIWA 1049 Realty, FLBD Management, Four D Investments Inc, Four D Investments LLC, Health Plus Management, HDS Investments, Kostanian Consulting Associates, Main Street Medical, Mega Group Solution, MEDA Management, MEH Investments, Midtown 305 Realty, MK Med Invest, Ortuz, Redy Ventures, SignMe, SJ2 Ventures, Surgicore 5th Avenue, Surgicore RBSC, YCentury, Arredondo-Calle, Blumberg, Chavez, K. Degradi, Denevich, M. Hatami, Hafeez, J. Katanov, S. Katanov, Keyserman, Klein, B. Kogan, Kostanian, L. Passanisi, S. Passanisi, Pyatetskaya, Ramirez, Reizis, Revutsky. Rubin, M. Seldes, Shakarov, Yadgarov, Yaguda, John Doe 1, John Does 2 through 20, and ABC Corporations 1 through 20, jointly and severally, treble damages sustained by them, together with the costs of this lawsuit, and reasonable attorneys' fees.

2029. The allegations of paragraphs 1 through 1822 above, describing the injury and damages sustained by the Plaintiff are repeated and realleged as though fully set forth herein.

## THIRTEENTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS ALL CITY ASC, EMPIRE STATE ASC, FIFTH AVENUE ASC, MANALAPAN ASC, NEW HORIZON ASC, NORTH QUEENS ASC, ROCKAWAYS ASC, ROCKLAND AND BERGEN ASC, JERSEY CITY ASC, SADDLEBROOK ASC, DEGRADI, HATAMI, KOGAN, TYLMAN, SURGICORE MANAGEMENT, SURGICORE MANAGEMENT NY, ALJIAN, CHAN, COCOZIELLO, KOPLIK, MENGER, NAIK, PACIA, RICHARD, SPRINGER, WEINER, AMINOVA, FINNEGAN, HOYLE, KILROY, LOPEZ, LUCERO, MORRIS, ROMERO, SANTORA, SANTOS, SPINA, YOUNG, ZYBIN, ACKERMAN, CONTEMPORARY ORTHOPEDICS, APAZIDIS, APAZIDIS PC, BAUM, BAY RIDGE PC, BERKOWITZ, ADVANCED ORTHOPAEDICS, BURSZTYN, DASSA, DASSA ORTHOPEDIC, GRAZIOSA, GRAZIOSA PC, HAAR, HAAR ORTHOPAEDICS, HOSTIN, HOSTIN ORTHOPAEDICS, KATZMAN, KATZMAN PC, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, NYSJ, MCMAHON, MCMAHON PC, SELDES, NYC ORTHOPEDIC, PASSAIC ORTHOPEDIC, SELDES PC, SINHA, ANJANI PC, UPENDRA SINHA, U.K. PC, VINAYAK SINHA AS ADMINISTRATOR OF THE ESTATE OF AJOY SINHA, M.D., MSJR, SINHA ORTHOPEDICS, WASSERMAN, BW ORTHOPEDICS,**

**SHAMALOV, BOWEN, BOWEN PLLC, HALL, HALL PLLC, JIMENEZ, J SPORTS, DEV HEALTHCARE, JONES, PHOENIX MEDICAL, KHAKHAR, PM&R, KOTKES, KOTKES PC, PORTAL, PORTAL MEDICAL, SHABTIAN, TOTAL ANESTHESIA, VORA, KDV MEDICAL, KETAN PC, KV MEDICAL, NJ VORA, NON-SURGICAL ORTHOPEDICS, XIE, INTEGRATED PAIN MANAGEMENT, ALEXANDER BOWEN PLLC, AMIGUD, FIFTH AVENUE ANESTHESIA, AMIGUD PC, EATON, ITZKOVICH, SYNERGY ANESTHESIA, ELKHOLY, PRECISION ANESTHESIA, KURTTI, ELTAKI, MCCARTHY, QUALITY ANESTHESIA, KAO, PROGRESSIVE-HUDSON, KHAN, ANESTHESIA PROFESSIONALS, NEUMAN, NEUMAN PLLC, NEUMAN PC, CENTURION ANESTHESIA, CENTURION MIDTOWN ANESTHESIA, CENTURION MIDTOWN MEDICAL, SEDATION VACATION, SCINAS, ROXBURY ANESTHESIA, JOHN DOE 1, JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20**

**(Common Law Fraud-Billing Fraud]**

2030.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

2031.   Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC, Saddlebrook ASC, Degradi, Hatami, Kogan, Tylman, Surgicore Management, Surgicore Management NY, Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, Bowen, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical

Orthopedics, Xie, Integrated Pain Management, Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, John Doe 1, John Does 2 through 20, and ABC Corporations 1 through 20, intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiff, made numerous false and misleading statements of material fact and/or material omissions as to the necessity of the medical services purportedly rendered and that the medical services were provided when in fact they were not provided as billed and exaggerated the level of service, if any, purportedly provided, thereby inducing Plaintiff to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme, All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC; Saddlebrook ASC, Degradi, Hatami, Kogan, Tylman, Surgicore Management, Surgicore Management NY, Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, Bowen, Bowen PLLC, Hall,

Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, John Doe 1, John Does 2 through 20, and ABC Corporations 1 through 20 made material misrepresentations and/or omitted material statements in submitting No-Fault claims to Plaintiff for payment.

2032.   Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC; Saddlebrook ASC, Degradi, Hatami, Kogan, Tylman, Surgicore Management, Surgicore Management NY, Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, Bowen, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical,

Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, (collectively the "Surgicore Pain Management Providers"); Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, John Doe 1, John Does 2 through 20, and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff, concealed the fact that the bills submitted to Plaintiff for reimbursement of No-Fault benefits for the Fraudulent Services were materially misrepresented.

2033.   Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC; Saddlebrook ASC, Degradi, Hatami, Kogan, Tylman, Surgicore Management, Surgicore Management NY, Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic, Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, Bowen, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev

Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, John Doe 1, John Does 2 through 20, and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff, concealed the fact that, in many instances, the services relating to Fraudulent Services were provided pursuant to a pre-determined protocol, pursuant to unlawful referral, kickbacks, and/or other financial arrangements between the Defendants and/or others, that was intended to maximize Defendants' profit and reimbursement of payments from the Plaintiff, as opposed to being based upon medical necessity.

2034.  Defendants All City ASC, Empire State ASC, Fifth Avenue ASC, Manalapan ASC, New Horizon ASC, North Queens ASC, Rockaways ASC, Rockland and Bergen ASC, Jersey City ASC; Saddlebrook ASC, Degradi, Hatami, Kogan, Tylman, Surgicore Management, Surgicore Management NY, Aljian, Chan, Cocoziello, Koplik, Menger, Naik, Pacia, Richard, Springer, Weiner, Aminova, Finnegan, Hoyle, Kilroy, Lopez, Lucero, Morris, Romero, Santora, Santos, Spina, Young, Zybin, Ackerman, Contemporary Orthopedics, Apazidis, Apazidis PC, Baum, Bay Ridge PC, Berkowitz, Advanced Orthopaedics, Bursztyn, Dassa, Dassa Orthopedic, Graziosa, Graziosa PC, Haar, Haar Orthopaedics, Hostin, Hostin Orthopaedics, Katzman, Katzman PC, McCulloch, McCulloch Orthopaedic, NYSJ, McMahon, McMahon PC, Seldes, NYC Orthopedic,

Passaic Orthopedic, Seldes PC, Sinha, Anjani PC, Upendra Sinha, U.K. PC, Vinayak Sinha as administrator of the estate of Ajoy Sinha, M.D., MSJR, Sinha Orthopedics, Wasserman, BW Orthopedics, Shamalov, Bowen, Bowen PLLC, Hall, Hall PLLC, Jimenez, J Sports, Dev Healthcare, Jones, Phoenix Medical, Khakhar, PM&R, Kotkes, Kotkes PC, Portal, Portal Medical, Shabtian, Total Anesthesia, Vora, KDV Medical, Vora PC, KV Medical, NJ Vora, Non-Surgical Orthopedics, Xie, Integrated Pain Management, (collectively the "Surgicore Pain Management Providers"); Alexander Bowen PLLC, Amigud, Fifth Avenue Anesthesia, Amigud PC, Eaton, Itzkovich, Synergy Anesthesia, Elkholy, Precision Anesthesia, Kurtti, Eltaki, McCarthy, Quality Anesthesia, Kao, Progressive-Hudson, Khan, Anesthesia Professionals, Neuman, Neuman PLLC, Neuman PC, Centurion Anesthesia, Centurion Midtown Anesthesia, Centurion Midtown Medical, Sedation Vacation, Scinas, Roxbury Anesthesia, John Doe 1, John Does 2 through 20, and ABC Corporations 1 through 20 intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff, made various misleading statements and/or material omissions intended to hold out the Surgicore ASCs as legitimate ASCs in compliance with core licensing requirements when, in fact, they were not, thereby inducing Plaintiff to make payments that Defendants were not entitled to receive because they were improperly licensed in violation of the applicable laws of New York and New Jersey and therefore are ineligible for the reimbursement of benefits under the No-Fault Law.

2035.   Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications, and bills for medical treatment which contained false representations of material facts and/or material omissions, including but not limited to the following fraudulent material misrepresentations and/or omissions:

a)      False and misleading statements, information and/or material omissions designed to conceal the fact that Defendants provided services according to

a treatment protocol intended to fraudulently bill Plaintiff for, *inter alia*, purported arthroscopic procedures (including but not limited to on the knee, shoulder, wrist, and ankle); pain management services (including but not limited to spinal annuloplasty, percutaneous discectomies, IDETs, discectomy, diskography, epidurography and anesthetic agent, diskography epidural, facet, trigger point injections, transforaminal and epidural injections), related anesthesiology services and inflated facility fees irrespective of medical necessity;

b)      False and misleading statements and/or material omissions made by the Surgicore ASCs for reimbursement of inflated facility fees that were fraudulent and/or far in excess of the amounts the Surgicore ASCs was entitled to receive;

c)      False and misleading statements and/or material omissions designed to conceal that the Surgicore ASCs were fraudulently and improperly licensed in violation of the applicable laws of New York and New Jersey and therefore were ineligible for the reimbursement of benefits under the No-Fault Law;

d)      False and misleading statements, information, and/or material omissions designed to conceal the fact that the Fraudulent Services were provided pursuant to an illegal referral and/or financial arrangement between and among the Defendants;

e)      False and misleading statements and/or material omissions made by the Surgicore Orthopedic Providers and/or Surgicore Pain Management Providers concerning Covered Persons' conditions in order to justify referrals for medically unnecessary surgical and interventional pain management procedures with the intent to defraud American Transit;

f)      False and misleading statements and/or material omissions that the Surgicore ASCs were in compliance with all laws and regulations governing healthcare practice and/or licensing laws, and was therefore eligible to receive reimbursement, when in fact they were not;

g)      False and misleading statements and information and/or material omissions designed to conceal the fact that the fraudulent services were provided pursuant to an illegal referral and/or financial arrangement between and among the Defendants;

h)      False and misleading statements and/or material omissions made by the Surgicore Orthopedic Providers, Surgicore Pain Management Providers and/or Surgicore Anesthesia Providers in which they falsely claimed the medical services they purportedly performed on Covered Persons were reimbursable pursuant to NYS Fee Schedule, when they were not;

i)      False and misleading statements and/or material omissions made by Surgicore Orthopedic Providers, Surgicore Pain Management Providers and Surgicore Anesthesia Providers in order to justify the billing for purported

medical services when in fact such services were medically unnecessary and/or of no diagnostic or treatment value; and

j)      Other misrepresentations and material omissions, including but not limited to those contained in paragraphs a) through i) above.

2036.   On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiff in connection with the Fraudulent Services set forth fictional representations of each Covered Persons' condition and services provided. The false representations contained therein not only were intended to defraud Plaintiff but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses were to be relied upon by any subsequent healthcare provider

2037.   The foregoing was intended to deceive and mislead the Plaintiff into believing that Defendants were providing medically valid services when, in fact, they were not.

2038.   Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

2039.   Plaintiff did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which Plaintiff were led to believe existed as a result of Defendants' acts of fraud and deception.

2040.   Had Plaintiff known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Defendants' claims for No-Fault insurance benefits submitted in connection therewith.

2041.   Furthermore, Defendants' far-reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiff to recovery of exemplary and punitive damages.

2042.  For the foregoing reasons, Plaintiff has sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $25,600,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## FOURTEENTH CLAIM FOR RELIEF

## <u>AGAINST ALL DEFENDANTS</u>

### (Unjust Enrichment/Restitution)

2043.  The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

2044.  By reason of their wrongdoing, Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received substantial moneys from Plaintiff that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

2045.  Plaintiff are entitled to recover restitution for the amount that Defendants were unjustly enriched as a result of payments made by Plaintiff to said Defendants.

2046.  By reason of the foregoing, Plaintiff has sustained compensatory damages and has been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $25,600,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

## FIFTEENTH CLAIM FOR RELIEF

### AGAINST ALL CITY ASC, EMPIRE STATE ASC, FIFTH AVENUE ASC, MANALAPAN ASC, NEW HORIZON ASC, NORTH QUEENS ASC, ROCKAWAYS ASC, ROCKLAND AND BERGEN ASC, JERSEY CITY ASC, SADDLEBROOK ASC, ACKERMAN, CONTEMPORARY ORTHOPEDICS, APAZIDIS, APAZIDIS PC, BAUM, BAY RIDGE PC, BERKOWITZ, ADVANCED ORTHOPAEDICS, BURSZTYN, DASSA, DASSA ORTHOPEDIC, GRAZIOSA, GRAZIOSA PC, HAAR, HAAR ORTHOPAEDICS, HOSTIN, HOSTIN ORTHOPAEDICS, KATZMAN, KATZMAN PC, MCCULLOCH, MCCULLOCH ORTHOPAEDIC, NYSJ, MCMAHON, MCMAHON PC, SELDES, NYC ORTHOPEDIC, PASSAIC ORTHOPEDIC, SELDES PC, SINHA,

ANJANI PC, UPENDRA SINHA, U.K. PC, VINAYAK SINHA AS ADMINISTRATOR OF THE ESTATE OF AJOY SINHA, M.D., MSJR, SINHA ORTHOPEDICS, WASSERMAN, BW ORTHOPEDICS, SHAMALOV, BOWEN, BOWEN PLLC, HALL, HALL PLLC, JIMENEZ, J SPORTS, DEV HEALTHCARE, JONES, PHOENIX MEDICAL, KHAKHAR, PM&R, KOTKES, KOTKES PC, PORTAL, PORTAL MEDICAL, SHABTIAN, TOTAL ANESTHESIA, VORA, KDV MEDICAL, KETAN PC, KV MEDICAL, NJ VORA, NON-SURGICAL ORTHOPEDICS, XIE, INTEGRATED PAIN MANAGEMENT, ALEXANDER BOWEN PLLC, AMIGUD, FIFTH AVENUE ANESTHESIA, AMIGUD PC, EATON, ITZKOVICH, SYNERGY ANESTHESIA, ELKHOLY, PRECISION ANESTHESIA, KURTTI, ELTAKI, MCCARTHY, QUALITY ANESTHESIA, KAO, PROGRESSIVE-HUDSON, KHAN, ANESTHESIA PROFESSIONALS, NEUMAN, NEUMAN PLLC, NEUMAN PC, CENTURION ANESTHESIA, CENTURION MIDTOWN ANESTHESIA, CENTURION MIDTOWN MEDICAL, SEDATION VACATION, SCINAS, ROXBURY ANESTHESIA, JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20

**(Declaratory Judgment under 28 U.S.C. § 2201 and 2202)**
**(Fraudulent Billing Scheme)**

2047.   The allegations of paragraphs 1 through 1822 are hereby repeated and realleged as though fully set forth herein.

2048.   At all relevant times mentioned herein, each and every bill mailed by the Surgicore Health Care Providers to Plaintiff sought reimbursement for services that, if performed at all, were fraudulently billed, not of any diagnostic or treatment value, and/or reflected a pattern of billing for services that were medically unnecessary.

2049.   At all times relevant herein, the Surgicore Health Care Providers exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents pursuant to a fraudulent treatment protocol, irrespective of medical necessity, that was also the result of unlawful referrals, kickbacks, and/or other financial arrangements between the Surgicore Health Care Providers and/or others for the medically unnecessary services.

2050.  At all times relevant herein, each and every bill mailed by the Surgicore Health Care Providers to Plaintiff made various misleading statements and/or material omissions intended to hold out the Surgicore ASCs as legitimate ASCs in compliance with core licensing requirements when, in fact, they were not, designed to induce Plaintiff into making payments that Surgicore Health Care Providers were not entitled to receive because they were improperly licensed in violation of the applicable laws of New York and New Jersey, and therefore are ineligible for the reimbursement of benefits under the No-Fault Law

2051.  In view of the Surgicore Health Care Providers' submission of fraudulent bills to Plaintiff, Plaintiff contends that the Surgicore Health Care Providers have no right to receive payment for any pending bills they have submitted because:

- The Surgicore Health Care Providers made false and fraudulent misrepresentations and/or material omissions in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement for the Fraudulent Services that if rendered at all, were not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary; services that were never rendered, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary;

- The Surgicore Health Care Providers made false and fraudulent misrepresentations and/or material omissions in the bills and supporting documentation submitted to Plaintiff as to the medical necessity of billed-for Fraudulent Services, when such services, if performed at all, were performed pursuant to a pre-determined treatment protocol designed solely to maximize reimbursement for the Surgicore Health Care Providers;

- The Surgicore Health Care Providers made false and fraudulent misrepresentations and/or material omissions in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for services performed pursuant to illegal referral and/or financial arrangement(s) between the Surgicore Health Care Providers; and

- The Surgicore Health Care Providers made false and fraudulent misrepresentations and/or material omissions in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for services from fraudulently and improperly licensed ASCs that are operated in

violation of the substantive licensing, regulatory, and applicable operating laws and requirements of New York and New Jersey.

2052. As the Surgicore Health Care Providers have knowingly made the foregoing false and fraudulent misrepresentations and/or material omissions about the services purportedly provided to Covered Persons and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that the Surgicore Health Care Providers are not entitled to receive payment on any pending, previously-denied, and/or submitted unpaid claims and Plaintiff, therefore, is under no obligation to pay any of Defendant Provider's No-Fault claims.

2053. Plaintiff has no adequate remedy at law.

2054. The Surgicore Health Care Providers will continue to bill Plaintiff for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiff has no obligation to pay the pending, previously denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands judgment as follows:

i) Compensatory damages in an amount in excess of $153,000,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii) Punitive damages in such amount as the Court deems just;

iii) Treble damages, costs, and reasonable attorneys' fees on the First through Twelfth Claims for Relief, together with prejudgment interest;

iv) Compensatory and punitive damages on the Thirteenth Claim for Relief, in an exact amount to be determined at trial, together with prejudgment interest;

v) Compensatory damages on the Fourteenth Claim for Relief, in an exact amount to be determined at trial, together with prejudgment interest;

vi) Declaratory Relief on the Fifteenth Claim for Relief declaring that Plaintiff is under no obligation to pay any of the Surgicore Health Care Providers No-Fault claims that were for services that were never rendered,

fraudulently billed, not of any diagnostic or treatment value and/or reflected a pattern of billing for services that were medically unnecessary, performed pursuant to a pre-determined treatment protocol, pursuant to illegal referral and/or financial arrangement(s), and/or were provided by fraudulently and improperly licensed ASCs that are operated in violation of the substantive licensing, regulatory, and applicable operating laws and requirements of New York and New Jersey; and

vii)    Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
        December 17, 2024

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP

By  /s/ Robert A. Stern
        Robert A. Stern, Esq.
        James McKenney, Esq.
        Robin K. Pass, Esq.
        Kristy R. Eagan, Esq.
        100 Wall Street, Suite 700
        New York, New York 10005
        (212) 858-7769


CADWALADER WICKERSHAM & TAFT LLP

By:  /s/ William J. Natbony
        William J. Natbony, Esq.
        Zachary Scrieber, Esq.
        200 Liberty Street
        New York, New York 10281
        (212) 504-6000

        *Attorneys for Plaintiff*

AMERICAN TRANSIT INSURANCE COMPANY,

PLAINTIFF,

-against-

ALL CITY FAMILY HEALTHCARE CENTER INC., BRONX SC, LLC D/B/A EMPIRE STATE AMBULATORY SURGERY CENTER, FIFTH AVENUE SURGERY CENTER, LLC F/K/A FIFTH AVENUE ASC ACQUISITION, LLC, MANALAPAN SURGERY CENTER, INC. F/K/A MANALAPAN SURGERY CENTER, P.A., NEW HORIZON SURGICAL CENTER LLC, NYEEQASC, LLC D/B/A NORTH QUEENS SURGICAL CENTER, ROCKAWAYS ASC DEVELOPMENT, LLC, ROCKLAND AND BERGEN SURGERY CENTER LLC, SURGICORE OF JERSEY CITY LLC, SURGICORE, LLC A/K/A SURGICORE SURGICAL CENTER, ANTHONY DEGRADI, WAYNE HATAMI, FELIKS KOGAN, LEONID TYLMAN A/K/A LENNY TILMAN, SURGICORE MANAGEMENT INC, SURGICORE MANAGEMENT NY LLC, JOHN ALJIAN, MD, EDWIN CHAN, MD, ALEXANDER COCOZIELLO, DO, ANDREW KOPLIK, MD, PETER MENGER, MD, RAVI NAIK, MD, ANTHONY PACIA, MD, MERWIN RICHARD, MD, STUART SPRINGER, MD, BRIAN WEINER, MD, MARINA AMINOVA, MELISSA FINNEGAN, HENRY KILROY, PAOLA LOPEZ, YANIN LUCERO, MONIQUE MORRIS A/K/A MONIQUE DEMARTINO A/K/A MONIQUE KILROY, AMAURY ROMERO A/K/A AMAURY SANCHEZ, TAMI SANTORA, JOSE SANTOS, MARK SPINA, LANA YOUNG, ILANA POCH-ZYBIN, PAUL ACKERMAN, M.D., CONTEMPORARY ORTHOPEDICS, PLLC, ALEXIOS APAZIDIS, M.D., ALEXIOS APAZIDIS, M.D. P.C. A/K/A TOTAL SPINE AND SPORTS CARE, HOWARD BAUM, M.D., BAY RIDGE ORTHOPEDIC ASSOCIATES, P.C., DOV BERKOWITZ, M.D., ADVANCED ORTHOPAEDICS, P.L.L.C., MARK BURSZTYN, M.D., GABRIEL DASSA, D.O., DASSA ORTHOPEDIC MEDICAL SERVICES, P.C., ALBERT GRAZIOSA, M.D., ALBERT GRAZIOSA MD, P.C., ROBERT HAAR, M.D., HAAR ORTHOPAEDICS & SPORTS MEDICINE, P.C., EMMANUEL HOSTIN, M.D., HOSTIN ORTHOPAEDICS & SPORTS MEDICINE, P.C., BARRY KATZMAN, M.D., KATZMAN ORTHOPEDICS P.C., KENNETH MCCULLOCH, M.D., MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. D/B/A NY SPORTS & JOINTS ORTHOPAEDIC SPECIALISTS, NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS PLLC, MARK MCMAHON, M.D., MARK S. MCMAHON, M.D., P.C., RICHARD SELDES, M.D., NYC ORTHOPEDIC AND SPINE, P.C., PASSAIC ORTHOPEDIC GROUP P.C., RICHARD M. SELDES, M.D., P.C., ANJANI SINHA, M.D., ANJANI SINHA MEDICAL P.C., UPENDRA SINHA, M.D., U.K. SINHA PHYSICIAN P.C., VINAYAK SINHA AS ADMINISTRATOR OF THE ESTATE OF AJOY SINHA, M.D., MUSCULOSKELETAL AND ARTHRITIS JOINT REPLACEMENT OF

24-CV-____

COMPLAINT

(TRIAL BY JURY DEMANDED)

QUEENS, PC, SINHA ORTHOPEDICS PC, BRADLEY WASSERMAN, M.D., BW ORTHOPEDICS, LLC, GENNADIY SHAMALOV, P.A. ALEXANDER BOWEN, M.D., BOWEN, MD PLLC, ANDREW HALL, M.D., ANDREW HALL, M.D., PLLC, JOSEPH JIMENEZ, M.D., J SPORTS MEDICINE P.C., DEV HEALTHCARE LLC, WILLIAM B. JONES, M.D., PHOENIX MEDICAL SERVICES, P.C. D/B/A ROCKVILLE CENTER PAIN MANAGEMENT & REHABILITATION, GAUTAM KHAKHAR, M.D., PHYSICAL MEDICINE & REHABILITATION OF NEW YORK, PC, HERSCHEL KOTKES, M.D., HERSCHEL KOTKES, M.D., P.C., BENJAMIN PORTAL, M.D., PORTAL MEDICAL, PC, DAVID SHABTIAN, D.O., TOTAL ANESTHESIA PROVIDER, PC, KETAN VORA, D.O., KDV MEDICAL, P.C., KETAN D. VORA, D.O., P.C., KV MEDICAL OF NY, P.C., NJ VORA HEALTH P.C. A/K/A VORA HEALTH, NON-SURGICAL ORTHOPEDICS OF NEW JERSEY, PC, JINGHUI XIE, M.D., INTEGRATED PAIN MANAGEMENT, PLLC, ALEXANDER BOWEN, MD PLLC, IGOR AMIGUD, M.D., FIFTH AVENUE ANESTHESIA ASSOCIATES, P.C., IGOR AMIGUD PHYSICIAN P.C., EDWARD EATON, M.D., CHAD ITZKOVICH, M.D., SYNERGY ANESTHESIA LLC, WAEL ELKHOLY, M.D., PRECISION ANESTHESIA ASSOCIATES, P.C. F/K/A PRECISION ANESTHESIA ASSOCIATES INC, NEAL KURTTI, M.D., KAREEM ELTAKI, M.D., F. ROBERT MCCARTHY III, M.D., QUALITY ANESTHESIA SERVICES LLC, SEN PIN KAO, PROGRESSIVE-HUDSON ANESTHESIA, LLC, ASIM KHAN, M.D., ANESTHESIA PROFESSIONALS PA, AVISHAI T. NEUMAN, M.D., AVISHAI T. NEUMAN MD, PLLC D/B/A CENTURION ANESTHESIA, AVISHAI NEUMAN MEDICAL PC, CENTURION ANESTHESIA SURGICAL CENTERS, LLC, CENTURION MIDTOWN ANESTHESIA, PLLC, CENTURION MIDTOWN MEDICAL, PLLC, SEDATION VACATION PERIOPERATIVE MEDICINE, PLLC D/B/A CENTURION ANESTHESIA, ATHANASIOS SCINAS, M.D., ROXBURY ANESTHESIA, LLC, ADVANCED PMR MANAGEMENT LTD LIABILITY CO., AEH HEALTHCARE MANAGEMENT CONSULTING LLC, ASC INVESTMENT SERVICES LLC, ASAR HEALTHCARE LLC, AS MED INVEST LLC, BDP VENTURES INC, BDP VENTURES LLC, BLUE WALL MANAGEMENT, LLC, BOOST HS LLC, CAPLEO HOLDINGS, LLC, CONTE DE FEES INC., FIABA LLC, 50 FRANKLIN LN REALTY LLC, FIWA 1049 REALTY, LLC, FLBD MANAGEMENT LLC, FOUR D INVESTMENTS INC, FOUR D INVESTMENTS LLC, GESHEFT ASSOCIATES LLC, HEALTH PLUS MANAGEMENT, LLC (F/K/A ACC INTERMEDIATE HOLDING COMPANY I, LLC), HDS INVESTMENTS, LLC, KOSTANIAN CONSULTING ASSOCIATES INC., MAIN STREET MEDICAL MANAGEMENT INC., MEGA GROUP SOLUTION INC., MEDA MANAGEMENT, LLC, MEH INVESTMENTS INC, MIDTOWN 305 REALTY, LLC, MK MED INVEST LLC, ORTUZ LLC, REDY VENTURES LLC, SIGNME, LLC, SJ2 VENTURES, SURGICORE 5TH AVENUE LLC, SURGICORE RBSC, LLC, YCENTURY LLC, JONATHAN ARREDONDO-CALLE, STUART BLUMBERG, AMANDA CHAVEZ, KRISTEN DEGRADI A/K/A KRISTEN LAIRD, SERGEY DENEVICH, MARY HATAMI, HARRIS

HAFEEZ, M.D., SVETLANA KATANOV, MARINA KEYSERMAN, GARY KLEIN, D.C., BEATA KOGAN, ARTHUR KOSTANIAN, LISA PASSANISI, SALVATORE PASSANISI, SHAREN PYATETSKAYA, MARIBEL RAMIREZ A/K/A MARIBEL ROMERO A/K/A MARIBEL RAMIREZ-PIMIENTA A/K/A MARIBEL PIMIENTA, DANIEL REIZIS, M.D., ALLA REVUTSKY. JEFFREY RUBIN, MARLA SELDES, ALBERT SHAKAROV, ROZA YADGAROV, YURA YAGUDA, JOHN DOE 1, JOHN DOES 2 THROUGH 20, AND ABC CORPORATIONS 1 THROUGH 20,

DEFENDANTS.

# COMPLAINT

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
100 WALL STREET, SUITE 700
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 858-7769


CADWALADER, WICKERSHAM & TAFT LLP
200 LIBERTY STREET
NEW YORK, NEW YORK 10281
TELEPHONE NO.: (212) 504-6000


ATTORNEYS FOR PLAINTIFF
